Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
          smurray@wpdn.net

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company,                            . | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 23-CV-79 |
| | ) | |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; and JOHN DOES 1-20, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S ANSWER TO DEFENDANTS'
## FIRST AND SECOND COUNTERCLAIMS

---

COMES NOW Plaintiff BCB Cheyenne LLC d/b/a Bison Blockchain ("Plaintiff" or "BCB"), through its counsel, and hereby serves its Answer to Defendants' First and Second Counterclaims as follows:

## DEFENDANTS' FIRST COUNTERCLAIM
### (Breach of Contract Against Plaintiff BCB Cheyenne LLC)

## FACTUAL BACKGROUND

1. Answering Paragraph 1 of the Defendants' First Counterclaim, Plaintiff admits the allegations in the first four sentences; Plaintiff admits the allegation, in the fifth sentence, that "The individuals involved in the crypto mining business are called miners," but denies the allegations in the remainder of the fifth sentence.

2. Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2. To the extent any response is required, Plaintiff denies the same.  Plaintiff admits "there is a finite number of Bitcoins available."

3. Plaintiff denies the allegations in Paragraph 3 of the Defendants' First Counterclaim. Additionally, the miner is not required to solve a computational problem chaining blocks of transactions. This task is performed by powerful computers, commonly known as ASICs.

4. Plaintiff admits in part and denies in part the allegations in Paragraph 4 of the Defendants' First Counterclaim. Plaintiff admits computers are needed to mine Bitcoin, but in cases with individuals and small Bitcoin mining operations, "lots of electricity" is *not* needed to mine Bitcoin. For example, individuals operating a single computer in their garage to mine Bitcoin, or a small-scale Bitcoin miner operating several dozen computers are not using "lots of electricity." In these instances, which are more the exception than the norm in Bitcoin mining, relatively little funding, experience, and expertise is needed. "Lots of electricity" is needed to mine for Bitcoin in instances of heavy-load industrial scale

Bitcoin mining facilities and operations like that at the North Range and Campstool sites where thousands of computers are using many megawatts of electrical power – in this case, 75 megawatts of power – to mine for Bitcoin. Building industrial scale Bitcoin mining facilities and operations (with several hundred to thousands of computers mining Bitcoin) requires significant capital investment, "lots of electricity," and experienced, expert individuals to manage and operate such industrial sized facilities.

5. Plaintiff admits the allegation in Paragraph 5 of the Defendants' First Counterclaim.

6. Answering Paragraph 6 of the Defendants' First Counterclaim, Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether ASIC facilities were launched in approximately 2012. Plaintiff admits that ASIC computers have the power to be far more powerful than the basic graphics unit ("GPU"), but deny the other allegations in the first sentence of Paragraph 6. Plaintiff admits the allegations in the second sentence of Paragraph 6.

7. Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the Defendants' First Counterclaim, and further aver that Defendants did not define the terms "very expensive" and "significant power consumption and electricity." However, Plaintiff acknowledges that for large-scale Bitcoin mining operations, like the North Range facility, the cost of ASIC mining rigs and the cost of electricity are two of the most significant financial expenditures.

8. Answering Paragraph 8 of the Defendants' First Counterclaim, Plaintiff admits the allegation that, on or about June 9, 2022, Plaintiff and Defendants entered into their DHS Agreement. Additionally, in order for Plaintiff to enter into the DHS Agreement with

Defendants, the Defendants required that Plaintiff also enter into a Consultancy Services Agreement with Terra Crypto Inc.  At the same time, Defendants also provided Plaintiff with a Side Letter regarding "Digital Mining Facilities - Right of First Refusal," which was considered an integral part of the definitive deal documents.

9.   Answering the first sentence of Paragraph 9 of Defendants' First Counterclaim, Plaintiff lacks knowledge or information sufficient to form a belief as to whether it represented to Defendants it was a "community-focused crypto developer," however, Plaintiff admits it represented to Defendants that it was "in the business of providing operation, maintenance, and hosting of digital currency mining services through (among other things) its use of certain infrastructure and utilities required for the mining of digital currency" as that language appears in the second recital of the DHS Agreement. Answering the second sentence of Paragraph 9 of Defendants' First Counterclaim, Plaintiff admits that it promised Defendants it would be the local operator of the facilities, however, Plaintiff denies that it promised Defendants it would be the "most efficient blockchain data center" in Wyoming.   Plaintiff acknowledges that its website located at https://bisonblockchain.com says "We set out to be the largest, most efficient blockchain company in Wyoming," however, that text was not published on the website until July 9, 2022 (which is a month after the DHS Agreement was signed).  To the extent Plaintiff made any verbal representations to Defendants regarding efficiencies, it most likely would have been in the context of recommending the installation and use of smart power distribution units (PDUs) and ASIC management software in the facility.

10.   Answering the first sentence of Paragraph 10 of Defendants' First Counterclaim, Plaintiff admits the allegation that Defendants emphasized to Plaintiff that

it was important for Defendants to start their mining operations as soon as possible. Plaintiff denies the allegations in the second and third sentences of Paragraph 10 of Defendants' First Counterclaim.  Defendants indicated that August 2022 was when it would like to begin mining operations, but Plaintiff never agreed to start mining operations by this date (given the many factors outside of Plaintiff's control that would be provided by Defendants and Defendants' other contractors and vendors).

11.    Plaintiff denies the allegations in Paragraph 11a of Defendants' First Counterclaim.  In order to energize the sites and begin crypto mining operations, many of Defendants' other contractors and vendors needed to have completed their important contractual obligations to Defendants.  For example, among other things, (i) CEGEN needed to have completed the Modular Data Centers, (ii) Shermco needed to have completed the site electrical work, and (iii) Black Hills Energy needed to complete its facilities to provide electric power to the North Range site.

Plaintiff denies the allegations in Paragraph 11b of the Defendants' First Counterclaim.  In order to fulfill its contractual obligations to Defendants during the Operations and Maintenance Phase (per Article II, Section 1.2 of the DHS Agreement), Plaintiff needed to provide, among other things, (i) "Hosting [of] MineOne's digital currency mining Facilities," (ii) "Management of daily operations of the Facilities," and (iii) "Hiring personnel or Subcontractors needed to ensure that MineOne's operations are always conducted properly and efficiently."  In September 2022, in reliance of the contractual agreements and promises Defendants had with its contractors and vendors for a targeted completion of construction by the end of November, Plaintiff hired a competent

and experienced miner, Stephen Randall, to serve as the site manager.  Mr. Randall was tasked with recruiting Wyoming locals to be hired as miners by Plaintiff and then training those individuals with all the knowledge and skills necessary to perform Plaintiff's obligations for the Defendants.  In order to develop a pipeline for local hiring, Plaintiff met with officials from the City of Cheyenne (including the mayor), Cheyenne Chamber of Commerce, the University of Wyoming, and Laramie County Community College. Eventually, Plaintiff had over ninety resumes from interested job applicants (of whom 15 had made the shortlist).  However, before Plaintiff could start spending money on payroll for these miners (which would be its largest Phase 2 cost), the DHS Agreement (Article 1, Section 3) required that Defendants and Plaintiff "agree on an operation & maintenance budget ('Phase 2 Budget')."  Plaintiff started on the Phase 2 budget in December 2022 and worked on it throughout January 2023 and February 2023.  Plaintiff made multiple requests of Defendants to schedule a meeting to discuss the Phase 2 budget (see Paragraphs 160, 161, 166 of Plaintiff's Complaint), but Plaintiff did not receive a response from Defendants. Plaintiff was ready and prepared to hire and train miners to work at the North Range facility, but Plaintiff did not hire a full staff of miners because Defendants had not approved the Phase 2 budget.

12.  Answering Paragraph 12 of the Defendants' First Counterclaim, Plaintiff denies that there were two components under the DHS Agreement.  In fact, there were many more than two components required by the DHS Agreement to complete the construction of the crypto mining facilities.  Further answering Paragraph 12 of the Defendants' First Counterclaim, Plaintiff admits that, among other things, funding for the mining equipment

and construction was the responsibility of the Defendants.  Further answering Paragraph 12 of the Defendants' First Counterclaim, Plaintiff denies the construction buildout was to be fully managed by Plaintiff, however, Plaintiff does admit it was appointed as project manager.  Plaintiff's specific obligations as project manager are in the DHS Agreement (Article 1, Section 6.2); nowhere in the DHS Agreement does it state or imply the "construction buildout is to be fully managed by Plaintiff."  Rather, Defendants contracted with other contractors and vendors to provide services for specific parts of the facility.  For example, Defendants signed an agreement with (a) Shermco for Shermco to provide construction management services and (b) CEGEN for CEGEN to provide modular data centers, which included CEGEN providing project management of the buildout of the modular data centers needed to mine Bitcoin.

