Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
        smurray@wpdn.net

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 23-CV-79 |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; and JOHN DOES 1-20, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT BITMAIN TECHNOLOGIES GEORGIA LIMITED'S MOTION TO SET ASIDE THE ENTRY OF DEFAULT

COMES NOW Plaintiff BCB Cheyenne LLC d/b/a Bison Blockchain ("Plaintiff" or "BCB"), through its counsel, and hereby submits its Response Memorandum in Opposition to Defendant Bitmain Technologies Georgia Limited's ("Bitmain Georgia") Motion to set aside the default (Doc. 81) and Memorandum in support of that Motion. (Doc. 82).

## I. PRELIMINARY STATEMENT

As Bitmain Georgia's lawyer, incorporator, and the person whose "professional responsibility [it was] to review legal documents such as [the Summons and First Amended Complaint] forwarded to her and to forward such documents to Bitmain Georgia accordingly," Ailan Liu acted with neglect – but not "excusable" neglect – when she downloaded the Summons and First Amended Complaint on the day it was served, October 25, 2023, but, without any explanation or justification, she never sent it to Bitmain Georgia before default was entered twenty-three days later.  Then, in an effort to explain or justify her failure to send the Summons and First Amended Complaint to her client, Bitmain Georgia, she misrepresented to Plaintiff's counsel, Patrick Murphy, that she "missed" Cogency Global's October 25, 2023 e-mail [with its Summons and First Amended Complaint], telling Mr. Murphy that the October 25 e-mail was "not received" by her; it did not go to her e-mail inbox; that it instead went to a "different folder;" and that "this was just a mix-up in our law firm e-mail system." (Doc. 82-1, page 54 of 65).  Now, in her *Declaration*, we learn that Ms. Liu actually received Cogency Global's e-mail [with its Summons and First Amended Complaint] on the same afternoon Cogency Global was served and sent it to her on October 25, 2023; she even "downloaded" the Summons and First Amended Complaint in that 10/25/23 e-mail on October 25, 2023; she was the only person at her California law firm who received Cogency Global's  10/25/23 e-mail; the e-mail did not go to a "different folder;" and there was no "mix up in our law firm e-mail system."  Ms. Liu offers no explanation as to why she never forwarded that 10/25/23 e-mail, with its Summons and First Amended Complaint, to Bitmain Georgia.  This is neglect, but not "excusable" neglect.[1]  A defendant's conduct is considered

---

[1] *See B.V. Reomie Automateriaal vs. IDE Invest and Real Estate*, *LLC*, 2022 WL 16901968, at *3 (November 11, 2022) (Skavdahl, Chief Judge) ("The Court finds IDE's conduct neglectful and careless, but not excusable.")

culpable if he has "defaulted willfully, *or has no excuse for the default."* *Viking Insurance Company of Wisconsin vs. Sumner*, 2016 WL 10672361, at *2 (Skavdahl, J.), *citing United States vs. Timbers Preserve, Routt County, Colorado*, 999 F.2d 452, 454 (10th Cir. 1993). Ailan Liu and Bitmain Georgia have **no excuse** for this default. As it was in *Viking Insurance* with Judge Skavdahl, so it is here: "Defendant Smith has failed to demonstrate 'good cause' to set aside the entry of default . . . The Court finds the failure to respond is due to the culpable conduct of Defendant Smith's counsel." *Viking Insurance* at *3, 4.

Wyoming courts have long held that "excusable neglect has traditionally been proved where a party acts in a reasonably prudent manner, but an outside force creates an undue delay, resulting in an untimely filing." *Chevron U.S.A. vs. Department of Revenue*, 155 P.3d 1041, 1043 (Wyo. 2007). Nothing like that happened here. This is gross negligence and a breach of Ms. Liu's admitted duty to send Bitmain Georgia the suit papers. No reasonable person would do what Ms. Liu did. This is neglect, but not "excusable" neglect. *IDE Invest, supra.*

Contrary to what Bitmain Georgia now argues, good causes does not exist to set aside the default. Bitmain Georgia's conduct was culpable. Courts sustain defaults based only upon the culpability of the default alone. *Viking Insurance* at *4, citing *Hunt vs. Ford Motor Co.,* 65 F.3d 178, *4 (10th Cir. 1995)(table decision); *and see United States vs. Torres*, 372 F.3d 1159, 1162-63 (10th Cir. 2004) ("three of the relevant circumstances in *Pioneer* weigh in favor of a finding of excusable neglect . . . Nonetheless, 'fault in the delay remains a very important factor - - perhaps the most important single factor - - in determining whether neglect is excusable . . . [t]he reason for the delay here was simply that defense counsel confused the filing deadlines for civil and criminal appeals. In *Pioneer*, the Supreme Court said that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect.'"").

Even if the Court were to consider 'other factors' – such as whether Bitmain Georgia has a meritorious defense, or would be prejudiced by not lifting the default – Bitmain Georgia, in its submittals, has not proven those factors. But the Court need not consider those 'other factors.' *Torres*, 372 F.3d at 1162-63. Because this default was caused by Bitmain Georgia's culpable conduct and inexcusable delay, the Court should deny Bitmain Georgia's motion to set aside the default. The Court should strike Bitmain Georgia's 12/13/23 Answer and affirmative defenses. Bitmain Georgia should not now be allowed to contest the well-pleaded facts[2] in BCB's *First Amended Complaint*. The Court should refuse to set aside the Clerk's default.

## II.  STANDARD OF REVIEW

District Judge Scott Skavdahl correctly synthesized the applicable standard of review for lifting – or not lifting – a default.

> Generally, the Court can set aside default for good cause shown. F.R.C.P. Rule 55(c). The good cause required for setting aside a default is lesser than the standard of excusable neglect for relief from judgment under Rule 60(b). *Dennis Garberg & Assoc., Inc. v. Pack-Tech Int'l Corp.,* 115 F.3d 767, 775 n. 6 (10th Cir. 1997). The principal factors in determining whether a defendant has met the good cause standard are: (1) whether the default was the result of culpable conduct of defendant: (2) whether plaintiff would be prejudiced if the default should be set aside: and (3) whether defendant presented a meritorious defense. *Hunt vs. Ford Motor Co.,* 65 F.3d 178, *4 (10th Cir. 1995)(table decision). "The preferred disposition of any case is upon its merits and not by default judgment." *Gomes v. Williams,* 420 F.2d 1364, 1366 (10th Cir. 1970). **However, "clients must be held accountable for the acts and omissions of their attorneys."** *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship.,* 507 U.S. 380, 396 (1993). **If the default was the result of defendant's culpable conduct, the district court may refuse to set aside the default on that basis alone.** *Hunt* 65 F.3d at *3 ( citation omitted). Generally,

---

[2] A defendant who fails to answer, plead or otherwise properly defend an action is deemed to have admitted the factual allegations of the complaint as true. *Brill Gloria Hausund Gartengeräte GmbH v. Sunlawn, Inc.,* Case No. 08–cv–00211–MSK–MEH, 2009 WL 416467, *2 (D.Colo. Feb. 18, 2009.) In addition, the court accepts the undisputed facts set forth in the affidavits and exhibits. *Id.*; *Deery American Corp. v. Artco Equipment Sales, Inc.,* Case No. 06–cv–01684–EWN–CBS, 2007 WL 437762, at *3 (D.Colo. Feb. 6, 2007). Even after entry of default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate basis for the entry of a judgment. *Procom Supply, LLC v. Langner,* Case No. 12–cv–00391–MSK–KMT, 2012 WL 4856724, *2 (D.Colo. Oct. 11, 2012).

a defendant's conduct is considered culpable if he has defaulted willfully *or has no excuse for the default*. *United States vs. Timbers Preserve Routt County Colo.*, 999 F.2d 452. 454 (10th Cir. 1993).

