Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
　　　　smurray@wpdn.net

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company, . | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 23-CV-79 |
| | ) | |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; and JOHN DOES 1-20, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## DECLARATION OF SEAN P. MURPHY IN SUPPORT OF PLAINTIFF'S RESPONSE AND OBJECTION TO DEFENDANT BITMAIN TECHNOLOGIES GEORGIA LIMITED'S MOTION TO SET ASIDE ENTRY OF DEFAULT

---

1.　　I am Sean Murphy, age 39, and declare and state as follows:

2.　　I have personal knowledge of the facts set forth herein, and if called upon to do so

I could competently testify thereto.

3.      I was born and raised in Casper, Wyoming. I graduated from the University of Notre Dame in 2007.

4.      This Disclosure provides factual information and evidence to support Plaintiff's contention that Ms. Liu's actions were culpable, and it shows that Ms. Liu acted with inexcusable neglect for an attorney representing a multi-billion dollar Chinese conglomerate in the United States through its wholly-owned subsidiary, Bitmain Technologies Georgia Limited ("Bitmain Georgia").

5.      This Disclosure provides factual information and evidence to support the showing that Bitmain Georgia, and its U.S. legal counsel, Ms. Liu, did not have safeguards in place to prevent its failure to timely answer BCB's *First Amended Complaint*, and what happened — Ms. Liu receiving the *First Amended Complaint* on October 25, 2023, downloading and viewing the *First Amended Complaint*, failing to send it to Bitmain, and then misrepresenting to Patrick Murphy about what happened — demonstrates more of the deception that BCB Cheyenne ("BCB") has observed over the last year.

6.      This Disclosure also provides factual information and evidence to show Bitmain representatives are willing to misrepresent material facts to hide what they are and what they have done.

7.      This Disclosure shows Ms. Liu and Bitmain Georgia are not some mere "affiliate" (as Ms. Liu characterizes Bitmain Georgia) where she, as Bitmain Georgia's corporate counsel, made a simple "procedural oversight." No—in fact, Bitmain Georgia is a wholly owned subsidiary of a multi-billion dollar global Chinese conglomerate of companies, and Ms. Liu is Bitmain Georgia's U.S. corporate attorney representing companies with over a billion dollars in sales and hundreds of millions of dollars in corporate operations, infrastructure, and assets across the United

States (with and through Bitmain's U.S. subsidiaries, specifically, Bitmain Georgia).

<u>**BACKGROUND AND FACTS**</u>

8.      I am a team member of BCB Cheyenne, LLC ("BCB"). I was hired to work for BCB (d/b/a Bison Blockchain) in a contract-to-hire role under the job title of "Site Administrator" at the North Range bitcoin mining facility.

9.      I relocated from Denver, Colorado to Cheyenne, Wyoming for the opportunity to work for BCB.

10.      I lost my job/income when Defendant MineOne Wyoming Data Center LLC ("MineOne") withheld and refused to make a $90,0000 payment to BCB under the terms of the 6/9/22 *Development, Hosting, and Services Agreement* ("DHS AGREEMENT").

11.      As MineOne was withholding (and then later entirely refused) to pay BCB for services rendered, Jiaming Li arrived to the North Range site on March 7, 2023 in a brand new BMW M5 that appeared to have been purchased or leased the same day in Denver based on the temporary license plate tags.

12.      A new BMW M5 costs more than $100,000. This happened on March 7, 2023 despite Jiaming Li saying that a "lack of funds" prevented Defendants from paying BCB's March 6, 2023 invoice for $90,000.



13.     The BMW pictured above has been parked at the North Range facility from March 2023 to present. As of December 11, 2023, the BMW remains parked at the facility where, upon information and belief, one or more MineOne and/or Bitmain representatives are living—the people who took my job and livelihood through collusion, deception, tortious interference, and breach of contract.

14.     Buying/leasing a new $100,000+ car — instead of paying the BCB team who made it possible for Defendants to operate and make millions of dollars in Wyoming — represents who the Defendants are and how they operate.

15.     I have been familiar with Bitmain and its global operations for several years. I first heard the name "Bitmain" used regarding its involvement at the North Range site in January 2023, a few weeks after I started working at the North Range site.

16.     In mid-January 2023, Haku Du told Michael Murphy on a phone call, and Michael Murphy told me in-person, that 'MineOne and Bitmain had entered into an agreement together.'

17.     Michael Murphy asked Ms. Du to send him confirmation and/or documentation regarding what MineOne and Bitmain had agreed to. At first, Ms. Du said she wasn't able to provide it. But, upon Michael Murphy's insistence on several phone calls, Ms. Du finally provided the agreement.

18.     On January 30, 2023, Ms. Du sent Michael Murphy a redacted Service Framework Agreement ("SF Agreement") (*see* "**Exhibit A**") between MineOne and Bitmain Georgia.

19.     MineOne knew that BCB knew exactly who "Bitmain" was even though MineOne and Bitmain tried to hide, minimize, and downplay Bitmain's size and involvement from BCB.

20.      Bitmain is a global multi-billion dollar Chinese conglomerate of more than thirty (30) subsidiary companies (most of which use the word "Bitmain" in the parent or subsidiary

company name).

21.     In 2013, Bitmain was founded by Micree Zhan and Jihan Wu, both of whom have become billionaires from Bitmain's success. In a cryptocurrency industry billionaire ranking from 2021[1], Micree Zhan was ranked #4 ($3.2 Billion) and Jihan Wu #8 ($1.8 Billion). The Bitmain co-founders' net worths are each currently estimated to exceed three billion dollars.[2]

22.     From 2019 to 2021, Bitmain's co-founders wrestled for control of Bitmain. Litigation ensued.

23.     Bitmain is no stranger to protracted litigation, corporate controversy and hostile take-over tactics. Bitmain's corporate culture has developed a multi-billion dollar "do-whatever-it-takes" mentality when it comes to using money and hostile corporate action.

24.     Micree Zhan took control of Bitmain (the Chinese conglomerate of companies) and Jihan Wu took control of a spin off cryptocurrency mining company (Bitdeer).

25.     Bitdeer, headquartered in Singapore, is now a public company listed on the NASDAQ stock exchange with an approximate market capitalization close to a billion dollars.

26.     Bitmain, the Chinese conglomerate of companies controlled by Micree Zhan, is headquartered in Beijing, and operates under the name Bitmain Technologies Limited.

27.     Bitmain Technologies Limited filed for an initial public offering (IPO) in September 2018. At the time, the Bitmain conglomerate was valued between $40 billion and $50 billion, which would have made it one of the largest public offerings in history. Bitmain closed a pre-IPO round raising approximately $1 billion (valuing Bitmain around $15 billion).[3]

28.     Bitmain ultimately chose to abandon its public registration, deciding to stay private

---

[1] https://www.coinbureau.com/analysis/richest-people-in-crypto/
[2] https://insidebitcoins.com/bitcoin-investors/micree-zhan-net-worth
[3] https://www.investopedia.com/news/crypto-mining-giant-bitmain-going-public-4050-billion-valuation/

and not become a publicly listed company.

29.     Bitmain chose to remain private – in part or in whole – to be able to maintain discreet sales and operations around the world and keep the size and enormity of Bitmain's operations, sales, cryptocurrency holdings, and business dealings private and out of the public's view.

30.     Bitmain did not need capital from an IPO to grow, take advantage of market opportunities, and succeed. It was already doing that.

31.      In 2018, Bitmain's sales were quickly growing year-to-year, and Bitmain had recently raised more than $700 million in a Series B round of financing led by Chinese billionaire, Shen Nanpeng, the managing director of HongShan (formerly Sequoia Capital China).

32.     Bitmain is known by insiders in the cryptocurrency and investment industries for its ability to obfuscate and hide its corporate and organizational structure, hide where it owns and operates its cryptocurrency mining facilities, and minimize the perception of its global multi-billion dollar sales and cryptocurrency mining operations.

33.     Such corporate secrecy and obfuscation is not possible for publicly listed companies where there are disclosure and filing requirements.

34.     Those who are not involved in the cryptocurrency mining and hardware industry are unlikely to have heard of Bitmain even though it is a multi-billion dollar global conglomerate with vast cryptocurrency mining operations and sales in the United States.

35.      Shortly after these proceedings began, I obtained a publicly filed (redacted) Prospectus that Bitmain filed as part of its 2018 IPO application which contained Bitmain's organizational chart ("2018 Org Chart") (*see "***Exhibit B***"*) in 2018.

36.     The (redacted) *Prospectus* and 2018 Org Chart show a complex web of more than

20 offshore and onshore companies. The *Prospectus* and 2018 Org Chart show Bitmain's highest level of corporate ownership, and the control of the Bitmain conglomerate, is held in BitMain Technologies Holding Company, a company domiciled in the Cayman Islands.

37.     The Prospectus and 2018 Org Chart show BitMain Technologies Holding Company (Caymans) owns 100% of Bitmain's subsidiary companies in China, the United States, Israel, Seychelles, and Hong Kong.

38.     Bitmain's 2018 Org Chart appears complex, but since that time, Bitmain's conglomerate has become *even larger* and *more complex*.

39.     Bitmain Georgia's 12/13/23 *Parent Corporation Disclosure* corroborates the structure of the complex web of companies tracing back to Bitmain Georgia in the United States by stating the following:

> Defendant Bitmain Technologies Georgia Limited is a Georgia corporation and is wholly owned subsidiary of Bitmain Delaware Holdings Company, Inc., a private corporation. Bitmain Delaware Holding Company, Inc. is a wholly owned subsidiary of Bitmain Switzerland AG, a private corporation. Bitmain Switzerland AG is a wholly owned subsidiary of Bitmain Technologies Limited, a private corporation. Bitmain Technologies Limited is a wholly owned subsidiary of Bitmain Technologies Holding Company, a private corporation. *Id* at 2.

(Doc. 85).

40.     Bitmain Georgia never says in its *Memorandum* and *Disclosures* this hierarchy of companies represents the backbone of a multi-billion dollar onshore and offshore Chinese conglomerate of companies (of which Ms. Liu is the corporate counsel for the U.S. companies).

41.     The following is a visual representation of Bitmain Georgia's 12/13/23 *Parent Corporation Disclosure*. Several of these companies (*e.g.,* Bitmain Switzerland AG, Bitmain Delaware Holdings Company, Inc., and Bitmain Georgia) did not exist in 2018, but were created after Bitmain's co-founders split the company, and when China banned bitcoin mining forcing

Bitmain's mining operations to leave China and find other countries (*i.e.,* the United States) to mine bitcoin with large amounts of electrical energy needed to power its operations.



42.     To increase and expand Bitmain's complexity and obfuscation, Bitmain and/or its investors have nine companies domiciled in the Cayman Islands that appear to be a part of Bitmain's global conglomerate.



43.     The majority of Bitmain's business growth has been concentrated in the United States where Bitmain continues to dominate the global cryptocurrency mining hardware market.

44.     On October 31, 2023, the *The New York Times* reported:[4] "Since bitcoin mining was banned in China in May 2021 over concerns about energy usage and economic destabilization, Bitmain has shipped 15 times more equipment to the United States than it did in the previous five

---

[4] https://www.nytimes.com/2023/10/13/us/bitcoin-mines-china-united-states.html

years combined, the records show. A recent presentation[5] by the company (Bitmain) claimed it controlled 90 percent of the global market for the equipment, which is specially designed for Bitcoin mining."



**Market share:** ANTMINER BTC miners now capture more than **90%** of the global market. ANTMINER is running on every mining farm on the earth.

Note 1: ANTMINER is the brand name of Bitmain's cryptocurrency mining hardware products and "farm" refers to cryptocurrency mining facility or data center.

Note 2: In September 2023, *Allied Market Research* published a report valuing the global cryptocurrency mining hardware market at $1,749.26 million ($1.7 billion) in 2022, and projecting it to reach $5,020.35 million ($5 billion) by 2032. According to Bitmain's own reporting (above), Bitmain captured 90% (*i.e.* $1.5B of a $1.7B market in 2022) of the global cryptocurrency mining market in 2022.

45.     Bitmain's sales, operations, and organizational structure in the United States have grown significantly in size and complexity since 2018.

---

[5] https://www.youtube.com/watch?v=GNpd2-w0a3k&t=167s

46.     After conducting a search of recent press releases and public filings, BCB quickly identified more than a billion dollars of recent sales in the United States (*see "***Exhibit C***"*).

47.     At the beginning of 2022, Bitmain had a single sale for 78,000 brand new S19XP bitcoin mining machines for $879 million[6], Bitmain's largest sale on public record.

48.     Bitman Georgia admits in Yiliang Gui's 12/12/23 *Disclosure* that Bitmain shipped "9,800 (brand new) S19XP bitcoin mining machines" to Cheyenne, Wyoming.

49.     Over the last three months (October, November and December 2023) Bitmain has more than $445 million in sales of its bitcoin mining machines in the United States alone. This chart shows the U.S. sales that BCB identified in several hours of searching recent press releases, announcements, and industry news available on the internet and public company filings with the Securities and Exchange Commission ("SEC").

| Date | Company | # Purchased | Bitcoin Miner Model (ASIC) | Amount |
|---|---|---|---|---|
| 10/6/2023 | Iris Energy | | S21 | $19,600,000 |
| 10/11/2023 | CleanSpark | 22,000 | S21 | $61,600,000 |
| 11/3/2023 | BTC Digital | 220 | S19J PRO | $440,000 |
| 11/8/2023 | Cipher Mining | 6,000 | S21 | $16,800,000 |
| 11/14/2023 | HIVE (HIVE) | 4,800 | S19K | $10,560,000 |
| 11/20/2023 | Metavesco, Inc | 50 | S19J PRO | $100,000 |
| 11/22/2023 | Core Scientific (CORZ) | 27,000 | S19J XP | $77,000,000 |
| 11/27/2023 | Bitfarms | | T21 | $95,000,000 |
| 11/30/2023 | Iris Energy | 7000 | T21 | $18,600,000 |
| 12/1/2023 | BETS | 3300 | S19 | $6,600,000 |
| 12/6/2023 | DMG | 4,550 | T21 | $12,100,000 |
| 12/14/2023 | Blockstream | | S19k PRO | $4,800,000 |
| 12/15/2023 | Iris Energy | | T21 | $22,300,000 |
| 12/18/2023 | Cipher Mining | 37,396 | T21 | $99,500,000 |
| | | | **TOTAL:** | **$445,000,000** |

*See* "**Exhibit C**" for more details and sources.

