# EXHIBIT 1

# **EXPERT REPORT OF PATRICK GAHAN**

dated February 28, 2024
regarding Plaintiff's Damages
in the matter of:

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability company,<br><br>              Plaintiff,<br>v.<br><br>MINEONE WYOMING DATA CENTER LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; BITMAIN TECHNOLOGIES HOLDING COMPANY, a Cayman Island Company; BITMAIN TECHNOLOGIES GEORGIA LIMITED, a Georgia corporation; and JOHN DOES 1-18, related persons and companies who control or direct some or all of the named Defendants.<br><br>              Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 23-CV-79-ABJ |

I, Patrick Gahan, was retained by Williams, Porter, Day & Neville, P.C. as an Expert Witness for the Plaintiff and to produce this Expert Report (the "Report"). The purpose of the engagement was to determine the Plaintiff's damages, as a result of Defendants' actions, relating to (a) Plaintiff's Development, Hosting, and Services Agreement, dated June 9, 2022, with Defendant MineOne Wyoming Data Center LLC ("MOW") and (b) Plaintiff's Consultancy Services Agreement, dated June 9, 2022, with Defendant Terra Crypto, Inc. ("Terra"). Based on my analysis below, the total damages Plaintiff has suffered as a result of Defendants' actions is **$38,983,848.00** as of the date of my Report (February 28, 2024), which then increases to **$42,058,001.00** as of the scheduled trial date (January 27, 2025).

## 1. PRELIMINARY INFORMATION

### 1.1. QUALIFICATIONS

1.1.1. **Background.** I am a highly experienced business executive, business owner, and consultant, with a deep understanding of the complex financial and operational aspects involved in managing and running diverse business ventures. In my most recent position as the CFO and Chairman of the Board at Waha Technologies (now Global Digital Holdings or GDH), I successfully oversaw the operations of over 40MW of bitcoin mining data centers. This includes managing both hosted client ASIC miners and GDH's own ASIC miners. In doing this, I gained extensive knowledge of power contracts and the efficient functioning of large-scale bitcoin mining operations.

1.1.2. I began my career with Booz Allen Hamilton and Lockheed Martin, developing custom software applications and managing large teams of software engineers. I then founded, grew, and sold Seismic, which specialized in creating custom cybersecurity software applications primarily for serving the government intelligence sector.

1.1.3. In 2011, I initiated a series of ALDER branded companies, which are now collectively recognized as ALDER Capital Partners. I grew four vintages of private SFR investment entities and four income, debt, and venture funds. I am currently a principal owner, managing member or financial partner in several different funds and operating entities, as well as a board member of, and advisory consultant to several start-up companies.

1.1.4. Since inception, ALDER Capital Partners and its affiliate entities have underwritten and funded over $200M in loans, and secured real estate backed

financing of over $60M. The team at ALDER prioritizes credit risk assessment and management as a critical aspect of operations.

1.1.5.  I bring a wealth of experience and value to complex restructuring engagements through my expertise in modeling, creative deal structure, contract review, and track record for negotiating win-win scenarios in difficult business situations. I have brought hands-on turnaround experience in the cryptocurrency sector over the last several years, along with strong relationships in domestic banking, strategic private debt, equity, and crypto.

1.1.6.  **Curriculum Vitae.**  My curriculum Vitae, along with a list of prior court involvements and my Rule 26 Disclosure, is attached hereto as "Exhibit A."

1.1.7.  **Other Similar Cases and Work.**  I am presently working on a case regarding a 15MW+ bitcoin mining farm in North Carolina to which it has been alleged that the host has been overcharging the clients pursuant to the maximum wattage allowed to be charged per contractual agreements. I am responsible for calculating the damages of five clients being submitted to arbitration.

1.1.8.   In my role as Chairman of the Board at GDH, I led the contract dispute discussions with the city of Washington, GA that canceled, without notice, the fixed price power contract with GDH due to the city's inability to source power at the rate they were contracted to sell to GDH; I facilitated the sale of a 36MW bitcoin mining operation in Washington, GA to a publicly traded company, CleanSpark, that was able to transfer in a neighboring city power contract to resolve GDH's power issue with the city; and I reviewed and approved the final site selection and power agreements for five new bitcoin mining operation locations.

## 1.2. PARTIES, THEIR KEY PERSONNEL & AGREEMENTS

1.2.1.   After BCB Cheyenne LLC's ("BCB") founding members (Michael Murphy, Emory Patterson, and Neil Phippen) won a competitive RFP for electrical power located around Cheyenne, WY in September 2021, BCB and Cheyenne, Light, Fuel & Power Company ("CFLPC"), a wholly owned subsidiary of Black Hills Energy Corporation ("BHE"), negotiated and entered into the Blockchain Interruptible Electric Service Agreement on February 22, 2022 ("Original BCIS Agreement"), which provided BCB with 45MW of electrical power in the North Range Business Park and 30MW of electrical power in the Campstool Business Park.  During this time and over the ensuing months, BCB put parcels of land

under contract at each site, initiated site plans for those parcels, and worked to secure financing for the project.

1.2.2.   In March 2022, BCB, Erick Rengifo, and Jiaming Li initiated discussions for Rengifo/Li managed and/or controlled entities to finance the project, with the requirement that the Rengifo/Li entities would "own and control" the project, meaning that those entities would:
- be assigned BCB's BCIS Agreement (or a revised, and more favorable version, thereof)
- purchase and own the land at both the North Range site and Campstool site
- contract and pay for the construction of bitcoin mining data centers at both the North Range site and Campstool site, and
- provide the bitcoin mining machines that would be hosted at both the North Range site and Campstool site.

1.2.3.   BCB offered to sell the development opportunity to the Rengifo/Li entities (including all of BCB's work to date) for $8.79M (if paid up-front) or $17.59M (if paid over the five year term of the Original BCIS Agreement).  Erick Rengifo countered with an offer to pay BCB (a) to assist in implementing the sites and (b) to provide operation and maintenance ("O&M") services after the sites were implemented.

1.2.4.   On June 9, 2022, the following took place:
- BCB effectively assigned a more favorable Restated BCIS Agreement ("Restated BCIS Agreement") to MineOne Wyoming Data Center LLC ("MOW")
- MOW and CLFPC entered into the Restated BCIS Agreement
- BCB and MOW entered into the Development, Hosting, and Services Agreement ("DHS Agreement") for BCB to provide implementation and O&M services to MOW
- BCB and MOW signed the Side Letter Re Digital Mining Facilities - Right of First Refusal ("Side Letter")
- BCB and Terra Crypto Inc ("Terra"), as required by the DHS Agreement, entered into the Consultancy Services Agreement ("CS Agreement"), whereby Terra would provide expert support to BCB, and through which Terra contractually promised to be responsible for ensuring that all the processes, activities and tasks with regard to the building of the sites are developed in a timely manner."  The CS Agreement, along with the DHS

Agreement and Side Letter, are collectively referred to as the "Primary Agreements" in this Report.

1.2.5.  On June 16, 2022, Bit Origin Ltd ("BO"), a publicly traded company on the NASDAQ exchange, issued a press release stating "Bit Origin Enter Agreement To Develop a 75MW Cryptominine Data Center in Cheyenne, Wyoming."  At that time BO owned 3,628 bitcoin mining machines, all of which were held in its wholly owned subsidiary SonicHash LLC ("SH").  MOW and Terra, together with BO and SH are collectively referred to as MOTBO (in Plaintiff's First Amended Complaint and in this Report).  Many key individuals related to the Defendants - for example, Erick Rengifo, Jiaming Li, Haku Du, Wiley Zhang, and several others - were and/or still are working for one or more of the MOTBO entities, such that the MOTBO entities appeared to be acting as alter egos of one another.

1.2.6.  Over the course of June 2022 to October 2022, MOW signed contracts directly with contractors and vendors to assist MOW in developing the North Range site and Campstool site, including but not limited to the following parties with significant site development and/or material responsibilities:
- CEGEN Green Energy Ltd, D.B.A CryptoCache ("CEGEN")
- Shermco Industries, Inc ("Shermco")
- Jiangsu Huapeng Transformer Company ("HuaPeng")
- Belyea Company ("Belyea")

1.2.7.  On or around December 2022, Bitmain Technologies Georgia Limited ("Bitmain") began negotiations with MOTBO to (i) host thousands of Bitmain bitcoin mining machines at the North Range site and the Campstool site and (ii) provide one or more multi-million dollar loans to MOTBO.  Eventually, Bitmain and MOW entered into a Service Framework Agreement ("NR SF Agreement").  Discovery is still pending to determine if Bitmain and MOTBO entered into any loan agreements, SF Agreements related to Campstool, and/or any other agreements.

1.2.8.  Over the course of June 2022 to March 2023, BCB substantially performed its contractual obligations to MOW under the DHS Agreement without breaching the DHS Agreement.  BCB also continued working on the Campstool site (at the direction of MOTBO, and with MOTBO paying fees and costs related to the site plan, engineering, and permits), eventually receiving approval (from the City of Cheyenne Department of Planning and Development, Cheyenne Department of Buildings, and Campstool Business Park Association) for MOW to build a bitcoin mining facility within the Campstool Business Park, which approval was a

requisite step for MOW to then close on the purchase of the Campstool Parcel and initiate implementation of the bitcoin mining facility at that location.

1.2.9.  At some point between December 2022 and March 2023, Bitmain, who was aware of the DHS Agreement between BCB and MOW, informed MOTBO that it did not want BCB to be the O&M service provider at either of the two sites (North Range and Campstool).  In March 2023, MOTBO informed BCB that Bitmain did not want BCB to be the O&M service provider at the North Range site, and that MOTBO was (a) removing BCB as the O&M service provider at North Range (and would not be paying BCB the agreed-upon consideration tied to those services) and (b) that BCB's services would no longer be needed at the Campstool site (and that MOW would not be paying BCB the agreed-upon consideration tied to those services).

## 1.3.  PLAINTIFF'S FILED COMPLAINTS

1.3.1.  On March 15, 2023, BCB filed its COMPLAINT FOR BREACH OF CONTRACT, ANTICIPATORY REPUDIATION OF CONTRACT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, ALTER EGO LIABILITY, ENTERPRISE LIABILITY, AND LOST PROFITS AND MONEY DAMAGES in Wyoming Chancery Court against several MOTBO-related defendants.  Defendants timely filed an objection to proceeding in Wyoming Chancery Court, as allowed by Rule 3 of the Wyoming Rules of Civil Procedure for Chancery Court, on May 2, 2023 (which requires the Court to dismiss the action without prejudice if any party timely objects to proceeding in Chancery Court).  The Chancery Court Case was later dismissed on May 12, 2023 based upon Defendant's timely objection and BCB's Stipulation to the dismissal of the case without prejudice.

1.3.2.   On May 2, 2023, upon learning that its Wyoming Chancery Court Case would be dismissed, BCB prepared and filed on May 3, 2023 its COMPLAINT FOR BREACH OF CONTRACT, ANTICIPATORY REPUDIATION OF CONTRACT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, ALTER EGO LIABILITY, ENTERPRISE LIABILITY, AND LOST PROFITS AND MONEY DAMAGES in the United States District Court for the District of Wyoming against MOTBO.

1.3.3.  On September 30, 2023, BCB filed its FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, ANTICIPATORY REPUDIATION OF CONTRACT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS,

ALTER EGO LIABILITY, ENTERPRISE LIABILITY, AND LOST PROFITS AND MONEY DAMAGES, which named Bitmain as an additional defendant for intentionally interfering with BCB's Primary Agreements with MOW and Terra.

1.3.4.   BCB's First Amended Complaint makes the following six claims for relief:
- First Claim - Breach of contract against MOW, including anticipatory repudiation of the DHS Agreement and Side Letter
- Second Claim - Breach of the implied covenant of good faith and fair dealing against MOW
- Third Claim - Breach of the CS Agreement against Terra
- Fourth Claim - Breach of the implied covenant of good faith and fair dealing against Terra
- Fifth Claim - Intentional interference with BCB's Primary Agreements with MOW and Terra, against Bitmain, BO, and SH
- Sixth Claim - Alter ego and enterprise liability against MOTBO

## 1.4.   INFORMATION CONSIDERED AND DOCUMENTS REVIEWED

1.4.1.   BATES BCB 000011-000030.  The Blockchain Interruptible Service Agreement ("Original BCIS Agreement"), dated and effective February 22, 2022, between CLFPC and BCB.  Among other things, this agreement attests to (i) significant value created by BCB, which it later effectively assigned to MOW in return for promised consideration as provided for in the DHS Agreement and (ii) BCB's plan to develop, and CLFPC's desire to provide power to, bitcoin mining facilities consuming no less than 75MW.

1.4.2.   Communications between BCB and MOTBO for the purpose of doing a deal for the opportunity to develop bitcoin mining sites using power from CLFPC, including but not limited to the following:
- BATES BCB 000043-000044. Michael Murphy's March 28, 2022 email with the BCB's original asking price of $17.59M (with payments spread over five years)
- BATES BCB 0406294.  Dr. Erick Rengifo's financial diagram from an April 4, 2022 call with Michael Murphy, which outlined MOTBO's counter-offer of $21.40M (with payments spread over five years, and which also included compensation to BCB for serving as the O&M Service Provider of both the North Range facility and Campstool facility).

1.4.3. <u>BATES BCB 00031-00033</u>.  The First Amendment to the BCIS Agreement, dated April 8 2022, between CLFPC and BCB, which amended the Effective Date of the BCIS Agreement to April 8, 2022.

1.4.4. <u>BATES BCB 00034-00035</u>.  The Second Amendment to the BCIS Agreement, dated May 23 2022, between CLFPC and BCB, which amended the Effective Date of the BCIS Agreement to April 29, 2022.

1.4.5. Communication, documents, and actions identified in <u>Michael Murphy's Campstool Affidavit</u> that ultimately led to MOW purchasing 9010 Venture Drive, Cheyenne WY 82007 (the "Campstool Parcel"), exercising its option for 30MW of power at the Campstool location in its Restated BCIS Agreement with CLFPC, and thereby including the aforementioned 30MW into the budget mentioned by the DHS Agreement, including but not limited to the following:
- BCB's Original BCIS Agreement and pre-final drafts of the DHS Agreement and Restated BCIS Agreement, which included the 30MW at Campstool site as a contractual requirement (rather than as an "option").
- Emails between BCB and agents and/or representatives of Campstool Land Company showing the Campstool Land Company would not allow the assignment of BCB's Campstool Lot 2 Purchase Agreement to MineOne (which effectively blocked the purchase of land at Campstool by MineOne around the time of the Primary Agreements).  This was the reason why (a) CLFPC's provision of 30MW was converted to an "option" in the Restated BCIS Agreement (rather than a contractual requirement, as it was in the Original BCIS Agreement) and (b) the addition of 30MW into the DHS Agreement Budget would occur in the future (rather than at the outset of the DHS Agreement).
- Documents and communication related to the work performed by BCB (at MineOne's direction and with MineOne's approval), MOW's vendor agreements, and MOW's vendor payments to obtain approval from the Campstool Architectural Review Committee such that MOW could build and operate a bitcoin mining facility on the Campstool Parcel.  With this approval, MOW would close on the purchase of the Campstool Parcel and exercise the option in the Restated BCIS Agreement for CLFPC to provide the 30MW at Campstool.
- The signed "Blockchain Interruptible Service Agreement – Security Fund" Letter, dated February 24, 2024, indicating that MOW was exercising the option in MOW's Restated BCIS Agreement to expand its service to the Campstool Parcel for 30MW.

- The General Warranty Deed, dated February 28, 2023 and recorded May 1, 2023, for the Campstool Parcel (9010 Venture Dr, aka Campstool Addition Fourth Filing: Lot 1, Block 4), documenting that MOW purchased the Campstool Parcel.

1.4.6. Communication, documents, and actions identified in Emory Patterson's Power Expansion Affidavit that indicate BCB's knowledge of, intent to develop, and actions taken to prepare for the eventual development of, additional power tranches at the North Range site and Campstool site beyond the initial 45MW and 30MW available at each respective site - such that the expansions were reasonably foreseeable and that the damages associated with them are contract damages (not consequential damages) - including but not limited to the following:

- Internal communications between BCB members, based on calls with BHE, discussing the availability of additional power capacity beyond the initial 75MW in the Original BCIS Agreement.
- BATES BCB 046810-046812; 046817-046818.  Emails between BCB and Shermco indicating the availability of additional power capacity beyond the initial 75MW in the Original BCIS Agreement.
- Several site plans for the North Range Parcel showing the intention to expand the North Range site beyond the initial 45MW, including:
  - BATES BCB 001812. The original site plan design prepared for BCB reflecting phase 1 modular data centers and a phase 2 steel building for future expansion.
  - BATES BCB 001735.  The original site plan design submitted to Laramie County Planning and Development (LCPD) and approved on June 13, 2022;
  - BATES BCB 046427.  A revised site plan draft based upon MOW's selected data center design (which also removed the phase 2 steel building for future expansion); and
  - BATES BCB 001736.  The final site plan submitted to LCPD and approved on August 18, 2022 (based on the draft providing for expansion beyond 45MW).
- Several site plans for the Campstool Parcel showing the intention to expand the Campstool site beyond the initial 30MW, including:
  - BATES BCB 046419. The original site plan design prepared for BCB reflecting (22) 2.5 MW data centers on Campstool Lot #2
  - BATES BCB 046422. An updated site plan resulting from a request by MineOne to change the 2.5 MW data centers to a 40'x8' 2 MW data center. The change resulted in (28) total data centers able to consume 56 MW.

- ○ BATES BCB 046804. A preliminary site plan for Campstool Lot #1 that reflects (10) data centers, where (3) data centers are labeled 'Future Data Center'.
- ○ BATES BCB 046433. An final updated copy of the site plan for Campstool Lot #1 that reflects (10) data centers, where (3) data centers are labeled 'Future Data Center'. This site plan was used in the permit application.

1.4.7.  BATES BCB 047399-047402.  Michael Murphy's June 4, 2022 email to Erick Rengifo regarding the Side Letter which provides additional context as to why the Side Letter provides a buy-out amount in the event the facilities are sold to a third party which does not want BCB to serve as the O&M Service Provider.

1.4.8.  BATES BCB 000100-000102.  The Third Amendment to and Restatement of the BCIS Agreement, dated June 9, 2022, between CLFPC and BCB, which effectively assigned BCB's BCIS Agreement to MOW.

1.4.9.  BATES BCB 000104-000125; BATES BCB 000103.  The Restated BCIS Agreement, dated June 9, 2022, between CLFPC and MOW, including Exhibit A thereto.  Among other things, this Restated BCIS Agreement (a) provided the ability for MOW (and BCB through its DHS Agreement with MOW) to receive savings from CLFPC procuring lower priced power and (b) converted the 30MW of power at Campstool from a specific contractual inclusion to an exercisable option by MOW (to allow MOW additional time to receive approval from the Campstool Architectural Review Committee prior to MOW closing on the purchase of the Campstool Parcel).

1.4.10.  BATES BCB 000068-000090.  The Development, Hosting & Services Agreement ("DHS Agreement"), dated June 9, 2022, between MOW and BCB.  It is the key document that governed the relationship between MOW and BCB. Among other things, it specified MOW's obligations (which MOW breached), BCB's obligations (which it fulfilled), and BCB's compensation for fulfilling its obligations (which BCB has now been denied due to MOW's breach).

1.4.11.  BATES BCB 000093-000099.  The Consultancy Services Agreement ("CS Agreement"), dated June 9, 2022, between Terra and BCB.  MOTBO required this agreement in order for Terra to bring its purported experience and expertise to the project because the principals of BCB had not previously built or hosted a bitcoin mining facility.  In return for Terra's expert consulting (among other things, to ensure that all processes, activities, and tasks with regard to the building of the

Facilities were developed in a timely manner), BCB was to pay Terra twenty percent (20%) of its net Hosting Fees and Performance Incentive compensation provided for in the DHS Agreement.

1.4.12. BATES BCB 000091-000092.  The Side Letter Re: Digital Mining Facilities - Right of First Refusal ("Side Letter"), dated June 9, 2022, between MOW and BCB.  This agreement documents the amount MOW agreed to pay BCB if MOW sold the bitcoin mining facilities to a third party and that third party no longer required BCB to perform services in relation to the facilities.  Although it doesn't specifically address the events in this case (as third party Bitmain has not purchased the facilities, at least as far as is currently known by Plaintiff), there is a match in that a third party (Bitmain) received control of the decision to designate the facilities' O&M service provider (via its SF Agreement with MOW) and that third party Bitmain did not desire for BCB to perform O&M services.  As such, the Side Letter's guidance as to the amount owed to BCB is highly informative for the purpose of calculating BCB's damages (particularly in light of no other specific language directly addressing the damage calculation due to a breach of contract by MOW).

1.4.13. BATES BCB 047403-047404; 047406-047407; 047413-047414; 047419-047439. The Phase 1 Budget (as referenced in the DHS Agreement), which documented the amount to be paid to BCB by MOW for providing the Phase 1 build and implementation services for both the North Range 45MW power tranche and the Campstool 30MW power tranche.

1.4.14. BATES BCB 047405; 047408-047411; 047415-047418; 047440. Communications between BCB and MOW indicating the Phase 1 Budget was approved (through a course of performance) even though the Phase 1 Budget was not initialed by BCB and MOW (as was required by the DHS Agreement).

1.4.15. BATES BCB 047441-047447; 047449-047540.  Invoices from BCB to MOW for BCB's Phase 1 services performed for the North Range 45MW power tranche.

1.4.16. BATES BCB 047541.  BCB's bank statements showing receipt of payment from MOW for invoices for Phase 1 services for the North Range 45MW power tranche.

