# Exhibit  B

Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
         smurray@wpdn.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MINEONE WYOMING DATA CENTER LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; BITMAIN TECHNOLOGIES HOLDING COMPANY, a Cayman Island Company; BITMAIN TECHNOLOGIES GEORGIA LIMITED, a Georgia corporation; and JOHN DOES 1-18, related persons and companies who control or direct some or all of the named Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 23-CV-79-ABJ |
| Defendants. | | |

## AFFIDAVIT OF MICHAEL MURPHY IN SUPPORT OF
## THE MERITS OF BCB'S CASE AND LIKELIHOOD OF BCB'S SUCCESS AT TRIAL

COMES NOW your affiant, on his oath, and hereby states as follows:

1. I am Michael Murphy, age 42, and I have personal knowledge of these matters and I am competent to provide this testimony.

2. I was born and raised in Casper, Wyoming.  I hold BBA (2004) and Masters of Accountancy (2005) degrees from the University of Notre Dame's Mendoza College of Business, where I graduated number one in each of my respective classes.  I have been a Certified Public Account (with experience at the Financial Accounting Standards Board and PwC) and a licensed real estate broker since 2006.

3. I am one of three founding members of BCB Cheyenne LLC ("BCB") who won a competitive RFP from Cheyenne Light, Fuel, and Power Company ("CLFPC"), a wholly-owned subsidiary of Black Hills Corporation ("BHE"), in 2021 and later negotiated a Blockchain Interruptible Service Agreement ("Original BCIS Agreement") between BCB and CLFPC, effective February 22, 2022, for 75MW of power across two locations in/around Cheyenne, WY (45MW at North Range and 30MW at Campstool), with power expansion possibilities at both sites, in order to build bitcoin mining facilities at both sites ("the Project").

4. During this time, and over the ensuing months through early June 2022, I worked for BCB to put parcels of land under contract at each site, initiate site plans for those parcels, and secure financing for the Project.

5. Related to the Project's financing, I played an integral role in working through and finalizing a deal between BCB and several entities owned, managed, and/or affiliated with Erick Rengifo and Jiaming Li, such that the Rengifo/Li entities would finance, own, and control the entire project, which included (but was not limited to) the following:

   ○ Negotiating a more favorable BCIS Agreement with CLFPC (the "Restated BCIS Agreement"), based on requirements from Erick Rengifo and Jiaming Li;

   ○ BCB effectively assigning the Restated BCIS Agreement to MineOne Wyoming Data Center LLC ("MineOne") by MineOne and CLFPC signing the Restated BCIS Agreement on June 9, 2022;

   ○ BCB and MineOne entering into the Development, Hosting, and Services Agreement ("DHS Agreement"), dated June 9, 2022;

○ BCB and MineOne entering into the Side Letter Re Digital Mining Facilities - Right of First Refusal ("Side Letter"), dated June 9, 2022; and

○ BCB and Terra Crypto Inc ("Terra") entering into the Consultancy Services Agreement ("CS Agreement"), dated June 9, 2022, (together with the DHS Agreement and Side Letter, the "Primary Agreements," and Terra, together with MineOne, MineOne Partners LLC, Bit Origin, Ltd, and SonicHash, "MOTBO").

6. After the Primary Agreements were signed and through the middle of March 2023, I worked diligently for BCB to ensure BCB substantially fulfilled its contracted obligations under the Primary Agreements.

7. MineOne and Terra failed and/or chose not to honor or meet their obligations to BCB under the Primary Agreements, which unjustified actions constitute a material breach, or material breaches, of the Primary Agreements.

8. Over the course of the project, MineOne entered into contracts with multiple vendors to procure vendors' materials, equipment, and/or services. Several of these vendors did not substantially fulfill their contractual obligations to MineOne. In several instances, MineOne now wrongfully blames BCB for MineOne's vendors not meeting their respective contractual obligations to MineOne (even though it was MineOne's vendors' responsibility - not BCB's - to perform under their respective agreements with MineOne).

9. This affidavit identifies evidence which shows (a) BCB's substantial likelihood of success on its breach of contract claims against MineOne and Terra and (b) BCB's substantial likelihood of success defending against MineOne's and Terra's frivolous counterclaims against BCB.

**BCB'S CONTRACTUAL OBLIGATIONS PER THE DHS AGREEMENT**

10. BCB and MineOne entered into the DHS Agreement on June 9, 2022. The DHS Agreement provided for two phases:

○ Phase 1 - Build and Implementation.

○ Phase 2 - Operations and Maintenance.

11. The DHS Agreement (Article 1, Section 6.2) identifies specific obligations required of BCB during Phase 1.  Those obligations, and BCB's corresponding substantial performance for each obligation (with evidence), are as follows:

| BCB'S DHS AGREEMENT PHASE 1 OBLIGATIONS | BCB'S PHASE 1 SUBSTANTIAL PERFORMANCE SUMMARY |
|---|---|
| "(a) Supporting and managing the land acquisition for the Facilities by MineOne (including all local Wyoming legal and other required support)." | BCB supported and managed the land acquisition for both the North Range site and Campstool site by MineOne.  Further, it assisted in MineOne's sale of the North Range site to Terra Crypto.<br><br>(BCB 001475 - 001730, BCB 001936) |
| "(b) Obtaining all permits and licenses, including construction permits for buildings and the Facilities' electric infrastructure, environmental licenses and permits, operations permits and licenses (including legal and other) required or recommended to comply with applicable law and regulation." | BCB assisted MineOne in obtaining all permits and licenses required or recommended to comply with applicable law and regulation.  Specifically, BCB assisted with the following:<br>• Coordinated between MineOne, its engineer [Shermco], its data center provide [CEGEN], its geotechnical testing company [Terracon], its other vendors, and the local municipalities, as and when required, to develop, compile, and submit project related documents, engineered documents, plans, and permit application packages required for approval of the North Range and Campstool projects.<br>• Engaged with the local Laramie County and City of Cheyenne Departments of Planning and Development and Departments of Building to facilitate pre-engineering meetings and actively coordinated the submittal and approval process of MineOne's engineering and construction documents in obtaining the required municipal permit approvals for both the North Range and Campstool projects/sites.<br>• Engaged with the Campstool Architectural Review Committee (CARC) to seek approval of MineOne's Campstool Project.<br><br>(BCB 000826 - 001817) |
| "(c) Supporting and managing the execution of the power purchase arrangements by MineOne." | BCB supported and managed the execution of the power purchase arrangements by MineOne.  Specifically, BCB negotiated a more favorable restated power purchase agreement with BHE for |

| | |
|---|---|
| | MineOne (which was to MineOne's satisfaction), effectively assigning its power purchase agreement to MineOne, and ensured all parties executed the required documents to effectuate said assignment. |
| | (MINEONE0024616 - 0024617, MINEONE0027151 - 0027154, BCB 000036 - 000138, BCB 001818 - 001881, BCB 001835, MINEONE0024885 - 0024886, and many more) |
| "(d)  All  other  reasonable related  activities  within  its control  to  enable  MineOne and  other  users  of  the Facilities  to  conduct  digital currency mining activities in a proper  and  timely  manner  to ensure  that  CFCO  occurs  not later than 31 October 2022." | BCB performed all other REASONABLE activities WITHIN ITS CONTROL to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than October 31, 2022.   After October 31, 2022, BCB continued performing all other reasonable activities within its control so that mining activities could commence as soon as possible.  For example, BCB: <br><br> • instituted, attended, and kept records of daily Foreman Meetings for Defendants, and for Defendants' contractors and subcontractors. <br> • instituted and led daily Procurement Meetings for Defendants, and for Defendants' electrical and construction contractors and construction manager. <br> • instituted and delivered daily progress reports with pictures and updates to inform Defendants of site progress, status, and delays caused by Defendants' contractors and vendors. <br> • held meetings with Defendants and Shermco to assist Shermco with its construction management contractual duties and responsibilities. <br> • consistently worked with Shermco to update and advance Shermco's construction project plan (which included BCB spending long hours with Shermco and Defendants to proactively address pressing issues raised daily and maintain flexibility to deliver on updated actionable plans upon Defendants' requests). <br> • did everything in its control to push CEGEN (Defendants' modular data center provider) to speed up shipments and procure required electrical and construction materials to the North Range site. <br> • held meetings with Defendants and CEGEN to do |

everything in its control to help Defendants hold CEGEN accountable for CEGEN's errors and delays.

