Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
         smurray@wpdn.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 23-CV-79 |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; BITMAIN TECHNOLOGIES HOLDING COMPANY, A Cayman Island Company; BITMAIN TECHNOLOGIES GEORGIA LIMITED, a Georgia corporation; and JOHN DOES 1-18, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S AMENDED EMERGENCY MOTION FOR PREJUDGMENT WRITS OF ATTACHMENT AND GARNISHMENT

COMES NOW Plaintiff BCB Cheyenne LLC d/b/a Bison Blockchain ("BCB"), through its counsel, and hereby submits Plaintiff's Amended Emergency Motion for Prejudgment Writs of Attachment and Garnishment (the "*Amended Emergency Motion*").

## A. Defendants' Withheld (and Unsubstantiated) Information is Finally Coming to Light.

Over the course of discovery, BCB has made so many attempts to obtain relevant documents and information from Defendants, but Defendants have objected to many of these requests and, ultimately, Defendants have withheld highly relevant documents and information[1].  Further, Judge Rankin did not compel Defendants to produce the AntAlpha *Loan and Security Agreement*, an agreement which would have informed BCB as to the nature, amount, and priority of AntAlpha's interest in and to the North Range parcel [ECF 190, Page 8 of 20].  Now that Defendants have provided new and relevant information (albeit unsubstantiated) – through MineOne Defendants' May 24, 2024 *Response to Plaintiff's Emergency Motion* ("*Response*"), and the May 24, 2024 Declaration of Erick Rengifo (the "*Declaration*") – BCB is able to make this more reasonable (and accurate) *Amended Emergency Motion*.  This *Amended Emergency Motion* explains how Defendants are obfuscating the true nature of the CleanSpark deal to extract and distribute to themselves as much money as they can – under the guise of 'paying creditors' based upon loan agreements that have just now been disclosed for the first time, despite BCB's requests for that information – ***before*** the Court conducts its evidentiary hearing and rules on BCB's emergency motion for Writs of Attachment and Garnishment.

---

[1] On October 11, 2023, BCB requested in its First Combined Discovery Request to MineOne (under RFP #6), "each and every document, contract, email, or other communication between Jiaming Li, Erick Rengifo…involving the North Range project, the Campstool project, and the planned expansions at both sites." For over six months now, BCB has tried to obtain highly relevant documents and communication from MineOne's owners, operators, and employees (*i.e.,* Erick Rengifo, Jiaming Li, Chong Wang, Huaili Zhang). The loan and financing documents and communications cited in Erick Rengifo's *Declaration* – which have never been produced to BCB under RFP #6 (and which BCB has not even heard about until now) – include the (1) *Terra Bridge Loan* "of $5,285,701 from Terra to MineOne in September 2022;" (2) an *unattractive lease arrangement* between MineOne and Terra; and (3) a *Repurchase and Debt Conversion Agreement* ("DCA") which, according to Erik Rengifo, *converted* the previous lease arrangement (#2) to the DCA Agreement (#3) on March 20, 2024. Erick Rengifo calls the DCA a "Senior Loan" of $4,152,434, and goes further to state: "Pursuant to the DCA, Terra became MineOne Data's second priority creditor behind AntAlpha." Erick Rengifo is simply inserting himself and Jiaming Li – the two owners/shareholders of Defendant Terra Crypto Inc., a defendant in this lawsuit – into creditor priority. BCB never received any documents or communications about *any* of these agreements that Defendants now say – long after the fact – have ultimately *converted* into a $4,152,424 debt on March 20, 2024. Erick Rengifo and Jiaming Li are the owners and/or operators of *both* Defendant MineOne and Defendant Terra Crypto, as well MineOne Cloud Computing Investment LP, and *all* the companies named as subsidiaries and "Affiliates" in the Presidential Order. These highly relevant documents and communications have been intentionally withheld and/or are just now appearing *out of thin air* when Defendants' owners and operators need them in their effort to abscond with over $10 million in CleanSpark *Purchase and Sale Agreement* monies.

### B.   Defendants' Mischaracterizations About the CleanSpark Closing and MineOne's Alleged Creditors.

MineOne wants this Court to believe that MineOne's sale to CleanSpark of the North Range and Campstool facilities is a *single* transaction, that Closing of the *entire* transaction requires CFIUS approval, and that amounts owing to AntAlpha should come from the first money received.  This is **not** an accurate portrayal of what is happening.  CleanSpark's purchase and payment obligations for **Campstool** and **North Range** are divisible.  BCB has credible evidence that CleanSpark wants to first close – and close quickly – on **only the Campstool facility** for $7.5M[2].  Closing first on **only Campstool** (without involving North Range) makes perfect sense for CleanSpark because the Campstool facility is **not** subject to CFIUS' approval, and it allows CleanSpark to close quickly and get started building its infrastructure at the Campstool site.  Closing first on **only Campstool** also benefits MineOne because none of the CleanSpark Purchase monies for Campstool are required to effectuate the Presidential Order (specifically, to pay off AntAlpha, Systems-MEC, and any vendors who may perform work to remove buildings and infrastructure from North Range).  This means MineOne can do whatever it wants with the entire $7.5M from the CleanSpark Purchase monies from Campstool which, as MineOne said in its *Response*, is to pay its 'creditors' (who just happen to be other Defendants in this lawsuit and related/affiliate parties to MineOne, and for which nothing has ever been said about in this lawsuit until now, despite BCB's requests for that information).  If MineOne does this, it will be to the detriment of MineOne's largest – and only true third-party arms-length non-defendant – creditor, BCB.  In all likelihood, MineOne is attempting to do this before the Court's evidentiary hearing (as this will allow MineOne to move this $7.5M beyond the reach of BCB and the jurisdiction of this Court). The only way to stop that from happening – and to ensure

