1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF WYOMING

3
   BCB CHEYENNE, LLC, d/b/a      | DOCKET NO. 23-CV-00079-ABJ
4  BISON BLOCKCHAIN, a Wyoming   |
   limited liability company,    | (Pages 1 through 210)
5                                |
        Plaintiff,               |
6                                | Cheyenne, Wyoming
        vs.                      | Wednesday, June 26, 2024
7                                | 1:33 p.m.
   MINEONE WYOMING DATA CENTER,  |
8  LLC, a Delaware limited       |
   liability company; MINEONE    |
9  PARTNERS, LLC, a Delaware     |
   limited liability company;    |
10 TERRA CRYPTO, INC., a Delaware |
   corporation; BIT ORIGIN LTD., |
11 a Cayman Island company;      |
   SONICHASH, LLC, a Delaware    |
12 limited liability company;    |
   BITMAIN TECHNOLOGIES HOLDING  |
13 COMPANY, a Cayman Island      |
   company; BITMAIN TECHNOLOGIES |
14 GEORGIA LIMITED, a Georgia    |
   corporation; and JOHN DOES 1-20,|
15 related persons and companies |
   who control or direct some or |
16 all of the named Defendants,  |
                                 |
17      Defendants.              |

18          TRANSCRIPT OF MOTION HEARING PROCEEDINGS
19   EMERGENCY MOTION FOR PROTECTIVE ORDER WITH PREJUDGMENT
            WRITS OF ATTACHMENT AND GARNISHMENT
20
        **BEFORE THE HONORABLE ALAN B. JOHNSON**
21            **UNITED STATES DISTRICT JUDGE**

22
       *MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC*
23            *Federal Official Court Reporter*
      *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
24        *307.433.2169 * MelanieSonntagCRR@gmail.com*
       *Proceedings reported with realtime stenography;*
25   *transcript produced with computer-aided transcription.*

2

```
1   APPEARANCES (via Zoom):
    For the Plaintiff:        PATRICK J. MURPHY
2                             SCOTT C. MURRAY
                              WILLIAMS, PORTER, DAY & NEVILLE
3                             159 North Wolcott Street, Suite 400
                              Casper, WY 82601
4
    For the Defendants        PAULA COLBATH
5    MineOne, Terra           DAVID A. FORREST
     Crypto, Bit Origin,      ALEX INMAN
6    and SonicHash:           LEILY LASHKARI
                              LOEB & LOEB, LLP
7                             345 Park Avenue
                              New York, NY 10154
8
                              KARI HARTMAN
9                             SEAN M. LARSON
                              HATHAWAY & KUNZ, LLP
10                            2515 Warren Avenue, Suite 500
                              Cheyenne, WY 82001
11
    For the Defendants        MARC S. GOTTLIEB, I
12   Bit Origin and           ORTOLI ROSENSTADT, LLP
     SonicHash:               366 Madison Avenue, Third Floor
13                            New York, NY 10022
14                            MEGGAN HATHAWAY
                              SUNDAHL, POWERS, KAPP & MARTIN, LLC
15                            2020 Carey Avenue, Suite 301
                              Cheyenne, WY 82001
16
    For the Defendants        KHALE J. LENHART
17   Bitmain Technologies:    HIRST APPLEGATE, LLP
                              1720 Carey Avenue, Suite 400
18                            Cheyenne, WY 82001
19                            DANIEL HIRSCH
                              O'MELVENY & MYERS, LLP
20                            400 South Hope Street, 18th Floor
                              Los Angeles, CA 90071
21
22
23
24
25
```

1                          I N D E X

                                              PAGE
2       Opening Statement by Mr. Murphy          8
        Opening Statement by Ms. Colbath        14
3
     PLAINTIFF WITNESSES:
4      ANDREW ASTUNO
       Direct Examination by Mr. Murphy         20
5      Voir Dire Examination by Ms. Colbath     22
       Direct Examination (Resumed) by Mr. Murphy  24
6      Cross-Examination by Ms. Colbath         31
       Further Direct Examination by Mr. Murphy 131
7
       MICHAEL MURPHY
8      Direct Examination by Mr. Murphy         40
       Cross-Examination by Ms. Colbath        103
9      Redirect Examination by Mr. Murphy      121
       Recross-Examination by Ms. Colbath      123
10     Further Direct Examination by Mr. Murphy 171

11   DEFENSE WITNESSES:
       ERICK RENGIFO, PhD
12     Direct Examination by Ms. Colbath       132
       Cross-Examination by Mr. Murphy         158
13
       MARK ALDRICH
14     Direct Examination by Ms. Colbath       159
       Cross-Examination by Mr. Murphy         163
15
       Closing Argument by Mr. Murphy          175
16     Closing Argument by Ms. Colbath         186
       Ruling by the Court                     194
17
                         E X H I B I T S
18                                  IDENTIFIED  RECEIVED
     PLAINTIFF EXHIBITS
19       8     General Ledger Journal           84        90
               Entries Chart
20       9     Related Party Lenders Chart      75        84
               (demonstrative)
21       15    DHS Agreement                    49        50
         16    Side Letter                      50        51
22       17    Consulting Services Agreement    51        52
         21    Email Compilation                63        --
23       100   Murphy Testimony Script          68        --

24   DEFENSE EXHIBITS
         47    Email Chain                     124        --
25

1          (Proceedings commenced 1:33 p.m., June 26, 2024.)

2          THE COURT:  I hope I'm seeing everyone on my screen.

3    You're all getting to be about postage stamp size as a result

4    of the growth of this case and the number of individuals who

5    are listed to participate.

6          The matter that brings this matter to the Court today

7    is BCB Cheyenne, a limited liability company, doing business

8    as Bison Blockchain, a Wyoming limited liability company.

9          They have brought this action against MineOne Wyoming

10   Data Center, a Delaware limited liability company; MineOne

11   Partners, LLC, a Delaware limited liability company; Terra

12   Crypto, Incorporated, a Delaware corporation, which is

13   associated with MineOne Partners and a -- a parent creditor;

14   Bit Origin, a limited company from the Cayman Islands;

15   SonicHash, a limited liability company from Delaware; Bitmain

16   Technologies, a Georgia limited liability organization, a

17   corporation; various John Does who control or direct some or

18   all of the named defendants who are members of these various

19   limited liability organizations.

20         The matters that bring this case to our attention is

21   the sale of the assets of the Bitchain organization that had

22   been created in this matter and the alleged allegations of BCB

23   of the fraud and imminent dissipation of those assets.

24         In kind of short form, this case commenced as a

25   result of the good fortune of a young Wyoming limited

1   liability company's ability to obtain a right to a substantial

2   amount of energy that could be applied to Bitchain technology

3   and mining operations, which involve very sophisticated

4   mathematical problems that need to be solved in order to find

5   success as well as tremendous amounts of energy to support

6   those activities.  In fact, one of these mining enterprises

7   will consume the energy of a small city.

8          Wyoming is favored in that regard, particularly

9   because of its cool weather, which helps cool the equipment,

10  and its windy conditions, which are also very satisfactory in

11  that regard.

12         BCB, having secured an understanding with Black Hills

13  Energy, then needed an organization with the wherewithal and

14  money, primarily, to create the structures on the ground and

15  to make the arrangement for the mining machines and undertook

16  whatever due diligence they did and located eventually MineOne

17  Partners and its associate Terra Crypto, Incorporated, and the

18  organization of the Wyoming MineOne Data Center was -- was

19  formed with an agreement that the MineOne entities would

20  provide the resources for the building of these things and BCB

21  would provide the wherewithal to navigate the regulatory

22  barriers to the operation and secure appropriate licensing and

23  then -- and on the ground begin its hosting obligation in a

24  sort of an amorphous way in assisting the construction of two

25  mining centers, one located in an area approximately 1 mile

1    from a nuclear missile base under the jurisdiction of the

2    United States Air Force in a business center and another in

3    another business center located some miles away from that

4    Warren Air Force Base location.

5           From the get-go delays occurred.  At some point,

6    I suspect early on from the information we've received and the

7    affidavits that have been filed, BCB was aware that

8    substantial Chinese membership existed -- that is, persons

9    having a living in -- in China and acquiring property in

10   Wyoming for the purpose of Bitcoin mining.

11          The location of the business park near Warren Air

12   Force Base, which was to consume the majority of the power to

13   be made available in Black Hills, also is the home of

14   two other significant power-required activities.

15          The first is NOAA's primary computer center, which is

16   a compendium of 70 universities primarily devoted to their

17   studies of climate and the location most recently of a -- a

18   new, more-than-15 petaflop computer located on that site, and

19   the second is a cloud center operated by the private company

20   Microsoft.

21          No application was submitted to the Federal

22   Government as part of this as building progressed, and, so far

23   as the Federal Government's knowledge, there was none until a

24   press release by one of the parties who are involved --

25   perhaps it was -- perhaps that was -- I can't remember --

1    Bitmain Technologies of Georgia -- disclosed what was in place

2    and about to commence operations.  And at that point Microsoft

3    became fully informed and informed CFIUS of -- of that

4    activity.

5            As a result, ultimately, the President of the

6    United States, as part of his powers under the separation of

7    powers doctrine and as a nonappealable-to-Federal Court

8    matter, ordered Bitmine [sic] Partners, LLC, and MineOne

9    Wyoming Data Center to divest.

10           They have since arranged a sale, which has taken

11   place.  Substantially before that time BCB and its aspiring

12   personnel, hoping to engage in the second part of their

13   understanding and become the hosts, had been pushed to the

14   side, they claim, and all in breach of their contractual

15   understandings in connection with this project.

16           Learning of the sale in this matter, emergency

17   motions have been filed and supplemented and that eventually

18   bring us here today.  We've had several hearings.

19           So, to make matters short, another organization

20   has -- is taking over in this mining operation separate and

21   apart from any of those that are before the Court today.

22           It is the desire of BCB to secure its hoped-for pot

23   of gold at the end of the rainbow, to obtain relief under

24   Wyoming statute by way of attachment of property and proceeds

25   of the sale transaction that is taking place in this matter.

1        As I understand it, any financial involvement in this

2   project really was represented by the effort of BCB to secure

3   the available power, which is key to this kind of operation.

4   And, of course, early on in the contractual understanding

5   between the parties, that critical power, however it might be

6   enforced against -- understanding -- against Black Hills was

7   transferred from BCB to the MineOne Partners or the MineOne

8   Wyoming Data Center under the agreement.  Some of this may be,

9   certainly, error and an oversimplification on my part.

10       At any rate, a very simple and conclusory affidavit

11  was filed under pertinent Wyoming law in support of the

12  emergency motion in this matter, and, hence, we are here today

13  with a hearing that will be proceeding under a timer.

14       So, Mr. Murphy, the time is yours.

15       MR. MURPHY:  May it please the Court, Counsel.

16  Patrick Murphy on behalf of Plaintiff BCB Cheyenne, LLC.

17       If the Court grants these writs of attachment and

18  garnishment of close to 15 1/2 million of CleanSpark purchase

19  monies and close to a million of the Black Hills Energy

20  security fund, a total of $16,528,276, we'll finally be on a

21  status quo.  Finally, we would have a level playing field.

22       These defendants will finally have to come to the

23  settlement table -- they will if the writs are issued -- to

24  negotiate with BCB as to how much of these attached monies it

25  will give BCB for BCB's hard work and value to settle and

1    resolve this matter.

2         If the Court does not attach or garnish these

3    CleanSpark purchase monies, the MineOne defendants will pay

4    and enrich themselves and their related parties.  They will

5    pay their own lawyers, we will endure eight more brutal months

6    of litigation, a long two-week bench trial in January, then an

7    appeal.  And for what?  MineOne won't have any money or assets

8    for BCB to collect from when BCB wins a judgment against

9    MineOne and Terra Crypto.  Everything BCB has suffered and

10   endured to get to this point will have been futile and a total

11   loss.

12        And, Your Honor, there's nothing extraordinary about

13   prejudgment writs of attachment and garnishment.  These

14   prejudgment attachment statutes have been Wyoming law and

15   Wyoming public policy for 150 years, since 1876.  BCB proved

16   all the required statutory elements with Michael Murphy's

17   merits affidavit on May 15th and amended emergency motion

18   affidavit on June 24.

19        He testified and will testify as follows:  The

20   defendants are indebted to BCB for over 38 million; there are

21   no legal setoffs to this indebtedness.  The defendants have

22   not paid any of this debt to BCB.  None of this indebtedness

23   is secured by any mortgage or lien upon the MineOne

24   defendants' real or personal property in Wyoming.  And MineOne

25   is about to assign, remove, dispose of, or conceal its

1    property with intent to defraud its creditor; namely, BCB.

2           The only loan that has priority over BCB's

3    $38 million claim is Antalpha's security claim for

4    approximately $6,903,000.

5           And BCB agrees this secured claim should be paid, but

6    no other claims or alleged loans should be paid with these

7    22,500,000 CleanSpark purchase monies.

8           After paying Antalpha's secured claim, thus allowing

9    free and clear title to pass to CleanSpark as early as

10   tomorrow, the Court should immediately attach all of the

11   remaining 15,529,165 CleanSpark monies and the $999,111 that

12   Black Hills Energy is holding for MineOne in its security

13   fund.

14          MineOne, Your Honor, anticipatorily repudiated its

15   DHS agreement with BCB on March 13th of '23 when MineOne

16   emailed BCB, telling BCB, quote:  "We negotiated with Wiley

17   and his team for them running the complete hosting and

18   management of the site.  We have made a simple agreement where

19   we set what your now limited responsibilities are," unquote.

20   It was a takeover.

21          On March 13th of '23, MineOne sent BCB a so-called

22   proposal, a proposed take-it-or-leave-it amendment to the

23   DHS agreement where, one, BCB would not be allowed to operate

24   the North Range or Campstool sites and would not receive the

25   agreed-upon consideration tied to those services, including

1   the compensation for all of BCB's up-front work and the value

2   BCB created with winning the lucrative energy contract from

3   Black Hills Energy.

4           Second, under the proposal BCB would no longer have

5   its right of first refusal or buyout in the event another

6   entity purchases the development.

7           And, third, in return for a much-reduced compensation

8   package, BCB would be minimized from being the site managers

9   with a team of BCB's own 10 to 15 employees to do just menial

10  work, working for MineOne.

11          Jiaming Li, who's not here today, Skyped this message

12  to Erick Rengifo on March 13th of '23, quote, "I just want to

13  get rid of BCB and move to the business."

14          And Erick Rengifo, replying to Jiaming Li, said

15  "I agree.  Hopefully, this agreement we will have them" --

16  meaning BCB -- "just marginally and we can do the business,"

17  unquote.

18          MineOne anticipatorily repudiated its DHS agreement

19  on March 13th with its decision to remove BCB as the host and

20  operator at North Range and completely preclude BCB from being

21  involved at Campstool, and MineOne had no cause to breach or

22  repudiate its DHS agreement with BCB.

23          BCB substantially complied with each and every

24  contractual obligation it had to MineOne.  BCB's primary

25  contractual obligation was to perform, quote, "all other

1    reasonable related activities within its control," unquote.

2    "Within its control."  BCB complied with its obligation to

3    perform reasonable activities within its control.

4         It was Defendant Terra Crypto, not BCB, who had the

5    contractual obligation under its CS agreement to assure

6    completion by the completion date.  Terra Crypto breached its

7    obligation to ensure that all tasks were developed in a timely

8    manner.  CEGEN and Shermco were MineOne's contractors, not

9    BCB's contractors, and their delays and problems caused this

10   project to be late.

11        Your Honor, MineOne and Terra Crypto have nothing on

12   BCB.  Throughout this case MineOne and Terra Crypto have been

13   unable to point to a specific contractual obligation that BCB

14   breached.  All they can do is try to hang their breach and

15   their contractor's failures on BCB without any specificity.

16        And BCB's damages are well-established in Patrick

17   Gahan's March 20, 2024, expert report.  BCB's damages against

18   MineOne are close to 22 million at the time of trial and close

19   to 42 million against Terra Crypto respectively.

20        Finally, as Michael Murphy will explain today, from

21   the 11,250,000 of Campstool proceeds and MineOne -- that

22   MineOne defendants intend to transfer 4,152,434 from MineOne

23   to Terra Crypto.  Terra Crypto is 100 percent Jiaming Li and

24   Erick Rengifo, the same owners and operators of -- you guessed

25   it -- MineOne.  They seek to pay themselves.

1           And MineOne says -- by way of the four loan

2    agreements MineOne has only recently -- and that now that --

3    provided -- that MineOne, its investors, and Defendant Terra

4    Crypto and their related parties -- they say they're owed

5    7,820,386 in alleged loans, but all of that money is really

6    just camouflaged equity.  It is not genuine, bona fide loans.

7           This is their scheme, to defraud BCB and get away

8    with all the money.  Today.  Tomorrow.  All of these companies

9    are related parties, investors, and/or companies owned and

10   operated by Erick Rengifo, Jiaming Li, and/or Chong Wang.

11          What MineOne is doing is what the prejudgment

12   attachment statute is intended to avoid.  MineOne is about to

13   assign, remove, or dispose of its property with the intent to

14   defraud its largest creditor, BCB, while paying themselves and

15   their related parties.

16          BCB is entitled to writs on the CleanSpark purchase

17   monies because MineOne is, quote, "about to assign, remove, or

18   dispose of its CleanSpark sales money to defraud its

19   creditors," Wyoming Statute 1-15-201.

20          In this context, defrauding one's characters simply

21   means MineOne pays its other related parties and unsecured

22   creditors, quote, "with actual intent to hinder, delay, or

23   dis- -- or defraud any creditor of the debtor," Wyoming

24   Statute 34-14-205.

25          Your Honor, we're about to present the evidence how

```
 1   MineOne is about to defraud BCB and get away with all the
 2   money.  If that happens, this litigation will escalate and
 3   expand.  But, by issuing the writs, the money will finally be
 4   held in a status quo, on a level playing field, and this case
 5   will be put on an expedited road to settlement and resolution.
 6           Thank you, Judge Johnson.
 7           THE COURT:  Very well.
 8           Did you wish to present your son at this point?
 9           MR. MURPHY:  I didn't know if you were going to have
10   Ms. Colbath present her opening statement now or if -- I can
11   go -- I can go -- I was going to ask -- actually call Andy
12   Astuno as our first of two witnesses.
13           THE COURT:  All right.
14           Ms. Colbath, do you wish to make your presentation
15   now?
16           I think you're muted.
17           MR. GOTTLIEB:  Paula, you're on mute.
18           MS. COLBATH:  May it please the Court, Paula Colbath
19   for the MineOne defendants.
20           I want to start where Mr. Murphy started.  He said to
21   Your Honor that the -- it's important to issue these writs of
22   attachment to maintain the status quo, to create what he
23   called a level playing field.
24           There will be no level playing field if a writ --
25   writ of attachment is issued against the MineOne defendants'
```

1    money because the fact of the matter is, as things will come

2    out in testimony, BCB has no money.

3            At the end of the day we've continued to litigate,

4    yet they have acknowledged in their reply brief, submitted to

5    you on late Monday night, at page 9, where I quote, "BCB

6    cannot afford to post a bond of more than a few thousand

7    dollars," so there's no level playing field.

8            If a writ is issued, my client's proceeds and money

9    will be frozen until some time after appeals, after next year

10   for some lengthy period of time while BCB, during the project,

11   have no skin in the game, didn't put up a dime for the

12   construction, and has no money now.  It's basically imploring

13   you not to require it to post a bond, so they're asking you

14   to -- to utilize what is well known as drastic, extraordinary

15   relief to coerce my clients to sit at a settlement table.

16           That is not the purpose of attachment.  Attachment is

17   only granted when there is clear evidence of fraud, secreting

18   of assets, hindering creditors, and there's absolutely no

19   evidence here presented up to this point of any type of

20   conduct like that.

21           Let's look at what the conduct is that Mr. Murphy --

22   which is a moving target.  As you know, he filed in May his

23   first emergency motion, then, when that fell flat with our

24   opposition to it, he filed an amended emergency motion

25   alleging new -- new facts, sent Your Honor emails, which I'll

1   talk about, alleging all kinds of hysteria and drama, that we

2   were taking all the assets out of Wyoming.  His son took

3   pictures, sent them to the Court.  I addressed that and I'll

4   address it again.

5           And, now, as a last resort, in the most recent

6   filings earlier this week, Mr. Murphy has once again changed

7   tack and now says that the loans that were made are, in his --

8   in his conclusion, camouflaged equity.  And we will have

9   witnesses address that.

10          The first -- the first evidence Mr. Murphy brought

11  forward was -- in his initial motion -- was Jiaming Li, one of

12  the principals, committed fraud.  He used the word "fraud,

13  intentional misrepresentations."  He didn't hold back at all,

14  said that there was fraud in connection with the CleanSpark

15  purchase and sale agreement.

16          Well, Mr. Murphy didn't read that purchase and sale

17  agreement closely because the lead-in to the particular

18  provision he relied on said "Except as disclosed on the

19  accompanying disclosure statements, there are no litigations

20  pending."  Well, of course.  We -- the litigation was

21  disclosed fully on a disclosure schedule, and that -- the

22  evidence of that was provided to Mr. Murphy.

23          That accusation was found in Mr. Michael Murphy's

24  affidavit, despite having received unequivocal evidence that

25  the corporate lawyers who were negotiating that deal provided,

1  in advance of CleanSpark's signature on the purchase and sale

2  agreement, disclosure of the lawsuit.  Neither one of them has

3  corrected their misrepresentation with this Court.

4         But the bottom line on their first example of fraud

5  was that they were just absolutely wrong, and -- and then they

6  moved on to sending you pictures.  "Look at this.  Right

7  before our very eyes" -- this happened on May 17th -- "the

8  MineOne defendants are taking all the assets out of Wyoming.

9  You must stop them."

10         Well, no.  Again, they went way out on that limb, and

11  the limb broke because property that was being removed was

12  directed to be removed by the President of the United States,

13  the miners, and those miners were the property of Bitmain, not

14  MineOne.  So the second fraud didn't exist.

15         Now that -- they're trying to attack loans that were

16  made into the project, and we will have the principals talk

17  about -- because of the severe delays that were occasioned

18  here that were breaches of the key contract here -- the

19  development, hosting, and service agreement signed by the

20  MineOne defendants and BCB in June of 2022, the -- the

21  deadlines were not met; the vendors were not supervised; the

22  permits were not obtained.  And you will hear evidence of

23  multiple breaches.

24         And Mr. Murphy gave you a very important date in his

25  opening, March 13th, 2023.  That's when he says that my

1  clients breached the development, hosting, and service

2  agreement, March 13th, 2023.

3          Well, by the end of the hearing, you will learn that

4  there were multiple repeated breaches by BCB of that same

5  contract starting as early as October 31st, 2022.

6          If the Court grants the writ of attachment, it would

7  actually -- one of the provisions of the statute, 1-15-201(b),

8  is that the writ did not hinder payment of creditors, and,

9  here, Mr. Murphy just turns a blind eye to the fact that the

10 MineOne defendants have multiple current creditors that are

11 owed money.

12         They -- they -- they have a secured lender, Antalpha,

13 upwards of $7 million.  Clean, insurable title cannot be

14 conveyed to CleanSpark unless that loan is paid in full to the

15 satisfaction of Antalpha.

16         Because this project had serious overruns, you'll

17 hear today that BCB prepared, with my client, a construction

18 budget for this project of $18 million.  By the time this

19 project was completed, the costs had escalated to over

20 $27 million.

21         I've just -- I'm going to move on a little quickly.

22         You're going to hear about numerous breaches from --

23 BCB failed to meet the October 31, '22, date; they failed to

24 secure the necessary approvals; they failed to adhere to

25 approved budgets; they didn't effectively manage the vendors.

1              And you're also going to hear, Your Honor,

2      importantly, how every penny of the proceeds from CleanSpark

3      is going to be used.

4              There's no absconding with money.  There are no

5      winners here.  There was upwards of $30 million put into this

6      facility.  None by BCB.  All by lenders and others.  And there

7      are vendors, there are lenders, there are service providers

8      that are owed money.

9              And in order for my clients to comply with the

10     Presidential order -- which requires everything to be stripped

11     off of the land from the underground wires, transformers, the

12     modular data centers right down to foundations -- that alone

13     is estimated to cost 2.6 million.  So if there is a writ

14     attaching all of the proceeds, there will be lawsuits because

15     MineOne owes people money today.  They're not contingent

16     liabilities, which is all BCB is.  They are actual, current

17     creditors owed money.

18             Finally, Your Honor, if -- if the Court were

19     inclined, at the end of the day, to -- to issue any type of

20     writ, we would implore the Court to require a substantial bond

21     in whatever the amount is of the money that will be tied up

22     since MineOne will not have use of that money and will likely

23     face lawsuits as a result of owing people money that's

24     currently due and creditors that stand well in front of BCB.

25             So with that, Your Honor, I would yield to Mr. Murphy

1  for his first witness.

2           THE COURT:  Thank you, Ms. Colbath.

3           Mr. Murphy.

4           MR. MURPHY:  Yes, sir.  Thank you, Your Honor.

5           We would call Andrew Astuno.

6           Andrew, are you there?

7           THE WITNESS:  Yes.  Good afternoon.

8           MR. MURPHY:  Good afternoon.

9           THE COURT:  Please raise your right hand and be

10  sworn.

11          THE COURTROOM DEPUTY:  Good afternoon.

12      (Witness sworn.)

13          THE WITNESS:  I do.

14      **ANDREW ASTUNO, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

15                       **BY MR. MURPHY:**

16  Q.  What is your name?

17  A.  Andrew Astuno.

18  Q.  And where do you live?

19  A.  Washington, DC.

20  Q.  Where and when did you graduate from law school?

21  A.  I graduated from the University of Denver Sturm College of

22  Law in 2011.

23  Q.  In which state or states are you admitted to practice?

24  A.  Colorado as of 2011 and the District of Columbia as of

25  2018.

 1  Q.  Have you been a practicing attorney since graduating from

 2  DU Law School?

 3  A.  Yes, I have.

 4  Q.  Did I reach out to you on June 1st, 2024, to tell you of

 5  this BCB versus MineOne lawsuit and ask whether you had

 6  experience and expertise working with CFIUS?

 7  A.  Yes, you did.

 8  Q.  Can you share with the Court your experience and expertise

 9  working with CFIUS?

10  A.  Most notably, as of 2020 I joined the Treasury Department,

11  where I exclusively worked on CFIUS matters in the review of

12  proposed foreign transactions.

13       I, in that role, was overseeing the review of both

14  debt and equity transactions that fell under CFIUS' review

15  authorities.  I also consulted with various agencies in the

16  collaborative interagency process that represents CFIUS and

17  coordinated several actions, including the negotiation of

18  national security agreements as certain cases required.

19       Following that experience I returned to private

20  practice, where, since then, I have been an international

21  trade regulatory attorney, where I've also continued to

22  evaluate a number of CFIUS matters.  I continue to specialize

23  in CFIUS matters in my private practice, including

24  representing foreign investors as they seek to enter

25  US markets as well as representing US businesses with

 1  sensitive technologies that could be subject to the CFIUS

 2  mandatory filing rules.

 3  Q.  Do you consider yourself an expert with respect to CFIUS

 4  and, in particular, with respect to its reviewal process and

 5  approval of covered transactions?

 6  A.  Yes, I do.

 7          MR. MURPHY:  Your Honor, at this time I'd ask that

 8  the Court qualify Mr. Astuno as an expert in this limited

 9  area.

10          MS. COLBATH:  Your Honor, could I do a little bit of

11  voir dire?

12          THE COURT:  Certainly.

13          MR. MURPHY:  On her time, I hope.

14          THE COURT:  Yep.

15                  **VOIR DIRE EXAMINATION**

16                  **BY MS. COLBATH:**

17  Q.  Mr. Astuno, have you ever been qualified by any State,

18  Federal Court, or administrative agency as an expert prior to

19  today?

20  A.  Yes, but not in this particular field.

21  Q.  Okay.  My -- let me focus the question on CFIUS.

22          Have you ever been qualified by a State or Federal

23  Court or administrative agency in the area of CFIUS

24  regulations?

25  A.  No.  I have not been retained until this matter.

1  Q.  Have you ever published a peer-reviewed article on a CFIUS

2  subject?

3  A.  I've been quoted in multiple articles pertaining to CFIUS

4  matters, and I've prepared numerous firm publications

5  pertaining to various updates concerning CFIUS' regulatory

6  updates.

7  Q.  On those articles were you listed as the author?

8  A.  Yes.  In terms of articles, I'm referring to client alerts

9  and firm briefings.  I'm also including that when you say --

10  when you use the term "articles."

11  Q.  And were you listed, Andrew J. Astuno, as the author of

12  those articles?

13  A.  Yes.  Again, we're -- several client alerts and firm

14  updates.  I was listed many times.

15  Q.  Okay.

16       What investigation did you do here which informed

17  your opinion?

18  A.  I reviewed the -- the underlying pleadings in this matter;

19  in particular, the allegation that MineOne made that, pursuant

20  to the DHS agreement, BCB was required to obtain CFIUS

21  approval as part of its requirement to obtain regulatory

22  approvals.

23       I assessed the nature of the assets and whether the

24  pertinent transaction that is the one involving Cheyenne LEADS

25  and MineOne would have been a covered transaction,

1    specifically a covered real estate transaction, pursuant to

2    Part 802 of the regulations.  And I also considered and

3    evaluated the pertinent transaction against the mandatory

4    filing rules outlined at Part 800.401.

5            MS. COLBATH:  Your Honor, I don't think he qualifies

6    as an expert.  And -- and I think his -- if -- the PowerPoint

7    that he prepared is limited to conclusions of law.  But in an

8    effort to move the proceeding ahead, I won't object.

9            THE COURT:  Very well.

10           Proceed, Mr. Murphy.

11           MR. MURPHY:  Thank you, Judge Johnson.

12                   **DIRECT EXAMINATION (Resumed)**

13                       **BY MR. MURPHY:**

14   Q.  Mr. Astuno, were you aware of President Biden's May 13,

15   2024, order of divestment and did you review it before

16   I called you?

17   A.  Yes, I did.

18           This executive order represented a very significant

19   newsworthy event across the greater international trade

20   regulatory community.  As soon as the order was issued, my

21   colleagues and I immediately read it and reviewed it.

22   Q.  Can you briefly explain at a procedural level what would

23   have led to this Presidential divestment order?

24   A.  Yes.

25           As outlined in the scope of the regulations of

1    Part 800, before a President will intervene as it relates to a

2    CFIUS blocking or a divestment order in this case, the

3    committee itself, the inner agency, will first have reviewed

4    it and undergone a national security risk assessment.

5            So, prior to President Biden's intervention, the

6    inner agency would have -- just like I said -- have conducted

7    a full review and assessment and referred or recommended to

8    the President that this divestment occur.

9            The process is rather elaborate.  It includes

10   involvement with heads of agencies -- nine agencies, in fact.

11   And, given the -- the nature of the assets and the proximity,

12   the real estate proximity issues, it's -- it appears that, in

13   this case, Pentagon officials and DOD officials were heavily

14   involved in, ultimately, that referral process.

15           I finally would mention that a divestment order is

16   historic in nature.  It's very rare.  It's deemed to be an

17   extremely rare and extreme remedy.  There's only been eight

18   divestment orders since CFIUS was first created under the

19   President Nixon administration.

20   Q.  When I contacted you, did I tell you I represent

21   BCB Cheyenne in a lawsuit BCB brought against the MineOne

22   entities who are the subject of President Biden's divestment

23   order on the North Range parcel?