13.    Plaintiff denies the allegations in Paragraph 13 of the Defendants' First Counterclaim.  The DHS Agreement obligated Plaintiff to perform "...activities within its control to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022" (Article I, Section 6.2).  Plaintiff and Defendants discussed August 2022 as a "desired" date to have the mining facilities completed, but Plaintiff never agreed that it would have the mining facilities completed by that date.  The only date ever agreed to was October 31, 2022 per the DHS Agreement, but *only* for "all other reasonable related activities within its control."  Further, even if Plaintiff had agreed to August 2022 (which it did not), the DHS Agreement would have superseded that date given the language in Article X, Section 9: "This [DHS] Agreement contains the entire understanding of the

Parties with respect to the subject matter hereof and supersede all prior and contemporaneous discussions, agreements and commitments between the Parties with respect thereto and any prior and contemporaneous confidentiality agreements executed by the Parties in respect of the transactions contemplated by this Agreement; and neither Party has relied upon any representation, express or implied not contained in this Agreement."

Only now do Defendants seek to allege it was entirely Plaintiff's duty, responsibility and obligation (*i.e.,* contractual responsibility) to have the facilities "up and running." Defendants' allegations are false and spurious.  Defendants intentionally fail to acknowledge Defendants had contracts with contractors and vendors, including for engineering, construction management, electrical install, data center construction, and other scopes of relevant work to complete the project and have the site up and running. Defendants intentionally fail to acknowledge their contractors and vendors did not properly procure and send required data center components, electrical and mechanical equipment, and other construction materials to the site on time to have the facilities up and running. Defendants intentionally fail to acknowledge the contractual failure by Black Hills Energy to provide Black Hills Energy facilities (i.e., the "interconnection") by early November 2022 (and which was not completed until February 22, 2023) which was required for the site to be fully up and running.  Defendants intentionally fail to acknowledge the severe Wyoming winter weather and its impact on Defendants' contractor and subcontractors to have the site up and running. In all these instances, Defendants intentionally omit and fail to acknowledge everything that was outside of Plaintiff's control to have the site up and running, and now – after the fact – Defendants try to pin the responsibilities for the delays

solely on Plaintiff, as opposed to where the contractual responsibilities actually rest: with Defendants' other contractors and vendors, and factors entirely outside of Plaintiff's control.

The following is a partial list of the companies and items that were outside of Plaintiff's control that caused the delays that Defendants wrongfully now try to pin on Plaintiff:

- Black Hills Energy: Defendants contracted with Cheyenne Light, Fuel, and Power Company (a subsidiary of Black Hills Corporation, hereby referenced as "Black Hills Energy") under a Blockchain Interruptible Electric Service Agreement ("BCIS Agreement") dated and effective June 9, 2022.  The Parties agreed (per Section 2.2 of the BCIS Agreement): "Not later than one hundred fifty (150) days after Customer [Defendants] provides notice to Company [Black Hills Energy] that it has closed on the real estate transaction for a parcel in the vicinity of the Company's North Range substation, which is necessary to allow Customer [Defendants] to commence construction of its Facility and to further allow Company [Black Hills Energy] to commence construction of the facilities to be furnished by Company pursuant to this Article 2.2 of this Agreement, Company [Black Hills Energy] shall install and maintain, in approved standards of construction, all facilities on Company's [Black Hill Energy's] side of the Point of Delivery which are necessary for the proper delivery of electrical power from Company's [Black Hill Energy's] North Range substation to the Point of Delivery. Company

[Black Hills Energy] will provide written notice to Customer [Defendants] when all facilities on Company's [Black Hill Energy's] side of each individual Point of Delivery are complete."   Defendants, via Plaintiff, provided notice to Black Hills Energy on June 13, 2022 that it had closed on the real estate transaction for the North Range parcel.  This obligated Black Hills Energy to provide all facilities on Black Hill Energy's side of the point of delivery in order to deliver electric power to Defendants' North Range parcel no later than November 10, 2022.  Black Hills Energy provided notice to Defendants that final construction of Black Hills Energy's facilities to the North Range parcel were complete on February 22, 2023.   In no event could the North Range facility have been fully "up and running" for Bitcoin mining before February 22, 2023 without Black Hills Energy first completing its facilities to enable it to deliver 45 MWs of electric power to the site. Plaintiff had no control over when Black Hills Energy would provide 45MWs of electric power to the site for Bitcoin mining. Then, within several weeks after being notified (on February 22, 2023) that Black Hills Energy was capable and ready to provide 45MWs to the site for Bitcoin mining, the Defendants executed their plan to stop paying Plaintiff, take action to wrongfully remove Plaintiff from Phase 2 of the DHS Agreement (and its well-deserved and significant financial remuneration), and ultimately breached the DHS Agreement causing significant damage to Plaintiff.

- CEGEN: Defendants contracted with CEGEN Green Energy Ltd, a Canadian

company ("CEGEN"), via the Simplified Purchase Order Agreement effective July 21, 20022, and later modified via the First Amendment to the Simplified Purchase Order effective December 5, 2022, for ten Modular Data Center buildings at the North Range site that required complex and expensive heavy-load industrial scale electrical infrastructure and installation. CEGEN did not provide the ten Modular Data Centers by late October 2022 as indicated in its proposal (in fact, the first Modular Data Center was not completed until February 2023, and that was after a new contractor (Systems-MEC) was hired to fix the defects with CEGEN's subcontractor's (Master Controls) work). CEGEN failed to procure needed construction materials, build functional modular data centers, and perform its contractual obligations. CEGEN's failures (and those of its subcontractors) were a primary reason for delays and additional costs to Defendants.

- Shermco: Defendants entered into a Consulting Management Master Service Agreement with Shermco Industries, Inc. ("Shermco") on July 25, 2022 for consulting and engineering design services related to the project. Defendants later engaged Shermco for additional services through an Electrical Install Agreement (Purchase Order SIQ-17819-22) and a Construction Management Agreement (Purchase Order SIQ-11754-22), both signed on October 26, 2022. Defendants intentionally fail to acknowledge that Shermco failed in its duties as the Construction Manager and in its role to perform Site Electrical Installation work to timely complete the project and was ultimately removed

and replaced with a new company, Systems-MEC. Shermco employs licensed engineers, licensed construction managers, and licensed electricians that were necessary to deliver the services under its contracts with Defendants. Other than the design of the data centers, which was CEGEN's responsibility, all other project engineering or design, construction management, and site electrical installations were Shermco's contractual duties and obligations, not Plaintiff's.

- LCPD and LCDOB: Defendants intentionally fail to acknowledge an oversight by Laramie County Planning and Development (LCPD) and Laramie County Department of Buildings (LCDOB), which are the governing bodies responsible for development and construction approvals and permits in Laramie County where the North Range site is located. Plaintiff participated in a pre-engineering and development application meeting with LCPD and LCDOB on March 4, 2022, received follow up meeting notes from that meeting on March 24, 2022, and facilitated multiple discussions with LCPD and LCDOB to gain feedback prior to officially submitting a proposed site plan. Defendants eventually received a Certificate of Review and approval of the site plan from LCPD on June 13, 2022. The Certificate of Review for the approved site plan is a required step prior to submitting an application for a building permit and then commencing construction. After Defendants hired Shermco and made the contractor and vendor selections, Shermco performed engineering services to revise the

overall site plan and data center layout as part of its engineered design. This revised site plan was submitted to LCPD on August 17, 2022 and approved by LCPD on August 18, 2022.  Both the site plan approved on June 13, 2022 and the site plan approved August 18, 2022 properly reflect the location of the existing water main on the property and should have been no surprise to LCPD.  On behalf of Defendants, Plaintiff submitted an application for a building permit with the LCDOB on September 1, 2022, which included a copy of the approved site plan, and later received a building permit on September 14, 2022.  However, on Friday October 28, 2022, after receiving the appropriate approvals and amidst ongoing construction, Plaintiff received a call from the LCPD expressing an issue the Board of Public Utilities ("BOPU") raised with the existing water main on the project site.  LCPD indicated that, now upon discovering of LCPD's and LCDOB's oversight of the issue, construction would need to stop unless the project engineer (Shermco) could come up with a solution to temporarily satisfy BOPU until such solution for relocation, removal, or abandonment could be agreed upon. Upon becoming aware of the issue, Plaintiff worked diligently to initiate conversations with Lovas Engineering, Shermco, LCDOB, and BOPU to work toward a plan for resolution. The resulting delays caused by the oversight of LCPD and LCDOB was not because of anything that Plaintiff did or could have reasonably known, anticipated, or controlled. Rather, the governing body made a mistake.