*Viking Insurance,* \*2 (emphasis added).

Although default judgment has traditionally been disfavored, the Wyoming Supreme Court has recognized it "is becoming … a common sanction for late filings by defendants." *Vanasse v. Ramsay*, 847 P.2d 993, 1000 (Wyo. 1991) (*quoting Matter of State Exch. Fin. Co.*, 896 F.2d 1104, 1106 (7th Cir. 1990)) (ellipses in original). It is intended to deter delay in judicial proceedings. Attorneys and parties are held to a reasonably high standard of diligence in observing court's rules of procedure. *Cessna Fin. Corp.* v. *Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444-45 (10th Cir. 1983).

*Viking Insurance,* \*4.

Courts equate "excusable neglect" in Rule 60(b), F.R.Civ.P., with "culpable conduct" in

Rule 55. *Vanasse*, 847 P.2d at 999, *quoting Fed. Sav. And Loan Ins. Corp. v. Kromke*, 858 F.2d

1067, 1071 (5th Cir. 1988) ("The same factors controlling the decision of a Rule 55(c) motion to

set aside an entry of default also apply to relief from the judgment under Rule 60(b)"); *and see*

*Matter of EMM v. State*, 414 P.3d 1157, 1159 (Wyo. 2018).

Under W.R.C.P. 55(c), an entry of default may be set aside for "good cause." "Good cause for setting aside an entry of default, pursuant to [W.R.C.P.] 55(c), is to be found in the justifications for relief from a final judgment articulated in [W.R.C.P.] 60(b)." *In re HLL*, 372 P.3d at 192 (*quoting Fluor Daniel, Inc. v. Seward*, 956 P.2d 1131, 1134 (Wyo. 1998)); *see also In re ARW*, 2015 WY 25, ¶ 18, 343 P.3d at 412. W.R.C.P. 60(b)(1) allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding for [among other things] . . . excusable neglect." **"[D]emonstrating excusable neglect is not a light burden, because that standard is intended to address certain unavoidable crises in life, such as genuine emergencies like death, sickness, or other unfortunate situations in which a reasonably prudent person might have exhibited the same behavior under similar circumstances."** *In re HLL*, ¶ 35, 372 P.3d at 192 (*citing RDG Oil & Gas, LLC v. Jayne Morton Living Tr.*, 2014 WY 102, ¶ 14, 331 P.3d 1199, 1202 (Wyo. 2014)).

*Matter of EMM*, 414 P.3d at 1159 (emphasis added).

"Good cause" and "excusable neglect" are linked inexorably with one another:

[S]imple inadvertence, mistake of counsel, or ignorance of the rules usually does

not constitute excusable neglect. *Stutts v. Miller*, 37 So.3d 1, 4 (¶9) (Miss. 2010); *Holmes v. Coast Transit Auth.*, 815 So. 2d 1183, 1186 (¶11) (Miss. 2002). Excusable neglect is "a very strict standard." *Webster v. Webster*, 834 So.2d 26, 29 (¶11) (Miss.2002). Good cause and excusable neglect have been linked inexorably to one another, as a showing of good cause has been said to require at least as much as a showing of excusable neglect. *Id.* at 28 (¶4).

*Burch v. Illinois Cent. R.R. Co.,* 136 So. 3d 1063, 1067 (Miss. 2014), *quoting Clark v. Knesal,* 113 So. 3d 531, 539-540 (Miss. 2013).

Excusable neglect "requires some evidence of diligence in order to justify relief." *Shamrock Plumbing, LLC v. Silver Baron Partners, LLC,* 277 P.3d 649 (Utah 2012). Excusable neglect is "such behavior as might be the act of a reasonably prudent person under the circumstances." *Fluor Daniel (NPOSR), Inc. v. Seward*, 956 P.2d 1131, 1133 (Wyo. 1998) ("We hold that the trial court did not abuse its discretion in concluding that the neglect was not excusable and that Fluor Daniels' culpable conduct lead to the Entry of Default and the Default Judgment.") Knowing it can never show "some evidence of diligence to justify relief," Bitmain Georgia carefully avoids analyzing "excusable neglect" in its *Memorandum*. Bitmain Georgia does, however, concede that a party's conduct under Rule 55 will be considered culpable if the party has "no excuse for the default." Bitmain Georgia *Memorandum* (Doc. 82, page 7 of 13), quoting *United States vs. Timbers Preserve, Routt County, Colorado*, 999 F.2d 452, 454 (10th Cir. 1993). Ailan Liu and Bitmain Georgia have "no excuse for the default."

### III.  LEGAL STANDARD FOR RELIEF

Last year, Chief Judge Skavdahl correctly recited the legal standard for relief for excusable neglect.

Under Rule 60(b), the Court may relieve a party from final judgment for the following reasons: "(1) mistake, inadvertence, surprise, or excusable neglect ... [or] (3) fraud ... misrepresentation or other misconduct of an adverse party." Fed. R. Civ. P. 60(b). " [F]or purposes of Rule 60(b)," excusable neglect" is understood to encompass situations in which failure to comply with a ... deadline is attributable to negligence. "*Jennings*, 394 F.3d at 856 (quoting *Pioneer Inv. Servs. Co., v.*

6

*Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 394 (1993)). In a general sense: "[t]he ordinary meaning of 'neglect' is 'to give little attention or respect' to a matter, or, closer to the point for our purposes. 'to leave undone or unattended to esp[ecially] through carelessness.' " *Pioneer Inv. Servs. Co.,* 507 U.S. at 388 (quoting *Webster's Ninth New Collegiate Dictionary* 791 (1983)). "The word [neglect] therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness.'" *Id.*

In analyzing excusable neglect, the Court "must consider 'all relevant circumstances surrounding the party's omission.'" *Doran L. Off. v. Stonehouse Rentals, Inc.*, 678 F. App'x 733, 736 (10th Cir.2017) (unpublished) (quoting *Pioneer Inv. Servs. Co.*, 507 U.S. at 395). Relevant circumstances include "(1) the danger of prejudice to the [nonmoving party], (2) the length of the delay and its potential impact on judicial proceedings, (3) **the reason for the delay, including whether it was within the reasonable control of the movant**, and (4) whether the movant acted in good faith." *Id*. at 736. **Fault or the reason for delay is the most important factor, "which alone may preclude a finding of excusable neglect."** *Id*. (citing *United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004)). "**Carelessness by a litigant or his counsel does not afford a basis for relief under Rule 60(b)(1 )."** *Pelican Prod. Corp.*, 893 F.2d at 1146. Further, the burden is on the moving party "to plead and *prove* excusable neglect." Id.