---

[6] https://www.coindesk.com/business/2021/12/29/marathon-digitals-record-purchase-of-bitcoin-miners-will-cost-879m/

50.     Bitmain's sales in the United States tell only part of the story about Bitmain's size and the enormous scale of its infrastructure and cryptocurrency mining operations in the United States.

51.     Bitmain has incorporated and operates at least five subsidiary companies in the United States. The following is a visual representation of at least five of Bitmain's subsidiary companies in the United States (*see* "**Exhibit D**").



52.     At the center of Bitmain's operations in the United States is Bitmain Georgia and its corporate counsel, Keesal, Young & Logan ("KYL") with Ms. Liu.

53.     In its 12/13/23 *Memorandum*, Bitmain Georgia refers to Ms. Liu of KYL as its "outside counsel."  Bitmain is a Chinese conglomerate and by "outside counsel" what Bitmain really means is that KYL is Bitmain's *entire* United States corporate counsel. KYL – through Ms. Liu – is the responsible legal party for Bitmain's subsidiary companies in the United States.

54.     Bitmain does what many multinational conglomerates do: it outsources its international legal work to attorneys with expertise living in each country. But, unlike most other companies, Bitmain is an enormous multinational conglomerate that conducts billions of dollars of business in the United States.

55.     In Ms. Liu's 12/12/23 *Declaration,* Ms. Lui states "KYL is corporate counsel for Bitmain Technologies Georgia Limited" and that she "specialize(s) in corporate and real estate

transactional matters and provide(s) general corporate counseling to clients regarding the formation of business entities, commercial transactions, and other corporate matters." (Doc. 82-1, ¶ 1).

*56.*    Bitmain Georgia argues with well-crafted words – without facts, by changing its story, and without answering Patrick Murphy's relevant email questions – to make Ms. Liu's professional carelessness appear to be a mere "inadvertence" when Ms. Liu "failed to forward the Summons and First Amended Complaint" for an "affiliate" (Bitmain Georgia).

57.    Bitmain Georgia refers to itself as an "affiliate" to downplay as much as possible its size and the scale of its operations—including its legal work, corporate filings, and business activity across the United States—all work which Ms. Liu is responsible for as Bitmain Georgia's corporate counsel.

58.    Ms. Liu admits she filed the incorporation documents for Bitmain Georgia.

59.    While Bitmain Georgia does business in Georgia, the Bitmain conglomerate uses Bitmain Georgia as the contracting entity to place hundreds of millions of dollars' worth of bitcoin mining machines and infrastructure at industrial cryptocurrency mining facilities – that it calls "data centers" – across the United States.

60.    Foreign registration statements are statutory requirements for corporate entities conducting business in other U.S. states. Bitmain Georgia has filed at least six foreign registration statements to conduct business in other states (*see* "**Exhibit E**").

     i.    **Texas (2/7/23).** Ms Liu signed the Texas foreign entity registration and is listed as the Authorized Person.

    ii.    **Montana (2/13/23).** An Authorized Representative is not listed. It is reasonable to infer it is Ms. Liu given the timing with the other states and the Atlas/Bitmain industrial facility in Montana.

   iii.    **South Carolina (2/13/23).** An Authorized Representative is not listed but it is reasonable to infer Ms. Liu filed in South Carolina given the timing and no

name for Authorized Person is listed.

iv. **Kentucky (2/14/23).** Ms. Liu is listed as the "Authorized Representative" who filed.

v. **Washington (2/16/2023):** Ms. Liu is the "Authorized Person" who filed.

vi. **Arkansas (4/27/2023).** Ms. Liu is the individual who is listed as the "Incorporator/Organizer."



61. In her role as corporate counsel for Bitmain Georgia, Ms. Liu has personally filed at least four foreign entity registrations (Texas, Washington, Arkansas, Kentucky), likely filed an additional two (Montana, South Carolina), and possibly others (*see "***Exhibit E***"*).

62. Ms. Liu has been *very* active as corporate counsel for legal work in the United States for Bitmain Georgia. Ms Lui receives, signs and files documents, and traffics legal work for wholly owned subsidiaries accounting for billions of dollars of business and assets.

63. But, for some unknown and unexplained reason, Ms. Liu neglected to file a foreign registration statement in Wyoming for Bitmain Georgia where Bitmain Georgia has at least 9,800

of its machines mining bitcoin.

64.    Ms. Liu is culpable and failing her duties as Bitmain Georgia's corporate counsel. Her failures are inexcusable, especially for an experienced attorney representing a multi-billion dollar business.

65.    With Ms. Liu's failure to file a foreign registration statement in Wyoming, Bitmain Georgia now owes the Wyoming Secretary of State's Office a statutory $5,000 late fee. If Ms. Liu had filed on time, the cost of the foreign registration in Wyoming would have been only $150. When mistakes are made there are consequences.

66.    Bitmain Georgia and Ms. Liu neglecting to file a foreign registration statement in Wyoming is an example of Ms. Lui's carelessness and culpability as Bitmain Georgia's corporate counsel and the consequences that come from such neglect and carelessness.

67.    The size and scale of Bitmain Georgia operations should not be under appreciated. Bitmain Georgia owns, sold, and/or operates with partner companies (*e.g.,* Merkle Standard in Washington and Atlas in Montana) hundreds of millions of dollars' worth of Bitmain's mining "Machines" and infrastructure across the United States whereby the locations of several of these sites match the states where Ms. Lui has filed the other foreign entity registrations for Bitmain Georgia…except Wyoming where Ms. Liu has not filed a foreign registration filing and now Bitmain Georgia owes a $5,000 late fee.

68.    Bitmain Georgia, Ms. Liu, and Mr. Guo never say Bitmain Georgia owns, operates, and/or contracts to have its bitcoin mining machines hosted at numerous industrial mining facilities across the United States.

69.    Bitmain Georgia, Ms. Liu, and Mr. Guo never say these other mining sites across the United States are large, industrial, multi-million dollar facilities requiring corporate legal work

from Ms. Liu.

70.    Instead, Mr. Guo refers to (and dramatically understates) Bitmain's operations as "data center hosting services" (12/8/23 *Declaration of Yiliang Guo*), never giving any indication of how large Bitmain's operations and corporate structure are in the United States, and the value and amount of bitcoin that Bitmain is mining off U.S. energy.

71.    Bitmain Georgia, Ms. Liu, and Mr. Guo never say Bitmain Georgia is the wholly owned Bitmain subsidiary that does the contracting at numerous large industrial facilities in the United States.

72.    Bitmain Georgia never says how large of a company it is and how much legal work must exist for Ms. Liu. Instead, in Ms. Liu's *Declaration*, she redacts an entire email from her Exhibit C because it is another — or as she says, unrelated — legal matter.

73.    There are foreseeably many legal matters on Ms. Liu's desk as the corporate counsel for a company with billions of dollars of imports, product sales, facilities, and operations across the United States.

74.    At the North Range site near Cheyenne, Wyoming, we estimate Bitmain – through its wholly owned subsidiary Bitmain Georgia – is conducting significant business with estimated revenues from Bitcoin mining of approximately $4.3 million each month.  While, at the same time, Bitmain Georgia has failed to file a foreign registration in Wyoming showing it is even doing business in Wyoming.

75.     The following chart shows just how much business Bitmain Georgia is conducting with its mining operations at the North Range facility (in green). The chart also provides estimates of how much Bitmain Georgia will generate with site expansions for more electrical power at the North Range and Campstool sites.

| BITMAIN REVENUE (December 2023) - forecast (in green) and future potential with site expansions (in orange) | | | | | |
|---|---|---|---|---|---|
| Site/Facility and Power | North Range 31.5MW | North Range +25MW | Campstool 30MW | Campstool +30MW | TOTAL |
| Bitcoin mining machines | 9,800 | 7,800 | 9,300 | 9,300 | |
| Estimated Bitcoin mined* per month | 99.3 | 79.0 | 94.2 | 94.2 | |
| Price of Bitcoin** (in USD) | $44,000 | $44,000 | $44,000 | $44,000 | |
| TOTAL REVENUE PER MONTH | $4,369,738 | $3,477,954 | $4,146,792 | $4,146,792 | $16,141,276 |
| North Range 31.5MW currently operating under Service Framework Agreement | | | | | |
| Other sites under development; unknown if Bitmain will mine at those | | | | | |
| *Mined Bitcoin includes transaction fee rewards | | | | | |
| **Some analysts believe the price of Price of Bitcoin could reach $180,000/bitcoin by the end of 2025 | | | | | |

76.     Bitmain Georgia and Ms. Liu minimize the enormous scale of Bitmain Georgia's business by referring to Bitmain Georgia as an "affiliate" — entirely mis-characterizing Bitmain Georgia — and not accurately depicting Bitmain Georgia as a wholly-owned subsidiary company at the center of Bitmain's multi-billion dollar business operation in the United States.

77.     To downplay and minimize Bitmain Georgia and Ms. Liu's inexcusable mistake as corporate counsel for Bitmain Georgia, Bitmain Georgia calls itself an "affiliate" in Bitmain Georgia's 12/13/23 *Memorandum.* The word "affiliate" seems to be employed to give the appearance Bitmain Georgia is a small company and Ms. Liu made a simple "inadvertent" mistake. This is not accurate.

78.     Ms. Lui, Mr. Guo, and Bitmain Georgia seem to not want the Court to know how enormous Bitmain's operations are in the United States through its wholly-owned subsidiary, Bitmain Georgia. Doing so would cast a bright light on how inexcusable and careless it was that Ms. Liu failed to take correct action as Bitmain's corporate counsel for a company with multi-billion dollar infrastructure, operations, and assets across the United States.

79.     Bitmain Georgia paints an incomplete picture to the Court because Bitmain's size and operations in the United States show how inexcusable and careless it was that Ms. Lui did not take proper action and Bitmain Georgia did not have the proper safeguards in place to respond to

the *Summons and First Amended Complaint* when she received it on October 25, 2023.

80.     Why didn't Ms. Liu take the proper action when she received the *Summons* and *First Amended Complaint*? She admits she received the email containing the *Summons and First Amended Complaint* and that she "downloaded" the *Summons and First Amended Complaint.*

81.     Why didn't Ms. Liu and Bitmain Georgia have the proper safeguards in place for her so-called "inadvertence?"

82.     Ms. Liu doesn't provide a reason for her so-called "inadvertence" – saying only that she has "no recollection of ever seeing either the October 25, 2023 email from the Agent or a copy of the *Summons and the First Amended Complaint*." (Doc. 82-1 ¶ 12, Ailan Liu's *Declaration*).

83.     And yet, Ms. Liu says she "downloaded" (*i.e.*, took action and likely read parts or all of) the *Summons and First Amended Complaint* on October 25, 2023.

84.     Ms. Liu downloaded the *Summons and First Amended Complaint* – either read or failed to read the S*ummons and First Amended Complaint* – and now Ms. Liu says she doesn't have any recollection of ever seeing the *Summons and First Amended Complaint* after admitting she "downloaded" it. This is not some small claims court complaint we are talking about: Ms. Liu says she has no memory of seeing BCB's thirty eight million dollar ($38M) federal court *First Amended Complaint*.

### BACKGROUND FACTS AND DEFENDANTS' MISREPRESENTATIONS INVOLVING THE SERVICE FRAMEWORK AGREEMENT

85.     On January 30, 2023, Ms. Du sent Michael Murphy an email with the "hosting agreement's google drive link" (to download the document) and a password (to access and view the document) (*see* "**Exhibit F**").

86.     BCB received a redacted Service Framework Agreement ("SF Agreement")

between Mine One and Bitmain Technologies Georgia Limited ("Bitmain Georgia") on January 30, 2023 (*see* **Exhibit A"**).

87.    The SF Agreement shows Bitmain and MineOne contracted for MineOne to host Bitmain's 9,800 Machines at the North Range site, with no mention of BCB being any part of the hosting or contracted services.

88.    The SF Agreement that Plaintiff received on January 30, 2023 reads "CONFIDENTIAL" across each page. The SF Agreement does not read "DRAFT" across any pages.

89.    Page 32 of the SF Agreement reads, "Submission Date: January 19, 2023."

90.    Only the most important information in the SF Agreement was redacted: the date the SF Agreement was made on (pg. 1), the identity of the individuals representing MineOne and Bitmain who signed the SF Agreement (pg. 34), and other sensitive terms in the SF Agreement such as: Hosting Fee (pg. 7), Delayed Compensation (pg. 8), Payment Method of Hosting Fee (pg. 12), Representations and Warranties (pg. 14), Test Site (pg. 18), sections of Hosting Capacity and Hosted Servers (pgs. 28-30), Billing and Payment (pg. 30), and key terms on pgs. 32 and 33.

91.    Pages 28-31 of the SF Agreement are "Appendix 1 Form of Service Order."

92.    On page 28 of the *Form of Service Order* it reads: "Date: March 10, 2023."

93.    In Bitmain Georgia's 12/13/23 *Memorandum* (Doc. 82) it reads: "Bitmain Georgia has a meritorious defense to this claim…Bitmain Georgia and MineOne Wyoming LLC ("MineOne") entered a Service Framework Agreement (the "Agreement"), dated March 10, 2023."