1.4.17. Agreements and/or purchase orders between Shermco and MOW, including but not limited to:

- BATES BCB 047559-047575.  The Consulting Management Master Services Agreement, signed July 25, 2022, which among other things, established Shermco as the engineer of record for the overall site engineering and project design and provided the framework for purchase orders.
- BATES BCB 002495-002500.  The Electrical Installation Scope Purchase Order, dated October 26, 2022, whereby Shermco was obligated to provide installation of the medium voltage and low voltage scope for the North Range 45MW power tranche by 12/30/2022.
- BATES BCB 002490-002494.  The Construction Management Scope Purchase Order, dated October 26, 2022, whereby Shermco was obligated to MOW to provide all construction management required for successful management and completion of the North Range 45MW power tranche including but not limited to overall management of the site, processes, schedule, subcontractors, quality assurance, quality control, and inspections.
- BATES BCB 047547-047552.  Documents and communication, as of January 2023, showing the estimated completion of Shermco's installation of the medium voltage and low voltage scope for the North Range power tranche to be March 1, 2023.

1.4.18. BATES BCB 047576-047593.  Documents and communication regarding the estimated (approx November 7, 2022) and actual (November 21, 2022) arrival of twenty 3,000 KVA transformers from HauPeng Transformer Company to the North Range site for the North Range 45MW power tranche.

1.4.19. BATES BCB 047594-047598; 047599-047601; 047602.  Documents and communication regarding the scheduled (November 25 to December 9, 2022) and actual (November 23, 2022 and February 27, 2023) arrival of two switchgear lineups from Belyea Company to the North Range site for the North Range 45MW power tranche.

1.4.20. Documents (including agreements) and communication, between CEGEN and MOW, including but no limited to:
- BATES BCB 046316-046331.  CEGEN's July 11 Quote 22-259 Rev2, which provided a delivery timeline of all ten data centers by November 4, 2022.
- CEGEN's July 13, 2022 email, including Quote 22-259  Rev 3, which provided a delivery timeline of all ten data centers by October 21, 2022.

- BATES BCB 0047606-047621.  CEGEN's July 18, 2022 email, including Quote 22-259 Rev 5, which provided a delivery timeline of all ten data centers by October 21, 2022.
- BATES BCB 002326-002331.  The Simplified Purchase Order Agreement, effective July 21, 2022, between CEGEN and MOW.
- BATES BCB 002344-002358.  The First Amendment to the Simplified Purchase Order, dated and effective December 5, 2022, which required that CEGEN complete data centers 1-6 no later than February 13, 2023 and data centers 7-10 no later than March 8, 2023, or else CEGEN would be in default of the agreement.
- BATES BCB 002277-002319.  The Subcontractor Labor and Material Contract Agreement, effective December 5, 2022, which required that CEGEN complete data centers 1-6 no later than February 13, 2023 and data centers 7-10 no later than March 8, 2023, or else CEGEN would be in default of the Subcontractor Labor and Material Contract Agreement.

1.4.21. BATES BCB 047626-047662.  The *redacted* Service Framework Agreement ("SF Agreement"), provided to BCB by Haku Du (of MOTBO) on January 30, 2023, of unknown signed and effective date (due to redaction), but which MOTBO represented to BCB had already been signed by MOTBO and Bitmain.  This critical document provides evidence of Bitmain's tortious interference with the Key Agreements between BCB and MOW/Terra.

1.4.22. Documents and communication regarding CLFPC's completion of its facilities to serve 45MW of electrical power to the North Range site, including but not limited to:
- BATES BCB 047663.  A January 6, 2022 email from Austin Allen with an estimated completion date of February 10, 2022;
- BATES BCB 004514.  A signed letter from Austin Allen of Black Hills Energy, dated February 22, 2023, to Erick Rengifo of MOW, indicating that CLFPC's facilities were complete to MOW's North Range 45MW facility.

1.4.23. Documents related to BCB's complaint filed in Wyoming Chancery Court, including but not limited to:
- Case No. CH-2023-0000006. Plaintiff BCB's Complaint, filed March 15, 2023
- Order Dismissing Case No. CH-2023-0000006 without Prejudice, filed May 12, 2023

1.4.24. Plaintiff BCB's Complaint, filed May 3, 2023, in the United States District Court for the District of Wyoming.

1.4.25. CASE 1:23-CV-00079-ABJ DOCUMENT 50. Plaintiff BCB's First Amended Complaint filed September 20, 2023.

1.4.26. CASE 1:23-CV-00079-ABJ Document 62. Defendants MOTBO's Answer, Defenses, and Amended Counterclaims, filed October 31, 2023, to Plaintiff BCB's First Amended Complaint.

1.4.27. Documents and communication regarding MOTBO's expected timing to build and operate the power expansions at North Range and Campstool, including but not limited to:

- BATES BCB 000803.  A WeChat message from Wiley Zhang, sent on/around May 11, 2022, indicating "Phase B, start construction next week!!!" with several images related to the North Range site showing where the additional data center facility was planned to be built at that site.
- BATES BCB 000802.  A WeChat message from Wiley Zhang, sent on/around May 13, 2022, indicating "Phase 2 60MW will officially start construction on June 1!" with several images related to the Campstool site, including (a) a plat map of Campstool Fourth Addition with the Campstool Parcel circled in red, (b) an aerial photo of the Campstool Parcel, and (c) a photo of a person standing next to the Campstool Parcel.
- BATES BCB 047348-047366; 047367.  BO's September 2023 Investor Presentation, which documents MOTBO's plan to build and operate "Phase 1b: 25MW / 8,400 slots ETD Dec 2023" and "Phase 2: 60MW / 18,750 slots ETD Mar 2024"
- BATES BCB 046819-047347.  BO's SEC K-6 filings from May 2023 to December 2023, indicating the current status and/or expected timeline for the power expansions at both the North Range and Campstool sites.

1.4.28. Plaintiff BCB's Rule 26 Initial Discovery Disclosures provided to Defendants on September 15, 2023, specifically Section (iii), which provides "A computation of each category of damages claimed by the disclosing party" and the documents supporting said computation:

- BATES BCB 000821 - the Phase 1 damages associated with each tranche of power.
- BATES BCB 000822 - the summary view of the Phase 2 damages.
- BATES BCB 000823 - a detailed view, on a monthly basis, of the Phase 2 hosting expenses.

- BATES BCB 000824 - a detailed view, on a monthly basis, of the Phase 2 Energy Price Savings Incentive.
- BATES BCB 000825 - a detailed view, on a monthly basis, of the Phase 2 Energy Uptime Incentive.

1.4.29. BATES BCB 047894.  Documents and communications regarding (a) historical power pricing provided by BHE and (b) forecasts for future power pricing based on calculations (by Erick Rengifo and Michael Murphy) utilizing the proposed and incorporated pricing provisions in the Restated BCIS Agreement.

1.4.30. BATES BCB 046380-046385. Bit Origin Ltd ("BO"), a publicly traded company on the NASDAQ exchange, issued a press release stating "Bit Origin to develop cryptomine data center in Cheyenne, Wyoming."

1.4.31. BATES BCB 046387.  Jiaming Li's April 21, 2022 email indicating that compensation for BCB's upfront work to develop the bitcoin mining project opportunity was incorporated into the hosting fees to be paid to BCB for providing O&M services.

## 1.5.  INFORMATION AND DOCUMENTS REQUESTED BUT (A) NOT RECEIVED IN TIME FOR CONSIDERATION IN THIS REPORT OR (B) NOT RECEIVED AT ALL

1.5.1.  The *unredacted* SF Agreement between Bitmain and MOW and any related documents, including all (a) drafts of the document(s) and (b) communications during the development and negotiation of said document(s) leading to its/their signing.

1.5.2.  Documents and communications between MOTBO and Bitmain regarding loans and/or financings of any kind from Bitmain to any MOTBO entity.

1.5.3.  Documents and communication showing Defendants' progress on the North Range +25MW expansion, including but not limited those with (a) Laramie County Planning and Development, (b) Laramie County Department of Buildings, (c) Defendants' contractors, including but not limited to Systems-MEC, and (d) BHE. [Note, this includes emails and WeChat messages by and/or between MOTBO and Bitmain representatives, as well as Erick Rengifo's and Jiaming Li's emails about North Range and Campstool from their Universal Capital Holdings, Inc. email accounts (rengifo@ucholdings.com and jiam@ucholding.com).

1.5.4.   Documents and communication showing Defendants' progress on the Campstool
site (for the original 30MW and the +30MW expansion), including but not limited
(a) any drafts and signed (second) Service Framework Agreement relating to
Campstool, and any other 'key documents' relating to to those with (ba) City of
Cheyenne Planning and Development, (cb) City of Cheyenne Department of
Buildings, (dc) budgets and other planning documents, and (e) Defendants'
contractors, including but not limited to Systems-MEC and (d) BHE.

1.5.5.   Documents and communication from CLFPC, including but not limited to:

a.   The actual amount of power consumed to date by MOTBO of the North
Range 45MW power tranche;

b.   The actual price of power consumed to date by MOTBO of the North
Range 45MW power tranche;

c.   Possible blocks of power that CLFCP could have purchased for MOTBO
(that would have allowed MOTBO not to be subject to day-ahead energy
pricing);

d.   Estimated timing of when additional power could be made available
(regarding the power tranches for Campstool 30MW, North Range
+25MW, and Campstool +30MW) based on the timeline to build
additional facilities on CLFPC's side of the meter;

e.   Power pricing forecasts for power to be used during the term of the
Restated BCIS Agreement.

f.   The submissions to CLFPC's BCIS Request for Submission (issued
August 24, 2023), which show high demand for CLFPC's power during
the previous Bitcoin bull run.

1.5.6.   Documents and communication from MOTBO, including but not limited to:

a.   The actual composition of the hosted machines consuming the North
Range 45MW power tranche;

b.   Any and all revenue MOTBO has generated or earned since March 2023
relating to the North Range site;

c.   Any and all Bitcoin MOTBO has generated, mined, or earned since March
2023 relating to the North Range site;

d.   Communications between MOTBO and Bitmain relating to
cryptocurrency mining at the North Range site and/or Campstool site;

e.   Communications including any settlement offers sought or agreed upon by
and between MOTBO and CEGEN relating to CEGEN's default and
failure to perform under its agreements with MOW;

f. Communications including any settlement offers sought or agreed upon by and between MOTBO and Shermco relating to Shermco's alleged failure to perform under its agreements with MOW;

g. Documents relating to any changes in design, contracts, and planned construction to the previously approved and permitted Campstool site, including its subsequent expansions, since MOTBO removed BCB from the project; and

h. Documents, communications, and calculations used to support MOTBO's claimed damages.

1.5.7. Outstanding and unanswered discovery Interrogatories, Requests for Production, Deposition transcripts, and subpoenas, including but not limited to:

a. Interrogatory answers from MOTBO and Bitmain, including but not limited to, MineOne Wyoming Interrogatories (Nos. 3, 7, 8, 10, 12, 17, 18, 19, 20), Terra Crypto Interrogatories (Nos. 3, 15, 16, 18, 20, 21), and any future Interrogatory answers from MOTBO and Bitmain.

b. Deposition transcripts of MOTBO and Bitmain representatives;

c. Documents and communication relating to MINEONE0010529, an email from Jiaming Li on December 15, 2022, talking about a "comprehensive partnership" between MOTBO and Bitmain.

d. Bitcoin wallet addresses showing MOTBO and Bitmain transactions and mining rewards;

e. Documents and communications involving the bitcoin miners that are (i.) currently at North Range site and (ii.) planned to be at the Campstool site.

1.5.8. Outstanding and unanswered third party subpoenas including but not limited to, YZY Capital, Universal Capital Holdings, BHE, Systems MEC, and CryptoKnight.

1.5.9. **Given that I was unable to review and consider the above identified information in Section 1.5, as well as other unidentified material information of which I may not be aware, I reserve the right to amend this Expert Report, and the damages identified therein, in the event additional material information is made available for review and consideration.**


## 2. DAMAGE ANALYSIS AND CALCULATION OVERVIEW

### 2.1. FOUR CATEGORIES OF DAMAGES; TWO PHASES OF THE PROJECT

2.1.1.   Based on the information and documents above, BCB suffered monetary damages stemming from four distinct categories: (a) the work to develop the bitcoin mining opportunity, (b) the work to implement/build the bitcoin mining facilities, (c) the work to operate/maintain the bitcoin mining facilities, and (d) performance incentive payments.   The DHS Agreement specified that BCB was to receive compensation for its work over two phases of the project: (a) the implementation and build phase ("Phase 1") and (b) the operation and maintenance phase ("Phase 2").   BCB's work to implement and build the bitcoin mining facilities was to be compensated as part of Phase 1.   BCB's work to develop the bitcoin mining opportunity, BCB's work to operate and maintain the bitcoin mining facilities, and the performance incentive payments, were to be compensated as part of Phase 2. The following table displays the relationship between the damage type, when/how the compensation was supposed to be paid, and the name with which this Report refers to each particular type of damage:

| DAMAGE TYPE | PAYMENT PHASE | DAMAGE NAME |
|---|---|---|
| Upfront Development Work | Phase 2 - Monthly | Phase 2 Damages |
| Build & Implementation Work | Phase 1 - Installments | Phase 1 Damages |
| Operation & Maintenance Services | Phase 2 - Monthly | Phase 2 Damages |
| Performance Incentives | Phase 2 - Annual (50% Reserve) | PI Damages |

2.1.2.   **DAMAGE CATEGORY 1 - Upfront development work (to be paid monthly in Phase 2)**.  BCB performed valuable upfront work to develop the bitcoin mining opportunity.   Defendants proposed a deal structure, which BCB agreed to, that deferred compensation for this upfront work to Phase 2 of the project (as confirmed in an email from Jiaming Li on April 21, 2022).  Defendants breached its agreement with BCB during Phase 1, just before Phase 2 was set to begin.  As such, BCB has received no compensation for its upfront work to develop the bitcoin mining opportunity, even though Defendants have generated significant revenues and profits based on BCB's work.  That upfront - and uncompensated - work included BCB:

- Researching CLFPC substations in Laramie County, Wyoming and identifying land parcels in proximity to each substation for potential purchase for the project;
- Winning a highly competitive RFP for 75MW of power (with the possibility of more power after consuming the initial 75MW of power) from CLFPC during the peak months of the previous bitcoin bull run (9/21-11/21) when it was difficult to find large amounts of power;
- Negotiating and signing an agreement with CLFPC for that 75MW of power;

- Negotiating and signing a purchase agreement for a parcel of land at the North Range Business Park (which required multiple proposals to Cheyenne LEADS, the parcel owner and entity managing the business park);
- Negotiating and signing a purchase agreement for a parcel of land at the Campstool Business Park;
- Negotiating a restated (and more favorable) power agreement with CLFPC that MOW signed with CLFPC (which effectively assigned BCB's power contract to MOW);
- Assisting Defendants in negotiating and signing a purchase agreement for the North Range parcel in the same form as BCB's purchase agreement (which effectively assigned BCB's purchase agreement to Defendants);
- Assisting Defendants in negotiating and signing a purchase agreement for a parcel of land at the Campstool Business Park;
- Assisting Defendants in the overall development of the Campstool Parcel, including but not limited to (a) facilitating pre-engineering meetings with the City of Cheyenne Department of Planning and Development and the Department of Buildings, (b) researching zoning compliance and other related due diligence, (c) facilitating a sound study, (d) facilitating geotechnical and environmental testing, (e) sourcing an architect for land planning and design of the site plan, (f) obtaining approval from the City of Cheyenne Department of Planning and Development for the site plan prior to initiating project engineering, (g) completing drainage and traffic studies, (h) assembling specifications for all components, equipment, and other required infrastructure for the development project, (i) sourcing engineers for the evaluation and design in consideration of the components, equipment, requirements, and overall design of the project prior to permit submission, (j) assembling and submitting a detailed and comprehensive permit package with all architectural and engineering documents including a completed permit application, (k) and facilitating review comments between architects and engineers for revisions and resubmissions to attain permit approvals (which were obtained on behalf of MOW for the Campstool project on January 18, 2023); and
- Compiling and coordinating submission of MOW's application to the Campstool Business Park's Campstool Architectural Review Committee (from which approval was required in order to begin construction of the project), with said approval obtained for the Campstool project on January 27, 2023.

This Report will refer to these Damage Category 1 damages, together with Damage Category 3 damages, as "**Phase 2 Damages**" (as these were payments that BCB should have received monthly during Phase 2).

2.1.3.   **DAMAGE CATEGORY 2 - Implementation and build work (to be paid in installments in Phase 1**.  BCB performed its contractually required work during Phase 1 of the North Range 45MW site and it received payments from Defendants for only some of that work.  Specifically, the Defendants refused to pay BCB's most recent invoice even though BCB had performed that work over the previous two months and the invoiced amount was within the approved Phase 1 budget.  Additionally, when Defendants breached its agreement with BCB, it thereby prevented BCB from performing - and receiving the profits from - the remaining implementation and build ("Phase 1") work for the North Range 45MW power tranche, the Campstool 30MW power tranche, the North Range +25MW expansion power tranche and the Campstool +30MW expansion power tranhce.  This Report will refer to these Damage Category 2 damages as "**Phase 1 Damages**" (as these were payments that BCB should have received during Phase 1).

2.1.4.   **DAMAGE CATEGORY 3 - Operation and maintenance ("O&M") work (to be paid monthly in Phase 2)**.  When Defendants breached the Primary Agreement in Phase 1, it prevented BCB from performing - and receiving the profits from - all of the operation and maintenance ("Phase 2") work for the North Range 45MW power tranche, the Campstool 30MW power tranche, the North Range +25MW expansion power tranche and the Campstool +30MW expansion power tranche.  This Report will refer to these Damage Category 3 damages, together with Damage Category 1 damages, as "**Phase 2 Damages**" (as these were payments that BCB should have received monthly during Phase 2).

2.1.5.   **DAMAGE CATEGORY 4 - Performance incentives (to be paid annually in Phase 2)**.  When Defendants breached the agreement in Phase 1, it prevented BCB from receiving any performance incentives which may have been paid during Phase 2.  The two performance incentives provided for by the DHS Agreement are as follows:
- Energy Price Savings Incentive
- Energy Uptime Incentive

This Report will refer to these Damage Category 4 damages as "**Performance Incentive Damages**" or "**PI Damages**"

## 2.2.  VALUATION METHODOLOGY FOR PHASE 2 DAMAGES

2.2.1.  BCB's definitive deal documents with the Defendants do not specifically address the calculation for damages in the event of a breach by Defendants.  However, the Primary Agreements do contain three instances of a common phrase to imply the value of BCB's upfront development work and Phase 2 O&M work, which together express the parties reasonable, agreed expectations as to the calculation of Phase 2 damages for Defendants' material breach of contract.  That phrase, which is "*an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term*…," is used as follows in the Primary Agreements:

Liquidated Damages - DHS Agreement, Article VII, Paragraph 1
"In the event of a MineOne Event of Default, if not cured, and if BCBC then chooses to terminate this Agreement, then without prejudice to BCBC's other rights and remedies available under this Agreement or law, MineOne shall be liable for liquidated damages to BCBC in *an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term* assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, an aggregate of 75MW."

Limitation of Liability - DHS Agreement, Article VII, Paragraph 1
"Except as expressly set forth hereinabove, including the provisions in Article VII relating to MineOne Damages and BCBC Damages, in no event shall a Party and its affiliates be liable, alone or in the aggregate, for any breach or series of breaches under this Agreement to the other Party for any damages, claims, demands, suits, causes of action, losses, costs, expenses and/or liabilities in excess of an amount equal to: (a) with respect to BCBC, thirty percent (30%) of the amounts received and retained by BCBC from MineOne under Article IV (if any); and (b) with respect to MineOne, the amounts due and unpaid to BCBC as at the date of breach, the maximum available Implementation Fee (including incentives) as provided in the Phase 1 Budget, and *an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term* assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, 75MW;"

Side Letter
"In consideration for your agreement to enter into the [DHS] Agreement, and for other good and valuable consideration, we hereby mutually agree that:

(i) should you elect not to issue an Acceptance Notice; and

(ii) the purchaser completes the purchase agreement in relation to the sale, but no longer requires services of BCBC in relation to the Facilities, we [MOW] shall pay you *an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term*, assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, 75MW."

2.2.2.   This last citation (from the Side Letter) is the most informative of the three.  It presents a scenario in which a purchaser of the bitcoin mining facilities "no longer requires the services of [BCB]," and then provides the formula for calculating the total compensation for BCB (which includes (a) compensation for BCB's upfront work to develop the bitcoin mining opportunity that was to be paid in Phase 2 and (b) compensation for Phase 2 O&M work which BCB will no longer get to perform and profit from).  This scenario (where a non-MOTBO party (a) gains control of the decision to specify the project's O&M service provider by purchasing the facilities and (b) no longer requires the services of BCB) is very similar to the fact pattern in this case.   Specifically, a non-MOTBO party (Bitmain) gained control of the decision to specify the project's O&M service provider (here via the SF Agreement rather than a facilities purchase agreement) and that non-MOTBO party (Bitmain) no longer required the services of BCB.

2.2.3.   Further, when BCB and MOTBO were negotiating the language for the Side Letter, Michael Murphy provided additional context in an email he sent to Erick Rengifo on June 4, 2022 for why this language was included:

"Side Letter - the original intent of why we [BCB] proposed a buy-out amount in the event of a third party sale of the facilities was to ensure the consistent treatment of BCB's interests regardless of the external event that could lead to an early termination or buy-out due to no fault of BCB. MineOne, through its proposed treatment, would create a mechanism to remove BCB from the deal at half price. We have updated this language to ensure consistent treatment with the other end-of-term scenarios. We have made a huge commitment to get this far, and will continue going above and beyond in the best interests of all parties, and want to ensure that if we are doing our jobs then we receive the same value regardless of the reason for our involvement ending due to no fault of our own."