- did everything in its control to push CEGEN to complete CEGEN's contractual responsibilities to Defendants, specifically, to provide ten completed modular data centers for the North Range site.

- did everything in its control, following CEGEN's and Shermco's failures and delays, to help qualify and ramp-up Defendants' newest contractor of choice, Systems-MEC. BCB quickly engaged with Systems-MEC in bringing them up to speed on the project, setting-up and running orientation, coordinating billing and payment workflows, and establishing update reports and meetings between Defendants and Systems-MEC, as well as communicating Defendants' desire to remove Shermco from the project and facilitating the associated hand-off of construction management and site electrical installation from Shermco to Systems-MEC. BCB's consistent oversight of onsite operations included daily site reviews and meetings with Defendants' contractors and vendors to push all parties to get the needed material to the site in an attempt to expedite overall construction and completion of the project, and to document contractor delays and errors that affected the project completion and delivery.

- went above and beyond to perform many of the contractual obligations of Defendants' contractors and vendors including material sourcing, procurement, purchasing, deliveries to the site, and onsite management and coordination of onsite material storage.

- held long update and status meetings three times each week with Defendants (many of whom were in China) at/around 6am MPT to advise and inform Defendants of site progress, material purchasing, procurement, and the status and delays of Defendants' contractors and vendors on the North Range site.

- did everything in its control to help Defendants' contractors and vendors overcome severe winter weather conditions impacting Defendants'

<table>
<tr>
<td></td>
<td>contractors and vendors. BCB devised and funded a method of enclosing the open sidewalls of the data centers with a foam board in order to allow for heaters to more effectively provide some level of reasonable comfort, which was necessary to keep the Defendants' contractors' morale up and their crews to continue working inside the data centers through very harsh winter conditions. BCB has not been fully reimbursed for all of its expenses to date.

- did everything in its control to navigate communication challenges (with two-way translation between English and Mandarin Chinese) to inform Defendants about the status, delays, and failings of Defendants' contractors and vendors on the North Range site.

(BCB 000036 - 000138, BCB 001818 - 001881, BCB 001882 - 002808)</td>
</tr>
<tr>
<td>"(e) Ensuring that all improvements are developed in accordance with the approved construction and engineering documents and all employees, contractors, or Subcontractors (if any) (as provided for below) carry standard general liability and workman's compensation insurance."</td>
<td>BCB ensured that all improvements were developed in accordance with the approved construction and engineering documents, including but not limited to:

- Although MineOne's vendors, such as Shermco and Cegen were contractually responsible for their respective inspections, compliance, and QA/QC, BCB regularly met with and/or spoke to Shermco and Cegen personnel multiple times on a daily basis in addition to MineOnes other vendors as needed to review progress, troubleshoot issues as they arose, work proactively to attain approvals in deviations from plan, and perform QA/QC to work in progress and work completed.
- In addition to BCB and MineOne's thrice weekly calls, BCB regularly communicated with MineOne via email on a daily basis to inform them of procurement items, including all project related materials, components, and equipment options when and wherever necessary, keep them up to date and obtain their approval on any deviations from plan, and communicate any of MineOne's requested changes when and wherever possible.
- BCB communicated with MineOne, MineOne's</td>
</tr>
</table>

| | |
|---|---|
| | vendors, and municipal agents and inspectors from the authority having jurisdiction whenever necessary in supporting sought approvals, deviations and/or variances from plan, and for inspection and approval of work in progress and work completed.<br><br>(BCB 002809 - 003218, MINEONE0017721 - 0017723, MINEONE0019125 - 0019128, MINEONE0013399 - 0013406, MINEONE0018944 - 0018955, MINEONE0007787 - 0007789, MINEONE0006025 - 0006033 and many more)<br><br>BCB also ensured that all employees, contractors, or Subcontractors (if any) carried standard general liability and workman's compensation insurance.<br><br>(BCB 001882 - 002808, BCB 002809 - 002817, BCB 002818, MINEONE0019233, MINEONE0019696 - MINEONE0019702, MINEONE0019623 - 0019634, MINEONE0019798, MINEONE0019793 - 0019795, MINEONE00197796, MINEONE0019797, MINEONE0019799) |
| "(f) Project management and services to support MineOne's responsibilities as specified in the Budget as and when the same fall due." | BCB provided project management services to support MineOne responsibilities as specified in the Budget as and when those responsibilities fell due. Those services included but were not limited to:<br>● regular coordination between MineOne and all of their vendors in facilitating payments of vendor deposits, invoices, and other monies due or to become due.<br>● regular coordination between MineOne and BHE to facilitate deposits, invoices, and other monies due or to become due.<br>● coordination between MineOne and LEADS to ensure annual membership dues were paid.<br>● coordination between MineOne the local governing authorities in paying permit fees or other required costs.<br><br>(BCB 0003219 - 0004503, MINEONE0013825 - 0013828, MINEONE0013687 - MINEONE0013690, MINEONE0011070 - 0011076 MINEONE0009603 - 0009604, MINEONE0011010 - 0011020, MINEONE0009606, MINEONE0010218, |

| | MINEONE0006068 - 0006071, MINEONE0011739 and many more) |
|---|---|

12. The DHS Agreement (Article 2, Section 1.2) also identifies BCB's Phase 2 "Operation and Maintenance" obligations.  Even though MineOne and Terra breached the Primary Agreements before Phase 2, and by so doing precluded BCB from fulfilling its Phase 2 obligations, BCB had taken steps to prepare for the future fulfillment of its Phase 2 obligations.  Those Phase 2 obligations, and BCB's corresponding actions to prepare for the future fulfillment of its Phase 2 obligations (where applicable), are as follows:

| BCB'S DHS AGREEMENT PHASE 2 OBLIGATIONS | BCB'S ACTIONS TO PREPARE FOR FULFILLMENT OF PHASE 2 OBLIGATIONS |
|---|---|
| "(a) Hosting MineOne's digital currency mining Facilities." | BCB took many actions to prepare for hosting MineOne's digital currency mining facilities.  For example, BCB: <ul><li>recruited and hired (on October 17, 2022) a highly experienced digital currency mining site manager, Stephen Randall, who worked closely with BCB to execute on BCB's Phase 1 Obligations while preparing with BCB for BCB's Phase 2 Obligations.</li><li>Stephen Randall's Affidavit (see "**Exhibit C**") details his experience and specialization as a highly qualified and competent industrial scale data center and bitcoin site manager (see **Exhibit C**, ¶ 1-9).</li><li>Among other things, Stephen Randal worked closely with BCB executives in;</li><li>preparing a site staffing plan for MineOne's review (see **Exhibit C**, ¶14, 16, 42-44, 53, 54-59, 97-99)</li><li>vetting over 80 resumes, and conducted more than 10 interviews, to fill the roles of its site staffing plan (see **Exhibit C**, ¶ 97-99)</li><li>drafting a thorough and detailed site security plan (see **Exhibit C**, ¶ 14, 33, 44, 51, 53)</li><li>begin hiring and training employees to operate the mining facilities (see **Exhibit C**, ¶ 14, 16, 42-44, 53, 54-59, 97-99)</li><li>begin sourcing and establishing relationships with skilled trades, vendors, and suppliers to</li></ul> |