---

[2] *See* Plaintiff's May 21, 2024 *Supplement* [ECF 192] to its *Emergency Motion* for further information.  BCB served a subpoena on BHE on May 16, 2024.  Based on emails obtained from BHE dated May 14, 2024 and May 15, 2024, "CleanSpark's goal is to close on the EBP Campstool next week [May 20-24, 2024]…" And CleanSpark "would like to accelerate the closing of the Campstool/EBP property with M1 [MineOne] as they see this as the path of least resistance." [ECF 182-1 and 182-2].

that justice may ultimately be served pending this Court's final ruling in this lawsuit – is for the Court to issue BCB's requested Writs of Attachment and Garnishment, especially for the $7.5M related to the Campstool Purchase Price (as detailed below in D(2)(c) of this Amended Emergency Motion).

### C. The Presidential Order, North Range versus Campstool, Purchase Price versus Contingent Payment.

To understand BCB's amended request for Writs of Attachment and Garnishment, it is important to comprehend (i) the requirements of the Presidential Order and how those pertain to *only the North Range site* (not the Campstool site), (ii) the separateness of the North Range site from the Campstool site (and *how each site can be sold separately from the other*), (iii) how the MineOne-CleanSpark *Purchase and Sale Agreement* ("*PSA*") separately allocates CleanSpark Purchase monies to *each* of the two sites, and (iv) how there is a Purchase Price for each site, as well as a Contingent Payment for each site (with the latter being contingent on certain triggering events as explained in the PSA).

Very importantly, *the Presidential Order applies only to the North Range site*. To effectuate the Presidential Order (through CleanSpark's purchase of the North Range site), certain parties must be paid (so that CleanSpark can take clear title to the land) and certain expenses must be paid (to remove the buildings and infrastructure from North Range, if that is ultimately required by CFIUS). CFIUS must also now approve the buyer (*i.e.*, CleanSpark). All of these things make it more complicated (and difficult) to close the transaction for *North Range*. In contrast, none of these things impact the *Campstool* site: Campstool is not subject to the Presidential Order, no third parties must be paid for CleanSpark to take clear title to Campstool, no expenses need to be incurred/paid to remove anything from the Campstool land (as there is nothing on the Campstool land), and CFIUS isn't required to approve the buyer (*i.e.*, CleanSpark). This makes it relatively straightforward (and easy) to close the transaction for Campstool.

The *PSA* allocates separate portions of the total $18.75M Purchase Price to (a) North Range,

and (b) Campstool: "The aggregate purchase price for the Property is US$18,750,000 (the "Purchase Price")...The Purchase Price shall be allocated as follows: (i) as to North Range, the sum of US$11,250,000; and (ii) as to Campstool, the sum of US$7,500,000." (*PSA* 2(a)).  Having separate amounts allocated to each site in the PSA enables MineOne and CleanSpark to close on each site separately (as the parties have already agreed to the value of each site).  It also enables this Court to identify specific amounts in BCB's requested Writs of Attachment and Garnishment and associate them to a specific site.  The *PSA* also provides for a Contingent Payment for each site (based on certain triggering events taking place, which may or may not take place).  Those Contingent Payments are valued at $250,000/MW (up to 25MW at North Range and up to 30MW at Campstool) based on the total additional power procured at each site.

### D. BCB's Amended Emergency Motion.

To honor and effectuate the Presidential Order[3], and based upon the (a) new (but unsubstantiated) information provided by MineOne, and (b) feedback from this Court in the May 23, 2024 *Order* [ECF 194], BCB now amends its original motion, and respectfully asks the Court for the following:

(1) BCB does **not** seek a "protective order" or "injunction" on any of the $18,750,000 - $32,500,000 CleanSpark Purchase monies, and BCB does **not** ask that the Court order *all* of the $18,750,000 - $32,500,000 of the CleanSpark Purchase monies be held, delivered to, and/or secured with a Court order into the Registry of this Court, or some other Court-protected interest-earning investment account.  Instead…

---

[3] In its *Emergency Motion*, BCB stated, "It is important for the Court to appreciate that BCB is not asking the Court to stop, block or prevent the sale of these North Range and Campstool Properties, or assignment of the electrical power contract, from Defendants MineOne and Terra Crypto to CleanSpark, Inc. *BCB wants the MineOne/CleanSpark deal to happen. BCB does not want to interfere with, or thwart, the sale.* The President of the United States has ordered MineOne and Terra Crypto to divest themselves of this Property, and *that Presidential Order must be honored. The best way to effectuate that Presidential divestment Order is for this sale to go forward,* but it must be done with judicial guardrails set now by this Court and future allocation and disbursement orders." (emphasis added) [ECF 182 at p. 6].