24   A.  Yes.  That is what you explained.

25   Q.  Did I share with you that the MineOne parties have filed

1   counterclaims against BCB?

2   A.  Yes.  And just like I explained to your opposing counsel,

3   that's also what I reviewed.

4   Q.  Okay.  Specifically did I share with you that the MineOne

5   parties in the last 30 days are making the new allegation

6   that, quote, "BCB is the entity that was required to obtain

7   approval from CFIUS before MineOne Data was permitted to

8   acquire the North Range facility"?

9   A.  Yes.  I -- you explained that and I also confirmed that in

10  my review of the pertinent pleadings.

11  Q.  Did I share with you that the MineOne defendants are now

12  alleging as follows, quote, "As project manager BCB was

13  contractually responsible for obtaining all permits and

14  licenses"?

15  A.  Yes, you did, and I confirmed that in my review of

16  Article I, Section 6, of the DHS agreement.

17  Q.  In your review did you also notice that there was nothing

18  said in that contractual provision about obtaining CFIUS

19  approval?

20  A.  That's correct.  I did -- I did confirm as much.

21  Q.  Yet did I also share with you that the MineOne defendants

22  allege that that contract provision includes obtaining

23  approval from CFIUS even though it doesn't say that?

24  A.  Yes.  And I -- I've also reviewed that -- that issue on --

25  on multiple grounds, that's correct.

1   Q.  Did I ask you whether you had the experience and the

2   expertise with CFIUS during your employment there to know

3   whether or not MineOne's allegation was accurate or not?

4   A.  Yes, you did.

5   Q.  Do you have the experience and the expertise with CFIUS to

6   know whether it was BCB or the MineOne parties and/or their

7   counsel who had the standing and the ability at the front end

8   of the real estate transaction in June of '22 to report this

9   transaction to CFIUS and seek CFIUS' approval?

10  A.  Given my extensive experience in this field, particularly

11  when I was working internally, inside the Treasury Department,

12  which serves as the chair of CFIUS, yes, I do believe I have

13  sufficient experience, knowledge, and expertise.

14  Q.  Would CFIUS have received or processed any notification

15  from BCB about this North Range real estate transaction?

16  A.  No.  And the reason why is because normally a party to a

17  transaction, as that term -- it's a term that has a specific

18  meaning under the pertinent regulations.  Only a party to a

19  transaction may notify CFIUS.

20          In other words, only a party to a transaction has the

21  equivalent of what I would refer to as regulatory standing to

22  notify CFIUS and for CFIUS to then properly assess that

23  application.  Even if BCB agreed or contractually agreed

24  through some mechanism to notify CFIUS on behalf of MineOne,

25  CFIUS would have rejected such filing.

1    Q.  Thank you, Mr. Astuno.  Let me switch gears just slightly.

2         Are you aware of the loan agreements, the alleged

3    loans between MineOne and the various -- and its various

4    investors and related parties made in March and April of

5    this year, 2024?

6    A.  From what I read and analyzed, yes, I am.

7    Q.  Did I send these loan agreement documents to you and

8    including the site-clearing bid -- not an invoice but the

9    site-clearing bid -- after BCB received these documents on

10   June 19th of '24?

11        MS. COLBATH:  Your Honor, I'm going to object.  There

12   was a -- a PowerPoint setting forth an opinion -- and that

13   PowerPoint is Exhibit 1, which we have objections to --

14   includes nothing to do with any loans and is beyond the scope

15   of what Mr. Astuno has said his expertise is.

16        MR. MURPHY:  We're not seeking to introduce the

17   PowerPoint slides, Your Honor.  We're trying to just move it

18   along quickly.

19        I've got three more questions for the witness.  It's

20   just about his review of these loans and CFIUS' continued

21   interest in them.

22        MS. COLBATH:  You didn't introduce him as a lending

23   expert.  You introduced him -- and -- and asked your questions

24   and qualified him -- as solely a CFIUS expert.

25        MR. MURPHY:  He's solely -- he's testifying solely as

1    a CFIUS expert.  He is not testifying as a loan expert.  He's

2    testifying in this respect with regard to the oversight and

3    interest CFIUS would have in these loans and that's all.

4              MS. COLBATH:  Well --

5              THE COURT:  Limited to only CFIUS regulation or law,

6    he may testify.

7              MS. COLBATH:  Thank you.

8              MR. MURPHY:  Thank you.

9    BY MR. MURPHY:

10   Q.  Mr. Astuno, do these loan agreements, these alleged loans,

11   equal approximately $7.8 million in proposed money transfers

12   by MineOne to others?

13   A.  Yes, they do.

14             MS. COLBATH:  Objection, Your Honor.  There's no

15   relationship to CFIUS.

16             MR. MURPHY:  Let -- that is a -- just a preliminary,

17   foundational question for my last two questions.

18             THE COURT:  Proceed.

19   BY MR. MURPHY:

20   Q.  Based on all of your experience working for CFIUS, what

21   will likely happen with CFIUS if these loan agreement

22   transactions go through and there is no writ of attachment and

23   garnishment issued by this Court?

24             MS. COLBATH:  Again, objection for the record.

25             THE COURT:  You may object.

1          Proceed.

2  A.   To that question I -- I would again say, given the rather

3  extreme circumstances underlying the recent divestment

4  order -- again, there's only been eight divestment orders in

5  the entire history of CFIUS -- it is fair to assume that any

6  future US business dealings conducted by MineOne and its

7  affiliate entities, the same entities that are parties to the

8  relevant loan agreements that I reviewed, will be subject to

9  heightened and ongoing scrutiny by CFIUS; namely, the same

10  Pentagon components, including the US Air Force, that recently

11  reviewed and took a very keen and strong interest in the

12  recent acquisition in proximity to the Warren Air Force Base.

13  BY MR. MURPHY:

14  Q.   Finally, if these funds are placed into escrow, would

15  the terms of the divestment order still be fulfilled and

16  adhered to?

17  A.   Yes.  So long as the relevant interests are transferred --

18  in other words, if MineOne divests itself of its former

19  assets -- the terms of the divestment order will be fully

20  satisfied, including if and when the sales proceeds are

21  attached by writ.

22          To be clear, the issuance of a writ of attachment in

23  this matter would not conflict with MineOne's potential

24  adherence to the terms of the divestment order, nor would

25  CFIUS object or become involved if such action was taken.

1    MR. MURPHY:  Nothing further, Your Honor.

2                    **CROSS-EXAMINATION**

3                    **BY MS. COLBATH:**

4  Q.  Mr. Astuno, am I correct that you attended the Notre Dame

5  University?

6  A.  That's correct.

7  Q.  And you graduated from Notre Dame in what year?

8  A.  2007.

9  Q.  Okay.  And you were classmates with Mr. Sean Murphy;

10  correct?  Mr. Patrick Murphy's son.

11  A.  I didn't know that at the time.  But years later, through

12  some certain mutual contacts in the legal community, I did --

13  I did realize that fact.  It's a small world.

14  Q.  Weren't you roommates at one point in time with

15  Mr. Murphy?

16             In Denver?

17  A.  That is correct.

18  Q.  Now, you were at CFIUS for less than a year and a half;

19  correct?

20  A.  I believe it was approximately 18 months, maybe a bit -- a

21  bit longer.

22  Q.  According to your résumé -- and I could show it to you but

23  let me try to refresh your recollection -- that it states that

24  you joined CFIUS in July of 2020, the beginning of the

25  pandemic, and you were there through January 2022.

1      Would that be -- does that refresh your recollection

2  how long you were with CFIUS?

3  A.   Yeah.  As I -- as I just said, approximately 18 months, so

4  I believe that -- that is correct.  I believe that's

5  consistent with what --

6  Q.   And when -- when you joined CFIUS in July of 2020, were

7  you working in person or remotely?

8  A.   It was both.  I -- a hybrid situation.

9  Q.   Now, are you currently employed?

10 A.   Yes.

11 Q.   And you're employed by Clifford Chance?

12 A.   That's correct.

13 Q.   And you're on a leave of absence right now; correct?

14 A.   I'm transitioning my files and I'm -- I'm soon going to be

15 leaving and joining another firm, that's right.

16 Q.   Yet you're on a leave of absence right now; correct?  Yes

17 or no.

18 A.   I -- whatever the operative terminology is, I -- I am --

19 like I said, I'm transitioning and I'm -- I'm soon leaving

20 this firm, my current employer.

21 Q.   Do you know a gentleman at Clifford Chance by the name of

22 Thomas Schulte?

23 A.   I do.

24 Q.   And who do you understand Mr. Schulte to be?

25 A.   He is the firm's general counsel.

1    　　　　MS. COLBATH:  And why don't we post, so the witness

2    can review, Tab 15.

3    BY MS. COLBATH:

4    Q.  Once we post that, the question to you, sir, is going to

5    be -- at the end of the second paragraph, Mr. Schulte advises

6    my colleague Alex Inman that you are currently on a leave of

7    absence, is how he described it.

8    　　　　Is -- looking at this letter, is that accurate?

9    　　　　MR. MURPHY:  Objection.  That letter has not been

10   produced to us.  First time I've seen it is on the screen.

11   That shouldn't happen.

12   　　　　MS. COLBATH:  Well, it came in yesterday.  And

13   I would note for the record that some time ago you received

14   over a hundred pages from Republic Title.  And until I saw a

15   reference on Monday night, I hadn't received those subpoenaed

16   documents.

17   　　　　So this came late yesterday and you're seeing it now.

18   It's short enough.  If you need a minute, I'll afford you

19   some time to review it.

20   　　　　MR. MURPHY:  I object.

21   BY MS. COLBATH:

22   Q.  But the -- Mr. Astuno, you're on a leave of absence from

23   Clifford Chance, aren't you?

24   A.  Again, I'm -- whatever the -- the operative terminology

25   is.  I -- I stand by what I -- what I said.

1          I am -- it's well -- it's clear to the world -- I'm

2    telling you now, this Court -- that I'm leaving Clifford

3    Chance and I'm going to join another firm in a matter of just

4    2 1/2 weeks.

5          If Mr. Schulte says I'm on a leave of absence, then

6    that's fine.  I'm fine with that terminology.

7          I -- I don't know what else to say.  I'm -- I'm

8    transitioning.  I'm leaving one firm and going to another.

9          To continue to work -- by the way, I will continue to

10   work in the field of CFIUS, to be clear.

11   Q.  Now, I think you stated that you're familiar with the

12   terms of the development, hosting, and services contract.

13   A.  Certainly, with respect to Section 6 or the operative term

14   that pertains to the -- to seeking regulatory approval, I am

15   familiar with those terms.

16   Q.  And -- and that provision was 6.2(b) concerning the

17   permits; correct?

18   A.  That -- that sounds right.  I would -- would appreciate

19   the opportunity to have that pulled up if -- if you don't

20   mind, but that does sound correct.

21   Q.  I do because you testified on direct without it, about

22   that particular provision, and we're under some time

23   constraints.

24   A.  Well, from memory -- it was from memory.  I don't know if

25   it was subsection (b) or not because I do remember --

1    I believe it was subsection 6.

2    Q.   Okay.  And you testified that that particular provision

3    did not reference CFIUS, the Committee on Foreign Investment

4    in the US; correct?

5    A.   That's correct.

6    Q.   And isn't that true because paragraph 6.2(b) that required

7    BCB to obtain all approvals and permits actually says that

8    they were responsible for obtaining, quote, "all," closed

9    quote, so there was no need to identify CFIUS?  Correct?

10   A.   Well, I would disagree with that because I read that to

11   include all of what is possible to be obtained.

12          There's no way BCB could have obtained CFIUS approval

13   because BCB was not a party to a covered transaction.  So

14   it -- if BCB lacked regulatory standing, it had no ability to,

15   again, obtain CFIUS approval.

16   Q.   Okay.  Mr. Astuno, you've spent a significant amount of

17   time in your career preparing voluntary notices and other

18   documents that get submitted to CFIUS; correct?

19   A.   Yes.  You can -- that's correct.

20   Q.   And those documents get submitted on behalf of the parties

21   to a transaction, be it a real estate or technology or other

22   type of transaction; correct?

23   A.   The parties themselves are the filing parties.  Their --

24   their representatives are the ones that are preparing,

25   oftentimes, the submissions, but the -- the submitting party

1  is the -- the transaction party itself.

2  Q.  Understood.

3  A.  The covered --

4  Q.  So -- so BCB certainly could have advised the MineOne

5  parties that a CFIUS filing was recommended and advisable;

6  correct?

7  A.  I -- I suppose, in theory, if -- if BCB was aware of the

8  particular CFIUS regulations in this instance and had

9  conducted a risk-based assessment, then it could have issued a

10 recommendation.

11         There was not a mandatory filing obligation, however,

12 in this instance because Part 802 -- that does refer to the

13 real estate regulations.  The real estate regulations do not

14 contain any mandatory filing obligations.

15 Q.  So -- so in your work on this matter, is it your expert

16 opinion that there was no covered transaction here?

17 A.  No.  That's -- that's not my opinion at all.  The -- it --

18 CFIUS would not have reviewed this matter if there wasn't a

19 covered transaction.  President Biden would not have had the

20 legal ability to issue an executive order if this transaction

21 was not covered; i.e., was under the jurisdictional

22 authorities of the committee.

23         This transaction was covered pursuant to Part 802, in

24 that it was a covered real estate transaction based on the

25 proximity of the relevant assets to a Part 1 sensitive site

1    listed at Annex A thereto.

2          If you open up the real estate regulations of

3    Part 802, you will see that the Warren Air Force Base is

4    identified.  That creates what's called proximity jurisdiction

5    under Part 802; however, that does not mean there was a

6    mandatory filing obligation.  A mandatory filing obligation

7    comes up in a different context.  Those factors were not met

8    here.

9    Q.  If -- if you had represented the MineOne parties at the

10   time and were aware that they had Chinese nationals in their

11   ownership and management structure, would you have recommended

12   to them to make a CFIUS filing?

13   A.  It's an interesting question.  I -- I would have wanted

14   to -- I certainly would have conducted a risk-based analysis.

15   I would have had a number of questions.  I would have wanted

16   to ascertain whether there was proximity jurisdiction.

17         And, ultimately, it's -- it's only a recommendation

18   that an attorney can give, as -- as you can surely understand.

19   But there is a possibility that I -- I will say, based on what

20   I've seen, there is a distinct possibility that, yes, I would

21   have advised, at the very least, a real estate notice, a

22   short-form real estate notice.

23   Q.  And you're familiar with the CFIUS online map that

24   identifies restricted areas; correct?

25   A.  That -- you're referring to the mapping tool that -- yes.

1  That -- that is used to identify whether there's proximity

2  jurisdiction.  That's right.

3          That's -- that online tool identifies all Part 1 and

4  Part 2 sites and even what's called Part 3 sites that don't

5  necessarily create jurisdiction but are otherwise deemed to be

6  sensitive sites.

7  Q.  And -- and that is a publicly available tool; correct?

8  A.  That is -- that is correct.  It is -- I will say -- rather

9  esoteric, if I may say.  It's a little bit unique in that it

10  takes a specialized skill set to understand and correctly

11  navigate and use.

12          But it is publicly available, that is right.

13  Q.  And did you have occasion to type in the coordinates for

14  the Campstool site to determine whether that was in a

15  restricted area?

16  A.  I believe that was -- that was not there.  There was not

17  jurisdiction for -- for Campstool.  I believe the divestment

18  order and the CFIUS review only pertain to the North Range

19  parcel.

20  Q.  My question is a little different.

21          Did you ever determine whether Campstool --

22  independent of the Presidential order -- whether Campstool is

23  in a restricted area?

24  A.  I did not conduct a real estate analysis in this matter.

25  It -- given that the transaction's already closed, that CFIUS

1   has already reviewed it, the President's already issued an

2   executive order, I felt there was no need whatsoever for me to

3   go back and conduct a real estate proximity analysis.

4           But I can tell you it's abundantly clear that there

5   is no proximity, there's no real estate jurisdiction to the

6   Campstool property.

7   Q.  Are you familiar with the CFIUS case management system

8   public portal?

9   A.  Yes, I am.  In fact, I was one of the consultants that

10  offered advice on how to build it out and to improve its

11  interface as of 2020.

12  Q.  And you have to register to use it; correct?

13  A.  Correct.

14  Q.  And the public portal allows external users to submit

15  filings and interact with CFIUS; correct?

16  A.  If they first establish a -- an account.  It's a rather

17  elaborate process to establish an account.  But I -- yes,

18  that's correct.  Once you have an account, you're able to --

19  to make submissions.

20  Q.  So, for instance, when you were representing clients and

21  making disclosures on their behalf to CFIUS, you could access

22  the portal and the documents that were filed?

23  A.  That's right.

24  Q.  Access is not limited to just owners or transaction

25  parties; correct?

1    A.  That's correct.

2         MS. COLBATH:  I have no further questions.

3         THE COURT:  Thank you.

4         MR. MURPHY:  Nothing further for this witness,

5    Your Honor.

6         And I would ask that he be excused from his subpoena.

7         THE COURT:  Mr. Astuno, you are excused from the

8    subpoena that has produced you on my screen.

9         THE WITNESS:  Thank you, Your Honor.

10        MR. MURPHY:  I think, Mr. Astuno, you can stay and

11   listen or you can go.  I think that's the gist of that.

12        Your Honor, I would call Michael Murphy to testify.

13        THE COURT:  Mr. Murphy, please raise your right hand

14   and be sworn.

15    (Witness sworn.)

16        THE WITNESS:  I do.

17   **MICHAEL MURPHY, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

18                    **BY MR. MURPHY:**

19   Q.  What is your name, please?

20   A.  Michael Murphy.

21   Q.  Do you have personal knowledge of the matters you're

22   testifying to today?

23   A.  Yes, I do.

24   Q.  How are you connected with Plaintiff BCB Cheyenne, LLC,

25   d/b/a Bison Blockchain?

1    A.   I'm one of three founding members of BCB, a team which

2    includes about a dozen individuals, including Cheyenne locals.

3    We all lost our jobs and livelihoods when the defendants

4    breached our agreement with them.

5              This has been an incredibly painful experience for

6    all of us at BCB, especially for our team members with

7    families and young children.  We deserve to be compensated for

8    the good and hard work we did and the tremendous value that we

9    created.

10   Q.   How deep into this are you?

11   A.   I'm about as deep as anyone can be.  I'm all in

12   financially, having invested most of my life savings.  I'm

13   all in emotionally and mentally, as well, for the past

14   three years.

15             This project and now this lawsuit has affected every

16   facet of my life, and now all of this -- everything from the

17   last three years -- is on the line today for me, BCB's team

18   members, and our families.

19             MS. COLBATH:  Your Honor, may I interrupt.

20             Mr. Murphy appears to be reading from something.

21   I -- I would ask that he not have any scripts or -- or answers

22   and that he answers his counsel's questions without the aid of

23   something that we can't all see.

24             MR. MURPHY:  That's inappropriate.  He's answering

25   the question.  It's -- it's clear.  And if he has some notes

1    with which he needs to remember some of the details in this

2    insanely complex matter, he's entitled to use those,

3    Your Honor.

4              MS. COLBATH:  I would ask that they be marked at the

5    appropriate time, then, because he's clearly reading a script.

6              THE COURT:  That would be fair.  It will be marked

7    and provided to you later.

8    BY MR. MURPHY:

9    Q.  Have you provided any affidavits to the Court in this

10   lawsuit?

11   A.  Yes.  I provided three affidavits.

12   Q.  Can you describe your three affidavits from a high-level

13   view?

14   A.  Yes.

15             The merits affidavit identifies evidence which shows,

16   number one, BCB's substantial likelihood of success on its

17   breach of contract claims against MineOne and Terra;

18   number two, BCB's substantial likelihood of success defending

19   against MineOne's and Terra's frivolous counterclaims against

20   BCB.  I should note it's 37 pages and references hundreds of

21   Bates-stamped documents as evidence of my assertions.

22             And then there's the Campstool affidavit, which

23   supports the expert report of Patrick Gahan, BCB's damages

24   expert.  The affidavit documents evidence of all the work BCB

25   did on the Campstool location, both before the DHS agreement

1    with MineOne and during the DHS agreement with MineOne.

2            And I should note that it's over 140 pages, single-

3    spaced, with hundreds of citations of actual emails as

4    evidence to my assertions.

5            And then, lastly, I have an amended emergency motion

6    affidavit, which documents the wild ride of the past 50 days

7    in this lawsuit.

8            It addresses the MineOne-CleanSpark purchase

9    agreement.  It provides an abbreviated overview of several

10   important filings and representations in this case.

11           And, most importantly, it provides the affidavit

12   testimony required by the Wyoming statute required for the

13   granting of a writ, including but not limited to a detailed

14   analysis of how MineOne and its alleged lenders are related

15   parties and how MineOne has devised and is about to implement

16   a scheme to assign, remove, dispose of, or conceal its

17   property with the intent to defraud BCB and that scheme is

18   likely to be carried out as early as tomorrow, based upon the

19   assertions from defendants, if this Court does not intervene.

20           THE COURT REPORTER:  He needs to --

21        (Reporter seeks clarification.)

22   BY MR. MURPHY:

23   Q.  Is the testimony in your three affidavits true and

24   correct?

25   A.  Yes.  Everything is true in my affidavits.

1           THE COURT:  All right.

2    BY MR. MURPHY:

3    Q.  Do you intend for the --

4           THE COURT:  He will need to --

5    BY MR. MURPHY:

6    Q.  Do you --

7           THE COURT:  -- slow down so the reporter can get all

8    that he's reading on the record.

9           MR. MURPHY:  Well said.

10          Well said.  Thank you, Judge.

11   BY MR. MURPHY:

12   Q.  Is the testimony in your three affidavits true and

13   correct?

14   A.  Yes.  Everything is true in my affidavits.

15   Q.  Do you intend for the Court, all counsel, and all parties

16   to rely on your affidavit testimony?

17   A.  Yes, I do.

18   Q.  Do you incorporate your affidavit testimony into your

19   testimony today without repeating or restating everything

20   you've said in your affidavits?

21   A.  Yes, I do.

22   Q.  Tell us, how did BCB come to be involved in this Cheyenne,

23   Wyoming, Bitcoin data center project?

24   A.  In the summer of 2021 the BCB team started researching

25   opportunities to build an enterprise, Bitcoin mining data

1    center, in and around Cheyenne or in and around Wyoming, given

2    my family roots in the state.

3         And to build a Bitcoin mining data center, as was

4    noted earlier, you need a lot of power.  And one of the

5    opportunities we identified where we could procure a lot of

6    power was with Black Hills corporation in Cheyenne.  Black

7    Hills issued a request for proposal for companies to submit

8    their plans for Black Hills' available power.

9         Over 15 companies submitted proposals, and,

10   ultimately, BCB won the RFP and then negotiated a power

11   agreement with Black Hills, which was effective on February 22

12   of 2022.  And that was for 75 megawatts of power across two

13   locations in and around Cheyenne, 45 megawatts at North Range

14   and 30 megawatts at Campstool.  We also had power expansion

15   possibilities at both sites.

16        I think, to get a general sense of the magnitude of

17   this BCIS agreement, it represented at least $150 million of

18   revenue to Black Hills over the five-year term of the

19   agreement based upon the 75 megawatts.  Identifying --

20   identifying this opportunity with Black Hills, winning this

21   RFP, and negotiating the contracts with Black Hills -- which

22   was the first of its kind with Black Hills -- was extremely

23   difficult and time-consuming work.

24   Q.  What else did the BCB team do to develop the Bitcoin data

25   center project in Cheyenne?

1  A.  Tremendous, tremendous amount of additional work.

2        And all of that is evidenced in my merits affidavit.

3  Q.  When did BCB make its initial contact with Rengifo and

4  Dr. Jiaming Li and in what context was that contact made?

5  A.  BCB made contact with Rengifo and Li in March of 2022 in

6  the hopes that one or several of their entities would help

7  finance the project.

8  Q.  Did Rengifo and Li want to finance the project for BCB?

9  A.  Only -- only if they owned and controlled the project.

10  So, given that, BCB made a proposal for Rengifo and Li to --

11  to -- to buy us out.

12  Q.  And how much did BCB ask to be compensated by Rengifo

13  and Li?

14  A.  We asked for an up-front payment of $8.8 million,

15  approximately, which was based on 5 percent of the estimated

16  value of the power contract.  We also indicated we would be

17  willing to finance a purchase over the five-year BCIS contract

18  term in return for 10 percent of -- approximately 10 percent

19  of the value of the contract, which was $17.6 million.

20  Q.  Did BCB discuss any other possible arrangements with

21  Rengifo and Li?

22  A.  Yes.  We mentioned to them that we were interested in

23  learning the Bitcoin mining business and the hosting business

24  and we would consider other arrangements if it allowed an

25  opportunity for us to stay involved in the project.

1   Q.   And how did Rengifo and Li respond to BCB's proposals?

2   A.   They responded by proposing a deal in which BCB would

3   defer payment for its up-front development work, including the

4   BCIS agreement, to Phase 2 of the project, as that would help

5   MineOne get up and running.  Rengifo and Li also promised to

6   provide expert consulting to BCB.

7        And I just want to note when -- when Ms. Colbath

8   makes the claims that BCB never put a dime into this or didn't

9   invest into the project, we invested years of our lives into

10  this project for no compensation.  And I also would just point

11  out that we -- we still have outstanding invoices to MineOne

12  right now.  That -- that is money that we put in.

13       And we also invested a lot of the money that MineOne

14  paid to us, a total of -- MineOne paid $450,000 in Phase 1.

15  We put a lot of that money into the project by paying for

16  BCB's employees.

17       So I just want to say that we put a lot into this

18  project.

19  Q.   Well, what happened next?

20  A.   I -- I then played a -- a role in finalizing a deal

21  between BCB and several entities owned, managed, and

22  affiliated with Rengifo and Li, such that the Rengifo-Li

23  entities would finance, own, and control the entire project.

24       And to finalize that deal I was involved with,

25  number one, negotiating a more favorable BCIS agreement with

1    Black Hills, based on the requirements from Rengifo and Li.

2    BCB then assigned that BCIS agreement to MineOne.  BCB and

3    MineOne then entered into the development, hosting, and

4    services agreement on June 9th of '22.  BCB and MineOne then

5    entered into a side letter regarding the digital mining

6    facilities, right of first refusal, on the same date,

7    June 9th, 2022.  And BCB and Terra Crypto, Inc., entered into

8    the consultancy services agreement on June 9th of 2022.

9            Ultimately, BCB assigned its valuable power contract

10   with BHC and the rest of its up-front development work to

11   MineOne in return for MineOne's promise to compensate BCB in

12   Phase 2 of the project for that up-front work and value.

13   Q.  Did BCB take any actions to protect the value of its

14   up-front development work in the agreements with Rengifo and

15   Li entities?

16   A.  Yes.

17           We did everything we could to protect the value of

18   the up-front work that we assigned to MineOne in the

19   DHS agreement.  Specifically we negotiated provisions into the

20   agreements with MineOne that -- that indicated the following:

21   In the side letter it says that if the facilities are ever

22   sold -- like they are about to be sold right now to

23   CleanSpark -- and if the purchaser no longer required services

24   of BCB in relation to the facilities, then MineOne would pay

25   BCB an amount equal to the net present value of the budgeted

1    amount of hosting fees net of costs and consulting fees

2    therein.

3         Furthermore, there's a provision in the DHS agreement

4    where, in the event of a MineOne event of default, then,

5    ultimately, MineOne would be liable for that -- that same

6    amount.

7    Q.  Mr. Murphy, what is the value of that amount?

8    A.  It is just over $19.4 million as of February 28th, 2024,

9    and that was calculated by BCB's expert witness Patrick Gahan.

10   Q.  Does BCB and do you agree with that amount calculated by

11   Expert Witness Gahan?

12   A.  Absolutely.

13   Q.  Did MineOne ever pay anything for BCB's up-front

14   development work and the valuable BCIS power agreement that

15   BCB assigned to MineOne?

16   A.  No.  MineOne avoided paying for BCB's valuable up-front

17   work when MineOne anticipatorily repudiated the DHS agreement.

18   Q.  Did you provide an affidavit on May 15th of this year in

19   which you addressed the merits of BCB's case and the

20   substantial likelihood of BCC -- BCB's success at trial?

21   A.  Yes, I did.

22   Q.  Do you affirm all of that affidavit testimony today?

23   A.  I do.

24   Q.  Do you have a copy of the DHS agreement with you today?

25   A.  I do.

1  Q.  Can you please screen-share that document with the Court

2  and all of us.

3  A.  I would be happy to.  Let me pull that up.

4  Q.  All right.

5  A.  Here you go.  This is the DHS agreement.

6  Q.  And what's the date of it?

7  A.  It's dated June 9th, 2022.

8  Q.  Is this the core written contract between BCB and MineOne

9  Wyoming Data Center, LLC?

10 A.  Yes, it is.

11 Q.  Who signed the DHS agreement for BCB?

12 A.  Emory Patterson, one of BCB's members.

13 Q.  Who signed it for Wyoming -- MineOne Wyoming Data?

14 A.  Erick Rengifo.

15      MR. MURPHY:  Your Honor, I would move the

16 introduction of this exhibit into evidence.  It's noted as

17 Plaintiff's Exhibit 15.

18      MS. COLBATH:  No objection.

19      THE COURT:  It's received.

20   (Plaintiff's Exhibit 15 received into evidence.)

21 BY MR. MURPHY:

22 Q.  Mr. Murphy, what other written and signed agreements or

23 contracts are there between BCB and MineOne Wyoming Data

24 Center?

25 A.  There is a side letter regarding digital mining

1   facilities, right of first refusal, which we call the side

2   letter, dated June 9th, 2022.

3   Q.  Can you please screen-share that with the Court?

4   A.  Yes, coming right up.

5   Q.  Is that it?

6   A.  This is it.

7   Q.  Who signed this side letter on behalf of BCB?

8   A.  Emory Patterson.

9   Q.  And who signed it on behalf of MineOne Wyoming Data?

10  A.  Erick Rengifo.

11          MR. MURPHY:  Your Honor, I would move the

12  introduction of the side letter into evidence as Plaintiff's

13  Exhibit 16.

14          MS. COLBATH:  No objection.

15          THE COURT:  Received.

16      (Plaintiff's Exhibit 16 received into evidence.)

17  BY MR. MURPHY:

18  Q.  Mr. Murphy, what written and signed agreements or

19  contracts exist between BCB and Terra Crypto, Inc.?

20  A.  The -- there was one contract, the consulting services

21  agreement or CS agreement.

22  Q.  Can you please screen-share that with His Honor?

23  A.  Yes.  I'd be happy to.

24          MR. MURPHY:  I can see it.  Can you?

25          MS. COLBATH:  Yes.

1            MR. MURPHY:  All right.

2    BY MR. MURPHY:

3    Q.  Who signed the CS agreement for each of the parties,

4    Mr. Murphy?

5    A.  Emory Patterson signed on behalf of BCB, and Erick Rengifo

6    signed on behalf of Terra Crypto, Inc.

7            MR. MURPHY:  Your Honor, I would move the

8    introduction of the CS agreement into evidence as Plaintiff's

9    Exhibit 17.

10           MS. COLBATH:  No objection.

11           THE COURT:  It's received.

12       (Plaintiff's Exhibit 17 received into evidence.)