- Weather Delays: Defendants intentionally fail to acknowledge the severe weather conditions between November 2022 to March 2023, with historical record low temperatures and high winds occurring in December 2022. On numerous occasions during the Cheyenne, Wyoming winter months, temperatures and wind conditions were too severe for workers to be on the site.  This caused delays, none of which were in Plaintiff's control. There were also numerous days where wind and snow conditions grinded construction progress to a halt, with outdoor conditions being difficult and unsafe to make progress with construction and electrical build-out of the modular data centers and electrical installation.   Further, on multiple occasions, the extreme weather in other parts of the state along critical stretches of Interstate highway caused road closures and delayed the arrival of infrastructure materials for the site, such as the SF6 switchgear, causing further delays.

- Defendants' Funding and Liquidity: Under the DHS Agreement, Defendants were responsible for "Financing construction of the Facility or Facilities and other required infrastructure to achieve CFCO [full operations]" (Article I, Section 6.1(a)).   Over the course of construction, Defendants failed to provide timely payments, citing lack of available funds and liquidity with which to make payments. Defendants' alleged inability to meet its contractual funding obligations in the DHS Agreement appeared tied to price of Bitcoin and/or other holdings, where Defendants were not able to – or chose not to –

make payments when the price of Bitcoin (and/or other holdings) decreased or was too low for their comfort. Plaintiff never anticipated that Defendants' alleged inability to meet its contractual payment obligations would be tied to the price of Bitcoin (and/or other holdings), especially when Defendants had previously provided Plaintiff with proof of funds in USD on May 13, 2022. Defendants' lack of funding, lack of liquidity, and/or decision to withhold or delay important payments to third parties to keep the project on schedule, contributed to delays with the buildout of the project. Now, Defendants try to recast their lack of funding, their reliance on liquidity tied to the price of Bitcoin (and/or other holdings), and/or their decision not to make payments on time to be Plaintiff's fault, though the DHS Agreement states it was Defendants' contractual responsibility to provide funding for the construction and infrastructure of the project.

Defendants were and are aware of many, if not all, of the aforementioned delays, and specifically the delays caused by Defendants' contractors and vendors. In his 3/13/23 email, Dr. Jiaming Li proposed to Plaintiff that he wanted to hire Plaintiff to address "legal actions" involving "third parties." Dr. Jiaming Li wrote, "Finally, we have set another two tasks that can create additional funds for you. One is related to legal actions we will take against third parties…" (see Exhibit B to Plaintiff's 5/3/22 Complaint). The third parties Dr. Jiaming Li is most likely referring to are CEGEN and Shermco. Dr. Jiaming Li (or any of the Defendants) made no mention or reference to any legal action toward Plaintiff at this time (or any other time before Defendants filed their Counterclaims), because Plaintiff had

performed its obligations under the DHS Agreement.  Rather, Dr. Jiaming Li wanted to recruit Plaintiff to assist Defendants in Defendants' recovery of damages from Defendants' other contractors and vendors, and they wanted to provide financial incentive for Plaintiff to do so, as evidenced in Defendants' proposed amendment to the DHS Agreement they sent to Plaintiff on 5/13/22.  Now, in response to the damages done to Plaintiff, Defendants want to turn things back on Plaintiff by seeking to pin on Plaintiff both the contractual obligations of Defendants' other third-party contractors and vendors (Black Hills Energy, CEGEN, Shermco, etc.) and other factors (weather delays, Defendants' illiquidity, etc.), all of which were outside of Plaintiff's control.

14. Plaintiff denies the allegations in the first sentence of Paragraph 14 of the Defendants' First Counterclaim.  Per the DHS Agreement, Plaintiff agreed to perform "all other reasonable related activities within its control to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022."   Answering the second sentence of Paragraph 14 of the Defendants' First Counterclaim, Plaintiff admits Michael Murphy sent an email on April 23, 2022 that stated the provided text (which Defendants excerpted from a longer email).  However, as mentioned previously, these dates were initial targets (and were not an "agreement" and were never a guarantee of performance).  Further, the Defendants failed to include text from the above referenced email that refers to the schedule as "preliminary."

15. Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Defendants' First Counterclaim, and further, Defendants do not define the terms "high," "Bitcoin facility," and "low-cost" making the

allegations vague and ambiguous.  For clarification, a 45MW Bitcoin hosting facility like the North Range site would generally be considered a large-scale Bitcoin hosting facility that consumes a significant amount of power.  For Bitcoin mining facilities at such industrial scale, it is important to minimize the cost of electricity because electricity is typically the largest operational expense incurred while mining Bitcoin, and even small price differences in the cost of electricity create material differences in the overall cost of electricity (for example, for 45MW with 99% uptime, a savings of $0.001/KWh in the price of electricity equates to annual savings of approximately $390,258).

Plaintiff denies the second sentence of Paragraph 15 of the Defendants' First Counterclaim. Defendants desired the lowest cost of electricity possible and oftentimes referred to $0.05/KWh as a target number.  After reviewing historical electricity pricing provided by Black Hills Energy, with the aim of increasing its chances of achieving this target number, and before Defendants signed its BCIS Agreement with Black Hills Energy, Defendants requested that Plaintiff negotiate a more favorable power pricing structure for Defendants with Black Hills Energy, which Plaintiff did.  This new structure would allow Defendants to benefit from electricity priced below the Pricing Transition Point (whereas in Plaintiff's BCIS Agreement, there was a fixed floor price). While this new structure increased the likelihood of achieving an electricity cost at or below the $0.05/KWH, it did not guarantee it.  For example, according to Defendants' BCIS Agreement with Black Hills Energy, in the event Black Hills Energy was unable to procure a block of power at a fixed price for Defendants, Black Hills Energy would procure electricity at variable prices in the day-ahead energy market.  In such cases, there was no contractual guarantee that the price of electricity in the day-ahead market would be at or below $0.05/KWh.  Furthermore, the

BCIS Agreement contained a provision that made it less likely to achieve $0.05/KWh electricity after the first anniversary of the Commercial Operation Date (due to a $0.0025/KWh increase in the Pricing Transition Point) and second anniversary of the Commercial Operation Date (due to another $0.0025/KWh increase in the Pricing Transition Point for the remainder of the BCIS Agreement term).  Defendants were aware of the pricing structure, and the likelihood it might not achieve its $0.05/KWh electricity price target, in its BCIS Agreement.

Furthermore, at no time did Plaintiff ever guarantee an electricity price at or below $0.05KWh.  Per the DHS Agreement (Article 2, Section 1.2), Plaintiff was obligated to track "daily all costs and expenses for the Power Supply and evaluate and secure lower price supply and coordinate with Terra to ensure the Power Supply tariff and fees paid are the most favorable and cost-efficient."  The DHS Agreement did not require that Plaintiff secure power at $0.05/KWh (because Plaintiff knew and told Defendants that it could not guarantee the price of power), however, the DHS Agreement did provide an Energy Price Savings performance incentive for Plaintiff to motivate it to assist Defendants in getting the lowest electricity price possible from Black Hills Energy.  Plaintiff diligently performed its obligations to "secure lower price supply" and "ensure the Power Supply tariff and fees paid are the most favorable and cost efficient" through multiple emails and phone calls with Black Hills Energy to discuss the possibility of Black Hills Energy procuring a fixed price block of power for Defendants.  As of mid-March 2023 (after Defendants breached their DHS Agreement with Plaintiff and refused to pay Plaintiff for two months of services rendered), there was a possibility of a fixed price block purchase through Black Hills Energy which would have resulted in an electricity price below

$0.05/KWh for a significant portion of Defendants' power needs at the North Range site. Plaintiff does not know if this block, or any other blocks, were ever eventually purchased by Black Hills Energy for Defendants.

16. Answering Paragraph 16 of Defendants' First Counterclaim, Plaintiff denies the allegation that Murphy explained to Defendants that the desired electricity price (i.e., at or below $0.05/KWh) was something Plaintiff could absolutely achieve. However, Plaintiff admits that Murphy explained to Defendants that Plaintiff's BCIS Agreement with the electric utility (which was later amended and restated, and then terminated when Defendants executed Defendants' BCIS Agreement with Black Hills Energy) allowed for a mixture of block and spot purchases. Plaintiff's BCIS Agreement stated (in Section 4.1): "Except where specifically indicated to the contrary in this Agreement, all energy procured by Company [Black Hills Energy] to serve BCIS Customer Facility Load shall be procured in the day-ahead market. Customer [Plaintiff] shall be permitted to work with Company [Black Hills Energy] to procure blocks of power in advance of the above-stated procurement deadline." This same language was eventually included in Defendants' BCIS Agreement with Black Hills Energy as well.