*IDE Invest*, at *3 (italics emphasis in original, bold emphasis added).

## IV.  THE RELEVANT FACTS

1.     Plaintiff BCB filed its First Amended Complaint ("FAC") on September 30, 2023 (Doc. 50).

2.     Bitmain Georgia is a Georgia limited liability company incorporated by Ailan Liu (Doc. 82-1, ¶ 2).

3.     Plaintiff served Bitmain Georgia with the Summons and First Amended Complaint on October 25, 2023 by hand-delivering the Summons and FAC to Cogency Global, Inc., the registered agent in Georgia for Bitmain Georgia (Doc. 63).

4.     That same day, October 25, 2023, at 12:47 PM PT, Cogency Global, Inc. e-mailed to Ms. Ailan Liu the NOTICE OF SERVICE OF PROCESS of this lawsuit, along with the Summons and FAC. (Doc. 82-1, page 46 of 65).

5.      Ailan Liu received Cogency Global's October 25, 2023 e-mail in her work inbox that same afternoon, and she opened the e-mail that afternoon (Doc. 82-1, ¶11, Ailan Liu's 12/12/23 *Declaration*).

6.      Ailan Liu "downloaded the Summons and First Amended Complaint on October 25, 2023 at 3:19 PM PT." *Id.*

7.      Ailan Liu never sent, forwarded, or provided Cogency Global's October 25, 2023 e-mail, or the Summons and FAC, to Bitmain Georgia, even though Ms. Liu "acknowledges that it was my professional responsibility to review legal documents such as those forwarded to me by the Agent and to forward such documents to Bitmain Georgia accordingly."  (*Id.* at (¶20).

8.      Ailan Liu "never communicated with anyone at Bitmain Georgia regarding the case, prior to November 21, 2023." *Id.*

9.      Bitmain Georgia's twenty-one day period to answer or otherwise respond to BCB's FAC expired on November 15, 2023. *See* Rule 4, Fed. R. Civ. P.

10.      Bitmain Georgia did not file any appearance, answer or other responsive pleading to the FAC until December 13, 2013 (Doc. 79).

11.      BCB, through its counsel, Patrick Murphy, filed its Motion for Entry of Default on November 16, 2013 (Doc. 68).

12.      The Clerk entered Default against Bitmain Georgia on Friday, November 17, 2033 (Doc. 69).

13.      Ailan Liu admits that her California law firm, KYL, "is corporate counsel for Bitmain Technologies Georgia Limited, a Georgia Corporation ("Bitmain Georgia") (Doc. 82-1, page 3of 65, ¶ 2 Ailan Liu *Declaration*).

14.      For the past three years, with respect to Bitmain Georgia, Ms. Liu says her "primary role has been . . . (b) serving as the agent for service of process for Bitmain Georgia's affiliates in

the state of California; (c) serving as the primary point of contact for the registered agent of Bitmain Georgia when it is served with legal service of process and/or sent with any notices; [and] (d) forwarding Bitmain Georgia the legal papers or other notices received by or forwarded to me . . ." *Id.* at ¶5.

15.     As the "primary point of contact" for the registered agent of Bitmain Georgia when Bitmain Georgia or its affiliates is served with legal service of process, Ms. Liu says, "after I receive an email notification from the agent for service of process, I download the documents and email the documents to Bitmain Georgia." *Id.* at ¶6.  Ms. Liu says she has "received numerous legal documents from the registered agent" before, but she offers no explanation for ***why*** she did not forward these BCB suit papers on October 25, 2023 to anyone with Bitmain Georgia. *Id.*

16.     Instead, Ms. Liu now says she has "no recollection of ever seeing either the October 25, 2023 email from the Agent or a copy of the Summons and the First Amended Complaint prior to November 21, 2023," even though she "… ***downloaded*** the Summons and First Amended Complaint on October 25, 2023 at 3:19 PM PT."

17.     In her November 21-24, 2023 phone and e-mail correspondence with Patrick Murphy, and in her December 12, 2013 *Declaration*, Ms. Liu never addresses or answers any of the following questions.  ***Why*** did Ms. Liu not send or forward Cogency Global's October 25, 2023 to her client Bitmain Georgia after downloading it?  Was she sick? Was there a death in her family? Was there some family emergency that diverted her attention from her "downloaded" Summons and First Amended Complaint on October 25, 2023? On October 26 or 27, 2023? Was there some emergency at her law firm?  Was there some other "unfortunate situation in which a reasonably prudent person might have exhibited the same behavior under similar circumstances?" Did Ms. Liu have some personal or psychological problem that precluded her from sending the Summons and First Amended Complaint to Bitmain Georgia from October 25 – November 15,

2023?   Did Ms. Liu read the Summons on October 25, 2023?   Did Ms. Liu read the FAC on

October 25, 2023 when she "downloaded" it?   Did Ms. Liu consider sending it to her contact, Polly

Hau, in the Bitmain legal department in China?   Did she "forget" to send it to Ms. Hau?   Did she

calendar it as a "to do" task?   What did she *do* with the downloaded Summons and FAC?   Ms. Liu

never answers these relevant questions.   These are the questions and answers that highlight Ms.

Liu's gross negligence, neglect and dereliction of duty, not her alleged inadvertence, "procedural

oversight," or "procedural failure."   (12/21/23 Affidavit of Patrick Murphy ¶¶ 20-21).

18.   Ms. Liu told Patrick Murphy a different story of these events when she spoke with

Mr. Murphy on November 22, 2023 (before signing her 12/12/23 *Declaration*).   In Mr. Murphy's

11/22/23 phone call with Ms. Liu, Ms. Liu told Mr. Murphy the following:

4.   Cogency Global, Inc. sent an e-mail to your Firm on October 25, 2023 with the First Amended Complaint and Summons attached to it;

5.   That October 25 e-mail from Cogency Global, Inc. was "not received" (by you or your Firm).

6.   That October 25 e-mail from Cogency Global, Inc. did not go to your e-mail inbox;

7.   That October 25 e-mail from Cogency Global, Inc. instead went to a "different folder;" and

8.   Someone with your Firm later discovered that October 25 e-mail from Cogency Global, Inc. in your law firm "system" [but you did not say "when, or what day, "what system," "what folder," or by whom it was discovered at your law firm, or what alerted someone at your law firm to look for it.