94.    The date the SF Agreement was actually signed is redacted.

95.    The "submission date" is listed as January 19, 2023.

96.     BCB received the redacted SF Agreement on January 30, 2023.

97.     Bitmain Georgia's *Memorandum* says Bitmain entered into the SF Agreement with MineOne on March 10, 2023 (the date listed on the *Form of Service Order)*.

98.     There is a clear contradiction of fact and/or misrepresentation involving Bitmain Georgia's meritorious defense.

99.     Bitmain Georgia either misrepresents the date it *actually* signed the SF Agreement with MineOne – i.e*.,* the redacted date likely in December 2022 or January 2023, prior to March 10, 2023 — <u>or</u> the SF Agreement had not yet been signed (when Michael Murphy received it on January 30, 2023) whereby Bitmain and MineOne were colluding to hide information showing tortious interference and/or colluding without telling BCB their plan and intent was to remove BCB from operations (as BCB was contracted to do in the DHS Agreement), and insert Huaili "Wiley" Zhang and his team of Chinese nationals that Bitmain was demanding operate the North Range site (and not BCB).


I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Executed this 21st day of December 2023 at Cheyenne, Wyoming.


_____
Sean P. Murphy

# Exhibit A



v5.0

## SERVICE FRAMEWORK AGREEMENT

**THIS AGREEMENT** (the "**Agreement**") is made on ▮▮▮▮▮▮▮▮▮

**BETWEEN:**

(1)   **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia, the United States of America (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**"); and

(2)   **MineOne Wyoming Data Center LLC.**, a corporation incorporated under the laws of the state of Delaware, the United States of America (File No. SR20222209695), having its registered office at 614N, Dupont Hwy, Suite 210, Dover 19901("**Service Provider**").

Each of the parties to this Agreement is referred herein individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS:**

(A)   Service Provider is the owner and operator of the Data Center Facility (as defined below) and provides Services (as defined below) at the Data Center Facility.

(B)   BITMAIN intends to situate the Hosted Servers (as defined below) at the Data Center Facility and receive Services from Service Provider in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth in this Agreement, the parties agree as follows:

## 1.   DEFINITIONS AND INTERPRETATIONS

1.1.   In this Agreement, these expressions have the following meanings:

"**Actual Hosting Unit Price**" means the effective unit price per kWh applicable during the relevant Billing Period under the applicable Service Order, which shall initially be the same as the Normal Hosting Unit Price set forth in such Service Order , subject to the adjustment mechanism in accordance with Article 3.2 and/or Article 6.9(c) (if applicable).

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"**Applicable Law**" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or



international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"**Billing Period**" means the period of approximate one (1) month for which Service Provider issues invoices to BITMAIN for the Services provided by Service Provider during such period, the determination of which shall follow the following principle: (a) the first Billing Period shall commence from 00:00 (Beijing Time) on the Initial Date until 23:59 (Beijing Time) on the last calendar day of the same month, and (b) each of the subsequent Billing Periods shall commence from 0:00 (Beijing Time) on the first calendar day of the month following the previous Billing Period until 23:59 (Beijing Time) on the last calendar day of such month.

"**Business Day**" means a day (other than Saturday or Sunday) on which banking institutions in the Relevant Jurisdiction are open generally for business.

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that, in the case of a Person that is an entity, such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the holders of the shares or other equity interests or registered capital of such Person or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing.

"**Data Center Facility**" means the data center facility owned and operated by Service Provider, details of which shall be submitted to BITMAIN in the form set forth in EXHIBIT A of APPENDIX I hereto, where Service Provider provides the Services to BITMAIN pursuant to the applicable Service Order(s).

"**Delayed Compensation**" means the corresponding amount payable by either Party as compensation for its delayed performance in accordance with Articles 3.4(A)(b), 3.4(A)(c) and 3.4(A)(d).

"**Deposit**" means the amount payable by BITMAIN to Service Provider equal to one (1) month of the theoretical amount of the Hosting Fees for one Billing Period, based on the Hosting Quantity for the respective batch of the Hosted Servers, calculated in accordance with the following formula: Deposit = Hosting Quantity for the respective batch of the Hosted Servers × 3.6 (kW) × Normal Hosting Unit Price × 24 ×30; the specific amount of the Deposit shall be initially set forth in paragraph 3.1 of the applicable Service Order, subject to the adjustment in accordance with Article 6.1(b) and/or Article 6.1(e) (if applicable).



"**Digital Assets Price**" means the price of the applicable digital asset at the relevant hour (Beijing Time), denominated in US Dollars and published on the website of Coinmarketcap (https://coinmarketcap.com/).

"**End-Period Meter Reading**" means the meter reading of the Separate Meter taken at 23:59 (Beijing Time) on the last day of the applicable Billing Period.

"**Force Majeure**" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"**Hosted Servers**" means the supercomputing servers and ancillary hardware equipment owned by BITMAIN or its designated third party(ies) and hosted at the Data Center Facility pursuant to the applicable Service Order.

"**Hosting Capacity**" shall have the meaning ascribed to it in the applicable Service Order.

"**Hosting Fee(s)**" means the fee for the Services payable by BITMAIN to Service Provider based on the Power Consumption during the applicable Billing Period, which shall be calculated in accordance with Article 3.1. For the avoidance of doubt, in no event shall the Hosting Fee be determined in accordance with the quantity of Hosted Servers.

"**Hosting Fee Ratio**" means the ratio of the Hosting Fee to the Theoretical Hashrate PPS Income during the relevant period.

"**Hosting Quantity**" means the agreed quantity of the Hosted Servers in accordance with the applicable Service Order, for which Service Provider shall provide the Hosting Capacity, the details of which shall be initially set forth in paragraph 2.1 of the applicable Service Order and subject to adjustment in accordance with Article 6.1(b) and/or Article 6.1(e), or other adjustment as agreed by the Parties; provided that the adjustment shall be confirmed in writing by the Parties by either emails or a supplemental agreement hereto.

"**Initial Date**" means the date on which the Hosted Servers under the first Service Order, or the first batch of Hosted Servers if there are more than one batch under the first Service Order, are powered-on for normal hosting and operation.



"**Inventory Assets**" means any asset stored or kept by BITMAIN at the Data Center Facility other than the Hosted Servers, which may include, without limitation, servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are returned for maintenance and repair, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers, and the packaging materials for the Hosted Servers.

"**Knowledge**" means with respect to Service Provider, the actual knowledge of Service Provider, and that knowledge which should have been acquired by Service Provider after making such due inquiry and exercising such due diligence as a prudent business person who would have made or exercised in the management of its business affairs, including but not limited to due inquiry of all necessary officers, directors and professional advisers of Service Provider and its Affiliates who could reasonably be expected to have knowledge of the matters in question.

"**Minimum Power Commitment**" means the commitment of power consumption of Service Provider pursuant to the applicable Power Purchase Agreement, the failure to utilize electrical power under which, or the failure to make payment of which regardless of the actual utilization, will constitute a breach of contract under such Power Purchase Agreement. The specific amount of the Minimum Power Commitment shall be set forth in the applicable Information Memorandum of Data Center Facility.

"**Minimum Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Monitoring Software**" means the software designated by the Parties to monitor the operation of the Hosted Servers, which shall be AntSentry (version V2 or such other version as may be upgraded by BITMAIN from time to time) unless otherwise mutually agreed between the Parties in the applicable Service Order.

"**Monthly Theoretical Hosting Fee**" means the theoretical amount of the Hosting Fee for one (1) month, which shall be calculated in accordance with the following formula: Monthly Theoretical Hosting Fee = $\sum$Rated Power of Each Hosted Server Powered-On (kW) × Normal Hosting Unit Price × 24 × 30.

"**Normal Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Online Status**" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible via the Monitoring Software where the status tag "Online" is indicated for such Hosted Server.

"**Online Status Ratio**" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers



v5.0

and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period. The Online Status Ratio shall finally be determined by the data as illustrated on the Monitoring Software, except that if there is a technical failure (including, but not limited to, technical failure of the Monitoring Software and/or the Hosted Servers, or offline of the NUC, etc.) that prevents from reading certain data, the aforementioned numerator and denominator shall be adjusted accordingly to subtract such time during which the relevant data cannot be read due to such technical failure, unless otherwise agreed by the Parties.

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality).

"**Power-off Server(s)**" means Hosted Server(s) that is/are powered off voluntarily by BITMAIN pursuant to Article 5.1.

"**Power Consumption**" means the amount of electrical power consumed by the Hosted Servers during the applicable Billing Period, which shall be determined by subtracting the End-Period Meter Reading of the Billing Period immediately preceding the relevant Billing Period from the End-Period Meter Reading of the relevant Billing Period, the unit of which shall be kWh.

"**Power Purchase Agreement**" means the power purchase agreement, or other similar agreement for procurement of electrical power for the Data Center Facility, entered into between Service Provider and the relevant power supplier of the Data Center Facility.

"**Rated Hashrate**" means the rated hashrate stated on the factory label of the applicable Hosted Server.

"**Rated Power**" means the amount of the rated electrical power stated on the factory label of the applicable Hosted Server.

"**Reconciliation Statement**" means the statement issued by Service Provider to BITMAIN every Billing Period for reconciliation between the Parties, which shall set out details including but not limited to Power Consumption, the applicable Actual Hosting Unit Price, the Online Status Ratio, Hosting Fees chargeable, any occurrence of interruption or suspension of any Service during such Billing Period, the form of which is set out in APPENDIX II hereto.

"**Relevant Jurisdiction**" means the State of Georgia of the United States of America.

"**Separate Meter**" means the separate meter installed by Service Provider at the Data Center Facility for metering the electrical power consumed by the Hosted Servers.

"**Service**" means the hosting service(s) provided by Service Provider to BITMAIN pursuant to this Agreement subject to the actual service(s) agreed between the Parties in the applicable Service Order. For the avoidance of doubt, the Parties agree and



acknowledge that the Service does not include any operation or maintenance of Hosted Servers.

"**Service Order(s)**" means the Service Order(s) executed by the Parties in the form set out in APPENDIX I hereto, as amended from time to time in accordance with this Agreement.

"**Theoretical Hashrate PPS Income**" means the theoretical earnings of the applicable Hosted Server based on the Rated Hashrate of such Hosted Server with reference to the prevailing network difficulty during the relevant period and the Digital Assets Price, which shall be calculated based on the real-time total network hashrate and the price of Bitcoin (BTC), with a sampling frequency of once an hour on a credible third-party platform[1], and the average value of the relevant data in each relevant period shall be the Theoretical Hashrate PPS Income of such period, the specific value shall be determined by the data as illustrated on the Monitoring Software. For avoidance of doubt, the Parties agree that: (a) when calculating the Hosting Fee Ratio for the Actual Hosting Unit Price Adjustment in accordance with Article 3.2 or the provision of Incentive Coupon in accordance with Article 3.9, the relevant period shall be the corresponding Billing Period; (b) when calculating the Hosting Fee Ratio for the voluntary power-off in accordance with Article 5, the relevant period shall be the consecutive 24*14 hours as stipulated in Article 5.1.

1.2.    In this Agreement, unless otherwise specified:

(i)      words importing the singular include the plural and vice versa where the context so requires;

(ii)     the headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement;

(iii)    references to Articles and Appendix(es) are references to the articles and appendix(es) of this Agreement;

(iv)    references to days, dates and times are to the days, dates and times of the Relevant Jurisdiction, unless otherwise indicated;

(v)     any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force;

(vi)    understanding and interpretation of this Agreement shall be based on the purpose of this Agreement and the original meaning of the context and prevailing understanding and practice in the industry, and provisions of this

---

[1] Unless otherwise specified by BITMAIN, the third-party platform shall be the website of Coinmarketcap (https://coinmarketcap.com/).



BITMAIN

v5.0

Agreement and relevant Appendix(es) shall be understood and interpreted as a whole;

(vii)    any prices or fees set forth in this Agreement are not subject to turnover taxes including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the turnover tax according to the state tax regulation of the relevant jurisdiction (i.e. State of Wyoming); and

(viii)   "**$**", "**US$**", "**US dollar**", "**US dollars**", "**dollar**" and "**dollars**" denote lawful currency of the United States of America.

## 2.    SCOPE OF SERVICES

Subject to the terms and conditions of this Agreement, Service Provider shall provide to BITMAIN, and BITMAIN shall receive from Service Provider, the Services agreed in each of the applicable Service Orders.

## 3.    HOSTING FEE AND PAYMENT

3.1.    <u>Hosting Fee Calculation</u>. Hosting Fee for each Billing Period shall be calculated as follows:

**Hosting Fee = Power Consumption × Actual Hosting Unit Price**





v5.0

3.3. <u>Other Fees</u>. Other fees set forth in the applicable Service Order shall be paid in accordance with such Service Order on a pay-per-use basis; provided that these fees may only be incurred after prior written approval of BITMAIN.

3.4. <u>Deposit</u>.

(a) <u>Payment of Deposit</u>. For each batch of Hosted Servers under the applicable Service Order, BITMAIN shall pay to Service Provider the Deposit in accordance with paragraph 3.1 of such Service Order on or before the seventh (7th) Business Day after the execution date of such Service Order, except as otherwise agreed by both Parties in the applicable Service Order.

(b) <u>Delayed Compensation</u>. The amount of the Delayed Compensation shall be calculated as follows:



(c) <u>Delay in Delivery of Hosted Servers</u>. Except as otherwise agreed by both Parties, in the event that BITMAIN fails to deliver the respective batch of Hosted Servers to the Data Center Facility on or before (x) the Initial Date, or (y) the estimated arrival date for the respective batch of Hosted Servers as set forth in paragraph 2.2 of the applicable Service Order, whichever is later:

(i) Service Provider shall be entitled to deduct from the Deposit the corresponding Delayed Compensation in accordance with the corresponding number of hours and number of Hosted Servers delayed; and

(ii) if BITMAIN fails to remedy such delay within thirty (30) calendar days, Service Provider shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit the difference between the Deposit which has been paid by BITMAIN and the deducted Delayed Compensation to BITMAIN within seven (7) Business Days from the termination of this Agreement.