2.2.4.   These three citations from the Primary Agreements, particularly the citation from the Side Letter (which presents a very similar scenario to the fact pattern in this case), when taken together, express the parties reasonable, agreed expectations as

to the calculation of Phase 2 Damages for Defendants' material breach of contract.  As such, this Report will utilize the phrase "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term*" to calculate the Phase 2 Damages.

2.2.5.   The calculation of "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term*" begins with determining "**the remaining Term**."  Both the DHS Agreement (Article 10, Paragraph 1) and CS Agreement (Article 6, Paragraph 1.1) state "...the term of this Agreement shall begin on the Agreement Date [June 9, 2022]. The term of this Agreement shall continue for five (5) years thereafter (the "Term").  This means the end of the Term is June 8, 2027.

2.2.6.   The next step in determining "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term*" is to calculate the "**budgeted amount of Hosting Fees**" through June 8, 2027.  Based on the information reviewed, it appears there is no Phase 2 budget.  BCB sent several requests to MOTBO to discuss a Phase 2 budget, but there is no evidence that MOTBO responded to those requests (likely because it already knew it and Bitmain were already going to remove BCB as the O&M Service Provider).  As such, I will develop a budget for Hosting Fees in this Report, based on the following:

- The sites' initial power available identified in the DHS Agreement (North Range 45MW and Campstool 30MW) - see Section 3 of this Report;
- The sites' additional power available at each site (North Range +25MW and Campstool +30MW) - see Section 4 of this Report;
- The percentage of power consumed based on the available power for each tranche of power - see Section 5 of this Report;
- The operational start date, which the DHS Agreement refers to as the Commencement of Commercial Operation ("CCO"), of each tranche of power mentioned directly above - see Section 6 of this Report;
- The Hosting Fee, which the DHS Agreement defines as "an amount equal to USD one cent ($ 0.01) per KWh consumed by the Miners and the Facilities multiplied by the metered consumption (in KWh) for the immediately preceding calendar month." (DHS Agreement Article IV, Paragraph 3) - see Section 7 of this Report;
- The uptime of the sites, as that determines how much of the available power is consumed - see Section 8 of this Report.

2.2.7.  The next step in calculating "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term"* is to determine the "**costs and consulting fees therein**" through June 8, 2027.  Those costs, as further detailed in Section 9 of this Report, include:

- Personnel expenses, benefits, and taxes
- Other expenses incurred in the operation of each site
- Terra's consulting fee

2.2.8.  The final step in calculating "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term"* is to determine the "**net present value**" of the net margin between the budgeted Hosting Fees and costs.  This includes, as further detailed in Section 10 of this Report:

- Selecting an appropriate net present value ("NPV") discount rate;
- Applying the NPV discount rate to each monthly net margin to calculate the NPV of each month's net margin; and
- Summing the NPV of each month's net margin to arrive at a total NPV net margin over the remaining term.

## 2.3.  VALUATION METHODOLOGY FOR PHASE 1 DAMAGES

2.3.1.  The DHS Agreement required that BCB provide services to implement the bitcoin mining facilities, and in return, it would be paid based upon the approved budget. The DHS Agreement states:

"For the Build & Implementation Phase [Phase 1], MineOne shall pay to BCBC… (iii) an implementation fee ("Implementation Fee"), in each case at the times and in the amounts set out in the Phase 1 Budget. The Implementation Fee may also be referred to as the "Project Management Fee" in the Phase 1 Budget and pro-rated for the North Range Facility and the Campstool Facility as specified in the Budget. The Implementation Fee shall not include any architectural or engineering fees, general contractor, contractor, Subcontractor, and/or other service provider, vendor, or association fees." (DHS Agreement Article IV, Paragraph 2)

2.3.2.  In order to calculate BCB's Phase 1 Damages based upon the language in the DHS Agreement, I will do the following in this Report:

- Identify "the amounts set out in the Phase 1 budget" for the Implementation Fee (aka the Project Management Fee) for each tranche of available power (and if not set out in the Phase 1 budget, then provide

estimates of what they would have been): North Range 45MW, Campstool 30MW, North Range +25MW, and Campstool +30MW;

- Determine the Implementation Fee amounts BCB earned and invoiced, and that Defendants paid to BCB;

- Determine the Implementation Fee amounts BCB earned and invoiced, and that Defendants did not pay to BCB; and

- Determine the Implementation Fee amounts BCB had not yet earned, but would have earned, if Defendants had not breached their agreement with BCB

## 2.4.  VALUATION METHODOLOGY FOR PI DAMAGES

2.4.1.  The DHS Agreement provided BCB with the opportunity to earn two different types of performance incentive compensation: the Energy Price Savings incentive and the Energy Uptime incentive.  The DHS Agreement states:

"For the Operation & Maintenance Phase [Phase 2], as and from CFCO [Commencement of Full Commercial Operation], MineOne shall make adjusted annual performance-based compensation payments to BCBC (the "Bonus Payments") at the times and in the amounts as provided for…." (DHS Agreement Article 4, Paragraph 4)

2.4.2.  **Energy Price Savings Incentive**.  The Energy Price Savings incentive was designed to reward BCB for assisting Defendants procure lower priced power from CLFPC (as lower priced power for the Defendants would mean more profits for the Defendants).  The DHS Agreement states:

"Energy Price Savings.  If for any period of twelve (12) calendar months as and from CFCO (adjusted also for any period less than a calendar month), when paying for electricity under the Power Purchase Agreement, MineOne pays an average all-in cost of power (that includes, as defined in the Power Purchase Agreement, the (i) Cost of Supply, (ii) a Utility margin consisting of one or several of the Utility Minimum Margin, Utility Margin Share, and Utility Variable Margin, and (iii) the WAPA Network Transmission Charges, together, the 'Average All-in Power Cost') in respect of such period that is less than the sum of the Margin Share Cost of Supply Rate and WAPA Network Transmission Charges (as defined in the Power Purchase Agreement as of the Effective Date of this Agreement), BCBC shall be entitled to, in addition to the Hosting Fee, an additional compensation in an amount equal to thirty percent (30%) of the electricity price savings.  Fifty percent (50%) of the additional compensation shall

be paid to BCBC by MineOne no later than the end of the immediately following calendar month after such twelve (12) calendar month period. The remaining fifty percent (50%) (the 'Price Savings Security Fund') will be retained by MineOne as security for adjustments related to the Average All-in Power Cost exceeding the sum of the Margin Share Cost of Supply Rate and WAPA Network Transmission Charges in subsequent periods. The additional compensation payable in respect of each subsequent twelve (12) calendar month period will be computed as described below. If the Average All-in Power Cost in respect of a relevant period exceeds the average of the sum of the Margin Share Cost of Supply and WAPA Network Transmission Charge, for such period, the amount of such excess will be deducted from the Price Savings Security Fund available at such time. If at any time the Price Savings Security Fund is not sufficient to meet the excess, BCBC shall reimburse MineOne for such shortfall from additional compensation paid to BCBC hereunder. If in the final twelve (12) calendar month period the Price Savings Security Fund has a negative balance, MineOne may set off the amount of such balance against final amounts payable to BCBC, provided always that BCBC shall have no liability hereunder in excess of aggregate performance incentive compensation for Energy Price Savings payments paid to it hereunder. As the Power Purchase Agreement does not set a Pricing Transition Point starting 30 days after the third anniversary of the Commercial Operation Date (as defined in the Power Purchase Agreement), the Parties agree that for the purpose of the performance incentive compensation payment that the Pricing Transition Point starting thirty (30) days after the third anniversary of the Commercial Operation Date shall be the same as the Pricing Transition Point starting thirty (30) days after the second anniversary of the Commercial Operation Date." (DHS Agreement Article IV, Paragraph 4(i))

2.4.3.  Based on the language above from the DHS Agreement, I will calculate, in this Report, BCB's 30% share of the energy price savings (or energy price overage, if applicable) over the entire term on a monthly basis for each tranche of power. The final result for each tranche of power at the end of the term is the ending balance in the Energy Price Savings Security Fund, which is BCB's PI Damages for Energy Price Savings for each respective power tranche. The PI Damages do not utilize an NPV discount rate because the DHS Agreement does not indicate to do so (whereas it does for the Phase 2 Damages). As such, the only relevant number for each tranche of power is the ending balance in each power tranche's security fund (because neither each monthly amount of savings, nor the final amount of savings, should be discounted back to present value). Please see Section 14 of this Report for an in-depth review of the PI Damages associated with the Energy Price Savings performance incentive.

2.4.4.  **Energy Uptime Incentive**.  The Energy Uptime incentive was designed to reward BCB for assisting Defendants procure more consistent and available power from CLFPC (as more consistent and available power for the Defendants would mean less downtime, and consequently more profits, for the Defendants).  The DHS Agreement states:

"Energy Uptime. 'Energy Uptime' shall mean the percentage of time in a period of twelve (12) calendar months that the Power Supply is available to Miners based on the total available power and time in such period. If for any such period, as and from CFCO, BCBC achieves an average Energy Uptime greater than 98%, then MineOne shall pay thirty percent (30%) of the additional mined Bitcoin received by MineOne as a result of the Energy Uptime exceeding 98%. Energy Uptime payments shall follow the same payment adjustments as provided above in paragraph 4(i) for performance incentive compensation for Energy Price Savings and will have a separate security fund (the 'Energy Uptime Security Fund') and as such, BCBC shall also have no liability hereunder in excess of the aggregate amount of performance incentive compensation for Energy Uptime payments paid to BCBC hereunder." (DHS Agreement Article IV, Paragraph 4(ii))

2.4.5.  Based on the language above from the DHS Agreement, I will calculate, in this Report, BCB's 30% share of the additional mined bitcoin over the 98% energy uptime threshold (or BCB's share of the deficit in mined bitcoin if the energy uptime was less than the 98% threshold) over the entire term on a monthly basis for each tranche of power.  The final result for each tranche of power is the ending balance in the Energy Uptime Security Fund, which is BCB's PI Damages for Energy Uptime for each respective power tranche.  The PI Damages do not utilize an NPV discount rate because the DHS Agreement does not indicate to do so.  As such, the only relevant number for each tranche of power is the ending balance in each power tranche's security fund (because neither each monthly amount of savings, nor the final amount of savings, should be discounted back to present value).  Please see Section 15 of this Report for an in-depth review of the PI Damages associated with Energy Uptime.

## 2.5.  MODELS USED FOR CALCULATING DAMAGES

2.5.1.  This Report uses several financial models to perform the calculation of BCB's damages.  Those models are as follows:
- Phase 2 Damages Model (including the Phase 2 Damages Expense Details) - attached hereto as **Exhibit B**

- Phase 1 Damages Model - attached hereto as **Exhibit C**
- Energy Price Savings PI Damages Model - attached hereto as **Exhibit D**
- Energy Uptime PI Damages Model - attached hereto as **Exhibit E**

2.5.2.   The following sections of my Report identify and explain the key assumptions used to build the aforementioned damage models (based upon the valuation methodologies outlined above), and when/where applicable, directly reference specific elements of the models.  The damage models are an integral part of my Report.

## 3. KEY ASSUMPTION - INITIAL POWER AVAILABLE AT EACH SITE

### 3.1.  NORTH RANGE 45MW

3.1.1.    The 45MW of power at the North Range site is the first tranche of power expressly provided for under the Primary Agreements between MOW and BCB. Its inclusion in the Phase 2 Damages Model is supported by numerous agreements, documents, and communication, the most important of which are the (a) DHS Agreement between MOW and BCB and (b) the Side Letter between MOW and BCB.

3.1.2.   The DHS Agreement makes multiple references to 45MW and the North Range Facility [**bold** added for emphasis]:

"4. Effective Date.  The effective date (the "Effective Date") shall occur on the date when (i) the Acquisition Agreement and Power Purchase Agreement for the **45MW North Range Facility** have been signed…."

"Commencement of full commercial operation ("CFCO") shall occur when mining at full capacity (defined as utilization of 98% of the maximum available power at a given facility) begins on construction completion, including all permits, licenses and everything required at such time for operation of the **North Range Facility** and the proper delivery of electrical power of **45MW of power** in accordance with the Power Purchase Agreement.

3.1.3.   The DHS Agreement also refers to "45MW" (with it implied that the power is associated with the North Range Facility) in the context of liquidated damages and limitation of liability, while the Side Letter refers to "45MW" (with it implied that the power is associated with the North Range Facility) in the context of a

right of refusal (both agreements which I cite and discuss in Section 2.2 of my Report).

## 3.2. CAMPSTOOL 30MW

3.2.1. The 30MW of power at the Campstool site is the second tranche of power expressly provided for under the Primary Agreements between MOW and BCB. Its inclusion in the Phase 2 Damages Model is supported by numerous agreements, documents, and communication, several of which are (a) the DHS Agreement between MOW and BCB, (b) the Side Letter between MOW and BCB, (c) the Original BCIS Agreement between CLFPC and BCB, (d) the assigned and Restated BCIS Agreement between CLFPC and MOW, (e) the Campstool Addition Architectural Control Improvement Request Approval, (f) the Campstool Parcel Warranty Deed (signed February 28, 2023 and recorded May 1, 2023), and (g) the signed "Blockchain Interruptible Service Agreement – Security Fund" Letter, dated February 24, 2024, indicating that MOW was exercising the option in MOW's BCIS Agreement to expand its service to the 30MW at the Campstool Parcel.

3.2.2. The DHS Agreement states:

"Campstool Facility Completion. Delivery of the Facility for Campstool and its incorporation into the Budget with its additional 30MW contracted power supply shall occur at such later date as the Parties hereto agree and following additional due diligence, in form and substance satisfactory to MineOne." (DHS Agreement Article 1, Paragraph 5.2)

3.2.3. The DHS Agreement also imputes 30MW at Campstool in the context of liquidated damages and limitation of liability, while the Side Letter does so in the context of a right of refusal (both agreements which this Report cites and discusses in Section 2.2), each specifically stating:

"an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, 75MW."

3.2.4. The Campstool 30MW power tranche was incorporated into the Phase 1 budget in June 2022 around the time the Primary Agreements were signed by BCB and MOW.  Over the ensuing eight months (July 2022 through March 2023) for the

Campstool 30MW power tranche, (a) BCB performed work and coordinated MOW's vendors and (b) MOW incurred and paid multiple costs, which were tracked against the Campstool 30MW Phase 1 budget.

3.2.5.  The Defendants may claim that the DHS Agreement and Side Letter support the position that the Campstool 30MW power tranche not be included in the damage calculation because (a) the Defendants did not agree "at such later date" to include the 30MW into the Phase 2 Budget and/or (b) the Campstool Facility has not achieved CCO [Commencement of Commercial Operation].  However, such a contention would fail to take into consideration the significant documents, events and representations made by the parties related to the Campstool 30MW power tranche leading up to the Primary Agreements, during BCB's engagement on the project, and after Defendants breached the Primary Agreements and effectively removed BCB from the project.  As indicated in Michael Murphy's Campstool Affidavit, BCB reasonably relied on MOTBO's intentions, statements, and actions in performing the required work to allow Defendants (a) to purchase the Campstool Parcel and (b) exercise its option with CLFPC for 30MW of power at Campstool (both of which confirm the the completion of the "additional due diligence, in form and substance satisfactory to MineOne"), and as a result, was reasonably expecting to receive the compensation for Campstool as documented in the DHS Agreement.   As documented in Michael Murphy's Campstool Affidavit, several key items that support the inclusion of the 30MW at Campstool into the DHS Agreement budget include:

- The Original BCIS Agreement between CLFPC and BCB was for the entire 75MW;
- BCB and Defendants intended to do a deal for 75MW (not 45MW), as evidenced in many documents and communications, including but not limited to the non-binding Summary of Terms dated April 8, 2022 and commented on through April 21, 2022 by and between MineOne Partners Limited, Terra and BCB, which has a stated objective to "build and operate a 75MW crypto mining facility in Wyoming;"
- The Campstool Land Company,  owner of the parcel of land at Campstool - said land which BCB had under contract to purchase, and said purchase contract which BCB and MOW had planned for BCB to assign to MOW so MOW could purchase the parcel - did not want assign the purchase contract to MOW due to concerns the Campstool Land Company's members had about potential noise from a possible bitcoin mining data center (even though the land was designated for "Heavy Industrial" use and BCB demonstrated the potential noise was within acceptable limits).  Further, before the Campstool Architectural Review Committee (CARC),

which was composed entirely of members of the Campstool Land Company, would consider whether or not to allow a bitcoin mining site within the Campstool Addition Fourth Filing, The Campstool Land Company wanted (a) BCB to terminate its purchase contract, (b) MOW to enter into a new purchase contract, (c) MOW to go through the expensive and time-consuming City of Cheyenne approval process (for the site plan, engineering plan, and permits), and (d) submit an Improvement Approval Request Form to the CARC.

- Given the newly discovered delays in MOW procuring land at Campstool, MOTBO provided revised language in the DHS Agreement, and CLFPC provided revised language in the Restated BCIS Agreement, to allow MOW, CLFPC, and BCB to move forward on the North Range 45MW power tranche while MOW and BCB continued working to receive approvals from the City of Cheyenne and then CARC for the facility at Campstool.  After BCB obtained approval from CARC for MOW's bitcoin mining site at Campstool, MOW would be able to close on the Campstool Parcel and exercise the Campstool 30MW option in the Restated BCIS Agreement (with assurance it would be able to actually build and operate the site per the Campstool Fourth Addition Protective Covenants).

- Even though both the final DHS Agreement and Restated BCIS Agreement made the Campstool 30MW an option (rather than requirement), it was always MOTBO's, BCB's and CLFPC's intent for the parties to implement and operate that power tranche, and that intent was confirmed in MOTBO's and BCB's course of performance after those agreements were signed by their respective parties, including but not limited to:
    - MOW approved  a Phase 1 budget for Campstool, and BCB tracked costs against this budget for MOW;
    - On June 13, 2022 (the same day MOW closed on the North Range Parcel), BCB submitted an application for a Temporary Use Permit to the Wyoming Office of State Land and Investments ("OSLI") for land adjacent to the Campstool Business Park and CLFPC substation, which was pre-approved by OSLI on July 7, 2022;
    - BCB contacted the broker for another parcel of land (which was owned by YZY Capital) in the Campstool Business Park and assisted MOW with negotiating and signing a purchase agreement with YZY Capital for that parcel of land (which was dated July 6, 2022 and countersigned July 15, 2022).
    - Over the next several months, at the direction of and with the approval of MOW, BCB (a) performed all necessary actions to

receive approval from the City of Cheyenne (Site Plan Certificate of Review, Engineering Plan Review, Permits), (b) negotiated and signed a Special Use Lease with OSLI for land adjacent to the Campstool Business Park and CLFPC substation, (c) coordinated a sound study, (d) negotiated three amendments to MOW's land purchase agreement with YZY, (e) coordinated earnest money payments under the land purchase agreement from MOW to First American Title, (f) found and coordinated with an attorney for MOW to assist in drafting an application letter and submitting the application to CARC, (g) discussed the application with several CARC members and answered their questions, and (h) ultimately, received CARC's approval for MOW to build a bitcoin mining facility on the Campstool Parcel.

- MOW and CLFPC signed the "Blockchain Interruptible Service Agreement – Security Fund" Letter, dated February 24, 2024, indicating, among other things, that MOW was exercising the option in MOW's Restated BCIS Agreement to expand its service to the Campstool Parcel for 30MW.

- After removing BCB as the O&M Service Provider, MOW closed on its purchase of the Campstool Parcel.

3.2.6.  BCB did everything necessary for MOW to close on a Campstool Parcel (as MOW would have done in June 2022 had (a) the Campstool Land Company allowed BCB to assign its land purchase contract to MOW and (b) CARC provided approval for a bitcoin mining facility).  MOW paid for all of the site plan, engineering, permit, and other relevant work related to the Campstool project (with those payments tracked against the Campstool Phase 1 budget), except it did not pay BCB for any of its work (as this was considered BCB's "upfront development work" that would be compensated in Phase 2 while BCB was performing O&M services at this site), and it did not pay annual fees under the TUP and SUL. Defendants attempted to sidestep its obligations to BCB related to the Campstool 30MW power tranche by manipulating the timing of the Campstool Parcel closing and waiting to close on the parcel until after Defendants had removed BCB.

3.2.7.  Further, Defendants included language in the proposed amendment to the DHS Agreement (which was provided to BCB on March 13, 2023) that would specifically exclude BCB from receiving compensation from Campstool (even though BCB had done all of the work for MOW at Campstool (a) to receive approval from CARC to operate a bitcoin mining facility and (b) to receive power

from CLFPC). The Defendants likely put this language into the proposed amendment because they knew, based on their representations, their intentions as demonstrated through "course of performance" (including all of BCB's work and Defendant's actions directing and confirming BCB's work, and Defendants paying for site plans, engineering approvals, and permits), and the overall totality of the evidence, that they had already consented to including Campstool into the project budget and were now looking for a way to avoid making those contractually agreed-upon payments.

## 4. KEY ASSUMPTION - ADDITIONAL POWER AVAILABLE AT EACH SITE

### 4.1. POWER EXPANSIONS

4.1.1. A "power expansion" is the procurement of additional power at a particular site beyond the initially contracted for power at that site. It is a normal and accepted practice in data center site development to start with an initial tranche of power from the utility and then contract for additional power tranches of power after completing the previous tranche of power. When evaluating a potential data center site, it is important to know not only the current available power, but the amount of power potentially available in the future.