| | |
|---|---|
| | support any immediate or future repair and maintenance needs of the mining facilities (for example, BCM for networking services)<br><br>(BCB 002698, MINEONE0010549 - 0010551, MINEONE0010552 - 0010553, MINEONE0010547 - 0010548 and many more) |
| "(b) Management of daily operations of the Facilities, including all budgeted maintenance and basic engineering (to include power management, ensuring internal loss of power and scheduled and unscheduled outage is minimized, that all facilities work properly, provide basic status checks on miners and plan and implement regular maintenance of Facilities and Miners in accordance with sound operating procedure) and other support to ensure the Miners are capable of operating at full nameplate capacity." | BCB took all necessary and reasonable actions to prepare for the management of daily operations of the facilities, and to ensure the Miners are capable of operating at full nameplate capacity.  For example, BCB:<br>● worked with MineOne and its data center provider [CEGEN] to identify and evaluate the required components to automate processes to support power curtailment and ramp up. Some of the components and systems MineOne approved were incorporated into the data center design.<br>● worked with MineOne and its engineer [Shermco] to identify and evaluate required components to provide backup power and temporary power solutions for core critical electrical loads to support the automation systems of the data centers. Some of the components and systems MineOne approved were incorporated into engineered designs.<br>● hired a site manager (Stephen Randall) who, among other things, coordinated and assisted with (i) hiring qualified staff, (ii) drafting SOPs for miner management, (iii) training staff to troubleshoot issues with miner and perform repairs, and (iv) drafting a site security plan. (see **Exhibit C**)<br>● worked to source and establish relationships with local skilled trades, vendors, and suppliers to support any immediate or future repair and maintenance needs of the data center facilities.<br><br>(BCB 002698, MINEONE0010549 - 0010551, MINEONE0010552 - 0010553, MINEONE0010547 - 0010548, MINEONE0020726 - 0020727 and many more) |

| | |
|---|---|
| "(c) Full time security of the Facilities, including maintaining and monitoring CCTV and security cameras that can be accessed remotely by MineOne and Terra." | BCB took actions to prepare for the full time security of the Facilities.  For example, BCB:<br>• evaluated and proposed several security monitoring and access control options to MineOne (Note: as of March 15, 2023, MineOne had not selected a security monitoring system, but had selected an access control system).<br>• helped coordinate the selected access control system into MineOne's data center design and engineered documents and plans.<br>• Developed a detailed security plan to ensure the highest standard of security, monitoring, and access controls for MineOne.<br><br>(MINEONE0009438 - 0009461, MINEONE0010544 - 0010545, MINEONE0020191 - 0020192, MINEONE0020196 - 0020227, MINEONE0004040 - 0004079) |
| "(d) Contracting all insurance coverage to ensure a safe work environment for its employees and Subcontractors (if any) in compliance with occupational health and safety regulations." | BCB took actions to contract all insurance coverage to ensure a safe work environment for its employees. For example, BCB:<br>• established its necessary insurance policy and provided a copy to MineOne.<br>• requested and obtained a copy of the insurance policies of all of MineOne's vendors performing work on the North Range site.<br>• established a waiver and release of liability form for visitors, guests, and temporary laborers for the benefit of both MineOne and BCB.<br><br>(BCB 001882 - 002808, BCB 002809 - 002817, BCB 002818, MINEONE0019233, MINEONE0019696 - MINEONE0019702, MINEONE0019623 - 0019634, MINEONE0019798, MINEONE0019793 - 0019795, MINEONE00197796, MINEONE0019797, MINEONE0019799, MINEONE0009581 - 0009582) |
| "(e) Repairing (if possible) and exchanging damaged Miners after consultation with MineOne and Terra." | BCB took actions to prepare for repairing damaged Miners.  For example, BCB:<br>• hired an experienced site manager who was skilled in the troubleshooting and repair of Miners. (see **Exhibit C**)<br>• budgeted for its staff to attend Bitmain's |

| | |
|---|---|
| | AMTC program (to learn and get certified in mining hardware maintenance and mining facility optimization)<br><br>(MINEONE0017556, MINEONE0017569, MINEONE0017570) |
| "(f) Maintaining records of all transactions and events in the Facilities including all scheduled and unscheduled outages and curtailments." | Not only did BCB maintain and share records of project commentions with MineOne during Phase 1, BCB took actions to prepare for maintaining records of all transactions and events in the Facilities during Phase 2.  For example, BCB:<br><br>• identified miner management software and worked with the vendor on an agreement to use the software at the site (said software which would allow for monitoring, reporting, auditing, repair ticketing, and power scaling and ramp-up automation and control).<br>• identified several software solutions for logging non-miner related transactions and events |
| "(g) Preparing the Budget with Terra in consultation with MineOne." | BCB prepared a draft budget (based on the experience of its competent site manager, Stephen Randall). BCB requested to meet with Erick Rengifo and Jiaming Li multiple times to review the Budget (as required by the Primary Agreements).  Erick Rengifo and Jiaming Li never responded to BCB's requests to review the Budget.<br><br>(MINEONE0017556, MINEONE0017569, MINEONE0017570) |
| "(h) Hiring personnel or Subcontractors needed to ensure that MineOne's operations are always conducted properly and efficiently." | BCB took many actions to support hiring personnel or Subcontractors needed to ensure that MineOne's operations are always conducted properly and efficiently.  For example, BCB:<br><br>• attended local Wyoming job fairs, distributed advertising materials in person and through online recruiting platforms for various required positions it intended to staff as part of its Phase 2 Obligations. BCB obtained over 80 resumes and/or applications for various positions. |

| | |
|---|---|
| | • conducted more than ten interviews to begin filling the roles identified in its staffing plan<br>• hired the site manager, Stephen Randall (Exhibit C)<br>• hired and began training its first data center site technician<br>• was about to hire and train many additional staff (from the resumes/interviews) for its Phase 2 obligations, but then MineOne breached the DHS Agreement (and removed BCB from its agreed-upon role as the O&M service provider).<br><br>(BCB 002698, MINEONE0010549 - 0010551, MINEONE0010552 - 0010553, MINEONE0010547 - 0010548 and many more) |
| "(i) Providing Terra with all information in relation to the Facilities, the Miners, the Containers and operations generally as and when requested." | At all times during BCB's Phase 1 Obligations, BCB kept, maintained, and shared detailed records of the project and communications with MineOne and Terra. BCB had planned to do the same in Phase 2. |
| "(j) Supplying information to Terra regarding any potential problems in terms of services, operations or any potential action that can affect the Miners." | At all times during BCB's Phase 1 Obligations, BCB kept, maintained, and shared detailed records of the project and communications with MineOne and Terra. BCB had planned to do the same in Phase 2. |
| (k) Tracking daily all costs and expenses for the Power Supply and evaluate and secure lower price supply and coordinate with Terra to ensure the Power Supply tariff and fees paid are the most favorable and cost-efficient. | During Phase 1, BCB consistently communicated with CLFPC regarding power (in general), the availability of potential blocks of power, and the cost of power (both blocks and day-ahead pricing), among other things, and relayed this information to MineOne and Terra.  As Phase 2 was approaching, BCB met with CLFPC multiple times to review the power purchase process and in order to prepare for MineOne's initial purchases of power in Phase 2 (and BCB provided this information to MineOne and Terra).  BCB was prepared to track daily all costs and expenses for the Power (just as it had tracked all of the other costs during Phase 1) and was ready to evaluate and secure the lowest price power for MineOne (in coordination with Terra). |

| | (BCB 001818 - 001881, BCB 001850 - 001851, MINEONE0028536 - 0028537, MINEONE0028526 - 0028527, MINEONE0024885 - 0024886, MINEONE0024829 - 0024831, MINEONE0024824 - 0024827 and many more) |
|---|---|
| (l)   Providing   any   other operational   activities reasonably   required   by MineOne in consultation with BCBC and/or Terra. | BCB was prepared to provide any other operational activities reasonably required by MineOne. |
| (m) Payment of all operation and   maintenance   costs ("O&M Costs") specified in the Budget as and when the same fall due. | BCB was prepared to pay for all O&M Costs specified in the Budget as and when they fell due. |

## MINEONE'S AND TERRA'S BREACH(ES) OF THE PRIMARY AGREEMENTS, INCLUDING MINEONE'S ANTICIPATORY REPUDIATION OF THE DHS AGREEMENT AND EVIDENCE SHOWING BCB'S LIKELIHOOD OF SUCCESS AT TRIAL

13. MineOne and Terra committed multiple breaches of the Primary Agreements.  Most significantly, MineOne anticipatorily repudiated its DHS Agreement with BCB just before Phase 2 (which provided BCB with over 95% of its consideration from the DHS Agreement) was set to begin at North Range.