(2) ***BCB requests*** the Court grant Writs of Attachment and Garnishment on all of the CleanSpark Purchase monies under the MineOne-CleanSpark *PSA*, including any amendments thereof and/or new agreements between MineOne and CleanSpark relating to North Range and/or Campstool, ***but <u>not</u> for those Purchase money amounts required to effectuate the Presidential Order***, as follows:

    (a) The *PSA* allocates $11.25M to the ***North Range Purchase Price*** (see *PSA* at pg 2, 2(a)(i)). BCB requests approximately **$4.05M** of this $11.25M be attached/garnished (pending confirmation of actual payoff amounts and costs).  This $4.05M is calculated by taking the $11.25M Purchase Price and subtracting from it (i) the AntAlpha secured loan (approx. $6.9M), (ii) the amount owing to SystemsMEC (approx. $300k), and (iii) the to-be-determined *actual and reasonable costs* to remove the buildings and other infrastructure as required by CFIUS[4] (*i.e,* $11.25M - $6.9M - $0.3M - TBD costs to clear the site  = approx. $4.05M attached/garnished);

    (b) The *PSA* also indicates there may be up to a $6.25M ***Contingent Payment*** for ***North Range*** (if it is triggered by Section 2(c) of the *PSA*) for reaching an agreed upon milestone of up to an additional 25MW.  BCB requests that this entire ***$6.25M*** be attached/garnished (since none of this Contingent Payment is required to (i) carry out the Presidential Order, (ii) pay off loans secured by the North Range property, and/or (iii) pay off contractors who performed work at the North Range property);

    (c) The *PSA* allocates $7.5M to the ***Campstool Purchase Price*** (see *PSA* at p. 2, 2(a)(ii)).  BCB requests that this entire ***$7.5M*** be attached/garnished (since none of this $7.5M

---

[4] On information and belief, CFIUS may not require all buildings and infrastructure be removed from the site (pending the outcome of its negotiations with MineOne and CleanSpark) as CleanSpark may desire to modify and reuse the existing buildings and infrastructure.  Because of this, "actual costs incurred," not "estimates," should be used in calculating the amount not subject to the proposed Writs of Attachment and Garnishment.  Further, if the Court ultimately decides to use estimates, which it should not (as those can be manipulated), MineOne should be required to submit supporting documentation to justify the estimates, which it has not done.

Purchase Price for Campstool is required to (i) carry out the Presidential Order, (ii) payoff loans secured by the Campstool property, and/or (iii) pay off contractors who performed work at the Campstool property). This $7.5M is the portion of the deal the parties are trying to close as soon as they can (and if MineOne has its way, it will receive these funds before the evidentiary hearing and put them beyond BCB's reach and this Court's jurisdiction); and

(d) The *PSA* also indicates there may be up to a $7.5M ***Contingent Payment*** for ***Campstool*** (if it is triggered by Section 2(c) of the *PSA*) for reaching an agreed upon milestone of up to an additional 30MW. BCB requests that this entire ***$7.5M*** be attached/garnished (since none of this Contingent Payment is required to (i) carry out the Presidential Order, (ii) pay off loans secured by the Campstool property, and/or (iii) pay off contractors who performed work at the Campstool property).

(3) After granting the Writs of Attachment and Garnishment on the above specified amounts, BCB requests that the Court designate an official (such as the U.S. Marshall) (the "Designated Official") to seize, and then maintain in an interest-bearing account, all CleanSpark Purchase monies – but not those Purchase monies noted in 3(a) above for the North Range site required to carry out the Presidential Order – from the following party(ies):

(a) <u>**the Escrow Holder**</u> under the *PSA* and/or any other escrow agents MineOne and CleanSpark designate;

(b) <u>**MineOne and its members, shareholders, directors, and/or managers, and any entities with similar ownership as MineOne as identified in the Presidential Order;**</u> and

(c) <u>**any Defendant in this lawsuit**</u>, including their members, shareholders, directors, managers, related parties of Defendants, and/or affiliated entities and/or persons of

Defendants.

(4) Further, BCB requests that the Court issue whatever order(s) and/or instruction(s) it deems necessary such that the Escrow Holder under the *PSA* will credit (but not disburse to) MineOne all funds seized by the Designated Official (per 4(a) above) to facilitate a timely and successful closing for North Range and/or Campstool per Section 6 of the *PSA*.

(5) Further, BCB requests that the Court require the Designated Official to perform the Section 4(e) duties of the *PSA* – as though the Designated Official was the Escrow Holder – for any seized funds the Designated Official may be holding (*i.e.*, if CleanSpark timely provides a Termination Notice to MineOne, the Designated Official "shall promptly release the Deposit and interest accrued thereon to the Buyer [CleanSpark]" (*PSA* 4(e)).

(6) Additionally, BCB requests that the Court grant Writs of Attachment and Garnishment on all of MineOne's funds held by Black Hills Energy ("BHE") pursuant to their June 9, 2022 *Restated Blockchain Interruptible Service Agreement*, which was later amended by their April 1, 2024 *Amended and Restated Blockchain Interruptible Service Agreement*, except for those funds required to satisfy any and all amounts owing to BHE under said agreement.

These modified requests allow the Presidential Order to be carried out in full (which requires payoff of all amounts that could impact CleanSpark from taking clear title to the North Range parcel, as well as payment to contractors to remove the buildings and infrastructure). These modified requests also protect BCB from Defendants quickly absconding with the CleanSpark Purchase monies (particularly the $7.5M Purchase Price for Campstool) beyond the reach of BCB and this Court's jurisdiction by Defendants paying themselves (under the guise of paying alleged 'creditors' based on 'loans' not disclosed before May 24, 2024, despite BCB's previous requests for any information about loans).

**E. BCB Previously Set Forth the Required Elements and Proof for the Writs.**

In its *Emergency Motion*, BCB identified the statutory elements for a prejudgment writ of

attachment/garnishment (WYO. STAT. § 1-15-103 and § 1-15-201, and BCB presented the facts needed to support the prejudgment writs.  All of that evidence is incorporated, but not re-stated, in this *Amended Emergency Motion*.