13   BY MR. MURPHY:

14   Q.  Are there any other written agreements or contracts by and

15   between BCB and the MineOne defendants?

16   A.  No, there are not.

17   Q.  Did BCB substantially perform its obligations in the

18   DHS agreement both in Phase 1 and in preparing for Phase 2?

19   A.  Yes, it did.

20   Q.  Did BCB substantially perform its obligations in the

21   CS agreement?

22   A.  Yes, it did.

23   Q.  Do you describe in your merits affidavit all the ways and

24   for all the reasons BCB substantially performed its

25   obligations in the DHS agreement and the CS agreement?

1    A.  Yes, I did.

2    Q.  Do you also describe in your merits affidavit all the ways

3    and for all the reasons known to you how MineOne and Terra

4    failed and/or chose not to honor or meet their obligations to

5    BCB under the DHS agreement, CS agreement, and side letter,

6    which unjustified actions constitute a material breach or

7    material breaches of those agreements?

8    A.  Yes.

9            MS. COLBATH:  Objection, Your Honor; leading here.

10   I wasn't going to object, but with questions of that sort,

11   I've got to protect the record here.

12           THE COURT:  Sustained.

13           MR. MURPHY:  I'll rephrase.

14   BY MR. MURPHY:

15   Q.  Did you also describe in your merits affidavits all the

16   ways how MineOne and Terra failed and/or chose not to honor or

17   meet their obligations to BCB under those agreements?

18   A.  Yes, I (indiscernible) --

19           MS. COLBATH:  And I (indiscernible) --

20   BY MR. MURPHY:

21   Q.  Do you describe in your merits affidavit how, over the

22   course of the project, the following took place:

23           One, that MineOne entered into contracts with

24   multiple vendors to procure vendors' materials, equipments,

25   and/or services?  Two, that several of these vendors did not

1  substantially perform their contractual obligations to

2  MineOne?  And, three, that, in several instances, how MineOne

3  has wrongfully blamed BCB for MineOne's vendors'

4  responsibilities to perform under their respective agreements

5  with MineOne?

6          MS. COLBATH:  Objection; leading.

7          THE COURT:  Sustained.

8  A.  I did.

9  BY MR. MURPHY:

10 Q.  Did you describe in your merits affidavit how each of the

11 parties complied or did not comply with their agreements?

12 A.  Yes, I did.

13 Q.  Mr. Murphy, as you mentioned earlier, the DHS agreement

14 provided for two phases.  Tell His Honor what those phases

15 were.

16 A.  The first phase is called Phase 1, the build and

17 implementation phase, and then there was a Phase 2, the

18 operations and maintenance phase.

19 Q.  Does the DHS agreement identify specific obligations

20 required of BCB during both Phase 1 and Phase 2?

21 A.  Yes.

22 Q.  Regarding Phase 1, what were BCB's obligations and how did

23 BCB substantially perform those Phase 1 obligations?

24 A.  My merits affidavit identifies each of BCB's specific

25 Phase 1 obligations and how BCB substantially performed each

1    of those Phase 1 obligations.

2            My merits affidavit also includes Bates-numbered

3    references to documents and communication to support my

4    assertions of how BCB substantially performed its Phase 1

5    obligations.

6    Q.  Have you prepared an exhibit identifying that?

7    A.  I -- I did, yes.  But I -- I --

8    Q.  Can we -- do we need to even go through that, or can we

9    just move beyond?

10   A.  I think we -- I think we probably need to move beyond with

11   our limited time.

12   Q.  Well, let's move on, then, to Phase 2.

13           Regarding Phase 2 -- BCB's Phase 2 obligations under

14   the DHS agreement -- did BCB perform any of those?

15   A.  MineOne and Terra anticipatorily repudiated the agreements

16   with BCB before Phase 2, and this precluded BCB from

17   fulfilling its Phase 2 obligations; however, BCB had taken

18   steps to prepare for the future fulfillment of its Phase 2

19   obligations.

20   Q.  What were BCB's Phase 2 obligations and what actions did

21   BCB take to prepare for the fulfillment of its Phase 2

22   obligations?

23   A.  My merits affidavit, again, identifies each of BCB's

24   specific Phase 2 obligations and the actions BCB took to

25   prepare for the future fulfillment of those Phase 2

1    obligations.

2            It also includes Bates-numbered references to

3    documents and communications that support my assertions of the

4    steps that BCB took to perform and to prepare for performing

5    of its Phase 2 obligations.

6    Q.   Tell His Honor what happened in early March of 2023.

7    A.   BCB and MineOne were preparing for the upcoming start of

8    Phase 2, and MineOne anticipatorily repudiated the

9    DHS agreement by removing BCB from the role promised to it by

10   MineOne in the DHS agreement.  This meant that BCB would not

11   be receiving significant Phase 2 compensation promised to it

12   in the DHS agreement.

13   Q.   How did Rengifo and Li indicate they were removing BCB

14   from BCB's agreed-upon Phase 2 role?

15   A.   Rengifo and Li communicated this to BCB on multiple

16   occasions.

17           For example, on a March -- on March 7, on a recorded

18   call, Rengifo said, quote, "Our major partner here, Bitmain,

19   doesn't want you, BCB, to be the host and the manager."

20           He goes on to say later in the call "I go directly to

21   the point.  So what they, Bitmain, want is Wiley and team to

22   do the hosting and management."

23           Rengifo later said in the call "So Wiley is going to

24   be in charge.  Wiley and team is going to be in charge of

25   everything that is operations, you know, the miners;

1    everything that is related to the operations.  Everything."

2            And -- and, lastly, Rengifo said "What these guys,

3    Bitmain, want to do is basically you, BCB, out completely."

4            The --

5    Q.  What is -- yeah.  I was just going to ask you what the

6    final and --

7    A.  Yeah.

8            MS. COLBATH:  Your Honor -- objection, Your Honor.

9    He -- this is all hearsay.  He's talking about some tape

10   and --

11           THE WITNESS:  This is a recorded call.  This is a

12   recorded call that has -- we have produced to you.

13           MS. COLBATH:  Play the recorded call and not -- that

14   you -- you're welcome to play the recorded call.  But his

15   recitation is hearsay.

16           THE COURT:  Sustained.

17           MR. MURPHY:  It's not hearsay, Judge, because it's

18   the admission of a party opponent.  By definition it is not

19   hearsay under Rule 801.

20           MS. COLBATH:  He -- he's talking about -- he --

21   Wiley -- Wiley is not connected with any of my clients.

22           MR. MURPHY:  That's so untrue.  I don't even know

23   where to start.

24           THE WITNESS:  We have -- we have evidence.  I just

25   want to note we have evidence where I said Wiley --

 1          MS. COLBATH:  Mr. Murphy, you can't give speeches.

 2   All right?  You've already got -- you've already got your --

 3          MR. MURPHY:  Wait a minute.  You can't give speeches,

 4   either.

 5          MS. COLBATH:  No.  I can make objections.  But the

 6   witness can't.

 7          And I'm objecting that the questions are -- are

 8   eliciting hearsay.  And he's talking about conversations that

 9   are double hearsay, and I'm making an objection.

10          THE COURT:  Sustained.

11   BY MR. MURPHY:

12   Q.  What is the -- what is the final and strongest example of

13   MineOne removing BCB?

14   A.  I -- I'd love to share this because it's irrefutable that

15   it took place.

16          That final and strongest example of MineOne removing

17   BCB and taking over the project was via a March 13 email from

18   Jiaming Li which Rengifo had approved via a Skype message

19   with Li, and it had a proposed no-choice amendment to the

20   DHS agreement and it indicated the following:  One, BCB would

21   not be allowed to operate the North Range site and it would

22   not receive the agreed-upon consideration tied to those

23   services, including the compensation for all of BCB's up-front

24   work to secure the power agreement with Black Hills.

25          Two, BCB would not be allowed to implement or operate

1    the Campstool site.  It would not receive the agreed-upon

2    consideration tied to those services, including the

3    compensation for BCB's up-front work to secure power agreement

4    with Black Hills.

5            Three, BCB would no longer have its right of first

6    refusal or buyout in the event another entity purchased the

7    development, like CleanSpark is currently doing.

8            Four, in return for a much-reduced compensation

9    package, BCB would be expected to perform a much-reduced scope

10   of menial work.

11           Five, BCB could earn additional compensation by

12   assisting MineOne's attorneys in MineOne's claims against

13   third parties and, two, assisting MineOne's secured tax

14   reductions or tax exemptions.

15           Lastly, in order for BCB to receive payment for the

16   $90,000 BCB had invoiced on March 6th of 2023 for Phase 1

17   services BCB had already provided and which Li had promised to

18   pay $45,000 towards on March 13th of '23, BCB would now have

19   to sign the proposed amendment just to receive $40,000, and

20   then it would have to deliver the site to full operational

21   completion to receive the remaining $50,000 for work already

22   completed.

23   Q.  Did anything in particular stand out in Rengifo's and Li's

24   proposed amendment?

25   A.  So many things.

1          One item I'd like to note today is that Rengifo and

2    Li wanted BCB to assist MineOne's attorneys in MineOne's

3    claims against third parties.  And that's because MineOne knew

4    that its other vendors had failed to perform their respective

5    obligations to MineOne.

6          But fast-forward to now.  And because BCB is the only

7    party litigating against MineOne and Terra, the MineOne

8    defendants now claim that everything was BCB's fault.  It is

9    telling that at no time up until BCB filed its lawsuit did

10   Rengifo or Li tell BCB that BCB had committed an event of

11   default and/or breached the DHS agreement.

12          The truth --

13          THE COURT:  Please -- slow down.  Slow down.

14          THE WITNESS:  Sorry.  I get -- I get emotional,

15   Judge, when talking about these things.

16   A.   (Continuing.)  It is telling that at no time up until BCB

17   filed its lawsuit did Rengifo or Li tell BCB that BCB had

18   committed an event of default and/or breached the

19   DHS agreement.

20          The truth is that MineOne wanted BCB to help collect

21   against the vendors who actually failed to meet their

22   obligations to MineOne, one of those -- I think, for

23   example -- being CEGEN.

24   BY MR. MURPHY:

25   Q.   Did Rengifo and Li's proposed amendment seem like a

1   proposal to you?

2   A.  No.  Absolutely not.  It was more like an attempt to

3   extort and force BCB into accepting a reduced role and reduced

4   compensation.

5           Rengifo and Li believed they could force BCB into

6   accepting this reduced role and reduced compensation because

7   they were withholding BCB's earned and invoiced $90,000.

8           In a Skype message to Rengifo on March 3rd, Li said,

9   quote, "BCB will have no option but to accept the proposal for

10  the 45 megawatts," to which Rengifo responded, quote, "Yes,

11  they have no option."

12  Q.  Did BCB notify Rengifo --

13          MS. COLBATH:  Again, Your Honor, objection.

14          The witness is reading and he's referencing documents

15  that haven't been authenticated.  He's not a party to them.

16  And he's just reading a script this entire time.

17          I know that I'm going to be able to get a copy of it

18  before I cross-examine him, but he can't be testifying to

19  documents that haven't been introduced and he's doing it --

20          THE WITNESS:  You introduced --

21          MS. COLBATH:  -- text messages between X and Y that

22  he's not even a party to.

23          MR. MURPHY:  These are Skype messages that your

24  clients produced in discovery.  We're reading from them.

25          MS. COLBATH:  And this is an evidentiary hearing

 1   where you need to authenticate and you can't read hearsay from

 2   a script.

 3           MR. MURPHY:  It's not hearsay, Judge, because these

 4   are the admissions of a party opponent when they're talking to

 5   each other.

 6           The defendants' two principals, Rengifo and --

 7           MS. COLBATH:  No --

 8           MR. MURPHY:  Paula, Paula, Paula.

 9           MS. COLBATH:  Go ahead.

10           MR. MURPHY:  These are -- these are the words in the

11   defendant principals' own Skype messages to each other that

12   Michael Murphy is reading.

13           MS. COLBATH:  Introduce them, then.

14           MR. MURPHY:  They're not hearsay.  I can't even --

15   I can't even finish with you.

16           MS. COLBATH:  Your Honor, they're acknowledging he's

17   reading from a script where he's embedded references to other

18   documents.

19           MR. MURPHY:  No, no, not invented.

20           MS. COLBATH:  What?

21           MR. MURPHY:  That's untrue.  This is your own

22   clients' Skype messages.

23           MS. COLBATH:  I haven't seen the Skype.  I'm entitled

24   to see it.

25           MR. MURPHY:  But you produced them to me.  What --

1    don't tell me you haven't seen them.

2            MS. COLBATH:  Produced?  Then mark it, have it

3    identified, and introduce them.  But he can't testify about a

4    document --

5            MR. MURPHY:  We'll do it later.

6            THE WITNESS:  Paula, see Exhibit 21, pages 46 to 48.

7    This was provided on the 19th.

8            MS. COLBATH:  You don't have to do that.

9            THE WITNESS:  Exhibit 21, pages 46 to 48.

10           MS. COLBATH:  None of this is in evidence.

11           THE WITNESS:  You have it.  It's -- it was Exhibit 21

12   provided on June 19th.

13           MS. COLBATH:  So then your counsel knows what to do.

14   But --

15           MR. MURPHY:  And I would move -- then I'll move its

16   admission as Plaintiff's Exhibit 30 today.

17           MS. COLBATH:  It's Exhibit 30?  I want to --

18           MR. MURPHY:  I'm going to -- I'm going to call it

19   Exhibit 30 because -- just for ease of reference.

20           THE WITNESS:  21, if we want to be precise, Dad.

21           MR. MURPHY:  All right.  Let's call it Exhibit 21.

22           I move the admission of BCB's Exhibit 21 into

23   evidence to prove the truth of what Mr. Murphy just

24   testified to.

25           MS. COLBATH:  I have multiple objections.  Hold on

1    here.  You're moving --

2         MR. MURPHY:  Then let's go to your time and not my

3    time.

4         MS. COLBATH:  Exhibit 21 is a compilation.

5         Okay.

6         MR. MURPHY:  This cannot be counted against my time,

7    this -- this --

8         THE COURT:  No, it's not.

9         MR. MURPHY:  Thank you, Judge.

10        MS. COLBATH:  So Exhibit 21 includes unauthenticated

11   Skype messages.  It includes charts and graphs that were

12   prepared for litigation, a jury, or something of the sort.

13        It includes an affidavit from Mr. Gahan who -- or

14   Mr. Randall -- who's not here to testify.  And if you wanted

15   him to testify, you had to have him present, so I object to

16   the Randall affidavit that is part of 21.

17        There's -- there's documents I have no idea where

18   they originated.  They're charts, BCB on-site -- this is about

19   150 pages of miscellaneous collections.

20        I absolutely object to the admission of Exhibit 21.

21        MR. MURPHY:  Then I -- then we will give you only the

22   page that has the Skype communications that Mr. Murphy just

23   testified to, and we won't introduce the rest of it.

24        MS. COLBATH:  I'd like to have them because, if

25   I want to cross-examine him on those, you need to identify

1    the pages for me.  The exhibit is about is 150 pages.

2              THE WITNESS:  46 to 48.

3              MR. MURPHY:  There you go.  Now -- now --

4              THE WITNESS:  But have --

5              MS. COLBATH:  Wait.  Hold it.  Where are there

6    page numbers?

7              THE WITNESS:  I'm sorry.

8              May -- if the Court allows, I'd like to provide a

9    clarification on this point.

10             MR. MURPHY:  Go ahead.

11             THE WITNESS:  Can I proceed?

12             So, Paula -- Ms. Colbath -- the quote where Li said

13   "BCB will have no option but to accept the proposal for the

14   45 megawatts" and, Rengifo's response, "Yes, they have no

15   option," that was part of Exhibit 6 that we provided to you on

16   June 19th.

17             And that's pages (indiscernible) and then --

18             MS. COLBATH:  Now -- Exhibit 21 --

19             THE COURT REPORTER:  Excuse me.

20         (Reporter seeks clarification.)

21             THE COURT:  I think the reporter --

22             THE WITNESS:  Yes, Exhibit 21 --

23             THE COURT:  We can't report any of this.  You've

24   totally lost the reporter at this point speaking over each

25   other.

 1          MR. MURPHY:  Mr. Murphy, go ahead without any

 2   interruption, yeah.

 3          THE COURT:  I think -- I think if you will offer --

 4   well, first of all, let's take a recess for 15 minutes to give

 5   the reporter a break.  And me a break.  And -- and then we can

 6   resume this.

 7          But, in the meantime, I think you can straighten out

 8   with your client, Mr. Murphy, the specific exhibits that you

 9   wish to offer and what their numbers will be, that they can be

10   displayed or Ms. Colbath will have an opportunity to look at

11   them.

12          MR. MURPHY:  Okay.  Thank you, Your Honor.

13   Thank you.

14          MS. COLBATH:  Your Honor, before the break, could you

15   also require Mr. Murphy to send me his -- the script he's been

16   reading off of so I have the benefit of it during cross?

17          THE COURT:  I think that's fair.

18          MS. COLBATH:  Thank you.

19          THE COURT:  We'll stand in recess.

20          MR. MURPHY:  Oh, last question:  How much time do

21   I have left, Your Honor, if you know?

22          THE COURTROOM DEPUTY:  51 minutes.

23          THE COURT:  51 minutes.

24          MR. MURPHY:  Thank you, Judge.

25      (A recess was taken from 3:08 p.m. to 3:39 p.m.)

1          THE COURT:  I'm informed the parties are ready to

2    proceed in this matter.

3          I don't see Ms. Colbath on my screen -- there she is.

4          MS. COLBATH:  I'm here, Your Honor.

5          THE COURT:  All right.

6          Have you got what you need, Ms. Colbath?  So far.

7          MS. COLBATH:  I do.  I do.  Thank you, Your Honor.

8          THE COURT:  All right.

9          Continue, Mr. Murphy.

10         I'm not sure -- I'm not sure that I'm broadcasting.

11   I'm sorry.

12         MR. MURPHY:  I can hear you, Judge.  This is

13   Pat Murphy.

14         THE COURT:  All right.  I'll let you proceed.

15         MR. MURPHY:  Okay.

16         Your Honor, over the break you had ordered us to send

17   the transcript, and we've done that to opposing counsel.  And

18   I wanted to explain to you and then make an offer.

19         We first sent the defense counsel the direct

20   examination script that Michael Murphy and I have worked up

21   the last few days, and we had carved off a -- a part for

22   rebuttal testimony and didn't send that.  But then we since

23   then said, "Well, let's just give them the whole thing," and

24   I think we've already sent everybody the entire thing.

25         And I would like to offer -- because the defense

1   counsel wants that so much, I would like to offer the long

2   script, everything, into evidence as Plaintiff's

3   Exhibit No. 100 at this time.

4         MS. COLBATH:  I -- I object.  The document is

5   completely unorthodox, that a script would be prepared for a

6   witness to read during testimony.

7         This is -- it -- just looking at it quickly, I would

8   make it akin to something like a demonstrative exhibit where,

9   clearly, the probative value of this as -- as an exhibit and

10   evidence is substantially outweighed by the prejudice.

11         I'd also ask that Mr. Murphy's testimony be stricken

12   up to this point and -- and that he not be permitted to

13   continue to use a script to testify at an evidentiary hearing

14   with answers that he -- Mr. Murphy just conceded they worked

15   on together.

16         MR. MURPHY:  I worked on the questions; he did the

17   answers.  With as much information as we have to cover in

18   the -- the few minutes we have left, it was absolutely needed.

19         THE COURT:  Well, let me --

20         MR. MURPHY:  You can impeach him.

21         THE COURT:  Go ahead.

22         I note there's lots of argument back and forth that

23   you're thinking of, and I appreciate -- and I appreciate what

24   you're doing.  I'm not sure I need to see the script.  I'd

25   rather hear the testimony.

1           But it's clear here we're running out of time.  And

2     Ms. Colbath's going to need adequate time in order to present.

3     I had three matters tomorrow morning scheduled.  I've asked --

4     would like to talk to you to see if we can't continue on

5     tomorrow morning.

6           And I have a full afternoon, as well.

7           But I thought that would certainly afford Ms. Colbath

8     the opportunity to take her time, as well.

9           MR. MURPHY:  Your Honor, if I might -- this is

10    Pat Murphy.

11          I have depositions with Bob Schuster the next

12    two days in Lander.  We've tailored everything to meet

13    Your Honor's order that we get all this done within

14    90 minutes.  That's what I'm fighting and struggling to do.

15          Ms. Colbath has her 90 minutes to use as she wants.

16          I do not -- I'm not able to do it tomorrow.  I --

17    I've got a -- Judge Bluemel in Kemmerer has ordered these

18    depositions to be taken.

19          I can't do this.  I -- we need to finish tonight.

20    And the CleanSpark -- they're trying to close tomorrow.

21          I -- we just -- we need to get this done, with all

22    due respect, in accordance with Your Honor's earlier order.

23          THE COURT:  Okay.  I'll -- I'll try to soldier on

24    with you.  But you better wind it up because we've used about

25    90 minutes already.

1          MR. MURPHY:  But I --

2          MS. COLBATH:  Thank you.

3          MR. MURPHY:  -- I don't think -- I -- well, we've

4   used part of my time, part of her time.

5          You told me that I've got 51 minutes left for my

6   presentation.  I'm ready to roll.

7          THE COURT:  Okay.  Let's go.

8          MR. MURPHY:  Okay.

9   BY MR. MURPHY:

10  Q.  Mr. Murphy, do you understand that BCB must prove various

11  elements by a preponderance of the evidence to demonstrate its

12  entitlement to a prejudgment writ of attachment and

13  garnishment?

14         MS. COLBATH:  Objection, Your Honor; seeks a legal

15  conclusion.  This witness isn't a lawyer, isn't a legal

16  expert.

17         THE COURT:  Sustained.

18  BY MR. MURPHY:

19  Q.  Do you understand that BCB must first show that it is

20  likely to win a judgment on both its claims for relief and the

21  MineOne's defendant counterclaims, as well?

22         MS. COLBATH:  Michael, you're -- you're muted.

23         THE WITNESS:  Thank you, Paula -- Ms. Colbath.

24  A.  Yes, I understand that, Mr. Murphy.

25  ///

1    BY MR. MURPHY:

2    Q.   Are the MineOne defendants indebted to BCB?

3    A.   Yes, they are.

4    Q.   For how much money are the MineOne defendants indebted

5    to BCB?

6    A.   $19,985,667 as of February 28th, 2024, based upon the

7    expert report of Patrick Gahan, BCB's expert witness.

8    Q.   Are there any legal setoffs to this indebtedness?

9    A.   No.

10   Q.   Have the MineOne defendants or any of the defendants paid

11   anything to BCB on this indebtedness?

12   A.   No, they have not.

13   Q.   And what is the nature of the MineOne defendants'

14   indebtedness to BCB?

15   A.   It represents BCB's compensatory damages from MineOne's

16   breaches of its contract with BCB.

17   Q.   Is BCB's requested attachment of the CleanSpark sales

18   proceeds sought to hinder, delay, or defraud any creditor of

19   MineOne?

20   A.   No, it is not.

21   Q.   Have -- has the MineOne defendants' payment of the

22   19,985,667 indebtedness been secured by any mortgage or lien

23   upon the MineOne defendants' real or personal property in the

24   State of Wyoming?

25   A.   No.  It is not secured by a mortgage or a lien.

1  Q.  Are the MineOne defendants about to assign, remove,

2  dispose of, or conceal any of its property with the intent to

3  defraud BCB?

4  A.  Yes.  I detailed this in my June 24th, 2024, amended

5  emergency motion affidavit.

6  Q.  And what amount of the CleanSpark sales proceeds is BCB

7  requesting of the Court?

8  A.  Regarding the Campstool transaction, BCB requests this

9  Court grant writs of attachment on $4,312,729 of the

10 11.25 million related to that property.

11        And related to the North Range transaction, we

12 request $11,216,436.  And as relates to the Black Hills

13 security fund, we request the full $999,111, and that is a

14 total of $16,528,276.

15        MS. COLBATH:  Your Honor, could I get an -- a

16 direction that the witness not continue to use his script and

17 read the answers?

18        MR. MURPHY:  How does he remember those specific

19 numbers without some notes to refresh his memory, Your Honor?

20        MS. COLBATH:  You introduce documents.  You don't

21 read from scripts.

22        MR. MURPHY:  I don't have time to.

23        THE COURT:  I'm going to overrule your objection.

24        If he -- if Mr. Murphy can testify that he cannot

25 remember evidence in this case sufficient to testify without

1   referring to notes, he -- he may do so, but he needs to say

2   when he's using notes to refresh recollection so that

3   Ms. Colbath knows.  Otherwise, if he does remember, he should

4   be testifying without the use of notes.

5          MS. COLBATH:  Your Honor, he -- he's reading

6   verbatim --

7          THE COURT:  And -- and, besides --

8          MS. COLBATH:  Okay.  Yeah.

9          THE COURT:  -- we're doing this --

10          MS. COLBATH:  I understand.

11          THE COURT:  -- without requiring the people from

12   New York to be present here in Cheyenne, Wyoming.  And

13   allowing Mr. Murphy to be up somewhere else because he has

14   depositions with Mr. Schuster and wants to be convenient for

15   Mr. Schuster to take his depositions.

16          So the Court's accommodated.  We're doing this with

17   everybody patiently listening in at great expense on Zoom

18   and -- when they could probably be doing something more

19   productive or present in the courtroom and able to interpose

20   objection.

21          MR. MURPHY:  I'll continue, Your Honor, with your

22   leave.

23   BY MR. MURPHY:

24   Q.  What size of bond, if the Judge grants the writ, is BCB

25   requesting?

1    A.   BCB's requesting a thousand-dollar bond but not more than

2    several thousand dollars.  And that's because there's no

3    damage or loss that would be incurred or supported by MineOne

4    as a result of a wrongful issuance of the writ.

5         The only potential damage that MineOne posits is the

6    potential damage that would result if the writ causes

7    CleanSpark to walk away from the deal, but there's no evidence

8    to indicate that CleanSpark's going to walk away from the deal

9    if the writ is issued.

10   Q.   Let me switch gears to the last area of your direct

11   examination.  And this is about Dr. Rengifo's alleged loans.

12        I need you to tell Judge Johnson if you're qualified

13   to analyze Dr. Rengifo's alleged transactions and whatever

14   supporting documentation the defendants have provided to make

15   that determination.

16   A.   Yes.  I believe I am.

17   Q.   Why -- why do you think you're qualified to do that?

18   A.   I hold bachelor's and master's of accountancy degrees from

19   the University of Notre Dame's Mendoza College of Business,

20   where I graduated number one in each of my respective classes.

21   I've been a certified public accountant and a licensed

22   real estate broker since 2006.

23        I've also worked at the Financial Accounting

24   Standards Board, which is responsible for issuing accounting

25   rules that the Securities and Exchange Commission requires all

1    public companies in the United States to follow.

2           And I would note that one thing that accounting

3    standards attempt to do and which CPAs do when performing

4    accounting work is to account for the economic substance of a

5    transaction, rather than the legal form.

6           And, in the context of Rengifo's alleged transactions

7    or related-party loans, that means I believe I'm qualified to

8    look at Rengifo's assertions and the supporting documentation

9    and then evaluate whether the true economic substance of those

10   transactions matches its legal form, regardless of whatever

11   legal form Rengifo claims for those transactions.

12   Q.  Well, where should this analysis start?

13   A.  It should start with better understanding the entities

14   involved in the transactions and the owners and managers of

15   those entities.

16          And I have an exhibit that I would like to share to

17   help explain this mess of entities that are involved.

18   Q.  Could you please share your screen with that, what we're

19   calling Exhibit 9 for everybody.

20          MS. COLBATH:  Well, hold on.  Let me pull your

21   Exhibit 9.

22          MR. MURPHY:  It's two pages, Paula, and we emailed

23   that to you this morning.

24          MS. COLBATH:  Well, I'm going to -- you -- you

25   emailed this today for the first time?

 1          MR. MURPHY:  No.  You had it last week on our

 2   designation deadline, but we resent it to you today so you'd

 3   have easy access to it.

 4          Let's -- Mr. Murphy, let's continue.

 5   BY MR. MURPHY:

 6   Q.  Can you please explain this proposed Exhibit 9.

 7   A.  Yes.  I'd like to focus on the related-party lenders that

 8   Rengifo discusses in Section 64(b) and 64(c) of his

 9   declaration.

10          The first is Terra Crypto, Inc.  That entity --

11   Rengifo and Li are the only two beneficial owners of Terra.

12   They control Terra; one or both of them serve as management of

13   Terra.  Rengifo signs documents on behalf of Terra.

14          Similarly, Rengifo and Li serve as management of

15   MineOne, as two of three primary decision-makers for that

16   entity.  They control MineOne.  Rengifo and Li are the only

17   two individuals that have been known to sign documents for

18   MineOne.

19          And, as such, I believe Terra Crypto and MineOne are

20   very much related parties.

21          Further, both Rengifo and Li have held management

22   positions at Defendant Bit Origin, an entity which invested

23   $3 million into the project via MineOne Cloud.

24          The next related-party lender I want to talk about --

25   it's actually a grouping of them.  It's Yu & Jing Investments,

1    Oriental Sun Enterprises, and Rising Sun Properties, which

2    Rengifo asserts in his declaration are third parties.

3            These entities are three of four owners of record.

4    They are members of MineOne.  These entities collectively own

5    17 percent of MineOne.  Each of these entities have invested

6    at least a million dollars into MineOne in early 2023.

7            These entities and MineOne are absolutely related

8    parties, contrary to Rengifo's assertion that they are third

9    parties.

10           The next entity I want to look at is BitGeek DT Group

11   Limited, again which Rengifo asserts is a third party.

12           BitGeek was founded by Chong Wang in and around 2019.

13   According to Bit Origin's filings, Chong Wang is the founder

14   of BitGeek.  We think but I can't say with certainty that --

15   we believe Chong Wang is a principal owner and/or management

16   person of BitGeek.

17           Based on accounting records that were disclosed by

18   the defendants in discovery, even though the defendants'

19   amended corporate disclosure statement does not indicate this,

20   BitGeek appears to have invested at least $5 million into

21   MineOne Cloud.

22           Mr. Wang was also the CEO of Defendant Bit Origin for

23   a period of time, and, as I said, that entity invested

24   $3 million into MineOne Cloud.  And, according to MineOne in a

25   disclosure to Bitmain, Mr. Wang is the ultimate beneficial

1    owner of the entire North Range project.

2            And although the defendants will not admit to it nor

3    provide any documents or communications with Mr. Wang, even

4    though we've asked for them, there is evidence that BCB has

5    that shows Mr. Wang is, indeed, one of the three founders and

6    primary decision-makers for MineOne Wyoming.

7            And so, based on that, I believe that BitGeek and

8    MineOne are related parties.

9            And the last one I want to mention is Intellectual

10   International Capital, which, again, Rengifo asserts is a

11   third party.  This entity is solely owned and controlled by

12   Jiaming Li.

13           Starting in March of '23 and for at least 45 days

14   thereafter, this entity made direct payments to multiple

15   vendors of MineOne to satisfy MineOne invoices.  As we

16   mentioned earlier, Li is a management person of MineOne and

17   one of two persons who signs documents on behalf of MineOne.

18           Based on that, Intellectual International Capital is

19   a related party to -- to MineOne.

20   Q.   Did you create Exhibit 9 that the Court is looking at now?

21   A.   Yeah.  Yes, I did.

22   Q.   And is there a second page to Exhibit 9?

23   A.   There -- there is a second page.  Let me just scroll down

24   for us.