17. Answering Paragraph 17 of the Defendants' First Counterclaim, Plaintiff denies the allegation that Murphy wrote several emails to Defendants explaining Plaintiff's process to get the required electricity price. Plaintiff admits that Murphy did write several emails explaining how Plaintiff's BCIS Agreement with the electric utility worked, which Plaintiff had provided to Defendants on March 9, 2022 via a shared document drive. Further, Defendants had a "desired" electricity price, not a "required" electricity price. If

Defendants "required" an electricity price of $0.05/KWh, then it should not have executed its BCIS Agreement with Black Hills Energy without Black Hills Energy guaranteeing it could purchase blocks of power at or below $0.05/KWh (which Black Hills Energy did not guarantee).

18. Plaintiff denies the allegations in Paragraph 18 of the Defendants' First Counterclaim.  Plaintiff admits that Murphy represented that he and Plaintiff had a good working relationship with Black Hills Energy (from the time they had spent working together over the previous 6-8 months on Plaintiff's RFP application and eventual BCIS Agreement).  Plaintiff also admits that Plaintiff explained it was possible for Defendants to get Defendants' desired price (at or below $0.05/KWh) based on how Black Hills Energy would procure electricity per the terms of Plaintiff's BCIS Agreement with Black Hills Energy (which called for electricity procurement in the day-ahead energy market and/or via a block purchase).  For example, in an email Murphy sent to Defendants on March 29, 2023, he stated "Regarding the electricity prices, those are determined by the PPA (specifically Article 6).  They are not able to be fixed contractually, but they can be fixed operationally at the floor price by directing the power company to purchase large blocks of power in advance (rather than only buying in the day ahead market).  This would require proactive work on your part (or our part, if you wanted us to be involved)."

Generally speaking, in Paragraphs 15-18 and Paragraph 22 of Defendants' First Counterclaim, Defendants reference the "required" electricity price and claim that Plaintiff made representations it could "absolutely achieve" and was "very confident" it could get that price, yet provide no evidence to support these mistaken claims.  In doing so,

Defendants want to show they relied on Plaintiff's representations about the power price and that Defendants signed its BCIS Agreement with Black Hills based on that reliance. Such a reliance would be completely untrue. Defendants are highly-educated individuals, particularly Dr. Erick Rengifo and Dr. Jiaming Li, who both hold PhDs in Economics. Over the course of March-May 2022, Plaintiff and Defendants had multiple conversations and exchanged multiple emails where Defendants documented their concerns about the electricity price based on Plaintiff's BCIS Agreement with the Black Hills Energy. Due to Defendants' concerns about the power price, they requested, and were provided with, historical power pricing information. Based on Defendants' analysis of the historical pricing information, in conjunction with Plaintiff's analysis of the historical pricing information, Defendants directed Plaintiff to negotiate more favorable power pricing terms with Black Hills Energy in the BCIS Agreement so that it would be more likely to achieve an electricity price at or below the $0.05/KWh target, however, these terms did **not** include a guarantee the electricity price would be below $0.05/KWh. Plaintiff did so, and secured more favorable terms for Defendants, but again, there was no guaranteed electricity price. Defendants were fully aware there was no guaranteed electricity price (even with the updated terms) and eventually signed its BCIS Agreement with Black Hills Energy.

19. Plaintiff denies the allegations in Paragraph 19 of the Defendants' First Counterclaim. As indicated in other responses, Plaintiff provided target dates (but never guaranteed dates) for completion to the best of its knowledge based on information provided by third party contractors and vendors, but no completion dates were ever agreed to except for the date agreed to in the DHS Agreement, which was October 31, 2022, but

only for "activities within its control." Further, as explained in other responses herein, delays and failures by Defendants' contractors, vendors, third parties, weather conditions, and Defendants' funding – things entirely outside of Plaintiff's control – were the reason the site was delayed and not completed in October 2022.

Plaintiff consistently made Defendants aware that all dates were dependent, among other factors, on Defendants' selection of its data centers, major electrical components (such as transformers and switchgear), data center components (including networking equipment and PDU's), completion of engineering (after the previous selections were made by Defendants), approval of municipal permits (after completion of engineering), lead times of all components and equipment, and construction progress.  Any dates provided by Plaintiff to Defendants were dates based on the direct representations of Defendants' contractors and vendors, and were subject to change from time to time.

20.  Plaintiff denies the allegations in Paragraph 20 of the Defendants' First Counterclaim.  The DHS Agreement does not indicate that it was required for Plaintiff's principals to be physically present at the facilities.  However, Plaintiff was physically present at the facilities for much of the buildout of the facilities.  Further, Defendants hired Shermco to provide construction management services for the buildout of the facilities, specifically to provide "all construction management required for successful management and completion of the project including but not limited to overall management of site, processes, schedule, subcontractors, quality assurance, quality control, and inspections. Shermco will not be responsible for inspections related to CryptoCache's [CEGEN's] scope of work" (SIQ-11754-22 – 45 MW NRBP (Cheyenne, WY) – Construction

Management Scope, Revision 5, [Quote SIQ-11754-22 (Revision 5) Scope executed October 26, 2022 & MSA executed 7-25-22).   A Shermco construction management representative was physically present at the facilities for much of the buildout of the facilities. Further still, Defendants hired CEGEN to provide modular data centers.   A CEGEN construction manager was physically present at the site off and on during the buildout of the facilities.

21. Plaintiff denies the allegations in Paragraph 21 of the Defendants' First Counterclaim.  Plaintiff informed Defendants that it (and its principals) had not built and operated a crypto mining facility of this size.  This is one of the reasons why Defendants chose to hire and contract with its own contractors and vendors directly (rather than having Plaintiff hire subcontractors and sub-vendors for the buildout of the facilities).  This is also why Defendants required Plaintiff to enter into a Consulting Services Agreement with Terra Crypto Inc (in which Terra Crypto would get 20% of Plaintiff's profits during the lucrative Phase 2 of the project, which was estimated to be approximately $4M at the time).  Under the Consulting Agreement, Terra Crypto was obligated to "ensure that all the processes, activities and tasks with regard to the building of the Facilities are developed in a timely manner." (Article 2, Section 1.2(b)).  This contractually ensured that Defendants could bring its purported experience (via Terra Crypto) to bear on the project (to make up for Plaintiff's lack of experience at that time).  Terra Crypto was also obligated to "provide expert support to [Plaintiff] as and when requested by MineOne and/or Company."  On multiple occasions, Plaintiff requested expert support but it was not provided.  One of the most notable examples of Terra Crypto not providing support is on/around January 8, 2023

when Dr. Rengifo (a) stopped attending the regular Monday/Wednesday/Friday meetings between Plaintiff and Defendants and (b) significantly cut back on responding to emails. On January 4, 2023, Bit Origin publicly announced the resignation of Dr. Rengifo as a Director and its Chief Strategy Officer.

Given that Plaintiff did not represent it had prior experience building a crypto mining facility of this size, this could not have been any reason, let alone the major reason, why Defendants chose to enter into the DHS Agreement with Plaintiff.  Plaintiff believes the major reason for Defendants entering into the DHS Agreement with Plaintiff is that was the lowest upfront cost way for Defendants to get access to and profit from the valuable power contract Plaintiff had worked to secure from Black Hills Energy, in addition to all of the other work Plaintiff had performed to date to develop the project.  Further, Plaintiff presented several options to Defendants for getting access to the valuable power contract and all of Plaintiff's prior work, one of which was for Defendants to "buy out" Plaintiff, in which case Plaintiff would no longer be involved in the project.  Ultimately, Defendants chose to retain Plaintiff's services via the DHS Agreement (knowing full well that Plaintiff had not built a facility and/or operated a facility of this size).

22. Plaintiff denies the allegations in Paragraph 22 of the Defendants' First Counterclaim.  Securing the power supply and hiring personnel to perform mining activities are both Phase 2 obligations of Plaintiff.  Regarding the power supply, per the DHS Agreement (Article 2, Section 1.2(k)), Plaintiff was required to track daily "all costs and expenses for the Power Supply and evaluate and secure lower price supply and coordinate with Terra to ensure the Power Supply tariff and fees paid are the most favorable

and cost- efficient."  That was the only contractual requirement regarding the electricity price to which Plaintiff was obligated to Defendants.  Plaintiff fully performed this obligation.  Defendants, to further incentive Plaintiff to assist in securing a "lower price supply" and that "Power Supply tariff and fees paid are the most favorable and cost-efficient" provided Plaintiff with an Energy Price Savings incentive in the DHS Agreement (Article 4, Section 4(i)).  Regarding hiring personnel, per the DHS Agreement (Article 2, Section 1.2(h)), Plaintiff was required to hire "personnel or Subcontractors needed to ensure that MineOne's operations are always conducted properly and efficiently."  Plaintiff performed this obligation as documented in its response to Paragraph 11 of the Defendants' First Counterclaim.