9.   You told me "This was just a mix up in our law firm e-mail system;" and that Bitmain Georgia, your client, was not trying to stall or delay answering BCB's First Amended Complaint.

10.   You said that you recently asked someone at Cogency Global, Inc. to "re-send you" its October 25 e-mail, which they did and that you received it in your inbox.

(Doc. 82-1, page 54 of 65); *and see* Affidavit of Patrick Murphy, ¶ 9.

19.     But then, a short while after talking to Patrick Murphy on the phone on November 22, 2023, Ms. Liu e-mailed Mr. Murphy that afternoon saying, "I *missed* that particular email inadvertently." (Doc. 92-1, page 51 of 65)(emphasis added). Ms. Liu did not "miss" that Cogency Global October 25 e-mail on October 25, 2023: Ms. Liu "downloaded" the Summons and FAC in that e-mail after 3:19 PM PT on October 25, 2023. It is not possible, on the one hand, for Ms. Liu to say she "*missed*" that e-mail inadvertently," and, on the other hand, to now acknowledge she "downloaded" the Summons and FAC from that Cogency Global, Inc. e-mail on October 25, 2023 at 3:19 PM PT." (12/21/23 Patrick Murphy Affidavit, ¶¶ 11-12).

20.     In her 12/12/23 *Declaration*, Ms. Liu now attempts to explain or justify what she told Plaintiff's counsel, Patrick Murphy, on November 22, 2023 when she was asking Mr. Murphy and BCB to stipulate to lift the default. She now says:

> "I told [Mr. Murphy] that I did not know how I had no recollection of seeing that email and that it may have gone to a different folder when it came in. I believe that when I was talking to him, I was still trying to put pieces together and figure out how I could not recall seeing that email, and thought there might have been a mix up in my emails or it might have been held up in our firm's spam folder when it came in.

(Doc. 82-1, Ailan Liu *Declaration*, ¶17).

21.     But, at the time Ms. Liu spoke with Mr. Murphy on Wednesday, November 22, 2023, Ms. Liu now admits she had already searched her own e-mails and actually seen that 10/25/23 Cogency Global e-mail on her inbox the prior day. She swears:

> On the morning of November 21, 223, I searched my work emails that I had received on October 25, 2023. *I discovered that on October 25, 2023 at 12:47 PM PT, the Agent had emailed me a link to download the Summons and First Amended Complaint,* and I was the sole recipient of the Agent's October 25, 2023 email. A true and correct copy of said email is attached hereto as Exhibit E."

(Doc. 82-1, *Declaration* Ailan Liu, ¶10).

22.     Ms. Liu misrepresented to Patrick Murphy, when they spoke on November 22,

2023, that (a) the October 25 e-mail from Cogency Global, Inc. was not received; (b) the October 25 e-mail did not go to her inbox; (c) the October 25, 2023 e-mail instead went to a "different folder;" and (d) "this was just a mix up in our law firm email system." (Patrick Murphy 12/21/23 Affidavit ¶ 12).  None of these statements are true.  In Ms. Liu's *Declaration*, she now concedes that she accessed her work e-mail the ***day before*** she told Mr. Murphy (a) – (d) above; that she "downloaded" the Summons and FAC on October 25, 2023 from her own work inbox e-mail; and that she was the "sole recipient" at her law firm who  received the October 25, 2023 e-mail from Cogency Global (Doc. 82-1, Ailan Liu *Declaration*, ¶ 10).

     **A.**     **How Big Bitmain Is.**

23.    Bitmain Georgia is a wholly owned subsidiary of a multi-billion dollar global Chinese conglomerate of companies, and Ms. Liu is Bitmain Georgia's U.S. corporate attorney representing over a billion dollars in sales and hundreds of millions of dollars in corporate operations, infrastructure, and assets across the United States (with and through Bitmain's U.S. subsidiaries, specifically, Bitmain Georgia). *See* Sean P. Murphy 12/21/23 Declaration, at ¶ 7.

24.    Bitmain is a global multi-billion dollar Chinese conglomerate of more than 30 subsidiary companies (most of which use the word "Bitmain" in the parent or subsidiary company name). *Id*. at ¶ 20.

25.    The size and scale of Bitmain Georgia operations should not be understated. Bitmain Georgia owns, sold, and/or operates with partner companies (e.g., Merkle Standard in Washington and Atlas in Montana) hundreds of millions of dollars worth of Bitmain's mining "Machines" and infrastructure across the United States whereby the locations of several of these sites match the states where Ms. Lui has filed the other foreign entity registrations for Bitmain Georgia…except Wyoming where Ms. Liu has neglected to file a foreign registration filing and now Bitmain Georgia owes a $5,000 late fee. *Id*. at ¶ 67.

**B.      How Much Money Bitmain Makes.**

26.      A recent presentation by the company (Bitmain) claimed it controlled 90 percent of the global market for the equipment, which is specially designed for Bitcoin mining." *Id*. at ¶ 44.

27.      After conducting a search of recent press releases and public filings, BCB quickly identified more than a billion dollars of recent sales in the US. *Id*. at ¶ 46.

28.      Over the last three months (October, November and December 2023) Bitmain has more than $445 million in sales of their bitcoin mining machines in the United States alone. *Id*. at ¶ 49.

**C.      How Bitmain Obfuscates How Big It Really Is.**

29.      Bitmain is known by insiders in the cryptocurrency and investment industries for its ability to obfuscate its corporate and organizational structure, hide where it owns and operates its cryptocurrency mining facilities, and minimize the perception of its global multi-billion dollar sales and cryptocurrency mining operations. *Id*. at ¶ 32.

30.      To increase and expand Bitmain's complexity and obfuscation, Bitmain and/or its investors have nine companies domiciled in the Cayman Islands that appear to be a part of Bitmain's global conglomerate. *Id*. at ¶ 42.

31.      Bitmain Georgia refers to itself as an "affiliate" to downplay as much as possible its size and the scale of its operations—including its legal work, corporate filings, and business activity across the United States—all work which Ms. Liu is responsible for as Bitmain Georgia's corporate counsel. *Id*. at ¶ 57.

32.      While Bitmain Georgia does business in Georgia, the Bitmain conglomerate uses Bitmain Georgia as the contracting entity to place hundreds of millions of dollars' worth of bitcoin mining machines and infrastructure at industrial cryptocurrency mining facilities – that it calls "data centers" – across the United States. *Id*. at ¶ 59.

33.     Bitmain Georgia and Ms. Liu minimize the enormous scale of Bitmain Georgia's business by referring to Bitmain Georgia as an "affiliate" — entirely mis-characterizing Bitmain Georgia — and not accurately depicting Bitmain Georgia as a wholly-owned subsidiary company at the center of Bitmain's multi-billion dollar business operation in the United States. *Id*. at ¶ 76.