(d) <u>Delay in Power-On of Hosted Servers</u>.

(i) Except as otherwise agreed by both Parties, Service Provider shall, to the satisfaction of BITMAIN, connect the Data Center Facility to electrical power and enable the Data Center Facility to reach its standard operational conditions for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, whichever is later.



(ii)     In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied on time, Service Provider shall immediately be liable to pay to BITMAIN the corresponding Delayed Compensation in accordance with the corresponding number of hours and number of Hosted Servers delayed.

(iii)    In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied for more than thirty (30) calendar days, BITMAIN shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit to BITMAIN the Deposit that has been paid by BITMAIN in full and the Delayed Compensation (if not paid in accordance with Article 3.4(d)(ii) yet) within seven (7) Business Days from the termination of this Agreement.

(e)     In case of any adjustment of Deposit in accordance with Article 6.1(b) and/or Article 6.1(e), Service Provider shall return the respective difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN in accordance with Article 6.1(b) and/or Article 6.1(e).

(f)     Unless otherwise stipulated in the Agreement, the Deposit that has been paid by BITMAIN and not yet returned in accordance with Article 6.1(b) and/or Article 6.1(e) shall be returned to BITMAIN in full unconditionally within seven (7) Business Days from the expiration or termination of this Agreement, regardless of whether any disputes have occurred during the Term of this Agreement.

3.5.    Prepayment of Hosting Fee. Prepayments of Hosting Fee shall be made by BITMAIN to Service Provider as follows:

(a)     Prepayment. Within seven (7) Business Days from the date on which BITMAIN has been provided documentation that Service Provider has sufficient procurement that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, or (z) in the event that Service Provider does not perform its obligations under Article 3.4(d)(d)(i) on time, the seventh (7th) Business Day after Service Provider has provided BITMAIN with documentation certifying that it has completed its relevant obligations, whichever is later, BITMAIN shall pay a prepayment to Service Provider in the amount of one (1) month's Monthly Theoretical Hosting Fee calculated based on the actual quantity of such batch of Hosted Servers powered-on (the "**Prepayment**").

(b)     Return of Prepayment. Each Prepayment shall be used to offset the Hosting Fee of the corresponding batch of Hosted Servers for the first Billing Period and the subsequent Billing Periods (if there is any Balance) in accordance with Article



3.6(c). If there is any unused Prepayment at the expiration or termination of this Agreement, Service Provider shall unconditionally return such unused Prepayment in full to BITMAIN within seven (7) Business Days from the termination or expiration of this Agreement, regardless of whether any disputes have occurred during the Term of this Agreement.

3.6.   Invoice, Payment and Settlement Mechanism.

(a)   Invoice. Service Provider shall issue the invoice of the Hosting Fee for the previous Billing Period to BITMAIN within seven (7) Business Days from the end of such Billing Period, with the Reconciliation Statement for such Billing Period and the supporting documents proving the Power Consumption for the such Billing Period (e.g., photos of the Separate Meter showing the Power Consumption at the end of such Billing Period) as attachments to the invoice.

(b)   Revision Against Objection and Payment. BITMAIN shall be entitled to raise to Service Provider any objection to the initial invoice (including its attachments) issued by Service Provider in accordance with Article 3.6(a) within five (5) Business Days upon its receipt of such invoice:

(i)   Except as otherwise agreed by both Parties, in the event that BITMAIN raises no objection to the initial invoice or its attachments within the aforementioned period, it shall be deemed that BITMAIN has approved the invoice and BITMAIN shall pay to Service Provider the Hosting Fee in the invoice within seven (7) Business Days after BITMAIN's receipt of the invoice, subject to the Settlement Mechanism in accordance with Article 3.6(c).

(ii)   In the event that BITMAIN raises any objection to the initial invoice and/or its attachments within the aforementioned period, the Parties shall diligently and expeditiously cooperate to resolve the discrepancies based on the factors such as Power Consumption, Hosting Fee Ratio and Actual Hosting Unit Price (including Actual Hosting Unit Price after adjustment as agreed in accordance with this Agreement, if applicable) within seven (7) Business Days upon BITMAIN's raising of objection (the "**Confirmation Period**"). Should all or part of the Hosting Fee in the invoice has been confirmed by both Parties in the Confirmation Period (such amount, the "**Confirmed Hosting Fee**"), BITMAIN shall pay the Service Provider the Hosting Fee in an amount equal to the Confirmed Hosting Fee within seven (7) Business Days after the expiration of the Confirmation Period, subject to the Settlement Mechanism in accordance with Article 3.6(c) and provided that Service Provider has issued an updated invoice to BITMAIN showing an amount equal to such Confirmed Hosting Fee (if the Confirmed Hosting Fee differs from the Hosting Fee shown in the initial invoice).



(iii)  In the event that there is still difference between the Confirmed Hosting Fee and the total Hosting Fee mutually agreed by both Parties for such Billing Period (such difference, the "**Disputed Hosting Fee**"), the Parties shall further cooperate diligently and expeditiously in the subsequent period until the discrepancies are resolved (such period, the "**Dispute Period**"). BITMAIN shall pay the Service Provider Hosting Fee in an amount equal to the Disputed Hosting Fee within seven (7) Business Days after both Parties have agreed on such Disputed Hosting Fee (if any), subject to the Settlement Mechanism in accordance with Article 3.6(c) and provided that Service Provider has issued an updated invoice to BITMAIN showing an amount equal to such Disputed Hosting Fee.

For avoidance of doubt, the Parties agree that Service Provider shall not suspend provision of Services or terminate this Agreement or any Service Order for up to fifteen (15) Business Days of Disputed Period for failure of BITMAIN to make payment before the Hosting Fee (including the Confirmed Hosting Fee and/or the Disputed Hosting Fee) has been determined and due in accordance with this Article 3.6(b).

(c)  <u>Settlement Mechanism</u>. The Hosting Fee (including the Confirmed Hosting Fee and the Disputed Hosting Fee, if applicable) for each Billing Period shall be settled in accordance with the following mechanism:

<u>For the First Billing Period:</u>

(i)  if the amount of Hosting Fee in the invoice equals to the Prepayment prepaid in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice;

(ii)  if the amount of Hosting Fee in the invoice is less than the Prepayment prepaid in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice and the portion of the difference between the relevant prepayment and the settled amount (the "**Balance**") shall be deferred to offset the Hosting Fee in the subsequent invoice(s) during such Billing Period (if any) and for the subsequent Billing Periods; and

(iii)  if the amount of the Hosting Fee in the invoice is more than the Prepayment prepaid in accordance with Article 3.5, BITMAIN shall pay to Service Provider the shortfall between the relevant prepayment and the amount of Hosting Fee in the invoice on or before the Hosting Fee is due in accordance with Article 3.6(b) and the Hosting Fee in the invoice shall be deemed as fully settled upon BITMAIN's payment of such shortfall.



For the Subsequent Billing Periods:

    (iv)    BITMAIN shall pay the amount of the Hosting Fee in the invoice after deducting the Balance (if any) on or before the Hosting Fee is due in accordance with Article 3.6(b).

3.7.    <u>Confirmation of Hosted Servers Security</u>. Notwithstanding the foregoing, Service Provider shall issue a confirmation of Hosted Servers' security (the form as attached in APPENDIX III hereto) of providing Hosted Servers' latest information and the current business operation of Service Provider within seven (7) Business Days before the due date of BITMAIN's each payment, otherwise BITMAIN is entitled to postpone any payments until the confirmation is provided.

3.8.    <u>Payment Method of Hosting Fee</u>. All payment of Hosting Fee pursuant to this Agreement, including any remittance or refund of Hosting Fee, shall be made in accordance with paragraph 0 of the applicable Service Order.



3.10.    <u>Increased Cost</u>. If there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs, utility cost increase, governmental fees or charges with respect to the provision of Services or the operation of the Data Center Facility, Service Provider shall not pass through any of such amounts to BITMAIN. For increase in sales tax of State of Wyoming due to the regulation changes or introduction of unexpected and unforeseeable industry specific taxes enforced by local government (if any), the Parties shall discuss on the responsibility of payment of taxes and expenses in good faith. Notwithstanding the foregoing, the Parties shall solely apply Article 3.2 or Article 6.9(c) or other applicable provisions under this Agreement to adjust the Hosting Fee.

## 4.    REPRESENTATIONS AND WARRANTIES

4.1.    Each of the Parties hereby makes the following representations and warranties to the other Party:

    (a)    It has the full power and authority to own its assets and carry on its businesses.

    (b)    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.



(c)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

(d)     The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

    (i)     any Applicable Law;

    (ii)     its constitutional documents; or

    (iii)     any agreement or instrument binding upon it or any of its assets.

(e)     All authorizations required or desirable:

    (i)     to enable it to lawfully enter into, exercise its rights under and comply with its obligations under this Agreement;

    (ii)     to ensure that those obligations are legal, valid, binding and enforceable; and

    (iii)     to make this Agreement admissible in evidence in its jurisdiction of organization,

have been, or will have been by the time, obtained or effected and are, or will by the appropriate time be, in full force and effect.

(f)     It is not aware of any circumstances which are likely to lead to:

    (i)     any authorization obtained or effected not remaining in full force and effect;

    (ii)     any authorization not being obtained, renewed or effected when required or desirable; or

    (iii)     any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

4.2.    Service Provider hereby makes the following representations and warranties to BITMAIN:

(a)     It has provided BITMAIN with all the information and materials of which it has Knowledge in accordance with BITMAIN's due diligence checklist. No information or materials provided by it in the due diligence process, when taken as a whole, contains any untrue statement or omits to state any material fact. There is no information that Service Provider has not disclosed to BITMAIN in



response to BITMAIN's inquiry, of which any of Service Provider's Representatives has Knowledge.

(b) The Services shall be free from defects and shall meet the specifications as stipulated herein (including but not limited to provisions of Article 6). Without prejudice to BITMAIN's other rights, in the event of any breach of this warranty, Service Provider shall make prompt payment of the fair market value for such Hosted Servers to BITMAIN if the Hosted Servers are damaged, lost or have other abnormalities due to reasons attributable to Service Provider.

4.3. BITMAIN hereby makes the following representations and warranties to Service Provider:

(a) BITMAN shall warranty the Hosted Servers are owned by BITMAIN or or its designated third party(ies).

(b) BITMAIN shall ensure the Hosted Servers are Antminer S19 XP in good shape (i.e. those are brand new machines or machines that have been tested or proved to be close to brand new) and work in order by the time they are powered on.

(c) BITMAIN shall do the best effort to repair the Hosted Servers in an industry accepted maintenance duration or ship new Hosted Servers to the Data Center Facility after they are unloaded. BITMAIN shall guarantee that no less than 90% of the Hosted Servers are in Online Status within a quarter (i.e. a three-month period commencing on January 1, April 1, July 1 or October 1) if the working environment has met BITMAIN requirements or the Voluntary Power-off Period has not been triggered.



# BITMAIN



## 6.    OPERATION ENVIRONMENT OF DATA CENTER FACILITY

6.1.    <u>Conditions of the Data Center Facility</u>. No later than the Initial Date and at all times up to and until the termination of this Agreement, Service Provider shall provide BITMAIN with sufficient server rooms, server positions, racks, power load and facilities, broadband network and network facilities, heat dissipation facilities, sand, rain and snow-proofing facilities, temperature and humidity monitoring and sensing equipment, security monitoring and other equipment reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least the following requirements:

(a)    There shall be at least two operators' dedicated network line access, network bandwidth configuration of 100Mbps per 10,000 miners, and network latency of no more than 100ms (based on the ping value from the Hosted Servers' intranet IP to ANTPOOL). Besides, a network environment containing RJ45 interfaces shall be provided for the Monitoring Software's servers in the Data Center Facility's operation and maintenance network;

(b)    The temperature of the air inlet of any Hosted Server at any time shall not be higher than 35°C or lower than 5°C. If the temperature conditions (especially high-temperature conditions) of the Data Center Facility are not satisfied, BITMAIN shall be entitled to reduce the Hosting Quantity of Hosted Servers to satisfy the heat dissipation requirements of the miners at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to temperature reasons designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity;



(c) The environmental humidity of the Data Center Facility at any time shall not be higher than 75% or lower than 10%;

(d) The measurement ranges of the temperature and humidity monitoring and sensing equipment shall cover -30°C~60°C. Temperature and humidity monitoring and sensing equipment may be wired transmission equipment or wireless transmission equipment, for the convenience of operation and maintenance real-time monitoring;

(e) The power load provided by Service Provider shall satisfy the requirements of this Agreement, the Service Orders and standard operational conditions. In the event that the power load is insufficient for any reason (including but not limited to damage to power supply equipment, insufficient supply from the power supplier, or policy changes at the location of the Data Center Facility), BITMAIN shall be entitled to reduce the Hosting Quantity of the Hosted Servers at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to insufficient power load designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity; and

(f) There shall be sufficient forklifts, lift trucks and other related machinery and equipment to provide timely racking and de-racking services for the Hosted Servers.

6.2. <u>Exclusive Server Room</u>. Service Provider shall provide exclusive server room(s) for the storage and operation of the Hosted Servers, which shall be physically separated from server rooms at the Data Center Facility for use by other customers of Service Provider. No server and/or other hardware equipment other than the Hosted Servers may be allowed in such exclusive server room(s) unless with prior written approval of BITMAIN. Service Provider shall take necessary measures satisfactory to BITMAIN to separate the Hosted Servers from other servers and/or hardware equipment, including but not limited to labeling the Hosted Servers. Besides, Service Provider shall provide room, network and power supply for the Monitoring Software, separate from the Hosted Servers.

6.3. <u>Standard Hosting Environment</u>. Service Provider shall maintain the standard hosting environment for the Hosted Servers in accordance with the conditions set forth in the applicable Service Order.