4.1.2. Neither the DHS Agreement (between MOW and BCB) nor either version of the BCIS Agreement (BCB's Original BCIS Agreement and MOW's Restated BCIS Agreement) refer to power expansions. However, BCB, Defendants, and several of Defendants' vendors, including the utility, CLFPC, discussed and planned for power expansions. Additionally, BCB attempted to include a "Right of First Refusal" provision in its Original BCIS Agreement with BHE, as it knew there was more power available at the North Range and Campstool sites after its research and due diligence.

4.1.3. It is reasonably foreseeable to expect that BCB, given its role in developing the bitcoin mining project, establishing and maintaining the relationship with BHE, implementing the project, and then serving as the O&M Service Provider, would have been the procuring cause and O&M Service Provider for the power expansions had Defendant Bitmain not interfered with BCB's Primary Agreements with MOW and Terra, especially since (a) BCB had been the key driver in progressing plans for the expansions (while it was still involved in the project) and (b) due to the operational efficiencies garnered from it already serving as the O&M Service Provider for the initial power tranches at each site.

4.1.4.  In order to differentiate between initial power and expansion power in this Report, the "+" symbol is used to indicate expansion power (i.e., +25MW) whereas initial power does not use the "+" symbol (i.e., 45MW).

## 4.2. NORTH RANGE +25MW EXPANSION

4.2.1.  The amount of power available for the North Range site expansion (specifically, 25MW) is based on the following items:

- A WeChat message from Wiley Zhang, sent on/around May 11, 2023, indicating "Phase B, start construction next week!!!" with several images related to the North Range site showing where the additional data center facility was planned to be built at that site. This establishes phase "B" as the power expansion at North Range.
- BO's September 2023 Investor Presentation, which documents that MOTBO energized "Phase 1a: 45MW" (which as documented above is the North Range 45MW) and that there is a "Phase 1b: 25MW." This confirms that phase "1" refers to North Range (since it references the initial 45MW power tranche at North Range) and then, based on Wiley Zhang's previous message indicating that phase "B" is also at North Range, confirms the amount of power available in the expansion (i.e., 25MW).

4.2.2.  Several key items that provide evidence of the availability of, and knowledge of that availability, by CLFPC, BCB, and Defendants of additional power beyond the initial 45MW of contracted for power at the North Range site are documented in Emory Patterson's Power Expansion Affidavit. This evidence shows it was reasonably foreseeable that BCB would have provided Phase 1 implementation services and Phase 2 O&M services for the North Range +25MW expansion tranche of power. As such, the lost profits associated with this additional power tranche are direct damages (rather than consequential damages) and are included in my damage calculation in this Report. Several of those items in Emory Patterson's Power Expansion Affidavit that support the inclusion of the +25MW North Range expansion power tranche into the calculation of BCB's damages, are as follows:

- Communication with BHE which indicated that future power expansions were possible (however, BHE would require a load study or other analysis, the customer to pay for any required upgrades, and progress and/or utilization of some or all of the initial 75 MW before committing to provide additional power).
- Meetings, emails, and other communication or exchanges of documents with Shermco that showed BCB took the necessary steps to consider and

incorporate power expansions into the site plans and other engineering documents.
- Meetings, emails, and other communication or exchanges of documents with MOTBO at various stages of the project indicate that MOTBO was aware of the power expansions.
- BCB's internal meetings regarding power expansions.

### 4.3.  CAMPSTOOL +30MW EXPANSION

4.3.1.  The amount of power available for the Campstool site expansion (specifically, 30MW) is based on the following items:
- A WeChat message from Wiley Zhang, sent on/around May 13, 2023, indicating "Phase 2 60MW will officially start construction on June 1!" with several images related to the Campstool site, including (a) a plat map of Campstool Fourth Addition with the Campstool Parcel circled in red, (b) an aerial photo of the Campstool Parcel, and (c) a photo of a person standing next to the Campstool Parcel.
- BO's September 2023 Investor Presentation, which implies Phase 1 is related to the North Range site (based upon it indicating that Phase 1a for 45MW has already been energized), and that Phase 2 is for 60MW. This 60MW corresponds to the Phase 2 60MW mentioned by Wiley Zhang (which included images of the Campstool Parcel). Subtracting the initial 30MW of power at Campstool (referenced by both the Original and Restated BCIS Agreements, as well as the Key Agreements) from this 60MW, equals 30MW of expansion power at Campstool.

4.3.2.  Several key items that provide evidence of the availability of, and knowledge of that availability, by CLFPC, BCB, and Defendants of additional power beyond the initial 30MW of contracted for power at the Campstool site are documented in Emory Patterson's Power Expansion Affidavit.  This evidence shows it was reasonably foreseeable that BCB would have provided Phase 1 implementation services and Phase 2 O&M services for the Campstool +30MW expansion tranche of power.  As such, the lost profits associated with this additional power tranche are direct damages (rather than consequential damages) and are included in my damage calculation in this Report.  Several of those items in Emory Patterson's Power Expansion Affidavit that support the inclusion of the +30MW Campstool expansion power tranche into the calculation of BCB's damages are as follows:
- Communication with BHE which indicated that future power expansions were possible (however, BHE would require a load study or other analysis, the customer to pay for any required upgrades, and progress and/or

utilization of some or all of the initial 75 MW before committing to provide additional power).

- Meetings, emails, and other communication or exchanges of documents with Shermco that showed BCB took the necessary steps to consider and incorporate power expansions into the site plans and other engineering documents.

- The approved site plan and engineering drawings reflect reserved future data centers for future power expansions.

- Defendants directed BCB to apply for a state land lease on adjacent land (to assist in getting CARC approval, but also for additional space to build out the site).

- Meetings, emails, and other communication or exchanges of documents with MOTBO at various stages of the project indicate that MOTBO was aware of the power expansions.

- BCB's internal meetings regarding power expansions.

## 5. KEY ASSUMPTION - POWER CONSUMPTION

### 5.1. BUDGETING POWER CONSUMPTION

5.1.1.  In this Report, I consider two approaches to budget the amount of power consumed based on the available power for each power tranche: (a) using the maximum available power for a specific power tranche and (b) estimating the amount of power consumed by each piece of equipment and summing those amounts together to arrive at a total amount of power consumed for a specific power tranche.

5.1.2.  *Maximum Available Power.*  The more straightforward of the two approaches, it simply uses the maximum available power for each tranche.  For example, for the North Range 45MW tranche, it assumes that all 45MW are used (primarily for the bitcoin mining machines, and secondarily for the supporting equipment).

5.1.3.  *The sum of each piece of equipment's power consumption.*  The other approach is to estimate the power consumption of each individual piece of equipment for a specific power tranche and then add those amounts together to get an estimate of total power consumed for a specific power tranche.  This involves identifying the type of each bitcoin mining machine consuming power and then multiplying the number of those machines by an estimate of that machine's power usage (typically the bitcoin mining machine's nameplate/manufacturer-rated power or a percentage of the nameplate/manufacturer-related power).      The power

consumption estimate from each individual bitcoin mining machine is then added to the power estimates for each piece of auxiliary equipment (such as fans, network switches, etc) to arrive at an estimate of total power consumption for a specific tranche of power.

### 5.2. POWER CONSUMPTION BASED ON AVAILABLE POWER

5.2.1. In this Report, I use the "Maximum Available Power" approach described above for the following reasons:

- *Incentive to maximize profits*. The primary reason I use the Maximum Available Power approach is that the MOTBO Defendants are incentivized to use as much power as possible, because the more power they use, the more profits they make (since their billing to hosted clients is based on power consumed).

- *Control over power consumption*.  In addition to being incentivized to use the maximum available power, the Defendants would have the means to do so because power utilization can be controlled (a) based on the number of bitcoin mining machines running and (b) by modifying the amount of power each individual bitcoin mining machine consumes.

- *Site infrastructure not a limiting factor*.  The site infrastructure (medium voltage switchgear, electric panels, transformers, PDUs, rackspace slots for mining machines, etc) was engineered to accommodate the utilization of the maximum available power, so it does not restrict the power consumption to some amount below the available maximum power for each power tranche.

- *Missing information*.  At the time of the breach (and at the time of my Report), the exact type and number of bitcoin mining machines is unknown.  So it introduces more uncertainty into the alternate approach of estimating the consumption for each individual piece of equipment (because it is not known what all of that equipment is).

## 6. KEY ASSUMPTION - HOSTING START DATES & RAMP UP

### 6.1. HOSTING FEE START DATES

6.1.1. In order to calculate "*the budgeted amount of Hosting Fees…for the remaining Term*," the Phase 2 Damage Model needs to identify a start date for when the budgeted Hosting Fees begin for each tranche of power.

6.1.2. The DHS Agreement states (emphasis added in **bold**):

"Commencement of commercial operation ("CCO") shall occur when mining in any capacity commences due to sufficient construction completion, with all permits, licenses and everything required at such time for operation of at least one Facility (anticipated to be the North Range Facility), and the proper delivery of electrical power to that Facility in accordance with the Power Purchase Agreement…. **Commencing on CCO, MineOne shall begin paying the Hosting Fee…to BCBC in accordance with the Phase 2 Budget**. Commencement of full commercial operation ("CFCO") shall occur when mining at full capacity (defined as utilization of 98% of the maximum available power at a given facility) begins on construction completion, including all permits, licenses and everything required at such time for operation of the North Range Facility and the proper delivery of electrical power of 45MW of power in accordance with the Power Purchase Agreement." (DHS Agreement, Article 1, Paragraph 5.1)

6.1.3.  Based on this language in the DHS Agreement, the Hosting Fees begin on the CCO dates identified in this Report for each respective tranche of power.  Further, I assume that the "ramp up" of power for each power tranche from CCO to CFCO (i.e., at least 98% utilization of maximum available power for a specific power tranche) takes place in a straight-line manner from CCO to CFCO over the course of ten (10) days.  This assumption is based on (a) each of the data centers having already been pre-loaded with the bitcoin mining machines before CCO and (b) each of the bitcoin mining machines having already been connected to power and internet before CCO.  To most simply account for this straight-line ten (10) day "ramp up" in the Phase 2 Damages Model, an equivalent of five (5) extra full days of budgeted Hosting Fees at full power consumption of the maximum available power for a particular power tranche is added prior to the start of CFCO.

## 6.2. NORTH RANGE 45MW CCO (HOSTING START DATE)

6.2.1.   In this Report, I primarily use two main considerations in evaluating possible CCO dates and then selecting the CCO start date for the North Range 45MW power tranche in the Phase 2 Damages Model.  Those considerations are (a) the words in the key phrase underlying the entire Phase 2 Damages Model, specifically "budgeted" (not "actual)" hosting fees for the Remaining Term and (b) MOW's vendors' contractual obligations and estimated timeline thereof based on the date of the Defendants' breach of and/or interference with the Primary Agreements.

6.2.2.   "Budgeted" not actual: The first consideration is the language underlying the Phase 2 Damages Model mentioned previously in Section 2.2, specifically, "*an*

*amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term….*" This phrase uses the word "budgeted" Hosting Fees for the remaining Term. It does not use the word "actual" Hosting Fees for the remaining Term. Further, given that this is to be applied to the "remaining Term," it suggests that it is the budget at the time of the Defendants' breach of contract, based upon information available at the time of the breach of contract (which likely occurred at some point in January 2023, or slightly before) rather than a budget developed later incorporating additional information after the breach of contract. Also, while one may think that using the "actual" start date (based on actual power consumed) may be a more straightforward approach, it is not the correct approach for the Phase 2 Damages Model. If the "actual" start date was used, it subjects BCB to the delays of MOW's vendors - which BCB did not control, especially after Defendants removed BCB from the project - who were contractually obligated to provide their respective deliverables to MOW. In addition, using the "actual" start date with actual power consumption is hampered by the lack of meaningful production by the Defendants regarding its actual power consumed. For all these reasons, I base the North Range 45MW CCO date in this Report on what would have been budgeted at the time of the Defendants' breach rather than retrospectively using actual data.

6.2.3. In using the "budgeted" approach at the time of the MOTBO breach of contract and Bitmain tortious interference to determine CCO, rather than the "actual" approach as to when CCO actually occurred), to set a CCO date in the Phase 2 Damages Model for the North Range 45MW power tranche, I consider key information regarding several of MOW's vendors' contractual obligations to ready the site for CCO. Those vendors and their contractual obligations are as follows:

- ***CLFPC*** - per the Restated BCIS Agreement between it and MOW, CLFPC was obligated to provide facilities on CLFPC's side of the meter (which were required to deliver power to the North Range site) no later than November 10, 2022. Around the time of the Defendants' breach in January 2023, CLFPC had completed some, but not all, of its facilities to allow for the delivery of 45MW of power to the North Range site. Based on the information available in January 2023, CLFPC estimated completion of all its facilities by February 10, 2023. CLFPC eventually provided notice to MOW on February 22, 2023 that it had completed all of its facilities to deliver 45MW to the North Range site. CLFPC is arguably the most important vendor, since without CLFPC performing its

obligations, then there would be no power delivered to the North Range site (and without power, there would be no Hosting Fees).

- ***CEGEN*** - per its most recent quote before the signing of the Simplified Purchase Order Agreement for ten data centers, CEGEN indicated it would have the ten data centers installed by October 21, 2022.   When CEGEN failed to deliver by this date, it then agreed with MOW, in the First Amendment to the Simplified Purchase Order Agreement, effective December 5, 2022, to provide all ten data centers per the following schedule:

  DC1 - 12/16/22     DC4 - 1/30/23     DC7 - 2/13/23     DC9 - 2/24/23
  DC2 - 1/3/22       DC5 - 1/31/23     DC8 - 2/24/23     DC10 - 3/8/23
  DC3 - 1/16/22      DC6 - 2/13/23

  The aforementioned First Amendment also subjected CEGEN to a daily penalty under the Agreement if CEGEN was unable to provide data centers 1-6 operationally complete by Feb 13, 2023.   Further, CEGEN would be in default under the Agreement if it did not provide data centers 1-6 operationally complete by Feb 13, 2023 and data centers 7-10 operationally complete by Mar 8, 2023.

- ***Shermco*** - per its Consulting Management Master Services Agreement, signed July 25, 2022, with MOW, and several ensuing purchase orders (for (a) Construction Management and (b) Site Electrical Installation), Shermco was required to complete the installation of the medium voltage and low voltage scope of work by December 30, 2022.   As of January 2023, based on information available at the time, the estimate of completion for Shermco's site electrical install was March 1, 2023.

- ***Huapeng*** - per its Purchase Contract for twenty transformers with MOW, and the shipping estimate provided by Iris Li, the twenty transformers were estimated to arrive at the North Range site by November 7, 2022.   The twenty transformers arrived on November 21, 2022.

- ***Belyea*** - per its signed Proposal and Terms and Conditions of Sale with MOW, dated August 18, 2022, Belyea was to have the two switchgear line-ups ready to ship within 12-14 weeks (which puts the estimated ship date between November 10-24, 2022, and estimated arrival date, based on one week for shipping, at November 17-December 1, 2022).   The first switchgear line-up arrived at the North Range site on November 23, 2022.   As of January 2023, it was estimated that the second switchgear line-up would arrive by February 17, 2023 (based on an email from Johnny Larson of Shermco).   The second switchgear line-up eventually arrived at the North Range site on February 27, 2023.

6.2.4. If MOW's vendors had each performed their respective contractual obligations to MOW, it is likely CCO would have occurred in November 2022, with CFCO occurring shortly after that (as Shermco's 12/30 site electrical install date accounted for known delays by CEGEN at the time of the Shermco Electrical Installation purchase order).  However, at the time of Defendants' breach of contract and tortious interference in January 2023, only one of these vendors had fulfilled its obligations, and the estimated completion of several vendors' obligations was still several months away.  At this time it seemed likely that (a) CLFPC would be complete with its facilities by February 10, 2023, (b) CEGEN would be complete with all ten data centers by March 8, 2023, (c) Shermco should have already completed its work, except for the final connections to the data center panels pending CEGEN's work, and (d) Belyea would have its final switchgear delivered to the site by February 17, 2023.  Given these estimates at the time of MOW's breach of contract and Bitmain's tortious interference around January 2023, it seems reasonable to assume a CCO date of March 1, 2023 and a CFCO date of March 10, 2023.

### 6.3.  CAMPSTOOL 30MW CCO (HOSTING START DATE)

6.3.1. Similar to how I've used the "estimated" CCO date (not actual CCO date) for the North Range 45MW power tranche around the time of Defendant MOTBO's breach and Defendant Bitmains tortious interference in this Report's Phase 2 Damages Model, I also use the estimated CCO date (not actual CCO date) for the Campstool 30MW power tranche (for the same reasons already mentioned).  As such, I will base the analysis in this Report on information available around the time of Defendants' breach and tortious interference (while BCB was still involved with the project), rather than information available after that time when the Defendants have taken actions not previously agreed to with BCB (for example, the North Range +25MW expansion appears to have been reprioritized over the initial Campstool 30MW power tranche, which has now pushed back the actual CCO of the Campstool 30MW power tranche).

6.3.2. This Report uses the following information to estimate a likely CCO (and CFCO) date for the Campstool 30MW power tranche:

- Based on MOTBO's directions (and MOTBO's payments to the necessary vendors), BCB worked diligently from June 2022 to January 2023 to secure approval from the Campstool Architectural Review Committee ("CARC") for MOW's bitcoin mining project within the Campstool Addition, with said approval provided on January 27, 2023.  At that point in time,  MOW should have been able to proceed with closing on the

purchase of the Campstool Parcel and exercise its option in the Restated BCIS Agreement with CLFPC to include the additional 30MW at Campstool.

- MOW, now with approval from CARC (i.e., the one thing missing in June 2022 that caused the Campstool 30MW to be made an "option" in the Restated BCIS Agreement and Primary Agreements), could exercise the Campstool option in its Restated BCIS Agreement with CLFPC, which would in turn trigger CLFPC's obligation to implement facilities on its side of the meter to deliver power to the Campstool Parcel. The Restated BCIS Agreement indicates that CLFPC would have at least 150 days to implement its facilities to deliver this power:

  "Customer [MOW] understands and agrees that Company [CLFPC] expects that it will be able to provide service at the East Business Park location [aka Campstool location] no sooner than one hundred fifty (150) days following the receipt of Customer's notice, and that such period may be extended depending on the proximity of the facility to the East Business Park substation." (Restated BCIS Agreement Section 18.10)

  Given that it took nearly eight and a half months for CLFPC to implement its facilities at North Range (June 9, 2022 to February 22, 2023), I estimate that would take eight and a half months for CLFPC to implement its facilities at Campstool (which accounts for the 150 day minimum time to do so in the Restated BCIS Agreement). Further, MOW's parcel at Campstool was the closest available parcel to the East Business Park [aka Campstool] substation, so this would likely have kept implementation times at the shorter end of the range.

- Given that site plans and engineering plans were already approved by the City of Cheyenne, and relationships with many vendors had already been established, it is reasonable to expect that the procurement of key materials (switchgear, transformers, data centers, etc) and buildout of the site would take no longer than the delayed North Range site buildout. The North Range site buildout took approximately eight months to complete (from the selection and ordering of key materials in mid July 2022 to when the site was estimated to achieve CCO in March 2023, based upon the estimate at the time of Defendants' breach in January 2023).

6.3.3. Based upon the information above, I use a CCO date for the Campstool 30MW power tranche that is approximately eight and a half months after the January 27, 2023 date that MOW would have been able to exercise its 30MW Campstool

option and close on the purchase of the Campstool Parcel.  This places CCO around mid October 2023.  As such, and to add in a slight buffer, I use October 22, 2023 as the CCO date for the Campstool 30MW power tranche, with CFCO taking place 10 days later on November 1, 2023.

## 6.4.  NORTH RANGE +25MW CCO (HOSTING START DATE)

6.4.1.  I use a similar process to calculate the CCO date for the North Range +25MW power tranche as I did for the Campstool 30MW power tranche.  Specifically, I estimate eight months for the site buildout concurrent with eight and a half months for CLFPC to build the facilities on CLFPC's side of the meter to deliver the additional power to the North Range site.  I also assume that the build and implementation work for the North Range +25MW power tranche starts upon CFCO of the Campstool 30MW power tranche (as CLFPC representatives had indicated to BCB on multiple phone calls that CLFPC would provide additional power after the initial 45MW at North Range and initial 30MW at Campstool was consumed).  With the Campstool 30MW CFCO estimate occurring on November 1, 2023, that would place CCO of the +25MW power expansion in mid June 2024.   As such, and to add in a slight buffer, I use June 21, 2024 as the CCO date for the North Range +25MW power tranche, with CFCO taking place 10 days later on July 1, 2024.

6.4.2.  The above CFCO date for the North Range +25MW expansion power tranche is reasonable based on BO's September 2023 Investor Presentation, which indicated that its ETD (which is assumed to mean "estimated time of deployment," i.e., when the facility is ready to host bitcoin mining machines) is December 2023.

## 6.5.  CAMPSTOOL +30MW CCO (HOSTING START DATE)

6.5.1.  I use a similar process to calculate the CCO date for the Campstool +30MW power tranche as I did for the Campstool 30MW power tranche and North Range +25MW power tranche, however I add an extra two months to account for potential delays with the City of Cheyenne's site and engineering review/approval process.  Specifically, I assume eight months for the site buildout concurrent with eight and a half months for CLFPC to build the facilities on CLFPC's side of the meter to deliver the additional power to the Campstool site, and an extra two months of extra delays for site plan and site engineering from the City of Cheyenne.  I also assume that the build and implementation work for the +30MW power tranche starts upon CFCO of the Campstool 30MW power tranche (as CLFPC representatives had indicated to BCB on multiple phone calls that CLFPC

would provide additional power after the initial 45MW at North Range and initial 30MW at Campstool was consumed).   With the Campstool 30MW CFCO estimate occurring on November 1, 2023, that would place CCO of the +30MW power expansion in mid August 2024.   As such, and to add in a slight buffer, I use August 22, 2024 as the CCO date for the Campstool +30MW power tranche, with CFCO taking place 10 days later on September 1, 2024.