14. The consideration promised to BCB as part of Phase 2 in the DHS Agreement was for (a) work already performed and (b) future work over the remaining term of the DHS Agreement.   As documented (with evidence) in Patrick Gahan's Expert Report (Document 151-1 Filed 03/21/24), "BCB performed valuable upfront work to develop the bitcoin mining opportunity. Defendants proposed a deal structure, which BCB agreed to, that deferred compensation for this upfront work to Phase 2 of the project (as confirmed in an email from Jiaming Li on April 21, 2022, (MINEONE0027622 - 0027624). Defendants breached its agreement with BCB during Phase 1, just before Phase 2 was set to begin." (Section 2.1.2).  Further, "When Defendants breached the Primary Agreement in Phase 1, it prevented BCB from performing - and receiving the profits from - all of the

operation and maintenance ("Phase 2") work for the North Range 45MW power tranche, the Campstool 30MW power tranche, the North Range +25MW expansion power tranche and the Campstool +30MW expansion power tranche." (Section 2.1.4).

15. MineOne and Terra anticipatorily repudiated the DHS Agreement by removing BCB from the role that BCB and MineOne/Terra had agreed in the DHS Agreement that BCB would have.  The timing of this removal just before Phase 2 was set to begin is not a coincidence: it was done in order that MineOne could extract all of the value from BCB in Phase 1 and then avoid having to pay BCB the agreed-upon consideration for all of the upfront work BCB had already performed and for the future work BCB was going to do (and as documented in Section 12 above, had been preparing to do in Phase 2).

16. Erick Rengifo and Jiaming Li said they were removing BCB from its agreed-upon role in the DHS Agreement because MineOne's client, Bitmain, wanted BCB to be removed. For example, on March 3, 2023, Erick Rengifo sent an email to me in which he stated, among other things, "...Bitmain [is] completely opposed to you being the Host [i.e., O&M Service Provider].  It is clear that you do not know the business and no one wants to have issues during operations." (MINEONE0025915).   I responded via email to Erick and stated that I disagreed with several of his points.  (MINEONE0018744 - 0018745)

17. On March 7, 2023, Erick Rengifo and Jiaming Li further communicated MineOne's anticipatory repudiation of the DHS Agreement to BCB in a GoogleMeet teleconference when they said the following:

   ○ 0:32: Erick Rengifo - "Our major client [Bitmain]-- our major partner here [Bitmain] is - - is -- he doesn't want you [Plaintiff BCB] to be the -- the -- the host and the manager."

   ○ 1:00: Erick Rengifo: "I go directly to the point. So what they [Bitmain] want is Wiley and team to do the hosting and management, the -- the real activities of hosting and management. And they told us, okay, you [MineOne] deal with BCB as you want as part of the payment structure, we [Bitmain] don't care, but we [Bitmain] want Wiley and team to do that. And why Wiley and team? Well, these guys are well known, so Wiley's well known. He has Indiana working with him and he has worked with these guys [Bitmain] before, so his reputation's extremely high. And - - and he knows how to manage these facilities."

- 1:31: Erick Rengifo: "...that was the kind of agreement so we [MineOne/Terra/BitOrigin] are negotiating it still [with Bitmain].... So Wiley is going to be in charge, Wiley and team is going to be in charge of everything that is operations, you know, the -- the miners, the -- everything that is related to operation. Everything."

- 3:04: Erick Rengifo: "They [Bitmain] told us, okay, you know what? As soon as Wiley is in charge of the -- of the hosting and management, we're [Bitmain] okay."

- 6:52: Emory Patterson: "So this decision [to replace BCB with Wiley for site operations] is coming from pressure from like Bit Origin and Bitmain?" Erick Rengifo: "They're the clients. Yes." Mr. Patterson: "Okay." Erick Rengifo: "So basically the ones [Bitmain] that are gonna operate with us, they are telling us they don't want you to be the operators [of the site]."

- 9:01: Erick Rengifo: "What these guys [Bitmain] want to do is basically you [Plaintiff BCB] out completely. And -- and we explained Saturday and Sunday was with them [Bitmain] explaining, guys, we cannot do that. We [MineOne] have an agreement [with Plaintiff BCB]. But these guys [Bitmain] are -- are -- are tough guys. You know, I would say no, no, no, but no. I would say no."

- 14:57: Jiaming Li: "There are two things [that factored into the decision to replace BCB with Wiley for site operations]. One is the Bitmain's relationship with -- with Wiley's team in China, back to China. They have managed 300,000 miners for Bitmain back to there. So that's why. And Wiley and Jack, they -- they had a very good relationship with them."

18. On March 13, 2023, Erick Rengifo and Jiaming Li further affirmed MineOne's anticipatory repudiation of the DHS Agreement to BCB when Jiaming Li sent an email to BCB (that Erick Rengifo had approved via a Skype message with Jiaming, (MINEONE0031135 - 0031142) with a proposed "amendment" to the DHS Agreement (BCB 000243, BCB 000244 - 000248, BCB 000249) that indicated, among other things and in simplified form, the following:

- BCB would not be allowed to operate the North Range site and would not receive the agreed-upon consideration tied to those services, including the compensation for BCB's upfront work to secure the development opportunity.

- BCB would not be allowed to implement or operate the Campstool site and would not receive the agreed-upon consideration tied to those services, including the compensation for BCB's upfront work to secure the development opportunity.

- BCB would no longer have its Right of First Refusal or buy-out in the event another entity purchases the development.

- In return for a much-reduced compensation package, BCB would be expected to perform a much-reduced scope of work including tracking daily power prices, providing any PR services reasonably required by MineOne, and helping MineOne maintain good relationships with local authorities and regulators.

- BCB could earn additional compensation by (1) assisting MineOne's attorneys in MineOne's claims against third parties, and (2) assisting MineOne secure tax reductions or tax exemptions.

- In order for BCB to now receive payment for the $90,000.00 BCB had invoiced on March 6, 2023, for Phase 1 services already provided, and which Dr. Jiaming Li had earlier promised to pay $45,000.00 towards on March 13, 2023, BCB would now need to sign the proposed amendment (to receive $40,000.00) and then deliver the site to full operational completion (to receive the remaining $50,000.00).

19. Jiaming Li's "proposed" amendment did not seem like a proposal; it seemed like an attempt to extort and force BCB into accepting a reduced role and reduced compensation. Jiaming Li and Erick Rengifo believed they could force BCB into accepting the reduced role and reduced compensation because they were withholding a $90,000.00 payment. In a skype message to Erick Rengifo on March 3, 2023, Jiaming Li said "BCB will have no option [but] to accept the proposal for the 45MWs," to which Erick Rengifo responded "Yes. They have no option." (MINEONE0031092 - 0031095).

20. On March 15, 2023, I sent an email to Dr. Erick Rengifo and Dr. Jiaming Li explaining that "MineOne's words and actions are an anticipatory repudiation and/or a material breach of our MineOne/BCB contract and the implied covenant of good faith and fair

dealing inherent in that contract.  Unilaterally removing BCB for no just cause and replacing BCB with Wiley's [MineOne] team precludes BCB from performing BCB's obligations under the contract, which will result in BCB not receiving the benefits it contracted for and reasonably expected to receive.  This is an intentional and tortious interference with, and a failure to cooperate in, BCB's performance." (BCB 000250 - 000252).

## MINEONE'S VENDORS' CONTRACTUAL OBLIGATIONS TO MINEONE, AND THOSE VENDORS FAILURE TO PERFORM THEIR RESPECTIVE OBLIGATIONS

21. Over the course of the project, MineOne entered into contracts with multiple vendors to procure vendors' materials and/or services.  Several of these vendors did not substantially fulfill their contractual obligations to MineOne.

22. The most important vendor that MineOne contracted with was CLFPC (for providing electrical power to the site, which was required for the operation of the bitcoin mining computers).  In MineOne's and CLFPC's Restated BCIS Agreement, CLFPC was obligated to provide all of the Facilities on CLFPC's side of the meter which were necessary for the proper delivery of electrical power by November 10, 2022.  Specifically,  "Not later than one hundred fifty (150) days after Customer [MineOne] provides notice to Company [CLFPC] that it has closed on the real estate transaction for a parcel in the vicinity of the Company's North Range substation [said closing which occurred on June 13, 2022], which is necessary to allow Customer to commence construction of its Facility and to further allow Company to commence construction of the facilities to be furnished by Company pursuant to this Article 2.2 of this Agreement, Company shall install and maintain, in approved standards of construction, all facilities on Company's side of the Point of Delivery which are necessary for the proper delivery of electrical power from Company's North Range substation to the Point of Delivery. Company will provide written notice to Customer when all facilities on Company's side of each individual Point of Delivery are complete." (Restated BCIS Agreement Article 2.2).  On February 22, 2023, CLFPC provided written notice to MineOne via a letter that said "Pursuant to Article 2.2 of the Block Chain Interruptible Service Agreement between

Cheyenne Light, Fuel and Power Company (Company) and MineOne Wyoming Data Center, LLC (Customer) this letter is to inform you that final construction of the company's facilities are complete to your North Range location." (BCB 004514 & MINEONE0019058).