The MineOne Defendants concede that BCB has alleged the needed element(s) to support a Writ of Attachment and Garnishment ("Writ"). [ECF 195 at Pages 11 and 12 of 26].  Those elements are: (1) "the Defendant...is about to assign, remove, dispose of or conceal, any of his property with intent to defraud his creditors;" and/or (2) "The defendant...is about to depart from the state to the injury of his creditors." WYO. STAT. 1-15-201(b).  But the MineOne Defendants then say neither of these "statutory prerequisites for a writ of attachment apply."  They do apply.

MineOne first says that, "Any money that the MineOne Defendants receive from the CleanSpark transaction will be used to repay its loans and creditors." [ECF 195, Page 16 of 26].  How do we know that?  We don't know that.  What assurance does MineOne provide?  None.  And MineOne telegraphs its intent to defraud BCB, its largest creditor, when it says, "In fact, the MineOne Defendants have numerous secured liens that have priority over any judgment that BCB would obtain."  *Id*.  They have one recorded secured lien (AntAlpha), not "numerous secured liens."  No other liens exist, and the other alleged "loans" are related-party loans or money transfers, none of which have priority over BCB's likely judgment.  MineOne then posits the following strawman, non sequitur argument to rebut BCB's argument that MineOne and Terra Crypto are about to assign, remove, dispose, or conceal their property with the intent to defraud BCB, their largest creditor. They say: "MineOne is only selling its property because of the Presidential Order, and therefore it cannot be stated that MineOne's agreement with CleanSpark shows any intent to defraud any of MineOne's creditors."  *Id*.  BCB does not quarrel with "why" MineOne is selling North Range and Campstool.  Instead, MineOne telegraphs its intent to pay its own related members and owners before it ever pays BCB anything. Where, as here, these other loans have no priority over BCB's judgment, MineOne acts to defraud BCB by paying (and

possibly exhausting) these limited CleanSpark sales proceeds by ***paying themselves, their related parties, and affiliates*** when it should use these sales proceeds to pay/satisfy any multi-million-dollar judgment to BCB.

### F. MineOne Does Not Have Numerous Secured Liens and Unsecured Creditors Ahead of BCB.

MineOne's *Response* and Erick Rengifo's *Declaration* are replete with unsupported assertions that BCB's *Emergency Motion* is "intended to derail the CleanSpark transaction and jump ahead of MineOne's proper creditors" [ECF 195 at page 11]; the "MineOne Defendants have numerous secured liens and unsecured creditors who are ahead [of] any payment that BCB could hope to attain," *Id*. at page 15, and "Any money that MineOne receives from the CleanSpark transaction will be used to pay off those [$21.73M] of loans and creditors that have priority over any alleged judgment that BCB may obtain" in the future, including MineOne's legal bills of over $1,500,000. *Id*. at 20-21. MineOne says it has "approximately $21.73 million in debt owed to creditors and ***BCB is clearly not one of them***." *Id*. at 21 (emphasis added). MineOne has no intention of ever paying BCB. But the only creditor who is prior to BCB is AntAlpha with what BCB is now being told (but not shown) is a mortgage with a balance of approximately $6.9M on North Range (but ***nothing*** on ***Campstool***). No other mortgage is filed on the North Range property. No mortgage is filed on the Campstool property. There is no materialman's or contractor's lien presently filed on either North Range or Campstool. Erick Rengifo says: "Terra became MineOne's second priority creditor behind AntAlpha," but provides no documentation or proof of his assertion. [ECF 195-1 page 22]. Rengifo says MineOne has "another $3,356,327 in additional funds from five lenders," *Id*., but three of those five lenders are members of MineOne, and their "loans" are more accurately characterized as related-party investments. But again, MineOne provides no documentation. Why?

Wyo. Stat. § 1-17-305 says a civil judgment in our federal court "is a lien upon all the real estate of the judgment debtor in the county or counties where the transcript is filed with the clerk of

the district court . . ."  BCB's judgment and lien priority relates back to the date this Court enters its order of attachment.  "An attachment lien continues until judgment in the suit has been entered and docketed, when it merges in the judgment lien."  7 C.J.S. Attachment § 282.  And, "by obtaining a writ of attachment, a creditor or claimant also takes priority over creditors that later levy, unsecured creditors, and claimants that join in the attachment proceeding as permitted by Rule 4: 60-15(e), even before the party obtaining the writ has yet to obtain a judgment against this defendant."  *B.B. v. Mell*, 465 N.J. Super. 331, 337, 243 A.3d 680, 684 (App. Div. 2020).  Finally, shareholders and related parties who loan or invest money in a company have a lower priority than genuine third-party judgment creditors and other unsecured creditors.  *See Cooper v. Mississippi Land Co.*, 220 So.2d 302, 304 (Miss. 1969) ("Officers, directors and shareholders of an insolvent corporation, or one rendered insolvent by conveyance to them, cannot prefer themselves in payment of pre-existing debts and thus deprive creditors of their claims against the corporation").

MineOne's remedies under the Wyoming Uniform Fraudulent Transfer Act include "An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by law."  Wyo. Stat. § 34-14-208(a)(iii).  Should MineOne use any of the Campstool or North Range *PSA* proceeds to pay any other perceived creditor, except AntAlpha when the North Range transaction closes, ahead of BCB, such payments will be wrongful preferences, fraudulent transfers[5].