25   Q.   All right.  And that shows where all the CleanSpark money

1    would -- would be going under the defendants' proposal; is

2    that right?

3    A.  Yes.  That is what this exhibit shows, how they want to

4    distribute the proceeds from the CleanSpark deal, the

5    remaining assets of MineOne, to alleged related-party lenders

6    and unsecured creditors.

7    Q.  Let's go back to page 1 of Exhibit 9 if you can.

8            You prepared this exhibit.  From what information did

9    you gather to prepare it?

10   A.  I used the defendants' amended corporate disclosure

11   statement that they provided to us.  I've used subpoena

12   information from one of the Terra entities.  We have used

13   accounting records that were produced by the defendants.

14           I believe those were three of the main sources of

15   information.

16   Q.  In other words, is this -- does this exhibit demonstrate

17   what -- information provided by the defendants, not

18   information provided from BCB?

19   A.  Yes.  This is information provided by the defendants.

20   Q.  Okay.  Was it also taken from information provided in

21   Erick Rengifo's May 2024 declaration?

22   A.  Yes.  That information factored into this, as well.

23   Q.  What is the implication of transactions between related

24   parties?

25   A.  According to one authoritative source in the accounting

1   world, the potential problem with a related-party transaction

2   is that the economic substance may differ with its legal form.

3          And according to the Financial Accounting Standards

4   Board, Statement No. 57 -- again, an entity that I used to

5   work for -- "Transaction" -- and it's -- quote, "Transactions

6   involving related parties cannot be presumed to be carried out

7   on an arm's-length basis, as the requisite conditions of

8   competitive free-market dealings may not exist.

9   Representations about transactions with related parties, if

10  made, shall not imply that the related-party transactions were

11  consummated on terms equivalent to those that prevail in an

12  arm's-length transaction unless such representations can be

13  substantiated."

14         Essentially -- that was the end of the quote.

15         Essentially, what this boils down to is this:

16  Substantiation is absolutely critical to verify that the

17  economic substance matches the legal form asserted by Rengifo

18  in his declaration.

19  Q.  Have the defendants provided any substantiation to support

20  their asserted loan transactions?

21  A.  They've -- they provided several loan documents and what

22  they call an asset purchase, and it's like a lease agreement.

23         But beyond that they've only provided scant evidence

24  to substantiate the transactions, even though BCB has asked

25  for contemporaneous communications, additional accounting

1    records, and bank statements.  And personally, if I may, if I

2    were MineOne, I would want to provide this substantiating

3    information to prove the economic substance of the

4    transactions.

5    Q.  As a CPA what factors or characteristics of a debt

6    transaction do you look at when evaluating whether or not it

7    is actually debt as opposed to equity?

8    A.   Several factors.  And I'll run down the list for you real

9    quick.

10          First, whether or not there's a fixed maturity date

11   on the funding, and a lack of fixed maturity date would

12   suggest camouflaged equity.

13          Another one is how the company intends to repay the

14   funding.  For example, knowing that repayment is via the

15   entity's future profits would suggest camouflaged equity.

16          The next is whether or not the funder can enforce

17   payment of principal and interest.  And a company not being

18   required to repay the funder until after the company is

19   profitable, that suggests camouflaged equity.

20          Next is if the funder participates in management.

21   And oftentimes participation in management suggests

22   camouflaged equity.

23          Next is the intent of the funder in the company,

24   and -- and an example there is not following proper procedures

25   and formalities for lending suggests camouflaged equity.

1    Next is underfunding of the company, such that thin

2  or inadequate funding of a company could show that there's

3  camouflaged equity.

4    Next is interest payments.  A funder's lack of

5  concern for interest payments -- for instance, not being paid

6  interest or waiving interest -- that could suggest camouflaged

7  equity.

8    Next is a company's failure to repay the funding on

9  the due date.  And a company who's not repaying the funding by

10  the due date, that could suggest camouflaged equity.

11    Next is the company's ability to procure loans from

12  outside or unrelated sources.  And an inability to obtain

13  funding from an outside source or unrelated source, that could

14  suggest that the funding received is camouflaged equity.

15    And the final one I have for today is the intent of

16  the parties based on the precision or accuracy of any

17  instruments documenting the funding.  For instance, a lack of

18  attention to detail, such as mistakes in the instrument or

19  unsigned instruments, that could suggest camouflaged equity.

20  Q.  Let's begin with your analysis.

21    What's the first related-party lender mentioned by

22  Rengifo?

23  A.  That would be Terra Crypto, Inc.

24  Q.  And what did he say about that in his declaration?

25  A.  He said that, quote, "BCB's delays, improper conduct, and

1    breaches caused MineOne Data to suffer a liquidity shortage

2    due to the delays in getting the site operational.  As a

3    result, MineOne Data borrowed a total of $5,285,701 from

4    Terra" --

5              THE COURT REPORTER:  Excuse me.

6         (Reporter seeks clarification.)

7              THE WITNESS:  Five million -- $5,285,701.

8              THE COURT REPORTER:  Thank you.

9    A.  (Continuing.)  -- "in September 20-" --

10             THE WITNESS:  You're welcome.

11   A.  (Continuing.) -- "in September 2022," end quote.

12   BY MR. MURPHY:

13   Q.  How do you respond to that assertion by Rengifo?

14   A.  I would say that BCB did not cause the delays, BCB did not

15   commit improper conduct, and BCB did not breach any contract

16   with MineOne.  And, further, MineOne did not suffer a

17   liquidity shortage due to BCB.  MineOne suffered a liquidity

18   shortage because it did not have the funds available for the

19   project that it earlier represented to BCB and Black Hills

20   that MineOne said it had.

21             Specifically MineOne provided proof of funds before

22   signing the DHS agreement of just under $21.5 million;

23   however, according to MineOne's own accounting records that

24   they produced in discovery, MineOne had only received just

25   over $8.1 million in investment capital to the end of

1   September 2022 and MineOne had spent approximately

2   $7.7 million by that time.

3          MR. MURPHY:  Your Honor, I would move the

4   introduction of Plaintiff's Exhibit 9 into evidence.

5          MS. COLBATH:  Again, Your Honor it's a demonstrative

6   here that they -- no citations on it where these actual

7   amounts -- they're not included in the exhibit.  He said he

8   referred to our corporate disclosure statement.  You could

9   compare that with this document.

10         And the information is not there, so we would object

11  to the introduction of this litigation-prepared document in

12  evidence.

13         THE COURT:  I'll accept it as a demonstrative.

14     (Plaintiff's Exhibit 9 received into evidence.)

15  BY MR. MURPHY:

16  Q.  Mr. Murphy, can you please go and screen-share your

17  Exhibit No -- Plaintiff's Exhibit 8.

18  A.  Yes.  There you go.

19  Q.  What is the significance of Exhibit 8?  And where did it

20  come from and that kind -- foundation for it?

21  A.  These are general ledger journal entries produced by

22  Defendant MineOne that appears to be their accounting of the

23  transactions on the project from June of 2022 up through the

24  end of April of '23.

25         BCB has -- we were not provided any accounting

1    records after the end of April of '23, but it appears that we

2    have everything from before that.

3    Q.  What is the significance of this document from MineOne as

4    it relates to the -- the related-party loans and transactions?

5    A.  Yeah.

6         As it -- as it relates to what I just spoke about

7    regarding the funding, if you add up the amount of investment

8    that came in in the accounting records up to the point in time

9    Erick Rengifo blames the liquidity shortage on BCB, you'll see

10   that they brought in just over $8.1 million, and then you can

11   see expenditures of approximately $7.7 million.

12        And what I want to call out is -- is that the -- the

13   issue here is MineOne represented and provided documented

14   proof of funds to BCB that it had $21.5 million for this

15   project, yet here we are and Erick is saying that they're

16   running into a liquid shortage due to BCB.  But they only

17   have -- they're only showing accounting records for just over

18   $8 million when they should have had the $21.5 million that

19   was earlier represented.

20        So my point is that there are -- there are liquidity

21   issues here.  And I alluded to earlier this could potentially

22   indicate that there was thin or inadequate funding of the

23   entity.

24   Q.  We know that MineOne says that it had a September 2022

25   bridge loan.  Did they produce the bridge loan documents?

1  A.  No.  No, no bridge loan documents have been produced with

2  Terra Crypto.

3  Q.  Did MineOne or Terra Crypto provide any other

4  substantiation for the September '22 bridge loan?

5  A.  No direct substantiation was provided for that particular

6  loan, no contemporaneous communications, no journal entries in

7  its accounting records for this loan.

8       For instance, in the records I'm sharing on my

9  screen, there's no accounting for any of the things that

10  Dr. Rengifo is describing regarding this bridge loan, and,

11  also, there's no bank statements provided that would show

12  MineOne receiving funds from Terra.

13       I would say this, too:  When MineOne did try to

14  substantiate this loan by providing to BCB loan agreements

15  between Terra and one of its affiliated entities, another

16  entity called Terra Global -- Terra Global owns 100 percent of

17  Terra, and Rengifo signed those loan agreements for both Terra

18  and Terra Global.  He was signing for both sides of the

19  transaction.  I believe that's called a related-party

20  transaction.

21       And those loan documents actually show that there was

22  a loan made in September and then there was a loan made later

23  in December, but, yet, Rengifo's declaration says that MineOne

24  borrowed the just over $5 million from Terra in September.

25  But then there was the second document that's happening in --

1    in December.

2         So the timing of these transactions, it doesn't match

3    what Rengifo has claimed in his declaration.

4    Q.  Have MineOne or Terra done anything to substantiate that

5    proposed lease agreement?

6    A.  So that -- to be clear, what -- what I'm talking about is

7    the September bridge loan.  The lease agreement is the next

8    thing that Rengifo wants to -- he explains in his declaration.

9    So let me -- let me -- let me talk about that real fast.

10        So Rengifo in his declaration --

11        MS. COLBATH:  Objection.  Your Honor, there's no

12   question pending.

13        THE COURT:  Sustained.

14        MR. MURPHY:  There was.  The question is --

15        THE COURT:  Sustained.

16        MR. MURPHY:  I'll ask it again, Your Honor.

17        THE COURT:  Please.

18   BY MR. MURPHY:

19   Q.  Have Mine -- did MineOne or Terra do anything to

20   substantiate this alleged lease agreement?

21   A.  To clarify, Mr. Murphy, what I just had talked about was

22   the bridge -- was September 2022 bridge loan.  The lease

23   agreement I believe you're asking about, that is at the second

24   step of this several-step transaction string that Rengifo

25   talks about in his declaration.

1          And regarding substantiation of that, I'd be happy

2   to -- to answer that question.

3   Q.  Let me pose that question to you.

4          What substantiation, if any, did they provide?

5   A.  Well, Terra produced a lease agreement, which they called

6   a purchase agreement, as an exhibit -- Exhibit 21, actually --

7   for this hearing.

8          And it immediately raises a red flag.  Rengifo and Li

9   signed the lease on behalf of MineOne, but there is no

10  countersignature for Terra.

11          In other words, there -- this is not a fully executed

12  document.  It's not even a full document.  We don't even have

13  a countersignature.  This is sloppy.  And -- and this would

14  not happen in a bona fide, arm's-length, third-party

15  transaction.

16          This is what I would call a lack of precision and --

17  and I believe suggests camouflaged equity.

18          Related to that lease purchase agreement that Rengifo

19  declares in his declaration, he also says that Terra owns the

20  underlying land.  And to that I would say that was true.

21  Terra did purchase the land from MineOne.  That happened on

22  September 19th of 2023.  However, importantly, in MineOne's

23  accounting records which I'm sharing on my screen, there are

24  no journal entries to account for that sales transaction to

25  related-party Terra.

1           I also want to make the comment related to this lease

2    arrangement and substantiation of it that you asked about --

3    Rengifo describes this lease as an unattractive lease

4    arrangement.  And I want to be clear he means unattractive for

5    MineOne.

6           And that is because the next document in this string

7    of documents Rengifo talks about in his declaration is this

8    March 20th DCA agreement, and it indicates in that agreement

9    that MineOne paid Terra $2,843,750 in lease payments from

10   September 14th of 2023 to April 1st of '24.  And, recall,

11   Terra is solely beneficially owned by Rengifo and Li.

12          So -- so, here, Rengifo and Li have benefited from

13   this unattractive lease arrangement to the detriment of

14   MineOne and MineOne's other investors.

15   Q.  Are these genuine loans or bogus loans?

16          MS. COLBATH:  Object to -- object to that.

17          THE COURT:  I would --

18          MS. COLBATH:  And with --

19          THE COURT:  I'll sustain the objection, which is

20   leading.

21   BY MR. MURPHY:

22   Q.  With your accounting experience and your CPA license and

23   evaluating this, how would you characterize these loans that

24   you've been describing to the Court?

25   A.  I would describe them as camouflaged equity.

1          Many of the factors I mentioned earlier regarding

2     evaluating economic substance for its legal form, one can say

3     the legal form of something is this, but, if the economic

4     substance doesn't match that -- which, in this case, most of

5     the factors they don't match -- that analysis then -- it --

6     that -- by performing that analysis, it leads me to the

7     conclusion that these are camouflaged equity amounts.

8          MR. MURPHY:  I would move the introduction of

9     Plaintiff's Exhibit 8 at this time.

10          MS. COLBATH:  No objection.

11          THE COURT:  Exhibit 8 is received.

12     (Plaintiff's Exhibit 8 received into evidence.)

13     BY MR. MURPHY:

14     Q.  Have you analyzed the other loans that the defendants have

15     posited or proffered here in the last month?

16     A.  Yes, I have, Mr. Murphy.  I would say the -- there is --

17     there is still one more loan that -- very importantly, it is

18     now the -- the controlling loan that MineOne and Terra are

19     relying on to try to extract the money out of from MineOne.

20     And that is what they call their DCA, they're saying gives

21     them higher priority than all other creditors other than

22     Antalpha.

23          So before moving on to the other entities, I --

24     I think it would be important for me to share my analysis on

25     this -- this -- basically, there were a lot of transactions

1   alleged between MineOne and Terra.  And they all happened and

2   they happened and they happened, and now, all of a sudden, we

3   get to the DCA agreement, which was very conveniently

4   allegedly signed a mere 1 1/2 months, approximately, before

5   MineOne and CleanSpark entered into the agreement.  It very

6   much appears like a cleanup or summary-type agreement to cover

7   one's trails and cover one's tracks.

8           And in my analysis of this -- which now defense

9   counsel can -- could look at in depth -- and I also outlined

10  this to a T in my -- I detailed it to a T, rather, in my

11  amended emergency motion affidavit -- I go into great detail

12  of mistakes in the agreement.  There's double-dipping that's

13  taking place.  There are dates mentioned that would suggest or

14  indicate that the document was actually manufactured or

15  created after March 20th, the date that -- that Rengifo has

16  declared that it was created.

17          And, again, defense counsel now has all of -- all of

18  those reasons in their hand with my statement.  They also have

19  all those reasons in my -- in my amended emergency motion

20  affidavit.

21  Q.  Let me just jump to light speed.

22          In summary, what is your analysis with respect to

23  this constellation of alleged loans that MineOne has provided

24  the Court with where they say that they are bona fide, genuine

25  loans that must be paid to their creditors ahead of BCB?

1          MS. COLBATH:  Objection; leading, Your Honor.

2          THE COURT:  Overruled.

3          You may answer.

4     A.  I would say the following:  These are related parties.

5          I would also say that MineOne and Terra and all of

6     the other entities -- they have not provided any

7     substantiation for these alleged transactions other than

8     providing documents with no way of knowing what date it was

9     actually signed.  There's no notarization; there's no

10    contemporaneous communications.

11         And when looking at the factors to evaluate economic

12    substance of a transaction, it would suggest that these

13    amounts are -- are camouflaged equity and, as such, any

14    payment to -- to these related parties which are alleged as

15    creditors but which the economic substance would suggest are

16    more akin to equity holders and given the fact that equity

17    holders have a lower priority compared to lenders or secured

18    lenders, it -- to -- it would appear to be an attempt by

19    MineOne to -- to -- to defraud the likely future judgment

20    creditor, BCB.

21         It appears to be an attempt to extract all of the

22    money out of the entity, out of MineOne, to the related

23    parties and the other investors of MineOne to the detriment of

24    BCB so, when BCB wins this lawsuit at trial in January '25,

25    there will be nothing left for BCB to collect.

1   BY MR. MURPHY:

2   Q.  When were those most recent loans allegedly signed?  In

3   relation to the CleanSpark sale.

4   A.  Yes.  So they allege that the DCA between MineOne and

5   Terra was signed on March 20th.  And then there's a series of

6   additional related-party loans that were signed after that

7   point in time.

8           There are the MineOne member loans, the Yu & Jing,

9   the Rising Sun; there's one other entity which I've already

10  mentioned.  Those, I believe, were on the 23rd or 24th --

11  I'm sorry.

12          THE WITNESS:  I'm sorry, Ms. Colbath, but I'm no

13  longer looking at my notes, so I can't speak to the specific

14  dates.

15  A.  (Continuing.)  That was the 23rd or 24th.  That's a

16  mere -- what is that? -- two weeks, 15 days before the

17  CleanSpark deal was announced.  I would guess that MineOne was

18  aware they were negotiating with CleanSpark at that point in

19  time when they decided, "Oh, we need to go clean up all of our

20  loans and put documentation in place."

21          And I would mention this regarding those MineOne

22  member loans:  The point in time when those entities actually

23  put the money into MineOne, no -- no loan documents were

24  produced from that point in time.  There -- and the reason for

25  that is because there were probably no loan documents.  These

1    are documented owners, members of MineOne, putting money into

2    the entity, and there's likely no documentation at the time to

3    document the loan.

4           And a lender -- a true lender, a lender who cares

5    about preserving the principal that they're putting into a

6    company more so than about the future profits of an entity,

7    that entity -- the lender is going to make sure that proper

8    formalities are covered to document their loan.

9           I should also mention on some of these loans I'm

10   talking about there's no interest even included.  The loan

11   documents that were produced, the cleanup loan documents that

12   were produced, they said that the interest is waived.  A

13   typical lender doesn't waive interest because -- what's the

14   point of lending and doing a loan if you're not going to get

15   interest from that transaction?

16   Q.  In addition to what you've been describing, do the MineOne

17   parties assert that MineOne also owes money to Bitmain Georgia

18   for 2,571,000, to Systems Mechanical for 303,675, and to

19   MineOne's attorneys for over 1.5 million?

20   A.  Yes, they do.

21   Q.  Have they provided any substantiation for those amounts or

22   those alleged loans or debts?

23   A.  Very, very little information.

24          As it regards to Bitmain, they pointed us to the

25   surface framework agreement where there's a clause that says

1    here's how much of a prepayment or a security that Bitmain

2    Georgia needs to give to MineOne.

3          And I can tell you that the amount mentioned in the

4    SF agreement -- guess what?  It actually does match what's in

5    the accounting records.  It's one of the few transactions that

6    match; however, that amount -- which, again, I don't have my

7    notes; I'm not reading from them anymore -- I believe it was

8    around -- around 1.9 million, give or take.  I can tell you it

9    was the exact amount if I was reading from my notes.

10          But that 1.9 million, it doesn't match up with the

11    approximately 2.571 million that Rengifo now declares is owed

12    to Bitmain Georgia.  And here's the thing:  There's no other

13    documentation provided by -- by MineOne to explain the

14    difference -- explain those two amounts.

15          An auditor -- an accountant, an auditor, a CPA would

16    say "You know what?  I can't just take your word for these

17    things," especially with all of the related parties taking

18    place.  They want to see statements; they want to see

19    invoices; they want to see money moving back and forth to

20    substantiate, to verify that these are things that have

21    actually taken place.

22          I'm unable to verify that these things have taken

23    place based on the very little information that's been

24    provided.

25    Q.  Did you find any evidence in the documents provided by

1    MineOne that they were willing to backdate documents?

2    A.  I did.  Yes.

3          There are communications that we have received in

4    discovery from Mine- -- from MineOne where it indicates that

5    there is a tendency, a proclivity by the defendants to -- when

6    it suits their interests -- to backdate documents to what

7    serves their interests the best.

8          THE WITNESS:  And, Ms. Colbath, if you'd like that

9    reference, I believe it's -- it's -- it's in the script that

10   we sent over to you.  So you can go find that and see exactly

11   what I'm talking about.

12   BY MR. MURPHY:

13   Q.  Let me jump to one last thing before I call time-out on

14   myself and save the rest for rebuttal.

15          I want to move forward quickly to the CFIUS

16   allegation that was first raised on May 17th in the status

17   conference to the Court?  You're aware that there -- MineOne

18   seeks to blame BCB for not getting that CFIUS approval?

19   A.  Yes, I am aware of that, that alleged claim.

20   Q.  You heard Mr. Astuno testify today that that was not BCB's

21   responsibility but, rather, MineOne's?

22   A.  I did hear that.

23   Q.  What's BCB's response to MineOne's allegation and

24   criticism of BCB for not seeking that approval with CFIUS?

25   A.  I -- I think there's a couple of things I would say to

 1   that.

 2          The first is it's -- it's totally untrue.  This was

 3   never an obligation of BCB.  And I will give you some facts of

 4   what actually played out.

 5          The first time we ever -- BCB, that is -- the first

 6   time BCB ever heard of CFIUS on the project was in a

 7   November 7th email from Betsey Hale at -- at Cheyenne LEADS.

 8   And in this email Betsey provided the report composed up by

 9   Microsoft that it had indicated it was providing to CFIUS.

10          And she said, "Hey, you know, heads-up; there's this

11   report out there, this public document.  You guys might want

12   to be aware of it."

13          Less than 20 minutes after receiving that email, one

14   of BCB's team members, Neil Phippen, reached out to Rengifo on

15   a messaging platform called WhatsApp, and we had a

16   conversation over there, back and forth, on WhatsApp.

17          The defendants have produced that conversation and --

18   I'm just scrolling through my notes right now so I can give

19   you an exact quote of -- of what was said in that -- here it

20   is.  I found it.

21          It says -- so, again, BCB notified immediately

22   Rengifo of this CFIUS situation that Betsey Hale had said.

23   And in that conversation Rengifo said "We are already working

24   on this."  And then he also goes on to say that he had --

25   MineOne had "coordinated with all legal to take immediate

1    action."

2         And guess what?  After that nothing was ever said

3    about CFIUS to BCB.  MineOne never asked BCB to do anything

4    regarding CFIUS.  The next time I heard anything about CFIUS

5    was on May 13th in the Presidential divestment order.

6         And I will say this:  If MineOne had ever asked BCB

7    to help with CFIUS, to do a filing with CFIUS -- to the extent

8    that BCB even could have done a filing with CFIUS, as -- as

9    Andy Astuno testified earlier -- if -- if BCB could have

10   helped in some way, it absolutely would have.  But MineOne

11   never asked BCB to do anything regarding CFIUS.

12   Q.  Last question at this point.

13        In BCB's mind and in -- and as you -- as BCB

14   perceives everything the way they stand right now, what will

15   happen if the Court does not grant writs of attachment and

16   garnishment on these 18-plus million dollars of CleanSpark

17   funds?

18        MS. COLBATH:  Objection, Your Honor; totally

19   speculative.

20        THE WITNESS:  I'm going to answer based on evidence.

21        THE COURT:  You may answer.

22        MR. MURPHY:  Go ahead.

23   A.  Again, I'm not reading from notes so I can't give you

24   specific quotes or specific filings, but I recall that there

25   was a filing within the last week or two where the defendants

1  represented that the -- Campstool could -- could close as soon

2  as Jan- -- June 27th.  Tomorrow.

3          And I -- I can tell you this:  We have evidence -- we

4  have hard, actual evidence that as late as June 4th CleanSpark

5  was pushing to close on June 6th at the same time the

6  defendants were saying "No emergency in site."  MineOne was

7  trying to close before the originally scheduled June 7th

8  hearing.

9          And in that email from CleanSpark that was produced

10 as part of a subpoena from Republic Title of Texas, the

11 general counsel for CleanSpark says something along these

12 lines -- again, I don't have my notes in front of me -- he

13 says something like "We must do whatever it takes to close."

14         CleanSpark wants to close.  They want to close.  The

15 defendants have said CleanSpark wants to close so they can

16 build the site out before the ground freezes.  That's a

17 legitimate concern.  Having been involved in the project, it

18 gets harder when the ground freezes.  You want to close these

19 things quickly to start doing the work to build the site as

20 quickly as possible.

21         So I can't guarantee the thing is going to close, but

22 all of the evidence shows -- based upon the statements of

23 CleanSpark, based upon what defendants have represented --

24 that there's a high likelihood that this could close tomorrow,

25 and I take their word for it that it very well may close.

1      And so, Mr. Murphy, to answer your question, what --

2    what I am concerned about, what BCB is concerned about, is,

3    without the action of this Court here today granting these

4    requested writs, that MineOne and CleanSpark will close at

5    least the Campstool transaction tomorrow and then likely

6    proceed to do exactly what Rengifo has indicated in his

7    declaration, and that is to pay around $4.3 million to these

8    related parties based upon the legal form of documents, which

9    are not substantiated or supported by any of the economic

10   substance.

11   BY MR. MURPHY:

12   Q.  And will any of the North Range money ever go to BCB if

13   MineOne has its way and the Court does not issue any writs?

14   A.  No.  No.  Because MineOne has plans for that other money,

15   as well, to other related-party lenders and other unsecured

16   creditors.

17       And I would just say that the defendants have not

18   been forthcoming with the status of that transaction.  And one

19   of the reasons why I chose to specifically address what

20   Ms. Colbath said earlier around BCB saying things in its

21   emergency motion or maybe not saying the right thing -- part

22   of the problem is defendants have not been transparent with

23   what's been happening.

24       BCB has had to subpoena third parties to learn

25   information about what has been going on behind their backs.

1    And so we have no idea right now what's happening with CFIUS

2    and MineOne on North Range and if that deal could close

3    tomorrow or that deal still needs another week or two due to

4    CFIUS -- we don't know if CFIUS is going to require all the

5    buildings to be removed or not.  It -- that is a giant

6    question mark.

7            But what I can tell you is that Rengifo has indicated

8    in his declaration that, when that deal closes, assuming it

9    closes -- which I'm pretty sure it's going to have to close

10   because President Biden has said this has to happen.

11           When that happens, without a writ in place MineOne is

12   going to distribute that money according to how Rengifo said

13   they were going to do it, and -- and BCB is not on that list.

14           And then there goes all the remaining assets of

15   MineOne.  And BCB -- we will be fighting here for the next

16   seven or eight months, we will go to trial, and, if we win at

17   trial, there will be nothing left to collect on.

18           And that -- that's a difficult thing to face after

19   the many years on this project, all of the time, the blood,

20   the sweat, the tears, as well as now all of the legal costs

21   that we have incurred.

22           MR. MURPHY:  Your Honor, I have nothing else for

23   Mr. Murphy at this time and like -- would like to reserve the

24   rest of my time to perhaps call him back in rebuttal.

25           MS. COLBATH:  Could we get from the court reporter --

1    my office is telling me that you've exhausted your time.

2            MR. MURPHY:  That's not what I'm hearing.  Let's get

3    if from the -- from the Court.

4            MS. COLBATH:  Exactly.  That's why I'm asking, Pat.

5            THE COURT:  7 minutes 12 seconds.

6            MS. COLBATH:  And --

7            MR. MURPHY:  We --

8            MS. COLBATH:  -- I have -- so that I can allocate my

9    time for my direct, I have how much left?

10           THE COURT:  You have an hour and a half.

11           MS. COLBATH:  An hour and a half.  That's what

12   I thought.

13           MR. MURPHY:  We can -- what -- excuse me.

14           What about all that time that we had in the

15   objections that was being -- that the Court said was being

16   credited to Paula, not me?

17           MS. COLBATH:  That's --

18           THE COURT:  We subtracted it.

19           MS. COLBATH:  Yes.  Okay.

20           MR. MURPHY:  Did we only -- each party only gets

21   90 minutes to start with.  There -- it should be something

22   less than 90 minutes, I would think.

23           MS. COLBATH:  It's -- let's work on it at a break.

24   So --

25           MR. MURPHY:  I thought it was -- 72 minutes left is

1  what we've calculated it to be.  That's why I asked.

2         MS. COLBATH:  I have more than 72.

3                    **CROSS-EXAMINATION**

4                    **BY MS. COLBATH:**

5  Q.  Okay.  Mr. Murphy, you have reviewed all of the exhibits

6  that were designated by the defendants; correct?

7  A.  I have reviewed the -- it was Exhibits 1 through 30, which

8  I -- I believe later may have been -- someone said that one

9  of -- like one of them was missing and so then they got

10 renumbered 1 through 29.

11        I have -- I have --

12 Q.  I'm going to stop you because we have a lot of time

13 constraints.

14        And the question was simply have you reviewed all of

15 the exhibits designated by the defendants.  Yes or no, please.

16        MR. MURPHY:  Does that mean 1 through 46, or does it

17 mean 1 through 30?

18        MS. COLBATH:  That means all the exhibits that were

19 designated.

20        MR. MURPHY:  That means 1 through 46, Michael.

21        THE WITNESS:  I was -- I was trying to clarify that.

22 A.  I have reviewed 1 through 29.  I have not reviewed the

23 late exhibits that were provided after the June 19th cutoff

24 date.

25 ///

1    BY MS. COLBATH:

2    Q.   Okay.  And the June 9th [sic] cutoff date was pursuant to

3    an order where the Judge directed the parties to designate

4    anticipated exhibits; correct?  Did you review his order?

5    A.   I -- I -- I -- I was informed by my attorney that we

6    needed to -- all parties were required to produce all of the

7    exhibits by that night, and I stayed up and nearly pulled an

8    all-nighter the night before and worked very late in the night

9    on the night of June 19th to produce all of BCB's exhibits.

10        I was under the impression that that was the

11   drop-dead cutoff date for exhibits.  If I'm mistaken, then --

12   then I -- I apologize.

13   BY MS. COLBATH:

14   Q.   So then, sir, you did not review the promissory notes

15   underlying the Terra bridge loan; correct?

16   A.   Those were part of the first -- those were part of

17   Exhibits 1 through -- originally 1 through 30 but now,

18   I believe, 1 through 29.

19   Q.   So when you said that there was no substantiation for the

20   Terra bridge loan, you recognize that there were promissory

21   notes; correct?

22   A.   So to -- I -- sorry to correct you, Ms. Colbath.

23        But I actually did discuss the loan agreements

24   between Terra Crypto and Terra Global, and I indicated that

25   MineOne has attempted to substantiate the September 22 bridge

1    loan by providing loans between an entirely different party,

2    albeit a related party.

3    Q.  Okay.  Now, you testified at the beginning of your

4    testimony that you were all in financially.

5             Do you recall that?

6    A.  Yes.  I am all in financially.

7    Q.  Okay.  And can you tell me approximately, as best you

8    can -- I recognize you don't have a script for these

9    questions -- how much BCB contributed in dollars to the

10   construction of the North Range facility?

11   A.  I can take a stab at this one.

12   Q.  I'm looking for a dollar amount, sir.

13   A.  Yes.  So I would have to clarify, first, the definition of

14   "construction" because, from an accounting standpoint, when

15   I look at it oftentimes -- work that is performed by vendors,

16   oftentimes that's capitalized as part of a project's cost to

17   be able to then be expensed over time.