23.  Plaintiff denies the allegations in Paragraph 23 of Defendants' First Counterclaim.

24.  Plaintiff denies the allegations in Paragraph 24 of the Defendants' First Counterclaim.  Plaintiff, as part of performing its DHS Agreement obligation of "all other reasonable related activities within its control to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner" (Article I, Section 6.2(d)), performed research and presented options to Defendants for many different contractors and vendors.  Based on this research and presented options, and other possible due diligence performed by Defendants, Defendants chose its contractors and vendors and contracted with them directly.  These contractors and vendors were not sub-contractors of Plaintiff; there were/are direct contractors and vendors of Defendants.  Ultimately, Defendants bear responsibility for its selection of contractors and vendors.

Defendants were not obligated to contract with any contractor or vendor presented by Plaintiff, and on at least one occasion (for the purchase of transformers), it chose to contract with a vendor unknown to Plaintiff.

25. Plaintiff denies the allegations in Paragraph 25 of the Defendants' First Counterclaim. Plaintiff represented that the Murphy family was from Wyoming, that Plaintiff was committed to creating local jobs in Cheyenne, and that it had begun the process of developing its local job applicant pipeline (as mentioned earlier in Plaintiff's response to Paragraph 11).

26. Plaintiff denies the allegations in Paragraph 26 of the Defendants' First Counterclaim. Please see Plaintiff's response to Paragraph 21 of the Defendants' First Counterclaim for additional information. Plaintiff did have the expertise and know-how needed to build and manage a digital crypto facility of this size. Multiple vendors and service providers that Defendants contracted with acknowledged Plaintiff's competency. For example, Hodgie Teichmann of BCM Site Services, sent an email on March 16, 2023 that stated "Bison [Plaintiff] is one of the best organized and managed groups we have experienced in the digital currency industry."

27. Plaintiff denies the allegations in Paragraph 27 of the Defendants' First Counterclaim. See Plaintiff's response to Paragraph 18 for further information about the alleged "promised electric rates." Up until Defendants breached the DHS Agreement, and for a time thereafter, Plaintiff diligently performed its obligations under the DHS to "secure lower price supply and coordinate with Terra to ensure the Power Supply tariff and fees paid are the most favorable and cost- efficient." Plaintiff was in regular communication with Black Hills Energy, inquiring about blocks of power and monitoring the price of

power in the day-ahead energy markets.  At the time of Defendants' breach of the DHS Agreement, there was a potential block of power available below Defendants' desired price of $0.05/KWh.  Plaintiff does not know if Defendants were able to secure this block, or some other block of power, from Black Hills Energy.

Defendants primarily breached the DHS Agreement (by verbal statements, a proposed written amendment to the DHS Agreement, and by numerous actions) by replacing Plaintiff as the operator of the sites to save themselves millions of dollars during Phase 2.  Defendants wrongfully attempted to get Plaintiff to agree to Plaintiff's removal as the site operator via an amendment to the DHS Agreement (because Defendants knew they were breaching the DHS Agreement by removing Plaintiff) by withholding payment to Plaintiff for several months of prior services rendered and invoiced, which was within the approved budget, unless Plaintiff signed the amendment.  At that point, Plaintiff had limited options, two of which were: (1) sign the amendment (knowing that Plaintiff would forego millions of dollars of contractually promised consideration) in return for a payment of less than half of what was owed for Plaintiff's previous two months of services in Phase 1, and then continue forward in a non-operational role; or (2) not sign the amendment and then exercise its legal rights.  Plaintiff went with option 2 (not signing the amendment) and proceeded forward with exercising its legal rights (rather than attempting to negotiate/mediate with Defendants) because it was clear Defendants had already made up their mind to replace Plaintiff (as evidenced by their team of Chinese nationals being on site and the proposed amendment to the DHS Agreement they had sent to Plaintiff). Defendants anticipatorily repudiated their DHS Agreement with Plaintiff, which

repudiation was unwarranted, unjustified, and constitutes the first material breach of the DHS Agreement.

Even though Plaintiff left the project, it still desired that all stakeholders associated with the project achieve success.  After leaving the project, and with no promise of any payment from Defendants for open and due invoices, Plaintiff sent over thirty-five emails to all relevant contractors and vendors associated with the project to ensure a smooth hand-off to Defendants.  Plaintiff did this even though Defendants had breached its DHS Agreement and was refusing to pay it for over two months of services.

28. Answering Paragraph 28 of the Defendants' First Counterclaim, Plaintiff admits that Defendants were required to deal with and negotiate directly with Black Hills Energy after Plaintiff transitioned off the project as a result of Defendants' breach of the DHS Agreement and its refusal of payment to Plaintiff for services rendered.  Plaintiff denies all other allegations in Paragraph 28 of the Defendants' First Counterclaim.  It is important to note that CEGEN and Shermco, and many of the other contractors and vendors on the project, were/are Defendants' contractors and vendors who Defendants contracted with directly; they are not project "subcontractors."

29. Answering Paragraph 29 of the Defendants' First Counterclaim, Plaintiff denies the allegation that Plaintiff consistently showed its lack of experience, skills, and expertise in the area of crypto mining and construction as time went on. To the contrary, Plaintiff consistently demonstrated its experience, skills, and expertise in crypto mining as the project developed.  Defendants mistakenly claim that Plaintiff was responsible for the obligations of Defendants' other contractors and vendors, for example, Shermco's

obligation to manage the site construction and CEGEN's obligation to provide the modular data centers.   Plaintiff went above and beyond its contractual obligations and responsibilities in the DHS Agreement to help Defendants' other contractors and vendors when they experienced delays, and to expedite the completion of construction of the site.

30. Plaintiff denies the allegations in Paragraph 30 of the Defendants' First Counterclaim.  Plaintiff did not have any contractors or subcontractors on the project. Defendants directly contracted with all of their own contractors and vendors. Defendants are either oblivious to the contractual duties between them and their contractors and vendors, or Defendants are aware of their contractual duties and are now intentionally omitting these duties to 'pass the contractual buck' from their contractors and vendors to Plaintiff.   While Plaintiff presented certain contractors and vendors to Defendants as options, it was Defendants who chose which contractors and vendors to contract with (as evidenced by the agreements Defendants entered into with these contractors and vendors). Plaintiff acknowledges several of Defendants' contractors and vendors did not perform their respective obligations as they were contractually required to do, and due to that, among other things, the project encountered delays.

Defendants are now trying to 'rewrite history' by mischaracterizing the delays, contractor failures and circumstances outside of Plaintiff's control as Plaintiff's "own making."  In reality, when confronted by the shortcomings, delays, and difficulties created by Defendants' contractors and vendors, Plaintiff acted quickly, and proactively jumped in to provide consistent support and troubleshooting of any issues and in helping find ways to problem solve, expedite the project, and resolve the delays and difficulties. Plaintiff even

hired additional staff prior to its Phase 2 obligations to support the increased demand for coordination resulting from the failure of Defendants' contractors, subcontractors, and vendors. Examples of Plaintiff fulfilling its contractual obligations under the DHS Agreement, and in some cases going "above and beyond" those obligations, include, but are not limited to, the following:

- Plaintiff instituted, attended, and kept records of daily Foreman Meetings for Defendants, and for Defendants' contractors and subcontractors.

- Plaintiff instituted and led daily Procurement Meetings for Defendants, and for Defendants' electrical and construction contractors and construction manager.

- Plaintiff instituted and delivered daily progress reports with pictures and updates to inform Defendants of site progress, status, and delays caused by Defendants' contractors and vendors.

- Plaintiff held meetings with Defendants and Shermco to assist Shermco with its construction management contractual duties and responsibilities.

- Plaintiff consistently worked with Shermco to update and advance Shermco's construction project plan (which included Plaintiff spending long hours with Shermco and Defendants to proactively address pressing issues raised daily and maintain flexibility to deliver on updated actionable plans upon Defendants' requests).

- Plaintiff did everything in its control to push CEGEN (Defendants' modular data center provider) to speed up shipments and procure required electrical

and construction materials to the North Range site.

- Plaintiff held meetings with Defendants and CEGEN to do everything in its control to help Defendants hold CEGEN accountable for CEGEN's errors and delays.

- Plaintiff did everything in its control to push CEGEN to complete CEGEN's contractual responsibilities to Defendants, specifically, to provide ten completed modular data centers for the North Range site.

- Following CEGEN's and Shermco's failures and delays, Plaintiff did everything in its control to help qualify and ramp-up Defendants' newest contractor of choice, Systems-MEC.   Plaintiff quickly engaged with Systems-MEC in bringing them up to speed on the project, setting-up and running orientation, coordinating billing and payment workflows, and establishing update reports and meetings between Defendants and Systems-MEC, as well as communicating Defendants' desire to remove Shermco from the project and facilitating the associated hand-off of construction management and site electrical installation from Shermco to Systems-MEC. Plaintiff's consistent oversight of onsite operations included daily site reviews and meetings with Defendants' contractors and vendors to push all parties to get the needed material to the site in an attempt to expedite overall construction and completion of the project, and to document contractor delays and errors that affected the project completion and delivery.