34.     Ms. Lui, Mr. Guo, and Bitmain Georgia do not want the Court to know how enormous Bitmain's operations are in the United States through its wholly-owned subsidiary, Bitmain Georgia. Doing so would cast a bright light on how inexcusable and careless it was that Ms. Liu failed to take correct action as Bitmain's corporate counsel for a company with multi-billion dollar infrastructure, operations, and assets across the United States. *Id*. at ¶ 78.

**D.     How Bitmain Exerts Influence to Get What it Wants.**

35.     Bitmain is no stranger to protracted litigation, corporate controversy and hostile take-over tactics. Bitmain's corporate culture has developed a multi-billion dollar "do-whatever-it-takes" mentality when it comes to using money and hostile corporate action. *Id*. at ¶ 23.

**E.     Erick Rengifro and Jiaming Li's Recorded Call with BCB on 3/7/23.**

36.     Bitmain Georgia, as the largest manufacturer of crypto mining machines in the world, exerted significant pressure on MineOne. The following quotations from a 3/7/23 recorded phone call with Dr. Jaiming Li and Dr. Erick Rengifo (of MineOne Wyoming), and with Michael Murphy and Emory Patterson with BCB, demonstrate how Bitmain Georgia exerted that pressure here:

0:46:     Erick Rengifo: "Jiaming, myself, and all the team has been discussing with these guys [Bitmain], because they have the power. So they -- these guys [Bitmain] are the power guys."

4:48:     Erick Rengifo: "The thing is that there are other conditions, for example, that we have with -- with Bitmain is that we need to provide them electricity 98% of the time."

13:28:     Jiaming Li: "Emory just asked if this [replacing BCB with Wiley for site

14

operations] is MineOne's desire, and the -- the answer is no."

33:10:   Erick Rengifo: "Well, indeed -- indeed Bitmain is -- is the main -- is the main partner there [at the Campstool site]. Now, they -- they can do that. And they can do everything, because what they want is they wanted to have their own MDCs. They want to have everything. They have everything, we want to do everything. Okay."

37.      Additionally, Bitmain Georgia was aware of the contractual relationship between

MineOne and BCB:

9:01:    Erick Rengifo: "What these guys [Bitmain] want to do is basically you [Plaintiff BCB] out completely. And -- and we explained Saturday and Sunday was with them [Bitmain] explaining, guys, we cannot do that. We [MineOne] have an agreement [with Plaintiff BCB]. But these guys [Bitmain] are -- are -- are tough guys. You know, I would say no, no, no, but no. I would say no." *Id.*

38.      Finally, Bitmain Georgia acted to disrupt and/or interfere with the contractual

relationship between BCB and MineOne:

0:32:    Erick Rengifo - "Our major client [Bitmain]-- our major partner here [Bitmain] is -- is -- he doesn't want you [Plaintiff BCB] to be the -- the -- the host and the manager."

1:00:    Erick Rengifo: "I go directly to the point. So what they [Bitmain] want is Wiley and team to do the hosting and management, the -- the real activities of hosting and management. And they told us, okay, you [MineOne] deal with BCB as you want as part of the payment structure, we [Bitmain] don't care, but we [Bitmain] want Wiley and team to do that. And why Wiley and team? Well, these guys are well known, so Wiley's well known. He has Indiana working with him and he has worked with these guys [Bitmain] before, so his reputation's extremely high. And -- and he knows how to manage these facilities."

1:31:    Erick Rengifo: "...that was the kind of agreement so we [MineOne/Terra/BitOrigin] are negotiating it still [with Bitmain].... So Wiley is going to be in charge, Wiley and team is going to be in charge of everything that is operations, you know, the -- the miners, the -- everything that is related to operation. Everything."

3:04:    Erick Rengifo: "They [Bitmain] told us, okay, you know what? As soon as Wiley is in charge of the -- of the hosting and management, we're [Bitmain] okay."

6:52:    Emory Patterson: "So this decision [to replace BCB with Wiley for site operations] is coming from pressure from like Bit Origin and Bitmain?" Erick Rengifo: "They're the clients. Yes." Mr. Patterson: "Okay." Erick Rengifo: "So basically the ones [Bitmain] that are gonna operate with us, they are telling us they don't want

you to be the operators [of the site]."

14:57:   Jiaming Li: "There are two things [that factored into the decision to replace BCB with Wiley for site operations]. One is the Bitmain's relationship with -- with Wiley's team in China, back to China. They have managed 300,000 miners for Bitmain back to there. So that's why. And Wiley and Jack, they -- they had a very good relationship with them."

34:26:   Jiaming Li: "That's why, you know, we were trying to secure -- still to secure that [Campstool] project with Bitmain and to use their container and miners so that they can, you know, get participated with -- with investments as well." *Id.*

39.     Bitmain Georgia has not registered with the Wyoming Secretary of State's Office to do business in the State of Wyoming. This violates Wyoming law. Pursuant to Wyo. Stat. Ann. § 17-16-1502:

> A foreign corporation which transacts business in this state without a certificate of authority shall be liable to this state, for the years or parts thereof during which it transacted business in this state without a certificate of authority, in an amount equal to all fees and license taxes, plus interest of eighteen percent (18%), which would have been imposed by law upon such corporation had it duly applied for and received a certificate of authority to transact business in this state as required by this act and thereafter filed all reports required by law, and in addition shall be liable for a penalty in the amount of five thousand dollars ($5,000.00), reasonable audit expenses and reasonable attorney fees.

This failure to comply with Wyoming law is another example of the lack of controls Bitmain Georgia and its corporate counsel, Ailan Liu, have employed while reaping the financial benefit of placing approximately 9,500 miners at the North Range bitcoin mining site.

## V. ARGUMENT

**A. The Court Should Only Consider the "Reason for Delay, Including Whether It Was Within the Reasonable Control of the Movant," to Determine Whether Defendant's Neglect is "Excusable," and the Default Was the Result of Bitman Georgia's Culpable Conduct.**

No one can plausibly argue that what Ailan Liu did – and did not do – is excusable.  It is abject neglect, but is not "excusable neglect."  It is culpable conduct.  There is no excuse for it,

especially from outside national counsel entrusted with providing such papers to his or her client. Neither Ms. Liu nor her client, Bitman Georgia, have any legally recognized excuse for this default. And Ms. Liu's subsequent misrepresentations to Plaintiff's counsel, Patrick Murphy, only serve to underscore  her culpable conduct leading to this default.  The Court should not set it aside.