6.4. <u>Title and Ownership</u>. Service Provider warrants and represents that it has good title to, or right by license, lease or other agreement to use, the Data Center Facility, and there is no actual, pending or threatened dispute or other claim as to title and ownership of the Data Center Facility.

# BITMAIN

6.5. <u>Safety and Security</u>. Server Provider shall take standard industry practices and all necessary measures, as well as install all necessary facilities, to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc. If any Hosted Server is damaged, lost or has other abnormalities due to reasons attributable to Service Provider, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

6.6. <u>Compliance with Applicable Law</u>. Service Provider shall ensure that the operation of the Data Center Facility, the individuals of Service Provider and provision of Services is at all times in compliance with Applicable Laws and that any and all applicable approvals, certificates, orders, authorizations, permits, qualifications and consents required for the operation of the Data Center Facility and provision of Services have been obtained no later than the Initial Date and are not revoked, cancelled or expired (unless properly renewed on or prior to such expiry) up to and until the termination of this Agreement. The Parties recognize that it is Service Provider's sole and exclusive responsibility to maintain a safe and healthy work environment at the Data Center Facility that is free from recognized hazards and fully complies with the Applicable Laws, including without limitation, the federal Occupational Safety and Health Act ("**OSHA**", if applicable), as well as any similar state or local laws. Accordingly, Service Provider promises and hereby covenants to maintain a safe and healthy work environment at the work places including but not limited to the Data Center Facility and the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets, that is free from recognized hazards and fully compliant with OSHA (if applicable), and any similar state or local laws, to ensure the safety of BITMAIN Personal (as defined below) during their work. Besides, Service Provider shall organize necessary safety training and safety drills for BITMAIN Personal on a regular basis.

6.7. <u>24/7 Access by BITMAIN Personnel</u>. If there is no other specific agreement, BITMAIN or the third party designated by BITMAIN (collectively, the "**O&M Service Provider**") shall be responsible for the operation and maintenance of the Hosted Servers. The O&M Service Provider may appoint one or more individuals ("**BITMAIN Personnel**") to carry out operation and maintenance activities on the Hosted Servers onsite at the Data Center Facility on a 24-hour per day, 7-day per week basis. Service Provider shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel, including but not limited to that Service Provider shall grant BITMAIN Personnel access and permit to:

(a)  enter into the Data Center Facility;

(b)  obtain the operational data of the Hosted Servers;

(c)  inspect the operational conditions of the Data Center Facility;

 **BITMAIN**

(d)     perform maintenance on the Hosted Servers;

(e)     handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and

(f)     check, examine and conduct inventory audits of the Hosted Servers and Inventory Assets.

6.8.    Test Site. Service Provider shall provide BITMAIN Personnel with proper test site for operation and maintenance of the Hosted Servers that meets the safety and security requirements. The test site shall provide 220V power supply and necessary network access, and shall have no less than 5 power outlets and 5 network interfaces unless otherwise required by BITMAIN Personnel.



6.10.   Inventory Storage. In addition to the space for hosting of the Hosted Servers, Service Provider shall provide sufficient space to BITMAIN for storage and safe-keeping of Inventory Assets.

6.11.   Installation and Accuracy of Separate Meter. Service Provider shall install Separate Meter(s) at the Data Center Facility to monitor the electrical power consumed by the Hosted Servers, and shall cooperate with BITMAIN to check and calibrate the accuracy

 **BITMAIN**

of the Separate Meter(s) regularly or occasionally in accordance with BITMAIN's request and instructions, to ensure the constant accuracy of the Separate Meter(s).

6.12.   Inventory Audit. BITMAIN shall be entitled to conduct inventory audit of the Hosted Servers regularly or occasionally, and Service Provider shall provide assistance and convenience accordingly. If the result of the inventory audit does not match the information as stipulated in the applicable Service Order, Service Provider shall assist BITMAIN to discover the reasons. If any Hosted Server is lost, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

## 7.   INSURANCE

7.1.   BITMAIN may keep, or procure the owner of the Hosted Servers (as applicable) to keep, in full force and effect during the Term of this Agreement appropriate commercial general liability insurance and property insurance covering the Hosted Servers, at the expense of the applicable owner of the Hosted Servers.

7.2.   In the event of any damage or loss of the Hosted Servers and upon request of BITMAIN, Service Provider shall provide BITMAIN and/or the owner of the Hosted Servers (as applicable) with documents and information in support of the insurance claim made to the insurance company.

7.3.   In the event of any damage or loss of the Hosted Servers caused by or results from the negligence or willful misconduct of Service Provider and that the insurance is unavailable or insufficient to cover the losses of BITMAIN and/or the owner of the Hosted Servers (as applicable), Service Provider shall be liable to indemnify BITMAIN (for and on behalf of the owner of the Hosted Servers, as applicable) for the difference between the insurance coverage, if any, and such losses.

## 8.   TITLE AND OWNERSHIP OF HOSTED SERVERS

8.1.   Ownership of Hosted Servers. Subject to Articles 8.2 and 8.3, Service Provider acknowledges and agrees that the Hosted Servers are assets of BITMAIN or any third party designated by BITMAIN (as applicable) (collectively, the "**Owner of Hosted Servers**") and the Owner of Hosted Servers shall solely have the proprietary interest in the Hosted Servers. The Owner of Hosted Servers' such interest shall not be affected by any factors, including but not limited to Service Provider's operating conditions, financial conditions or any disputes or lawsuits against its shareholders or any third parties. In no event shall Service Provider's creditors, shareholders or other third parties be entitled to file disputes regarding the ownership of the Owner of Hosted Servers. Without prejudice to the foregoing, in the event that any such dispute occurs, Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance in proving the Owner of Hosted Servers' proprietary interest in the Hosted Servers.

Case 1:23-cv-00079-ABJ Document 95-2 Filed 12/21/23 Page 41 of 85



8.2.  Priority Right. In the event that the Owner of Hosted Servers proposes to dispose of any Hosted Server that is owned by such Owner of Hosted Servers (the "**Offered Server**"), the Owner of Hosted Servers shall give Service Provider notice (the "**Disposal Notice**") of such proposed disposal at least seven (7) days prior to the proposed disposal, and Service Provider shall be entitled to purchase such Offered Server(s) at the price and on the terms specified in the Disposal Notice. If Service Provider waives such priority right, fails to respond to the Disposal Notice, or fails to execute the purchase agreement of the Offered Server(s) within seven (7) days since the date of the Disposal Notice, the Owner of Hosted Servers shall be entitled to dispose the Offered Server(s) to any third party without any limitation.

8.3.  Subject to Article 8.2, if the Owner of Hosted Servers transfers all or part of the Offered Server(s) to a third party, BITMAIN shall be entitled to transfer its rights and obligations with regard to the hosting services attached to such Offered Server(s) hereunder to such third-party purchaser, and Service Provider shall provide corresponding assistance and execute the relevant documents in this regard.

**9.   INDEMNIFICATION**

9.1.  Service Provider shall indemnify, defend, and hold BITMAIN and its Affiliates, and its and their officers, directors, agents, and employees (each, a "**BITMAIN Indemnified Person**"), harmless from and against any third-party action, claim, suit, proceeding, demand, investigation, or charge alleging any costs, losses, liabilities, damages, fines, judgments, fees, or expenses (including reasonable attorneys' fees and court costs) directly or indirectly, as a result of, or based upon or arising out of: (i) Service Provider's performance of the Services hereunder; (ii) any failure to comply with Applicable Law in connection with the Services or this Agreement; (iii) any liability or damage incurred by reason of any act or omission of Service Provider; or (iv) facts, which if true, would constitute a breach of any of Service Provider representations, warranties, or covenants hereunder, including, but not limited to, Service Provider fails to provide Services required by BITMAIN in accordance with this Agreement, such as frequent power outages at the Data Center Facility, Data Center Facility being shut down or being required to make improvements by competent authorities, etc., which prevents Hosted Servers from being in a stable Online Status. Should (i) in the event that BITMAIN asserts claim(s) against Service Provider, Service Provider fails to respond to the claim and take remedial action satisfactory to BITMAIN within ten (10) calendar days following receipt of written notice thereof from BITMAIN; or (ii) in the event that any third party asserts claim(s) against Service Provider and/or BITMAIN, Service Provider fails to use counsel reasonably acceptable to BITMAIN within ten (10) calendar days following receipt of written notice thereof from BITMAIN, BITMAIN shall be entitled to terminate this Agreement by written notice with immediate effect and control the defense and settlement of any such claim using counsel of its own choice with Service Provider bearing the costs and expenses of such representation (if applicable). Service Provider may not settle any action, claim, suit, proceeding, demand, investigation, or charge under this Article 9.1 without


v5.0

BITMAIN's prior written consent (if applicable). For avoidance of doubt, BITMAIN shall be entitled to participate in any defense using its own counsel at its own cost.

9.2. BITMAIN shall indemnify, defend, and hold Service Provider and its Affiliates, and its and their officers, directors, agents, and employees (each, a "**Service Provider Indemnified Person**"), harmless from and against any third-party action, claim, suit, proceeding, demand, investigation, or charge alleging any costs, losses, liabilities, damages, fines, judgments, fees, or expenses (including reasonable attorneys' fees and court costs) directly or indirectly, as a result of, or based upon or arising out of: (i) any failure to comply with Applicable Law in connection with this Agreement; (ii) any liability or damage incurred by reason of any act or omission of BITMAIN; or (iii) facts, which if true, would constitute a breach of any of representations, warranties, or covenants hereunder, including, but not limited to, (a) BITMAIN delays payments which are not under disputes between the Parties, or (b) less than 90% of the Hosted Servers are in Online Status within a quarter (i.e. a three-month period commencing on January 1, April 1, July 1 or October 1) due to BITMAIN's material negligence or willful act subject to the working environment has met BITMAIN requirements or the Voluntary Power-off Period has not been triggered. Should (i) in the event that Service Provider asserts claim(s) against BITMAIN, BITMAIN fails to respond to the claim and take remedial action satisfactory to Service Provider within ten (10) calendar days following receipt of written notice thereof from Service Provider; or (ii) in the event that any third party asserts claim(s) against Service Provider and/or BITMAIN, BITMAIN fails to use counsel reasonably acceptable to Service Provider within ten (10) calendar days following receipt of written notice thereof from Service Provider. Service Provider shall be entitled to terminate this Agreement by written notice with immediate effect and control the defense and settlement of any such claim using counsel of its own choice with BITMAIN bearing the costs and expenses of such representation (if applicable). BITMAIN may not settle any action, claim, suit, proceeding, demand, investigation, or charge under this Article 9.2 without Service Provider's prior written consent (if applicable). For avoidance of doubt, Service Provider shall be entitled to participate in any defense using its own counsel at its own cost.

9.3. Subject to other provisions of this Article 9, each Party hereby agrees to indemnify, defend and hold harmless the other Party and its respective Affiliates, officers, directors, agents and employees from and against any and all losses, liabilities, damages, liens, claims, obligations, judgments, penalties, deficiencies, costs and expenses (including reasonable attorneys' fees and court costs) resulting from or arising out of any breach or omission of performance by such Party of any of the representations, covenants or other agreements in this Agreement.

## 10. FORCE MAJEURE

10.1. A Party shall not be considered to be in default or breach of this Agreement and shall be excused from performance or liability for damages to the other Party, if and to the extent that the performance of any obligation of such Party under this Agreement (other



v5.0

than an obligation to make payment) is prevented, frustrated, hindered or delayed as a consequence of an event of Force Majeure, *provided* that:

(a) such Party claiming to benefit under this Article 10.1 (the "**Affected Party**") shall:

    (i) immediately and in any event no later than 24 hours from the occurrence of such event of Force Majeure, give the other Party (the "**Non-Affected Party**") a written notice (including via email) setting out details of such event of Force Majeure; and

    (ii) within three (3) days from the occurrence of such event of Force Majeure, produce to the Non-Affected Party supporting materials evidencing such event of Force Majeure and how its occurrence prevented, frustrated, hindered or delayed the performance of the Affected Party's obligation under this Agreement;

(b) the Affected Party shall take all necessary measures to mitigate the impact of such event of Force Majeure and shall resume normal performance of this Agreement promptly after the removal of such event of Force Majeure, unless it is impracticable or unnecessary to resume the performance of this Agreement; and

(c) Notwithstanding any other agreement to the contrary in this Agreement, Service Provider shall unconditionally waive BITMAIN's Hosting Fees for the duration of the Hosted Servers' inoperability due to the effects of such Force Majeure event and BITMAIN shall waive its rights to Services for the duration that the Service Provide couldn't provide Services due to the effects of such Force Majeure event.

10.2. If the normal performance of this Agreement cannot be resumed within fourteen (14) calendar days from the occurrence of such event of Force Majeure, BITMAIN shall be entitled to terminate this Agreement with immediate effect without any liability for breach of contract.

## 11. TERM AND TERMINATION

11.1. <u>Term</u>. This Agreement shall have a term effective from the date hereof (the "**Effective Date**") and expiring on the second (2nd) anniversary of the Effective Date (the "**Term**").

11.2. <u>Termination</u>. This Agreement may be terminated prior to the expiry of the Term:

(a) upon mutual agreement in writing of the Parties;

(b) upon either Party giving a written notice to the other Party if such other Party (i) files in any court or agency pursuant to any Applicable Law, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the



v5.0

appointment of a receiver or trustee of such other Party or of its assets, (b) is served with an involuntary petition against it, filed in any insolvency proceeding that is not dismissed within ninety (90) days after the filing thereof, (c) makes an assignment of the assets associated with this Agreement for the benefit of its creditors, (d) fails to maintain or renew any material business registration license, approval or permit that is required under any Applicable Law to carry out its normal business, (e) is subject to actual or potential liquidation, winding up, or dissolution, or (f) authorizes or consummates the merger, acquisition, reorganization, consolidation, business combination or similar transaction, or any transaction or series of transactions in which in excess of 50% of such other Party's voting power is transferred;

(c)    upon Service Provider giving a written notice to BITMAIN to terminate pursuant to Article 3.4(c)(ii) or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by BITMAIN to Service Provider upon termination;

(d)    upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 3.4(d)(iii), Article 6.9 错误!未找到引用源。, Article 9.1, Article 15.3 or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by Service Provider to BITMAIN upon termination;

(e)    upon either Party giving a written notice of its intention to terminate this Agreement in whole or in part of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination and the termination shall be effective only to the extent of such notice; and

(f)    upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 10.2.