6.5.2.   The above CFCO date for the Campstool +30MW expansion power tranche is reasonable based on BO's September 2023 Investor Presentation, which indicated that its ETD (which is assumed to mean "estimated time of deployment," i.e., when the facility is ready to host bitcoin mining machines) is March 2024.

## 7. KEY ASSUMPTION - HOSTING RATE

### 7.1.  NORTH RANGE 45MW AND CAMPSTOOL 30MW HOSTING RATE

7.1.1.  The "budgeted amount of Hosting Fees…corresponding to the Remaining Term" for each month of operations is based on two important variables: the hosting rate and the estimated power consumption in a particular month.  The hosting rate is set by the DHS Agreement, where it says that BCB's Hosting Fee for each calendar month shall be "an amount equal to USD one cent ($0.01) per KWh consumed by the Miners and the Facilities multiplied by the metered consumption (in KWh)...." (DHS Agreement Article IV, Paragraph 3).  Given that the DHS Agreement specifically references both the North Range 45MW site and Campstool 30MW site, I use the $0.01/KWh for those two power tranches in the Phase 2 Damages Model.

### 7.2.  NORTH RANGE +25MW AND CAMPSTOOL +30MW HOSTING RATE

7.2.1.  As mentioned earlier in this Report, the DHS Agreement does not specifically reference the additional power tranches at North Range (+25MW) and Campstool (+30MW).  As such, it does not explicitly set the hosting rate for these power tranches (like it did for the North Range 45MW and Campstool 30MW tranches). However, it is reasonable to assume that BCB and MOW would have agreed to the same hosting rate for the power expansions as it had already agreed to for the initial power at each site.  As such, I use the $0.01/KWh hosting rate for both the North Range +25MW and Campstool +30MW power tranches in the Phase 2 Damages Model.

## 8. KEY ASSUMPTION - UPTIME

### 8.1.  TWO TYPES OF UPTIME

8.1.1.   The other important variable in determining the "budgeted amount of Hosting Fees…corresponding to the Remaining Term," for each month, in addition to the hosting rate, is the estimated power consumption for each month of the remaining term.   As I previously explained in this Report, given the Defendants' likely desire to use as much of maximum available power as possible and the limited information about the specific composition of bitcoin mining machines, it is reasonable to use the maximum available power as the starting point for estimating the monthly power consumption for each site.  An important factor that affects how much of the maximum available power is consumed in a month is "uptime," which is what percentage of time over a period of time that power is being consumed.  In this Report, I look at uptime from two different perspectives: Energy Uptime and Operational Uptime.

### 8.2.  ENERGY UPTIME

8.2.1.   For the purpose of this report, Energy Uptime is the percentage of time for any given period that CLFPC provides power to a site.   Energy Uptime can be affected by several factors, including but not limited to curtailment or interruption, which is the deliberate reduction of available power for any number of reasons.   Under the Restated BCIS Agreement between CLFPC and MOW, either of those parties could effectively curtail or interrupt the maximum available power.

8.2.2.   The Restated BCIS Agreement (section 3.2) between CLFPC and MOW allows CLFPC to curtail/interrupt up to three hundred hours per calendar year.  However, whenever CLFPC is curtailing/interrupting power, it isn't making money (since it isn't selling power to MOW), so CLFPC is incentivized to not curtail/interrupt the power supply. As such, CLFPC would likely have been very selective in curtailing the power, most likely only for important system repairs and/or upgrades.  Based on this, it's reasonable to assume that this component of Energy Uptime would be as close to 100% as possible.

8.2.3.  The Restated BCIS Agreement between CLFPC and MOW also allows MOW to effectively curtail itself by MOW choosing to purchase less than the maximum amount of available power.   MOW may choose to purchase less than the maximum amount of available power if it had not pre-purchased a block of

power, and as such, was subject to day-ahead power pricing, and that day-ahead power pricing was too high for it and/or its hosted clients to operate profitably. Given the possibility to avoid day-ahead pricing by purchasing a block (per section 4.1 of the Restated BCIS Agreement), and given MOW's likely desire to consume as much of the maximum available power as possible (since like CLFPC, MOW wouldn't be making money if it wasn't consuming power), it's reasonable to assume this component of Energy Uptime would be as close to 100% as well.

8.2.4.   Based upon CLFPC's desire to provide as much power as possible, and MOW's desire to consume as much power as possible, I assume an Energy Uptime rate of 99.6% in the Phase 2 Damages Model.  This Energy Uptime rate would allow for approximately three (3) hours per month for curtailment/interruption of the power supply from CLFPC.

## 8.3.  OPERATIONAL UPTIME

8.3.1.   Whereas Energy Uptime is based on the power available to a site, this Report bases Operational Uptime on the equipment at the site consuming the power that is available to it.  Almost all of the power for each power tranche would be used by the bitcoin mining machines.  Other equipment consuming power include, but is not limited to, fans, network switchgear, and lights.   As long as the core infrastructure of the site (switchgear, transformers, PDUs, networking equipment, etc.) is properly working to deliver power and internet to the bitcoin mining machines, the bitcoin mining machines would be consuming power.  Given that all of the infrastructure equipment is new (with the exception of the network switches, which are refurbished), including most of the bitcoin mining machines, it is reasonable to assume there would be few issues leading to operational downtime.  Further, any maintenance of equipment which would require power to be turned off for any of the power tranches, could be coordinated during some or all of the estimated curtailment from CLFPC.   Lastly, the number of staff identified in the budget (see Section 9 below) would allow for a higher operational uptime as (a) more preventative maintenance could be performed (to prevent operational downtime) and (b) quicker troubleshooting and repairs could be performed (to limit operational downtime if it occurred).  Given these factors, which support a higher operational uptime, I assume an operational uptime rate of 99.9% in the Phase 2 Damages Model.

## 8.4.  ESTIMATED UPTIME

8.4.1. The combination of Energy Uptime and Operational Uptime (assuming the downtime periods from each do not overlap) is 99.5% (which is calculated by multiplying 99.9% Energy Uptime x 99.6% Operational Uptime = 99.5% Uptime). I apply this 99.5% combined uptime percentage to each tranche of power after CFCO for each tranche of power. For the ten day "ramp up" between CCO and CFCO, I assume a 90% Uptime rate (to account for any potential issues that might arise in energizing additional infrastructure and/or bitcoin mining machines for the first time).

## 9. KEY ASSUMPTION - COSTS

### 9.1.  COSTS

9.1.1.  After calculating the revenue associated with operating each tranche of power through June 8, 2027 (i.e., *the budgeted amount of Hosting Fees…for the remaining Term*), the next step is to determine the expenses associated with generating that revenue, specifically the "***…costs… therein…for the remaining Term.***"  The DHS Agreement specifically identifies some of these "costs":

"BCBC shall ensure that all O&M Costs are paid or reimbursed from the Hosting Fee, including all costs and expenses incurred or reserved for in respect of such calendar month including, without limitation, scheduled and unscheduled operation and maintenance costs and all expenses for personnel, security, insurance and consultancy costs of Terra as provided for in the Consultancy Services Agreement. Costs for non-budgeted equipment repairs will not be paid or reimbursed from the Hosting Fee, and will instead be the responsibility of MineOne. (DHS Agreement, Article IV Paragraph 3)

9.1.2.  I estimate the individual cost items for the remaining term, broken out by each tranche of power, in the "Phase 2 Expense Detail" chart of the Phase 2 Damages Model.

### 9.2.  PERSONNEL COSTS

9.2.1.  The largest cost of providing O&M services is the people working on the site doing the actual operations and maintenance. The cost of this labor is paid as salary to each employee working on the sites. In addition to each employee's salary, there are additional costs for each employee, specifically, payroll taxes and employee benefits. Over the course of the remaining term, the labor costs,

including payroll taxes and employee benefits, account for over eighty percent (80%) of the total costs (not including the Terra consulting fee).

9.2.2.  For personnel costs, the Phase 2 Damages Model identifies the employee positions recommended for a well-staffed operation for each tranche of power, the start date for each position (based on CCO for each tranche of power), the salary for each position, and the annual raise rate for all positions.

9.2.3.  The personnel staffing plan includes four positions: Operations Manager, Operations Admin, Lead Site Technician, and Site Technician:

- Operations Manager & Operations Admin - each of these separate roles are allocated to the first site's tranche of power in the Phase 2 Damages Model (North Range 45MW) even though each of the roles include performing services for the other site and expansion tranches at both sites.
- Lead Site Technicians - one per site.
- Technicians - based on (a) at least one technician on site at all times (to perform preventative maintenance and repairs, and also to serve a site security role) and (b) at least one technician for every 10MW of managed bitcoin mining machines (based on the ratio used by other O&M service providers to ensure proper staffing levels to perform the necessary preventative maintenance and repairs for all of the bitcoin mining machines at a particular site).  In order to have at least one technician on a site at all times based on a forty hour work week for each employee, there must be a staff of at least five technicians allocated to each site (168 total hours per week / 40 hours per per week per employee = 4.2 employees).

9.2.4.   In the Phase 2 Damages Model, the start date for each employee, and the beginning of that employee's salary and related costs, coincide with CCO (in order to align the start of that cost item with the start of the revenue generated from that cost).  Any costs associated with employees before CCO (for example, onboarding, training, racking the bitcoin mining machines, etc) would have been paid for under the Phase 1 Implementation budget (rather than the Phase 2 O&M Budget).

9.2.5.  Each employee's salary is based on typical salaries for the role at similar O&M service providers.  The annual raise rate is based on (a) the projected rate of inflation and (b) an incentive for each employee to optimize his/her performance.

## 9.3.  OTHER COSTS

9.3.1.  In addition to personnel (and personnel related) costs, there are additional costs associated with providing the O&M services.  The Phase 2 Damages Model includes both of the additional costs referenced by the DHS Agreement: security and insurance.  It also includes estimates for several other reasonable and expected expenses associated with performing O&M services, which are based on costs at comparable bitcoin mining sites, including but not limited to:

- Network maintenance and troubleshooting (to supplement on-site staff)
- Professional fees for legal matters and bookkeeping
- Employee equipment (cell phones, tablets, PPE, etc)
- Site equipment (fuel, repair kits, vehicle to move between sites, etc)
- Training and continuing education for employees
- Site utilities (electrical, water, sewer/port-o-john, etc)
- Software (for payroll, business management, etc)

9.3.2.  I also identify costs related to major site consumables and infrastructure in the Phase 2 Damages Model, which would be covered by MOW per MOW's obligations in the DHS Agreement, but I do not include those costs in the calculation of the net hosting fees.  Article II of the DHS Agreement indicates that during Phase 2, MOW is responsible for:

"1.1(b) Payment of all Power Supply fees (as invoiced by the Utility) and other costs and expenses as provided for in the Phase 2 Budget" and

"1.1(d) Payment or reimbursement of any budgeted cost to BCBC for repairs or replacement to infrastructure, buildings, Containers, site, and Facilities."

This would include, but is not limited, to the following site and infrastructure costs:

- Filters and other site consumables
- Generator servicing
- Electrical inspections, maintenance and repairs
- HVAC inspections, maintenance and repairs
- Forklifts (one per site)
- Miner management software

## 10. KEY ASSUMPTION - TERRA'S CONSULTING FEE

### 10.1.  CONSULTING FEE

10.1.1. After calculating (i) the "*...the budgeted amount of Hosting Fees…for the remaining Term*" and (ii) subtracting from that amount the "*...costs…therein…for the remaining Term,*" the next step is to determine the "***...consulting fees therein…for the remaining Term.***"

10.1.2. Based on the information reviewed, it appears the MOTBO Defendants required that Terra provide consultancy services to BCB because the MOTBO Defendants (a) knew that the North Range site and Campstool site were the first bitcoin data center projects the BCB principals would be implementing and managing and (b) wanted to ensure they could provide guidance, assistance, and oversight on the work that BCB was performing (based upon the extensive bitcoin data center experience and expertise the MOTBO Defendants represented themselves having to BCB). The DHS Agreement states:

"Audit & Supervision. Terra shall be appointed to provide audit, supervision and consultancy to BCBC (on the terms contained in the Consultancy Services Agreement)." (DHS Agreement Article III, Paragraph 2.1)

10.1.3. The CS Agreement provided the specific terms of Terra's consultancy services. It required the following of Terra during Phase 1:

"Consultant Phase 1 Obligations. The Consultant [Terra] shall be responsible for the following during the Build & Implementation Phase ("Consultant Phase 1 Obligations"):

(a) Approve the Initial Budget presented by the Company [BCB] to MineOne.

(b) Ensure that all the processes, activities and tasks with regard to the building of the Facilities are developed in a timely manner and coordinate all operational activities with the Company [BCB] and funding needs with MineOne.

(c) Provide expert support to the Company [BCB] as and when requested by MineOne and/or Company [BCB]." (CS Agreement Article II Paragraph 2.1)

10.1.4. In return for Terra's services (both in Phase 1 and Phase 2), the CS Agreement indicates how Terra was to be compensated by BCB. The CS Agreements states:

"Consultancy fee. In consideration of the services to be provided by the Consultant [Terra] hereunder, the Company [BCB] shall pay to the Consultant [Terra] during the Term a consultancy fee ("Consultancy Fee") in an amount

equal to 20% of the Net O&M Margin. For these purposes, the "Net O&M Margin" shall be the amount of net Hosting Fee paid by MineOne to the Company [BCB] pursuant to the Development, Hosting & Services Agreement after deduction of all O&M Costs paid or reimbursed from the Hosting Fee, including all costs and expenses incurred or reserved for in respect of such calendar month including, without limitation, scheduled and unscheduled operation and maintenance costs and all expenses for personnel, public services, security and insurance." (CS Agreement Article IV Paragraph 1)

10.1.5. Regarding the timing of payment of the Consultancy Fee by BCB to Terra, the CS Agreement states:

"The Consultancy Fee shall be invoiced by the Consultant [Terra] to the Company [BCB] and payable by the Company [BCB] to the Consultant [Terra] at the same time as MineOne pays Hosting Fee to the Company [BCB]." (CS Agreement Article IV Paragraph 1)

The DHS Agreement required that MOW pay the Hosting Fee to BCB on a monthly basis "for the immediately preceding calendar month" (DHS Agreement Article IV Paragraph 3).

10.1.6. The contractual language cited above makes the calculation of the Consultancy Fee and its timing of payment a straightforward exercise in the context of the DHS Agreement and CS Agreement if there were no breaches of either of those agreements.  For each month, the estimated monthly Net O&M margin (i.e., the budgeted Hosting Fee less the estimated costs incurred) is multiplied by twenty percent (20%), with the resulting product being the amount of the Consultancy Fee.  That monthly Consultancy Fee is then subtracted from the monthly Net O&M Margin to arrive at "*an amount equal to…the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term.*"

## 10.2.  IMPLICATIONS OF TERRA'S BREACH OF THE CONSULTANCY AGREEMENT

10.2.1. Based upon the documents and information reviewed, Terra did not fulfill its obligations under the CS Agreement, one of which was to "(b) Ensure that all the processes, activities and tasks with regard to the building of the Facilities are developed in a timely manner…."

10.2.2. Terra indirectly acknowledged it did not fulfill this obligation because it, along with the other MOTBO Defendants, filed a counterclaim against BCB alleging that BCB breached the DHS Agreement by having a "total inability to properly and timely perform its Phase 1 obligations under the DHS Agreement" (Defendants MOTBO's Answer, Defenses, and Amended Counterclaims, filed October 31, 2023, to Plaintiff BCB's First Amended Complaint paragraph 36). This timely performance is likely in regards to the DHS Agreement's requirement of BCB to perform "(d) All other reasonable related activities within its control to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022."

10.2.3. Whereas BCB's obligation for timely performance in the DHS Agreement was **qualified** (i.e., it was only for "all other reasonable activities within its control"), Terra's obligation for timely performance in the CS Agreement was **unqualified**. Terra's obligation was not only for reasonable activities within its control (like BCB's obligation). Terra's obligation was universal; it was for "...all the processes, activities and tasks." By alleging that BCB didn't timely perform (which BCB did for reasonable activities within its control), MOTBO acknowledges that timely performance was not achieved on the project, and that timely performance was ultimately Terra's obligation.

10.2.4. Based on Terra's breach of the CS Agreement, and its indirect acknowledgement thereof, BCB is entitled to damages from Terra. For the purpose of the Phase 2 Damages Model, the simplest way to calculate that relief is to waive BCB's obligation to pay the Consultancy Fee under the CS Agreement and DHS Agreement. As such, the Phase 2 Damages Model does not include the Consultancy Fee payment in the calculation of "*an amount equal to…the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term.*"

## 11. KEY ASSUMPTION - NET PRESENT VALUE

### 11.1. NET PRESENT VALUE

11.1.1. The final step in determining "*an amount equal to the net present value of the budgeted amount of Hosting Fees (net of costs and consulting fees therein) for the remaining Term*" with the Phase 2 Damage Model is to calculate the "net present value."

11.1.2. Net Present Value (NPV) is the value of all future cash flows over a specified term discounted to the present. Each future cash flow in net present value calculations is discounted to adjust for the risk of an opportunity and to account for the time value of money.  While it is possible for an opportunity's risk and time value of money to change over the course of the opportunity, for the purpose of most NPV calculations, those variables are held constant (which they will be in this Report).

11.1.3. In order to calculate the present value of each cash flow in a typical scenario, each cash inflow is discounted back to its present value, which is performed by dividing the cash flow amount by $(1 + i)^t$, where "i" is the discount rate and "t" is the time of the cash flow (in this case, an integer based on the number of months from the present to the time of the cash flow).  However, in some scenarios, such as this, the cash flows have occurred before the date used to calculate net present value (rather than in the future).  The aforementioned formula handles these cash flows as well, and rather than "discounting" them back to the present date, it "marks them up" to the present date.  After each cash inflow is discounted or marked up to its present value, the present values of each cash inflow are summed together to arrive at the NPV.

## 11.2.  DISCOUNT RATE

11.2.1.  As previously mentioned, the discount rate adjusts for the risk of an opportunity to account for the time value of money.  A metric commonly used as the discount rate for finding the present value of a company's cash flows is the Weighted Average Cost of Capital (WACC).  A reasonable way to determine an appropriate discount rate for the Phase 2 Damages Model is to base it on WACCs for similar companies, for example, bitcoin mining companies, bitcoin O&M service provider companies, and/or more broadly, companies in the information technology industry.

11.2.2.  The "mean" (or average) WACC for public companies operating in the Information Technology industry group in the Developed economic region (based on data from 1,522 public companies compiled by Finxbox.com, an online source of accurate and up-to-date financial information on publicly traded companies), is 10.5%.  While WACCs for bitcoin mining companies and/or bitcoin O&M service provider companies typically skew higher than this, 10.5% is used as the NPV discount rate in the Phase 2 Damages Model as a conservative estimate.

## 11.3.  NET PRESENT VALUE DATE

11.3.1.   Another important consideration in calculating NPV is what date to use as the present date.  Should it be the date when the Defendants breached the agreement?  Should it be the date of this Report?  Should it be the date BCB would be able to collect a potential award from a trial?  The choice of date has a significant impact on the final value of damages.

11.3.2.   This Report calculates damages based on two relevant NPV dates: (i) February 28, 2024, the date of this Report, and (ii) January 27, 2025, the first day of the scheduled trial in this matter.  It does this to illustrate that BCB's damages increase every day solely based on the contractual language that requires BCB's damages to be based on NPV.  It also provides the damages based on the scheduled trial date as that date is currently the most likely date for BCB to be made whole by Defendants.

## 12. PHASE 2 DAMAGES

### 12.1.  PHASE 2 DAMAGES BASED ON 2/28/24 REPORT DATE

12.1.1.   The Phase 2 Damages, based on the 2/28/24 Report Date, for each power tranche are as follows:
- North Range 45MW - $12,473,213
- Campstool 30MW - $6,962,454
- North Range +25MW - $4,973,931
- Campstool +30MW - $5,772,770

### 12.2.  PHASE 2 DAMAGES BASED ON 1/27/25 TRIAL DATE

12.2.1.   The Phase 2 Damages, based on the 1/27/25 scheduled trial date, for each power tranche are as follows:
- North Range 45MW - $13,743,642
- Campstool 30MW - $7,671,598
- North Range +25MW - $5,480,539
- Campstool +30MW - $6,360,741

## 13. PHASE 1 DAMAGES

### 13.1.  NORTH RANGE 45MW PHASE 1 DAMAGES

13.1.1.  When Defendant Bitmain interfered with, and Defendants MOTBO materially breached, BCB's and MOW's DHS Agreement, there was still remaining Phase 1

implementation work to be performed by BCB.  By breaching during Phase 1, Defendants not only refused to pay BCB for actual services performed and invoiced by BCB for Phase 1, but Defendants denied BCB its contractual right to earn the remaining unpaid Phase 1 implementation fees for each power tranche.

13.1.2.  The first step in calculating BCB's Phase 1 Damages for the North Range 45MW power tranche is to identify the amount set out in the Phase 1 budget for the North Range 45MW implementation fee.  The Phase 1 budget used by BCB and the Defendants indicates the implementation fee for the North Range 45MW power tranche was $600,000.00.