23. As such, CLFPC was over three months late in performing its obligations under its Restated BCIS Agreement with MineOne. CLFPC's delay in fulfilling its contractual obligations to MineOne was outside the control of BCB; no reasonably related action by BCB could have sped up CLFPC's performance or their procurement of critical equipment and components required to deliver the power to MineOne.

24. MineOne contracted with several other vendors which failed to timely perform their respective obligations to MineOne. In each case, the vendor's delay in fulfilling its contractual obligation to MineOne was outside the control of BCB. No reasonably related additional action by BCB could have sped up those vendors' performances under their respective agreements with MineOne. Several of those vendors, their contractual obligations to MineOne, and their untimely performance, are as follows:

| VENDOR | VENDOR'S CONTRACTUAL OBLIGATION TO MINEONE | VENDOR'S UNTIMELY PERFORMANCE |
|---|---|---|
| CEGEN | In CEGEN's most recent quote before signing its Simplified Purchase Order Agreement with MineOne for ten data centers, it indicated it would have the ten data centers installed by October 21, 2022 (BCB 047606 - 047621, BCB 0023226 - 002331).<br><br>When CEGEN failed to deliver by this date, it then agreed with MineOne, in the First Amendment to the Simplified Purchase Order Agreement, effective December 5, 2022, to provide all ten data centers per the following schedule:<br>DC1 - 12/16/22   DC6 - 2/13/23<br>DC2 - 1/3/22     DC7 - 2/13/23<br>DC3 - 1/16/22    DC8 - 2/24/23<br>DC4 - 1/30/23    DC9 - 2/24/23<br>DC5 - 1/31/23    DC10 - 3/8/23 | By the time MineOne anticipatorily repudiated BCB's and MineOne's DHS Agreement and BCB had notified MineOne of MineOne's breach of the DHS Agreement (approx March 13, 2023), CEGEN had failed to deliver a single data center in an operationally complete state. CEGEN's failure to timely perform exposed it to a daily penalty and qualified it for default under the First Amendment to the Simplified Purchase Order Agreement. |

| | | |
|---|---|---|
| | (BCB 002344 - 002358, BCB 002277 - 002319, BCB 002326 - 002331)<br><br>The aforementioned First Amendment also subjected CEGEN to a $1,000 daily penalty under the Agreement if CEGEN was unable to provide data centers 1-6 operationally complete by Feb 13, 2023. Further, CEGEN would be in default under the Agreement if it did not provide data centers 1-6 operationally complete by Feb 13, 2023 and data centers 7-10 operationally complete by Mar 8, 2023.<br>(BCB 002349) | |
| Shermco | Shermco's Consulting Management Master Services Agreement (BCB 002501 - 002517), signed July 25, 2022, with MineOne, and several ensuing purchase orders (for (a) Construction Management (BCB 002490 - 002494) and (b) Site Electrical Installation (BCB 002495 -002500)), required Shermco to do the following for MineOne:<br><br>Construction Management Scope Summary<br><br>● Shermco will provide all construction management required for the successful management and completion of the project including, but not limited to overall management of site, processes, schedule, subcontractors, quality assurance, quality control, and inspections. Shermco will not be responsible for inspections related to CryptoCache's [CEGEN] scope of work.<br><br>Electrical Scope Summary<br><br>● Complete the installation of the medium voltage and low voltage scope of work by December 30, 2022. | Although Shermco was contractually responsible to provide all construction management and site electrical install in it's agreements with MineOne, excluding any work or inspections related to CEGEN's scope of work, they failed to procure and install necessary materials and equipment in time such that would have allowed energization of the data centers had CEGEN performed and delivered the data centers on time. Shermco additionally made errors in their design and procurement of electrical components in the ehouse, installation of conduits and/or cables from BHE's primary transformers to the ehouse switchgear and from the ehouse switchgear to the data center transformers (MINEONE006007, MINEONE0031185 - 0031191, |

| | | |
|---|---|---|
| | • Provide labor and materials to install and terminate all medium voltage (25kV) site electrical from BHE's (2) primary meters to the data center transformers.<br>• Provide labor and materials to install and terminate all low voltage (415V, 120/208V) site electrical from transformers to data center electrical panels.<br>• Provide labor and materials to install site grounding grid.<br>• The above scope also included sourcing, procurement, and install of required electrical materials and equipment paid for by MineOne. This included, but was not limited to, all cable, tray, supports, conduit, lugs, termination kits, fittings, etc. | MINEONE0031193 - 0031195, MINEONE0005793 -0005794), mismanaged MineOne's other subcontractors performing site improvements and other installations, and were ultimately removed by MineOne and replaced with a different construction manager and electrical install company, Systems Mechanical Electrical LLC (Systems-MEC).<br><br>(MINEONE0007580 -0007581, MINEONE0001775 -000176)<br><br>Systems-MEC highlighted several of the shortfalls and failures of Shermco through various delay letters and notices that correlated to work previously under direct management and control of Shermco.<br><br>(MINEONE0007456 - 0007458, MINEONE0006140, MINEONE0004289, MINEONE0006142) |
| Belyea | Based on the signed Proposal and Terms and Conditions of Sale between Belyea and MineOne, dated August 18, 2022, Belyea was to have two switchgear line-ups ready to ship within 12-14 weeks (which would have put the estimated ship date between November 10-24, 2022, and estimated | The first switchgear line-up arrived at the North Range site on November 23, 2022. (MINEONE0020117 - 0020124) |

| | arrival date, based on one week for shipping, at November 17-December 1, 2022).<br>(BCB 047594 - 047596, BCB 047597, BCB 047598) | The second switchgear line-up eventually arrived at the North Range site on February 27, 2023 (which was approximately two months late).<br>(BCB 047602) |
|---|---|---|

25. MineOne knew, and still knows, that some of its key vendors did not perform their contractual obligations to MineOne.  As evidence of this, in MineOne's March 13, 2023 proposed amendment to its DHS Agreement with BCB, MineOne tried to entice BCB to sign the proposed amendment by offering BCB the opportunity to make additional money.  Specifically, the proposed amendment stated "If BCBC provides all needed additional support to MineOne's lawyers in order to get compensated by the sued third-parties and, in case that MineOne receives a compensation from these third-parties, BCBC will be entitled to 20% (twenty percent) of the recovered funds minus all legal and other fees paid to get this payments. The payments will be made in a maximum of 5(five) days after the compensation has been effectively deposited in MineOne's bank accounts and after all legal and related fees have been fully paid." (BCB 000246).  Before BCB filed its first lawsuit against MineOne, et al, MineOne didn't blame BCB for MineOne's other vendors' performance issues.  Rather, MineOne wanted BCB's to help MineOne recover compensation from MineOne's vendors who did not perform timely their obligations to MineOne.

26. The following is a list of Skype communications between Erick Rengifo, Jiaming Li, and Haku Du.  These communications provide evidence that these individuals believed that MineOne's other vendors (specifically CEGEN and Shermco) did not perform their respective obligations to MinOne (even though MineOne now asserts that all of the delays are due to BCB's alleged breach of the DHS Agreement).  Emphasis added.

   ○ MINEONE0030643-MINEONE0030645: Haku Du, "**CC [CEGEN] will delay the whole process** anyway although they promised a lot at the beginning so I expect the they can only deliver two MDCs by the end of Nov. **they [CEGEN] are running behind the schedule.**" (11/12/2022, 12:48 AM)

- MINEONE0030685-MINEONE0030688: Jiaming Li to Erick Rengifo, "4. Very slow progress in wyoming due to lack of experience of BCB…" (11/28/2022, 5:47 AM). Erick Rengifo, "It is not inexperience. The engineers there are top notch. **The issue is a delay with CEGEN that they [BCB] are following each day.**" (11/28/2022, 11:12 AM PM).