## G.  Defendants are Colluding as Alleged Creditors.

Defendants are attempting to 'abscond with the money' by suggesting they are required to pay themselves (as alleged creditors) before paying BCB (*i.e.,* the party that should lawfully receive the payment).  The fingerprints of Erick Rengifo and Jiaming Li - the same two individuals which evidence

---

[5] While BCB posits that payments to Systems-MEC and any vendors who perform work at North Range to remove buildings and infrastructure would be wrongful preferences, BCB believes the Presidential Order must be effectuated, which necessitates the payment to these parties.

shows were responsible for making and implementing the decision for MineOne and Terra to breach their respective agreements with BCB - are all over this. Erick Rengifo and Jiaming Li are the two individuals who own, control, manage and/or are affiliated with **all** the companies named in the Presidential Order.  Erick Rengifo's and Jiaming Li's network of related, managed and/or owned companies were identified as national security risks in the Presidential Order and ordered removed from North Range.  And now that the Presidential Order has been issued, Erick Rengifo and Jiaming Li are doing everything they can to get as much money from the CleanSpark Purchase monies – particularly the $7.5M Purchase Price from Campstool – for themselves, members/shareholders of their managed and/or owned entities, and affiliated co-Defendants, all to the detriment and harm of BCB (even though BCB is the highest priority creditor for Campstool and the second highest priority creditor, behind AntAlpha, at North Range).  Those related and/or affiliated parties and the alleged amounts owed to those parties are as follows:

(1) The **related party** Defendant Terra (owned by Erick Rengifo and Jiaming Li) had an alleged $5,285,701 unsecured Bridge Loan, which was then allegedly converted to a Lease Agreement (with no date provided), and then later allegedly converted to a $4,152,434 "Senior Loan" on March 20, 2024[6];

---

[6] In a series of Skype messages on April 2, 2023 (MINEONE0031278), Erick Rengifo and Haku Du appear to have discussed the alleged unsecured bridge loan. Haku Du said, "steven helped drafted the land purchase agreement | between mineone and terra ***zero consideration and mineone actually just entrusted the land to terra***." Erick Rengifo responded, "***This is not good in the sense that there will not be way to legal way to return the funds to TC [Terra Crypto] because price is zero*** | I think at least we need to put the price that include interest | This will not change the spirit of the document and will ***make it more credible***." Haku Du responded, "***This agreement is really just for AA loan purpose***… generally speaking AA will not care about use of proceed. Although I know it is hard to agree but our goal is to get the money and pay back the bridge loan so we can create some transactions between mineone and terra for example buying campstool land, buying equipment for campstool and etc." (emphasis added). *See* "**Exhibit A**". "Zero consideration" and "just entrusted the land to terra" do not sound like a lease arrangement. "This is not good in the sense that there will not be way to legal way to return the funds to TC because price is zero" does not sound like this was a true third-party arms-length transaction. "I think at least we need to put the price that include interest [to] make it more credible" sounds like changing what happened earlier to make things look more legitimate after the fact. And "this agreement is really just for AA loan purpose" sounds like specific structuring work was done after-the-fact to help achieve what Defendants wanted it to show (which, at the time, was to help with obtaining the AntAlpha loan), which demonstrates Defendants' proclivity to do what is necessary after-the-fact to achieve what they now want documents to show (which in this case, is an alleged second priority senior loan).

(2) The unsecured "Additional Third Party Loans" for $3,356,327 ***from related parties*** most of which are members (*i.e.* shareholders/owners) of MineOne and Chinese nationals; and

(3) The $2,571,000 allegedly owed to Defendant Bitmain for prepayment of services under the *SF Agreement (which is not secured).*

If the Court does not issue the above requested Writs of Attachment and Garnishment, Erick Rengifo and Jiaming Li will pad (a) their own pockets with $4.05M (via their ownership in Defendant Terra and their numerous subsidiary and affiliate companies cited in the Presidential Order), (b) the pockets of their investors with over $3.36M (via the MineOne Wyoming members/shareholders), and (c) the pockets of their client, Bitmain (a co-Defendant in this lawsuit) with over $2.57M, all while doing so under the front of "paying creditors."  The Court must see through this collusion and attach/garnish the requested CleanSpark Purchase monies until the Court later decides the outcome of this lawsuit based on its merits. Otherwise, the Defendants  and their members will abscond with over $10M under the guise of paying back creditors (Collusion Total: $4,152,434 + $3,356,327 + $2,571,000 = **$10,079,761)**. The bulk of this money Defendants seek to abscond with will likely come from the $7.5M Purchase of     Campstool, which is likely to happen very soon (since it is not subject to the Presidential Order and CFIUS approval).

## H.  The Emergency Remains (Despite Defendants' Representations to this Court).

As Defendants tell the Court "there is no emergency," Defendants are colluding and may be absconding with $7.5M (from a closing on Campstool) before the evidentiary hearing. There is credible evidence obtained through subpoena from BHE [*see* ECF 182-1 and 182-2] to demonstrate that CleanSpark desires to close on ***Campstool*** separately from North Range, and it desires to do so quickly. Defendants never mention how CleanSpark wants to close quickly on $7.5M for ***Campstool***, and also never mention how there is nothing in the Presidential Order about ***Campstool*** that would limit or delay

a quick closing on ***Campstool***. In other words, without a Writ of Attachment for the Campstool sales money, Defendants may quickly close on ***Campstool*** and abscond with $7.5M (and use it to pay themselves as 'alleged creditors').