18             And so, if you're asking me what did BCB contribute

19   to the -- the construction of the buildings, well, I can tell

20   you that BCB was paid $450,000 in Phase 1, and a substantial

21   portion of that $450,000 was paid to BCB's employees to be on

22   the site and to participate in the building of the site.

23             So BCB -- in my eyes, it spent its money to

24   contribute to the capital assets that MineOne would have on

25   its books.

1    Q.  Sir, in -- in Phase 1 of the project the MineOne parties

2    paid BCB $450,000; correct?

3    A.  They did.

4    Q.  Now, did BCB contribute a dime to the construction of the

5    facilities at the North Range?  And I'm not referring to money

6    that MineOne paid to third parties.  I want to know what came

7    out of BCB's bank account for the construction of the site.

8    A.  Yes.  There is an amount, Ms. Colbath.  So when -- when

9    MineOne -- when -- has falsely alleged that there are no

10   remaining invoices or reimbursements that have not been

11   covered back to BCB, well, there is an invoice for $12,000, a

12   portion of which was related to the North Range project where

13   MineOne did not reimburse BCB for expenses that BCB fronted

14   for MineOne.

15          So to answer your question, yeah, BCB did pay money

16   for things related to the North Range project out of pocket

17   that it was not reimbursed for.  So BCB has spent money.

18   Q.  How much?

19   A.  I -- I cannot recall off the top of my head.  I -- I have

20   to go back and look at -- at accounting records and statements

21   to get you a -- a number on that.

22   Q.  Okay.  At some point in March of 2023 BCB left the

23   North Range site; correct?

24   A.  BCB demobilized from the project after MineOne breached

25   its contract.

1    Q.  So, sir, in March of 2023 BCB picked up and left the

2    North Range site; right?

3              MR. MURPHY:  Objection; duplicative, repetitive,

4    argumentative.  Misstates the witness' testimony.

5              MS. COLBATH:  I asked a simple yes-or-no question.

6    The witness did not answer it.  And so I'm asking it again.

7    A.  Ms. Colbath, in -- in March of '23, after BCB had just

8    worked for two months without being paid and -- when having

9    asked for payment and invoicing MineOne for payment -- and

10   MineOne refused to make that $90,000 payment and then having

11   been informed that Wylie's team had replaced us in Phase 2 and

12   we'd been relegated to menial work in Phase 2 and we weren't

13   going to get any money from Campstool -- with all of that laid

14   out in front of us, BCB decided -- and realized that its

15   contract had been breached and we weren't getting paid and

16   that MineOne had positioned this amendment in a -- making a

17   no-choice option.

18             So BCB -- what we did -- you may call it walked off

19   the site or left the project or whatever you may have it.

20             But after the contract was breached, BCB informed

21   MineOne the contract was breached, and then we left the

22   project, as you said.  I like to think of it as we

23   demobilized.  But we didn't stop working on the project at

24   that point.

25             BCB then sent over 30, maybe 35 emails to MineOne's

1  vendors, letting them know that BCB had demobilized -- it put

2  both MineOne representatives and the vendors on the same

3  email.  In some of the emails it mentioned, "Hey, here's how

4  much is owing."  It let everybody know about the transition.

5        And I can tell you this:  The night we breached or --

6  I'm sorry.  The night -- let me clarify.

7        The night Mine- -- the day that MineOne -- the day

8  MineOne breached on March 15th -- no; I'm sorry -- on the 13th

9  and then BCB left the site on the 15th, when we filed the

10  Chancery Court lawsuit -- I can tell you on that night

11  I stayed up until 3:30 or 4:00 in the morning drafting an

12  email to Black Hills and to MineOne explaining everything that

13  needed to happen to move forward with the project.

14        So when you make claims or when the defendants make

15  claims that we just left the project and walked away, that is

16  wholly false because I can tell you -- I still remember

17  standing --

18        MS. COLBATH:  Your Honor, I -- this is not

19  acceptable.  I have to cut the witness off because he's

20  filibustering to use up my time.

21        I'm being very careful to -- to ask him very direct,

22  almost yes-or-no questions, and he's just using it as a

23  platform to wind out my clock and it's inappropriate.

24        I would ask you to caution the witness to answer the

25  question or say he can't.

1            THE COURT:  Okay.

2            Listen to the question carefully.  And then answer it.

3            MS. COLBATH:  Okay.

4    BY MS. COLBATH:

5    Q.  I think you just said you left the site on March 15th,

6    2024.  Correct?

7            MR. MURPHY:  Not 2024.  Misstates the evidence.

8            MS. COLBATH:  I -- I stand corrected.

9            March 15, 2023.

10   A.  BCB demobilized from the site on that date but with the

11   qualifications that I have presented.

12   BY MS. COLBATH:

13   Q.  Now, you -- during direct you looked at what was marked as

14   Plaintiff's Exhibit 15, the development, hosting, and services

15   agreement.

16            Do you recall that?

17   A.  Yes.  I -- I do recall --

18   Q.  Was (indiscernible) the agreement --

19            THE COURT REPORTER:  I didn't hear the question.

20       (Reporter seeks clarification.)

21            THE WITNESS:  I'm sorry.  What?

22   BY MS. COLBATH:

23   Q.  Are you familiar with the agreement?

24   A.  Yes.  Yes.  I don't have it memorized but I am . . .

25   Q.  And in paragraph 6.2 of what's been marked as Plaintiff's

1    Exhibit 15 is set forth BCB's Phase 1 obligations; correct?

2    A.   Let me -- I'm pulling it up right now so I can go to

3    Section 6.2.  Please bear with me just -- I don't have all the

4    sections memorized yet.  You would think that I would after

5    all of this litigation.

6            Okay.  I'm on 6.2 of the DHS agreement.

7    Q.   And 6.2(b) required BCB to obtain, quote, "all permits and

8    licenses, including construction permits for buildings and the

9    facilities' electric infrastructure, environmental licenses

10   and permits, operations permits, and licenses (including legal

11   and other) required or recommended to comply with applicable

12   law and regulation"; correct?

13   A.   That is what it states, correct.

14   Q.   Okay.  And subparagraph (d), BCB was required to perform,

15   quote, "all other reasonable related activities within the --

16   within its control to enable MineOne and other users of the

17   facilities to conduct digital currency mining activities in a

18   proper and timely manner to ensure that CFCO occurs not later

19   than 31 October 2022."

20           Was that that part of BCB's responsibilities at the

21   North Range?

22   A.   Yes.  Those were part of BCB's responsibilities.

23   Q.   Okay.

24   A.   Thank you for quoting the actual contractual language.

25   Q.   And -- and the reference to CFCO required that BCB have

1    the site -- "commencement of full commercial operation";

2    correct?

3    A.   I -- I believe that is what "CFCO" means but --

4    Q.   Okay.

5    A.   -- so my --

6    Q.   Thank you.  Thank you.

7            MR. MURPHY:  No, don't cut him off.

8            Your Honor, I object to her cutting off the witness.

9            THE COURT:  Overruled.  It was a yes-or-no question.

10   BY MS. COLBATH:

11   Q.   And --

12   A.   Yes.  CFCO --

13   Q.   And that commencement of full commercial operation meant

14   the utilization of 98 percent of the maximum available power

15   at the North Range facility; correct?

16   A.   I'm -- where is that defined at, Ms. Colbath?

17   Q.   It's in paragraph 5.1.

18   A.   Yes.  That is what the words of the contract say.

19   Q.   Okay.  Now, you'll agree with me that the North Range site

20   was intended to have 10 modular data centers built on it;

21   correct?

22   A.   That is correct.

23            According to the -- MineOne's agreement with CEGEN.

24   Q.   Okay.  Now, as of March 31, 2022, was there even one

25   modular data center that was operational?

1   A.  On --

2           MR. MURPHY:  Pardon me --

3   A.  (Continuing.)  -- on March 31?

4   BY MS. COLBATH:

5   Q.  On the -- on October 31, 2022, the deadline set forth in

6   your contract with MineOne, was there even one modular data

7   center that was operational?

8   A.  No.  There were not.  And it was very frustrating --

9   Q.  That was enough.  You've answered it.

10          Now, on November 30th, 2022, of the 10 modular data

11  centers that were supposed to be operational by October 31,

12  2022, did you have 1 that was operational?

13  A.  I -- no.  I don't believe any were operational on that

14  date.

15  Q.  And come December -- we're now two months after the

16  deadline set forth in paragraph 6.2(d) for you, BCB, to have

17  the site "fully commercially operational" -- was there even

18  1 of the 10 modular data centers operational?

19  A.  No, there were not.

20  Q.  Okay.  And that was the case come January 31; right?

21  Still none?

22  A.  Paula, you're absolutely right.  None of them were

23  operational at the time.

24  Q.  -- (indiscernible) three --

25  A.  You are right.  Yes, none of them.

1              What's your point?

2    Q.  Okay.  And there should have been -- under the contract,

3    by October 31, 2022, there should have been 10 that were

4    operational; correct?

5    A.  That is what MineOne wanted so long as BCB

6    (indiscernible) -- stayed within--

7    Q.  That's what the contract provides, sir.  Correct?

8    A.  The -- the con- -- the contract -- I -- I refer back to

9    the --

10   Q.  According to (d), sir.

11   A.  I refer to the contract in BCB's actual contractual

12   obligations, to do things within its control to deliver by

13   that date.

14              I -- I -- I -- I believe -- and I feel that I have

15   to --

16   Q.  No, I'm not asking what you believe.  These are yes -- yes

17   or nos, and I -- we've just got to be conservative with the

18   time.

19              Now, you've acknowledged you walked off or left the

20   site on March 15th, 2023; correct?

21   A.  BCB demobilized on March 15th.

22   Q.  And as of the day you packed up all the computers and your

23   papers from the trailer that was on the construction site,

24   there wasn't one modular data center that was operational;

25   correct?

1    A.   They were not operational by that date.

2    Q.   Okay.  Now, did BCB -- you or anyone at BCB -- ever make a

3    disclosure to the Committee on Foreign Investment concerning

4    MineOne's acquisition of land in Cheyenne, New York [sic]?

5    A.   No.  MineOne never asked us to do that.

6    Q.   Now . . . did anyone at BCB ever make disclosure to the

7    Committee on Finance -- the Committee on Foreign Investment in

8    the US regarding the MineOne parties' plans to build a digital

9    currency mining facility?

10   A.   No, BCB did not do that.

11   Q.   At any time prior to the date that you commenced your

12   first lawsuit in Chancery Court, did anyone at BCB contact

13   Mr. Astuno, the CFIUS expert who testified today who was your

14   brother's roommate?

15   A.   I'm sorry.  What were the -- the dates and the timing on

16   that question?

17   Q.   Prior to the date that you commenced your Chancery Court

18   proceeding in March of 2023, did you or anyone at BCB contact

19   your brother's roommate, Mr. Astuno, the -- the CFIUS expert

20   from today?

21   A.   No, ma'am, we did -- we did not.

22   Q.   Okay.  Now, initially, you had discussions with the

23   MineOne parties that you could actually complete the

24   construction by August of 2022; correct?

25   A.   Those were preliminary timelines based on information

 1    available at the time.

 2    Q.  Yes.  So the answer is, "Yes, we had conversations with

 3    MineOne very early on that we could actually complete the

 4    construction by August of 2022"; correct?

 5              MR. MURPHY:  Objection.  It's argumentative, it's

 6    duplicative, and it misstates slightly the witness' testimony.

 7              It's not -- it's not even a question.  It's just a

 8    speech at the end of an answer.  I object.

 9    BY MS. COLBATH:

10    Q.  So in --

11              THE COURT:  It's cross-examination.

12    BY MS. COLBATH:

13    Q.  -- 2022 --

14              MS. COLBATH:  I'm rephrasing it.

15    BY MS. COLBATH:

16    Q.  Sir, in early 2022 did you have conversations with

17    representatives of the MineOne parties that BCB could complete

18    construction of the 10 modular centers by August of 2022?

19    A.  It was a preliminary target date based on information

20    available at the time when there were no agreements even

21    signed.  We didn't even know at that point in time if

22    agreements would get signed.

23              No contractors or vendors had been --

24    Q.  No question pending.

25              Now, since BCB walked off the project in March of

1   2023, has BCB received any revenues from any source?

2   A.  Let me think about that.

3          No.  I don't believe we have.

4   Q.  And you -- you've reviewed, sir, the counterclaims that

5   have been asserted by the MineOne parties against BCB?

6   A.  I -- yes.  I believe I have.  But they're not all fresh in

7   my mind right now.

8   Q.  Okay.  And you've reviewed the initial disclosures that

9   were filed by the MineOne parties setting forth the damages

10  that they seek in respect to those counterclaims from BCB?

11  A.  I -- I believe you're referring to the totally bogus and

12  overstated and -- and -- and . . . statements with no basis or

13  evidence whatsoever, I think -- yes.  If that's what you're

14  referring to, then, yes, I did review that.

15         And I -- frankly, I laughed at it because it was so

16  ridiculous and outlandish, the numbers that MineOne was

17  claiming for damages.

18  Q.  And when the MineOne parties obtain their judgment against

19  BCB, what financial assets does BCB own to satisfy that

20  ultimate judgment?

21  A.  BCB currently -- we have very little assets because all

22  the work that we did before the DHS agreement to get the power

23  contract, all the development work of the project, that all

24  got deferred to Phase 2 and, you know, we got breached.

25         Your -- your clients breached on us, and we never got

1  any of the money that we had worked for so hard to get.  So,

2  because of that, we -- we don't really have much money left,

3  Ms. Colbath.

4  Q.  Well, you were -- you were paid $450,000 for your efforts

5  from June 2022 through the day you walked off the North Range

6  site; correct?

7  A.  Yes.  MineOne did pay $450,000 for Phase 1.

8  Q.  And -- and you never issued any type of default notice to

9  the MineOne parties under the -- the development, hosting, and

10  services contract; correct?

11  A.  We did not issue a default notice because an event -- we

12  don't believe an event of default took place.

13        This was an anticipatory repudiation, a breach of

14  contract.  I don't believe there was an event of default that

15  specifically spoke to that.

16  Q.  You don't have a law degree, do you?

17  A.  No.  No, ma'am, I do not.

18  Q.  Okay.  Because today probably a dozen times you've used

19  the expression "anticipatory repudiation."

20        What -- what do you understand that to mean in a

21  legal sense?

22  A.  It's when one party takes an action that -- that

23  frustrates or prevents the other party from performing its

24  contractual duties as part of a contract.

25        And that's what we believe MineOne did, is they took

1    action to repu- --

2    Q.  I asked you what the meaning was as you used it.  That --

3    please.

4    A.  Yes.  I understand.

5    Q.  Now, at some point in time you participated in the

6    preparation of a budget for the North Range site that totaled

7    $18 million in construction costs; correct?

8    A.  We did work on a budget with -- with MineOne, Erick

9    Rengifo, and Jiaming Li.  I cannot recall off the top of my

10   head what that exact number was for Phase 2.

11   Q.  Do you have any notion, as you sit here today, what the

12   final construction cost was for the North Range site?

13   A.  Yeah.  Based upon my recollection at the time, which is

14   now over a year ago, I remember knowing right towards -- or

15   thinking right at the end of the project -- you know, like a

16   month or two before it ended, before your clients hired

17   Systems MEC, a very expensive contractor -- I remember at that

18   time thinking, "Wow, we are getting really close to the

19   budgeted amount," and BCB was doing everything it could, all

20   reasonable related activities within its control, to help keep

21   that cost down.

22         We assisted your clients in -- in doing an amended

23   agreement with CEGEN to help keep that cost within budget, and

24   I -- I -- I -- what I do know is that we were coming up on --

25   on that limit of the budget, Systems came in, started charging

 1  a whole bunch of money to get the site done.  And I remember

 2  thinking at that time, "Oh, wow, they're going over budget on

 3  this project."

 4          But I would just note that if CEGEN had performed

 5  according to its terms, it was much more likely to come in

 6  within budget.  Truly, CEGEN's breach of the agreement with

 7  MineOne forced MineOne to have to go hire a much more

 8  expensive contractor, Systems MEC, to complete the project and

 9  Systems took them way over -- way over budget.

10  Q.  Would you be surprised to learn that the final

11  construction costs were over budget by $9 million?

12  A.  I would have to look at the documentation to determine

13  whether or not I would be surprised by that or not.

14  Q.  Well, you --

15          MR. MURPHY:  If you have that, I'd -- I'd ask that

16  you provide that.

17          MS. COLBATH:  Excuse me.  Do you have an objection to

18  the question?  If not, I would appreciate you not making

19  statements --

20          MR. MURPHY:  I object --

21          MS. COLBATH:  -- in the middle of the examination.

22          MR. MURPHY:  I do object.  There's a lack of

23  foundation.

24          And if you're going to say that it was 9 million over

25  budget -- I think, Your Honor, she should show us that

1    document so the witness can look at it.

2            MS. COLBATH:  Let's look at Murphy Tab 11.

3            THE WITNESS:  I'm sorry.  What are we looking at?

4            MS. COLBATH:  One of my colleagues, I think -- if

5    I've got the right document -- is going to put a document up.

6    I'm going to ask you to take a look at it.

7            THE WITNESS:  Okay.

8    BY MS. COLBATH:

9    Q.  While -- while he's doing that, let me ask you -- you,

10   during your direct, had a -- testified as to the MineOne

11   defendants' general ledger and other financial records;

12   correct?

13   A.  I -- I did.  I did testify to the general ledger provided

14   by MineOne.

15   Q.  All right.  So -- okay.  We can take this down.  That's

16   not the document I was expecting.

17           MS. COLBATH:  Okay.  I'm going to save the remainder

18   of my time for my client.

19           MR. MURPHY:  Your Honor --

20           MS. COLBATH:  Maybe recross if necessary but --

21           MR. MURPHY:  Yeah.  May I be allowed to ask a few

22   more questions of Mr. Murphy, Your Honor?

23           THE COURT:  Yeah.

24           MR. MURPHY:  On my time.

25           THE COURT:  Yeah.  Sure.

1           MR. MURPHY:  Okay.  Thank you.

2                   **REDIRECT EXAMINATION**

3                   **BY MR. MURPHY:**

4    Q.  Mr. Murphy, with respect to the operational date that you

5    talked about earlier, could anyone have reached the completion

6    date by either October 31 or November 22 on this project?

7    A.  No.  It would not have been possible.

8           And the reason for that -- I'll just give you the

9    most obvious example.

10          Black Hills Energy was required to provide power by,

11   I think, November 10th or November 11th, and Black Hills

12   Energy wasn't able to provide power until then.  They provided

13   notice to MineOne that they -- Black Hills -- had done all of

14   the work on its side to deliver the power.  They notified

15   MineOne of that in February -- February 22nd of '23.

16          So it would have been impossible for any mining to

17   have taken place before February 22nd due to one of MineOne's

18   vendors, Black Hills in this case, not doing the work

19   Black Hills needed to do to have the power ready.

20          I don't want to throw Black Hills under the bus.  If

21   I -- just to be a little precise, the truth -- one of -- the

22   true issue, the big problem that MineOne conveniently doesn't

23   talk about anymore, is a company called CEGEN, the entity

24   contracted to build the 10 data centers.

25          CEGEN -- CEGEN breached its agreement with MineOne.

 1    MineOne wanted BCB to help collect money from CEGEN.

 2            Nobody liked CEGEN.  CEGEN was understaffed.  They

 3    didn't deliver the materials on time.  And it's only now, when

 4    MineOne is involved in litigation against BCB, that BCB gets

 5    blamed for all of the problems.  But during the project this

 6    was CEGEN's fault.  CEGEN was slow; CEGEN was the cause of the

 7    issues.

 8            Ms. Colbath said that, you know, BCB -- or she's

 9    trying to insinuate that BCB had an obligation to deliver

10    everything by October 31st, but we have to focus on things

11    within BCB's control.  BCB could not control the performance

12    of CEGEN.  BCB could not control the performance of

13    Black Hills.  BCB could not control the performance of

14    MineOne's other vendors.

15            And upon closer inspection, one would actually see

16    these other vendors had problems that led to the delays.  BCB

17    did everything within its control to -- to do it.

18    Q.  But what party to this lawsuit -- what defendant -- had

19    the contractual duty to ensure the -- the fully operational

20    date?

21    A.  That was Terra Crypto, Inc., in the CS agreement.

22    Q.  What was the reason you and I worked on a script for all

23    your testimony today?

24    A.  It was --

25            MS. COLBATH:  Objection, Your Honor.  I -- I didn't

1    inquire into that at all.  It's beyond the scope of my cross.

2            THE COURT:  Sustained.

3            MR. MURPHY:  I'd reserve the rest of my time.  Thank

4    you, Judge.

5            THE COURT:  Okay.

6            MS. COLBATH:  Just a couple on those last questions,

7    Mr. Murphy.

8                    **RECROSS-EXAMINATION**

9                    **BY MS. COLBATH:**

10   Q.  When you -- when BCB determined that it couldn't comply

11   with its contractual obligation under the development,

12   hosting, and service agreement in 6.2(d) -- that's the --

13   that's the provision that has the required October 31, 2022,

14   date -- did you go to the MineOne parties and ask for an

15   amendment or modification to the contract?

16   A.  You led me into that question indicating that --

17   Q.  Yes or --

18   A.  -- you felt as though I breached, as if BCB breached.

19           And, Ms. Colbath, the answer to your question is that

20   we had at least thrice weekly calls with the defendants.  And

21   I remember that because they were all hours of the day --

22   5:00 a.m. in the morning -- due to several of the defendants

23   calling in from China.  They would take place at 8:00 or

24   9:00 at night.

25           They were well informed of the status of the project,

1    and they knew everything that was happening.  All parties knew

2    what was happening, and your clients were aware that other

3    parties were not fulfilling their obligations and that was

4    going to push back the -- the completion date of the project.

5    Q.  You -- BCB was the project manager of the construction;

6    correct?

7    A.  BCB was named as the project manager.

8    Q.  Okay.

9    A.  It's specific contractual obligations.

10            MS. COLBATH:  I'd like to show the witness

11   Defendants' Exhibit 47.

12            THE WITNESS:  I -- I don't believe I have reviewed

13   that.  It didn't come in in time.

14            MR. MURPHY:  Objection to --

15            MS. COLBATH:  I'm using -- I'm using it for purposes

16   of my recross, and I didn't have to produce to your father my

17   cross-examination documents.  And he just asked you some

18   questions which triggered this document.

19            So if we could show the witness --

20            MR. MURPHY:  Your Honor, I -- time-out.

21            I object to that.  That's one of their late-listed

22   exhibits that we moved to strike with the Court yesterday,

23   Exhibits 30 through 47 were all late, and we've moved the

24   Court to strike those.

25            She should not be allowed to use those.  Even if she

 1   doesn't admit them, she shouldn't be allowed to use them.

 2   That was the -- just the gist of our motion.

 3            MS. COLBATH:  And, Your Honor, I'm using it for

 4   recross based on something that Mr. Murphy elicited.  So I --

 5   I never was required to -- to disclose all of my cross-

 6   examination materials.

 7            MR. MURPHY:  Oh, that is so not cross-examination.

 8   You listed 30 through 47 late.

 9            And never said why.

10            THE COURT:  Well, it's not being offered into

11   evidence in this case.  If your client's memory is refreshed

12   as a result of the use of the -- her showing him the exhibit,

13   fine.  If not, that's fine, as well.

14            She'll have to live with the answer.

15            MS. COLBATH:  So if it's -- it's Murphy Tab 5, if we

16   could have that brought up, and I'm going to ask the witness

17   to identify it for the record.

18            It appears to be an email to Mr. Murphy and his other

19   two founding members from Jiaming Li dated March 16th, 2023.

20   BY MS. COLBATH:

21   Q.   Do you recognize this email, Mr. Murphy?

22   A.   Was this in response to another email?

23   Q.   You're welcome to look at the entire document.  I --

24   I believe it was in response to an email that you sent.

25   I'm going to focus you on -- because of time constraints --

1    the first page and -- page and a half -- of the document.

2         In or about March 16th, 2023, the MineOne parties

3    told BCB that they had not complied with that provision of the

4    contract, that Section 6.2(d); correct?

5    A.   Can you show me where it says that, Paula?

6    Q.   Sure.  You can start with --

7    A.   You did refer to --

8    Q.   -- with --

9    A.   I think you did.  I think -- if I -- if I may, this

10   appeared --

11   Q.   You've asked me to clarify so let me -- let me point you.

12        It starts "Let's discuss this in a call, but your

13   basic premises completely ignore what has happened until now.

14   We are delayed since the beginning of October" -- question --

15   exclamation point.  "This is a catastrophe for us.  We have

16   lost revenues, comma, clients, comma, investors, and our

17   reputation is heavily damaged."

18        Then skip down.  In the middle of the second

19   paragraph, "You have not delivered what we were expecting by

20   the end of October, and, as such, we have clearly paid more

21   than is supposed to have been paid, given the status of the

22   facilities."

23        Then if you keep going down, "You need to" -- "As you

24   should recognize, without him and his team, the situation

25   could have been terrible at this point.  You need to recognize

1    that your role as a PM" -- short for "project manager" -- "has

2    not been good.  You can blame anyone, but the role of the

3    project manager is to be in charge and solve issues.  The

4    project manager is responsible for the good and bad things

5    that happen.  You cannot escape that.  Otherwise, why should

6    we have a project manager if the project manager does not have

7    the responsibility to have the facilities up and running?"

8           So my question to you is, you were -- BCB was told

9    expressly by the MineOne parties that they hadn't met the

10   October 31, 2022, deadline and that that had created a

11   catastrophe; correct?

12   A.  You just said so much stuff, Paula, that is incorrect.

13          I mean, you quoted this email, but the claims of this

14   email are so incorrect I don't even know how to respond to

15   your question because, if I responded to it, it would be like

16   I was admitting to these things.

17   Q.  Okay.  So . . .

18          THE COURT:  So your testimony is "incorrect";

19   correct?

20          THE WITNESS:  Can she repeat the question again?

21   BY MS. COLBATH:

22   Q.  Well, let me just ask you.

23          Did -- did you receive the email?

24   A.  I believe this was a response to the email I sent to

25   Li and Rengifo when we informed them that MineOne had breached

 1 | the contract.  I believe (indiscernible) --
 2 | Q.  You --
 3 | A.  -- the response if I recall now.
 4 | Q.  So -- so you did receive this email; correct?
 5 | A.  I believe I did, yes.  I haven't looked at it for a while,
 6 | but I believe I did receive this.
 7 |        MS. COLBATH:  Okay.  I'm going to ask that it be
 8 | moved into evidence as my first exhibit.
 9 |        MR. MURPHY:  That's a --
10 |        MS. COLBATH:  Is there objection?
11 |        MR. MURPHY:  Yeah, there is an objection.  That's
12 | just hearsay.  Jiaming Li is not here to testify about it.
13 |        THE COURT:  The objection is sustained.  And it was
14 | not a document that was produced --
15 |        MS. COLBATH:  I -- I --
16 |        THE COURT:  -- in a timely way.
17 |        MS. COLBATH:  Your Honor, I would like to be heard on
18 | that because I'm not introducing it for the truth of
19 | everything in it.  I'm introducing it that these things were
20 | said at -- at -- in March of 2023 to BCB.
21 |        THE COURT:  Well, it was said after the parties were
22 | at swords' point.
23 |        MS. COLBATH:  I'm sorry.  I -- I missed the end part.
24 |        THE COURT:  "Swords' point."
25 |        MS. COLBATH:  Okay.  It -- it --

1          THE COURT:  There was a dispute that existed then

2     that we're still talking about.  And you're talking about this

3     applying and having been given -- as information provided on

4     October 31 and November 22nd.

5          MS. COLBATH:  Correct.  I'm -- I'm introducing it

6     just for the sole purpose of showing that my clients did

7     communicate issues, not the truth of -- of all of the

8     complaints in here but that they were communicating at this

9     time with BCB.

10          BCB has testified that they walked off the site on

11     3/13 --

12          THE COURT:  Yes.

13          MR. MURPHY:  Object --

14          THE COURT:  I'm not going to argue with you,

15     Ms. Colbath.  I've -- I've ruled on it.

16          MS. COLBATH:  Okay.

17          THE COURT:  This document was produced after the

18     Chancery Court lawsuit was filed.

19          MS. COLBATH:  Okay.  I . . . I'm -- I'm -- concluded

20     my recross.

21          MR. MURPHY:  I would only -- I would only call

22     Andy Astuno very quickly for a quick rebuttal as a -- this

23     final witness, plaintiff's, if he -- if Mr. Astuno can rejoin

24     the call.  I hope he can.

25          MS. COLBATH:  Could we get from the court reporter --

1   I had understood that you had exhausted your time.

2           THE COURT:  He has 4 minutes and 15 seconds.

3           MS. COLBATH:  Okay.

4           MR. MURPHY:  Okay.

5           THE COURT:  And actually --

6           MR. MURPHY:  I don't see Mr. --

7           THE COURT:  Actually, I want to tell you, in looking

8   at our clock, in terms of time that you used, you were right,

9   Mr. Murphy.  The time that Ms. Colbath had was about

10  72 minutes.

11          So we have been keeping track.

12          MR. MURPHY:  Thank you, Judge.

13          And I think most of that -- she spent 14 minutes and

14  7 seconds crossing Andy Astuno.

15          So I don't see Andy Astuno on the call, so we'll have

16  to wait on --

17          THE WITNESS:  Hello.  This is Andrew Astuno coming

18  back online here.

19          I -- I apologize.  I -- I am in a quiet place.  I'm

20  in my car but I'm happy to continue my testimony with the

21  Court's permission.

22          MR. MURPHY:  Well, I'll leave that up to the Court.

23  I just have a -- one or two questions for him, Your Honor.

24          THE COURT:  Please ask the questions.

25  ///

1    **ANDREW ASTUNO, PLAINTIFF'S WITNESS, FURTHER DIRECT EXAMINATION**

2                    **BY MR. MURPHY:**

3    Q.  Mr. Astuno, Ms. Colbath keeps saying today that you and

4    Sean Murphy, my middle son, were roommates.

5            What is the situation with that?  Were you roommates

6    or not?

7    A.  For one year Sean Murphy resided in my home in Denver,

8    Colorado, approximately 10 years ago.  We were introduced by a

9    mutual contact through the Notre Dame Club of Denver.  But

10   I do think that it's important to clarify that by no means did

11   we have some long-standing relationship as cohabitants or

12   roommates, and, certainly, we do not live together currently.

13           That is certainly not the case.  In fact, I do not

14   know where Sean Murphy currently lives.

15           MR. MURPHY:  Thank you.

16           All right.  That's all I have for Mr. Astuno,

17   Your Honor.

18           THE COURT:  All right.  You've got 3 minutes and

19   24 seconds.

20           MR. MURPHY:  I don't -- I want to save that for

21   cross-examination or final rebuttal.

22           THE COURT:  Very well.

23           MS. COLBATH:  Okay.  Pat, you're done with your case?

24           MR. MURPHY:  Yes, I am.  Thank you.

25           MS. COLBATH:  Okay.

 1          So the MineOne defendants would like to call Erick --

 2    Dr. Erick Rengifo.

 3          THE COURT:  Please raise your right hand and be

 4    sworn.

 5       (Witness sworn.)

 6          THE WITNESS:  Yes.

 7    **ERICK RENGIFO, PhD, DEFENDANTS' WITNESS, DIRECT EXAMINATION**

 8                    **BY MS. COLBATH:**

 9    Q.  Okay.  Dr. Rengifo, could you give Judge Johnson a -- a

10    brief summary of your work history and educational background.