- Plaintiff went above and beyond to perform many of the contractual

obligations of Defendants' contractors and vendors including material sourcing, procurement, purchasing, deliveries to the site, and onsite management and coordination of onsite material storage.

- Plaintiff held long update and status meetings three times each week with Defendants (many of whom were in China) at/around 6am MPT to advise and inform Defendants of site progress, material purchasing, procurement, and the status and delays of Defendants' contractors and vendors on the North Range site. Despite Plaintiff's efforts to go above and beyond its contractual obligations and provide a high level of service in circumstances beyond its reasonable control, it was not uncommon for Defendants to berate and blame Plaintiff for all the shortcomings of Defendants' contractors and vendors on these calls.

- Plaintiff did everything in its control to help Defendants' contractors and vendors overcome severe winter weather conditions impacting Defendants' contractors and vendors. Plaintiff devised and funded a method of enclosing the open sidewalls of the data centers with a foam board in order to allow for heaters to effectively provide some level of reasonable comfort, which was necessary to keep the Defendants' contractors' morale up and their crews to continue working inside the data centers through very harsh winter conditions. Plaintiff has not been fully reimbursed for all of its expenses to date.

- In addition to all of the efforts of Plaintiff to deliver an exceptional level of

service to Defendants, and despite the shortcomings of Defendants' contractors and vendors, Plaintiff did everything in its control to navigate communication challenges (with two-way translation between English and Mandarin Chinese) to inform Defendants about the status, delays, and failings of Defendants' contractors and vendors on the North Range site.

31. Plaintiff denies the allegations in Paragraph 31 of the Defendants' First Counterclaim. Plaintiff assisted Defendants by searching for and identifying contractors and vendors for all aspects of the project, some of which Defendants contracted with for services and supplies.  Further, not only did Plaintiff assist Defendants with searching for and vetting potential contractors and vendors, Plaintiff went above and beyond its contractual responsibilities to help Defendants' contractors and vendors when Defendants' contractors and vendors were unable to perform to the terms of their respective agreements with Defendants.  For example, when Defendants' contractor CEGEN was unable to deliver the modular data centers – by the date CEGEN indicated CEGEN would do so – Plaintiff found additional local labor that Defendants chose to hire to help speed up and do the work that CEGEN was contractually responsible for.

Ultimately, Defendants contracted with and hired all the vendors and suppliers on the project. Defendants made the decision on who it contracted with and hired.  Plaintiff directly hired only three team members including the site manager, Stephen Randall. Given Mr. Randall's extensive experience and expertise with digital crypto currencies and scaled Bitcoin mining, Defendants covertly attempted to solicit Mr. Randall to work for Defendants, and then Defendants made a proposal to Mr. Randall for Mr. Randall to invest

into the project for the benefit of the Defendants. Mr. Randall's experience and expertise operating large scale Bitcoin mining facilities is equal to, or exceeds, that of the Defendants.

32. Plaintiff denies the allegations in Paragraph 32 of the Defendants' First Counterclaim. Defendants contracted with multiple contractors and vendors to perform different parts of the project work scope. Some of those contractors and vendors performed to the terms of their respective agreements with Defendants. Some of those contractors and vendors, such as CEGEN and Shermco, did not perform to the terms of their respective agreements with Defendants. Only now do Defendants try to 'pass the buck' onto Plaintiff for the delays and performance failings of Defendants' contractors and vendors, and for factors outside of Plaintiff's control.

Further, Plaintiff acknowledges Defendants sent staff from Defendant Bit Origin's Indiana and Georgia bitcoin mining facilities, which included foreign nationals from China and at least one illegal alien from Jamaica, to the North Range site. Many of the personnel that Defendants sent to the North Range site interrupted and circumvented Defendants' contractors and Plaintiff. Defendants demanded changes to established construction designs, engineering, and/or in items Plaintiff had discussed and received direction or approval from Defendants on in their recurring Monday/Wednesday/Friday morning status and update calls. For example, when the roofs for data centers 1, 2, 3, and 6 were under construction, Mr. Zhang demanded Plaintiff work with him to change the roof design to accommodate a hand sketch he had made. Despite Plaintiff's efforts to explain the impact to the schedule and that the roof structure materials were already ordered and being

delivered and installed according to the design, Mr. Zhang continued to demand the roof be changed and said it could all be completed in a few days. The changes he was demanding were significant and among other things, would require revised engineered drawings and new approvals from the municipality.  On another occasion, while Plaintiff was meeting with Billy Inman, the owner of Inman Roofing, to discuss industry standard and accepted flashing techniques for the data center roofs, Mr. Zhang interrupted the meeting, canceled the scheduling of Inman Roofing to install the flashings, and said he and his guys will use adhesive tape from China to cover any gaps where the flashing would go.  Mr. Inman did his best to explain to Mr. Zhang that Mr. Zhang's plan would not meet required building codes, likely would not pass inspection, and would put the expensive bitcoin mining equipment at risk to the climate elements.  Despite (i) Plaintiff's insistence for Mr. Zhang and "his guys" to stand down because they were not licensed roofers, (ii) did not have permission to operate other contractor roofing hoisting equipment, and (iii) were uninsured, Mr. Zhang disregarded Mr. Inman and Plaintiff, and went ahead with his plan.

Additionally, there are numerous examples of personnel that Defendants brought to the North Range site sitting in Plaintiff's office — passing the time doing nothing – while Plaintiff tried to motivate them to help work on the project. Then, when Mr. Zhang came to the site – to proclaim his orders and demands – the personnel from China jumped into action walking around the site telling licensed electricians and engineers how to do their work. One example of Mr. Zhang's tirades came during the orientation meeting where Mr. Zhang was yelling at everyone in Mandarin and doing everything in his power to make Plaintiff responsible for Defendants' contractors' performance delays, and for delays

resulting from circumstances outside of Plaintiff's control. Soon after, Mr. Zhang told Sean Murphy it was Defendants' plan to take over and operate the site going forward.

33. Plaintiff denies the allegations in Paragraph 33 of the Defendants' First Counterclaim.  Answering Paragraph 33 of the First Counterclaim, Plaintiff denies the allegation that Plaintiff refused to respond to emails requesting information so the project could continue moving forward. Even as Defendants breached the DHS Agreement, stopped paying Plaintiff, and Plaintiff realized it was being ousted from the project, Plaintiff continued to meet every day with Defendants, worked around the clock for several weeks to help to bring the facility online, and answered Defendants' questions about accounting, procurement, vendors, and Black Hills Energy.  Plaintiff's conduct was professional in the weeks following Defendants' breach where Plaintiff went above and beyond any obligation it had to Defendants after Defendants stopped paying Plaintiff and breached the DHS Agreement.

34. Answering Paragraph 34 of the Defendants' First Counterclaim, Plaintiff denies the allegation that Plaintiff's actions caused significant delays, disruptions, and damage to Defendants' ability to make the facilities operational. To the contrary, it was primarily due to Plaintiff's actions that the project continued forward and progress was made despite the inability of several of Defendants' contractors and vendors (specifically CEGEN and Shermco) to perform per the terms of their respective agreements with Defendants.

35. Plaintiff admits the allegations in Paragraph 35 of the Defendants' First Counterclaim.  Plaintiff properly and timely performed all of its duties per Article 1, Section 6.2 of the DHS Agreement.

36. Answering Paragraph 36 of the Defendants' First Counterclaim, Plaintiff denies that it failed to properly and timely perform its Phase 1 obligations under the DHS Agreement, and that it did not have the ability, experience, and technical expertise to complete its Phase 2 obligations. Further, Plaintiff denies that it was to perform the Phase 2 Obligations "among other things." Plaintiff agreed to perform the specific Phase 2 obligations documented in Article 2, section 1.2 of the DHS Agreement. The DHS Agreement states "BCBC shall be responsible for the following during the Operation and Maintenance Phase (the "BCBC Phase 2 Obligations")...." This is the list of Plaintiff's contractual requirements for Phase 2. Plaintiff had the ability, experience, and technical expertise to complete its Phase 2 obligations. However, Plaintiff did not have an opportunity to perform the majority of its Phase 2 obligations because (a) Defendants breached the DHS Agreement around the time Phase 2 was to begin and (b) Defendants refused to pay Plaintiff for two months of Plaintiff's services. Nevertheless, Plaintiff had started its Phase 2 obligations in anticipation of the start of Phase 2. Specifically, Plaintiff had prepared a budget and requested on several occasions to meet with Defendants to discuss it, but Defendants ignored those requests. Plaintiff had also started hiring and training personnel to ensure that Defendants' Phase 2 operations were conducted properly and efficiently.