The Tenth Circuit thoughtfully established the framework for how district courts should lift, or refuse to lift, a default.  This is the oft-cited framework in *Hunt v. Ford Motor Co.*, 65 F.3d 178 (10th Cir. 1995) (unpublished):

> Under Rule 55(c), good cause is required to be shown for the court to set aside and entry of default.  Fed.R.Civ.P. 55(c).  The principal factors in determining whether a defendant has met the good cause standard are (1) whether the default was the result of culpable conduct of the defendant, (2) whether the plaintiff would be prejudiced if the default should be set aside, and (3) whether the defendant presented a meritorious defense.  *In Re Dierschke*, 975 F.2d 181, 183, (5th Cir. 1992).  These factors are not "talismanic" and the court may consider other factors. *Id*. at 184.  **However, the court need not consider all the factors.  If the default was the result of the defendant's culpable conduct, the district court may refuse to set aside the default on that basis alone**. *Id*. at 184; *Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388 (9th Cir.1988), *cert. denied*, 493 U.S. 858, 110 S.Ct. 168, 107 L.Ed.2d 124 (1989).  *But cf. Berthelsen v. Kane*, 907 F.2d 617 (6th Cir. 1990); *Federal Deposit Ins. Corp v. Franscisco Inv. Corp.*, 873 F.2d 474 (1st Cir. 1989).  **Generally, a defendant's conduct is considered culpable if he had defaulted willfully or has no excuse for the default**.  *United States v. Timbers Preserve, Routt County, Colo.*, 999 F.2d 452, 454 (10th Cir. 1993); 6 James W. Moore, et al., Moore's Federal Practice, § 55.10 [1] at p 55-74, n. 24 (2d ed. 1994); *see also*, *Meadows v. Dominican Republic*, 817 F2d 517, 521 (9th Cir.), *cert. denied*, 484 U.S. 976, 108 S. Ct. 486, 487, 98 L.Ed. 2d 485 (1987) (**receiving actual notice of complaint and failing to respond is culpable conduct**).

*Hunt*, 65 F.3d at *3 (emphasis added).

And the Tenth Circuit has also announced the framework with which to evaluate whether "excusable neglect" exists.  *U.S. vs Torres*, 372 F.3d 1159, 1161, 1162 (10th Cir. 2004).  Despite three of the four "factors' weighing in favor of vacating the default judgment, the *Torres* Court reversed the district court, refusing to vacate the judgment because of the defendant's "fault in

the delay, including whether it was within the reasonable control of the movant [Bitmain

Georgia]." *Id*. at 1162.  The *Torres* Court reasoned as follows:

> The leading case on "excusable neglect" is *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 113 S. Ct. 1489, 123 L.Ed.2d 74 (1993), in which the Supreme Court addressed the meaning of that term in Bankruptcy Rule 9006(b)…

> The Court held that the determination whether a party's neglect is excusable "is at bottom on equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id*. at 395, 113 S. Ct. 1489.  Such circumstances include "[1] the danger of prejudice to the [nonmoving party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Id*.

> … Applying the *Pioneer* factors to the facts of this case, we determine that the district court abused its discretion in finding excusable neglect.  Three of the relevant circumstances noted in *Pioneer* weigh in favor of finding of excusable neglect.  Defendant filed his notice of only 18 days after the entry judgment; it does not appear the government would be prejudiced by the delay if the Defendant's appeal is permitted to proceed; and there is no indication that defense counsel acted in bad faith.  **Nonetheless, "fault in the delay remains a very important factor—perhaps the most important single factor—in determining whether neglect is excusable."**  *City of Chanute*, 31 F.3d at 1046*; see Graphic Communications Int'l Union v. Quebecor Printing Providence, Inc.*, 270 F.3d 1, 5 (1st Cir.2001) ("**We have observed that the four *Pioneer* factors do not carry equal weight; the excuse given for the late filing must have the greatest import.**" (internal quotation marks and bracket omitted)); *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 4457, 463 (8th Cir. 2000) (same).

> The reason for the delay here was simply that defense counsel confused the filing deadlines for civil and criminal appeals.  In *Pioneer,* the Supreme Court said that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect." *Pioneer*, 507 U.S. at 392, 113 S. Ct. 1489.

*Torres*, 372 F. 3d at 1161, 62, 63 (emphasis added).

In *IDE Invest*, Judge Skavdahl invoked this *Torres* framework in refusing

to lift the default or set aside the default judgment.  Judge Skavdahl ruled:

> The reason for delay is "perhaps the most important single factor-in determining whether neglect is excusable." *Torres, 372 F.3d at 1163*.  Because of the heavy emphasis that is placed on the reason for delay, it is unnecessary to consider other factors, such as whether IDE's conduct was in good faith, and the danger of prejudice to Plaintiff if the Court were

to set aside the default judgment. At the very least, if considered, Plaintiff would undoubtedly be prejudiced to some extent, given the increased difficulties in discovery, or an increased possibility of fraud or collusion due to the death of Ms. Van Essen-Hagen. (See ECF No. 25 at 10-11.)

The Court finds IDE's conduct neglectful and careless, but not excusable.

*IDE Invest* at *7.

In our case, Ailan Liu "downloaded" the Summons and First Amended Complaint on the same day it was served on Bitmain Georgia. Thereafter, she did nothing with it. And she provides no excuse, reason or explanation for doing nothing with it.

Courts conclude this is neglect, but not excusable neglect; it is culpable conduct. *See Orosco v. Schabron,* 9 P.3d 264, 267 (Wyo. 2000) (Affidavit of attorney alleging undiagnosed disorder is not sufficient to show incapacity for purposes of excusable neglect); *Fluor Daniel,* 956 P.2d at 1134-35 (error on the part of the attorney's staff does not rise to the level of excusable neglect); *Viking Insurance* at *6 ("In sum, the court finds that Defendant Smith's default is the result of counsel's unexplained and inexcusable culpable conduct);" *Ins. Co. of  N. Am. v. S/S "Hellenic Challenger*, 88 F.R.D. 545, 548 (S.D.N.Y. 1980)(evidence that employee misplaced complaint so that it never reached attention of appropriate authorities did not establish excusable neglect); *and see IDE Invest* at *5 ("IDE's failure to respond to Plaintiff's Complaint was 'not due to circumstances which were beyond its reasonable control'"); *RDG Oil & Gas***,** *331 P.3d at 1205* ("[F]ailure to attend to business is not excusable neglect").

Three times in its *Memorandum* Bitmain Georgia characterizes Ms. Liu's neglect and failures as a mere "procedural oversight" or "procedural failure." (Doc. 82, Page 7 of 13). It says her failure is "solely due to inadvertence." *Id.* This minimizes and mischaracterizes Ms. Liu's culpable conduct. Ms. Liu downloaded the Summons and First Amended Complaint. She had them. She saw them. And then – for reasons she can't or won't explain – she never sent them to

Bitmain. That is not a "procedural failure;" it is a substantive failure of her very duty of care. It is neglect, but not "excusable" neglect. It is negligence, even gross negligence. It is culpable conduct: it is inexcusable. She had/saw the lawsuit, and did nothing with it after downloading it.