## 12.    CONFIDENTIALITY

12.1.    From the date of this Agreement until the fifth (5th) year anniversary of the expiry of the Term or the earlier termination pursuant to Article 11.2, each Party hereby agrees that it will, and will cause its Affiliates and its and their respective directors, officers, employees, professional advisors, agents and other Persons acting on their behalf (collectively, "**Representatives**") to hold, in strict confidence the terms and conditions of this Agreement, all exhibits and schedules attached hereto and the Transactions, including their existence, and all non-public records, books, contracts, instruments, computer data and other data and information, whether in written, verbal, graphic, electronic or any other form, provided by any other Party and its Representatives



(except to the extent that such information has been (a) already in such Party's possession prior to the disclosure or obtained by such Party from a source other than any other Party or its Representatives, provided that, to such Party's knowledge, such source is not prohibited from disclosing such information to such Party or its Representatives by a contractual, legal or fiduciary obligation to any other Party or its Representatives, (b) in the public domain through no breach of the confidentiality obligations under this Agreement by such Party, or (c) independently developed by such Party or on its behalf) (the "**Confidential Information**").

12.2.   Notwithstanding the foregoing, each Party may disclose the Confidential Information (i) to its Affiliates and its and their respective Representatives so long as such persons are subject to appropriate nondisclosure obligations, (ii) as required by applicable Law (including securities Laws and applicable securities exchanges rules) or requests or requirements from any Governmental Authority or other applicable judicial or Governmental Order, or (iii) in connection with any enforcement of, or dispute with respect to or arising out of, this Agreement, or (iv) with the prior written consent of the other Party.

12.3.   The content of this Agreement and any information that belongs to but not disclosed by the other Party in the course of signing or performing this Agreement through public channels are confidential information under this Agreement; without prior written consent of the Party who is entitled to disclose the confidential information, the Party who obtains the confidential information shall not give such confidential information to any third party, nor shall the Party who obtains the confidential information uses it for purposes other than those stipulated in this Agreement.

12.4.   This Article 12 shall survive termination of this Agreement.

## 13.   INJUNCTIVE RELIEF

13.1.   Service Provider acknowledge that monetary damages may not provide a remedy in the event of certain breach of Service Provider's obligations to this Agreement and therefore, in addition to any other rights of BITMAIN, Service Provider grants to BITMAIN the right to enforce this Agreement by means of injunction, both mandatory (specific performance) and preventive, without the necessity of obtaining any form of bond or undertaking whatsoever, and waives any claim or defense that damages may be adequate or otherwise preclude injunctive relief.

## 14.   NOTICES

14.1.   All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the respective Parties at the addresses specified below or at such other address for a Party as may be specified in a notice given in accordance with this Article 14.1.


**BITMAIN**

v5.0

14.2. The following are the initial address of each Party:

**If to Service Provider:**

Address:   635 Logistics Dr, Cheyenne, WY 82009

Attn:       Operation Department

Email:     info@mineonepartners.com

**If to BITMAIN:**

Address:   900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA

Attn:       Legal Department

Email:     legal@bitmain.com

## 15.   ANTI-COMMERCIAL BRIBERY

15.1. Service Provider shall not, and shall procure its directors, officers, employees, consultants, agents and other representatives (collectively with Service Provider, the "**Service Provider Associates**") not to, directly or indirectly engage in any activity of commercial bribery, i.e. providing any unjustified interests in any form including but not limited to cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service etc. to any director, officer, employee, consultant, agent and other representative of BITMAIN (collectively, "**BITMAIN Associates**")in order to obtain the any immediate or future business opportunity with BITMAIN whether under this Agreement or any other business relationship, regardless of whether such unjustified interests is provided on the own initial of Service Provider Associates or in response to explicit or implicit request of BITMAIN Associates.

15.2. If any of BITMAIN Associates explicitly or implicitly requests commercial bribes, Service Provider shall immediately notify BITMAIN of such activity with relevant evidence and cooperate with BITMAIN in its investigation.

15.3. If any of Service Provider Associates commits commercial bribes in contravention of Article 15.1, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Service Provider and claim for damages against Service Provider.

## 16.   GENERAL

# BITMAIN

16.1. <u>Entire Agreement and Amendment</u>. This Agreement, together with all Services Orders, appendixes, schedules, annexes and exhibits, constitute the full and entire understating and agreement between the Parties, and supersede all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof. This Agreement may only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

16.2. <u>Assignment</u>.

    (a)     BITMAIN may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party subject to fifteen (15) days' prior notice to Service Provider.

    (b)     Service Provider may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part subject to BITMAIN's prior written consent.

    (c)     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

16.3. <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws.

16.4. <u>Dispute Resolution</u>. All disputes arising under this Agreement shall be submitted to arbitration in Houston, Texas, before a single arbitrator of the American Arbitration Association ("**AAA**"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in the Relevant Jurisdiction. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

16.5. <u>Severability</u>. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal or unenforceable under any Applicable Law in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such Applicable Law, or, if for any reason it is not deemed so modified, it shall be invalid, illegal or unenforceable only to the extent of such

# BITMAIN

v5.0

invalidity, illegality or limitation on enforceability without affecting the remaining provisions of this Agreement, or the validity, legality or enforceability of such provision in any other jurisdiction.

16.6.   <u>Counterparts</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

*[The remainder of this page is intentionally left blank for signature]*





v5.0

## APPENDIX I
## FORM OF SERVICE ORDER

Date: March 10, 2023

This is a Service Order under the Service Framework Agreement dated March 10, 2023 (the "**Service Framework Agreement**") between **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia of the United States of America (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**") and **MineOne Wyoming Data Center LLC.**, a corporation incorporated under the laws of the State of Delaware of the United States of America (File No. SR20222209695), having its registered office at 614N, Dupont Hwy, Suite 210, Dover 19901("Service Provider"). Unless otherwise specified, capitalized terms used herein shall have the same meaning as those defined in the Service Framework Agreement.

1.  **DATA CENTER FACILITY**

    This Service Order is corresponding to the Information Memorandum of Data Center Facility submitted by the Service Provider on January 19, 2023 with the reference number of BMHS2023002-01 attached hereto as EXHIBIT A (the "**Corresponding Memo**") as well as the Data Center Facility as described in the Corresponding Memo located at 635 Logistics Dr., Cheyenne, WY 82009.

2.  **HOSTING CAPACITY AND HOSTED SERVERS**

2.1.    Under this Service Order, Service Provider agrees to provide to BITMAIN Hosting Capacity as follows, together with the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets. The number of the Hosting Quantity shall be determined based on the calculation of each Hosted Server's power as 3,600W.

| Batch No. | Hosting Capacity (MW) | Hosting Quantity (Units) | |
|---|---|---|---|
| 1 | 35.28 | 9,800 | |
| **In Total** | **35.28** | **9,800** | |

Service Provider shall ensure that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for each batch of Hosted Servers to be in Online Status on or before the respective estimated power-on date as set forth in the table above. For avoidance of doubt, the Parties agree and acknowledge that if this Service Order is the first Service Order under the Service Framework Agreement, the estimated power-on date of the first (1st) batch shall be the Initial Date referred to in the Service Framework Agreement.

# BITMAIN

v5.0

2.2. Details of the Hosted Servers hereunder are as follows, subject to the specific model, rated hashrate, rated power and quantity of the Hosted Servers actually delivered to the Data Center Facility:

| Batch No. | Model | Rated Hashrate (T) | Rated Power (kW) | Hosting Capacity (MW) | Hosting Quantity (Units) | Estimated Arrival Date |
|-----------|-------|-------------------|------------------|----------------------|--------------------------|------------------------|
| 1 | S19XP | TBD | 3.6 | 35.28 | 9,800 | Before February 25th |
| In Total | - | - | - | 35.28 | 9,800 | - |



3.4. Taxes and Expenses.

Pursuant to the prevailing tax regulation of the State of Wyoming, the services provided by the Service Provider or the payment of any amounts made by BITMAIN are not



subject to turnover tax including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the turnover tax, hence the Service Provider shall not charge any additional taxes in relation to the services rendered under this agreement. If the tax regulation of the State of Wyoming changes, the taxes and expenses may be agreed and confirmed in writing by the Parties otherwise.

**4.    BILLING AND PAYMENT**

4.1.    The Prepayment is estimated to be paid as follows, subject to the quantity of the Hosted Servers powered-on as confirmed by documentation provided by Service Provider and the date of provision of such documentation by Service Provider:



4.2.    All payment of Hosting Fee under this Service Order, including any remittance or refund of Hosting Fee, shall be made:

☒  via wire transfer of immediately available funds in the US Dollars to the bank account of designated by the receiving Party; or

☐ via other methods: _____.

4.3.    Account Information of Service Provider

Account Name: Mineone Partners LLC
Bank Name: East West Bank
Bank Address: 9300 Flair Drive, 4th Fl. El Monte, CA 91731
Account Number: 8003223032
SWIFT CODE: EWBKUS66XXX

**5.    TERM AND TERMINATION OF SERVICE ORDER**

5.1.    This Service Order shall be effective from the date hereof and expire on the expiry or early termination of the Service Framework Agreement.

5.2.    This Service Order may be terminated prior to its expiry:

(a)    upon mutual agreement in writing of the Parties;



v5.0

(b) upon BITMAIN giving a written notice to Service Provider if the Data Center Facility fails to meet its standard operational conditions of the respective Hosting Capacity for the Hosted Servers to be in Online Status within thirty (30) calendar days after the estimated power-on date set forth in paragraph 2.1 of this Service Order; meanwhile, BITMAIN shall not be liable to pay Service Provider any fee, charges or expenses during the period of such operational conditions;

(c) upon Service Provider giving a written notice to BITMAIN if BITMAIN fails to deliver the first batch of Hosted Servers within thirty (30) calendar days from (i) the estimated arrival date set forth in paragraph 2.2 of this Service Order, or (ii) the actual date on which the Data Center Facility meets the standard operational conditions of the respective Hosting Capacity, whichever is later; and

(d) upon either Party giving a written notice of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination.

5.3. Upon expiry or early termination of this Service Order, Service Provider shall:

(a) in any event no later than five (5) Business Days from the expiry or early termination, issue the invoice of the Hosting Fee for the unpaid Billing Period, with the Reconciliation Statement for such unpaid Billing Period and the supporting documents proving the Power Consumption for the such Billing Period (e.g., photos of the Separate Meter showing the Power Consumption at the end of such Billing Period) as attachments to the invoice in accordance with Article 3.6(a) of the Service Framework Agreement; and

(b) issue to BITMAIN the updated invoice(s) of the Hosting Fees for the unpaid Billing Period(s) in accordance with Articles 3.6(b)(ii) and 3.6(b)(iii) of the Service Framework Agreement (if applicable).

5.4. Settlement of Last Invoice

BITMAIN shall make payment(s) to Service Provider to settle the outstanding amount in the invoice for the unpaid Billing Period(s) in accordance with Article 3.6(b) of the Service Framework Agreement (if applicable).

6. **PREVAILING PROVISION**

In the event of any discrepancy between the provision of this Service Order and the Service Framework Agreement, the provision in this Service Order shall prevail.

*[The remainder of this page is intentionally left blank for signature]*



**BITMAIN**

v5.0

## EXHIBIT A
## INFORMATION MEMORANDUM OF DATA CENTER FACILITY

Service Provider: **MineOne Wyoming Data Center LLC.**
Submission Date: January 19, 2023
Ref. Number: BMHS2023002-01

| BASIC INFORMATION | | | | | |
|---|---|---|---|---|---|
| Location | 635 Logistics Dr, Cheyenne, WY 82009 | | | | |
| Jurisdiction | State of Wyoming, U.S. | | | | |
| Land Area (sq. m) | 12.06 acre= 48,805.088 Square meters | | | | |
| Building Area (sq. m) | 1270 Square meters | | | | |
| Construction Structure | ☒ Steal Structure ☐ Warehouse ☐ Container | | | | |
| Designed No. of Racks | 6 Racks per MDC | | | | |
| Heat Dissipation Method | ☐ Hydro Cooling ☒ Air Cooling | | | | |
| Local Temperature (°C) | Max. | 29 | Min. | -8 | Avg. | 17 |
| Server Air Inlet Temperature (°C) | Max. | N/A, not energized | Min. | N/A | Avg. | N/A |
| Humidity (%) | 42.4% on average | | | | |
| Air Pressure (kPa) | 1000 on average | | | | |
| **ELECTRICAL POWER** | | | | | |
| Power Type | ☒Grid hybrid ☐ Wind ☐ Solar ☐ Hydro ☐ Nuclear | | | | |
| Max. Power Capacity (MW) | 45 MW | | | | |
| Minimum Power Commitment | ☐ Not Available  ☒ 10 MW | | | | |
| **NETWORK** | | | | | |
| Network Operator | Lumen and Star link | | | | |
| Network Bandwidth, Mb/s | 1000 | | | | |
| **COMPLIANCE STATUS** | | | | | |
| Project Approval Documents | ☐ Not Available  ☒ Provided to BITMAIN on [12/06/2022] | | | | |
| Power Purchase Agreement(s) | ☐ Not Available  ☒ Provided to BITMAIN on [12/06/2022] | | | | |
| Land Title Document | ☐ Not Available  ☒ Land Ownership Certificate OR ☐ Lease Agreement OR ☐ Land License Agreement provided to BITMAIN on [12/06/2022] | | | | |



v5.0



OTHER INFORMATION

[2] Please indicate the ultimate beneficial owner who is either (i) an individual, or (ii) a company listed on a qualified stock exchange.