13.1.3.  Over the course of Phase 1 implementation of the North Range 45MW power tranche, BCB provided MOW with six $90,000.00 progress invoices for services rendered (for a total of $540,000.00).  MOW paid the first five $90,000.00 invoices (for a total of $450,000.00), but did not pay the sixth invoice, which was the progress billing for BCB's services provided in January and February 2023.

13.1.4.  BCB's Phase 1 Damages for the North Range 45MW power tranche are the remaining unpaid budgeted implementation fees, consisting of the sixth $90,000.00 invoice (for services rendered in January and February 2023) and the remaining uninvoiced $60,000 of the Phase 1 budget for the North Range 45MW power tranche, for a total of $150,00.00 of Phase 1 Damages related to the North Range 45MW power tranche.

## 13.2.  CAMPSTOOL 30MW PHASE 1 DAMAGES

13.2.1.  The Phase 1 budget used by BCB and the Defendants indicates the implementation fee for the Campstool 30MW power tranche was $400,000.00.

13.2.2.  Due to Defendants' actions, BCB was denied its contractual right to perform any Phase 1 implementation work for the Campstool 30MW power tranche (and to then be paid for that implementation work).  As such, BCB's Phase 1 Damages for the Campstool 30MW power tranche is the full budgeted amount of implementation fees, which is $400,000.00.

## 13.3.  NORTH RANGE +25MW PHASE 1 DAMAGES

13.3.1.  Defendants' actions also denied BCB the opportunity to perform Phase 1 implementation services for power expansions at both sites and to receive Phase 1 implementation fees from implementing those expansion power tranches.  It is

reasonably foreseeable that BCB would have performed the Phase 1 implementation services for any power expansions given its role in developing the bitcoin mining opportunity, its relationship with CLFPC, its prior implementation work, and its presence and role as the O&M Service Provider at each site.

13.3.2. The Phase 1 budget used by BCB and the MOTBO Defendants only included the North Range 45MW tranche and the Campstool 30MW tranche, so there is no specific document that provides the budgeted amount of Phase 1 implementation fees for any power expansion at either the North Range site or Campstool site. As such, I estimate the likely Phase 1 implementation fees for the expansion power tranches (rather than identifying an amount in a Phase 1 budget).

13.3.3. For the power expansions (NR+25MW and CS+30MW), I estimate Phase 1 implementation fees based on the cost per MW charged for the initial North Range 45MW implementation and the initial Campstool 30MW implementation, and then apply a 10% discount to account for the likely efficiencies (for example, using many of the same vendors and processes) in implementing another tranche of power at an existing site.

13.3.4. The Phase 1 implementation fees for the North Range 45MW site and Campstool 30MW site, on a per MW basis, are $13,333.33/MW (i.e., NR: 45MW/$600,000 = $13,333.33; CS: 30MW/$400,000 = $13,333.33). Using a $13,333.33/MW rate for the North Range +25MW power expansion, and then applying a 10% discount, results in Phase 1 implementation fees of $300,000.00. (i.e., 25MW x $13,3333.33/MW x 0.9 = $300,000.00). This $300,000.00 is BCB's Phase 1 Damages related to the North Range +25MW expansion power tranche.

## 13.4  CAMPSTOOL +30MW PHASE 1 DAMAGES

13.4.1. Based on the same logic and formula as the other expansion power tranche (North Range +25MW), the Phase 1 Damages for the Campstool 30MW power expansion are $360,000.00. (i.e., 30MW x $13,3333.33/MW x 0.9 = $360,000.00).

## 14. PI DAMAGES - ENERGY PRICE SAVINGS

### 14.1.  ENERGY PRICE SAVINGS PI DAMAGES - DEFINITIONS

14.1.1. Before diving into the mechanics of the Energy Price Savings PI Damages Model, it is important to understand several important terms in the DHS Agreement that underlie the model:

- Average All-in Power Cost - the (a) Cost of Supply, (b) a Utility margin consisting of one or several of the Utility Minimum Margin, Utility Margin Share, and Utility Variable Margin, and (c) the WAPA Network Transmission Charges;
- Margin Share Cost of Supply Rate - the (a) Cost of Supply and (b) a Utility margin consisting of the Utility Minimum Margin and Utility Margin Share
- Variable Cost of Supply Rate - includes the (a) Cost of Supply and (b) a Utility Variable Margin
- Pricing Transition Point - the specific Cost of Supply at which (a) if the Cost of Supply is less than the PTP, then the Average All-in Power Cost uses the Margin Share Cost of Supply Rate and (b) if the Cost of Supply is more than the PTP, then the Average All-in Power Cost uses the Variable Margin.
- Lowest Possible Variable Cost of Supply Rate - the sum of the PTP plus the highest Utility Variable Margin rate (i.e., 18%); this is the Cost of Supply at which MOW does not receive any additional price savings per its Restated BCIS Agreement compared to BCB's Original BCIS Agreement.  In other words, any Cost of Supply Rate less than the Lowest Possible Variable Cost of Supply Rate results in energy price savings for MOW that BCB negotiated into MOW's Restated BCIS Agreement.

14.1.2. The DHS Agreement indicates BCB shall be entitled to thirty percent (30%) of the energy price savings when MOW pays an Average All-in Cost of Power that is less than the sum of the Margin Share Cost of Supply Rate and WAPA Network Transmission charge.  In order to simplify the Energy Price Savings Damages Model, it is possible to remove the WAPA Network Transmission charge, as it is a component of both sides of the equation (i.e. it is part of (a) the Average All-in Cost of Power and (b) it is specifically referenced as part of the comparison point - "less than the sum of the Margin Share Cost of Supply Rate and WAPA Network Transmission Charges").   The All-in Cost of Power without the WAPA Network Transmission charge is the Cost of Supply plus a utility margin.  This means the key comparison is between (a) the Cost of Supply plus a utility margin and (b) the Margin Share Cost of Supply.

14.1.3. As mentioned before, the Margin Share Cost of Supply is the (a) Cost of Supply and (b) a Utility margin consisting of the Utility Minimum Margin and Utility

Margin Share.  Further, the price of power is based on the Margin Share Cost of Supply whenever the Cost of Supply is less than the Pricing Transition Point. And further still, whenever the Margin Share Cost of Supply is used, that means MOW is receiving an energy price savings under its Restated BCIS Agreement as compared to BCB's original BCIS Agreement.  This means that whenever MOW receives energy price savings under its restated BCIS Agreement, it is receiving the Margin Share Cost of Supply.  So calculating the difference between the "Cost of Supply plus a utility margin" and the "Margin Share Cost of Supply" for the purpose of determining the price savings, the result will always be zero because the "Cost of Supply plus a utility margin" IS the "Margin Share Cost of Supply" for all Costs of Supply less than the Pricing Transition Point.  This means that the All-in Cost of Power, as defined in the DHS Agreement, can never be less than the Margin Share Cost of Supply, which renders the entire Energy Price Savings clause moot.  It is clear the parties made a mistake in their DHS Agreement by comparing the All-in Cost of Power to the Margin Share Cost of Supply in order to determine the energy price savings incentive.

14.1.4.  Rather than using the Margin Share Cost of Supply as the reference point for determining energy price savings, the parties should have used - and very likely intended to use - the "lowest possible Variable Cost of Supply."  The lowest possible Variable Cost of Supply is the Cost of Power at the Pricing Transition Point.  The Pricing Transition Point is the transition between price savings under MOW's Restated BCIS Agreement compared to BCB's Original BCIS Agreement.  So if the All-in cost of power is less than the lowest possible Variable Cost of Supply, then there is an energy price savings relative to BCB's Original BCIS Agreement.  Conversely, if the All-in cost of power is greater than the lowest possible Variable Cost of Supply, there is no energy price savings relative to BCB's Original BCIS Agreement.  As such, in this Report's Energy Price Savings PI Damages model, I use the "lowest possible Variable Cost of Supply" rather than the Margin Share Cost of Supply as the comparison point to the incurred All-in Cost of Power when determining if there are energy price savings, and if so, how much they are.

## 14.2.  ENERGY PRICE SAVINGS PI DAMAGES - MODEL

14.2.1.  In order to calculate BCB's PI Damages for Energy Price Savings based upon the language in the DHS Agreement (referenced in Section 2.4 of this Report), I utilize a model that does the following:
- On a monthly basis, it estimates the two most important variables in the model: Energy Cost and Transmission Cost.

- It then calculates the difference between the (a) Cost of Supply plus utility margin and (b) the lowest possible Variable Cost of Supply.
- It then multiplies that difference by the number of kilowatt hours consumed, broken out by each power tranche, to determine the total price savings or price overage for each power tranche.
- It then multiplies that price savings or price overage by thirty percent (30%) to calculate BCB's share for each power tranche.
- It then applies BCB's monthly share of the energy price savings or energy price overage to the Energy Price Savings Security Fund for each power tranche.  If there is an energy price savings in any given month, the balance of the Energy Price Savings Security Fund increases.  If there is an energy price overage in any given month, the balance of the Energy Price Savings Security Fund decreases.

14.2.2.  Given that (a) BCB only receives a net energy price incentive so long as there is an energy price savings over the term of the agreement (despite the fact the DHS Agreement provided for annual payments) and (b) the DHS Agreement does not indicate that the value of the energy price savings should be based on net present value, the focal point of this model is the final balance in the Energy Price Savings Security Fund.  If the final balance is positive (representing an energy price savings over the term of the DHS Agreement), then that is the amount BCB would have received over the course of the DHS Agreement (less the 20% required to be paid to Terra, if Terra had not breached the CS Agreement).  If it is negative, then BCB would ultimately not have made any additional compensation from the energy price savings performance incentive over the course of the DHS Agreement, and as such would not have any PI Damages from the energy price savings incentive.

## 14.3.  ENERGY PRICE SAVINGS PI DAMAGES - ASSUMPTIONS

14.3.1. Wherever possible, the Energy Price Savings PI Damages Model incorporates the same assumptions as the Phase 2 Damages Model, specifically:
- The energization date for each tranche of power;
- The maximum amount of available power is used;
- The uptime rate for each tranche of power; and
- That Terra should not receive its 20% Consultancy Fee due to its breach of the CS Agreement.

14.3.2. The primary and most important variable in the Energy Price Savings Damages Model is the Cost of Energy. A secondary variable is the Transmission Cost (of that energy). Both of those components are part of the Cost of Supply.

14.3.3. *Cost of Energy.* Estimates for the energy price were based upon the following:
- CLFPC-provided historical day-ahead energy prices for 2018, 2019, 2020, and 2021, with 990 high price and 990 low price trade prices for peak hours from the Palo Verde ("PV") wholesale energy market;
- CLFPC-provided peak to off-peak monthly average discount rate for the aforementioned peak hour data set;
- Removal of three outlier prices from the data set (as the price was extremely high, and in that scenario, it would be expected that the sites would curtail, and not use, any power); this is the equivalent of curtailing for three days over a four year period, which is reasonable.
- Calculating the mean price for the following: (i) peak high, (ii) peak low, (iii) off-peak high, (iv) off-peak low.
- Calculating the average peak and average off-peak price
- Pro-rating the peak and off-peak average prices by the number of hours of each in a typical week (i.e., 88 peak, 80 off-peak) to determine a pro-rated average cost of energy
- Discounting the pro-rated average cost of energy by $5/MW, based upon CLFPC's representation that CLFPC usually gets power at a $5-$10/MW discount to PV pricing, which results in an average energy price of approximately $30/MW.

14.3.4. Block Purchases of Energy. Based on MOW's Restated BCIS Agreement, it has the ability to "...work with Company [CLFPC] to procure blocks of power" (BCIS Agreement, Section 4.1). In general, purchasing one or more blocks of power removes some or all of MOW's exposure to the variability of the day-ahead energy market. At the time of drafting this Report, there was not enough available data to factor block purchase prices into the Cost of Energy for the Energy Price Savings PI Damages Model, however, it remains a viable strategy for further reducing (and smoothing) the forecasted power price (pending more data).

14.3.5. *Transmission Cost.* In this Report I assume that the power procured for the bitcoin mining sites comes from energy producers located relatively close to Cheyenne, WY and would be transmitted over previously established and efficient transmission routes with available capacity. As such, I use an estimate of $2/MW for the transmission cost over the remaining term. That being said, this Report

acknowledges the possibility that the estimated transmission cost could be higher, particularly in the scenario of CLFPC procuring one or more large blocks of power (as discussed in Section 14.3.4) from energy producers located farther away from the bitcoin mining sites and/or with more expensive transmission routes to the bitcoin mining sites.

## 14.4.  ENERGY PRICE SAVINGS PI DAMAGES

14.4.1.  Based on the Energy Price Savings PI Damages Model, which factors in the assumptions above, the Energy Price Savings PI Damages for each tranche of power are as follows:
- North Range 45MW:  $1,731,289
- Campstool 30MW:     $1,089,163
- North Range +25MW:  $816,742
- Campstool +30MW:    $940,981

## 15. PI DAMAGES - ENERGY UPTIME

## 15.1.  ENERGY UPTIME PI DAMAGES - DEFINITIONS

15.1.1.  Before diving into the mechanics of the Energy Uptime Damages Model, it is important to understand several important terms incorporated into the model:
- Energy Uptime - the percentage of time that the Power Supply is available to the bitcoin mining machines based on the total available power during a particular time period.
- Power Supply - the supply of reliable electric power and energy from the utility

## 15.2  ENERGY UPTIME PI DAMAGES - MODEL

15.2.1.  In order to calculate BCB's PI Damages for Energy Uptime based upon the language in the DHS Agreement (referenced in Section 2.4 of this Report) I utilize a model that does the following:
- Starting with the historical bitcoin price and total network hashrate for January 2023 (based on an average of sampled data from Blockchain.com: https://www.blockchain.com/explorer/charts/market-price and https://www.blockchain.com/explorer/charts/hash-rate - see Exhibit F), it projects the bitcoin price and network hashrate for each month for the remaining Term (using the same growth rate for both of those items based on the bitcoin price and network hashrate equilibrium theory, explained below in Section 15.3.3-15.3.5);

- It then calculates the amount of bitcoin mined, on a monthly basis, for each tranche of power, given the assumed hashrate for each tranche of power and estimated Energy Uptime;

- From those monthly amounts of estimated bitcoin mined, it then subtracts the amount of bitcoin mined, on a monthly basis, for each tranche of power, based on an Energy Uptime of 98%, with the difference being the amount of additional mined bitcoin based on the Energy Uptime greater than 98% (if the difference is a positive number). If the difference is negative, it means that the Energy Uptime was less than 98%;

- Then it multiplies that difference, for each month, by thirty percent (30%) to calculate BCB's share of the monthly additional (or deficit in) mined bitcoin for each power tranche;

- Then, on a monthly basis, it multiplies BCB's share of the additional mined (or deficit in) bitcoin by the projected bitcoin price in USD for each respective month, to convert the bitcoin to a USD amount***;

- Then it applies BCB's monthly share of the additional (or deficit in) mined bitcoin in USD to the Energy Uptime Security Fund for each power tranche. If the monthly amount is a positive number, the balance of the Energy Uptime Security Fund increases. If the monthly amount is a negative number, the balance of the Energy Uptime Security Fund decreases.

15.2.2.  ***Alternative approach: as mentioned directly above, the model converts the additional (or deficit in) bitcoin to USD on a monthly basis. It does this to standardize the total damages across all four damage categories in USD (so that the total damages can be quoted in a single currency, rather than some of it in USD and and some of it in bitcoin). That being said, based on a strict application of the language in the DHS Agreement, if there are any Energy Uptime PI Damages, they should be based on a number of bitcoin (not an amount of dollars). Given this, I've presented the balance of the Energy Uptime Security Fund for each month in bitcoin (as well as as USD) in the event the Court prefers that approach instead of the USD approach.

15.2.3.  Given that (a) BCB only receives a net energy uptime incentive so long as there is an energy uptime greater than 98% over the term of the agreement (despite the fact the DHS Agreement provided for annual payments) and (b) the DHS Agreement does not state the value of the energy uptime should be based on net present value, the focal point of this model is the final balance in the Energy Uptime Security Fund. If the final balance is positive (representing an average energy uptime greater than 98% over the term of the DHS Agreement), then that

is the amount BCB would have received over the course of the Agreement, less the 20% required to be paid to Terra.  If the final balance is negative, then BCB would ultimately not have made any additional compensation from the energy uptime performance incentive over the course of the DHS Agreement, and as such would not have any PI Damages from the energy uptime incentive.

## 15.3.  ENERGY UPTIME PI DAMAGES - ASSUMPTIONS

15.3.1.  Wherever possible, the Energy Uptime PI Damages model incorporates the same assumptions as the Phase 2 Damages Model, specifically:
- The CFCO date for each tranche of power;
- The maximum amount of available power is used;
- The Energy Uptime for each tranche of power; and
- That Terra should not receive its 20% share due to its breach of the CS Agreement.

15.3.2.  The Energy Uptime model also relies on assumptions for the following:
- Consistent bitcoin mining profitability (in USD) over the remaining term based on both the bitcoin price and bitcoin network hashrate increasing at the same monthly growth rate throughout the remaining term (based on historical data over the previous four year period).  See Sections 15.3.3-15.3.5 for more information on the "bitcoin price and network hashrate equilibrium theory."
- Consistent bitcoin transaction fees over the remaining term (as a percentage of the bitcoin block reward, taking into account the bitcoin Halving estimated to occur in late April 2024) based upon historical bitcoin transaction fees. (See Section 15.3.3 for more information about the Halving).
- A doubling of the bitcoin price in USD at the bitcoin Halving (in order to maintain consistent bitcoin mining profitability based on the bitcoin price and total network hashrate equilibrium theory).
- A realistic mix of bitcoin mining machines for the initial power tranche at each site based upon the total available slots in the approved designs for each tranche, which then allows for the calculation of the total hashrate for each initial power tranche.
- For the expansion power tranches at each site, usage of only the latest generation bitcoin mining machines, which then allows for the calculation of the total hashrate for each expansion power tranche.

15.3.3. When mining bitcoin, profitability is based on two main factors: (a) the total hashrate of all bitcoin mining machines (the "Network Hashrate") and (b) the price of bitcoin in USD.  The bitcoin market operates in cycles of approximately four (4) years. This cycle is tied to an automatic algorithm that determines the payment to the decentralized network of validators that verify all bitcoin transactions (the "Reward"). Approximately every four (4) years, or precisely 210,000 blocks, the Reward is cut in half (an event known as a "Halving").  The algorithm automatically regulates the complexity involved with processing so that it takes an average of 10 minutes to process each block to maintain the 4-year timeline between Halvings. With each Halving, the amount of new bitcoin entering the market is reduced by half, which historically has caused an upward price trend leading up to and following each Halving.

15.3.4. To project the value of the performance incentive tied to a share of the Reward paid in bitcoin, I compared the historical trend of bitcoin price growth (in USD) to Network Hashrate growth over the previous four (4) year period (since bitcoin mining is based on four year cycles).  As the chart below demonstrates, the overall growth in the price of bitcoin is very similar to the overall growth of the Network Hashrate over the preceding four years.  At different times during the four year cycle, the growth rates in bitcoin price and Network Hashrate can vary, but when looking at a four year time horizon, these two growth rates trend towards equilibrium with one another.



15.3.5.  Based on this Network Hashrate growth rate and Bitcoin price (in USD) growth rate equilibrium, I use a conservative approach in this Report of maintaining the approximate average monthly earnings in USD for mining rather than increasing the monthly earnings amount in USD due to supply and demand driven price increases of bitcoin (which have occurred in the past, as shown in the chart above).  Much like historical four-year mining cycles, bitcoin mining over the remaining term would earn at least as much per month as it does today with the USD price of bitcoin finding an equilibrium with the growing Network Hashrate and lower reward paid for bitcoin mining.