- MINEONE0030716-MINEONE0030728: Jiaming Li to Erick Rengifo, "I see from email, we have payment regarding the second 30 mw to cegen?" (12/5/2022, 9:37 AM)… "we won't use them for the next 30 mw MDC" (12/5/2022, 9:38 AM). Erick Rengifo, "**But for north range there is no way we do not finish the agreement without a legal action [against CEGEN]**" (12/5/2022, 9:47 AM). Haku Du, "**they [CEGEN] have been totally ignoring the payment term we have built and confirmed and agreed, and badly managed the flow of work**. so i believe a revised contract is not enough…money flow need to be secured and penalty should be attached to the default." (12/5/2022, 2:40 PM).

- MINEONE0030902-MINEONE003090: Jimaing Li, "**but the switchgear [from Belyea] was always mentioned to be finish connected before christmas" (1/3/2022, 8:32 AM)… "not only cegen delays**" (1/3/2022, 8:33 AM)

- MINEONE0030957-MINEONE0030969_: Haku Du to Erick Rengifo, "**Cegen has made the project miserable**…. Erick" (2/2/2023, 10:51 AM). Erick Rengifo, " i know!!!!" (2/2/2023, 10:51 AM). Haku Du, "**This cegen is really a true liar and not respecting agreement at all**" (2/2/2023, 10:52 AM). Erick Rengifo, "**I know, we will take action, once this is done**. Their [CEGEN] reputation is terrible and we will complain .. in the USA there are strong consumer protection bureaus…we will do this in the most strongly way" (2/2/2023, 10:55 AM). Haku Du, "sometimes I just don't know how I should react to what cegen has done to our project. I just want them to go to hxxxl…" (2/2/2023, 10:55 AM)

- MINEONE0031036-MINEONE0031040: Haku Du to Erick Rengifo, "**there is a very big mistake made by shermco inside of the ehouse.**" (2/27/2023, 4:48 PM)… "**they ordered the wrong panels and a series of shipping costs, material costs incurred and still a very important equipment(two panles) are still**

**outstanding.**" (2/27/2023, 4:50 PM)... **shermco did a worst job and they are creating chaos on the site.**"(2/27/2023, 4:51 PM)

○ MINEONE0031051-MINEONE0031059: Jimaing Li to Erick Rengifo, "**They [BCB] need to deal with cegen and shermco**"... "**Potential law suits**" (3/1/2023, 4:21 PM). Erick Rengifo, "**they [BCB] are PMs and as such technically have no responsibility**"... "**we should sue them if we want**"... "**but Shermco and cegen signed agreements with us**" (3/1/2023, 4:22 PM)... "**thus we are directly responsible**" (3/1/2023, 4:23 PM).

○ MINEONE0031060-MINEONE0031067: Haku Du, "We have been super polite… and we have fulfilled all our obligations and we now have a huge amount of overshooting budget"..."And potential lawsuits with cegen and shermco" (3/1/2023, 4:34 PM). Erick Rengifo, "suits in the sense that we will sue them, correct?"..."not them to us" (3/1/2023, 4:35 PM). Haku Du, "yes we will sue them…"..."shermco and cegen all equally evil…"(3/1/2023, 4:38 PM). Erick Rengifo, "ok, that we can do…what we will win, I doubt it, but we can…**it is amazinf how Shermco has failed so miserably!**" (3/1/2023, 4:39 PM). Haku Du, "**shermco couldn't complete the ehouse as they promised by the end of December and they misordered the significant panel and created a lot of trouble**" (3/1/2023, 4:43 PM). Erick Rengifo, "this is bad, technically we owe them [Shermco] money and as such they can sue us"..."we will need to prove they [Shermco] did not perform but this will be hard to prove in front of a judge…this will go into arbitration…a nightmare!!!!!!!" (3/1/2023, 4:53 PM). Haku Du, "I have asked Bcb to document everything" (3/1/2023, 4:59 PM).

## MINEONE'S AND TERRA'S FRIVOLOUS FIRST COUNTERCLAIM AGAINST BCB FOR BCB'S ALLEGED BREACH(ES) OF THE DHS AGREEMENT

27. MineOne's and Terra's Counterclaims (Document 23) and Amended Counterclaims (Document 62) against BCB provide little substance, convey a poor understanding and willful ignorance of BCB's obligations under the DHS Agreement, and contain multiple false statements (as pointed out and corrected by BCB in its Answers to the Counterclaims (Document 36) and Amended Counterclaims (Document 51).

28. MineOne and Terra mistakenly assert that BCB, as the project manager, had ultimate responsibility for constructing and readying the site for mining operations by October 31, 2024, regardless of MineOne's vendors' non-timely performance, procurement issues, and other factors outside of BCB's control.  Even though MineOne and Terra provide in its Counterclaims the specific lists of BCB's Phase 1 and Phase 2 obligations under the DHS Agreement, they do not understand, or disregard, what the actual words of the contract state, specifically (with emphasis added): "All other **reasonable** related activities **within its control** to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022."  To be sure, BCB was obligated to perform only "reasonable" related activities to the extent they were "within its [BCB's] control."  It was not possible for BCB to "control" MineOne's other vendors' performance (for example, how was it that BCB was supposed to control the timing of when CLFPC provided all of its facilities to deliver electrical power to the site?).  It was those other vendors' obligations to timely perform their respective obligations to MineOne per each of their respective agreements with MineOne.

29. Furthermore, in claiming that BCB breached its obligations "to have the mining facilities completed as soon as possible (and no later than the end of October 2022)" (Document 62, Section 13) since the mining facilities were not up and running by the end of October 2022, MineOne and Terra are actually acknowledging that Terra breached its contractual obligation to BCB under BCB's and Terra's CS Agreement.  The CS Agreement required Terra to (emphasis added) "***ensure that all*** the processes, activities and tasks with regard to the building of the Facilities ***are developed in a timely manner*** and coordinate all operational activities with the Company and funding needs with MineOne."  Terra's obligation is to "ensure that all" processes, activities, and tasks are developed in a timely manner.  It is different and more expansive than BCB's limited contractual obligation.  And Terra's obligation – unlike BCB's contractual obligation –  is not limited to those things "within its [Terra's] control."  As such, Terra breached the CS Agreement (since the mining facilities were not up and running by the end of October 2022).  BCB did not breach the DHS Agreement (since BCB was responsible for only those reasonable related

activities within its control, and BCB performed those activities).  See below for a side by side by side comparison of this critical language:

| MineOne's Counterclaim assertion regarding BCB's alleged obligations under the DHS Agreement | BCB's actual obligation based on exact wording from the DHS Agreement (Article I, Section 6.2(d)) | Terra's actual obligation based on exact wording from the CS Agreement (Article II, Section 1.2(b)) |
|---|---|---|
| Plaintiff BCB had the duty, responsibility, and obligation to have the mining facilities completed (i.e., "up and running") as soon as possible (and no later than the end of October 2022). (Document 62, Section 13) | All other **reasonable** related activities **within its control** to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022. | **Ensure that all** the processes, activities and tasks with regard to the building of the Facilities **are developed in a timely manner** and coordinate all operational activities with the Company and funding needs with MineOne. |

30. MineOne and Terra asserted many mistaken, frivolous, and wrongful claims against BCB in MineOne's and Terra's Amended Counterclaims (Document 62).  For each claim, BCB has facts and supporting evidence to show the mistaken, frivolous, and wrongful nature of MineOne's and Terra's assertions.  Here are several examples of the many mistaken, frivolous, and wrongful claims MineOne and Terra have asserted against BCB:

- ○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
  Paragraph 14: Plaintiff BCB acknowledged and agreed to an initial August 2022 completion deadline (and subsequently to an October 2022 deadline) for completion of the facilities.

  **Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

  BCB never acknowledged and agreed to what MineOne claims BCB agreed to. Rather, BCB agreed to what was in the DHS Agreement, which states that BCB agreed to perform: "all other reasonable related activities within its control to enable MineOne and other users of the Facilities to conduct digital currency

mining activities in a proper and timely manner to ensure that CFCO occurs not later than 31 October 2022."

○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
Paragraph 20: Under the DHS Agreement, for BCB to fulfill its contractual obligations it was expected and necessary for BCB's principals to be physically present at the facilities to ensure orderly and timely process, implementation and operation of the project and its buildout.

**Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**
The DHS Agreement does not indicate that it was required for Plaintiff's principals to be physically present at the facilities. However, Plaintiff was physically present at the facilities for much of the buildout of the facilities. Further, Defendants hired Shermco to provide construction management services for the buildout of the facilities, specifically to provide "all construction management required for successful management and completion of the project including but not limited to overall management of site, processes, schedule, subcontractors, quality assurance, quality control, and inspections. Shermco will not be responsible for inspections related to CryptoCache's [CEGEN's] scope of work" (SIQ-11754-22 – 45 MW NRBP (Cheyenne, WY) – Construction Management Scope, Revision 5, [Quote SIQ-11754-22 (Revision 5) Scope executed October 26, 2022 & MSA executed 7-25-22, (BCB 002490 - 002494). A Shermco construction management representative was physically present at the facilities for most of the buildout of the facilities. Further still, Defendants hired CEGEN to provide modular data centers. A CEGEN construction manager was physically present at the site off and on during the buildout of the facilities.

○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
Paragraph 21: Plaintiff's numerous statements about its prior experience and capabilities to build and operate a crypto mining facility of this size was the major

reason for MineOne Wyoming Data Center entering into the DHS Agreement with Plaintiff (and its members).

**Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

BCB informed MineOne and Terra that BCB (and its principals) had not built and operated a crypto mining facility of this size. This is one of the reasons why MineOne and Terra chose to hire and contract directly with its own contractors and vendors (rather than having BCB hire subcontractors and sub-vendors for the buildout of the facilities). This is also why MineOne and Terra required BCB to enter into the CS Agreement with Terra (in which Terra would get 20% of BCB's profits during the lucrative Phase 2 of the project, which was estimated to be approximately $4M at the time). Under the CS Agreement, Terra was obligated to "ensure that all the processes, activities and tasks with regard to the building of the Facilities are developed in a timely manner." (Article 2, Section 1.2(b)). This contractually ensured that MineOne and Terra could bring its purported experience (via Terra) to bear on the project (to make up for BCB's lack of experience at that time).

○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
Paragraph 27: Plaintiff failed to secure the promised electric rates and ultimately walked off the project (and hastily filed this and a prior lawsuit).

**Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

BCB did not "promise" certain electric rates, and BCB was not obligated to secure certain electric rates. Rather, the DHS Agreement provided a performance incentive in which BCB would receive a bonus when MineOne received power under a certain price. Generally speaking, MineOne and Terra reference the "required" electricity price and claim that BCB made representations it could "absolutely achieve" and was "very confident" it could get that price, yet provide no evidence to support these mistaken claims. In doing so, MineOne wants to show they relied on BCB's representations about the power price and that

MineOne signed its BCIS Agreement with Black Hills based on that reliance. Such a reliance would be completely untrue. Defendants are highly-educated individuals, particularly Dr. Erick Rengifo and Dr. Jiaming Li, who both hold PhDs in Economics. Over the course of March-May 2022, BCB and Defendants had multiple conversations and exchanged multiple emails where Defendants documented their concerns about the electricity price based on BCB's Original BCIS Agreement with the BHE. Due to Defendants' concerns about the power price, they requested, and were provided with, historical power pricing information. Based on Defendants' analysis of the historical pricing information, in conjunction with Plaintiff's analysis of the historical pricing information, Defendants directed Plaintiff to negotiate more favorable power pricing terms with BHE in the Restated BCIS Agreement (MINEONE0024327 - 0024329, BCB 000101 - 000102, BCB 000103, BCB 000104 -000125) so that it would be more likely to achieve an electricity price at or below the $0.05/KWh target, however, these terms did not include a guarantee the electricity price would be below $0.05/KWh. Plaintiff did so, and secured more favorable terms for Defendants, but again, there was no guaranteed electricity price. Defendants were fully aware there was no guaranteed electricity price (even with the updated terms) and eventually signed its Restated BCIS Agreement with Black Hills Energy.

○  **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**

Paragraph 30: "When confronted with delays and difficulties of its own making, Plaintiff BCB had no desire to attempt to remedy the issues as Project Manager of Phase 1 of the project. For example, BCB reacted slowly to the problems that it was confronting. Two of its main recommended subcontractors/providers were not at the required standard of quality and performance for a project of this magnitude, complexity, and sophistication. It was paralyzed to take appropriate action."

**Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

Plaintiff did not have any contractors or subcontractors on the project. Defendants directly contracted with all of their own contractors and vendors. Defendants are either oblivious to the contractual duties between them and their contractors and vendors, or Defendants are aware of their contractual duties and are now intentionally omitting these duties to 'pass the contractual buck' from their contractors and vendors to Plaintiff. While Plaintiff presented certain contractors and vendors to Defendants as options, it was Defendants who chose which contractors and vendors to contract with (as evidenced by the agreements Defendants entered into with these contractors and vendors). Plaintiff acknowledges several of Defendants' contractors and vendors did not perform their respective obligations as they were contractually required to do, and due to that, among other things not related to BCB, the project encountered delays. Defendants are now trying to 'rewrite history' by mischaracterizing the delays, contractor failures and circumstances outside of Plaintiff's control as Plaintiff's "own making." In reality, when confronted by the shortcomings, delays, and difficulties created by Defendants' contractors and vendors, Plaintiff acted quickly, and proactively jumped in to provide consistent support and troubleshooting of any issues and in helping find ways to problem solve, expedite the project, and resolve the delays and difficulties. Plaintiff even hired additional staff prior to its Phase 2 obligations to support the increased demand for coordination resulting from the failure of Defendants' contractors, subcontractors, and vendors.  Please see earlier sections of this Affidavit for specific examples of how BCB performed actions to fulfill its obligations under the DHS Agreement (and was not "paralyzed" to take appropriate action).

○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
Paragraph 33: "BCB refused to respond to emails requesting information so the project could continue moving forward."

**Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

Even as Defendants breached the DHS Agreement, stopped paying Plaintiff, and Plaintiff realized it was being ousted from the project, Plaintiff continued to meet

every day with Defendants, worked around the clock for several weeks to help to bring the facility online, and answered Defendants' questions about accounting, procurement, vendors, and Black Hills Energy. Plaintiff's conduct was professional in the weeks following Defendants' breach where Plaintiff went above and beyond any obligation it had to Defendants after Defendants stopped paying Plaintiff and breached the DHS Agreement.

- ○ **MineOne's mistaken, frivolous, and wrongful claim asserted against BCB:**
  Paragraph 36: "Given Plaintiff BCB's total inability to properly and timely perform its Phase 1 obligations under the DHS Agreement, it was clear that Plaintiff BCB does not have the ability, experience, and technical expertise to complete its Phase 2 obligations"

  **Facts and evidence rebutting MineOne's mistaken, frivolous, and wrongful claims asserted against BCB:**

  Plaintiff had the ability, experience, and technical expertise to complete its Phase 2 obligations. However, Plaintiff did not have an opportunity to perform the majority of its Phase 2 obligations because (a) Defendants breached the DHS Agreement around the time Phase 2 was to begin and (b) Defendants refused to pay Plaintiff for two months of Plaintiff's services. Nevertheless, Plaintiff had started its Phase 2 obligations in anticipation of the start of Phase 2. Specifically, Plaintiff had prepared a budget and requested on several occasions to meet with Defendants to discuss it, but Defendants ignored those requests. Plaintiff had also started hiring and training personnel to ensure that Defendants' Phase 2 operations were conducted properly and efficiently.

31. MineOne and Terra, in their Amended Counterclaims, fail to identify any specific example – based on BCB not fulfilling its obligations under the ***actual wording*** of DHS Agreement – in which BCB breached the DHS Agreement.

32. BCB  has made a good faith effort to understand MineOne's and Terra's asserted breach of contract claim against BCB.  For example, Interrogatory Number 3 of BCB's First Additional Interrogatories for MineOne states "Please identify each document and

communication that demonstrates BCB did not do "all reasonable activities within its control to enable MineOne and other users of the Facilities to conduct digital currency mining activities in a proper and timely manner to ensure that CFCO occurred not later than 31 October 2022." (see DHS AGREEMENT at 6.2(d))."  MineOne responds by providing multiple objections, and then simply states "Defendant incorporates its Counterclaims and Amended Disclosures as if fully set forth herein and refers BCB to their contents."