In this Court's *Order* on Plaintiff's *Emergency Motion*, **the Court relied** on what Ms. Colbath represented to the Court when she stated: "There is no emergency present, no money has exchanged hands and no money will for at least 30 days [from May 17, 2024], and likely longer" [ECF 194 at p. 4]. However, Defendants provide no evidence to support Ms. Colbath's representation to the Court, and Defendants' deceptive do-whatever-it takes pattern of behavior suggests they will try to get the $7.5M from Campstool as quickly as possible, and in doing so, irreparably harm BCB.

Erick Rengifo, in his *Declaration*, swears that "the May 15, 2024 payment into escrow under the *PSA* was not made. No payment was made under the *PSA* on May 23, 2024." [ECF 195-1 at p. 17]. But Erick Rengifo does ***not say*** if an escrow payment was made on days other than May 15, 2024 and May 23, 2024. Erick Rengifo goes on to say, "the Due Diligence Period has been extended for 10 business days (until May 29, 2024), and the earliest date that a payment into escrow could be made under the extended *PSA* is 15 days after May 29, 2024 (the due diligence period)." *Id*. But Erick Rengifo and the Defendants do not provide any evidence of this (which they could easily do by providing all amendments to the *PSA*). Erick Rengifo further says:

> Moreover, as it is established in the PSA's timelines, there are 30 additional days after the due diligence period to close the deal. In all likelihood, no escrow payment will be made by that date either, as the PSA itself is subject to approval from CFIUS, which has 10 days to approve CleanSpark as a purchaser once the final deal is submitted for review to CFIUS. However, it is expected that CFIUS will take at least 30 days, if not longer to approve the CleanSpark transaction.

*Id.* What Erick Rengifo fails to explain is that ***only the sale of the North Range site is now subject to CFIUS review and approval—but not Campstool*** or the $7.5M in Purchase monies allocated to Campstool. Defendants provide no evidence to suggest the Campstool closing is also subject to the same timeline and requirements as North Range. Their silence on this key point is telling. Defendants

are purposefully not mentioning that ***this $7.5M for Campstool*** can be closed on a separate, faster timeline in hopes Campstool will close before this Court can take emergency action, so MineOne can receive those funds as quickly as possible, and then abscond with the money (by paying over $10M to themselves and their co-Defendant Bitmain as 'alleged creditors'). If Defendants take possession of the $7.5M of Campstool *PSA* monies, Defendants will have misrepresented to the Court their intention when Ms. Colbath said: "There is no emergency present, no money has exchanged hands ***and no money will for at least 30 days*** [from May 17, 2024], and likely longer." [ECF 194 at p. 4].

## I. More Misrepresentations and False Narratives from Defendants.

Repeating something that is untrue does not make it true. Yet this is what Erick Rengifo does in his *Declaration* and what MineOne does in its May 24, 2024 *Opposition Memorandum*. Fourteen (14) times Erick Rengifo says, "BCB walked off the job." [ECF 195-1]. Eight (8) times MineOne says BCB "walked off the job" or "abandoned the job." [ECF 195]. Five (5) times Defendants say there is "no emergency" [ECF 195, ECF 195-1]. And five (5) times Defendants (now) say BCB failed to get approval from CFIUS and therefore BCB breached the DHS Agreement first [ECF 195][7]. This rhetoric is so flawed and mistaken, and built on a foundation of collusion. BCB did ***not*** walk off the job[8]. BCB did ***not*** abandon the job. This is an emergent situation concerning the $7.5M of Campstool

---

[7] The very first time the MineOne Defendants ever mentioned "CFIUS," or alleged that BCB breached its contract by failing to seek or obtain CFIUS' approval, was on the 5/17/24 status conference with the Court. Nowhere in the extensive pleadings is CFIUS mentioned. Nowhere in discovery is CFIUS mentioned: the MineOne Defendants say nothing about CFIUS in their April 28, 2024 interrogatory answers. But the MineOne Defendants now seem to have been in contact with CFIUS since October 2022. Any amendments to the pleadings were to have been filed by September 30, 2023. [ECF 46, p.2] If the MineOne Defendants now or ever move to amend their affirmative defenses or Counterclaims to allege that BCB breached its contract with failing to seek or obtain CFIUS' approval for this project, BCB will oppose that proposed amendment for undue delay, futility of amendment, and bad faith.

[8] MineOne, under the financial coercion and influence of Bitmain, was in the process of removing BCB from BCB's contracted-for role in the DHS Agreement as the O&M Service Provider even though BCB had not breached the DHS Agreement. On March 3, 2023, Erick Rengifo sent an email to Michael Murphy and said, "We have Bitmain completely opposed to you being the Host." Then on March 7, 2023, on a recorded Google Meet conference, Erick Rengifo told BCB "Our major client [Bitmain]-- our major partner here [Bitmain] is -- is -- he doesn't want you [BCB] to be the -- the -- the host and the manager." And then on March 13, 2023, Michael Murphy received an email from Jiaming Li that (1)

monies. And BCB shares **no** fault and breached **no** contract in any way, especially relating to the events that have transpired between Defendants, CFIUS, and the President's Order involving who the **Defendants are** and the national security risks they pose. Defendants' primary mischaracterizations – that BCB "walked off the job" and that BCB did not get "approval from CFIUS" — will be addressed at the evidentiary hearing.  Further, in Michael Murphy's future rebuttal Affidavit to Erick Rengifo's May 24, 2024 *Declaration*, Mr. Murphy will address so many of the errors and mis-statements in Erick Rengifo's *Declaration*.  Unlike Erick Rengifo, Michael Murphy will support his Affidavit with evidence and documents.  And BCB will address other items raised in MineOne's May 24, 2024 *Response* at the evidentiary hearing.  For example, at the future evidentiary hearing, BCB will rebut MineOne's meritless argument that, "BCB breached the DHS Agreement when it failed to obtain CFIUS approval for the MineOne Defendants to begin construction on their North Range bitcoin mining facility, which ***directly caused*** President Biden's Order requiring MineOne to divest from the premises." [ECF 195, Page 18 of 26] (emphasis added).