11    A.  Of course.

12          So I'm a PhD in economics.  And my specialization is

13    in finance and econometrics.  I did my PhD at (indiscernible)

14    Universite Catholique de Louvain in Belgium --

15          THE COURT REPORTER:  Excuse me.

16       (Reporter seeks clarification.)

17    BY MS. COLBATH:

18    Q.  Mr. Rengifo, so we have a court reporter, and it's going

19    to be very important that you speak loudly, slowly, and

20    enunciate because on the Zoom -- and it's also -- we've been

21    at this for a while.

22          So if you can keep your voice up so that the court

23    reporter and -- and all -- everyone can hear and try to speak

24    a little slower.

25    A.  Perfect.

1           Do you hear me now?

2    Q.  Yes.

3    A.  Perfect.

4           So I'm Erick Rengifo.  I'm a PhD in economics.

5    I have specialized in finance and econometrics.  I did my PhD

6    in Universite Catholique de Louvain.  It's in Belgium.  I have

7    a master's degree also in economics, one in finance, and one

8    in quantitative methods.

9           My experience -- my current job is also being a

10   professor, a full professor at Fordham University, economics

11   department.

12          I have been -- I'm a senior consultant of TABS Group

13   that is now a (indiscernible) international.  I have done a

14   lot of consulting in terms of trade, equity trade, with help

15   of -- I do -- Minaya Corporation that is doing equity trading.

16   We do investments --

17          THE COURT:  I didn't understand that last part.

18          Something about trading.

19          THE WITNESS:  Yes.

20   A.  (Continuing.)  So we have a corporation that does a --

21   stock trading in New York.  We have a corporation that is

22   doing, basically, high-frequency trading.  We have operations

23   also in Peru.  We do a -- some transactions related to world

24   refinery; we have investments in the -- the jewelry industry.

25   And we also have investments in technology for crypto trading

1    and equity trading.

2            THE COURT:  And you talk about "we."  Who's the "we"?

3            THE WITNESS:  It's myself, Erick.

4            THE COURT:  You alone?

5            THE WITNESS:  With Jiaming Li.  That is -- we're

6    one-on-one partners.

7            THE COURT:  So Mr. Li is your -- your colleague?

8            THE WITNESS:  Partner in one of -- yes.  Partner in

9    one of the -- in some of the ventures that we have, that's

10   correct.

11           THE COURT:  Thank you.

12   BY MS. COLBATH:

13   Q.  Now, how was MineOne introduced to BCB?

14   A.  It -- we were looking -- after -- what happened in May

15   2021 was China basically banned crypto miners.  So all --

16   basically -- all miners were looking for opportunities outside

17   China.

18           And we arrived to -- to USA, and we helped

19   Mr. Wang to arrive to USA for miners.  And we were looking for

20   opportunities in Texas; we were looking in Georgia, Indiana.

21   We also looked for opportunities in Canada.

22           And then we simply start talking with our colleagues

23   and telling them we're interested on -- on building facilities

24   for crypto mining.  And we go -- we got a lead, and this lead

25   put us in touch with Michael Murphy from BCB.

1    Q.  Now, BCB has claimed that MineOne did not let BCB know at

2    the start of the discussions that BCB was dealing with Chinese

3    investors.

4    A.  Well, it was always -- yes.

5    Q.  Is that correct?  And could you comment on that?

6    A.  Yeah.  It's not correct.

7         We always presented ourselves having Chinese

8    investors coming with us because we -- they were expelled from

9    China.  And that we were looking for opportunities in -- in

10   the USA, you know.

11        And from Day One -- when we visited, also, the --

12   our -- the facilities of -- where -- we did a tour.  Michael

13   did a tour -- Michael and Neil, I think, did a tour for us, a

14   very short tour in the facilities.

15        Jiaming Li was with me.  And it was clear -- and

16   Jiaming Li clearly stated that he was -- he was from China; he

17   was a point of contact from China.

18   Q.  Now, there's been -- there was -- has been some discussion

19   of contracts with Black Hills Energy, and I don't know if you

20   were listening in earlier.

21        But could you explain to the Court the importance of

22   the electrical contracts with regard to digital currency

23   facilities and how they work?

24   A.  Yes.

25        Well, when we are talking about the crypto mining

1    facilities -- so the -- the business of creating data centers

2    for allowing other people to run the miners -- you're talking

3    about an industry that is very careful about the cents.  So

4    in -- in general, what we are receiving now is 8 cents

5    per kilowatt.  That's our revenue per kilowatt.

6          So having the price as low as possible -- the energy

7    price as low as possible -- it is a must.  Energy price more

8    or less represents between 60 to 70 percent of the total

9    price, total expenses of a mining facility.

10          So, for us, price is a crucial element in order to --

11    to do this investment.

12    Q.  And did there come a point in time when you reviewed any

13    contracts with Black Hills Energy?

14    A.  Yes.  We -- we reviewed the contract that Michael provided

15    to us, and immediately what caught our attention -- and we

16    discussed this pretty intensive with Michael -- was that this

17    contract was completely particular in a sense -- not in all

18    sense but in a bad sense.

19          So they have a -- a minimum price of 5 cents, and

20    this price was increasing in time.  I think it was 525, 550 in

21    the next three years, and they stayed constant for the next --

22    the last two years.  So they have a minimum; they have a floor

23    of 5 cents.

24          So this was -- in our view, this was insane.  And

25    Michael himself, in a couple of emails and discussions, he

1    acknowledged this was a -- a kind of a -- a normal contract

2    but that's basically one of the main drivers to allow them to

3    win the -- the -- the -- the contract with BHE.

4            So having 5 cents as a floor is -- is completely

5    insane.  Why?  Because this means that if you get 13 cents,

6    you are under contract.  If you have 15 cents, you are still

7    under contract.  So what miners look is not for a floor.  What

8    they look is for a ceiling.

9            No -- and -- and that's what -- what happens so . . .

10   this was the reason that I came in from -- from BHE and BCB.

11   Q.  And when you say that you look for a ceiling when you look

12   for an electricity contract, would it be accurate to say that

13   you look for a cap on --

14   A.  Yes.

15   Q.  -- what you're going to pay for the electricity, not --

16   not the lowest price where it could just go randomly high?

17   A.  Completely right.

18   Q.  Okay.  Now, what was BCB's role at the North Range site?

19   A.  Well, they were -- we always asked them and they --

20   they -- they renew this stuff, is that -- they're the local

21   people.  So they presented themselves as local.  So they're

22   going to be the boots in the ground.  They're going to be our

23   eyes and ears.  So that's the way they presented themselves.

24           And so -- and their role was for -- remember, the

25   BHE's agreement has two phases.  It has Phase 1 and it has

1    Phase 2.  So we just talk about Phase 1.

2          They were in charge -- they were project manager.

3    So, basically, they have the specific roles.  And their

4    specific role was, basically, to be sure that everything was

5    moving appropriately.  So they control monitoring -- you know,

6    doing some risk analysis, doing -- just trying to understand

7    what's going on.

8          And, basically, they needed to do a correct

9    assessment of the situation.  That was their role, basically.

10   Q.  And BCB's -- and -- and can you describe BCB's performance

11   under the development, hosting, and services contract?

12   A.  Well, we tend to divide up -- we can say we have a

13   November break, too.  You know?  Before November what we --

14   what was happening is that we have a BCB role supporting,

15   giving us information, dumping almost everything.

16         So every time that we asked for something -- "Why are

17   we delayed?  So we're supposed -- we're in the middle of

18   August.  Why don't we have our -- our -- at least we have some

19   of the procurement in place?  What is happening with -- with

20   all the vendors?  Where are not they working correctly?"

21         And so this was being reported in a mine -- in a very

22   dumb way.  They were saying "No problem; everything's under

23   control.  We're a little delayed.  Yeah, it's going to take

24   two more weeks.  We have talked already with CEGEN" -- and

25   Michael correctly described CEGEN as -- as a really terrible

1   corporation.

2          So, basically, they were presenting all these

3   problems but giving us a report that all the -- that the

4   deadlines -- even not -- even though -- even though they are

5   not going to be satisfied at any point in time, but they were

6   saying, you know, they're going to be done in two weeks or

7   they're going to be done in one month.  So they basically

8   downplayed everything.

9          Then we arrived to -- to November, and then in

10  November they said two weeks after that deadline, so we -- we

11  really were -- were worried about whether things were

12  happening, what things were happening.

13         So we send an -- a consultant, basically, to analyze

14  the situation.  This consultant was in -- in Wyoming for

15  almost two -- two days.  He came back to us and he told us,

16  "Well, you know, what they have told you about the completion

17  by the end of November is impossible.  Even though -- even the

18  completion of facilities by the end of December or even

19  January is impossible."

20         So at this stage what MineOne -- we were in panic

21  mode because -- this was a catastrophe for us in terms of

22  retaining -- retaining our commitment -- our committed

23  investors.  So they basically walked away.  But it was a

24  catastrophe because we didn't have a single MDC done by the

25  time.

1      So nothing happens up to December, and then we -- we

2  said "Okay.  We need to do something here."  And we then hired

3  these consultants, and we send them almost full-time to

4  Wyoming to help BCB, to help our project manager.

5      And they worked together.  You know, of course, they

6  have some discrepancies in personalities, et cetera, so they

7  tried to help.  But one of the roles that our consultant has

8  was not only to help BCB but to find a solution for a problem

9  that we were facing.  At that time remember, Paula, we didn't

10  have a single MDC.  We didn't have even an expectation of

11  having an MDC.

12      So this consultant worked in parallel, worked helping

13  the -- the team of BCB but also looking for -- for a solution

14  and they did it.  You know, by mid-January 2023 they basically

15  found a -- a corporation that -- as Michael said, is more

16  expensive, yes.  But, you know, at least they have all the

17  resources, all the people, all the capacity to move the

18  project forward.

19      So this is when we brought in Systems MEC.  And we

20  never -- we never really gave BCB -- so we include BCBC --

21  BCBC in -- in negotiations with Systems.  So they were present

22  there.

23      And when we agree on -- when we arrived to an

24  agreement with Systems, it was BCB, the -- the gatekeeper.

25  So -- they always were the gatekeeper, so we never

 1    communicated directly -- MineOne never had a communication,

 2    direct communication, with the providers or the vendors.  We

 3    always have an intermediary, was BCB as our project manager.

 4          So -- and then the time happens and then we arrive

 5    to -- to March that things were moving faster, so we were

 6    happy with that.

 7          And then on March we simply -- probably we proposed

 8    we need a different proposal to -- to -- to BCBC.  We're at

 9    March.  And then back in March, basically, BCBC walked away.

10    Q.  So you mentioned just now in your answer that you made a

11    proposal to BCB in March.  I assume that's March of 2023.

12    A.  Correct.

13    Q.  Okay.  And can you describe for the Court what the

14    proposal was --

15    A.  Yes.

16    Q.  -- and why you -- why the MineOne parties made the

17    proposal?

18    A.  Yes.  So we were --

19          MR. MURPHY:  Objection -- just a minute.

20          Objection, Your Honor.

21          There is a written proposal.  That is the best

22    evidence, and I would ask that you provide that to all of us

23    so we can see what the written proposal was.

24          MS. COLBATH:  Okay.  He was part of the negotiations,

25    and, in the interest of time, I -- I just want him to describe

```
 1   what took place.

 2           MR. MURPHY:  I -- I object.  The best --

 3           MS. COLBATH:  When you --

 4           MR. MURPHY:  -- evidence is the written --

 5           MS. COLBATH:  When you do the cross-examination of

 6   him, you can use that document.  I'm -- I'm asking the

 7   witness.

 8   BY MS. COLBATH:

 9   Q.  At some point in time -- you just testified March of

10   2023 -- the MineOne parties made a proposal, and I'd like you

11   to describe the proposal and why you made it.

12           MR. MURPHY:  Your Honor, I need a ruling on this

13   because I've got less than three minutes left of my time.

14   I don't have time to exam- -- cross-examine the doctor.

15           And we -- she should just get the exhibit.

16           MS. COLBATH:  I don't think I designated it.  If

17   I can't use things that I did designate, you can't force me to

18   go get a document that I didn't designate.

19           THE COURT:  The Court has seen the document.

20           MS. COLBATH:  If the witness could --

21           THE COURT:  I'm going to overrule the objection.

22           MS. COLBATH:  Thank you.

23   BY MS. COLBATH:

24   Q.  So, Dr. Rengifo, please describe for the Court what the

25   circumstances were that led to the proposal.
```

1    A.  Yes.

2           At that time, remember, we had a lot of pieces

3    happening.  We didn't have an MDC ready.  Everything was not

4    in -- not in our place.  And we had a client -- and this is

5    Bitmain.  Bitmain is our client.  That is basically the one

6    that provides the miners, and we are going to be providing the

7    service of -- of hosting.

8           And according to our agreement with Bitmain, March 10

9    was the -- the deadline for us to start, basically, helping

10   them produce their -- their mining.

11          March 10, was nothing there.  And we were expecting

12   to have the MDCs done soon.  As soon as we saw that this was

13   not possible, then we started thinking seriously "What is

14   going to happen if we start operations with a team that is not

15   really ready for taking over the organization?"

16          What is going to happen is, basically, we're going to

17   have -- it's going to be a catastrophe.  Once we start

18   operations, we're going to be seeing -- collapsing.  And once

19   we collapse, our -- our main client, Bitmain, is going to

20   simply quit.  And if they quit, we are going to be losing

21   everything.

22          So a terrible deal for not -- not having a

23   professional team managing the operations, at least at the

24   beginning.  That's what we tried to explain to -- to BCBC, "We

25   need to be very careful because if we fail in this crucial

1   part of the -- of the operations and reputation of the -- of

2   the first MDCs, et cetera, all the project is going to

3   collapse." So we are going to bankrupt. Everyone is going to

4   lose. And so that's -- that was the proposal.

5          So we had at the time -- the -- the group of experts

6   that we had managed -- that -- the people that have managed

7   already crypto mining facilities, more than -- more than a

8   hundred-mill facilities, so they had this experience.

9          We conveyed to them "What we have in your -- in your

10  agreement is not only the operations side of everything. You

11  are going to be in charge of energy" -- and that is extremely

12  important, as mentioned to you, Paula. It is very important.

13  It is one of the main components of the cost, so energy is

14  crucial for us.

15         So we never minimized their work. But we're telling

16  to them -- and Michael was always saying "This contract needs

17  an active management" so -- and that's what we provided.

18         "So please focus on the electricity; let this team

19  focus on the operations. So they're going to be working

20  operations; you do the electricity, the PR, et cetera."

21         And on top of that, what was coming the -- just to --

22  to mention something about the -- we wanted to sue Shermco and

23  CEGEN -- yeah. This was a proposal that they made to us.

24  I think this was all in the same recording that Michael is

25  saying.

1        They proposed to us -- Emory told us "Why don't we

2    sue CEGEN and Shermco?  We can do that because we have all the

3    documents.  We can give this all to you."

4        So it was not our idea.  And I remember it clearly,

5    myself saying, "Well, Emory, we are not in the business of

6    suing people.  We are in the business of creating business."

7    And "If you want to do this, want to proceed, okay; you are

8    more than welcome."  And, basically, there wasn't any reason.

9        So we needed the operations to be a successful

10   operation.  If it -- if it was not going to be a successful

11   operation at the time, simply we -- we collapse.

12   Q.  Did there come a point in time where you discussed the

13   proposal with BCB?

14   A.  Well, the thing is that when we proposed this one here, we

15   sent out a proposal to them, and we agree with them in the --

16   in the following terms.

17       So we are going to go in person because this is very

18   important.  We need to agree.  We need to discuss face-to-face

19   and arrive to a conclusion and then -- we're going arrive to

20   a -- to -- you know -- to a conclusion that's going to be

21   mutually beneficial for us.

22       And so that's why on March 15, 2023, Jiaming Li,

23   Haku Du, and myself flew to Denver.  And then from Denver we

24   drove to -- to Wyoming, to the -- our facility.  And it was

25   simply -- where the expectation was to find Michael, Emory,

1    and Neil and start discussing because it was a proposal.

2              So when we arrived to -- to the facilities and

3    then -- we had this office; it's -- it's a trailer office.

4    And then we get in and we -- we did -- we didn't see the --

5    the guys from BCBC.

6              And then we asked them "So where are these guys?

7    Where is -- where is Emory and Michael?"

8              And one of them told us, "Well, they quit already, a

9    couple of days ago."

10             So for us it was a shocking situation.  So in the --

11   I remember Jiaming Li calling, I think, Michael; no reply.

12   And then we were basically in shock with -- "They quit?  Where

13   they have gone?" you know.

14             Because we had a -- a meeting at the time with

15   Tony -- Tony Simpson that is the CEO of -- of Systems MEC.

16   And then we -- we wait for a minute, a couple of minutes, and

17   nothing happened so we moved together to see Tony and then we

18   start discussing things that we were --

19             MR. MURPHY:  Objection, Your Honor.  This is

20   nonresponsive now.  It's just a speech.

21             MS. COLBATH:  That's not true.  I gave him -- I gave

22   him a -- a lob ball question so that he could explain what

23   took place.

24             MR. MURPHY:  The answer -- the question was --

25             MS. COLBATH:  I stayed away from leading questions.

```
 1              MR. MURPHY:  -- did you -- did you talk to him about
 2    it or not.  Yes or no.
 3              THE COURT:  Well, I'll sustain the objection.
 4              Ask your next question.
 5    BY MS. COLBATH:
 6    Q.  After -- after you arrived at -- in Cheyenne, Wyoming, and
 7    the BCB principals, you learned, had quit, what happened next?
 8    A.  We met Tony Simpson, the one -- the one that was in charge
 9    of our -- our facilities at -- the building of our facilities.
10    He was the CEO of Systems MEC.
11              And, basically, we worked with him and -- what -- but
12    we are not the experts, so we were out a PM.  So, basically,
13    we sit with him, and he explained some of the things that he
14    was doing.
15    Q.  After -- after BCB quit, did you hire a new property
16    manager?
17    A.  A project manager.
18    Q.  Project manager.  Excuse me.
19    A.  No.  No.  So we were -- we were left in -- in the limbo.
20              Michael said that he has sent emails and communicated
21    to every -- every one of the -- of the vendors.  Yeah -- no,
22    they did it.  So they communicated.  Because he was clear,
23    saying "I'm not part anymore of the MineOne project, so you
24    deal directly with Erick, Jiaming Li, Haku Du" -- so he did
25    that.  He provided us with some invoices, et cetera.  He did
```

1   that.

2          But the thing is that when you get to a facility, the

3   facility's not running just by papers.  So for us it was a

4   surprise.  Okay.  What is next?  We are not project managers.

5   We're not professional project managers.

6          So we started relying completely on -- on Tony and

7   the people that was with us because we were really in a -- in

8   a panic mode, so everything was in a catastrophe at that time.

9          We have a client, Bitmain, that was complaining to

10  us.  Well, they were complaining before that.

11         We were in the limit of the budget, so we were -- we

12  really need money, so we were looking for funding in an

13  emergency.  We're not in a -- we're not talking about this

14  fantastic world that Michael is describing and we should

15  all -- you have the conditions that you can say what is

16  camouflage, what is not camouflage.

17         We need to be clear and sound here.  We were at the

18  brink of a collapse.  MineOne was ready to basically file for

19  bankruptcy.  We didn't have funding.  We didn't have -- given

20  the -- the situation with zero MDCs --

21         MR. MURPHY:  Objection, Your Honor.  It's all

22  nonresponsive.  It's just a self-serving speech.

23         THE COURT:  Sustained.

24         MR. MURPHY:  It is not responsive to the question.

25         THE COURT:  Sustained.

1         MS. COLBATH:  I asked what happened next, and he's

2    describing what happened next.

3         And I would appreciate it if -- if, Mr. Murphy, you

4    wouldn't interrupt the witness in the middle of his answer.

5         I'll just follow up on when he's describing what

6    happened next.

7    BY MS. COLBATH:

8    Q.  You just talked about issues looking for funding,

9    potential bankruptcy, and a collapse.

10        And I would ask you to expand on that and tell the

11   Court what the situation was and what the MineOne parties had

12   to do in response.

13   A.  Perfect.

14        So what happens is -- remember, we were having a

15   client that was in -- in partial panic mode.  We were supposed

16   to serve them -- starting serving them on -- serving them on

17   March 10.

18        We have a -- we didn't have a project manager that

19   was in place, so we needed to take over all the

20   responsibilities of a project manager, so this implies,

21   basically, understand what the things were done, what was

22   wrong, what needs to be redone, and start talking with a --

23   a -- a -- Systems MEC.

24        And, at the same time, we needed to start looking for

25   funding.  We had -- our reputation was lost far beyond -- it

1   was far before -- you know, October, more or less, when --

2   when -- we didn't deliver anything.

3            So we were not able to secure our investors because,

4   basically, we didn't produce a single MDC by October, not a

5   single MDC, like you say, by November, December.  Nothing.  So

6   we were in a situation that was a very strong and a stressful

7   situation.  We were looking for money.

8            Now, when you have this type of situation, the

9   financial markets don't work.  So you can go to a bank, but

10  the bank is going to close the doors.  You can go to a hedge

11  fund, mutual fund, whatever you want.  No one is going to give

12  you a single penny.  No one is going to give you money.

13           THE COURT:  I think -- I think we're just getting in

14  an argument again.

15           THE WITNESS:  Yes.

16           THE COURT:  What happened?

17           What happened?

18           THE WITNESS:  So, basically -- yes.

19           What happened is that they left us as -- and we need

20  to assume the position of project manager.  We are not

21  professional project managers.  We need to do that because we

22  were forced by them -- by themselves leaving this -- this

23  facilities.

24           And, also, at same time we were forced now to have an

25  additional challenge, Your Honor.  It is -- we were -- we

1    needed -- we were in a -- they were -- they sue us.  And when

2    they sue us, what happens is a -- basically, we are not any

3    more eligible in the financial markets to get money.

4          So -- and that was our stressing situation.  We

5    needed money to finish the project.  But we were not able to

6    get money from capital markets, not banks, not hedge funds.

7          So we needed to look for money if we wanted to

8    survive.  So where do we -- where did we get the money from?

9    Well, parties that we already knew, we need to beg them to

10   help us with money so they lend us money.

11         And, remember, it's $200,000 for a couple of weeks,

12   and then we need to lend more money to pay the $200,000 to get

13   for additional funding.

14         MineOne is -- sorry.  Systems, as Michael correctly

15   said, these are very -- very good professionals, but they are

16   very expensive.  They have 40 or 45 people in the place that

17   we need -- they need to pay.  So, basically, every single week

18   we have bills coming to us and bills coming to us and we have

19   no money.

20         So we talked with Systems.  We -- and they help us to

21   continue moving this stuff.  But they weren't there to help us

22   with what was going to be a turnout, so they asked us --

23   "Okay.  You know what?  I think you need to pay me

24   $1 million."

25         So we need to provide to all these parties, all

1   these -- all these parties that Michael said camouflage -- we

2   don't understand why.  But we get the money to pay to Systems.

3            And at the end of the day, we -- Your Honor, by

4   August 2023 -- just by August 2023 -- so from March that they

5   left to August 2023 -- we finally got the 10 MDCs up and

6   running.

7   BY MS. COLBATH:

8   Q.  Let me ask you, the -- the transaction with CleanSpark

9   includes a -- an assignment of the Black Hills contract;

10  correct?

11  A.  Correct.

12  Q.  Could you -- could you describe for the Court the

13  contract, when it came into being, that will be assigned as

14  part of that transaction?

15  A.  Yes.

16           So it is -- it is not at all the original contract

17  that BHE signed with -- with BCB.  The -- remember that I told

18  you at the very beginning that BCB agreement with BHE was the

19  floor 5 cents?

20           So this was a really catastrophic contract even

21  though, you know, we helped -- we -- we worked together with

22  BCB to get an -- an amendment contract, et cetera.

23           But even though the price that we got, Your Honor,

24  from -- from March to -- March -- March '23 to March '24 --

25  so -- yes, to March '24 -- it was 5.7 cents.  We couldn't

1    operate on July because the price was more or less 8.2 cents,

2    and we couldn't operate on August; the price was very similar.

3    But remember our -- our limit, our ceiling, our revenue is

4    8 cents.

5            So everything else, everything -- if the price goes

6    above 8 cents, we're simply done.  We cannot operate.  We need

7    to close our operations.  Okay?  And that's what happened in

8    July and August.  And that was a problem with the contract.

9            So given this problem with the contract that has no

10   limit, no -- no upper limit --

11           THE COURT:  You're talking about July and August of

12   2022?

13           THE WITNESS:  Yes.  July and August of 2022 -- this

14   is -- that -- no, July and August 2023.  Because we already

15   started operations on July and August 2023.

16           THE COURT:  Well, didn't -- didn't BCB go back to

17   Black Hills and negotiate a better price for you --

18           THE WITNESS:  No.  So this was (indiscernible) --

19           THE COURT:  -- in 2022?

20           THE WITNESS:  That was 2022.

21           So when -- November of 2022 when we entered into

22   the -- the discussion with them, we have this floor of

23   5 cents.

24           The modification of the agreement, they didn't

25   modify -- they didn't modify the 5 cents floor.  What they did

1    is basically -- what we tried to help them to do -- is

2    basically tried to align the incentives of BHE with our

3    incentives of getting better price.

4            So what we told them is the following:  "If you

5    provide us electricity below 5 cents, we are going to share

6    the difference."  So, for example, if they provide us

7    electricity for 3 cents, the difference between 5 cents and

8    3 cents, 2 cents, we're going to be -- was going to be divided

9    equally between BCB -- sorry -- between BHE and MineOne.

10           So this was an amendment.  But the amendment never

11   changed the floor price.  The floor price was existing up to

12   April 2024.

13           So what happens is that even though this price --

14   with the 5.7, it was a reasonable one; it implied our floor.

15   But we decided -- we said, you know, "This is impossible.  If

16   we want to survive, if we want to really move the project, we

17   need to find cheaper prices."

18           So that's why in September 2023 we started discussing

19   with BHE -- so we're talking September 2023 so B- -- sorry.

20   BCB already quit on March 2023.

21           We start discussing with -- with BHE, the electricity

22   provider, and finding new sources of energy and we did it.  So

23   more or less by November, December 2023, we find something

24   that -- we found something that's called in-balance market

25   and, basically, negotiated with different negotiations by the

1    end of March, and by the first day of April we sign our

2    agreement.

3            So what is the beauty of all this agreement and why

4    the -- why this agreement is the one that has the value, is

5    that the maximum average price, including all the fees and --

6    and benefits for BHE, is below 4.5 cents.

7            So that's why CleanSpark now, for example, is looking

8    at this contract-- at this contract, not the previous

9    contract, this contract -- as the contract.  I -- I can tell

10   you and many of the -- of the colleagues in Wyoming mentioned

11   that, including BHE, this is the price -- this is the best

12   price ever for any corporation.

13           For anyone.  Even Microsoft someone mentioned don't

14   have this.  They don't -- they do not have this price.

15           So we negotiated this price for almost five --

16   five months.  We found it.  We worked together with BHE.  We

17   need a lower price, means a lot of changes.

18           And that's the agreement, Paula, basically, she is --

19   CleanSpark is -- is inheriting.

20   BY MS. COLBATH:

21   Q.  And what was BCB's role in negotiating this April 2024

22   contract that's going to be assigned as part of the CleanSpark

23   deal?

24   A.  Nothing.  They quit on April 2023 -- sorry -- March --

25   mid-March 2023.

1          And then we started the discussion to get this price

2     by September 2023.  So it was over six months after they quit.

3     Q.  And could you -- could you briefly just describe, if and

4     when the CleanSpark transaction closes, how the proceeds of

5     the transaction will be used by the MineOne parties?

6     A.  Well, what we need to do is something that is -- is

7     meaningful, is we need to pay back the people that have helped

8     us support and -- and arrive to this point in which we have

9     built everything.

10          So I -- I completely disagree with -- with Michael in

11    the sense of there is no transaction records.  No, we have --

12    every single money has been banked.  Every single money has

13    been banked by the -- by the party that originated the money

14    because -- come to MineOne and we have paid to any of the

15    other vendors.  And sometimes when we needed an origin

16    payment, our -- the one that was originating the loan, they

17    directly -- by order of us -- they directly paid to the

18    vendor.

19          So what we need to understand is this was an

20    emergency situation.  So we didn't have time to sit and

21    prepare contracts and agreements and discuss with lawyers and

22    coming back and forth with lawyers.  No.

23          This was "I need 200,000 to pay -- to pay Systems" --

24    or one of the contractors of Systems.  Well, there was --

25    these guys are about to -- they're going to move because they

1    don't have money that -- we're not paying them.

2          So this was an emergency crisis situation.  That's

3    what we tried to do.  We tried to convince every -- every

4    individual -- every corporation that we had in our -- in our

5    books and tell them "Please help us here because, if you don't

6    help us at this stage, we're going to collapse."

7          And then something that was good is that we -- on

8    December 2023, Your Honor, we start talking -- discussing

9    with a -- with a lender that is called Antalpha that Michael

10   mentioned in the -- in his conversation.

11         And Antalpha, we started on December 2023.

12   January 2024, we signed an LOI, and these guys approved the

13   agreement just on August 2023.  So you can imagine at the

14   time -- it is basically eight months of negotiations to get

15   that $8 million that they offered to us.

16         So in -- in a crisis situation, that was impossible

17   to do.  We cannot have these type of conversations with anyone

18   in the market because two things happen.

19         We were in a -- we were in a terrible situation.  We

20   didn't have -- we had zero money, zero MDCs.  We were -- we

21   had dealt with our project manager that simply abandon us and

22   not only simply abandoned us but also sue us.

23         MR. MURPHY:  That's -- objection -- objection,

24   Your Honor.  I'm sorry, but this is nonresponsive now.

25         MS. COLBATH:  And he is fine because I -- my time --

1    I have another witness so I -- I'm done with Dr. Rengifo.

2            There's a lot more to cover but -- but -- but with --

3    you know, I'd like to save some for Mr. Aldrich.

4            So I don't know if you have any time left for

5    Dr. Rengifo, Pat.

6            MR. MURPHY:  I just have one thing.

7                        CROSS-EXAMINATION

8                        BY MR. MURPHY:

9    Q.  Dr. Rengifo, isn't it true that you weren't even at the

10   project in November of '22, December of '22, January of '23,

11   and February of '23?

12   A.  From January to more or less the end of February, I was

13   not in the calls, but I was working hard, as usual, to get

14   funding, and I was in -- working to -- with Jiaming Li and

15   Haku Du that were always present in the conversations.

16           MR. MURPHY:  Nothing else, Your Honor.

17           Thank you.

18           THE WITNESS:  Thank you, Patrick.

19           MS. COLBATH:  The MineOne defendants would like to

20   call as their next witness Mark Aldrich.

21           THE COURT:  Mr. Aldrich, raise your right hand and be

22   sworn.

23       (Witness sworn.)

24           THE WITNESS:  I do.

25   ///

1    **MARK ALDRICH, DEFENDANTS' WITNESS, DIRECT EXAMINATION**

2                    **BY MS. COLBATH:**

3   Q.   Mr. Aldrich -- and thank you for -- for attending.

4        Could you give the Court a brief summary of your work

5   experience?