37. Plaintiff incorporates by reference its responses to the allegations contained in Paragraphs 1-36 of the Defendants' First Counterclaim above as if fully set forth herein.

38. Plaintiff admits the allegation in Paragraph 38 of the Defendants' First Counterclaim.

39. Answering Paragraph 39 of the Defendants' First Counterclaim, Plaintiff denies the allegation that Defendants have complied with all of its obligations under the DHS Agreement.

40. Plaintiff denies the allegations in Paragraph 40 of the Defendants' First Counterclaim.  Plaintiff has addressed the false and spurious allegations in Paragraph 40 in previous responses.

41. Plaintiff denies the allegations in Paragraph 41 of the Defendants' First Counterclaim.   Plaintiff fully performed its obligations for Phase 1 under the DHS Agreement, and Plaintiff was prepared to perform its obligations under Phase 2 until Defendants breached the DHS Agreement and refused to pay Plaintiff for two months of services rendered.

42. Plaintiff denies the allegations in Paragraph 42 of the Defendants' First Counterclaim. Defendants currently owe Plaintiff $90,000.00 for past services rendered, $12,154.75 invoiced for reimbursements, and damages in an amount no less than $22,000,000.00 due to Defendants' material breach of the DHS Agreement.

43. Plaintiff denies the allegations in Paragraph 43 of the Defendants' First Counterclaim.

44. Plaintiff denies the allegations in Paragraph 44 of the Defendants' First Counterclaim. Only now – after Defendants tried to hire Plaintiff's site manager, Mr. Randall, then tried to retain Plaintiff's services to help Defendants clean up their legal troubles with Defendants' contractors (Shermco and CEGEN), and were then sued by Plaintiff for breaching the DHS Agreement – do the Defendants bring false, unsupported,

and spurious counterclaims against Plaintiff for "no less than $40,000,000." Defendants desperately miswrite history in an effort to shift all contractual responsibility and blame to Plaintiff.  Defendants' arguments and rhetoric are a form of projection; they use post-hoc fallacies and straw man arguments to assert false allegations and manufacture a narrative built of mischaracterized and untrue facts.  Further, in seeking damages against Plaintiff for "no less than $40,000,000," where, as here, the parties have a contractual limitation of damages provision limiting Defendants' potential damages to no more than $135,000, Defendants only validate the financial value of the DHS Agreement, the high financial stakes of industrial scale Bitcoin mining, and ultimately legitimize the significant monetary value of the damages to Plaintiff.

45.     Plaintiff denies every allegation in the Defendants' First Counterclaim that is not specifically admitted above.

### DEFENDANTS' SECOND COUNTERCLAIM
### (Legal Fees Pursuant to Contract)

### FACTUAL BACKGROUND

1.     Plaintiff admits the allegation in Paragraph 1 of Defendants' Second Counterclaim.

2.     Plaintiff admits the allegations in Paragraph 2 of Defendants' Second Counterclaim.  Plaintiff denies the allegation in the second sentence of Paragraph 2, to wit: "Plaintiff's Chancery Court Complaint has been dismissed and Defendants are the prevailing parties therein."  The Chancery Court case was dismissed without prejudice under W.R.C.P.Ch. C. 3(a) "with each party to bear its own fees and costs."  And, pursuant

to Article 18 of BCB's DEVELOPMENT, HOSTING & SERVICE AGREEMENT with Defendant MineOne Wyoming Data Center LLC, "The prevailing party or parties shall be the party who is entitled to recover its costs of suit, whether or not suit if (sic) filed and whether or not the suit proceeds to final judgment."  Because neither Plaintiff nor MineOne Wyoming Data Center LLC was the prevailing party in the Chancery Court lawsuit, neither of them is entitled to recover its attorney fees for the filing, or defense, of the March 15, 2023 – May 12, 2023 Chancery Court lawsuit.

3.     Answering Paragraph 3 of Defendants' Second Counterclaim, Plaintiff admits that Plaintiff's claims stem from Plaintiff's DEVELOPMENT, HOSTING AND SERVICES AGREEMENT with Defendants to build and operate two Bitcoin mining facilities in Wyoming.  Plaintiff affirmatively states that Plaintiff's claims also stem in part from Plaintiff's CONSULTANCY SERVICES AGREEMENT.

4.     Plaintiff admits the allegations in Paragraph 4 of Defendants' Second Counterclaim.

5.     Plaintiff admits the allegations in Paragraph 5 of Defendants' Second Counterclaim.

6.     Plaintiff admits the allegations in Paragraph 6 of Defendants' Second Counterclaim.

7.     Plaintiff admits the allegations in Paragraph 7 of Defendant's Second Counterclaim.

8.     Answering Paragraph 8 of Defendants' Second Counterclaim, Plaintiff admits the allegation that, "On June 9, 2022, MineOne Wyoming Data Center LLC and

Plaintiff entered into the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, but Plaintiff denies the remaining allegations in Paragraph 8.  The selective quote in Paragraph 8 is taken from the sentence, in the recitals, which says, "**Whereas**, MineOne will acquire, develop, build, own and host a 45MW digital currency  mining facility and an additional 30MW digital currency mining facility and BCBC shall then provide certain project management and operation and maintenance services in relation to the Facilities (referred to below) on the terms and conditions herein contained."

9.      Answering Paragraph 9 of Defendants' Second Counterclaim, Plaintiff admits that Defendants have correctly quoted *part* of the Attorneys' Fees and Disbursements' agreement between Plaintiff and MineOne Wyoming Data Center LLC, but the entire paragraph is quoted below as follows:

>     18.    <u>Attorneys' fees and disbursements.</u>  In the event of any arbitration, litigation or other dispute between the parties in connection with the interpretation, performance or enforcement of this Agreement, the prevailing party in such arbitration, litigation or other dispute shall be entitled, in addition to equitable relief or damages or both or other relief, to be reimbursed by the non-prevailing Party for all costs and expenses of the arbitration, litigation, or other dispute including, without limitation, arbitration fees, court costs, expert witness fees, investigation costs and attorneys' fees and disbursements, incurred therein by such prevailing party or parties and, if such prevailing party or parties shall recover judgment in any such action or proceedings, such costs, attorneys' fees may be included in and as a part of such judgment.  The prevailing party or parties shall be the party who is entitled to recover its costs of suit, whether or not suit if (sic) filed and whether or not the suit proceeds to final judgment.  If no costs of suit are awarded, the arbitrator(s) or court, as applicable, shall determine the prevailing party.

10.     Plaintiff denies each and every allegation in Paragraph 19 of Defendants'

Second Counterclaim.

11.     Plaintiff lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 11 of Defendants' Second Counterclaim and therefore denies the same.  At many points during the project, Plaintiff reminded Defendants that Plaintiff was doing everything within its control to complete the project as quickly as possible despite the delays caused by MineOne's other contractors and vendors, including CEGEN and Shermco, and other outside forces.

12.     Plaintiff denies the allegations in Paragraph 12 of Defendants' Second Counterclaim.  Instead of retaining counsel in connection with Plaintiff's alleged (but non-existent) breach of contract and misconduct under the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, MineOne Wyoming Data Center LLC retained counsel to defend itself against Plaintiff's meritorious allegations of anticipatory repudiation, breach of contract, and breach of the implied covenant of good faith and fair dealing inherent in the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.  Further, at the time of Defendants' anticipatory repudiation, breach of contract, and breach of the implied covenant of good faith and fair dealing inherent in the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, Defendant was planning to retain (or may have already retained) legal counsel against some of its other contractors and vendors, but not Plaintiff, as evidenced by Defendant attempting to coerce Plaintiff into signing a proposed amendment to the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, which would provide compensation to Plaintiff for assisting "MineOne's legal team to start proceedings against third-parties."   The proposed amendment also tied part of Plaintiff's compensation to the recovered funds from the third

parties that Defendants would sue.  As evidenced by the proposed amendment, Defendant desired Plaintiff's help in recovering from its contractors and vendors that had actually breached their contractual obligations to Defendant.  At no time up until Plaintiff notified Defendants of its breaches did Defendant indicate it was retaining counsel in connection with Plaintiff's alleged breaches and misconduct under the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.

13.   Answering Paragraph 13 of Defendants' Second Counterclaim, Plaintiff acknowledges that MineOne Wyoming Data Center LLC's legal fees and costs will increase as it defends against Plaintiff's meritorious claims, but any increase in attorneys fees and costs has nothing to do with Plaintiff's alleged (but non-existent) "bad faith effort to beat MineOne Wyoming Data Center to the courthouse," which allegation is denied.

14.   Answering Paragraph 14 of Defendants' Second Counterclaim, Plaintiff re-asserts and incorporates by reference all of its admissions, denials and responses to all the allegations in Defendants' First and Second Counterclaims in response thereto.