Our case is similar *to IDE Invest*, *supra*. The agent for service was served with the Complaint, but the person to whom she e-mailed it never sent it to IDE Invest, and IDE Invest did not timely answer. Finding that "IDE has not presented any evidence indicating that it has a reasonable policy in place to see that important mail is delivered to the appropriate personnel or that said policy was or was not followed here," Judge Skavdahl correctly reasoned as follows when refusing to vacate the default judgment:

> The Court first looks to IDE's proffered reason for delay and whether the delay in seeking relief was within the IDE's reasonable control. *See Jennings*, 394 F.3d at 856. It was. The parties agree that IDE was served through its registered agent, Cloud Peak Law, LLC, on April 26, 2022. Ashley Preston, of Cloud Peak Law Group, P.C., [8] attests to forwarding the Plaintiff's Complaint and Summons to IDE at "the following email address: *Ideinvestandrealestate.com*." [9] (EFC No. 20-2 at 1 [Exh. 1]. Defendant's argument is premised on Ms. van Essen-Hagen having been the only one to have received the Plaintiff's Complaint and Summons. ***This fails as an initial matter -- service was made on IDE's registered agent. The same agent designated and chosen by IDE. Subsequent action or inaction taken by IDE's registered agent -- which the Court notes is a law firm – and IDE's employee or employees (e.g., Ms. van Essen-Hagen), was within the selection and control of IDE***. *See Doran L. Off.,* 678 F. App'x at 736 (noting Defendant's chosen registered address to receive service of lawsuit(s) was within Defendant's control); *Gripe v. City of Enid*, 312 F.3d 1184, 1189 (10th Cir. 2002) ("Those who act through agents are customarily bound by their agents' mistakes."); *White*, 1994 WL 395902, at *3 (**"[E]ven where the blame lies with the attorney, the denial of 60(b) relief is not too harsh a result for a party, who freely selected the attorney as their agent"**).

*IDE Invest.,* at *3 (emphasis added).

As it was in *IDE Invest*, so it is here. Bitmain Georgia does not present this Court with any evidence of any internal controls to assure that lawsuit papers timely reach Bitmain Georgia. Leaving it up to one person – like Ms. van Essen-Hagen in *IDE Invest*, and Ailan Liu here – is not excusable neglect. Judge Skavdahl further reasoned as follows:

> Further, "default that is caused by the movant's failure to establish minimum procedural safeguards for determining that action in response to a summons and complaint is being taken does not constitute default through excusable neglect.'" *Gibbs v. Air Canada,* 810 F.2d 1529, 1537 (11th Cir. 1987).  *See also Rogers v. Hartford Life & Acc. Ins. Co.,* 167 F.3d 933, 939 (5th Cir. 1999)(affirming a finding of no excusable neglect where a lack of minimum internal safeguards "was at least a partial cause of [defendant's] failure to respond"); *Park Corp. v. Lexington Ins. Co.,* 812 F.2d 894, 898 (4th Cir. 1987)(Haynsworth, J., concurring)(Rule 60(b) relief was properly denied not because of the loss of the papers and not because the loss was explained but because [defendant] made no showing that it had in place reasonable internal controls designed to prevent or discover such losses.")

*IDE Invest*, at *5.

This late filing happened, in part, because Bitmain Georgia had "no reasonable internal controls in place designed to prevent or discover losses."  *Park Corp., supra.*  The Court should adopt Judge Skavdahl's reasoning and ruling.  Ms. Liu saying, in her *Declaration*, that "there has never been an issue before when I did not timely forward [legal papers] to Bitmain Georgia" is not a "reasonable internal control."  (Doc. 82-1, Page 4 of 5, ¶6).  It is no 'control' at all.

Other defaulted defendants have made the same arguments that Ailan Liu and Bitmain Georgia are making here.  For example, in *North Cent. Illinois Laborers' District Council v. S. J. Groves & Sons Company, Inc.,* 842 F.2d 164, 167 (7th Cir. 1988), the Court observed that the default judgment "states that its staff was operating short-handed and that North Central's complaint was 'inadvertently' overlooked.  This explanation is not contested." *Id.*  The Court then observed.

> The crux of this case is the proper characterization of  [the defendants'] in-house error which resulted in [the defendants'] failure to respond to North Central's complaint.  We have often stated that "neither ignorance nor *carelessness* on the part of the *litigant* or his attorney provides grounds for relief under Rule 60(b)(1)." .  . . "Rule 60(b) is applied liberally in the default judgment context only in the exceptional circumstances where the events contributing to the default judgment have not been within the *meaningful control* of the defaulting party, or its attorney."  . . . The district court, however, could reasonably view the error as careless and within S.J. Groves' meaningful control.

(emphasis added.)

The same is true here.  All the events of this default were within the "meaningful control" of Bitmain Georgia.  This failure was "so careless and within [Bitmain Georgia's] control." *Id.* Bitmain Georgia's mis-characterization of its error here as a mere "procedural oversight" is a mistaken and overly-generous characterization of what actually happened.

Where, as here, the default was the result of Bitmain Georgia's culpable conduct, "the district court may refuse to set aside the default on that basis alone."  *Hunt,* 65 F.3d at *3; *IDE Invest,* at *7; *Viking Insurance* at *2.  Bitmain Georgia and Ailan Liu have "no excuse for the default." *Id.*  Under either standard – culpable conduct or excusable neglect – this default should remain.

**B.      Under Federal and State Law, Ailan Liu's Knowledge <u>Is</u> Bitmain Georgia's Knowledge, and Ailan Liu's Culpable Conduct <u>Is</u> Bitmain Georgia's Culpable Conduct.**

Tenth Circuit and Wyoming state case law hold that Ailan Liu's knowledge is imputed to Bitmain Georgia, and her culpable conduct is Bitmain Georgia's culpable conduct.  Bitmain Georgia is deemed to have Ailan Liu's 10/25/23 knowledge of this suit. *See Murphy v. Housel,* 955 P.2d 880 (Wyo. 1988) ("The attorney's knowledge is deemed to be the client's knowledge when the attorney acts on his behalf.").  *See Hochhalter,* 708 P.2d at 670 ("We hold that a litigant is not reasonably entitled to relief under Rule 60(b)(6) solely because his counsel was grossly negligent.  To hold otherwise would be inconsistent with holding each party 'bound by the acts of his lawyer-agent'"); *and see Orosco v. Schabron* 9 P.3d 264, 267 (Wyo. 2000)(bald assertions of some adverse condition that caused the attorney to mishandle the case, in the absence of further proof, are not enough to support a finding of excusable neglect). Tenth Circuit law also reflects these important principles in the context of Rule 55(c) and 60(b).  "Carelessness by a litigant or his counsel does not afford a basis for relief under Rule 60(b)(1)." *Pelican Production Corp. v. Marino,* 893 F.2d 1143, 1146 (10th Cir. 1990); *Viking Insurance* at *4 ("The Court finds the failure

to respond is due to culpable conduct of Defendant Smith's counsel"); *and see Pioneer Investment Services Company v. Brunswick Associates, Limited Partnership,* 507 U.S. 380, 396 (1993)("clients must be held accountable for the acts and omissions of their clients").