v5.0

**IN WITNESS WHEREOF**, the undersigned have executed this Service Order on the date first written above.

Signed for and on behalf of BITMAIN



Signed for and on behalf of Service Provider



Page **34** of **36**

BITMAIN

v5.0

## APPENDIX II
## FORM OF RECONCILIATION STATEMENT

| Hosting Capacity 矿场容量 (MW) | Actual Hosting Quantity 实际托管数量 (Units) | Billing Period 计费周期 | Power Consumption 耗电量 (kW) | Online Status Ratio 在线率 | Actual Hosting Unit Price 实际托管单价(US$) | Total Hosting Fee 总费用(US$) |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL

Case 1:23-cv-00079-ABJ   Document 95-2   Filed 12/21/23   Page 57 of 85



## APPENDIX III
### FORM OF CONFIRMATION OF HOSTED SERVERS SECURITY
*[To Be Provided]*





v5.0

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN



Signed for and on behalf of Service Provider



# Exhibit B

## HISTORY, REORGANIZATION AND CORPORATE STRUCTURE

**Corporate structure immediately following the [REDACTED]**

The following diagram illustrates the simplified corporate and shareholding structure of our Company and principal subsidiaries immediately following the completion of the [REDACTED] (assuming the [REDACTED] is not exercised):



offshore

onshore

# Exhibit C

**Bitmain's Bitcoin Miner Sales (United States)**
**$1.7 Billion Identified**

| Date | Company | # Purchased | Bitcoin Miner Model (ASIC) | Amount |
|---|---|---|---|---|
| 2022 | Marathon (MARA)* | 78,000 | S19 XP | $879,060,000 |
| 11/7/2022 | CleanSpark | 10,000 | S19J PRO+ | $28,000,000 |
| 12/22/2022 | HIVE (HIVE) | 1,640 | S19J PRO | $3,280,000 |
| 2/14/2023 | Iris Energy | 44,000 | S19J PRO | $67,000,000 |
| 2/16/2023 | CleanSpark | 20,000 | S19J PRO+ | $32,300,000 |
| 4/13/2023 | CleanSpark | 45,000 | S19 XP | $144,900,000 |
| 4/18/2023 | DMG | 1,550 | S19 PRO, PRO +, XP | $3,100,000 |
| 6/1/2023 | CleanSpark | 12,500 | S19 XP | $40,500,000 |
| 6/7/2023 | Bitfarms | 4,660 | Mixed - S19J PRO | $7,700,000 |
| 7/14/2023 | Meten Holding | 200 | S19J PRO | $400,000 |
| 7/18/23 | TeraWulf (WULF) | 18,500 | S19J XP | $75,400,000 |
| 10/6/2023 | Iris Energy | | S21 | $19,600,000 |
| 10/11/2023 | CleanSpark | 22,000 | S21 | $61,600,000 |
| 11/3/2023 | BTC Digital | 220 | S19J PRO | $440,000 |
| 11/8/2023 | Cipher Mining | 6,000 | S21 | $16,800,000 |
| 11/14/2023 | HIVE (HIVE) | 4,800 | S19K | $10,560,000 |
| 11/20/2023 | Metavesco, Inc | 50 | S19J PRO | $100,000 |
| 11/22/2023 | Core Scientific (CORZ) | 27,000 | S19J XP | $77,000,000 |
| 11/27/2023 | Bitfarms | | T21 | $95,000,000 |
| 11/30/2023 | Iris Energy | 7000 | T21 | $18,600,000 |
| 12/1/2023 | BETS | 3300 | S19 | $6,600,000 |
| 12/6/2023 | DMG | 4,550 | T21 | $12,100,000 |
| 12/14/2023 | Blockstream | | S19k PRO | $4,800,000 |
| 12/15/2023 | Iris Energy | | T21 | $22,300,000 |
| 12/18/2023 | Cipher Mining | 37,396 | T21 | $99,500,000 |
| *largest US sale identified | | | **TOTAL:** | **$1,726,640,000** |

## Links to reference Bitmain bitcoin miner sales
## (number corresponds to line item above)

1. https://bitcoinmagazine.com/business/marathon-bought-78000-bitcoin-miners-for-879-million

2. https://www.coindesk.com/business/2022/09/07/bitcoin-miner-cleanspark-buys-10k-new-machines-for-28m-after-discounts-credits/

3. https://finance.yahoo.com/news/hive-blockchain-provides-results-shareholder-071400636.html

4. https://cointelegraph.com/news/iris-energy-to-nearly-triple-hashrate-with-estimated-44-000-new-btc-miners

5. https://www.globenewswire.com/en/news-release/2023/02/16/2609840/0/en/CleanSpark-Announces-Purchase-of-20-000-New-Latest-Generation-Mining-Machines.html

6. https://world.einnews.com/article/627612938

7. https://world.einnews.com/pr_news/628642266/update-dmg-announces-new-miner-purchases

8. https://world.einnews.com/pr_news/637099492/cleanspark-buys-12-500-antminer-s19-xP-bitcoin-miners-for-40-5m

9. https://world.einnews.com/pr_news/638144315/bitfarms-improves-energy-efficiency-with-purchase-of-4-660-high-performance-miners

10. https://www.prnewswire.com/news-releases/meten-holding-group-ltd-announces-purchaSe-of-200-units-of-antminer-s19j-pro-bitcoin-mining-machines-301877428.html

11. https://theminermag.com/news/2023-11-08/cipher-bitcoin-mining-q3

12. https://irisenergy.gcs-web.com/news-releases/news-release-details/iris-energy-increases-mining-capacity-25-70-ehs

13. https://www.prnewswire.com/news-releases/cleanspark-acquires-4-4-ehs-of-new-antminEr-s21-bitcoin-miners-expects-to-achieve-hashrate-of-over-20-ehs-301953163.html

14. https://finance.yahoo.com/news/btc-digital-ltd-announces-purchase-123000974.html

15. https://theminermag.com/news/2023-11-08/cipher-bitcoin-mining-q3

16. https://hivedigitaltechnologies.com/news/hive-digital-announces-purchase-of-4800-bitmain-s19k-pro-asic-miners-and-provides-strategic-update/

17. -

18. https://www.coindesk.com/business/2023/09/22/bankrupt-bitcoin-miner-core-scientific-to-buy-27k-bitmain-servers-for-77m/

19. https://www.globenewswire.com/news-release/2023/11/27/2786528/0/en/Bitfarms-Initiates-Transformative-Fleet-Upgrade-that-Supports-17-EH-s-and-391-MW-in-2024.html

20. https://irisenergy.gcs-web.com/news-releases/news-release-details/iris-energy-increases-mining-capacity-83-ehs

21. https://www.prnewswire.com/news-releases/bets-announces-purchase-of-3300-units-of-s19-miners-302003033.html

22. https://news.bitcoin.com/bitcoin-miner-dmg-acquires-4550-t21-antminers-for-12-1-million

23. https://cointelegraph.com/news/blockstream-targets-bitcoin-miner-surplus-series-2-basic-note

24. https://www.globenewswire.com/news-release/2023/12/15/2796924/0/en/Iris-Energy-Increases-Mining-Capacity-to-10-EH-s.html

25. https://www.globenewswire.com/news-release/2023/12/18/2797695/0/en/Cipher-Mining-Purchases-7-1-EH-s-of-New-Miners-and-Option-to-Purchase-an-Additional-8-7-EH-s-of-Latest-Generation-Miners-from-Bitmain.html

# Exhibit D



05-102
(Rev.9-15/33)

**Texas Franchise Tax Public Information Report**

To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP),
Professional Associations (PA) and Financial Institutions

■ **Tcode** 13196 Franchise

■ Taxpayer number

| 3 | 2 | 0 | 8 | 2 | 3 | 2 | 9 | 0 | 0 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|

■ Report year

| 2 | 0 | 2 | 2 |
|---|---|---|---|

**You have certain rights** under Chapter 552 and 559,
Government Code, to review, request and correct information
we have on file about you. Contact us at 1-800-252-1381.

| Taxpayer name | **BITMAIN DELAWARE HOLDING COMPANY, INC.** | ■ ○ Blacken circle if the mailing address has changed. |
|---|---|---|

| Mailing address | **GALLERIA TOWER I, 2700 POST OAK BOULEVARD** | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|

| City **HOUSTON** | State **TX** | ZIP code plus 4 **77056** | **0804356238** |
|---|---|---|---|

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | **GALLERIA TOWER I, 2700 POST OAK BOULEVARD, HOUSTON, TX, 770** |
|---|---|
| Principal place of business | **GALLERIA TOWER I, 2700 POST OAK BOULEVARD, HOUSTON, TX, 770** |

You must report officer, director, member, general partner and manager information as of the date you complete this report.

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

1000000000015

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name **RAN CHENG** | Title **DIRECTOR** | Director ● YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address | City | | State | ZIP Code |
| Name | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address | City | | State | ZIP Code |
| Name | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address | City | | State | ZIP Code |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| **BITMAIN DEVELOPMENT INC.** | **DE** | | **100.000** |
| **BITMAIN TECHNOLOGIES GEORGIA LIMITED** | **GA** | | **100.000** |

**SECTION C** Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file (see instructions if you need to make changes) | You must make a filing with the Secretary of State to change registered agent, registered office or general partner information. |
|---|---|
| Agent: | |
| Office: | City | State | ZIP Code |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

| I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution. | | | |
|---|---|---|---|
| sign here ▶ **RAN CHENG** | Title | Date | Area code and phone number ( ) - |

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|



05-102
(Rev.9-15/33)
FORM

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP),*
*Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | | | | | | | | | | | ■ Report year | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2 | 0 | 8 | 2 | 3 | 2 | 9 | 0 | 0 | 7 | 2 | 0 | 2 | 2 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| Taxpayer name | |
|---|---|
| **BITMAIN DELAWARE HOLDING COMPANY, INC.** | ■ ○ Blacken circle if the mailing address has changed. |

| Mailing address | |
|---|---|
| **GALLERIA TOWER I, 2700 POST OAK BOULEVARD** | Secretary of State (SOS) file number or Comptroller file number |

| City | State | ZIP code plus 4 | |
|---|---|---|---|
| **HOUSTON** | **TX** | **77056** | **0804356238** |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office  **GALLERIA TOWER I, 2700 POST OAK BOULEVARD, HOUSTON, TX, 770**

Principal place of business  **GALLERIA TOWER I, 2700 POST OAK BOULEVARD, HOUSTON, TX, 770**

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

1000000000015

**SECTION A**  Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | Term expiration | m m d d y y |
|---|---|---|---|---|---|
| | | ○ YES | | | |
| Mailing address | City | | State | | ZIP Code |
| Name | Title | Director | | Term expiration | m m d d y y |
| | | ○ YES | | | |
| Mailing address | City | | State | | ZIP Code |
| Name | Title | Director | | Term expiration | m m d d y y |
| | | ○ YES | | | |
| Mailing address | City | | State | | ZIP Code |

**SECTION B**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| **BITMAIN TECHNOLOGIES DELAWARE LIMITED** | **DE** | | **100.000** |
| **BITMAIN DELAWARE INVESTMENT COMPANY, INC.** | **DE** | | **100.000** |

**SECTION C**  Enter information for each corporation , LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

| Registered agent and registered office currently on file *(see instructions if you need to make changes)* | *You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.* |
|---|---|
| Agent: | |

| Office: | City | State | ZIP Code |
|---|---|---|---|
| | | | |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here ▶ | **RAN CHENG** | Title | Date | Area code and phone number ( ) - |
|---|---|---|---|---|

| **Texas Comptroller Official Use Only** | | | |
|---|---|---|---|
| | | VE/DE ○ | PIR IND ○ |

# Exhibit E

| | | |
|---|---|---|
| **Form 301**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: $750** | THE STATE OF TEXAS<br><br>**Application for**<br>**Registration of a**<br>**Foreign For-Profit**<br>**Corporation** | This space reserved for office use. |

1.  The entity is a foreign for-profit corporation. The name of the entity is:

Bitmain Technologies Georgia Limited

*Provide the full legal name of the entity as stated in the entity's formation document in its jurisdiction of formation.*

2A.  The name of the corporation in its jurisdiction of formation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof). The name of the corporation with the word or abbreviation that it elects to add for use in Texas is:

2B.  The corporation name is not available in Texas. The assumed name under which the corporation will qualify and transact business in Texas is:

*The assumed name must include an acceptable organizational identifier or an accepted abbreviation of one of these terms.*

3.  Its federal employer identification number is:          32-0662275

☐  Federal employer identification number information is not available at this time.

4.  It is incorporated under the laws of: (set forth state or foreign country)    **Georgia**

and the date of its formation in that jurisdiction is:          07/23/2021
<i>mm/dd/yyyy</i>

5.  As of the date of filing, the undersigned certifies that the foreign corporation currently exists as a valid corporation under the laws of the jurisdiction of its formation.

6.  The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below.

Technology

The corporation also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is incorporated.

7.  The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is:          02/28/2023
<i>mm/dd/yyyy     Late fees may apply (see instructions).</i>

8.  The principal office address of the corporation is:

478 County Road 118, Pecos, TX, 79772

| *Address* | *City* | *State* | *Country* | *ZipCode* |
|---|---|---|---|---|

Complete item 9A or 9B, but not both.  Complete item 9C.

☒ 9A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

COGENCY GLOBAL INC.