## 15.4.  ENERGY UPTIME PI DAMAGES

15.4.1.  Based on the Energy Uptime PI Damages Model, which factors in the assumptions above, the Energy Uptime PI Damages for each tranche of power are as follows:

- North Range 45MW:  $1,123,031
- Campstool 30MW:    $705,135
- North Range +25MW: $555,834
- Campstool +30MW:   $629,305

*[Remainder of Page Intentionally Left Blank]*

## 16. CONCLUSION: TOTAL DAMAGES (PHASE 2 + PHASE 1 + PI)

### 16.1.  TOTAL DAMAGES SUMMARY (AT REPORT DATE & TRIAL DATE)

16.1.1.  The following is a summary of BCB's total damages as of the date of this Report (February 28, 2024):

|  | PHASE 2 | PHASE 1 | PI (Price) | PI (Uptime) | TOTAL |
|---|---|---|---|---|---|
| North Range 45MW | *$12,473,213* | *$150,000* | $1,731,289 | $1,123,031 | $15,477,533 |
| Campstool 30MW | *$6,962,454* | *$400,000* | $1,089,163 | $705,135 | $9,156,752 |
| North Range +25MW | $4,973,931 | $300,000 | $816,742 | $555,834 | $6,646,507 |
| Campstool +30MW | $5,772,770 | $360,000 | $940,981 | $629,305 | $7,703,056 |
| **TOTAL** | $30,182,368 | $1,210,000 | $4,578,174 | $3,013,306 | **$38,983,848** |

16.1.2.  The following is a summary of BCB's total damages as of the scheduled trial date for this matter (January 27, 2025):

|  | PHASE 2 | PHASE 1 | PI (Price) | PI (Uptime) | TOTAL |
|---|---|---|---|---|---|
| North Range 45MW | *$13,743,642* | *$150,000* | $1,731,289 | $1,123,031 | $16,747,962 |
| Campstool 30MW | *$7,671,598* | *$400,000* | $1,089,163 | $705,135 | $9,865,896 |
| North Range +25MW | $5,480,539 | $300,000 | $816,742 | $555,834 | $7,153,115 |
| Campstool +30MW | $6,360,741 | $360,000 | $940,981 | $629,305 | $8,291,028 |
| **TOTAL** | $33,256,520 | $1,210,000 | $4,578,174 | $3,013,306 | **$42,058,001** |

### 16.2.  LIMITATION OF LIABILITY

16.2.1. The DHS Agreement between BCB and MOW contains a provision to limit each of those parties' liability (which was previously cited in Section 2.2 of this Report).  The relevant portion of that citation states that MOW's liability shall be limited to:

> "...the amounts due and unpaid to BCBC as at the date of breach, the maximum available Implementation Fee (including incentives) as provided in the Phase 1 Budget, and an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, 75MW"

16.2.2. Based on that language, and the analysis provided in this Report, the damages included within MOW's limitation of liability are the (a) Phase 2 Damages for the

North Range 45MW power tranche and the Campstool 30MW power tranche and (b) the Phase 1 Damages for the North Range 45MW power tranche and the Campstool 30MW power tranche.  As such, **MOW's contractual limitation of liability limits its damages payable to BCB to the following amounts (based upon NPV date):**

- **Preliminary Expert Report Date (2/28/24):  $19,985,667.00**
- **Schedule Trial Date (1/27/25):           $21,965,240.00**

16.2.3. While MOW has a limitation of liability (provided for in its DHS Agreement with BCB), the other Defendants in this matter do not have a limitation of liability. Specifically, Terra's CS Agreement with BCB does not include a limitation of liability provision.  And the remaining Defendants do not have contracts with BCB, and thus have no limitation of liability.  As such, **the damages payable by Terra, BitOrigin, SonicHash, and Bitmain to BCB are not limited, and are the following amounts (based upon NPV date):**

- **Preliminary Expert Report Date (2/28/24):  $38,983,848.00**
- **Schedule Trial Date (1/27/25):           $42,058,001.00**

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

_____
Patrick Gahan

3/20/2024
Date

## EXHIBIT A

**A.1.  Prior Testimony as an Expert in the Last Four Years.**  None.

**A.2.  Compensation.**  I am being compensated at the following rate for my work as an Expert Witness, with additional rates for my supporting team:
- Patrick Gahan, at $1,500/hour;
- Jonathan Lyman, General Counsel, at $400/hour;
- Craig Heiser, Managerial Accountant, at $250/hour; and
- Justin Lee, Actuary, at $200/hour.

**A.3.  Exhibits I May Use to Summarize or Support My Opinions.**
- Phase 2 Damages Model
- Phase 1 Damages Model
- PI Damages Model - Energy Price Savings
- PI Damages Model - Energy Uptime
- Bitcoin price vs network hashrate equilibrium chart

**A.4.  Curriculum Vitae.**  See attached.

## Contact

patrick@aldercp.com

www.linkedin.com/in/pgahan
(LinkedIn)
www.enduringhearts.org (Other)

## Top Skills

Financial Reporting

Fundraising

Charitable Trusts

# Patrick Gahan

Founding Partner & CEO at ALDER Capital Partners

Marietta, Georgia, United States

## Summary

Patrick Gahan is an experienced entrepreneur and philanthropist with a strong understanding of the financial and operational cost efficiencies involved in the organization and execution of various types of businesses.

He began his career with Booz Allen Hamilton and Lockheed Martin, developing custom software applications and managing large teams of software engineers. He then founded, grew, and sold Seismic LLC, which specialized in creating custom cybersecurity software applications primarily for serving the government intelligence sector.

Mr. Gahan founded what evolved into ALDER Capital Partners in 2011 while building a rental real estate portfolio which ultimately grew into four vintages of private SFR investment entities and four income, debt, and venture funds. He is currently a principal owner, managing member or financial partner in several different funds and operating entities, as well as a board member of and advisory consultant to several start-up companies.

Since inception, ALDER Capital Partners and its affiliate entities have underwritten and funded over $100M in loans, and secured real estate backed financing of over $60M across a number of private lenders. The team at ALDER prioritizes credit risk assessment and management as a critical aspect of operations.

Mr. Gahan brings a wealth of pertinent experience and value to complex restructuring engagements through his expertise in modeling, creative deal structure, contract review, and track record for negotiating win-win scenarios in difficult business situations. He has brought hands on turnaround experience in the cryptocurrency sector over the last several years, along with strong relationships in domestic banking, strategic private debt, equity, and crypto broker-dealers.

—————

# Experience

ALDER Capital Partners
Founding Partner & CEO
April 2011 - Present (12 years 9 months)

ALDER Capital Partners offers sophisticated PE investment opportunities for accredited investors in a variety of asset classes including real property, collateralized debt positions, distressed/CRO projects, and post-revenue SMB companies, where the ALDER team can provide growth capital, guidance, and advisory support.

Risk assessment and management is a primary aspect of our process at ALDER, having underwritten, funded, and serviced over $100M of private debt since 2012 across several ALDER affiliate companies.

WAHA Technologies
3 years

Chairperson of the Board
June 2022 - Present (1 year 7 months)

Acting CFO
January 2021 - June 2022 (1 year 6 months)

Managing strategic growth capital needs of an efficient carbon neutral bitcoin mining operation.

Marquee Funding Partners
Managing Partner
December 2018 - Present (5 years 1 month)

Whether you're an aggregator, a fix and flipper, a wholesaler, Marquee Funding Partners (MFP) is your one-stop source for your real estate investment funding needs. MFP has underwritten and funded over $50M in collateralized loans since its inception in 2018.

- Deal flow pipeline generation
- Marketing
- Risk assessment & management

Enduring Hearts
Board Director & Treasurer
April 2013 - July 2022 (9 years 4 months)

My wife and I founded Enduring Hearts after our daughter received a life-saving heart transplant to raise awareness and funding for the many challenges surrounding pediatric heart transplants.

A heart transplant is not a lifetime cure; it's more of a bridge to life. One in four transplant recipients require another in 5 years and of those one in three will require yet another entirely new heart in 3 years. Enduring Hearts raises money to fund research that improves the long-term outcomes of heart transplants, focused on pediatrics.

We have a team of world-renowned medical professionals and researchers on our Scientific Advisory Committee who carefully review the research submissions to ensure the ones we choose to fund have the most impact. Our long-term goal is to raise a minimum of $100,000,000 over the next 10 years to help advance this important research and to make a heart transplant into a cure.

### Seismic LLC
Founder & CEO
March 2004 - February 2011 (7 years)

Seismic provides intelligent security engineering and enterprise development solutions to complex technological challenges within the government intelligence community. Seismic was acquired by Applied Signal Technology in 2010.

### Lockheed Martin Information Technology
Senior Operations Research Manager
October 2003 - March 2005 (1 year 6 months)

Technical Task Order Lead responsible for management of a variety of technical projects on a multi-million dollar intelligence community contract.

### Booz Allen Hamilton
Senior Consultant
2001 - 2003 (2 years)

### The Johns Hopkins University
Software Engineer
May 1999 - December 2001 (2 years 8 months)

Developed Software applications for the Mathematics, Computer Science, Biology, Finance Management, and various other University departments.

Calvert Cliffs Nuclear Power Plant Inc
Network Engineer
December 2000 - August 2001 (9 months)

SSB, Inc
Software Engineer
May 1999 - September 1999 (5 months)

_____

## Education

University of Maryland - Robert H. Smith School of Business
MBA, Finance · (2002 - 2004)

The Johns Hopkins University
Bachelor of Science, Computer Science · (1998 - 2001)

**EXHIBIT B**

**Phase 2 Damages Model with NPV Date 2/28/24 and**
**Phase 2 Damages Model with NPV Date 1/27/25**
**(including the Phase 2 Damages Expense Details)**







## <u>EXHIBIT C</u>

**Phase 1 Damages Model**

**PHASE 1 DAMAGES MODEL**

| | TOTAL | 2022-Dec | 2023-Jan | 2023-Feb | 2023-Mar | 2023-Apr | 2023-May | 2023-Jun | 2023-Jul | 2023-Aug | 2023-Sep | 2023-Oct | 2023-Nov | 2023-Dec | 2024-Jan | 2024-Feb | 2024-Mar | 2024-Apr | 2024-May | 2024-Jun | 2024-Jul | 2024-Aug | 2024-Sep | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | NR45 CFCO - 3/10/23 | | | | | | | CS30 CFCO - 11/1/23 | | | | | | | | | NR>25 CFCO - 7/1/24 | | NR>30 CFCO - 9/1/24 | |
| Remaining Implementation Fees | | | | | | | | | | | | | | | | | | | | | | | | |
| North Range 45MW | $150,000 | $0 | $0 | $0 | $150,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 |
| Campstool 30MW | $400,000 | $0 | $0 | $0 | $0 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 |
| North Range >25MW (estimate) | $300,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $0 | $0 | $300,000 |
| Campstool >30MW (estimate) | $360,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $360,000 |
| **TOTAL PHASE 1 DAMAGES** | **$1,210,000** | $0 | $0 | $0 | $150,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $37,500 | $37,500 | $82,500 | $82,500 | $82,500 | $82,500 | $82,500 | $82,500 | $45,000 | $45,000 | $1,210,000 |

<u>**EXHIBIT D**</u>

**Energy Price Savings PI Damages Model**

**<u>EXHIBIT E</u>**

**Energy Uptime PI Damages Model**



# <u>EXHIBIT F</u>

**Hashrate vs Price Equilibrium**

| Hash Rate | Market Price | Date | Hash Rate Growth % | Market Price Growth % |
|---|---|---|---|---|
| 114,190,850.88 | $9,854.79 | 2/10/20 | 0% | 0% |
| 109,742,275.19 | $10,368.53 | 2/14/20 | -4% | 5% |
| 108,969,442.27 | $10,180.65 | 2/18/20 | -5% | 3% |
| 109,742,275.19 | $9,669.63 | 2/22/20 | -4% | -2% |
| 113,169,220.50 | $8,785.52 | 2/26/20 | -1% | -11% |
| 114,708,937.78 | $8,534.17 | 3/1/20 | 0% | -13% |
| 119,328,089.64 | $9,067.39 | 3/5/20 | 4% | -8% |
| 108,616,241.39 | $7,931.94 | 3/9/20 | -5% | -20% |
| 105,324,840.14 | $5,600.03 | 3/13/20 | -8% | -43% |
| 82,285,031.36 | $5,357.61 | 3/17/20 | -28% | -46% |
| 104,501,989.82 | $6,189.85 | 3/21/20 | -8% | -37% |
| 112,492,821.36 | $6,698.46 | 3/25/20 | -1% | -32% |
| 101,664,512.29 | $5,885.41 | 3/29/20 | -11% | -40% |
| 91,290,582.46 | $6,809.11 | 4/2/20 | -20% | -31% |
| 116,184,014.05 | $7,343.20 | 4/6/20 | 2% | -25% |
| 116,308,064.12 | $6,873.24 | 4/10/20 | 2% | -30% |
| 123,623,036.71 | $6,871.95 | 4/14/20 | 8% | -30% |
| 111,187,583.31 | $7,259.36 | 4/18/20 | -3% | -26% |
| 112,649,865.25 | $7,130.99 | 4/22/20 | -1% | -28% |
| 111,856,556.34 | $7,699.27 | 4/26/20 | -2% | -22% |
| 111,856,556.34 | $8,628.77 | 4/30/20 | -2% | -12% |
| 126,294,576.81 | $8,885.93 | 5/4/20 | 11% | -10% |
| 108,878,107.85 | $9,821.80 | 5/8/20 | -5% | 0% |
| 95,268,344.37 | $8,814.53 | 5/12/20 | -17% | -11% |
| 81,658,580.89 | $9,385.70 | 5/16/20 | -28% | -5% |
| 98,579,623.70 | $9,510.67 | 5/20/20 | -14% | -3% |
| 94,064,526.43 | $8,730.73 | 5/24/20 | -18% | -11% |
| 95,695,558.86 | $9,569.21 | 5/28/20 | -16% | -3% |
| 97,074,591.28 | $10,204.23 | 6/1/20 | -15% | 4% |
| 133,797,229.46 | $9,623.75 | 6/5/20 | 17% | -2% |
| 111,952,783.84 | $9,775.15 | 6/9/20 | -2% | -1% |
| 116,048,617.39 | $9,473.50 | 6/13/20 | 2% | -4% |
| 97,298,323.04 | $9,454.81 | 6/17/20 | -15% | -4% |
| 112,206,937.05 | $9,284.78 | 6/21/20 | -2% | -6% |
| 128,684,878.86 | $9,240.85 | 6/25/20 | 13% | -6% |
| 115,344,676.15 | $9,185.35 | 6/29/20 | 1% | -7% |
| 123,188,120.49 | $9,072.42 | 7/3/20 | 8% | -8% |
| 118,480,294.23 | $9,256.23 | 7/7/20 | 4% | -6% |
| 119,264,931.94 | $9,235.96 | 7/11/20 | 4% | -6% |
| 117,268,964.18 | $9,193.51 | 7/15/20 | 3% | -7% |
| 121,580,323.16 | $9,214.66 | 7/19/20 | 6% | -6% |
| 138,825,759.06 | $9,613.11 | 7/23/20 | 22% | -2% |
| 121,437,040.40 | $11,042.40 | 7/27/20 | 6% | 12% |
| 114,737,065.75 | $11,343.88 | 7/31/20 | 0% | 15% |
| 108,037,091.11 | $11,194.25 | 8/4/20 | -5% | 14% |
| 130,649,505.53 | $11,767.60 | 8/8/20 | 14% | 19% |
| 123,844,534.08 | $11,573.11 | 8/12/20 | 8% | 17% |
| 105,309,977.96 | $11,914.01 | 8/16/20 | -8% | 21% |
| 130,584,372.67 | $11,865.82 | 8/20/20 | 14% | 20% |
| 111,720,008.70 | $11,763.93 | 8/24/20 | -2% | 19% |
| 127,430,634.92 | $11,534.75 | 8/28/20 | 12% | 17% |
| 125,685,009.78 | $11,923.25 | 9/1/20 | 10% | 21% |
| 130,921,885.19 | $10,159.62 | 9/5/20 | 15% | 3% |
| 136,239,328.01 | $10,227.83 | 9/9/20 | 19% | 4% |
| 151,760,264.12 | $10,330.77 | 9/13/20 | 33% | 5% |
| 142,275,247.61 | $10,943.89 | 9/17/20 | 25% | 11% |
| 123,857,644.32 | $10,430.46 | 9/21/20 | 8% | 6% |
| 144,020,516.65 | $10,692.84 | 9/25/20 | 26% | 9% |
| 149,781,337.31 | $10,840.80 | 9/29/20 | 31% | 10% |
| 151,592,064.05 | $10,551.77 | 10/3/20 | 33% | 7% |
| 155,408,725.01 | $10,670.80 | 10/7/20 | 36% | 8% |
| 142,937,654.49 | $11,376.61 | 10/11/20 | 25% | 15% |
| 148,693,533.19 | $11,503.73 | 10/15/20 | 30% | 17% |
| 143,146,506.84 | $11,758.16 | 10/19/20 | 25% | 19% |
| 151,099,090.55 | $12,944.52 | 10/23/20 | 32% | 31% |
| 99,407,296.42 | $13,651.47 | 10/27/20 | -13% | 39% |
| 124,259,120.52 | $13,810.32 | 10/31/20 | 9% | 40% |
| 122,675,182.48 | $14,155.59 | 11/4/20 | 7% | 44% |
| 154,387,134.42 | $15,490.60 | 11/8/20 | 35% | 57% |
| 115,998,982.07 | $16,295.57 | 11/12/20 | 2% | 65% |
| 137,334,450.87 | $16,725.15 | 11/16/20 | 20% | 70% |
| 147,831,351.57 | $18,687.45 | 11/20/20 | 29% | 90% |
| 135,584,967.42 | $19,172.52 | 11/24/20 | 19% | 95% |
| 135,399,801.27 | $17,732.42 | 11/28/20 | 19% | 80% |
| 149,512,250.29 | $19,226.97 | 12/2/20 | 31% | 95% |
| 142,846,099.01 | $19,377.66 | 12/6/20 | 25% | 97% |
| 131,418,411.08 | $18,247.76 | 12/10/20 | 15% | 85% |
| 129,933,875.83 | $19,276.59 | 12/14/20 | 14% | 96% |
| 146,639,659.86 | $23,150.79 | 12/18/20 | 28% | 135% |
| 142,927,263.41 | $23,824.99 | 12/22/20 | 25% | 142% |
| 137,358,668.73 | $26,443.21 | 12/26/20 | 20% | 168% |
| 153,482,070.38 | $28,856.59 | 12/30/20 | 34% | 193% |
| 159,954,205.88 | $33,000.78 | 1/3/21 | 40% | 235% |
| 136,839,436.24 | $39,486.04 | 1/7/21 | 20% | 301% |
| 151,611,247.40 | $35,544.94 | 1/11/21 | 33% | 261% |
| 150,586,847.08 | $36,828.52 | 1/15/21 | 32% | 274% |
| 144,440,445.16 | $36,020.13 | 1/19/21 | 26% | 266% |
| 143,884,925.39 | $32,099.74 | 1/23/21 | 26% | 226% |
| 150,095,785.48 | $30,419.17 | 1/27/21 | 31% | 209% |
| 124,217,201.77 | $33,136.46 | 1/31/21 | 9% | 236% |
| 174,939,225.83 | $37,002.09 | 2/4/21 | 53% | 275% |

| Date | Market Price | Hash Rate |
|---|---|---|
| 2/10/20 | $9,854.79 | 114,190,850.88 |
| 2/10/24 | $47,134.54 | 570,491,417.64 |
| | | |
| Time periods | 48 | 48 |
| Monthly Growth | 3.314% | 3.408% |



Bitcoin Hashrate Growth vs Bitcoin Price Growth
(over previous 4 year period)