33. It has now been over a year since BCB filed its lawsuit in Federal Court.  Why hasn't MineOne been able to identify a specific example (with evidence) of BCB breaching the DHS Agreement (based on the actual contractual obligations identified in the agreement), even when asked point blank in an interrogatory?  In many cases, as here, the most simple reason is the right reason: MineOne is unable to identify a specific example of BCB breaching the DHS Agreement because BCB DID NOT BREACH THE DHS AGREEMENT.

34. MineOne's and Terra's counterclaims against BCB are meritless.  They are a tactic employed to (i) obfuscate the truth, (ii) intimidate and extort BCB, and (iii) evade the damage and harm they have caused to BCB.

**MINEONE'S AND TERRA'S FRIVOLOUS SECOND COUNTERCLAIM AGAINST BCB FOR LEGAL FEES PURSUANT TO THE DHS AGREEMENT**

35. In their Amended Counterclaims (Document 62), MineOne and Terra mistakenly assert that the "parties' dispute first arose when the mining facilities were not close to being operational in August 2022 (as promised by BCB), and MineOne Wyoming Data Center learned that Plaintiff had breached the DHS Agreement by failing to fulfill all of its duties and responsibilities thereunder and that Plaintiff (and its members) did not have the necessary and promised experience, knowledge, and technical expertise to oversee and manage the building and/or operation of a digital currency mining facility, as they were required to do under the DHS Agreement."  As explained previously, BCB was not obligated to ensure mining facilities were operational in August 2022 (rather, BCB was obligated to perform "all other **reasonable** related activities **within its control** to enable MineOne and other users of the Facilities to conduct digital currency mining activities in

a proper and timely manner to ensure that CFCO occurs not later than 31 **October 2022**.").  As explained previously, MineOne again fails to mention any specific "duties and responsibilities" under the DHS Agreement that BCB failed to fulfill.  Why?  Because BCB did not breach the DHS Agreement.  And further still, MineOne outright lies when it says BCB "did not have the necessary and promised experience, knowledge, and technical expertise to oversee and manage the building and/or operation of a digital mining facility."  BCB was always truthful when explaining its experience, knowledge, and technical expertise to MineOne.  It was due to BCB's truthful explanation of these matters before the Primary Agreements were drafted and signed that led MineOne and Terra to require BCB to enter into the CS Agreement with Terra so that Terra could "Ensure that all the processes, activities and tasks with regard to the building of the Facilities are developed in a timely manner" and to "Provide expert support to the Company [BCB] as and when requested by MineOne and/or Company [BCB].  If BCB had the "experience, knowledge, and technical expertise" that MineOne and Terra now falsely claim that BCB said it had, there would have been no reason for MineOne and Terra to require BCB to enter into the CS Agreement with Terra (and ultimately agree to provide Terra with 20% of BCB's profits).

36. MineOne and Terra go on to further falsely assert that MineOne was "was forced to retain counsel in connection with Plaintiff's breaches of contract and misconduct under the DHS Agreement and MineOne Wyoming Data Center's legal fees have continued to mount."  MineOne never said anything to BCB about a "dispute" with BCB until **after** MineOne breached the DHS Agreement and BCB then filed its Chancery Court lawsuit against MineOne and Terra in March 2023.  Instead of retaining counsel in connection with BCB's alleged (but non-existent) breach of contract and misconduct under the DHS Agreement, MineOne retained counsel to defend itself against BCB's meritorious allegations of anticipatory repudiation, breach of contract, and breach of the implied covenant of good faith and fair dealing inherent in the DHS Agreement. Further, at the time of MineOne's anticipatory repudiation, breach of contract, and breach of the implied covenant of good faith and fair dealing inherent in the DHS Agreement, MineOne was planning to retain (or may have already retained) legal counsel against some of its other vendors, but not BCB, as evidenced by MineOne attempting to coerce BCB into signing a

proposed amendment to the DHS Agreement, which would provide compensation to BCB for assisting "MineOne's legal team to start proceedings against third-parties." The proposed amendment also tied part of BCB's compensation to the recovered funds from the third parties that MineOne would sue. As evidenced by the proposed amendment, MineOne desired BCB's help in recovering from its vendors that had actually breached their respective contractual obligations to MineOne. At no time up until BCB notified MineOne of MineOne's breaches did MineOne indicate it was retaining counsel in connection with BCB's alleged breaches and misconduct under the DHS Agreement.

37. The DHS Agreement (BCB 000068 - 000090) specifically addresses attorney and legal fees:

> "<u>Attorneys' fees and disbursements.</u> In the event of any arbitration, litigation or other dispute between the parties in connection with the interpretation, performance or enforcement of this Agreement, the prevailing party in such arbitration, litigation or other dispute shall be entitled, in addition to equitable relief or damages or both or other relief, to be reimbursed by the non-prevailing Party for all costs and expenses of the arbitration, litigation, or other dispute including, without limitation, arbitration fees, court costs, expert witness fees, investigation costs and attorneys' fees and disbursements, incurred therein by such prevailing party or parties and, if such prevailing party or parties shall recover judgment in any such action or proceedings, such costs, attorneys' fees may be included in and as a part of such judgment. The prevailing party or parties shall be the party who is entitled to recover its costs of suit, whether or not suit if (sic) filed and whether or not the suit proceeds to final judgment. If no costs of suit are awarded, the arbitrator(s) or court, as applicable, shall determine the prevailing party."

38. BCB fully expects to be the prevailing party in this matter (as supported and evidenced by this Affidavit), and as such, based on the applicable attorney fees language cited above in the DHS Agreement, BCB (a) shall not be required to pay MineOne's and Terra's legal fees and (b) BCB shall be entitled to recover its costs of suit from MineOne and Terra.

## **MINEONE'S AND TERRA'S FRIVOLOUS COUNTERCLAIM AGAINST BCB**
## **FOR ALTER EGO LIABILITY**

39. In their Amended Counterclaims (Document 62), MineOne and Terra mistakenly assert that BCB's members are alter egos of BCB.

40. BCB and its seven members have no alter ego liability to Defendants under the factors and analysis in WYO. STAT. § 17-29-304(c)(i-iv): Plaintiff and its members have committed no fraud; BCB was not inadequately capitalized (specifically, BCB raised $3M from investors); BCB observed company formalities as required by law; BCB did not intermingle the assets, business operations, and finances of the company and the members to such an extent that there is no distinction between them.

41. Defendants Third Counterclaim for Alter Ego Liability is a meritless claim without any basis in law or fact. It constitutes a Rule 11, F. R. Civ. P. violation.

## **SUMMARY**

42. As detailed in this Affidavit, and with references to supporting evidentiary documents, BCB substantially performed its obligations under the DHS Agreement (both in Phase 1, and in preparing for Phase 2).

43. As detailed in this Affidavit, and with references to supporting evidentiary documents, MineOne and Terra breached its Primary Agreements with BCB, thus denying BCB of the significant consideration MineOne had promised to BCB and for which BCB had worked hard to earn.

44. As detailed in this Affidavit, and with references to supporting evidentiary documents, MineOne and Terra have blamed BCB for the delays and non-performance of MineOne's other vendors – even though those delays and non-performance by MineOne's other vendors are the contractual obligations of MineOne's other vendors (and not BCB) – which have provided erroneous grounds for MineOne and Terra to file frivolous counterclaims against BCB.

45. The foregoing taken together, it is clear that BCB has: (a) a substantial likelihood of success on its breach of contract claims against MineOne and Terra and (b)  a substantial likelihood of success defending against MineOne's and Terra's frivolous and poorly documented counterclaims.

FURTHER AFFIANT SAYETH NOT.

DATED this 15th day of May, 2024.

_____

(SIGNATURE)

STATE OF ARIZONA          )
                          )
COUNTY OF PIMA            )

      Before me, a Notary Public in and for the County of Pima, State of Arizona, personally appeared Michael Murphy, this 15th day of May, 2024, and he being duly sworn by me upon his oath, says that the facts alleged in the foregoing instrument are true and correct.

Witness my hand and official seal:      _____
                                        Notary Public

S

E

A

L

My Commission Expires:  April 10, 2025



Sandra Reyes
Notary Public
Pima County, Arizona
My Comm. Expires 04-10-25
Commission No. 607161