### J.  Patrick Murphy Made No *Ex Parte* Communication.

Orally and in writing, MineOne's lead counsel has accused BCB's counsel, Patrick Murphy, of wrongfully making an *ex parte* communication with the Court on May 17, 2024 when Mr. Murphy

---

indicated "We have negotiated with Wiley and his team, for them running the complete Hosting and Management of the site, they accepted 0.55 cents…," which meant that BCB was no longer the O&M Service Provider, and (2) included a proposed amendment to the DHS Agreement which would, among other things, formalize the removal of BCB as the O&M Service Provider at the North Range site.  Further, MineOne owed BCB $90,000.000 for services rendered and invoiced related to the implementation of the North Range site, but MineOne's proposed amendment to the DHS Agreement indicated it would not pay any of that $90,000.00 unless BCB signed the proposed amendment (which would deny BCB millions of dollars which BCB was contractually entitled to as the O&M Service Provider).  Facing this situation - specifically, that BCB (1) was being removed from its contracted-for role as the O&M Service Provider despite not breaching the DHS Agreement; (2) wasn't being paid for services rendered and invoiced; and (3) was being coerced into signing the proposed amendment in order to receive payment to which it was already owed and which MineOne was wrongfully withholding – BCB "saw the writing on the wall" and decided its best course of action was to begin an orderly transition off the project.  Thereafter, BCB left the site and then communicated professionally and courteously with all of the vendors on the project to inform them of BCB's transition off the project and to connect them with MineOne representatives.  This was not an easy decision for BCB.  BCB had been working for over a year and a half - and committed countless hours at all hours of the day and night - to develop, build, and bring this project to fruition.  No one wanted this project to be successful more than BCB.  But Defendants anticipatorily repudiated the DHS Agreement and the Consultancy Services Agreement, effectively forcing BCB off the site.  ***This*** is what MineOne **means** when it says, "BCB walked off the job."

sent an email to Judges Johnson and Carman before the 10:30 a.m. status conference with the Court. Mr. Murphy's email to the Court and all counsel is attached as **"Exhibit B."**  At the status conference, Ms. Colbath said this was an *ex parte* communication.  Then, in the Court's 5/23/24 *Order*, the Court adopted Ms. Colbath's mistaken argument.  The Court first said, "Through *ex parte* email and motion with the record . . ." and later said, "Further, the nature of the filings – both *ex parte* through email correspondence with the Court and counsel . . ."  [ECF 194 at pp. 3, 4].  Then, in MineOne's 5/24/24 *Response* to Plaintiff's *Emergency Motion*, Ms. Colbath doubles down on her mistaken *ex parte* argument against Patrick Murphy.  [ECF 195, p. 15 of 26].

Mr. Murphy's 5/17/24 email to Judges Johnson and Carman is **not** an *ex parte* communication.  As the Court observed, and Ms. Colbath concedes, Mr. Murphy copied all counsel on his email to the Court.  By definition, this is not an *ex parte* communication.  *See United States v. Rodriguez-Mesa*, No. CR14-3915 JH, 2015 WL 13662599 (D.N.M. Apr. 30, 2015).   As Judge Herrera correctly observes:

> Black's Law Dictionary, 7th edition, defines *ex parte* as 'done or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested.'  Because the Government copied Ms. Baiz on its emails to the Court, they were not done 'without notice to' the Defendant and therefore were not *ex parte* . . . The emails that the Court received from Mr. Mysliwiec clearly show that he copied Ms. Beiz on those messages at her court-registered email address.  If Ms. Baiz did not receive one of those messages for some reason, that does not transform Mr. Mysliwiec's email into an improper *ex parte* communication . . .  Fourth, Ms. Baiz falsely accuses Mr. Mysliwiec of a second *ex parte* communication in the form of an email he sent the Court transmitting the Government's transcript of an audio recording.  Again, because the Government copied Ms. Baiz on the email, it is not an *ex parte* communication . . .

Patrick Murphy does not ask for an apology from Ms. Colbath.  Instead, Mr. Murphy asks that the Court amend and correct its 5/23/24 *Order* to reflect that Mr. Murphy did not make an *ex parte* communication with his 5/17/24 email to the Court and all fourteen defense counsel.

## CONCLUSION

Over thousands of years, humans have devised ingenious ways and schemes to "assign, remove,

dispose of or conceal, his/its property to defraud his creditors." Wyo. Stat. § 1-15-201.  More recently, with statehood, humans have discovered how to "depart from the state to the injury of his creditors." *Id.*  The colluding Defendants, who have been identified by the President and United States Federal Government as security risks, are doing that here:  under the guise of pretending to pay creditors with a higher (but feigned) priority than BCB, Defendants are telegraphing their intent to make fraudulent transfers of millions of dollars that rightfully belong to their biggest [judgment] creditor, BCB. Without a prejudgment Writ of Attachment and Garnishment, Defendants will very likely take possession of $7,500,000 from the imminent sale of Campstool, deploy their guise to pay themselves as alleged priority creditors, and remove this $7,500,000 from this Court's jurisdiction — and BCB's reach — forever.  They boldly proclaim they will never pay BCB.  This Court's emergency prejudgment Writs are needed so BCB is not irreparably harmed with Defendants quickly absconding with the $7,500,000 in sales proceeds for Campstool.