6   A.   Yes.

7        I'm a chemical engineer and I've spent over 40 years

8   designing, actual construction of, construction management of

9   industrial facilities, including power plants, power

10  generation facilities, crypto mining facilities, about

11  1500 megawatts total, either design or construction or both.

12  Q.   Did you have any involvement at any point in time with the

13  crypto mining facilities in Cheyenne, Wyoming?

14  A.   Yes.  Yes, we did.  I was the project executive in charge,

15  so the engineering team, the construction management team, and

16  the direct hire construction team all worked directly for me.

17       I also operated as a subject matter expert in each of

18  those fields.

19  Q.   And how did you end up getting involved in the Cheyenne,

20  Wyoming, MineOne facilities?

21  A.   So we were brought in as -- by BCB -- as they were

22  working, I believe, to -- to finally land the job.  And we

23  ended up having three scopes that BCB gave us.

24       We had the design engineering for the -- the site,

25  which included mechanical, civil -- we were partnered with

1    someone locally.  We also did electrical.  And we had all of

2    the systems up to the boundary of the modular data centers

3    that were under contract to BCB.  So that was one scope.

4            The second scope, we were awarded the construction

5    management of the entire site, which included preparation and

6    monitoring of schedule in progress, site safety.  You know,

7    procurement activities like receiving of materials and

8    verifying quantities and overall control of the site.

9            And then, third, we were awarded direct hire

10   construction activities for electrical and instrumentation of

11   the facilities up to the boundary with the data centers.

12   Q.  Could you describe for the Court your interactions and

13   observations of BCB in connection with the project.

14   A.  So it became apparent, as we were brought in, that they --

15   they truly needed the expertise.  They, as near as we could

16   tell, were over their head as far as engineering of these

17   types of facilities and construction of these types of

18   facilities.  And I think we provided a lot of direction,

19   expertise.

20           We also pointed them in the direction for their

21   subcontractor CEGEN, who had things that did not meet the

22   National Electric Code in their design.  Even though it was

23   outside of our direct area of responsibility and we were not

24   stamping those electrical drawings, we felt obligated to point

25   out code violations that would interfere with the facility

1    being operational.

2    Q.   Did there come a point in time when you were transitioned

3    off the project?

4    A.   There did.  There was.  And it was, I would say, late

5    February, maybe early March.

6         You know, we knew that the project was having

7    challenges, which we had been pointing out for many months.

8    We prepared a critical path method schedule of the

9    construction and engineering and procurement activities, and

10   we reported routinely to BCB.  I personally was on multiple

11   calls weekly with them.

12        And I believe -- well, throughout the project, our

13   interaction was direct with BCB.  We did not talk to MineOne.

14   All reports were given to BCB, all pay apps went to BCB, and

15   they passed on the information that they chose to MineOne.

16        We notified them multiple times of schedule problems,

17   of shortfalls, and of corrective actions that we could see.

18   And we did not see the vast majority of our recommendations

19   being acted upon.

20        In fact, we were blocked from pushing and making

21   corrective action with CEGEN, who was their subcontractor,

22   even being told "We don't care if there's OSHA violations.

23   You cannot direct our subcontractor on-site."

24   Q.   Just so the record is clear, which party said to you that

25   they didn't care about OSHA violations?

1    A.   That was -- that was Emory.

2    Q.   Someone affiliated with BCB?

3    A.   Yes.  And I wouldn't characterize it as they didn't care.

4    But even though we were responsible for site safety as

5    construction managers, as we were pointing out and identifying

6    OSHA violations, which I would shut down a site for, we were

7    told that CEGEN was --

8              MR. MURPHY:  Objection.  Time-out.  Time-out.

9              "We were told that" is hearsay.

10             THE COURT:  Sustained.

11             THE WITNESS:  Okay.

12   A.   (Continuing.)  I was told --

13             MR. MURPHY:  Same thing.

14             THE WITNESS:  I have firsthand knowledge.

15             MR. MURPHY:  Same objection.  It's hearsay.

16             THE WITNESS:  Okay.

17             MS. COLBATH:  Well, again -- this is not being

18   introduced for whether there was actually an OSHA violation.

19   It's what was discussed at the time and -- and who was having

20   conversations.  MineOne was not part of that.

21             But -- but I -- I'll move on.

22             THE COURT:  Well, you can even say -- lay a

23   foundation.  I don't even know who's talking.  I mean, it's

24   just somebody out there talking.

25   ///

1    BY MS. COLBATH:

2    Q.  Did there come a point in time when you did interact with

3    representatives of the MineOne parties?

4    A.  We interacted with MineOne after we were removed from site

5    and we still had unpaid bills.  And, at that point, I got to

6    meet Dr. Rengifo and we worked out payment for the unpaid

7    monies for work that had been completed and was due.

8           But until that point we had been held at arm's length

9    and not been allowed to communicate with MineOne.

10   Q.  And did MineOne ultimately make all of the payments to

11   Shermco that it agreed to make?

12   A.  They did.

13          To my knowledge.

14          MR. MURPHY:  Can I ask the Court how much time Paula

15   has left, please?  I thought -- I think we're done.

16          THE COURT:  I think it's pretty close.

17          She has about 10 minutes.

18          MR. MURPHY:  Oh, what?

19          MS. COLBATH:  So I'm -- I'm saving it for the MineOne

20   defendants' accountant.  I have no further questions.

21          THE WITNESS:  Okay.

22          MR. MURPHY:  Very quickly.

23                        CROSS-EXAMINATION

24                        BY MR. MURPHY:

25   Q.  Sir, we talked yesterday -- didn't we? -- on the phone?

1   A.  We did.

2   Q.  You told me that Shermco sued MineOne for nearly $500,000

3   and then settled the case later; right?

4   A.  No.  That's not what I said.

5           I said --

6   Q.  You said --

7   A.  -- Shermco made claim to MineOne for monies that were due

8   and owing and unpaid.  We did not file a suit against MineOne.

9   Q.  I'd be surprised to learn that.

10          You said CEGEN was MineOne's subcontractor.  But

11  don't you mean that CEGEN was MineOne's -- was MineOne's

12  subcontractor, not BCB's subcontractor?

13  A.  I was told that -- by BCB -- that CEGEN was BCB's

14  subcontractor.

15  Q.  Have you ever seen the contract between Shermco and

16  MineOne?

17  A.  Yes.

18  Q.  Have you seen this contract between CEGEN and MineOne?

19  A.  No.

20  Q.  You've never seen a contract between BCB and Shermco;

21  correct?

22  A.  That is correct.

23          We originally negotiated one, and at the last minute

24  they asked us to transfer the parties from BCB to MineOne,

25  which we did.

1        MR. MURPHY:  Nothing more, Your Honor.

2        THE COURT:  Who is "they"?

3        THE WITNESS:  "They"?  I'm sorry.

4        THE COURT:  You said --

5        MS. COLBATH:  You said "they asked us."

6        THE COURT:  -- "they asked us."

7        THE WITNESS:  Oh, I'm sorry.  My mistake.

8        BCB negotiated a contract with us for service, and,

9    at the last minute before we were to sign the contract, BCB

10   requested that we agree to change the contract to be between

11   Shermco and MineOne, which we agreed to.

12        THE COURT:  Thank you.

13   BY MR. MURPHY:

14   Q.  And MineOne wanted that, didn't they, Mr. Aldrich?

15   A.  It is my understanding that MineOne requested BCB to

16   transfer the contract from BCB to MineOne.

17        MR. MURPHY:  Thank you.  Nothing further for you.

18        MS. COLBATH:  Okay.  Nothing.

19        Our final witness -- thank you so much.

20        THE WITNESS:  Thank you.

21        MS. COLBATH:  Our last witness is Ed Deignan.  Okay.

22        MR. MURRAY:  Your Honor, this is Scott Murray on

23   behalf of Plaintiff BCB at this point.

24        We would renew that objection to preclude Mr. Deignan

25   from testifying in today's hearing.

 1              THE COURT:  Overruled.

 2              Please raise your right hand and be sworn.

 3         (Witness sworn.)

 4              THE WITNESS:  (No response.)

 5              MS. COLBATH:  Ed, are you on mute?

 6              There.  I can hear you now.  Okay.

 7              THE WITNESS:  Yes.  The answer was yes to that

 8    question.

 9              MS. COLBATH:  Okay.

10              THE COURT:  I think -- before you start,

11    Ms. Colbath --

12              MS. COLBATH:  Yes.

13              THE COURT:  -- repeat the objection, Counsel.

14              MR. MURPHY:  Your Honor, this is Pat Murphy.

15              Our objection has been -- and in writing yesterday --

16    that Mr. Deignan was not listed as a witness until June the

17    22nd, on Saturday night.

18              Your Honor's deadline is June 19th.  This was all

19    information -- all of these loans that he's apparently now

20    going to testify about was well known and well anticipated by

21    MineOne even back in May of this year.  They simply didn't

22    list him.  He's not a true rebuttal witness.  He is a witness

23    that they should have called in their case in chief on

24    June 19th to give testimony about the loans.

25              He's -- that's -- that's why he should be precluded.

1    They just missed the deadline.  And they chose not to.

2              MS. COLBATH:  So -- so if I could be heard,

3    Your Honor.

4              This is a classic no good deed goes unpunished.

5    Mr. Murphy's son submitted, I think, a -- a 78-page affidavit

6    on Monday night and has continued to raise -- he purported to

7    be an expert on the loans, and so this is in rebuttal to what

8    we just heard from Mr. Murphy.

9              He testified working for FASB, and he went into great

10   detail about camouflaged equity, testifying as an expert.

11   This is absolutely in response to that testimony.

12             Rebuttal, again -- when I submitted my witness list,

13   I said I was not disclosing, but as a courtesy to Mr. Murphy

14   and to give him as much heads-up as possible, I did add

15   Mr. Deignan.

16             And there's no prejudice to Mr. Murphy, and the

17   testimony will be under 10 minutes so that the Court can have

18   some background in response to what Mr. Murphy testified to

19   today.

20             MR. MURPHY:  None of it's been disclosed.  It's not

21   10 minutes.  It would only be about three.  But the Court has

22   heard the arguments.

23             The other thing is I've been asking for this loan

24   information since October '23 and now they list him at the --

25   at the 11th hour with no designation.  It's unfair.

1          MS. COLBATH:  I requested information --

2          MR. MURPHY:  It's not fair.

3          MS. COLBATH:  -- and Judge Rankin actually ruled

4    and -- and said we did not have to provide loan information.

5    That was -- that was a written order and decision.

6          MR. MURPHY:  Not true.

7          THE COURT:  All right.

8          Mr. Murphy, I'll sustain your objection.  When a

9    party -- and I'm just quoting from a -- an earlier case from

10   this District, *Linnik versus Trans Quality, Incorporated*.  And

11   you want to might check it at 2022 Westlaw 2189547 at Note 2.

12   Wyoming District Court, January 12th, 2022.

13         When a party "seeks to rebut theories which they knew

14   about or reasonably could have anticipated, the District Court

15   is within its discretion in disallowing rebuttal testimony,"

16   citing *Comcoa, Inc., versus NEC Tel, Incorporated*,

17   931 F.2d 655, 664, Tenth Circuit, 1991.

18         "Because plaintiffs were warned that rebuttal

19   evidence would be restricted and because they reasonably could

20   have anticipated defendants' evidence, it was within the

21   District Court's discretion to disallow plaintiff's rebuttal

22   evidence," *Fashauer versus New Jersey Transit Rail Operations*,

23   57 F.3d 1269 at 1287.  That case held that the District Court

24   acted within its discretionary -- discretion by precluding

25   rebuttal testimony to that which reasonably could have been

1   anticipated.

2          MS. COLBATH:  Your Honor, might we get a ruling on my

3   motion to strike the two affidavits that were filed at

4   midnight on Monday night as part of a reply?

5          Mr. Murphy was granted additional pages in his reply

6   brief but then took the liberty to submit two entirely new

7   affidavits, one of Emory Patterson, Docket 242-4, a 78-page

8   affidavit on reply -- it had 112 paragraphs -- and another

9   Michael Murphy affidavit, Docket 242-3, on reply, 38 pages,

10  50 if you include the exhibits.  That had 86 pages.

11         They were an absolute abuse to the extension that he

12  received for five additional pages on his reply brief.  Both

13  affidavits were chock-full of new material that did not

14  respond to our opposition.

15         So we would like those two affidavits stricken from

16  the record.

17         MR. MURPHY:  They -- they are not even part of the

18  hearing today.  This is a moot issue.

19         MS. COLBATH:  Not moot.  You filed --

20         MR. MURPHY:  It hasn't been -- they haven't been

21  offered into evidence today, and they're not the evidence

22  today.

23         Why are -- this is -- it's moot.

24         MS. COLBATH:  It's not moot.  I filed a motion and --

25  and it's -- it's ready for decision.

1           THE COURT:  Well, what were they submitted for?

2           MS. COLBATH:  To -- to put new facts before the

3    Court, to -- to extend what Mr. Murphy couldn't fit into his

4    brief.  The first eight pages of one of them is an entire

5    recitation -- it's where I learned for the first time that

6    Mr. Murphy had received documents from Republic Title.  He

7    references material that was totally new.

8           It was totally inappropriate as a reply.  He was

9    entitled to a reply brief and has submitted, as I said, over a

10   hundred pages of new testimony on this motion.

11          THE COURT:  Well, I'll agree with you.  I will not

12   consider it for this hearing.

13          MS. COLBATH:  Thank you.

14          MR. MURPHY:  Your Honor, I'd like to use my last

15   2 1/2 minutes to call back Michael Murphy as a rebuttal

16   witness.

17          MS. COLBATH:  I'm told that you exhausted the time.

18          Could we get a time from the court reporter?

19          THE COURT:  2 minutes and 59 seconds is what it says

20   on the clock.

21          MS. COLBATH:  Okay.  I keep getting emails that

22   indicate that it ended.  But okay.

23          MR. MURPHY:  Michael Murphy, are you there?

24          THE WITNESS:  I'm here.

25   ///

1           MR. MURPHY:  Okay.  Back under oath.

2                **MICHAEL MURPHY, PLAINTIFF'S WITNESS**

3            **FURTHER DIRECT EXAMINATION BY MR. MURPHY:**

4    Q.  Did you hear Erick Rengifo testify?

5    A.  I did.

6    Q.  What is your re- -- rebuttal to what Dr. Rengifo

7    testified to?

8    A.  I rebut most of what he said.  There's not enough time to

9    go through all the details.

10          A lot of those details were provided in Emory

11    Patterson's rebuttal affidavit, which was produced at such a

12    late time because the defendants failed to produce information

13    to BCB until the last time moment on June 19th.  The new

14    information that has come available to us is why we're having

15    to -- to provide our new information.  If defendants would

16    just hurry up and give us their info, we could get back to

17    them.

18          But specifically to Rengifo, his claim -- this is

19    what I want to make very clear to the Court:  No one is

20    disagreeing about how the project was delayed.  The project

21    was delayed.  It was very delayed.  And that caused all our

22    problems.

23          But we have to look at the contract facts.  At the

24    end of the day, MineOne signed a contract with Shermco.

25    MineOne signed a contract with CEGEN.  MineOne signed a

1  contract with Black Hills.  MineOne signed a contract with all

2  of its vendors.

3          The only party that BCB signed a contract with was

4  MineOne, and earlier we had signed a contract with Black Hills

5  that was assigned.  But BCB had no subcontractors on the site.

6  We were not responsible for other parties.  Only MineOne, as

7  the contracting party with its vendors, had the ability to

8  control or enforce those vendors' performance.

9          BCB could not force CEGEN to build the 10 data

10 centers faster.  CEGEN had to do that.

11         MineOne's claims that this was late, they need to

12 take those up with the vendors who were actually responsible

13 and who were contractually responsible.

14         So that's the main point I want to make, is look at

15 the contracts.  MineOne wants to distract us and say it's

16 BCB's fault.  But if you look at the actual contracts, you

17 will realize that BCB did everything its contract said, and

18 MineOne is getting upset because it doesn't want to have to go

19 deal with all of its other vendors.  It just wants to lump

20 them all together with -- with BCB.

21         So that's the main point I want -- I want to make

22 about it.

23         The other thing I -- the other final point here -- or

24 maybe another point if I have the chance -- is Dr. Rengifo is

25 very smart.  He is a PhD.  Jiaming Li is very smart.  He is

1    a PhD.

2          They understand how to structure things to benefit

3    themselves.  They have structured things in a way to get the

4    money out with their related parties under the guise of doing

5    related-party loans.

6          That's the other -- other point that I wanted to

7    make.

8    Q.  My last question:  Rengifo says that you knew they were

9    Chinese back in June and -- of 2022.

10   A.  In June of '22?  When we were first introduced to them, we

11   were talking with Erick and Jiaming Li, and Erick mentioned

12   that he represented a multinational group of investors.

13         Jiaming Li, he -- he appeared to be Chinese; he

14   looked Chinese.  He represented to us, though, that --

15   I think -- that maybe he was from Mongolia.  He -- he said he

16   was living in Singapore.

17         And, yes, I'm aware that Bitcoin mining was banned in

18   China and a lot of Bitcoin miners wanted to relocate to the US

19   and maybe one or two -- we were -- I'm sorry.

20         We were aware that they -- they -- MineOne had

21   clients that were Chinese, people -- people that had the

22   Bitcoin mining machines.  But there was much -- much

23   obfuscation and a lack of transparency with who their

24   investors really were.  BCB was never privy to that

25   information with the actual investors and their -- their

1  origin.

2          And I should note this regarding the -- the power

3  contract that Erick talked about:  There was a floor in the

4  original agreement for 5 cents.  At the direction of MineOne,

5  BCB then renegotiated a new contract with Black Hills where

6  there was no floor.

7          And we have to remember that MineOne signed that

8  contract for that power.  And why did they sign the contract

9  for the power?  They wanted the power.  It was one of the

10  critical factors needed to conduct their business.  A lot of

11  other companies wanted the power.

12          MineOne had the contract.  They read the contract.

13  They understood the contract.  Very smart people.  They're

14  very smart.  They knew exactly what they were signing.  They

15  signed that agreement.

16          So their claims now that they were paying more money

17  than they thought they were going to pay -- they should have

18  known what contract they were signing.

19          MR. MURPHY:  That's all I have, Your Honor.

20          Thank you.

21          THE COURT:  Very well.

22          Are we ready for our closing?

23          MR. MURPHY:  Yes, I am.

24          MS. COLBATH:  Sure.

25          THE COURT:  Do we want to take a brief recess with

1    the court reporter?  And the Court.

2            We'll stand in recess for 15 minutes.

3        (A recess was taken from 6:06 p.m. to 6:35 p.m.)

4            THE COURT:  Thank you.

5            Mr. Murphy.

6            MR. MURPHY:  Thank you, Your Honor.

7            May it please the Court and counsel.

8            Under Wyoming law, quote, "An order of attachment

9    binds the property attached from the time the writ is

10   executed," 1-15-212.

11           "The property attached or its proceeds shall be

12   subject to the judgment to be rendered," 1-15-211.  "An

13   attachment creates a lien under these prejudgment attachment

14   statutes," *Platte County State Bank versus Frantz*.

15           "And a garnishment is a process of attachment, and a

16   garnishee is bound from the time of service.  Personal

17   property capable of manual delivery shall be attached by

18   taking it into custody."  And Wyoming -- and under Wyoming

19   law, a prejudgment writ of attachment makes MineOne's property

20   subject to execution upon BCB obtaining a final judgment.

21           What that means is this:  When BCB obtains the

22   judgment, it can satisfy that judgment from MineOne's property

23   subject to attachment by the prejudgment writs; i.e., the

24   requested portion of the 22,500,000 CleanSpark sales proceeds

25   held by this Court or a designated third-party receiver or

1    custodian.

2         The whole purpose of obtaining prejudgment writs of

3    attachment and garnishment is to establish that BCB is

4    entitled to its requested portion of the 22,500,000 sales

5    proceeds after obtaining the judgment.

6         And the Utah Federal Court wisely observed, quote,

7    "A prejudgment writ of attachment is intended to preserve the

8    status quo by placing the property in the custody of the law

9    to be so held until the Court determines whether or not

10   plaintiff in this action is entitled to judgment in the main

11   case," *DiTucci versus Ashby* in our brief, 2019.

12        Furthermore, BCB does not have to show priority over

13   MineOne's alleged related-party creditors, but BCB proved

14   today its claim is superior to all other claims other than the

15   Antalpha claim.  Shareholders and related parties who would

16   loan or invest money in an insolvent company -- which MineOne

17   is based on its liabilities exceeding its assets -- have a

18   lower priority than genuine third-party judgment creditors and

19   other unsecured creditors.

20        The Mississippi Supreme Court said in '69, quote,

21   "Officers, directors, and shareholders of an insolvent

22   corporation or one rendered insolvent in conveyance to them

23   cannot prefer themselves in payment of preexisting debts and,

24   thus, deprive creditors of their claims against the

25   corporation."

1          And, today, BCB proved all the statutory elements for

2    prejudgment attachment.  BCB proved MineOne is indebted to BCB

3    for nearly 20 million.  Terra Crypto is indebted to MineOne

4    for even more.  There are no legal setoffs to this

5    indebtedness.

6          MineOne has not paid anything to BCB on this

7    indebtedness.  BCB's requested attachment of the CleanSpark

8    sales proceeds are not sought to hinder, delay, or defraud any

9    creditor of the MineOne defendants.

10         The MineOne defendants' payment of the 19,985,667

11   indebtedness is not secured by any mortgage or lien upon the

12   MineOne defendants' real or personal property in Wyoming, and

13   the MineOne defendants are about to assign, remove, or dispose

14   of their property, these CleanSpark sales money, with the

15   intent to defraud their biggest creditor, BCB.

16         And the Wyoming Fraudulent Transfer Act says in this

17   context, quote, "Defrauding one's creditor simply means

18   MineOne is paying its other related parties and unsecured

19   creditors with the actual intent to hinder, delay, or defraud

20   any creditor of MineOne," 34-14-205(a)(i).

21         And, in determining actual intent under

22   paragraph (a)(i) of the statute, "Consideration may be given,

23   among other factors, to whether, one, the transfer or

24   obligation was to an insider; two, the debtor retained

25   possession or control of the property transferred after the

1    transfer; and, four, before the transfer or obligation was

2    incurred, the debtor had been sued or threatened with suit by

3    its creditor"; here, BCB.

4         And BCB proved each of these statutory factors.

5    Specifically, all of these alleged loans are to an insider,

6    related-party arrangements.  Second, MineOne retains

7    possession or control of the CleanSpark monies after the

8    closing.  And, third, before the CleanSpark closing happens,

9    MineOne was sued by Creditor BCB.  In fact, a year ago.

10        And we proved, today, definitively, the CFIUS defense

11   is no defense to BCB's claim.  Andrew Astuno testified that

12   MineOne and MineOne only could notify CFIUS and seek CFIUS'

13   approval for its -- for this real estate transaction.  MineOne

14   is, again, trying to blame BCB for what only MineOne could do.

15        And BCB also proved these things:  That MineOne

16   anticipatorily repudiated its DHS agreement on March 13, '23,

17   with its decision to remove BCB as the host and operator at

18   North Range and completely preclude BCB from being involved at

19   Campstool and MineOne had no cause to breach or repudiate its

20   DHS agreement with BCB.  In fact, BCB substantially complied

21   with each and every contractual obligation it had to MineOne.

22        BCB's primary contractual obligation was to, quote --

23   was to perform, quote, "all other reasonable related

24   activities within its control."  "Within its control."

25        BCB complied with its obligation to perform

1    reasonable activities within its control.  It was Defendant

2    Terra Crypto, not BCB, who had the contractual obligation in

3    the CS agreement to, quote, "assure," unquote, completion by

4    the completion date.  Terra Crypto breached its obligation to

5    ensure that all tasks were developed in a timely manner.

6          CEGEN and -- and Shermco were MineOne's contractors,

7    not BCB's subcontractors, as Mark Aldrich originally and

8    mistakenly testified, and their delays and problems caused the

9    project to be late, but those are not hung on BCB.

10         The camouflaged equity.  It is so clear these MineOne

11   loans are not real, genuine loans.  They are false loans; they

12   are camouflaged equity, nothing more.  They are really an

13   insider's and related party's equity contributions.  They are

14   false and contrived efforts to move these CleanSpark monies to

15   Jiaming Li, Erick Rengifo, and other insiders, including

16   members and owners of MineOne Wyoming Data Center, and those

17   fake loans are made to defraud BCB and line Rengifo and Li's

18   pockets with this CleanSpark money.

19         Do you think we'll ever see it after they get it?

20         MineOne's alleged related-party loans are nothing

21   more than camouflaged equity.  As the Court said in 2010,

22   *In Re:  Lexington Oil and Gas,* 423 Bankruptcy Reporter 353,

23   District of Oklahoma, quote, "When a plaintiff establishes the

24   presence of sufficient badges of fraud, he or she is entitled

25   to a presumption of fraudulent intent.  The Court concludes

1    that the Dow note and the Cox note should be recharacterized

2    as equity contributions."

3            That's what this Court should do here.  The amounts

4    provided by the MineOne members to MineOne should not be

5    viewed as unsecured loans but, rather, as camouflaged equity.

6    Any anticipated payments to the MineOne members which MineOne

7    has said it plans to do partially out of the Campstool

8    proceeds and the remainder out of the North Range proceeds

9    ahead of Future Judgment Creditor BCB will defraud BCB.

10           And without the Court granting BCB's requested

11   prejudgment writs of attachment and garnishment, MineOne and

12   CleanSpark will close on the Campstool transaction, and Erick

13   Rengifo and Jiaming Li, beneficial owners of MineOne and the

14   only two owners of Terra Crypto, will have $4,152,434 sent to

15   Defendant Terra Crypto, an entity they solely beneficially own

16   and manage.  There are reasons to support the attachment.

17           MineOne projects its own fear to scare the Court into

18   not issuing this prejudgment attachment, saying, "BCB's writ

19   for attachment must be denied as the MineOne defendants should

20   be allowed to close on the properties, delivering clear title

21   to CleanSpark at the conclusion of the hearing."  Then they

22   say -- get this -- "Finding otherwise will almost certainly

23   kill any deal for the sale of the properties."

24           That is -- that's a scare tactic; it's wholly untrue.

25   These MineOne defendants also admit in their newest pleading

1    the parties are ready to close on Campstool as early as

2    June 27, 2024, tomorrow.

3           Which way is it, MineOne?  Is it that you're going to

4    scare off the CleanSpark deal, or are you going to close

5    tomorrow?

6           In reality, Your Honor, this sale is happening, and

7    it's happening fast and certain.  When the Court issues a writ

8    of attachment and garnishment on any portion of the

9    22,500,000, the Presidential divestment order can and will be

10   effectuated without problem or delay.  Andy Astuno testified

11   to that.

12          MineOne will be able to live -- to deliver clear

13   title to CleanSpark on both Campstool and North Range because,

14   first, BCB consents to 6,903,000 being paid from the

15   11 million 250 Campstool purchase monies to release and clear

16   out Antalpha's secured mortgage on North Range, thus

17   delivering clear title to North Range.

18          Second, no one besides Antalpha has filed a mortgage

19   or security interest on North Range or Campstool.  And, third,

20   BCB is not seeking a writ against the Campstool or North Range

21   lands or real property.  Instead, BCB seeks a writ only on the

22   remaining 15,529,165 of CleanSpark purchase monies and the

23   999,111 of MineOne's remaining security deposit with

24   Black Hills Energy.

25          You know, CleanSpark and MineOne were hours away,

1    literally, from closing on Campstool on June 5th of 2024.

2    MineOne delivered its warranty deed to CleanSpark on June 5th,

3    2024, for Campstool.

4         And now they may close as soon as tomorrow and move

5    11,250,000, all on the value BCB created, all that was

6    created, built, and earned by BCB's hard work and their

7    securement of the electrical power contract.

8         Attaching these purchase monies does nothing to

9    impair or impede the sale of either property, and attaching

10   the purchase monies does nothing to impair or delay the

11   divestment order under the Presidential order.  Instead,

12   attaching these CleanSpark monies promotes and effectuates the

13   Presidential order.

14        With respect to the bond, in their newest pleading

15   MineOne wants you to set a bond in an amount not less than

16   32 1/2 million.  My God.  Even though there is no possibility

17   MineOne will suffer any damage -- any damage -- if the writs

18   are issued and the monies are held by the Court, not by BCB.

19        The Wyoming attachment statute, like other states'

20   prejudgment attachment statutes, leaves the amount of the bond

21   to Your Honor's discretion.

22        And recently the Minnesota Federal Court identified

23   the factors Courts consider in establishing a prejudgment

24   attachment bond.  Quote, "In establishing the amount of the

25   bond, the Court shall consider the value and nature of the

1  property attached, the method of retention or storage of the

2  property, the potential harm to the respondent or any party,

3  and other factors the Court may deem appropriate."

4          First, with the Court or its designee financial

5  institution holding all 15-plus million of the attached

6  CleanSpark purchase monies, there is no damage or loss, quote,

7  "which may be incurred or supported by MineOne as a result of

8  a wrongful issuance of the writ," Wyoming Statute 1-15-104(a).

9  "No damage or loss."  That's because all of the money will

10 stay in the Court's control until a final judgment is entered

11 or execution issued.

12         The only way MineOne can lose any of the money is for

13 the Court to later enter judgment against MineOne and BCB then

14 executes on it.  If the Court later finds in MineOne's favor,

15 they've lost nothing, and they've made a good 5 percent on all

16 of their money because the money is protected and will be

17 earning interest at or near 5 percent between now and final

18 judgment.

19         BCB, MineOne, and MineOne's other creditors will

20 actually gain from this 5 percent interest on the invested and

21 attached CleanSpark funds.  MineOne reserves all of attached

22 proceeds and the 5 percent interest it generates if it

23 prevails at trial.

24         And even if, somehow, MineOne would later argue that

25 the Court erred with its wrongful issuance of the writ,

1    MineOne suffers no damage or loss from any wrongful issuance

2    of the writ.  The only potential damage MineOne posits is,

3    quote, "is that the potential damage that would result if the

4    writ causes CleanSpark to walk away from the deal," unquote.

5    That's in their response at page 10.

6              Did Your Honor hear any evidence today that

7    CleanSpark is going to walk away from the deal?  No.  The

8    evidence is undisputed.  They're going to close on this puppy

9    tomorrow, and then they're going to go and close on

10   North Range.

11             There is no evidence presented at this hearing that

12   CleanSpark will walk away from its 22,500,000 purchase if the

13   Court enters writs of attachment and garnishment.

14             This deal is happening.  CleanSpark is closing and

15   paying 22 1/2 million to the escrow agent, Republic Title of

16   Texas, as quickly as possible, and MineOne will quickly

17   receive and distribute the entire 22 1/2 million with, quote,

18   "the actual intent to hinder, delay, or defraud a creditor,

19   BCB, of the debtor if the Court does not attach and garnish

20   the money."

21             MineOne has told the Court it will never pay BCB.  We

22   believe them.  But with MineOne telegraphing its actual intent

23   to hinder, delay, or defraud BCB's likely judgment creditor,

24   the Court should exercise its broad discretion and properly

25   set the bond at 1,000, 2,000, or even $3,000.  BCB cannot

 1   afford to post a bond of more than a few thousand dollars.

 2   More importantly, an expensive bond is not needed under our

 3   case circumstance.