15.   Answering Paragraph 15 of Defendants' Second Counterclaim, Plaintiff admits the allegation that "MineOne Wyoming Data Center LLC and Plaintiff BCB are Parties to the valid and binding DEVELOPMENT, HOSTING AND SERVICES AGREEMENT;" in fact, they are the only Parties to the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, and none of the other Defendants are entitled to any fees, attorneys fees or costs under Paragraph 18 of the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT as they are not Parties to the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.  Not being parties to the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, none of the other Defendants

can contractually recover their fees, attorney fees, expert fees, or costs from Plaintiff.

16.    Answering Paragraph 16 of Defendants' Second Counterclaim, Plaintiff admits the allegation that the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT contains the attorney fee provision set forth above in Paragraph 9 of Plaintiff's answer to MineOne Wyoming Data Center LLC's Second Counterclaim, but Plaintiff denies every other allegation in Paragraph 16, and particularly Defendant MineOne Wyoming's characterization of the parties' attorney fee paragraph.

17.    Plaintiff denies Defendants' allegation, in Paragraph 17 of the Second Counterclaim, that MineOne Wyoming Data Center LLC has complied with all of its obligations under the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.  In fact, MineOne Wyoming Data Center LLC anticipatorily repudiated and materially breached its DEVELOPMENT, HOSTING AND SERVICES AGREEMENT, and did so before Plaintiff withdrew from the site and filed this suit.

18.    Plaintiff denies the allegations in the first sentence of Paragraph 18 of the Second Counterclaim.  Plaintiff denies the allegations in the second sentence of Paragraph 18 for all the reasons expressed in Plaintiff's answer to Paragraph 2 of Defendants' Second Counterclaim.

19.    Plaintiff denies the allegations in Paragraph 19 of Defendants' Second Counterclaim.

20.    Plaintiff denies the allegations in Paragraph 20 of Defendants' Second Counterclaim.  Defendants SonicHash LLC, Bit Origin, Ltd., MineOne Partners LLC, and Terra Crypto Inc. are not parties to the DEVELOPMENT, HOSTING AND SERVICES

AGREEMENT, and lack standing to seek any recovery under Paragraph 18 of the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.  Plaintiff is not liable for legal fees, costs or disbursements to any of those four Defendants, and those four Defendants knowingly mis-state they have some legal entitlement to their legal fees, costs and disbursements when they know they are not parties to the DEVELOPMENT, HOSTING AND SERVICES AGREEMENT.  Plaintiff denies it is legally liable to any of the Defendants, including MineOne Wyoming Data Center LLC, and Plaintiff is not liable to any of the Defendants, including MineOne Wyoming Data Center LLC, for any legal fees, expert fees, costs or disbursement.

21.     Plaintiff denies every allegation in the Defendants' Second Counterclaim that is not specifically admitted above.

## <u>AFFIRMATIVE DEFENSES</u>

COMES NOW Plaintiff BCB Cheyenne LLC d/b/a Bison Blockchain, through its counsel, and for its Affirmative Defenses to Defendants' First and Second Counterclaims states as follows:

1.     Defendants' First and Second Counterclaims fail to state a claim upon which relief can be granted.

2.     Defendants' Counterclaims are barred by the doctrines of waiver/or estoppel.

3.     Defendants' Counterclaims, which are premised (at least in part) on alleged breach(es) of contract by Plaintiff, are barred, in whole or in part, because Defendants first materially breached the terms of the DEVELOPMENT, HOSTING & SERVICES AGREEMENT

and the CONSULTANCY SERVICES AGREEMENT, thereby excusing any further or future performance by Plaintiff.

4.      Defendants' First and Second Counterclaims are barred, in whole or in part, because Defendants' damages, which damages are denied, were not proximately or legally caused by, and were not the result of, action or omission of Plaintiff.

5.      Defendants' Counterclaims and damages, which claims and damages are denied, are barred, in whole or in part, because the alleged damages suffered by Defendants were the result of one or more intervening and/or superseding actions taken by Defendants, by Defendants' contractors (including, but not limited to those taken by CEGAN and Shermco), slowed the commencement of mining operations at the North Range site.

6.      Defendants' Counterclaims are barred, in whole or in part, by Defendants' failure to take reasonable steps to avoid and/or mitigate their damages.

7.      Defendants' Counterclaims are barred, in whole or in part, because Defendants' conduct, actions and inactions amount to and constitute bad faith.

8.      Defendants' Counterclaims are barred because Defendants' conduct constitutes unclean hands.

9.      Defendants' Counterclaims are barred by the equitable doctrine of unjust enrichment; Defendants continue to benefit, unjustly, from the valuable work and services provided by Plaintiff.

10.     Defendants' Counterclaim damages, which damages are denied, are limited to no more than $135,000 (30% of $450,000.00) pursuant to the Parties' limitation on liability clause and the consequential damages clause in Article VIII of the DEVELOPMENT,

HOSTING & SERVICES AGREEMENT, which provisions state, in relevant part, as follows:

## Article VIII

## Limitations on Liability and indemnification

    2.    . . . <u>Overall Limitation of Liability</u>.  Except as expressly set forth hereinabove, including the provisions in Article VII relating to MineOne Damages and BCBC Damages, in no event shall a Party and its affiliates be liable, alone or in the aggregate, for any breach or series of breach under this Agreement to the other Party for any damages, claims, demands, suits, causes of action, losses, costs, expenses and/or liabilities in excess of an amount equal to:

    (a) with respect to BCBC, thirty percent (30%) of the amounts received and retained by BCBC from MineOne under Article IV (if any) . . . as at the date of the relevant claim (each the "***Maximum Liability***"), regardless of whether such liability arises out of breach of contract, guaranty or warranty, tort, product liability, indemnity, contribution, strict liability, or any other legal theory.  Any damages, claims, demands, suits, causes of action, losses, costs, expense and/or liabilities of a Party and its affiliates arising under this Agreement shall be applied toward the foregoing aggregate liability cap (*i.e.*, shall reduce such Party's liability under this Agreement on a dollar-for-dollar basis).

    3.    <u>Consequential Damages</u>.  Unless otherwise expressly provided for in this Agreement, the Parties hereto waive all claims against each other (and against the parent companies and affiliates of each, and their respective members, shareholders, officers, directors, agents and employees) for any consequential, incidental, indirect, special, exemplary or punitive damages (including loss of actual or anticipated profits, revenues or product; loss by reason of shutdown or non-operation; increased expense or operation, borrowing or financing; loss of use or productivity; and increased cost of capital) arising out of this Agreement; and, regardless of whether any such claim arises out of breach of contract, guaranty or warranty, tort, product liability, indemnity, contribution, strict liability or any other legal theory, and each Party hereto hereby releases the other Parties from any such liability.

    11.    Plaintiff reserves the right to assert additional affirmative defenses as they may become known during the course of discovery.

WHEREFORE, Plaintiff prays that Defendants take nothing on their First and Second Counterclaims; that judgment be entered in favor of Plaintiff and against Defendants on their First and Second Counterclaims; that Plaintiff recover its attorney fees, expert witness fees and costs for defending against Defendants' First and Second Counterclaims pursuant to Paragraph 18 of the DEVELOPMENT, HOSTING & SERVICES AGREEMENT, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this 24th day of July, 2023.

BCB CHEYENNE LLC d/b/a
BISON BLOCKCHAIN,

Plaintiff

By:     /s/ Patrick J. Murphy
        Patrick J. Murphy (WSB No. 5-1779)
        Scott C. Murray (WSB No. 7-4896)
        Williams, Porter, Day & Neville, PC
        159 N Wolcott St. Suite 400
        Casper, WY 82601
        Ph: (307) 265-0700
        pmurphy@wpdn.net
        smurray@wpdn.net

        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of ***Plaintiff's Answer to Defendants' First and Second Counterclaim*** was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 24th day of July, 2023.

| | | |
|---|---|---|
| Sean M. Larson, WSB No. 7-5112 | ☐ | U.S. Mail (Postage Prepaid) |
| HATHAWAY & KUNZ, LLP | ☐ | Fax |
| P.O. Box 1208 | ☐ | Overnight Delivery |
| Cheyenne, WY 82001 | ☐ | Hand Delivery |
| slarson@hkwyolaw.com | ☒ | CM/ECF Email |
| | | |
| Paula Colbath, *Pro Hac Vice* | ☐ | U.S. Mail (Postage Prepaid) |
| Sarah Levitan Perry, *Pro Hac Vice* | ☐ | Fax |
| LOEB & LOEB LLP | ☐ | Overnight Delivery |
| 345 Park Avenue | ☐ | Hand Delivery |
| NewYork, NY 10154 | ☒ | CM/ECF Email |
| pcolbath@loeb.com | | |
| sperry@loeb.com | | |

/s/ Patrick J. Murphy
Patrick J. Murphy