## C.   Other Factors the Court May -- But Should Not – Consider.

The Court need not consider "other factors" to uphold this default.   *Hunt, IDE Invest., Torres,* and *Viking Insurance.*   But if the Court considers these other factors, here is the analysis.

### i.   Meritorious Defense

In its *Memorandum* (Doc. 82, Page 9 of 13), Bitmain Georgia contends, in a conclusory fashion only, that "Bitmain Georgia did not engage in any actions with the intent to disrupt or otherwise interfere with any contract that may exist between MineOne and Plaintiff," and that "Bitmain Georgia lacked knowledge as to whether MineOne or Terra entered into a valid and enforceable contract with Plaintiff."   Bitmain Georgia cites only its attorney's *Declaration* for these broad statements, but Mr. Lenhart has no personal knowledge of what Bitmain Georgia did. *Id.*  And Bitmain Georgia provides *no facts* to support this.   BCB, on the other hand, has provided *specific facts* showing that Bitmain Georgia *knew* of BCB's contract with MineOne Wyoming yet still pressured MineOne Wyoming into breaching MineOne Wyoming's contract with BCB by requiring that MineOne Wyoming replace BCB as the site operator with MineOne Wyoming's own team led by Wiley. *See* 3/7/23 Video Recorded Call between MineOne Wyoming and BCB; *and see* Patrick J. Murphy Affidavit about that recorded call at ¶¶ 27-29.   Bitmain Georgia has done nothing more than assert, without factual support, that a meritorious defense exists. A meritorious defense does not exist. Bitmain Georgia knew of BCB's contract with MineOne Wyoming but then pressured Defendant MineOne Wyoming to remove BCB as the site operator (thus denying BCB from the contractually-promised consideration for serving as the site operator at both the North Range site and Campstool site for at least four more years) so that Bitmain

Georgia's desired site operator team – a MineOne-related group consisting primarily of Chinese nationals led by Wiley, with whom Bitmain had previous experience – could serve as the site operator. *Id.* In this way, Bitmain Georgia knowingly interfered with BCB's contract with MineOne Wyoming, which MineOne Wyoming breached when it replaced BCB as the site operator with Wiley's team (per Bitmain Georgia's requirement). Bitmain Georgia "failed to present more than a bald conclusion that it had meritorious defenses," which cannot support setting aside the default. *See U.S. Aviation, Inc. v. Wyoming Avionics, Inc.*, 664 P.2d 121, 127 (Wyo. 1983).

> ii.     *Prejudice*

Bitmain Georgia attempts to shift the burden to BCB to "show that it would be prejudiced by the court setting aside the default." (Doc. 82, pg. 8). However, Bitmain Georgia, as the party seeking to set aside the default properly entered against it, has the burden of establishing that BCB would ***not*** be prejudiced by the default being set aside. *See Rosty v. Skaj*, 2012 WY 28, ¶ 27, 272 P.3d 947, 957 (Wyo. 2012) ("The proponent of a motion to set aside default judgment has the burden of proving that he is entitled to relief").

Where, as here, Bitmain Georgia tortiously interfered with MineOne's contract with BCB, and that interference caused MineOne to replace BCB as the host, Bitmain Georgia suffers no prejudice *from the default*. *See* 3/7/23 Video Recorded Call between MineOne Wyoming and BCB; *and see* Patrick J. Murphy Affidavit about that recorded call at ¶¶ 27-29. Bitmain Georgia brought on its own legal liability with its own misconduct. While Bitmain Georgia should suffer a loss for its misconduct, the *default* is not causing this loss; Bitmain Georgia's *tortious misconduct* caused its loss.

Moreover, Bitmain Georgia's default will lead to a two-month delay with obtaining any discovery from Bitmain Georgia. Plaintiffs' expert witness designation is due on February 28,

2024, and BCB will not receive any discovery from Bitmain Georgia until early February, 2024, if then. This impairs BCB's ability to take meaningful depositions of the other Defendants, and it further impairs BCB's ability to furnish a complete Expert Report from its damages expert. This prejudices BCB.

Finally, even if the Court sustains this default, and judgment for any amount of damages is later entered against Bitmain Georgia, Bitmain Georgia can recover, and be indemnified, for all of its loss with a legal malpractice and/or errors and omissions claim against Ailan Liu, her law firm, KYL, and their malpractice insurers. This is Bitmain Georgia's legal and proper recourse. And, when it does that, Bitmain Georgia will have suffered no loss, no prejudice, because of the default its attorney and agent, Ms. Liu/KYL, culpably and inexcusably caused.

## CONCLUSION

Bitmain Georgia has failed to meet its burden of establishing the good cause necessary to set the default aside. Bitmain Georgia acted with culpable conduct. Ms. Liu acted with abject neglect, but not excusable neglect. Under established case law, the Court need only consider Bitmain Georgia's culpable conduct to refuse to set aside the default for "good cause." There is no good cause on this record. Consequently, the Court should deny Bitmain Georgia's *Motion to Set Aside Default* (Doc. 81) and should also strike Bitmain Georgia's *Answer* (Doc 79) as being untimely.

Respectfully submitted this 21st day of December, 2023.

> BCB CHEYENNE LLC d/b/a BISON
> BLOCKCHAIN, Plaintiff
>
>
> By:   /s/ Patrick J. Murphy
>       Patrick J. Murphy (WSB No. 5-1779)
>       Scott C. Murray (WSB No. 7-4896)
>       Williams, Porter, Day & Neville, PC
>       159 N Wolcott St. Suite 400

Casper, WY 82601
Ph: (307) 265-0700
pmurphy@wpdn.net
smurray@wpdn.net

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of **Plaintiff's Response Memorandum in Opposition to Defendant Bitmain Technologies Georgia Limited's Motion to Set Aside the Entry of Default** was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 21st day of December, 2023.

Sean M. Larson, WSB No. 7-5112
Kari Hartman, WSB No. 8-6507
HATHAWAY & KUNZ, LLP
P.O. Box 1208
Cheyenne, WY 82001
slarson@hkwyolaw.com

☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF Email

Paula Colbath, *Pro Hac Vice*
Sarah Levitan Perry, *Pro Hac Vice*
Alex Inman, *Pro Hac Vice*
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
pcolbath@loeb.com
sperry@loeb.com
ainman@loeb.com

☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF Email

Khale J. Lenhart, WSB No. 7-4581
Tyson R. Woodford, WSB No. 8-6650
HIRST APPLEGATE LLP
1720 Carey Ave. Room 400
P.O. BOX 1083
Cheyenne, WY 82003
klenhart@hirstapplegate.com
twoodford@hirstapplegate.com

☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF Email

Marc Feinstein, *Pro Hac Vice*
William Pao, *Pro Hac Vice*
O'MELVENY & MYERS
400 South Hope Street
Los Angeles, CA 90071-2899
mfeinstein@omm.com
wpao@omm.com

☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF Email

/s/ Patrick J. Murphy
Patrick J. Murphy