**OR**

☐ 9B.  The initial registered agent is an individual resident of the state whose name is:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

9C.  The business address of the registered agent and the registered office address is:

| 1601 Elm Street, Suite 4360 | Dallas | TX | 75201 |
|---|---|---|---|
| *Street Address* | *City* | *State* | *Zip Code* |

10.  The corporation hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11.  The name and address of each person on the board of directors is:

| Director 1 | | | | | |
|---|---|---|---|---|---|
| Ran | | Cheng | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| Building 1, No. 9, Courtyard | Fenghao, East Road | Beijing | China | 100094 | |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* | |

| Director 2 | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| | | | | | |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* | |

| Director 3 | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| | | | | | |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* | |

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

**Effectiveness of Filing** (Select either A, B, or C.)

A. [X] This document becomes effective when the document is filed by the secretary of state.

B. [ ] This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. [ ] This document takes effect upon the occurrence of a future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

---

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:     2/7/23

Signature of authorized person (see instructions)

Ailan Liu

Printed or typed name of authorized person.



# CERTIFICATE OF FACT

I, CHRISTI JACOBSEN, Secretary of State for the State of Montana, do hereby certify the following information for the Foreign Profit Corporation:

## Bitmain Technologies Georgia Limited

Date Incorporated: July 23, 2021                    Qualification Date: February 13, 2023

Term: Perpetual                                          Status: Active-Good Standing

Jurisdiction: Georgia

Purpose: Technology

Registered Agent: COGENCY GLOBAL INC

Agent Physical Address: SUITE 2B 40 WEST 14TH ST, HELENA, MT 59601, UNITED STATES

Agent Mailing Address: SUITE 2B 40 WEST 14TH ST, HELENA, MT 59601, UNITED STATES

Principal Office Address: 200 TECHNOLOGY WAY, BUTTE, MT 59701-5970, UNITED STATES

Directors / Officers
- Ran  Cheng, BUILDING 1, NO. 9, COURTYARD FENGHAO EAST ROAD, HAIDIAN DISTRICT BEIJING, 100094, CHINA CHINA

History Details:

- 02/13/2023 Initial Filing
- 08/11/2023 (RA) Statement of Change of Commercial Registered Agent

Bitmain Technologies Georgia Limited (F1340180)



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State of Montana, at Helena, the Capital, this 4th day of December, 2023

Christi Jacobsen

Christi Jacobsen
Montana Secretary of State

Certificate Number: 47853942

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

Filing ID: 230214-0910244

Filing Date: 02/13/2023

Dec 05 2023
REFERENCE ID: 1489293

**STATE OF SOUTH CAROLINA**
**SECRETARY OF STATE**

*Mark Hammond*
SECRETARY OF STATE OF SOUTH CAROLINA

**A FOREIGN CORPORATION FOR A CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS IN THE STATE OF SOUTH CAROLINA**

Pursuant to Section 33-15-103 of the 1976 South Carolina Code of Laws, as amended, the undersigned corporation hereby applies for authority to transact business in the State of South Carolina, and for that purpose, hereby submits the following statement:

1. The name of the corporation is (see Sections 33-4-101 and 33-15-106 and Section 33-19-500 (b)(1) if the corporation is a professional corporation. (Must match corporation name on certificate of existence from domestic state)

   Bitmain Technologies Georgia Limited

2. It is incorporated as (check applicable item) [X] a general business corporation, [ ] a professional corporation under the laws of the state of _Georgia_

3. The date of its incorporation is _07/23/2021_ and the period of its duration is _Perpetual_

4. The address of the principal office of the corporation is:
   2600 Weaver Rd.
   _____
   (Street Address)
   Macon, Georgia 31217
   _____
   (City, State, Zip Code)

5. The address of the proposed registered office in the state of South Carolina is:
   2 Office Park Court, Suite 103
   _____
   (Street Address)
   Columbia _____ South Carolina ____ 29223 ____
   (City)                                            (Zip Code)

6. The name of the proposed registered agent in South Carolina at such address is
   Cogency Global
   _____
   (Print Name)
   I hereby consent to the appointment as registered agent of the corporation
   _____
   (Signature of the Registered Agent)

Form Revised by South Carolina Secretary of State, April 2018
F0002
SC Secretary of State
Mark Hammond

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

Dec 05 2023
REFERENCE ID: 1489293

*Mark Hammond*
SECRETARY OF STATE OF SOUTH CAROLINA

| Bitmain Technologies Georgia Limited |
| --- |
| |

Name of Corporation

7. The name and usual business address of the corporation's directors (if the corporation has no directors, then the name and address of the persons who are exercising the statutory authority of the directors on behalf of the corporation) and principal officers:

a.) Ran Cheng
(Director Name)
Building 1, No. 9, courtyard, Fenghao East Road

(Business Address)
Haidian District, Beijing, China, International 10009
(City, State, Zip Code)


(Director Name)


(Business Address)


(City, State, Zip Code)


(Director Name)


(Business Address)


(City, State, Zip Code)

b.) Ran Cheng
(Principal Officer Name)
CEO
(Principal Officer Position)
Building 1, No. 9, courtyard, Fenghao East Road

(Address)
Haidian District, Beijing, China, International 10009
(City, State, Zip Code)


(Principal Officer Name)


(Principal Officer Position)

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

Dec 05 2023

REFERENCE ID: 1489293

*Mark Hammond*
SECRETARY OF STATE OF SOUTH CAROLINA

Bitmain Technologies Georgia Limited

Name of Corporation

_____
(Address)

_____
(City, State, Zip Code)

_____
(Principal Officer Name)

_____
(Principal Officer Position)

_____
(Address)

_____
(City, State, Zip Code)

8.  The aggregate number of shares which the corporation has authority to issue, itemized by classes and series, if any,
    within a class: (if no shares are issued please enter "none")

    Class of Shares (and Series, if any)        Authorized Number of Each Class (and Series)
    Ran Cheng                                    100
    _____             _____
    _____             _____

9.  Unless a delayed date is specified, this application shall be effective when accepted for filing by the Secretary of State
    (See Section 33-1-230): _____

Date: 02/13/2023
      _____

Name of Corporation:

Bitmain Technologies Georgia Limited

Ran Cheng
_____
Signature of Officer

Ran Cheng
_____
Type or Print Name

CEO
_____
Position of Officer

Form Revised by South Carolina Secretary of State, April 2018
F0002

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

Dec 05 2023
REFERENCE ID: 1489293

*Mark Hammond*
SECRETARY OF STATE OF SOUTH CAROLINA

Control Number : 21203283

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

## CERTIFICATE OF EXISTENCE

I, **Brad Raffensperger**, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that

### Bitmain Technologies Georgia Limited
#### a Domestic Profit Corporation

was formed in the jurisdiction stated below or was authorized to transact business in Georgia on the below date. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.

| | | |
|---|---|---|
| Docket Number | : | 24431385 |
| Date Inc/Auth/Filed | : | 07/23/2021 |
| Jurisdiction | : | Georgia |
| Print Date | : | 02/01/2023 |
| Form Number | : | 211 |



*Brad Raffensperger*

**Brad Raffensperger**
**Secretary of State**

# Commonwealth of Kentucky
# Michael G. Adams, Secretary of State

P101
1260420
Michael G. Adams
KY Secretary of State
Received and Filed
**2/14/2023 12:00:00 AM**
**Fee receipt:  $90.00**

Michael G. Adams
Secretary of State
P. O. Box 718
Frankfort, KY 40602-0718
(502) 564-3490
http://www.sos.ky.gov

## Certificate of Authority

**FBE**

Pursuant to the provisions of KRS 14A.9 - 030 the undersigned hereby applies for authority to transact business in Kentucky on behalf of the entity named below and,  for that purpose, submits the following statements.

1. The business entity is a **profit corporation.**

2. The name of the entity is: **BITMAIN TECHNOLOGIES GEORGIA LIMITED**

3. The name of the entity to be used in Kentucky is (if applicable): **N/A**

4. The state or country whose law the entity is organized is **California.**

5. The date of organization is **7/23/2021** and the period of duration is **perpetual.**

**7. Principal Office**

325 Prison Connector, Sandy Hook, KY 41171

**8. Registered Agent/Office**

828 Lane Allen Road, Suite 219, Lexington, KY 40504

I, **Cogency Global Inc.,** consent to serve as the **Registered Agent** on behalf of this Entity.
on Tuesday, February 14, 2023

As the Authorized Representative, I, **Ailan Liu** , declare under penalty of perjury under the laws of the state of Kentucky that the foregoing is true and correct.



**WASHINGTON**
Secretary of State
**Corporations & Charities Division**

| |
|---|
| Filed<br>Secretary of State<br>State of Washington<br>Date Filed: 02/16/2023<br>Effective Date: 02/16/2023<br>UBI #: 604 905 113 |

# FOREIGN REGISTRATION STATEMENT

## UBI NUMBER

UBI Number:
**604 905 113**

## BUSINESS NAME

Business Name
**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

## JURISDICTION

Country:
**UNITED STATES**

State:
**GEORGIA**

## DOING BUSINESS AS (DBA) NAME    RCW 23.95.525

DBA Name:

## REGISTERED AGENT    RCW 23.95.410

| Registered Agent Name | Street Address | Mailing Address |
|---|---|---|
| COGENCY GLOBAL INC. | 1780 BARNES BLVD SW, TUMWATER, WA, 98512-0410, UNITED STATES | |

## REGISTERED AGENT CONSENT

Customer provided Registered Agent consent? * - **Yes**

## PRINCIPAL OFFICE

Phone:
**562-436-2000**

Email:
**MARIA.SMITH@KYL.COM**

Street Address:
**BUILDING 1, NO. 9 COURTYARD, FENGHAO EAST ROAD, HAIDIAN DISTRICT, BEIJING, 100094, CHINA**

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2023020600104104 - 1
Received Date: 02/06/2023
Amount Received: $200.00

Mailing Address:
**400 OCEANGATE STE 1400, LONG BEACH, CA, 90802-4325, UNITED STATES**

## GOVERNORS

| Title | Governor Type | Entity Name | First Name | Last Name |
|-------|---------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | REN | CHENG |

## DATE OF FORMATION IN HOME JURISDICTION

Date of formation in its Home Jurisdiction:
**07/23/2021**

## PERIOD OF DURATION IN HOME JURISDICTION

Duration:
**PERPETUAL**

## NATURE OF BUSINESS

Nature of Business:
**OTHER SERVICES**
**TECHNOLOGY**

## DATE BEGAN DOING BUSINESS IN WASHINGTON

Date Began doing Business in WA:
**02/16/2023**

## EFFECTIVE DATE

Effective Date:
**02/16/2023**

## CERTIFICATE OF EXISTENCE

Certificate of Existence is included? **- Yes**

## UPLOAD ADDITIONAL DOCUMENTS

| Name | Document Type |
|------|---------------|
| No Value Found. | |

## UPLOADED DOCUMENTS

| Document Type | Source | Created By | Created Date |
|---------------|--------|------------|--------------|
| CERTIFICATE OF EXISTENCE | ONLINE | KEFFLYN MATHEWS | 02/06/2023 |

## EMAIL OPT-IN

☑   I hereby opt into receiving all notifications from the Secretary of State for this entity via email only. I acknowledge that I will no longer receive paper notifications.

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2023020600104104 - 1
Received Date: 02/06/2023
Amount Received: $200.00

## AUTHORIZED PERSON - STAFF CONSOLE

☑ Document is signed.

Person Type:
**INDIVIDUAL**

First Name:
**AILAN**

Last Name:
**LIU**

Title:
**AUTHORIZED PERSON**

This document is a public record. For more information visit www.sos.wa.gov/corps

Work Order #: 2023020600104104 - 1
Received Date: 02/06/2023
Amount Received: $200.00



**Details**

**For service of process contact the** <span style="color:blue">**Secretary of State's office.**</span>

LLC Member information is now confidential per Act 865 of 2007

**For access to our corporations bulk data download service** <span style="color:blue">click here.</span>

Corporation Name
BITMAIN TECHNOLOGIES GEORGIA LIMITED

Fictitious Names
—

Filing #
811434038

Filing Type
Foreign For Profit Corporation

Filed Under Act
For Bus Corp; 958 of 1987

Status
Good Standing

Principal Address
1150 HIGHWAY 113 MORRILTON, AR 72110

Reg. Agent
COGENCY GLOBAL INC

Agent Address
1215 TWIN LAKES DRIVE LITTLE ROCK, AR 72205

Date Filed
04/27/2023

Officers
AILAN LIU, Incorporator/Organizer
RAN CHENG, CEO

Foreign Name
—

Foreign Address

400 OCEANGATE, SUITE 1400 LONG BEACH, CA 90802

State of Origin
GA
Purchase a Certificate of Good Standing for this Entity
Pay Franchise Tax for this corporation

Exhibit F

**From: Info@MineOne** info@mineonepartners.com
**Subject:** Re: bitmain
**Date:** January 30, 2023 at 6:12 PM
**To:** Michael Murphy  murf@bcbv.net
**Cc:** Emory Patterson  emory@bcbv.net,  Neil Phippen  neil@bcbv.net,  Jiaming Li  jli@mineonepartners.com

it is mineone

Get Outlook for iOS

---

**From:** Michael Murphy <murf@bcbv.net>
**Sent:** Tuesday, January 31, 2023 8:01:30 AM
**To:** Info@MineOne <info@mineonepartners.com>
**Cc:** Emory Patterson <emory@bcbv.net>; Neil Phippen <neil@bcbv.net>; Jiaming Li <jli@mineonepartners.com>
**Subject:** Re: bitmain

Hi Haku, thanks for this info.

When I click on the hosting agreement, it is asking me for a password to access it.  Can you please share that with me?

On Mon, Jan 30, 2023 at 9:38 AM Info@MineOne <info@mineonepartners.com> wrote:

> Hi Michael,
>
> Please find attached bitmain's water quality requirement and the hosting agreement's google drive link (https://drive.google.com/file/d/135d9vvob_j1wvJxCXIWukSPALYUtcdzH/view?usp=sharing). Please do keep it confidential because we have a confidentiality term in the agreement.