| | | | | |
|---|---|---|---|---|
| 152,367,873.17 | $46,364.30 | 2/8/21 | 33% | 370% |
| 167,285,007.61 | $47,471.40 | 2/12/21 | 46% | 382% |
| 147,040,325.16 | $49,160.10 | 2/16/21 | 29% | 399% |
| 152,267,677.07 | $56,001.20 | 2/20/21 | 33% | 468% |
| 168,466,366.12 | $50,624.84 | 2/24/21 | 48% | 414% |
| 140,388,638.44 | $45,113.92 | 2/28/21 | 23% | 358% |
| 160,906,977.90 | $48,448.91 | 3/4/21 | 41% | 392% |
| 149,267,953.88 | $52,299.33 | 3/8/21 | 31% | 431% |
| 152,466,552.89 | $57,253.28 | 3/12/21 | 34% | 481% |
| 145,003,155.20 | $56,872.38 | 3/16/21 | 27% | 477% |
| 169,563,074.62 | $58,085.80 | 3/20/21 | 48% | 489% |
| 167,389,189.04 | $52,508.23 | 3/24/21 | 47% | 433% |
| 164,128,360.69 | $55,783.71 | 3/28/21 | 44% | 466% |
| 160,517,766.38 | $58,736.92 | 4/1/21 | 41% | 496% |
| 165,624,244.47 | $59,054.10 | 4/5/21 | 45% | 499% |
| 180,576,433.20 | $58,102.58 | 4/9/21 | 58% | 490% |
| 155,272,729.19 | $63,554.44 | 4/13/21 | 36% | 545% |
| 145,361,065.34 | $60,087.09 | 4/17/21 | 27% | 510% |
| 167,634,131.80 | $53,808.80 | 4/21/21 | 47% | 446% |
| 133,638,398.78 | $49,075.58 | 4/25/21 | 17% | 398% |
| 169,978,665.11 | $53,584.15 | 4/29/21 | 49% | 444% |
| 185,429,301.39 | $57,213.33 | 5/3/21 | 62% | 481% |
| 175,184,588.60 | $57,380.27 | 5/7/21 | 53% | 482% |
| 176,209,059.88 | $56,750.00 | 5/11/21 | 54% | 476% |
| 164,348,929.98 | $46,736.58 | 5/15/21 | 44% | 374% |
| 139,447,576.95 | $36,964.27 | 5/19/21 | 22% | 275% |
| 156,878,524.07 | $34,754.54 | 5/23/21 | 37% | 253% |
| 148,163,050.51 | $38,445.29 | 5/27/21 | 30% | 290% |
| 148,572,947.38 | $37,310.54 | 5/31/21 | 30% | 279% |
| 137,063,775.40 | $36,885.51 | 6/4/21 | 20% | 274% |
| 131,832,333.59 | $33,450.19 | 6/8/21 | 15% | 239% |
| 136,724,465.13 | $35,494.90 | 6/12/21 | 20% | 260% |
| 128,812,374.14 | $38,324.87 | 6/16/21 | 13% | 289% |
| 104,040,763.73 | $35,592.35 | 6/20/21 | -9% | 261% |
| 108,995,085.81 | $34,639.38 | 6/24/21 | -5% | 251% |
| 89,177,797.48 | $34,456.67 | 6/28/21 | -22% | 250% |
| 98,706,076.21 | $33,856.86 | 7/2/21 | -14% | 244% |
| 87,820,755.11 | $34,211.01 | 7/6/21 | -23% | 247% |
| 89,248,734.87 | $33,515.57 | 7/10/21 | -22% | 240% |
| 91,390,704.50 | $32,814.61 | 7/14/21 | -20% | 233% |
| 115,543,619.13 | $31,783.49 | 7/18/21 | 1% | 223% |
| 91,755,226.96 | $32,297.89 | 7/22/21 | -20% | 228% |
| 115,543,619.13 | $37,318.14 | 7/26/21 | 1% | 279% |
| 112,465,862.13 | $42,214.15 | 7/30/21 | -2% | 328% |
| 98,004,603.30 | $38,138.00 | 8/3/21 | -14% | 287% |
| 113,858,289.12 | $44,634.13 | 8/7/21 | 0% | 353% |
| 108,813,934.54 | $45,611.46 | 8/11/21 | -5% | 363% |
| 124,500,915.71 | $47,056.41 | 8/15/21 | 9% | 377% |
| 123,727,618.09 | $46,734.65 | 8/19/21 | 8% | 374% |
| 119,087,832.42 | $49,523.50 | 8/23/21 | 4% | 403% |
| 123,466,373.91 | $49,056.86 | 8/27/21 | 8% | 398% |
| 119,963,781.74 | $47,155.87 | 8/31/21 | 5% | 379% |
| 143,606,278.87 | $49,947.38 | 9/4/21 | 26% | 407% |
| 125,412,870.36 | $46,078.38 | 9/8/21 | 10% | 368% |
| 145,552,163.41 | $46,059.12 | 9/12/21 | 27% | 367% |
| 134,567,094.48 | $47,785.26 | 9/16/21 | 18% | 385% |
| 113,928,907.44 | $42,901.56 | 9/20/21 | 0% | 335% |
| 135,990,412.48 | $42,815.56 | 9/24/21 | 19% | 334% |
| 122,769,122.38 | $41,011.16 | 9/28/21 | 8% | 316% |
| 141,656,679.67 | $47,727.10 | 10/2/21 | 24% | 384% |
| 139,433,297.27 | $55,343.76 | 10/6/21 | 22% | 462% |
| 144,377,740.44 | $54,625.74 | 10/10/21 | 26% | 454% |
| 139,433,297.27 | $57,397.74 | 10/14/21 | 22% | 482% |
| 154,737,198.73 | $61,971.59 | 10/18/21 | 36% | 529% |
| 144,754,153.65 | $60,697.06 | 10/22/21 | 27% | 516% |
| 156,733,807.74 | $60,345.17 | 10/26/21 | 37% | 512% |
| 140,175,299.15 | $61,731.29 | 10/30/21 | 23% | 526% |
| 153,966,937.65 | $62,954.86 | 11/3/21 | 35% | 539% |
| 145,353,402.67 | $63,293.22 | 11/7/21 | 27% | 542% |
| 152,890,245.78 | $64,838.81 | 11/11/21 | 34% | 558% |
| 169,070,703.35 | $63,584.25 | 11/15/21 | 48% | 545% |
| 163,435,013.23 | $58,133.02 | 11/19/21 | 43% | 490% |
| 176,960,669.50 | $57,578.22 | 11/23/21 | 55% | 484% |
| 155,225,116.62 | $54,801.15 | 11/27/21 | 36% | 456% |
| 172,098,304.92 | $57,229.76 | 12/1/21 | 51% | 481% |
| 190,973,602.87 | $49,380.43 | 12/5/21 | 67% | 401% |
| 173,208,616.56 | $47,659.68 | 12/9/21 | 52% | 384% |
| 178,007,627.46 | $46,757.09 | 12/13/21 | 56% | 374% |
| 153,952,542.67 | $46,173.51 | 12/17/21 | 35% | 369% |
| 178,007,627.46 | $48,934.57 | 12/21/21 | 56% | 397% |
| 161,682,278.53 | $50,470.89 | 12/25/21 | 42% | 412% |
| 143,583,516.01 | $46,408.87 | 12/29/21 | 26% | 371% |
| 168,921,783.54 | $47,327.87 | 1/2/22 | 48% | 380% |
| 168,921,783.54 | $43,120.63 | 1/6/22 | 48% | 338% |
| 191,422,128.44 | $41,849.00 | 1/10/22 | 68% | 325% |
| 201,114,388.10 | $43,099.37 | 1/14/22 | 76% | 337% |
| 209,595,115.31 | $42,381.48 | 1/18/22 | 84% | 330% |
| 186,746,029.13 | $35,071.43 | 1/22/22 | 64% | 256% |
| 173,501,629.90 | $36,823.50 | 1/26/22 | 52% | 274% |
| 189,394,908.97 | $37,918.62 | 1/30/22 | 66% | 285% |
| 172,445,464.55 | $37,092.40 | 2/3/22 | 51% | 276% |
| 204,326,154.12 | $43,834.02 | 2/7/22 | 79% | 345% |
| 248,110,330.01 | $42,401.27 | 2/11/22 | 117% | 330% |
| 206,979,740.54 | $44,536.20 | 2/15/22 | 81% | 352% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 200,196,675.82 | $40,115.05 | 2/19/22 | 75% | 307% | | |
| 183,513,619.50 | $37,291.48 | 2/23/22 | 61% | 278% | | |
| 214,099,222.75 | $37,704.56 | 2/27/22 | 87% | 283% | | |
| 190,365,286.65 | $42,464.40 | 3/3/22 | 67% | 331% | | |
| 202,691,096.57 | $38,032.50 | 3/7/22 | 78% | 286% | | |
| 213,647,372.06 | $38,741.04 | 3/11/22 | 87% | 293% | | |
| 212,277,837.63 | $39,320.82 | 3/15/22 | 86% | 299% | | |
| 210,160,951.25 | $42,222.32 | 3/19/22 | 84% | 328% | | |
| 195,149,454.74 | $42,905.06 | 3/23/22 | 71% | 335% | | |
| 216,984,358.76 | $46,858.53 | 3/27/22 | 90% | 375% | | |
| 200,371,606.28 | $45,539.22 | 3/31/22 | 75% | 362% | | |
| 206,055,907.17 | $46,611.26 | 4/4/22 | 80% | 373% | | |
| 217,424,508.95 | $42,278.94 | 4/8/22 | 90% | 329% | | |
| 198,950,531.06 | $40,102.20 | 4/12/22 | 74% | 307% | | |
| 231,514,552.33 | $40,388.78 | 4/16/22 | 103% | 310% | | |
| 237,127,026.32 | $41,375.79 | 4/20/22 | 108% | 320% | | |
| 227,305,196.83 | $39,465.57 | 4/24/22 | 99% | 300% | | |
| 222,163,205.21 | $39,770.04 | 4/28/22 | 95% | 304% | | |
| 222,163,205.21 | $38,510.65 | 5/2/22 | 95% | 291% | | |
| 211,795,588.96 | $36,013.03 | 5/6/22 | 85% | 265% | | |
| 225,257,597.89 | $31,003.93 | 5/10/22 | 97% | 215% | | |
| 189,527,082.36 | $30,074.61 | 5/14/22 | 66% | 205% | | |
| 189,527,082.36 | $28,680.97 | 5/18/22 | 66% | 191% | | |
| 248,560,108.02 | $30,278.94 | 5/22/22 | 118% | 207% | | |
| 205,096,744.97 | $29,193.92 | 5/26/22 | 80% | 196% | | |
| 216,986,411.34 | $31,715.58 | 5/30/22 | 90% | 222% | | |
| 206,582,953.26 | $29,681.76 | 6/3/22 | 81% | 201% | | |
| 266,405,768.74 | $31,117.83 | 6/7/22 | 133% | 216% | | |
| 191,184,617.32 | $28,344.50 | 6/11/22 | 67% | 188% | | |
| 179,141,491.82 | $22,550.79 | 6/15/22 | 57% | 129% | | |
| 198,711,570.75 | $20,540.38 | 6/19/22 | 74% | 108% | | |
| 189,622,396.21 | $21,088.30 | 6/23/22 | 66% | 114% | | |
| 214,611,394.16 | $20,702.23 | 6/27/22 | 88% | 110% | | |
| 202,851,865.72 | $19,226.70 | 7/1/22 | 78% | 95% | | |
| 186,682,514.10 | $20,181.91 | 7/5/22 | 63% | 105% | | |
| 221,726,603.85 | $21,582.60 | 7/9/22 | 94% | 119% | | |
| 179,699,992.66 | $20,223.69 | 7/13/22 | 57% | 105% | | |
| 189,844,347.09 | $20,774.23 | 7/17/22 | 66% | 111% | | |
| 181,711,862.64 | $23,154.09 | 7/21/22 | 59% | 135% | | |
| 220,256,803.20 | $21,300.72 | 7/25/22 | 93% | 116% | | |
| 177,582,047.58 | $23,792.00 | 7/29/22 | 56% | 141% | | |
| 199,607,727.90 | $22,981.77 | 8/2/22 | 75% | 133% | | |
| 222,690,688.34 | $22,947.19 | 8/6/22 | 95% | 133% | | |
| 196,079,851.37 | $23,959.92 | 8/10/22 | 72% | 143% | | |
| 203,082,703.20 | $24,314.89 | 8/14/22 | 78% | 147% | | |
| 250,867,150.79 | $23,193.99 | 8/18/22 | 120% | 135% | | |
| 242,410,954.69 | $21,402.93 | 8/22/22 | 112% | 117% | | |
| 204,358,072.27 | $20,233.32 | 8/26/22 | 79% | 105% | | |
| 219,862,688.89 | $19,793.02 | 8/30/22 | 93% | 101% | | |
| 258,699,436.02 | $19,834.94 | 9/3/22 | 127% | 101% | | |
| 195,564,454.61 | $19,280.08 | 9/7/22 | 71% | 96% | | |
| 235,601,272.09 | $21,794.52 | 9/11/22 | 106% | 121% | | |
| 203,901,883.44 | $19,694.69 | 9/15/22 | 79% | 100% | | |
| 242,133,486.58 | $19,542.20 | 9/19/22 | 112% | 98% | | |
| 232,575,585.80 | $19,280.58 | 9/23/22 | 104% | 96% | | |
| 234,283,743.88 | $19,104.89 | 9/27/22 | 105% | 94% | | |
| 244,753,784.95 | $19,314.69 | 10/1/22 | 114% | 96% | | |
| 247,871,667.56 | $20,167.79 | 10/5/22 | 117% | 105% | | |
| 281,762,541.49 | $19,441.88 | 10/9/22 | 147% | 97% | | |
| 276,154,660.02 | $19,383.33 | 10/13/22 | 142% | 97% | | |
| 251,371,549.51 | $19,548.97 | 10/17/22 | 120% | 98% | | |
| 240,750,216.43 | $19,171.34 | 10/21/22 | 111% | 95% | | |
| 283,822,315.27 | $20,101.27 | 10/25/22 | 149% | 104% | | |
| 247,200,081.04 | $20,816.16 | 10/29/22 | 116% | 111% | | |
| 300,302,320.67 | $20,153.99 | 11/2/22 | 163% | 105% | | |
| 263,186,945.49 | $20,920.33 | 11/6/22 | 130% | 112% | | |
| 244,879,481.27 | $17,550.23 | 11/10/22 | 114% | 78% | | |
| 283,256,116.39 | $16,587.96 | 11/14/22 | 148% | 68% | | |
| 268,636,445.87 | $16,683.22 | 11/18/22 | 135% | 69% | | |
| 258,991,482.25 | $16,194.75 | 11/22/22 | 127% | 64% | | |
| 249,807,387.13 | $16,453.47 | 11/26/22 | 119% | 67% | | |
| 281,033,310.52 | $17,170.62 | 11/30/22 | 146% | 74% | | |
| 268,175,577.36 | $17,117.57 | 12/4/22 | 135% | 74% | | |
| 258,748,833.58 | $17,234.58 | 12/8/22 | 127% | 75% | | |
| 280,878,668.03 | $17,206.87 | 12/12/22 | 146% | 75% | | |
| 234,916,704.17 | $16,637.60 | 12/16/22 | 106% | 69% | | |
| 251,387,886.91 | $16,904.64 | 12/20/22 | 120% | 72% | | |
| 247,871,972.41 | $16,838.10 | 12/24/22 | 117% | 71% | | |
| 247,871,972.41 | $16,539.28 | 12/28/22 | 117% | 68% | | |
| 274,241,331.17 | $16,613.71 | 1/1/23 | 140% | 69% | | |
| 305,064,103.23 | $16,826.41 | 1/5/23 | 167% | 71% | | |
| 286,421,296.92 | $17,192.07 | 1/9/23 | 151% | 74% | 255,693,088 | $16,926 |
| 289,810,898.07 | $19,933.36 | 1/13/23 | 154% | 102% | | |
| 261,608,422.14 | $21,145.18 | 1/17/23 | 129% | 115% | | |
| 282,163,369.59 | $22,772.50 | 1/21/23 | 147% | 131% | | |
| 289,637,895.94 | $23,089.74 | 1/25/23 | 154% | 134% | | |
| 269,948,142.51 | $23,755.85 | 1/29/23 | 136% | 141% | | |
| 260,167,412.71 | $23,454.41 | 2/2/23 | 128% | 138% | | |
| 277,772,726.36 | $22,763.74 | 2/6/23 | 143% | 131% | | |
| 291,465,748.08 | $21,638.55 | 2/10/23 | 155% | 120% | 282,361,932 | $20,166 |
| 317,275,458.36 | $22,211.80 | 2/14/23 | 178% | 125% | | |
| 315,328,983.16 | $24,641.94 | 2/18/23 | 176% | 150% | | |
| 332,847,260.00 | $24,185.67 | 2/22/23 | 191% | 145% | | |
| 299,630,548.49 | $23,563.11 | 2/26/23 | 162% | 139% | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 359,556,658.18 | $23,467.36 | 3/2/23 | 215% | 138% | | |
| 353,136,003.57 | $22,410.62 | 3/6/23 | 209% | 127% | | |
| 357,219,695.92 | $20,224.85 | 3/10/23 | 213% | 105% | 299,212,591 | $23,208 |
| 318,250,274.55 | $24,767.46 | 3/14/23 | 179% | 151% | | |
| 320,415,242.40 | $26,975.39 | 3/18/23 | 181% | 174% | | |
| 398,152,679.75 | $27,306.32 | 3/22/23 | 249% | 177% | | |
| 344,632,512.67 | $27,999.84 | 3/26/23 | 202% | 184% | | |
| 328,332,326.26 | $28,033.06 | 3/30/23 | 188% | 184% | | |
| 377,232,885.49 | $27,802.23 | 4/3/23 | 230% | 182% | | |
| 349,935,510.55 | $27,925.55 | 4/7/23 | 206% | 183% | | |
| 380,882,188.36 | $30,234.98 | 4/11/23 | 234% | 207% | 347,461,924 | $25,148 |
| 295,183,695.98 | $30,319.32 | 4/15/23 | 159% | 208% | | |
| 319,313,867.43 | $28,829.57 | 4/19/23 | 180% | 193% | | |
| 341,432,463.63 | $27,590.55 | 4/23/23 | 199% | 180% | | |
| 355,961,504.63 | $29,480.35 | 4/27/23 | 212% | 199% | | |
| 312,374,381.62 | $28,086.65 | 5/1/23 | 174% | 185% | | |
| 355,568,840.11 | $29,535.38 | 5/5/23 | 211% | 200% | | |
| 405,682,569.26 | $27,640.09 | 5/9/23 | 255% | 180% | 345,706,017 | $28,883 |
| 415,228,041.47 | $26,785.94 | 5/13/23 | 264% | 172% | | |
| 344,768,089.14 | $27,398.27 | 5/17/23 | 202% | 178% | | |
| 354,690,591.13 | $26,756.57 | 5/21/23 | 211% | 172% | | |
| 376,858,753.08 | $26,477.29 | 5/25/23 | 230% | 169% | | |
| 379,321,882.18 | $27,744.66 | 5/29/23 | 232% | 182% | | |
| 331,093,463.90 | $27,251.93 | 6/2/23 | 190% | 177% | | |
| 343,827,827.89 | $27,243.64 | 6/6/23 | 201% | 176% | | |
| 415,140,266.27 | $25,852.82 | 6/10/23 | 264% | 162% | 368,061,643 | $27,553 |
| 385,148,460.16 | $25,127.04 | 6/14/23 | 237% | 155% | | |
| 369,534,333.40 | $26,337.08 | 6/18/23 | 224% | 167% | | |
| 325,294,307.57 | $29,903.73 | 6/22/23 | 185% | 203% | | |
| 364,329,624.48 | $30,266.70 | 6/26/23 | 219% | 207% | | |
| 334,845,664.79 | $30,471.50 | 6/30/23 | 193% | 209% | | |
| 390,233,669.50 | $30,774.87 | 7/4/23 | 242% | 212% | | |
| 425,480,581.58 | $30,214.55 | 7/8/23 | 273% | 207% | | |
| 321,592,673.51 | $30,391.64 | 7/12/23 | 182% | 208% | 358,651,744 | $27,807 |
| 364,471,696.65 | $30,240.28 | 7/16/23 | 219% | 207% | | |
| 300,153,161.94 | $29,802.29 | 7/20/23 | 163% | 202% | | |
| 369,831,574.54 | $29,178.42 | 7/24/23 | 224% | 196% | | |
| 343,365,594.26 | $29,316.12 | 7/28/23 | 201% | 197% | | |
| 400,593,193.30 | $29,683.61 | 8/1/23 | 251% | 201% | | |
| 426,605,738.32 | $29,048.01 | 8/5/23 | 274% | 195% | | |
| 330,756,213.44 | $29,565.82 | 8/9/23 | 190% | 200% | 359,304,136 | $29,988 |
| 445,348,917.31 | $29,283.84 | 8/13/23 | 290% | 197% | | |
| 362,008,769.04 | $26,662.05 | 8/17/23 | 217% | 171% | | |
| 380,936,887.23 | $26,123.41 | 8/21/23 | 234% | 165% | | |
| 378,799,106.99 | $26,049.42 | 8/25/23 | 232% | 164% | | |
| 348,384,580.16 | $27,731.23 | 8/29/23 | 205% | 181% | | |
| 436,863,203.69 | $25,869.09 | 9/2/23 | 283% | 163% | | |
| 393,005,453.94 | $25,753.31 | 9/6/23 | 244% | 161% | | |
| 427,999,090.25 | $25,832.82 | 9/10/23 | 275% | 162% | 384,179,176 | $28,018 |
| 506,061,817.40 | $26,536.02 | 9/14/23 | 343% | 169% | | |
| 385,677,556.73 | $26,763.76 | 9/18/23 | 238% | 172% | | |
| 442,953,295.79 | $26,581.86 | 9/22/23 | 288% | 170% | | |
| 445,792,739.99 | $26,212.82 | 9/26/23 | 290% | 166% | | |
| 400,361,632.73 | $26,970.43 | 9/30/23 | 251% | 174% | | |
| 401,774,935.78 | $27,797.56 | 10/4/23 | 252% | 182% | | |
| 444,516,950.23 | $27,937.18 | 10/8/23 | 289% | 183% | | |
| 393,226,532.89 | $26,758.66 | 10/12/23 | 244% | 172% | 429,839,349 | $26,315 |
| 491,483,968.44 | $28,517.32 | 10/16/23 | 330% | 189% | | |
| 455,077,748.56 | $29,682.60 | 10/20/23 | 299% | 201% | | |
| 436,874,638.62 | $33,902.65 | 10/24/23 | 283% | 244% | | |
| 415,637,677.02 | $34,090.68 | 10/28/23 | 246% | 246% | | |
| 447,130,946.67 | $35,440.51 | 11/1/23 | 292% | 260% | | |
| 394,344,654.36 | $35,048.35 | 11/5/23 | 245% | 256% | | |
| 478,181,706.86 | $36,696.25 | 11/9/23 | 319% | 272% | 434,084,636 | $29,812 |
| 443,696,225.38 | $36,497.35 | 11/13/23 | 289% | 270% | | |
| 479,063,315.81 | $36,624.30 | 11/17/23 | 320% | 272% | | |
| 456,556,985.53 | $35,808.95 | 11/21/23 | 300% | 263% | | |
| 492,891,191.48 | $37,800.94 | 11/25/23 | 332% | 284% | | |
| 452,678,810.61 | $37,867.37 | 11/29/23 | 296% | 284% | | |
| 523,621,012.27 | $39,976.04 | 12/3/23 | 359% | 306% | | |
| 456,057,010.69 | $43,298.70 | 12/7/23 | 299% | 339% | | |
| 481,794,448.29 | $41,238.31 | 12/11/23 | 322% | 318% | 455,567,980 | $36,473 |
| 508,560,806.52 | $41,934.71 | 12/15/23 | 345% | 326% | | |
| 485,140,243.07 | $42,262.62 | 12/19/23 | 325% | 329% | | |
| 612,085,087.55 | $43,742.33 | 12/23/23 | 436% | 344% | | |
| 433,112,839.73 | $43,470.76 | 12/27/23 | 279% | 341% | | |
| 554,813,968.25 | $42,249.69 | 12/31/23 | 386% | 329% | | |
| 493,963,403.99 | $44,190.10 | 1/4/24 | 333% | 348% | | |
| 553,078,468.16 | $46,972.42 | 1/8/24 | 384% | 377% | | |
| 578,549,187.09 | $42,843.98 | 1/12/24 | 407% | 335% | 506,898,177 | $42,272 |
| 440,279,570.05 | $43,132.40 | 1/16/24 | 286% | 338% | | |
| 489,551,347.76 | $41,659.40 | 1/20/24 | 329% | 323% | | |
| 632,919,956.75 | $40,068.49 | 1/24/24 | 454% | 307% | | |
| 545,500,073.22 | $42,030.81 | 1/28/24 | 378% | 327% | | |
| 676,117,474.02 | $43,061.16 | 2/1/24 | 492% | 337% | | |
| 638,049,611.83 | $42,653.29 | 2/5/24 | 459% | 333% | | |
| 570,491,417.64 | $47,134.54 | 2/10/24 | 400% | 378% | 533,406,001 | $42,985 |