Following the evidentiary hearing, the Court should issue its writs of attachment and garnishment on all of the CleanSpark Purchase monies under the MineOne/CleanSpark *PSA*, including any amendments thereof and/or new agreement between MineOne and CleanSpark relating to North Range and/or Campstool, but not for those Purchase money amounts required to effectuate the Presidential Order.  It should also issue its writs of attachment and garnishment on all of MineOne's funds held by BHE in the Security Fund (except for those amounts needed to make BHE whole). Without these prejudgment writs, there will never be any money for BCB to execute against should the Court later enter judgment for BCB, and against the MineOne Defendants, for $38,983,848. Contrary to what the MineOne Defendants say, these Writs will not hinder, delay, or defraud any genuine creditor.  Instead, they will preserve the status quo until the Court later determines and allocates the CleanSpark Purchase monies to the rightful creditor(s).

Respectfully submitted this 30th day of May 2024.

> BCB CHEYENNE LLC d/b/a
> BISON BLOCKCHAIN, Plaintiff

By:    Patrick J. Murphy (WSB No. 5-1779)
        Scott C. Murray (WSB No. 7-4896)
        Williams, Porter, Day & Neville, PC
        159 N Wolcott St. Suite 400
        Casper, WY 82601
        Ph: (307) 265-0700
        pmurphy@wpdn.net
        smurray@wpdn.net

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this ____ day of May, 2024.

| | |
|---|---|
| Sean M. Larson, WSB No. 7-5112<br>Kari Hartman, WSB No. 8-6507<br>HATHAWAY & KUNZ, LLP<br>P.O. Box 1208<br>Cheyenne, WY 82001<br>slarson@hkwyolaw.com<br>khartman@hkwyolaw.com | [ ]  U. S. Mail (prepaid)<br>[ x ]  CM/ECF Electronic Transmission<br>[ ]  Overnight Delivery<br>[ ]  Hand Delivery<br>[ ]  Electronic Mail |
| Paula Colbath, *Pro Hac Vice*<br>Alex Inman, *Pro Hac Vice*<br>LOEB & LOEB LLP<br>345 Park Avenue New York,<br>NY 10154<br>pcolbath@loeb.com<br>ainman@loeb.com | [ ]  U. S. Mail (prepaid)<br>[ x ]  CM/ECF Electronic Transmission<br>[ ]  Overnight Delivery<br>[ ]  Hand Delivery<br>[ ]  Electronic Mail |
| Marc Feinstein, *Pro Hac Vice*<br>William Pao, *Pro Hac Vice*<br>Daniel Hirsch, *Pro Hac Vice*<br>*David* Iden, *Pro Hac Vice*<br>Kaitlyn Farrell, *Pro Hac Vice*<br>Sherin Parikh, *Pro Hac Vice*<br>O'MELVENY & MYERS<br>400 South Hope Street<br>Los Angeles, CA 90071-2899<br>mfeinstein@omm.com<br>wpao@omm.com<br>dhirsch@omm.com<br>diden@omm.com<br>kfarrell@omm.com<br>sparikh@omm.com | [ ]  U. S. Mail (prepaid)<br>[ x ]  CM/ECF Electronic Transmission<br>[ ]  Overnight Delivery<br>[ ]  Hand Delivery<br>[ ]  Electronic Mail |
| Khale J. Lenhart, WSB No. 7-4581<br>Tyson R. Woodford, WSB No. 8-6650<br>HIRST APPLEGATE LLP<br>1720 Carey Ave. Room 400<br>P.O. BOX 1083<br>Cheyenne, WY 82003 klenhart@hirstapplegate.com<br>twoodford@hirstapplegate.com | [ ]  U. S. Mail (prepaid)<br>[ x ]  CM/ECF Electronic Transmission<br>[ ]  Overnight Delivery<br>[ ]  Hand Delivery<br>[ ]  Electronic Mail |

| Meggan J. Hathaway<br>Jane M. France<br>SUNDAHL, POWERS, KAPP & MARTIN, LLC<br>500 W. 18th Street, Ste. 200<br>Cheyenne, WY 82003<br>mhathaway@spkm.org<br>jfrance@spkm.org | [   ]<br>[ x ]<br>[   ]<br>[   ]<br>[   ] | U. S. Mail (prepaid)<br>CM/ECF Electronic Transmission<br>Overnight Delivery<br>Hand Delivery<br>Electronic Mail |
|---|---|---|
| Marc S. Gottlieb<br>ORTOLI ROSENSTADT, LLP.<br>366 Madison Avenue, 3rd Floor<br>New York, NY 10017<br>Telephone: (212) 588-0022<br>Facsimile: (866) 294-0074<br>Email: msg@orllp.legal | [   ]<br>[ x ]<br>[   ]<br>[   ]<br>[   ] | U. S. Mail (prepaid)<br>CM/ECF Electronic Transmission<br>Overnight Delivery<br>Hand Delivery<br>Electronic Mail |

Patrick J. Murphy