 4          Final thoughts:  Your Honor sees and hears how

 5   contentious this case is.  You saw it today.  Without these

 6   writs this case goes to trial.  Without -- I strike that --

 7   yeah.

 8          With the writs -- with the writs, we can settle this

 9   case and we would.

10          If the Court does not grant these writs tonight, all

11   is lost for BCB, years of hard work, creativity, and all the

12   value BCB earned in winning the power contract and developing

13   valuable assets.  MineOne will close on Campstool tomorrow,

14   the escrow agent will send 6,903,000 to Antalpha and more than

15   4 1/2 thousand to Jiaming Li and Erick Rengifo, the Terra

16   Crypto owners.  This money will be forever lost to BCB.

17          Then, when North Range closes, all 11,250,000 will be

18   paid to MineOne, and MineOne will divvy it up to Jiaming Li,

19   Erick Rengifo, all their insiders and related parties and

20   forever beyond the reach of BCB, even though BCB will likely

21   be MineOne's judgment creditor for over 38 million.

22          Everything turns on Your Honor's decision to issue or

23   not issue these writs.

24          If the Court does not attach or garnish these

25   purchase monies, the MineOne defendants will pay and enrich

1  themselves and their related parties, and they'll pay their

2  own lawyers to keep fighting BCB.  But, by issuing the writs,

3  Your Honor, the money -- all of the money at dispute -- will

4  finally be held in a status quo, a time-out.  It will finally

5  put this on a level playing field where justice can eventually

6  be done.

7         And when that happens, that will put this case on an

8  expedited road to settlement and resolution, and that road,

9  the -- and that expedited path to settlement and resolution

10 also ensures that the Presidential order is effectuated and

11 entirely resolved.

12        Judge Johnson, please issue these writs of attachment

13 and garnishment this night and put all of us on an expedited

14 path to settlement and full resolutions.

15        Thank you very much.

16        THE COURT:  Ms. Colbath.

17        MS. COLBATH:  Thank you, Your Honor.  May it please

18 the Court.

19        THE COURT:  Thank you.

20        MS. COLBATH:  First, I think we've lost sight a

21 little bit about how harsh and extraordinary and drastic the

22 relief that Mr. Murphy seeks is under the law.

23        This is not deciding a motion to allow someone leave

24 to amend a complaint.  This is some of the most drastic

25 relief, which requires -- it's statutory.  It requires strict

1   compliance with the statute, and you have to have compelling

2   facts, which are absolutely absent here.

3           Mr. Murphy was required to show that the MineOne

4   parties have sought to hinder, delay, or defraud a creditor

5   and that MineOne is about to assign, remove, dispose, or

6   conceal its property.  And here's the important part, "with

7   intent to defraud creditors," and there's absolutely nothing

8   in this record about any intent to defraud.

9           Actually, this transaction with CleanSpark was

10  publicly announced, was driven by the Presidential order, and

11  creates monies that will actually go -- we have outlined

12  penny-for-penny where the money will go, and nothing is going

13  sideways.

14          Mr. Murphy tries to -- now in his closing, he wants

15  the Court to recharacterize loans that the MineOne parties

16  received under very desperate circumstances that were actually

17  created by BCB.

18          We have a situation where there were tremendous cost

19  overruns, severe delays in getting the operation up and

20  running, and Mr. Murphy's client doesn't want to take any

21  responsibility for that even though their obligations under

22  the development, hosting, and service agreement, which spans

23  18 pages, were crystal clear.

24          They missed key deadlines.  They can point fingers at

25  other vendors.  They had the obligation to manage those

 1   vendors, and it is BCB that agreed to the October 31, 2022,

 2   date.

 3          I think it's interesting and very compelling that

 4   Mr. Murphy tries to make a lot of -- he calls them fake loans,

 5   false loans.

 6          Well, once Mr. Murphy -- as we heard, his clients

 7   walked off the site, packed up their bags.  No notice, no

 8   default notice, no telephone call, no termination notice,

 9   just -- my clients flew in from China and from New York to

10   meet with representative of BCB, and they were nowhere on the

11   site.

12          They just -- and then, once they left, within

13   48 hours they had filed a lawsuit.  They had decided to file

14   that lawsuit some time earlier.  It didn't get prepared in

15   24 hours.

16          So they didn't cross-examine Erick -- Dr. Rengifo --

17   about the necessity for the loans, how the proceeds were used.

18   And Dr. Rengifo testified that they were desperate to keep the

19   vendors on the site working so they had to go and get

20   nontraditional -- Bank of America, Wells Fargo wasn't going to

21   lend into a situation where the project manager, without

22   notice, had walked off the site and left MineOne to figure out

23   how to proceed.  And, to add insult to injury, that property

24   manager, BCB, brought a lawsuit.  And people don't lend into

25   situations where there are lawsuits.

1          So, as Dr. Rengifo described, this was catastrophic.

2     This was on the verge of a bankruptcy-type situation, and they

3     were successful in getting enough money to carry them until

4     the Antalpha loan ultimately came through.

5          This is BCB's burden on -- on attachment.  I didn't

6     have to call any witnesses, and they -- they fall short of

7     meeting their burden.

8          There's nothing fraudulent about the CleanSpark

9     transaction.  Arm's length, public company, announced, no --

10    no quibbling with the consideration, that it was fair and

11    adequate.  There was no secrecy surrounding it.  It's a public

12    company.  The purchase and sale agreement was filed with

13    the SEC.

14         Again, the proceeds -- Mr. Murphy says that MineOne

15    won't suffer any damages, they lose nothing, and that's just

16    not true.

17         MineOne has current creditors.  BCB is a contingent,

18    remote liability.  You heard two varying scenarios today about

19    the underlying facts.  The fact is the contract here provided

20    an October 31, 2022, date that didn't even come close.  There

21    wasn't even substantial compliance; there wasn't any

22    compliance.

23         And so when Mr. Murphy says that my clients in

24    March of 2023 made a proposal for an adjustment to the

25    contract, that they wanted to sit down -- they flew in to

1   actually sit down and have a conversation -- that's because

2   BCB, as you also heard from Mr. Aldrich, who was there

3   onsite -- they were in way over their heads.

4           And -- and the clients that were going to host miners

5   at this facility -- the MineOne parties were face -- did pay a

6   $200,000 penalty because they didn't have sufficient mining

7   capacity when they had agreed that they would have it.

8           There are -- there are vendors that are due; there

9   are lawyers; there are lenders and lenders get paid before

10  equity.

11          There are people -- in this situation it's -- it's

12  kind of -- what -- I scratch my head when I think of the

13  juxtaposition here because you've got BCB with both hands out,

14  claiming $19 million for a phase that it didn't lift a pencil

15  for.  BCB did not put in one dime in this project.  And my

16  clients, who went to -- to third parties and were able to get

17  the money to make this a success, are now being accused of

18  like nefarious conduct when they were able to save the project

19  when -- when BCB, you know, just -- just walked to the

20  courthouse.

21          You heard Dr. Rengifo talk about BCB's breaches.

22  There were significant cost overruns; there were extreme

23  delays in delivery under the contract; there were permitting

24  obligations that were not satisfied.

25          And on the permitting, no one has suggested that BCB

 1   should have listed itself as the owner on a permit.  We all

 2   know we hire agents.  Their expert said that he had made

 3   filings on behalf of clients before but you have the client

 4   sign.  And so that didn't happen here.

 5          Mr. Murphy acknowledged knowing that CFIUS was

 6   interested.  He had received a report and an email -- the

 7   report prepared by Microsoft -- and an email that CFIUS might

 8   be interested.  He had the obligation -- contractual, black

 9   and white, under 6.2 of the contract -- to take action and he

10   didn't.  They -- BCB walked off the job, filed its lawsuit,

11   and created the situation that we now find ourselves in.

12          I think it's also highly relevant that the agreement

13   that is being assigned to CleanSpark is an agreement that BCB

14   had absolutely nothing to do with.  This agreement came into

15   being in April of 2024.  It -- it -- the negotiations for it

16   started well after BCB walked off the site.

17          And the -- the contract actually is a very novel

18   contract.  And I don't know, given the -- the accent that

19   Dr. Rengifo has, whether you really understood that this is a

20   whole new area that they contracted with Black Hills, that

21   is -- this is the first of its type.  And BCB had absolutely

22   nothing to do with the creation, negotiation, and assignment

23   of that contract.

24          I want to address the bond because Mr. Murphy

25   minimizes the importance of the bond.

1        If money is tied up until 2025, 2026, there are

2    current creditors that are owed money that are not going to

3    stand by and wait until 2026 for Mr. Murphy -- for this matter

4    to be resolved.  They're owed money; they want to be paid.

5    The property is being sold, and MineOne will receive lawsuits,

6    demands because it owes people now.  It has -- it has people

7    knocking on its door now.

8        And so there will be damage, and this isn't where

9    there's a -- lose nothing.  This is a situation where MineOne

10   almost loses no matter what happens.  If writs are issued, we

11   lose because we don't have access to the cash that we need.

12       And at least 2.6 of that cash is absolutely required

13   for the MineOne parties to comply with the Presidential order.

14   Mr. Murphy keeps glossing over that, but the order requires a

15   dismantling of the site -- transformers, underground wires,

16   right down to foundations -- and the estimate, which was

17   provided to Mr. Murphy, is 2.6 million from someone who knows

18   the site.  That's a requirement or the alternative is the

19   US Government will come in and confiscate the property without

20   any remuneration.

21       So there is huge damage and risk here to -- to the

22   MineOne parties.  A bond is absolutely essential.

23       Mr. Murphy is asking, essentially, no bond when --

24   when there are significant damages that will befall the

25   MineOne parties, and he -- and he's brazen in his request to

1   you.

2          He's saying, basically, "Please give us this

3   extraordinary writ of attachment because it will give us a

4   litigation advantage.  I promise you, Judge, this is going to

5   go on a fast track to settlement if you do this extraordinary

6   thing."

7          That -- that -- that is not the purpose of a writ of

8   attachment.  It's to secure an ultimate judgment where someone

9   has shown a propensity to conceal, to secrete.  And, here,

10  everything is absolutely totally aboveboard.

11         The other thing Mr. Murphy does in his reply papers

12  is he accuses me of scare tactics.  I've kept the Court

13  totally informed about the CleanSpark transaction.

14  CleanSpark -- he keeps saying, "Oh, well, we were going to

15  close on June 5th."  There was no closing.  We agreed on a

16  hearing, and there was not going to be a closing until the

17  hearing.

18         The scare tactics are Mr. Murphy, in his reply brief

19  to the Court, quite astounding to me, threatening to go after

20  other parties for attachment if you don't give him this

21  attachment.  He's going to make a lot more motions; he's

22  threatened to bring in other parties.  And that's an abuse of

23  process.  I mean, that's the scare tactic.

24         It's -- you're not entitled under the circumstances

25  here.  The money is going to current creditors.  The money is

1  needed to comply with the Presidential order, and lenders are

2  owed money now.

3          Mr. Murphy and BCB haven't come close to establishing

4  the type of fraudulent conduct, especially here, that this

5  transaction is driven by CFIUS' and the Presidential order.

6          And so, on behalf of the MineOne parties, we would

7  ask that the motion be denied in its entirety.

8          THE COURT:  Thank you.

9          Well, we'll take five minutes and I'll announce what

10  I think we should do.

11      (A recess was taken from 7:11 p.m. to 7:15 p.m.)

12          THE COURT:  This matter has come before the Court

13  upon the emergency motion for a protective order with

14  prejudgment writs of attachment and garnishment filed by the

15  plaintiff, BCB of Cheyenne, a limited liability company, which

16  does business as Bison Blockchain.  We'll refer to them as

17  "BCB," as they have been referred to throughout this hearing.

18          The matter came to the Court's attention first on a

19  request -- an amended emergency motion for protection and

20  prejudgment writs of attachment and garnishment under our

21  Electronic Filing System No. 203, which was filed on June 3rd.

22          And having reviewed the filings and applicable law

23  and being otherwise fully advised, I find that the plaintiff,

24  although in a -- in the arguments and the evidence that is

25  before the Court, there's plenty of room for casting various

1    forms of fault and uncertainty around but enough here to

2    satisfy me that the statutory requirements for a prejudgment

3    writ of attachment and garnishment have been satisfied, and,

4    therefore, the motion will be granted by the Court.

5              On May 3rd of 2023 plaintiffs -- plaintiff filed the

6    instant lawsuit against the defendants, MineOne Wyoming Data

7    Center, a limited liability company; MineOne Partners, another

8    LLC; Terra Crypto, Incorporated; Bit Origin, Ltd.; and

9    SonicHash, LLC, following dismissal of a similar motion in

10   Wyoming Chancery Court.  This lawsuit came to the Federal

11   Court.

12             The present pretrial matter arises from the

13   prospective sale -- the prospective sale, which is well on its

14   way and clothing -- closing is imminent -- of MineOne

15   defendants' North Range and Campstool properties and the

16   impending transfer of operations from MineOne to an outfit we

17   don't know much about called CleanSpark, Incorporated.

18             It was a forced sale in many senses, compelled by an

19   executive order from the President of the United States.  And,

20   as we've heard today from Mr. -- the Notre Dame graduate and

21   the Denver law school graduate who works with -- and -- and

22   has been involved in other matters and -- involving CFIUS,

23   that it isn't the President that really makes these decisions

24   but, really, a committee of individuals representing nine

25   different agencies of the Federal Government, including

1  Department of Defense agencies as well as others that may be

2  called in from time to time to offer their expertise under

3  law.

4          But, ultimately, the President ordered divestiture of

5  this Bitcoin mining operation that was under development by

6  MineOne and its associates and was about to become fully

7  active, as explained here by Dr. -- I'll massacre his name --

8  Rengifo -- or Rengifo might be the way to pronounce it -- in

9  the business park located -- North Range Park, they called

10 it -- located approximately 1 mile from Warren Air Force Base,

11 where nuclear weapons are assembled and where ultimate control

12 and command of a -- one leg of the stool, nuclear defense

13 stool of the United States, exists with the 20th Air Force.

14         Three legs of the stool, of course, bombers,

15 land-based missiles, and sea-based, submarine-based nuclear

16 armament that has been relied upon since the commencement of

17 the Cold War for the defense of this country and is, of

18 course, a very sensitive issue in this nation.

19         The other area is called Campstool, located east of

20 Cheyenne in another business park, could be a sensitive area

21 because in that area outfits like major telecommunications

22 facilities are also -- also -- also located.

23         And the -- and the problem that ultimately was not in

24 my wheelhouse but was in the lane of -- occupied by the

25 President and by the committee was -- was that involving

1    investment in sensitive areas by foreign governments or those

2    that may be close to foreign governments on property located

3    within the United States.

4           Beyond that, I'm not an expert, and we've heard from

5    the self-proclaimed expert today.  That objection, of course,

6    stands on the record.  I think I heard enough that I'm

7    satisfied he has some familiarity that I certainly don't have

8    and found his testimony to be helpful.

9           This case has had -- in the emergency motion mode --

10   has had a plethora of difficult contacts by and between

11   Ms. Colbath and Mr. Murphy, who have both strived to -- very

12   hard -- to present the positions of their respective parties

13   before this Court as we have moved forward to either greater

14   success or lesser success, but those presentations have

15   matured, certainly, in the presentation that the Court has

16   heard today.

17          The plaintiff's amended emergency motion was filed on

18   June 17th, and the plaintiff responded to the defendants'

19   opposition on June 24th of 2024, and today is June 26th, the

20   date that we had set aside for hearing on this matter.

21          And, really, up to the 11th hour, the parties have

22   wished to submit additional matters.  I think it would be

23   largely an endless exercise had it been permitted by the Court

24   to proceed on.

25          Under the Federal Rules of Civil Procedure, at the

1    commencement of and throughout an action, every remedy is

2    available that, under the law of the state -- or the forum --

3    is located, provides for seizing a person or properties to

4    secure satisfaction of a potential judgment.  We look to

5    Rule -- Federal Rule of Civil Procedure 64(a) for support.

6           These remedies include attachment, garnishment, and

7    other corresponding or equivalent remedies.  The right to

8    prejudgment remedy of attachment is purely statutory under

9    Wyoming law, and, therefore, strict compliance with applicable

10   statutes is important -- imperative.

11          The teaching there is from *NEPCO* -- N-E-P-C-O --

12   *Fund II, a limited liability company, against DeFelice*, found

13   at 2013 Westlaw 12086095 at Note 1, an opinion of this Court

14   on June 4th of 2013, which looks to the general rule found in

15   7 CJS, Attachment No. 3 -- or Section 3.

16          The United States District Court addressing a motion

17   for prejudgment attachment in a diversity action generally

18   applies the law of the state when -- where the District Court

19   sits, and I don't want to go too much further in that regard

20   but to point out in Wyoming we look to Wyoming Statute

21   Annotated 1-15-201(a) as well as other pertinent statutes

22   which states, in pertinent parts, that before a prejudgment

23   writ of attachment may issue, the plaintiff must file an

24   affidavit -- and we have had nothing but affidavits filed in

25   support of the emergency motion that has been made -- by

1    Mr. Murphy, by other associates that we've heard today, and,

2    certainly, on the part of the defendant -- first, that the

3    defendant is indebted to the plaintiff, specifying the amount

4    of the indebtedness and the nature of the indebtedness.

5            That -- that first one has been a -- in my mind -- an

6    issue of thought and discussion for, really, several weeks.

7    The Wyoming statute just says "indebtedness."  It doesn't

8    indicate the state.  You know, we know there are all kinds of

9    indebtednesses.  There are debts from promissory notes; there

10   are moral obligations; there are -- you go to Black's Law

11   Dictionary, and there are 30 or so different kinds of remarks

12   about indebtedness and liquidated, unliquidated.

13           Much of the indebtedness here is represented by the

14   over a hundred pages of single-spaced, typewritten product of

15   the plaintiff's expert in this matter, really demonstrates

16   a -- a -- a contingent sort of indebtedness, seeking

17   compensatory value that plaintiff contends it is entitled to

18   receive as a result of its agreements -- not specifically

19   spelled out but represented -- had those agreements fully

20   succeeded, and over a five-year term the plaintiff would have

21   received -- or expected to have received -- a modest 15- to

22   $20 million portion of the profits with -- in their view --

23   with little obligation in connection to that.

24           They called it hosting but, certainly, not one that

25   involved great financial responsibility, in that MineOne would

1   have had the responsibility of paying Black Hills in this

2   case.

3          To that extent it's hard for me to put down in

4   dollars and cents what I think the plaintiff indebtedness

5   would be, and that amount undoubtedly will be something that

6   will be achieved -- if it is achieved at all -- with a

7   verdict, a jury verdict after the evidence is presented.

8          The attachment is not, in my view, sought to hinder

9   or delay or defraud any creditor.  And my thought in that

10  regard is this case doesn't stop by granting a writ of

11  attachment or garnishment in this case but is one that leaves

12  remedies that are open to creditors that may be pursued and

13  even with -- I think there's even procedures by which, with

14  the posting of a bond, portions of any amount that might be

15  attached or garnished could be released to allow the creditor

16  to receive due compensation for work that was already

17  performed in this case and that is satisfactorily established

18  for purposes of the Court and to protect others.  A bond could

19  be posted for that.

20         Third, that the payment of the indebtedness has not

21  been secured by a mortgage or lien upon real or personal

22  property in this state.  Certainly not in this case and wasn't

23  even originally so secured.

24         Grounds for attachment.  The defendant is not a

25  resident of this state.  It's not.  It is an organization, the

1    organizations that are -- answer to the State of Delaware and,

2    I assume, pay taxes in that state.

3          But the concern is that the members -- and it is the

4    members that are significant in any -- not for purposes of

5    jurisdiction but in any LLC -- are connected to China.  The

6    actual connection to the government of China, a -- a nation

7    which values its government over any individual, certainly, or

8    any individual right is a matter of some concern by --

9    justifiably -- by the members of CFIUS.

10          The defendant stands in defiance of an officer or

11    conceals himself so that process cannot be served upon him,

12    that is not a situation that seems to apply here.

13          The fourth element is the defendant has assigned,

14    removed, disposed of, or concealed or is about to assign,

15    remove, dispose, or conceal any of his property and, of

16    course, with intent to defraud what Mr. Murphy contends is the

17    single-largest source of debt in this matter, and that is the

18    claim that exists with his client.

19          And that the defendant has departed or is about to

20    depart from the state to the injury of his creditors --

21    namely, BCB -- and the risk of the raise disappearing and

22    going overseas or to parts unknown and then followed by

23    bankruptcy proceedings followed in -- falls in an appropriate

24    location would not be unusual to see.

25          And that the defendant fraudulently contracted the

1   debt or incurred the obligation respecting which the action is

2   brought.  Well, I think that's an issue best left to the trial

3   in this case.

4          The plaintiff does bear the burden of establishing

5   facts sufficient to justify the issuance of the writ under

6   Wyoming Statute 1-15-103(a)(v).

7          The plaintiff may also obtain a writ of a garnishment

8   subject to Section 1-15-101 through 1-15-108, and Wyoming

9   Statute Annotated, Section 1-15-401(a), states "A prejudgment

10  writ of a garnishment is available as a means of attachment of

11  tangible or intangible property other than earnings from

12  personal services of the defendant at any time after the

13  filing of a complaint and before judgment in cases in which

14  a writ of attachment is available under Wyoming

15  Statute 1-15-201."

16         And, here, plaintiff was informed about the

17  prospective sale of MineOne defendants' North Range and

18  Campstool properties and impending transfer of operation

19  contracts to CleanSpark, a third party who is not subject to

20  the underlying litigation.

21         Through this sale of property, plaintiff asserts that

22  MineOne defendants intended to abscond from Wyoming and the

23  United States with the purchase money, thus removing the

24  proceeds beyond the jurisdiction of this Court's reach and of

25  our ability to recover it or use the proceeds to satisfy any

1   obligation to BCB.

2          MineOne defendants confirm that the party entered

3   into a purchase and sale agreement on May 9th, 2024, to sell

4   its properties in Laramie County to CleanSpark.  The sale was

5   prompted by the discussion between MineOne and the

6   United States Federal Government's Committee on Foreign

7   Investment in the United States, CFIUS.

8          In light of the objection to MineOne, a foreign

9   company operating facilities within -- or foreign -- a

10  national company -- native company or Delaware company that

11  all members -- or significant membership -- appears to be

12  foreign, operating facilities within 1 mile of Warren

13  Air Force Base led to the consequences that led to the forced

14  sale and dismantling of the North Range property.

15         Enough -- enough with that.  I want to talk about

16  what we've listened to today.

17         I was impressed with the arguments that have been

18  made by Mr. Murphy about the nature of -- of what is happening

19  here, preserving the status quo.

20         I acknowledge -- as I have, I think, earlier -- that

21  the statutes are to be strictly followed.  There is an

22  acknowledgement here of the Antalpha -- how do you pronounce

23  it?  Antalpha? -- indebtedness in this matter, noting that the

24  Court has reviewed here -- although denied by the defense --

25  the extensive relationships between MineOne, ultimately, and

1   numerous organizations that are indebted and connected with --

2   I think there is substantial merit to the arguments and the

3   evidence that we have seen that this may be camouflaged equity

4   investments, so-called by Michael Murphy in his presentation.

5           Certainly, the Dow creditors and Cox creditors would

6   be of concern and deserve extensive scrutiny in that regard,

7   but, on its face, it appears that there is a significant

8   connection here.

9           The defendant in this matter has attempted to

10  indicate that BCB, whose role in this in Phase 1 -- using the

11  terms of the parties in that regard -- as the project manager,

12  was -- was interesting to the Court of how it was structured

13  and the surrounding comments about it because BCB was really

14  the cat's paw, deliberately selected in this matter by the

15  Chinese members for the purpose of presenting a local face on

16  this project and disguising, in a way, the responsibility of

17  the foreign members or making not -- it not as apparent after

18  these agreements and contracts were entered into.

19          Of course, BCB was eager and would have done

20  anything -- even stupidly giving up their one asset in this

21  matter, their winnings of the Black Hills lottery that they

22  had -- for the opportunity to put together a blockchain

23  program, mining program, that could bring great -- great

24  wealth with the electricity that would be provided for it.

25          So they played the role of the face of this

1   organization in Phase -- Phase 1.  But MineOne wasn't willing

2   to give up control.  They insisted that they controlled the

3   money and that the contracts with the people to build this

4   thing would be contracts that they had the financial control

5   over and were the signatories to, not BCB.  A recipe for

6   disaster, it seems to me, looking back on the ill-fated

7   contractual relationships that existed by and between these

8   parties.

9          However, October 31 went past with a grinning

10  Halloween clown at the door of the North Range facility, not

11  done yet.  November went past.  And then MineOne woke up -- if

12  they weren't already awakened by the hundreds of emails that

13  were flying back and forth to one another -- and sent their

14  own expert out to take a look.

15         And he reported to them what they had been told, that

16  the -- Black Hills wasn't prepared to deliver the power even

17  if the construction was done, which it was not at North Range

18  and, of course, hadn't started at all at Campstool.

19  Engineering was still progressing on the project.  But the pay

20  was under control of -- of the defendant in this matter.

21         The closing in this case will involve a sum of

22  $15,529,165.  I have seen today and heard through the

23  well-organized and prepared testimony of Michael Murphy --

24  certainly on one -- one-sided on this entire matter and feels

25  badly injured as a result of what has occurred -- that it

1   became apparent -- and it really has become -- it became

2   apparent to me, looking back on it in retrospect, that the

3   effort on the part of the defendant was to get BCB out of it,

4   out of their relationship, to get rid of them.  And they had

5   hoped that -- offering them the paltry sum of $45,000 -- that

6   BCB would sign the new agreement and disappear for all

7   practical purposes, not having any real connection in Phase 2.

8           And, admittedly, BCB went into this, no experience

9   hosting major mining projects, hoping to learn as they went,

10  not having put together the engineering and all of the

11  wherewithal that goes into developing one of the very largest

12  Bitcoin mining projects in the entire nation for MineOne, but

13  MineOne knew or certainly should have been aware of their

14  amateur status, essentially, very bright, very capable of

15  learning very quickly, top student at Notre Dame, a top

16  university in the nation, and with degrees and certificates to

17  prove that status.

18          The worry here of the defendant is that, with this

19  writ of attachment attaching the sum of 15 thousand

20  529 thousand 165 dollars, that CleanSpark will walk away.

21          I agree, generally, with Mr. Murphy in this matter

22  that you're not stopping the closing on the properties or the

23  investment of CleanSpark into development of Campstool.  All

24  can go forward tomorrow as planned, subject to the -- subject

25  to the writ in this matter, which will allow this matter to

1   proceed to a jury hearing.

2           I wouldn't be surprised, not being, you know, very

3   naive, that CleanSpark might call up the parties and say,

4   "Hey, you better get busy settling this case so that we can --

5   everybody can get paid and -- what they don't wish to

6   accept -- and move on with their lives."

7           Because it appears to me that, any settlement of this

8   matter, no one is going to be happy.  Each are going to take

9   serious losses, starting with the initial loss that occurred

10  when CFIUS took its action, which the head of Cheyenne LEADS,

11  as part of the Chamber of Commerce at the City of Cheyenne,

12  was aware of in November of 2022 and advised BCB, who, in

13  turn, was informed in a call by the defendant in this case "We

14  got it handled."  Too bad they didn't.  But we probably still

15  would be here in litigation.

16          I wrote down here "BCB walked."  That seems to be a

17  big issue in the defense expert's testimony.  Well, it's not

18  surprising considering, as I mentioned, what was happening at

19  that time, how they were being frozen out.

20          I could look at other affidavits that I've read in

21  connection with this matter.  The expert that was sent out by

22  the defense had, pretty frankly, indicated that they needed --

23  that BCB needed to go -- to them, to their face -- early on in

24  January, talking to the individual from Arizona who signed the

25  affidavit that I read.

1            The matter of bond is -- is one that the Court
2    doesn't have a good answer for in this matter.  I will order
3    a -- a bond for -- in a somewhat attempt to perhaps deal with
4    some of these creditor -- potential creditor losses, their
5    inability to file -- if they haven't -- inability to file a
6    bond.
7            I will order a -- a bond in the sum of a hundred
8    thousand dollars, conditioned, in this matter.
9            And finally, I'll ask you, Mr. Murphy, since you are
10   well motivated in this matter -- maybe too much so in some
11   sense of what we've seen here, as the parent of principals
12   involved in the BCB.
13           Nevertheless, candidly, I think, for the first time,
14   I heard admissions made of the naivete of BCB in connection
15   with this matter by you.  I've heard you back away a little
16   bit of the -- on the fraud, the potential that certainly
17   exists here in this case, and the concerns of -- reflected by
18   the layers upon layers -- I thought that were very well
19   explained by Michael Murphy -- of the defense and its
20   financing in this matter and the camouflaged equity theories,
21   which had meaning to me and evidentiary strength in this case.
22           I will ask you, Mr. Murphy, to draft the writ that
23   I will sign and make sure that it is properly directed.
24           When will you be able to do that?
25           You're on mute.  Sorry.  Did we mute you?

1           MR. MURPHY:  You did.  But that's okay.

2           I'm going to ask Scott Murray, my partner, to do

3      that.  I've got to run over -- there's this guy called

4      Bob Schuster who wants to meet --

5           THE COURT:  I know Schuster.  I've dealt with him in

6      the past.

7           MR. MURPHY:  Don't you -- you and I both know that.

8           We'll do it.  We'll do it.

9           THE COURT:  All right.

10          MR. MURPHY:  And we'll do it tomorrow and circulate

11     it to counsel, also.

12          THE COURT:  Please do.

13          MS. COLBATH:  Your Honor, what about the timing for

14     the bond?

15          THE COURT:  It -- I think it's -- I don't see any

16     reason that it shouldn't be at the same time as we issue the

17     writ.

18          So they'll be busy tomorrow.

19          MS. COLBATH:  So just so the record is clear, the

20     writ doesn't become effective until the bond is posted?

21          THE COURT:  Bond posted -- bond will be posted.  It

22     will be part of the writ.

23          MS. COLBATH:  Thank you very much.

24          THE COURT:  Yep.

25          Thank you, everybody, for your patience.  It's now

1    7:30 in the evening.  It must be close to 10:00 -- 9:30 on

2    your part, Paula.

3            MS. COLBATH:  Yes, 10:00.  And I'm already thinking

4    about a reconsideration motion on your bond amount,

5    Your Honor.  But we'll give you a breather for a couple of

6    days.

7            THE COURT:  All right.  Well, I'll look forward

8    to it.

9            MS. COLBATH:  I appreciate your time.

10           THE COURT:  Thank you.

11           MR. GOTTLIEB:  Thank you, Your Honor.

12           MR. MURPHY:  Good night, Your Honor.

13           THE COURT:  All right.  We'll stand in recess.

14       (Proceedings adjourned at 7:55 p.m., June 26, 2024.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E
2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court
6     Reporter for the United States District Court for the District
7     of Wyoming, a Registered Diplomate Reporter, Certified
8     Realtime Reporter, and Certified Realtime Captioner, do hereby
9     certify that I reported by realtime stenography the foregoing
10    proceedings contained herein on the aforementioned subject on
11    the date herein set forth and that the foregoing pages
12    constitute a full, true, and correct transcript.

13

14         Dated this 1st day of July, 2024.

15

16

17

18                    /s/ Melanie Humphrey-Sonntag

19         _____

20                   MELANIE HUMPHREY-SONNTAG
                         RDR, CRR, CRC
21                 Federal Official Court Reporter

22

23

24

25