1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3    _____

BCB CHEYENNE, LLC, d/b/a        | DOCKET NO. 23-CV-00079-ABJ
4    BISON BLOCKCHAIN, a Wyoming     |
limited liability company,      | (Pages 1 through 53)
5                                    |
Plaintiff,              |
6                                    |
vs.                     |
7                                    |
MINEONE WYOMING DATA CENTER,    | Cheyenne, Wyoming
8    LLC, a Delaware limited         | Thursday, July 11, 2024
liability company; MINEONE      | 1:35 p.m.
9    PARTNERS, LLC, a Delaware       |
limited liability company;      |
10   TERRA CRYPTO, INC., a Delaware  |
corporation; BIT ORIGIN LTD.,   |
11   a Cayman Island company;        |
SONICHASH, LLC, a Delaware      |
12   limited liability company;      |
BITMAIN TECHNOLOGIES HOLDING    |
13   COMPANY, a Cayman Island        |
company; BITMAIN TECHNOLOGIES   |
14   GEORGIA LIMITED, a Georgia      |
corporation; and JOHN DOES 1-20,|
15   related persons and companies   |
who control or direct some or   |
16   all of the named Defendants,    |
|
17          Defendants.              |

18   _____

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
19               MOTION TO COMPEL DISCOVERY

20        **BEFORE THE HONORABLE MARK L. CARMAN**
**UNITED STATES MAGISTRATE JUDGE**
21

22

*MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC*
23            *Federal Official Court Reporter*
*2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
24       *307.433.2169 * MelanieSonntagCRR@gmail.com*
*Proceedings reported with realtime stenography;*
25   *transcript produced with computer-aided transcription.*

```
 1    APPEARANCES (via Zoom):
      For the Plaintiff:        PATRICK J. MURPHY
 2                              WILLIAMS, PORTER, DAY & NEVILLE
                                159 North Wolcott Street, Suite 400
 3                              Casper, WY 82601

 4    For the Defendants        PAULA COLBATH
       MineOne, Terra           ALEX INMAN
 5    Crypto, Bit Origin,       LOEB & LOEB, LLP
      and SonicHash:            345 Park Avenue
 6                              New York, NY 10154

 7                              KARI HARTMAN
                                HATHAWAY & KUNZ, LLP
 8                              2515 Warren Avenue, Suite 500
                                Cheyenne, WY 82001
 9
      For the Defendants        MARC S. GOTTLIEB, I
10    Bit Origin and            ORTOLI ROSENSTADT, LLP
      SonicHash:                366 Madison Avenue, Third Floor
11                              New York, NY 10022

12                              MEGGAN HATHAWAY
                                SUNDAHL, POWERS, KAPP & MARTIN, LLC
13                              2020 Carey Avenue, Suite 301
                                Cheyenne, WY 82001
14
      For the Defendants        TYSON R. WOODFORD
15     Bitmain Technologies:    HIRST APPLEGATE, LLP
                                1720 Carey Avenue, Suite 400
16                              Cheyenne, WY 82001

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                                                              PAGE
        Argument by Mr. Murphy                                  6
3       Argument by Ms. Colbath                                24
        Argument by Mr. Murphy                                 40
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced 1:35 p.m., July 11, 2024.)

2          THE COURTROOM DEPUTY:  Court is now in session, the

3    Honorable Mark L. Carman presiding.

4          THE COURT:  Good afternoon.

5          We're going to come to order in the case of

6    BCB Cheyenne, LLC, d/b/a Bison Blockchain, plaintiff, versus

7    MineOne Wyoming Data Center, LLC, and et al.  This is Civil

8    Case 23-CV-79.

9          We are here on a hearing that I requested relating to

10   Plaintiff BCB Cheyenne, LLC's expedited motion to compel

11   discovery from the MineOne defendants.  That's the only motion

12   that's involved today.

13         I set this hearing because, quite frankly, since the

14   time that this motion was filed, there's been a fair amount --

15   I think that would be a minor statement -- of activity, and

16   it -- I have some doubts as to about what is still in issue

17   and what is not in issue following the events of the hearing

18   and the resulting order entered by Judge Johnson.

19         I do want to set a couple of ground rules for today's

20   hearing.

21         I know that there are significant disputes that have

22   arisen between the parties and both parties have vigorously

23   represented their clients.  But, quite frankly, if you want to

24   tell me that the other side is bad, don't waste your time.

25   I'm tired of hearing that.  I don't want to hear any

1   derogatory comments about opposing counsel.  And if I can't

2   make that any clearer, I will if it comes up.

3            You can say that they did not tell us that or they

4   failed to answer that question appropriately.  You can make

5   factual statements.  But we do not need to hear the ongoing

6   back-and-forth about character assassination in this case.

7   We're going to stay focused on a legal argument, and there

8   will be sanctions if parties violate that rule.

9            Also, there are times when this hearing -- when these

10  hearings, including conferences I've had with these parties --

11  have become heated and people start to talk over each other.

12  I am going to protect the court reporter vigorously in this

13  matter.  That will not occur.  I hope I make myself clear to

14  everybody in that regard.

15           Now, in conjunction with this motion, I have been

16  provided documents, which I ordered on an informal conference

17  to provide me, redacted and unredacted versions of those so

18  that I could review them.  There was some difficulty in

19  getting those documents to me in a manner and getting all the

20  documents to me in a way that allowed me to review them.

21  There -- some of the documents -- I didn't receive the

22  unredacted version of some of the documents, and there were

23  attachments that I had some difficulty, at least initially,

24  figuring out where they went.

25           I have completed the process of getting those

1   documents organized in a way that I can review them, but,

2   because of that delay and my other court demands, I have been

3   unable to complete that review.  I'm about -- I think

4   I've done 5 of the 10 days.  And I was in court all day this

5   morning, so I was unable to make any progress in that regard.

6          While I do not have the latter dates, I do have a

7   good sense of at least what the earlier -- and these are Skype

8   messages -- deal with.  So I may have some questions in that

9   regard for the parties, but I do think that relates to this

10  expedited motion to compel discovery.

11         So what I'm going to do is I'm going to turn to

12  Mr. Murphy first, and I'm going to ask him to identify those

13  areas that still remain in issue.  I know that a lot of

14  documents were produced in preparation for the hearing or

15  maybe even during the hearing or after the hearing.  It

16  doesn't really matter to me; it just matters to me whether or

17  not they were produced.

18         And so I do not . . . I do need Mr. Murphy to tell me

19  what is still at issue, what documents he's still looking for

20  or believes he's entitled to that he has not yet received and

21  which he continues to maintain this motion to compel on.

22         So, Mr. Murphy, I turn to you first.

23         MR. MURPHY:  All right.  Thank you, Your Honor.

24         And, if it please the Court, Ms. Colbath, and all the

25  other counsel, let me just directly answer your question right

1    off the front and then jump into my argument, Your Honor.

2              The -- the four groups is that BCB needs and requests

3    all loan documents, investment documents, sales documents,

4    promissory notes, and security documents.  That's the first

5    category.

6              THE COURT:  Okay.

7              MR. MURPHY:  Second --

8              THE COURT:  Let's go through that.  One second,

9    Mr. Murphy.

10             Loan documents.  What else?

11             MR. MURPHY:  Investment documents.

12             THE COURT:  Investment.

13             MR. MURPHY:  Sales documents.

14             Promissory notes.

15             And security documents.  Like security interests,

16   that kind of thing.

17             THE COURT:  For this myriad of entities which may or

18   may not be related?  Is that a fair statement?

19             MR. MURPHY:  Somewhat fair.  It's clear that most all

20   of them are related.  But it has to do with all of the alleged

21   loans that MineOne says it has with its alleged creditors who

22   we believe are really just camouflaged equity.

23             THE COURT:  Understood.

24             And I don't know if it's clear, but I attended the

25   entire hearing on the writ, so I have a -- a much broader

1   understanding of what is occurring than maybe I did before

2   that hearing.

3           Second category, Mr. Murphy.

4           MR. MURPHY:  It would be the drafts of all of those

5   financial documents I just mentioned, Judge.

6           In other words, not just the -- the final documents

7   of those but the drafts of those.

8           THE COURT:  Third?

9           MR. MURPHY:  Third is that we're seeking all of the

10  contemporaneous correspondence, unredacted, in native

11  EML form, including all attachments in native form, concerning

12  those loan documents by and between all individuals and/or

13  entities involved with negotiating and/or a party to those

14  financial documents that I mentioned in the first category.

15          THE COURT:  Now, that would exceed the Skype messages

16  that I'm currently reviewing.  My understanding of the Skype

17  messages are simply internal in nature.

18          Correct?

19          MR. MURPHY:  I think -- I think you're right,

20  Your Honor.  I think that those Skype messages are just a

21  separate, independent matter, as compared with the

22  contemporaneous correspondence regarding these loan documents.

23          THE COURT:  Okay.  And the fourth category?

24          MR. MURPHY:  The last category is that, for the

25  specific time period of May 1 of 2022 through May 31 of 2024,

1   the accounting journal entry ledgers, which would contain

2   information on all of those transactions, those financial

3   transactions, which would include the date, the time, and the

4   author of each entry and, if later edited, the day, time, and

5   author of each entry, and all of the bank statements for

6   MineOne.  That's where we would see the contemporaneous

7   evidence of how MineOne treated or didn't treat all of these

8   alleged loans.

9            And that's it.

10           THE COURT:  Well, you make it sound like it's nothing

11  at all.

12           MR. MURPHY:  I don't mean to say that.  In fact,

13  I said in my papers that it was a robust request.

14           THE COURT:  Okay.  Before I ask for Ms. Colbath's

15  comments on those particular categories, I'm going to go ahead

16  and allow you to make your argument, Mr. Murphy.

17           MR. MURPHY:  All right.  And, again, thank you, Your

18  Honor.

19           And, if it please the Court and counsel, I don't know

20  if you saw BCB Member Michael Murphy on the Zoom call, but

21  I asked Mr. Murphy to be here because he could better answer

22  any of Your Honor's questions about these MineOne loans and

23  whether they should properly be characterized as entities.

24           So I don't think Mr. Murphy will be speaking, but, if

25  the Court has a specific question that I'm not able to answer,

1    I'd like to be able to defer.

2         So --

3         THE COURT:  Mr. Murphy, when -- when you say "the

4    phone call," you're talking about the hearing on the writ?

5         MR. MURPHY:  No.  I'm talking about today's call

6    right now in realtime with Your Honor.

7         THE COURT:  Oh.  I thought you were saying you don't

8    know if I was on the call.

9         MR. MURPHY:  I didn't know that you were on the call

10   until you just informed us.

11        But what I was trying to say -- obviously

12   inartfully -- is that Michael Murphy, the BCB member, is here

13   on this Zoom call today if Your Honor has any specific

14   question about one of those loans.  I know Michael is much

15   more prepared to answer that than I am.

16        THE COURT:  Okay.

17        MR. MURPHY:  That's all.

18        THE COURT:  I understand.  But, anyway, the bottom

19   line is I did hear his testimony during that hearing.

20        MR. MURPHY:  Fine.

21        THE COURT:  Okay.

22        MR. MURPHY:  I'm with you now.  I'm with you.  Okay.

23        Let me give you the -- you had earlier asked, when

24   you started the hearing, that -- I think you had some doubts

25   as to what is or what is not at issue today, and the first

1    part of my argument speaks to the context for the expedited

2    motion to compel.

3         As I mentioned, BCB is seeking the contemporaneous

4    financial documents and correspondence that will prove or tend

5    to prove that MineOne's alleged loans and financial

6    obligations to others are genuine, bona fide loans or whether

7    they are really camouflaged equity.

8         And this discovery issue is as important now as it

9    was before the June 26th evidentiary hearing.  It is relevant

10   and needed for BCB's July 22 response to MineOne's July 8

11   motion to increase the surety bond from $100,000 to over

12   $23 million, and it is relevant for trial.

13        Following the evidentiary hearing and the oral

14   arguments -- and your memory is going to be better than mine;

15   you were there -- Judge Johnson found and ruled as follows:

16   He said, quote -- and I have the transcript -- "It became

17   apparent to me, looking back on it in retrospect, that the

18   effort on the part of MineOne was to get BC out of it, out of

19   their relationship, to get rid of them.  And they had hoped

20   that -- offering them the paltry sum of $45,000 -- that BCB

21   would sign the new agreement and disappear for all practical

22   purposes, not having any real connection in Phase 2," unquote.

23        Judge Johnson observed that BCB was, quote, "being

24   frozen out by MineOne from this project in March '23,"

25   unquote, and then he said "I think there is substantial merit

1   to the arguments and the evidence we have seen that this may

2   be camouflaged equity investments," unquote.

3          Judge Johnson said the alleged loans or equity

4   contributions are a question best left to the trial in this

5   case, and he found, with respect to MineOne's alleged loans

6   and whether they are more properly characterized as

7   camouflaged equities, that, quote, "The potential certainly

8   exists here in this case and the concerns of -- reflected by

9   the layers upon layers -- I thought they were very well

10  explained by Michael Murphy -- of the defense and its

11  financing in this matter and the camouflaged equity theories,

12  which had meaning to me and evidentiary strength in this

13  case."

14         All right.  That's the background from that hearing.

15         And now we turn to MineOne's newest pleading, from

16  Monday of this week, and this is MineOne's July 8th objections

17  to the amount of the prejudgment attachment bond.

18         With these new objections to the Court's $100,000

19  surety bond, MineOne is seeking to wipe out Judge Johnson's

20  prejudgment writs of attachment and garnishment.  I say that

21  because MineOne is asking Judge Johnson to increase the

22  $100,000 surety bond from that 100,000 to at least 22 million

23  939 dollars and -- and 679 dollars [sic].

24         MineOne knows that BCB will never be able to post a

25  surety bond of 150,000 or more because such a bond will

1    require BCB to put up the same amount of money as collateral

2    to obtain the bond, which BCB can't do.

3            And I don't know if the Court has encountered this in

4    your legal career or your judicial career, but, to obtain a

5    surety bond like this, the -- the promisor -- in this case,

6    BCB -- actually has to put up its own money in the face amount

7    of the bond to secure the bond.  It's a rather remarkable

8    racket the surety bond companies have, but that's the way

9    it is.

10           And here's how it is important to our discovery issue

11   today:  MineOne says this to justify its new request that a

12   new bond for nearly 23 million be required, quote -- they say

13   "The losses the MineOne defendants will suffer as a result of

14   the Court's seizure and attachment of over 15 1/2 million of

15   the CleanSpark sales proceeds as a result of the wrongful

16   issuance of the writ will be in the amount of $22,939,679.68

17   and, of that, 11,250,000 in damages if CFIUS does not approve

18   the sale of the land at North Range and MineOne does not

19   receive the proceeds from the CleanSpark transaction plus

20   $2,369,311.68 in outstanding attorneys' fees plus 1,500,000 in

21   estimated attorneys' fees through discovery and trial and to

22   defend against potential lawsuits from lenders plus $4,152,434

23   in the minimum amount Terra Crypto will sue MineOne Data in

24   connection with its unpaid loan due and owing plus $3,667,934

25   in the minimum amount the additional five lenders will sue

1    MineOne Data in connection with their unpaid loans due and

2    owing," unquote.  Those are the unpaid loans that we're

3    talking about with the expedited motion to compel.

4           So, consequently, Your Honor, the question of whether

5    MineOne's alleged loans are genuine, bona fide loans or

6    whether they are really just camouflaged equity is before the

7    Court on MineOne's July 8th motion and will be at issue,

8    according to His Honor, at the January trial.

9           And, with its expedited motion to compel discovery,

10   BCB asked the Court to compel the discovery of those four

11   categories of documents that I mentioned earlier, which will

12   prove or tend to prove whether these millions of dollars of

13   alleged loans are bona fide loans or really just camouflaged

14   equity.  This is the requested production that will either

15   substantiate the representations made by Dr. Ringifo in his

16   May 24 declaration about the transactions involving related

17   parties or expose these financial transactions as camouflaged

18   equity.

19          We also know and we proved it to Judge Johnson that

20   the MineOne defendants are an intertwined web of related

21   parties, each with an interest and a motive to position its

22   and their creditor priority higher than BCB's creditor

23   priority.

24          So, while MineOne offers to provide BCB with only

25   most of the subject -- the subject documents themselves, BCB

1  needs all of the following four categories of information to

2  substantiate the true nature of these financial transactions

3  and expose whether they are genuine loans or camouflaged

4  equities.  And then I have -- I -- I've shared with you those

5  four categories.

6          So we need to get to MineOne's counter and rebuttal

7  to this.  What is MineOne's counter for these four groups of

8  documents?

9          MineOne first says, quote, "BCB's document requests

10  are not relevant to its cause of action for breach of contract

11  against the MineOne defendants," unquote.

12          We know these financial documents are not relevant to

13  BCB's breach of contract claim, but they are highly relevant

14  to whether these alleged loans are genuine, bona fide loans or

15  camouflaged equity.  They are relevant to the amount of the --

16  BCB's surety bond.  They are relevant to the priority of these

17  alleged loans versus BCB's likely judgment, and John- -- and

18  Judge Johnson said, quote, "This issue about loans versus

19  equity is best reserved for trial."

20          MineOne next says "BCB's improper financial document

21  requests are a last-ditch" -- this is a quote -- "last-ditch,

22  improper effort to salvage a frivolous application for

23  attachment," unquote.

24          We know BCB's attachment application was not

25  frivolous.  It was well supported and it was granted.  Even

1    with only most of the subject documents themselves, BCB was

2    able to demonstrate that MineOne's alleged loans look more

3    like camouflaged equity than loans.

4         MineOne next says that, quote, "BCB is, at best, a

5    speculative judgment creditor holding unproven, utterly

6    speculative claims and even more speculative and unsupport- --

7    unsupportable allegations of damages," unquote.

8         But Judge Johnson eviscerated this argument when he

9    found that BCB had proven it had a substantial likelihood of

10   prevailing at trial for more than the $15,529,165 that

11   His Honor attached with the Court's writs.

12        MineOne next says that a plaintiff is, quote, "not

13   permitted the discovery of facts concerning a defendant's

14   financial status or ability to satisfy a judgment since such

15   matters are not relevant and cannot lead to the discovery of

16   admissible evidence," unquote.

17        But this general rule with which Your Honor is well

18   familiar applies to personal injury and wrongful death cases

19   where the plaintiff cannot show a prima facie case of willful

20   and wanton misconduct but is simply not applicable here.

21        Here, the question is whether MineOne's alleged loans

22   are really loans or camouflaged equity.  The question is not

23   whether MineOne acted with willful and wanton misconduct to

24   support a punitive damages award.  The punitive damages case

25   law and the law disallowing a defendant tortfeasor's financial

1   ability to pay a compensatory verdict is inapplicable to this

2   breach of contract case and MineOne's contention that its

3   alleged loans have priority over BCB's likely judgment.

4          MineOne next says that BCB's financial requests,

5   quote, "are a mere pretext to disrupt the MineOne defendants'

6   preparation for the upcoming evidentiary hearing and should be

7   denied," unquote, but this argument wasn't valid before the

8   evidentiary hearing and it clearly isn't valid now.

9          Judge Johnson was persuaded that these loans look

10  more like camouflaged equity than loans, and these requested

11  financial documents -- the loan documents themselves, the

12  drafts of these loans, the contemporaneous correspondence, and

13  the accounting ledgers and MineOne bank statements -- will

14  provide the definitive proof on the trial question of loans

15  versus equity.

16         MineOne next argues that, quote, "there is simply

17  insufficient time to collect the requested financial documents

18  and to process them for production before the June 26th

19  evidentiary hearing," unquote.  Even if that argument had

20  merit back on June 19th, one week before the evidentiary

21  hearing, it has no merit today.

22         And, finally, MineOne heavily exaggerates with its

23  final argument.  MineOne says BCB's financial discovery

24  requests are, quote, "wildly overbroad," unquote.  MineOne

25  says BCB's requests seek, quote, "excruciating detail

1    regarding every single one of the transactions comprising

2    MineOne Data's 27.8 million investment in building and

3    operating the subject cryptocurrency mining facilities,"

4    unquote, but this is not the case at all, Your Honor.

5          Instead, BCB's financial document requests are

6    limited to the available evidence surrounding these loans,

7    insider loans between related parties, and whether they

8    represent genuine loans or camouflaged equity.  They do not

9    seek evidence of every single one of the many transactions

10   comprising MineOne's 27.8 million investment in building and

11   operating the project.  MineOne makes this exaggerated

12   argument to influence the Court into thinking this is an

13   overbroad request, not a targeted financial request.

14         And, in closing, I'd just like to highlight for

15   Your Honor two examples of the loans versus equity that really

16   should firmly root this in the Court's mind.

17         The first example is Terra Crypto.  Terra Crypto is a

18   defendant in the case.  Terra Crypto is beneficially owned by

19   Erick Ringifo and Jiaming Li.  They control Terra Crypto.

20   Similarly, Erick Ringifo and Jiaming Li serve as the

21   management of MineOne, as two of the three primary

22   decision-makers, and they control MineOne.  Terra Crypto and

23   MineOne are definitely related parties.

24         And, according to Erick Ringifo's declaration, he

25   says, quote, "MineOne borrowed a total of $5,285,701 from

1    Terra in September 2022," end quote.  However and importantly,

2    the defendants have not produced any September 2022 bridge

3    loan document between MineOne and Terra Crypto, and there is

4    no substantiation of this alleged loan ever existing, no

5    contemporaneous communications, no journal entries in its

6    accounting records documenting the loan, no bank statements

7    showing MineOne receiving funds from Terra.

8            And, as I mentioned in my email earlier today, the

9    defendants did produce two loan documents between Terra Crypto

10   and its parent entity, TG -- TGAM -- but those loan documents

11   were dated September '22 and December '22, not solely

12   September '22, which would have been expected based on

13   Dr. Ringifo's declaration.

14           And Erick Ringifo signed the loan agreements on

15   behalf of both entities.  Why, I ask, were these loan

16   documents produced and not the loan documents between

17   Defendant MineOne and Defendant Terra Crypto?  I wish I knew.

18           The second and last example are the alleged loans

19   from the trio of MineOne Data members:  Yu & Jing Investment,

20   LLC; Oriental Sun, LLC; and Rising Sun, LLC.  These three

21   entities are members, owners of MineOne.  As such, these

22   entities are related parties to MineOne.

23           MineOne produced a single loan document for this

24   collective group of MineOne members.  The loan or alleged loan

25   was made as of April 23, 2024, which was a mere 15 days before

1    the MineOne/CleanSpark PSA was signed on May 8, 2024.  MineOne

2    has produced no information to substantiate the document was

3    signed on April 23rd of '24, which it -- it could easily do,

4    as the MineOne members each signed via DocuSign, which tracks

5    the electronic signing date.

6          Also, the MineOne members' loan agreement states,

7    quote, "the lenders jointly lent $1,454,600 to the borrower

8    and agreed to charge 10 percent annualized interest rate from

9    May to July 2023," unquote.  But, again, MineOne did not

10   produce any loan documents from May to July of 2023 when the

11   MineOne members apparently sent funds to MineOne.  Why?

12         The MineOne members' loan agreement states, quote,

13   "The lender would like and the borrower agrees to put the

14   outstanding balance of $1,586,207 under contract," quote.

15   This line suggests why MineOne hasn't provided the

16   aforementioned May-to-July 2023 loan agreements between the

17   MineOne members and MineOne.  By indicating that they are now

18   agreeing to, quote, "put the outstanding balance under

19   contract," the implication is that these loans were never put

20   under contract -- i.e., documented in a signed loan

21   agreement -- at the time the funds were sent to MineOne.

22         It is clear that MineOne created the April 23, 2024,

23   loan agreement to, quote, "clean up and formalize," unquote,

24   the earlier transactions between it and the MineOne members

25   and place these alleged loan amounts higher in priority than

1    an equity investment in light of the forthcoming sale of

2    MineOne's assets to CleanSpark.

3         And so BCB has requested and is requesting that

4    MineOne produce evidence to substantiate and corroborate these

5    MineOne member loans so that MineOne can prove that these are

6    bona fide, arm's length transactions, but MineOne has produced

7    no substantiating evidence, such as the requested

8    contemporaneous communications, accounting journal ledgers, or

9    bank statements.

10        You know, one would think that MineOne would want to

11   provide this substantiating evidence to prove its claims about

12   these loans, but MineOne's refusal to do so strongly suggests

13   that the corroborating information does not exist and/or does

14   not show what MineOne wants it to show.

15        So these are just two of the many examples of

16   MineOne's alleged loans and a mere sampling of their

17   deficiencies to suggest that these alleged loans are nothing

18   more than the camouflaged equity, and a full and more thorough

19   analysis was provided in Michael Murphy's amended emergency

20   motion affidavit.

21        In conclusion, Your Honor, the Court should view

22   these alleged loan transactions for what they really are,

23   equity transactions amongst related parties whose principals,

24   the same principles who made the decision to breach MineOne's

25   and Terra Crypto's contracts with BCB, stand to benefit

1    personally from strategically calling these subject

2    transactions loans rather than equity, and BCB needs the

3    requested documents to prove this.

4            Thank you, Judge Carman.

5            THE COURT:  Okay.  Before I turn to Ms. Colbath, to

6    summarize, you're seeking all these different various forms of

7    financial documents for the reasons you stated.

8            If there was not the issue regarding the writs before

9    the Court, would you still contend that you're entitled to

10   that information at this time?

11           MR. MURPHY:  The way I would answer -- good question.

12   And I appreciate it.

13           The way I would answer that is, given the new

14   July 8th motion to increase the bond meteorically from a

15   hundred thousand to over 23 million and -- and MineOne's

16   contention that all of these different loans must be paid

17   ahead of BCB's likely judgment, that's what is now causing

18   the -- these loan documents to be relevant.  If -- if there

19   was no issue extant and that the -- the writs were allowed to

20   stand as is, as stated -- and we know, by the way, CleanSpark

21   is going to close on Campstool tomorrow -- there wouldn't be

22   as much of a need for these.

23           But Judge Johnson has told us these -- these loans

24   versus equity -- those questions are reserved for trial.  And

25   to -- if -- if His Honor is telling me this is a trial issue,

1  it's a trial issue, and I've got to marshal the evidence to

2  prove our contention that they're really just equity and --

3  and bogus loan transactions.

4          So twofold.  Judge Johnson says we're trying this --

5  these equity versus loan things -- at trial.  And, secondly,

6  the brand-new motion to increase the bond puts these -- this

7  financial information front and center again, just like it was

8  before the evidentiary hearing.

9          THE COURT:  Okay.  And I do recall specifically Judge

10 Johnson making that statement.  And that leads me to believe

11 that Judge Johnson, since it is a bench trial, wishes to

12 address not only the underlying liability issues but the

13 priority of how the funds would be distributed at that trial.

14         Is that your understanding?  Or would that be your

15 understanding?

16         MR. MURPHY:  Not only is it my understanding, but you

17 said it better than I did a moment ago.

18         THE COURT:  Okay.

19         Okay.  Mrs. Colbath, good afternoon.

20         Can I ask -- I'm going to ask you a couple questions

21 before you make your argument.

22         You're muted.

23         MS. COLBATH:  I said "good afternoon," Your Honor,

24 when you addressed me.  So let me say it again.

25         Good afternoon, Your Honor.

1           THE COURT:  Okay.

2           MS. COLBATH:  Very pleased to be back in your

3    courtroom.

4           THE COURT:  Very good.  It's good to see you again.

5           Before I hear your argument, Mr. Murphy said

6    something that is actually in my own mind, and that was, if

7    you're contending that these are actual, valid loans and you

8    wish to make that presentation to the Court, in -- whether

9    it's at the trial or at the -- it's in further hearings in

10   this case, wouldn't you want to -- to provide this information

11   to support your position that these are valid loans and not

12   camouflaged equity?

13          MS. COLBATH:  So -- so, Your Honor, we have produced,

14   to my knowledge -- and I've sent an email while you've

15   been on.

16          It certainly was my intention, for purposes of the

17   evidentiary hearing, to produce every loan agreement, every

18   promissory note, every security document.  I don't know what

19   the reference to "sales documents" means.  You know,

20   I don't -- in this context -- or there was another reference

21   to investment documents.  So the first category.

22          When we get to things like every draft and every

23   communication from before we even came in contact and signed

24   a contract with BCB, they want every communication

25   contemporaneous with -- I don't know -- three or four

1  different -- like -- I didn't follow all the dot -- you know,

2  whatever.

3          We have reached a point in this case where like

4  proportionality is just totally lost.  I produced the loan

5  documents.  This -- what is being asked -- I mean, every --

6  they want my general ledger?  They want every journal entry?

7  If anyone changed something in the general ledger, I've got to

8  go and produce that at this point?

9          The most important thing that we heard from BCB's

10  counsel was they admit that these documents are not relevant

11  to their breach of contract claim.

12          And I will go back to the transcript.  I do not

13  recall Judge Johnson saying that one of the -- the issues that

14  he intended to try in this case was the priority of liens

15  because that does not arise from the parties' pleadings.

16          At the end of the day there will be a judgment or a

17  resolution of the case, and the documents that are being

18  sought are absolutely classic postjudgment discovery.  And all

19  that is before the District Judge at this point are pleadings

20  that -- that -- BCB never mentioned a loan in its, you know,

21  hefty 254-paragraph -- what -- you know, I mean -- this was

22  not a -- a typical notice pleading that was 10 pages and put

23  me on notice of a breach of contract.  This was a day-by-day,

24  blow-by-blow recitation of what took place.

25          And so these -- this material was sought for the

1    evidentiary hearing; an adverse decision has been made.

2    I didn't expect to have to argue the motion to increase the

3    bond, but that has nothing to do with --

4             THE COURT:  Okay.  Time-out.  Let me -- excuse me.

5             MS. COLBATH:  Yes.

6             THE COURT:  I understand there's two -- there's

7    two things that can be addressed:  One is whether or not this

8    is information that will be presented at the bench trial -- in

9    other words, that Judge Johnson expects to address at the

10   bench trial.  That's one issue.

11            But we do have the issue of the -- the writ which was

12   argued, and now you have filed a motion, which I have not

13   read --

14            MS. COLBATH:  Okay.

15            THE COURT:  -- that addresses, apparently, increasing

16   the amount of the writ -- I know you would not be asking to

17   reduce the amount of the writ, so -- I may be making an

18   assumption there -- and the -- and critical to the decision on

19   that does involve the priority of these documents.

20            So does not your motion to increase the amount of the

21   writ create a relevance even if it did not exist before?

22            MS. COLBATH:  Okay.  So the answer to that is --

23   is no.

24            And -- and I understand that you haven't looked at

25   the motion papers.  But the basis of the motion -- Judge

1    Johnson candidly acknowledged to everyone he didn't know what

2    to do with the bond, and he set a bond of a hundred thousand

3    dollars while seizing $15 million.

4          And, while Wyoming doesn't have any cases on the

5    issue of the bond that I think either party could find, there

6    are numerous other District Courts in the Tenth Circuit and

7    they -- they are very specific.

8          And so -- and they say that a bond should be set --

9    and the numbers that BCB's counsel referenced, the -- the

10   magnitude of them is absolutely correct because that's what

11   the law, you know, in Utah and the District Courts that do

12   have decisions say.  It's double the amount of the plaintiff's

13   claim.  That's one line of cases.

14         That has absolutely nothing to do -- whether we've

15   got bridge loans, short-term loans, secured loans.  That is a

16   simple mathematical calculation based on what the plaintiff

17   claims his damages are.

18         The second --

19         THE COURT:  That's one -- there's a line of cases

20   that says that, but there's also a line of cases -- and the

21   Wyoming statute seems to imply that it has to be related to --

22   the Wyoming statute doesn't say that.  And so there's -- the

23   Wyoming statute appears to say -- and I don't have it off the

24   top of my head -- that it would be that that would be

25   necessary to protect the -- the party who is posting -- who is

1   the beneficiary of the bond from damages associated if it's in

2   error.

3          MS. COLBATH:  Correct.

4          THE COURT:  And so in that circumstance and applying,

5   admittedly, just the language of the statute, it would appear

6   to me, then, that those -- whether they're camouflaged equity

7   or loans would be critical to the Court's decision.

8          MS. COLBATH:  So I -- I mean, I -- I candidly with

9   Your Honor disagree because the damages that will befall my

10  client as a -- as a result of having their $15 million seized

11  and withheld from them until all the appeals and everything

12  are exhausted relate to situations like -- okay -- if the

13  CFIUS order isn't complied with, there could be a forfeiture

14  of the land.

15         Well, if I -- we don't remove the improvements and we

16  lose the benefit of our contract, that damage is potentially

17  11,250,000.  That's not relating to a loan that my client

18  made.

19         So the damages as a result of this are also

20  different.  It's that right now we've put into the Court what

21  is owed in legal fees.  The cases that -- the cases seem to be

22  clear in the Tenth Circuit where a party is denied counsel

23  and -- and then that is an irreparable harm that needs to be

24  taken into account.  Again, that's a damage.  It's all laid

25  out and -- and briefed in the motion.  It doesn't relate

1    at all to whether something is camouflaged or not camouflaged.

2    It just doesn't relate to that.

3            And these issues are -- are just, you know, black-

4    letter law-type issues, that someone's got to have a judgment

5    before they start mining a general ledger and -- and all the

6    communications.

7            And, you know, the issue here, in part, is that there

8    was a -- there was a very significant campaign against my

9    client.  And there have been subpoenas issued that -- that,

10   you know, have -- obviously, subpoenas to CleanSpark

11   jeopardize transactions.  And so, you know, my client's trying

12   to secure money from third parties, like an Antalpha, which is

13   subject to this motion, which BCB's counsel has already

14   consented to allow it to be paid.

15           So why we would have to go back at this point and --

16   and get every communication, you know, trying to secure funds

17   to salvage this project is just so marginal it -- it doesn't

18   go to merits discovery.  To me, we've all lost focus that the

19   case here is about who breached the contract and what were the

20   damages.

21           THE COURT:  That is the best thing I've heard you

22   say.  I have not heard a single argument in the hours

23   and hours I've spent on the case about breach of contract.

24           And it would be wonderful if we could get to that

25   issue, but we've had these side issues regarding discovery and

1    the writ.

2           You attached loan agreements to your motion for -- to

3    increase the writ -- or the bond, I should say.  I'm sorry.

4           And --

5           MS. COLBATH:  Yes.  I --

6           THE COURT:  -- and some of them are dated, you know,

7    just basically in the last few months.

8           If you --

9           MS. COLBATH:  Correct.

10          THE COURT:  -- were on the other side and you

11   received loan agreements for loans that were supposedly

12   occurring in '22 and '23 and you saw the loan agreement was

13   dated in '24, wouldn't that raise substantial red flags in

14   your mind as to the validity of those documents?

15          MS. COLBATH:  I -- I agree that the date is something

16   that's curious.  It obviously has an explanation.  If anyone

17   knows what was going on and -- and, you know, like --

18   I mean -- listen.  CFIUS wanted -- wanted the ownership to --

19   you know, they were the driving force, frankly, in that.

20          But the fact that a loan -- someone has some issues

21   or questions doesn't -- doesn't impact at all the -- the

22   issues before the Court, and that is who breached this

23   contract and what were the damages.

24          And if they are successful at the end of the day in

25   getting a judgment, then issues of priority -- I mean, that --

1    there's no issue now at -- I mean, they -- they successfully

2    got the attachment.  That's done.  The record has been

3    established.  They said -- that motion was made for expedited

4    discovery, they absolutely needed it, and they got the

5    attachment without it.  So they've received their attachment.

6            It -- it -- you know, I -- my biggest concern,

7    honestly, at this point -- my client has spent over a million

8    dollars providing discovery in this case, and I just see like

9    another -- like every time -- you know, this is so marginally

10   relevant to the issues that -- that -- that are being

11   discussed and that need to be decided by the Court.  It

12   doesn't -- it's not in a pleading.

13           And, again, where I started off, I don't think that

14   the issue of determining priority is before Judge Johnson at

15   the trial.  And I certainly would be making a motion in limine

16   on that now -- you know, based on what I'm hearing.

17           First, you have to have liability.  Then -- then --

18   then, once there's a judgment -- if the judgment is -- is, you

19   know, for -- for, you know, $50,000, you don't get to priority

20   issues.

21           So like that cart is so far before the horse when we

22   don't even have a liability determination.

23           And to like have -- have the defendants produce

24   general ledgers, you know, for -- and, plus, you know, on some

25   of the document requests they're requesting that you require

1   nonparties -- they're asking for the accounting journal

2   entries and the bank statements related to an entity called

3   MineOne Cloud Computing Investment One Limited Partnership.

4   They're not even a party.

5          I mean, so -- you know, I don't have the ability --

6   you know, I'm -- I represent very specific parties here.

7          I -- I -- I think Mr. Murphy's concession that if --

8   he acknowledges it doesn't relate to any claim asserted by any

9   party currently in the case.  And -- and BCB's counsel also

10  readily acknowledges that their request is what they call

11  robust.

12         "Robust" is code for -- from -- from my -- you know,

13  it's so overbroad.  It's marginally relevant.  And -- I mean,

14  the undertaking to like comply with every communication -- as

15  you saw, this -- this project -- they raised money before they

16  started.  There were significant cost overruns.  There were

17  extended delays.  We can fight about why that was.  That's the

18  reality that everyone agrees to.

19         There was a constant effort -- before this project

20  became, you know, something that we thought could be

21  realistic, there was issues with raising money.

22         So we're back from 2022, before we even sign a

23  contract with BCB.  They want to know every -- every transfer,

24  every dime -- meanwhile, I just want to put the -- the -- just

25  flip this a little bit:  I, too -- you heard one of the

1    witnesses testify at the outset of his testimony how he was

2    totally in this, every penny, family, friends, the whole bit.

3          I, too, asked for financial information about where

4    that 3 million went that the plaintiff raised, and they have

5    taken the position that that has -- money is not anything

6    that's relevant at this point.  And they have refused to

7    produce anything on that because, until there's judgments --

8    you know, where money went and when it went is irrelevant

9    until you have a judgment.

10         So we produced the loan agreements.  You know -- bank

11   statements.  Bank statements don't indicate in any way, shape,

12   or form --

13         THE COURT:  I don't -- I don't think I'm going to

14   order bank statements regardless of what I do, so you can move

15   on on that.

16         MS. COLBATH:  Okay.

17         THE COURT:  I would need something further before

18   I would order bank statements.

19         MS. COLBATH:  Understood.

20         So -- so a draft -- let me -- let's talk about, then,

21   the other categories.

22         There has to be -- if there's any inclination on the

23   Court's part -- not that -- that my clients, my office, we

24   don't spend the next 45 days trying to track down every

25   communi- -- you know -- communication relating to someone

1    asking for financing.  There's -- just to even -- with the

2    massive -- see, we did a different kind of collection than --

3    than the plaintiff here.

4         We actually hired a firm to image everything and

5    apply search terms against it, and, you know, we're up to --

6    I don't know -- over 30,000 pages or documents.  Plaintiff, on

7    the other hand, they did a self-collection.  They went and

8    said, "Okay.  Well, this looks good and we'll produce that."

9         And so when you have the massive amount of data that

10   I have -- we took entire servers and -- and did a search --

11   that's what makes it so much more difficult.  It's not going

12   to a file drawer and pulling out a -- a loan file on

13   something.  It just doesn't work that way.

14        So, again, proportionality -- this is all about

15   priority.  I would say that frequently Courts bifurcate issues

16   and, if the priority becomes a real issue at the end of the

17   day, when -- when one of us has our judgment, the appropriate

18   time for this type of discovery is at that point, when it is

19   an important discovery item.

20        And, you know, you do the discovery then, when --

21   when it's -- when it's relevant.  It -- it is not relevant

22   now.

23        THE COURT:  As you know, Ms. Colbath, one of the --

24   the tasks that I assumed upon myself was a limited in camera

25   review of Skype messages.  Thank goodness I limited it to

1   10 days.

2        In that there is -- in that redacted portion that --

3   I don't want to say anything that would obviously reveal it,

4   but there are discussions about money issues.  And about the

5   bridge loan and, you know, this money, that money.

6        MS. COLBATH:  Sure.

7        THE COURT:  And you have decided that -- not to

8   produce those or redact those simply because you're standing

9   on -- on the position that -- that they are economic in nature

10  and, therefore, are not relevant?  Or are you standing on any

11  other position that that information is -- is not only

12  irrelevant but, also, privileged in some form?  And I -- I use

13  that term not in the lawyer -- attorney-client privilege.

14       MS. COLBATH:  So --

15       THE COURT:  It doesn't seem -- it doesn't -- it

16  didn't seem to be anything there that is very shocking, quite

17  frankly.  But it might provide some information regarding, you

18  know, what is loans and what are investments if it -- if I

19  think about it in that context.

20       MS. COLBATH:  Yeah.  So -- so until the attachment

21  became an issue, I mean, I think both sides, you know, had

22  objected to any kind of financial records from the other.  And

23  so, consistent with that position, anything having to do with

24  loans.

25       And BCB's counsel at one point pressed Judge Rankin

1  on this issue, and Judge -- if you recall, Judge Rankin asked

2  us to -- to submit to him the Antalpha loan agreement and

3  attachments and exhibits and we do so.  And at that point in

4  time Judge Rankin said "You don't have to produce it."  So --

5  so -- and that was an actual loan agreement.

6          So defi- -- you know, clearly, we don't -- we weren't

7  producing communications relating to our -- you know, who we

8  contact to raise money and things of that sort.  Both sides

9  had objected.  And so that's the redactions that you see.

10          You know, I started to try to look at what you were

11  receiving, and my eyes were glazing over, I think like yours,

12  so I just kind of said "I" -- you know, "Whatever he says we

13  have to produce we'll produce."  And I think we already said

14  we would produce CFIUS so that we could take that off your

15  plate.

16          But it was just being consistent with our objections.

17  There wasn't any, you know -- I -- and I didn't sit down and

18  do the redactions.  My -- my colleagues and people on the team

19  did it, and I think we said we're not producing anything

20  relating to loans, investors, those kinds of communications,

21  so it was redacted.

22          I mean, some of it I'm -- I'm sure most of it --

23  probably is not going to move the needle for anyone here.

24          THE COURT:  I really haven't seen anything that moves

25  the needle very far.

1          I do -- I do -- the SEC stuff has nothing to do with

2     this, in my opinion, and I -- so I -- but -- believe me,

3     there's nothing very substantive about the SEC in this stuff

4     so far.  There's nothing that substantive in any of these

5     communications.

6          MS. COLBATH:  I agree.

7          I knew it would be painful for you, but you agreed

8     that you -- as a compromise -- that you -- the other thing was

9     you said you'd look at 10 of them.

10         And I think I explained at one point -- the way we

11    did it so that we could move through it quickly was, rather

12    than doing each individual message as its own separate kind of

13    document, we just took the entire day.  So you got a little

14    bit more, and that maybe is what created the confusion.

15         THE COURT:  Okay.

16         MS. COLBATH:  But I -- but I --

17         THE COURT:  You do bring up the fact that I -- I --

18    I volunteered for that, so I walked right into it.

19         I -- I have to look at this -- and, obviously, I'm

20    not going to make a decision today.

21         Mr. Murphy, don't worry.  I'll get back to you.

22         I have to look at this in two aspects:  Is this

23    information -- and that would be communications regarding --

24    or -- and that one gets to be difficult but -- communications,

25    drafts, things of that nature and ledgers regarding these

1    financial transactions and whether they are loans or -- or

2    capital contributions -- would that be discoverable at this

3    point in time with the fact that the -- the writ is still an

4    issue, based upon your recent motion?  Or would it be an issue

5    based upon if the writ's -- if the writ was a dead issue at

6    this point in time and we were only looking at the -- the

7    trial?

8           I think it would be -- I think it would be an easier

9    case if the writ was not there.  And I say that with the

10   understanding that I need to go back and read that motion now.

11   It is interesting that you attached those loan documents to

12   it, but that -- I don't know exactly why they're attached.

13          So do you understand --

14          MS. COLBATH:  I've got an answer for that.  I've got

15   an answer.

16          You saw the speed with which we all had to talk and

17   move and think during that evidentiary hearing.  I mean, the

18   clock was ticking.  And it just wasn't sufficient time to

19   spend arguing admissibility of -- of like all the documents

20   that we really wanted in.

21          I had made a -- an effort to try to get consent on

22   key things, and I had to make a judgment call, and I said

23   "I need to have my witness get -- deliver his testimony," and

24   so I attached them this time.

25          That's -- that's the truth.

1    THE COURT:  Okay.  Well, I'm going to review it and

2    see whether or not, in my opinion -- ultimately, I have to

3    decide -- if I do find that the validity -- and I -- I don't

4    want to use the word "validity" -- whether they're loaned or

5    capital contributions is at issue because of the pending

6    motion to increase the writ, then I would order discovery.

7    MS. COLBATH:  I understand.

8    THE COURT:  If I find that it's not relevant for that

9    issue, then I have to go to the next issue, is whether or not

10   they need to be produced at this point in time because of what

11   Judge Johnson said or because of issues that may be at trial

12   in this matter, at least reasonably anticipated to be at issue

13   in the trial.

14   So with that being said, Mr. Murphy, I will turn back

15   to you.

16   You've heard what -- my conversations with

17   Ms. Colbath; you've heard my comments.

18   What else would you like to tell me?

19   MS. COLBATH:  Your Honor, could I just make one final

20   point to leave you with as you -- after -- think about the

21   motion and everything.

22   Because when I'm thinking of the type and the nature

23   and the volume of the documents that are being sought, general

24   ledgers, every -- you know, every accounting entry, things of

25   that sort -- really, what is happening because -- and I say

1   this because it's how I -- my client and I feel.

2        It's like -- you know, BCB's counsel didn't move for

3   a receiver.  But right now it's like they're acting like a

4   receiver, like review -- you know, I've got to turn over a

5   general -- and not that -- I don't even know what's in the

6   general ledger.  I don't do accounting for -- for my client.

7   But the nature of these requests is they basically want to

8   second-guess and decide everything for the company.

9        And, again, I just -- I want to leave you with that

10  word, "proportionality," because I've been on the -- you

11  know -- the end of worldwide collections, expensive.  We -- we

12  did it the proper way with an outside vendor and everything.

13       So I appreciate you giving me the additional time.

14       THE COURT:  Okay.

15       Mr. Murphy.

16       MR. MURPHY:  Very, very quickly, Judge Carman.

17       I just need to clarify what Ms. Colbath said earlier,

18  that this is -- the motion that the -- MineOne filed on

19  July 8th is not a motion to increase the writ amount.  It's a

20  motion to increase the amount of the surety bond.

21       THE COURT:  I apologize.  I may have said that

22  incorrectly.  I apologize if I did.

23       MR. MURPHY:  Another -- okay.  No worries.

24       And then we just all need to remember that it was not

25  until MineOne sought to take the Campstool -- really -- the

 1   CleanSpark money and give it to its alleged creditors that

 2   this issue of loans and equity was first thrust upon us.

 3            When we learned about the CleanSpark sale on around

 4   May the 9th or 10th -- I think -- it may have been May the

 5   12th -- and then the President issued his order the next day,

 6   on May 13th.  And then on May 15th we filed our emergency

 7   motion.

 8            So we know that the loans and who they were paying or

 9   not paying was not an issue in the underlying case.  But when

10   they secretly did their deal with CleanSpark and then we found

11   out about it afterward and realized that they're trying to pay

12   all the money to themselves and their related parties, that

13   then thrust the case into a whole different posture.

14            And Judge Johnson alluded to that -- I know you were

15   with him that day, on May 17th when he -- when both of you sat

16   on the bench in the courtroom, and I think Judge Johnson said

17   words to the effect that this is a whole different deal than

18   it was before.  And that was accurate.

19            So that's the reason these are important, and it's

20   finally -- the combination of what Judge Johnson is telling us

21   is going to be at issue in trial on loans versus equity

22   combined with the new motion to increase the bond that keeps

23   this financial discovery very relevant.

24            I understand why -- or I believe why -- MineOne

25   doesn't want me or BCB to see its contemporaneous

1    communications about these things or about its drafts of the

2    loan documents.  It's not going to help them.  It's going to

3    hurt them, and they don't want us to have it.  But we need to

4    have it to present the case that Judge Johnson believes is

5    teed up for trial.

6             Thank you, Judge Carman.

7             THE COURT:  Okay.

8             I'm going to review additional materials and will

9    issue a decision in this case.

10            As I previously said, I -- at this point in time

11   I would not be inclined to order banking records established

12   unless there's some other finding later on that would be

13   required to go into that level of detail.

14            I -- oh, okay.

15            No.  I think what is of issue here is maybe drafts,

16   maybe some communications, and the . . .

17            MR. MURPHY:  The documents themselves.

18            THE COURT:  Well, the documents.  But a lot of those

19   have been produced except for the drafts of the documents.

20            Some level of -- of contemporary correspondence

21   potentially.

22            My understanding at this point in time -- and you

23   would not agree -- disagree -- would you? -- that loan

24   documents have been produced.  I understand you contest their

25   validity or their completeness but --

1          MR. MURPHY:  No -- Your Honor, I do disagree with

2    that.

3          The loan documents, as I said at the end of my

4    opening argument -- some of them have not been produced.  Some

5    of them -- some of them have --

6          THE COURT:  Oh, between the other parties.

7          MR. MURPHY:  -- and some -- yeah.  And some have not.

8          THE COURT:  The other parties.

9          MR. MURPHY:  So I want all of the subject loan

10   documents.  All of them, not some of them.  So clarification

11   there.

12         THE COURT:  Do you have the transcript of that

13   hearing available in front of you, Mr. Murphy?

14         MR. MURPHY:  I don't.  All I did was order what Judge

15   Johnson ruled.  But I'm probably going to order the rest of

16   the transcript.  I just haven't done it yet.

17         THE COURT:  I was wondering if you could give me some

18   guidance because I want to go back and look at that ruling, as

19   well.

20         Do you have any page numbers about that language that

21   you're referring regarding the issues at the trial?

22         MR. MURPHY:  I do.  I do, Your Honor.

23         Just a sec here.

24         You want to look at these pages:  Page 208.  Let's

25   see where else I wrote it down here.

1          Really, I think it's 2- -- 200 through 208.  There's

2     20 pages of Judge Johnson's rulings.  I think it really goes

3     from about 199 to 219 if I recall.  But I think the juice is

4     in 200 to 208.

5          THE COURT:  Okay.  I will endeavor to get an order

6     out in this.

7          I do have five more days that I need to review

8     regarding the in camera, but I do think a lot of the ruling on

9     the in camera may be related to my overall ruling regarding

10    these other documents.

11         I'm going to raise another issue in this case, and

12    that is whether or not the parties are willing to discuss any

13    form of mediation in this matter.

14         I see that both sides are working very hard; they're

15    both expending a tremendous amount of lawyers' time, which

16    means dollar signs.  And I don't know whether or not the

17    parties are interested in mediation.

18         If you're interested in mediation, I can conduct it

19    up until the time that I -- my recall ends and I return to my

20    life of retirement.

21         After that time there are -- there will be a new

22    Judge, but I don't think that Judge will be acceptable to

23    Ms. Colbath for various reasons.  And so -- so . . . you're

24    always free to use a private mediator, as well.

25         I -- I have heard Mr. Murphy's previous position

1  regarding mediation, and that was that, at least in the past,

2  he was -- he was willing to do mediation.

3          Ms. Colbath, have you had any conversations with your

4  clients about whether or not . . . it would be worthwhile to

5  undertake any kind of mediation at this stage of the

6  proceedings?

7          MS. COLBATH:  I -- I've had those conversations.

8  I actually had them with Mr. Murphy before he even filed this

9  action.  Between the Chancery Court and the Federal Court

10 I suggested it.  However, things didn't go -- anyway, that's

11 ancient history at this point.

12         And we obviously would love to use your offices

13 and -- and assistance to see -- I -- I can tell you there have

14 been some -- not -- not me but with other counsel here --

15 try -- some preliminary discussions, and I -- I think it's --

16 it, you know, is ripe.

17         THE COURT:  Mr. Murphy, do you have any thoughts on

18 this?

19         MR. MURPHY:  I -- I have a lot of thoughts on this.

20 But what I'm going to do -- and I think it would be helpful to

21 you -- is if I defer to our friend Marc Gottlieb in New York

22 City and have him tell you about his call with me on July 1st

23 and what we think about that.

24         Marc?

25         MR. GOTTLIEB:  Good afternoon, Your Honor.

1          I'll be happy to -- to discuss that with -- with the

2   Court.

3          I do have one issue I do want to raise aside from

4   this, and it's one that benefits and burdens all the parties

5   here -- but we're all together -- and that is the issue of how

6   we're going to get -- with all of this going on -- how we're

7   going to get 40 depositions done in 30 days.

8          But I -- I'd like the Court to just be -- to think

9   about that for a moment because that's what we're facing here.

10  While we go -- while we're all going through all of these --

11  all the other parties are going through all of these other

12  discovery disputes, not much is being done on the issue of the

13  breach of contract, which gets to the heart of this case.  But

14  I'll leave that out there for the time being.

15         Mr. Murphy and I did speak -- I think it was last

16  week.  We had a very pleasant conversation, and I really

17  enjoyed speaking with him about this case and about the

18  possibility of settling.

19         One of -- and -- and I will say this:  Mr. Murphy

20  seemed very open and very amicable to settling this case, and

21  I expressed to him that, given the fact that there's a lot of

22  complexities here and that there are writs of attachment now,

23  that settlement is probably -- it's probably a ripe time to

24  talk about settlement and we're very interested in doing so.

25         The only concern I have is the fact that, because the

1    Court chose to freeze so much money there, it's really put

2    us -- it's put the defendants in a very bad position from a

3    negotiating standpoint for many reasons.

4              Number one, it gives plaintiff the view that they've

5    already won and that pot of gold is theirs and all they have

6    to do is just maybe -- maybe give some of it back to us as

7    opposed to, you know, a reasonable, equitable settlement.

8              And, number two, that, because all this money is

9    being frozen, we're concerned about even having the ability to

10   continue to litigate this case.  And whereas the Court was

11   trying to protect the plaintiffs and bending over backwards,

12   it's -- it's hampered us in our ability to litigate this case,

13   and it weakens our settlement position.

14             With that being said, Mr. Murphy and I did promise to

15   speak with each other to see if we can get closer to -- to

16   numbers that make sense.  I never give up.  We are very wide

17   open, all of us, to settling this case.

18             And I don't know that we need a professional mediator

19   to do it because we're all very, very experienced lawyers, and

20   I'm not sure that a mediator is going to tell Mr. Murphy or

21   tell me anything that's going to really alter the equation too

22   much, but we're happy to do it.  And I think that we should

23   have that discussion.

24             So if that advances the ball here -- I hope it does.

25             Pat, you can step in on anything I just said.

1           MR. MURPHY:  Okay.  Thank you, Marc.

2           And, Judge Carman, you know, Marc is spot on about a

3    lot of the things he just shared with you.

4           Marc called me on July 1st, while I was at a

5    mediation with Brad Bonner up in Cody, and said that he has

6    been designated to be the settlement representative or the

7    attorney negotiating for all of the defendants.  I was happy

8    to hear that.  Marc and I have an excellent working

9    relationship.

10          And we both talked about whether we should have a

11   mediation.  We both mentioned to each other that, man, that's

12   just so time-consuming and costly to go find a mediator, do

13   mediation statements, all that preparation when we really need

14   to be more focused on the litigation or on settling the case.

15          And when I left the July 1st conversation with Marc,

16   I understood that he would be getting back to me with a firm

17   settlement offer on behalf of the defendants, and I'm totally

18   prepared to respond to that within the same day that I get it.

19          We talked about how we needed to talk settlement and

20   talk litigation on parallel tracks simultaneously, at the same

21   time.  I understand that.  I agreed with that.  Marc is right

22   about that.

23          Marc agreed with me -- as I had predicted to Judge

24   Johnson before he -- His Honor granted the writs -- that

25   granting of the writs would be a change in the settlement

1    landscape, it would be the -- the thing that would kick-start

2    any settlement talks.  And on July 1st I got that call from

3    Marc, and it seemed to be the case.

4           Now, I haven't heard anything from Marc since

5    July 1st and now it's July 11th, so I have to have a little

6    bit of pause on -- on how genuine the defendants are about

7    making that opening offer to me.  But I -- I am receptive to

8    it if it ever comes.

9           If Marc and I feel that we are better off to mediate

10   it, we'll jump on it.  I -- I've -- I've already told him --

11   and everybody -- that I would be -- I remember mediating with

12   Judge Rankin last year following a trial I had with Judge

13   Freudenthal.  I jumped on it.  I would jump on Your Honor

14   being the Mediator Judge on this case.  But I just haven't

15   been able to get, heretofore, any firm commitment from the

16   defendants as a group or individually.

17          That's where we're at.  So my attitude is good.

18   Positive attitude, as always, wanting to see the case settle.

19   It's not going to settle cheaply or unreasonably but

20   reasonably, and I'm ready to engage.

21          MR. GOTTLIEB:  Your Honor, if I --

22          MR. MURPHY:  Have been for the last 10 days.

23          MR. GOTTLIEB:  Let me respond to that.  Patrick, let

24   me just respond to that briefly.

25          I agree with you.  We are going to make an offer of

1   settlement.  It is going to come.  We're trying to work it out.

2           But, that being said, one of the things I will tell

3   you -- and I think I did mention this to you -- is, in order

4   to get a -- in order to get a settlement, one of the things

5   that -- that is done in a mediation, as you know, is that both

6   sides really put forth a lot of their evidence, and, you know,

7   the mediator looks at the evidence and tries to convince each

8   side that the -- you know -- that the other side's evidence is

9   very compelling.  And you always think the other -- the

10  mediator's in the bag for the other side.  I tell my clients

11  that all the time, that the other side is saying the same

12  thing.

13          But what I will say is we don't have the luxury yet

14  of having all of the definitive evidence that we would need to

15  even the playing field because right now, in order to --

16  obviously, a settlement is not based upon -- I always tell my

17  clients this.

18          A settlement is not based upon what you want or what

19  I want.  The math is really what you're likely to get versus

20  what's on the table.  That's really it.  What you want has

21  nothing to do with a settlement; right?  Other than your

22  willingness to accept what's on the table.

23          So in order to decide what's -- what you're likely to

24  get -- what either side is likely to get by way of a

25  verdict -- it does require some -- some depositions, some --

1   some witness testimony.  It requires more than we currently

2   have, in my opinion, in order to move you.

3        I -- I think what we have in our personal side is

4   enough to win the case.  But to convince you to move off your

5   position -- and vice versa, by the way.  It goes the other way

6   around, as well.

7        So the fact that we haven't gotten there yet doesn't

8   mean we won't get there.  We're not on trial until January.

9   I do believe we have a big squeeze between now and then.

10       But -- the fact that we haven't reached a settlement

11  today doesn't mean we won't get there, but we may need to do a

12  little bit more of this discovery to weaken each other's --

13  weaken each other up a little bit in order to get to a

14  reasonable number.

15       MR. MURPHY:  The greatest mediation I ever had was

16  over the Hitching Post Inn that the guys burnt down.  I think

17  there was a gentleman named Judge Mark Carman who mediated

18  that three-day mediation.

19       THE COURT:  I've had longer.

20       MR. MURPHY:  Have you really?  I'm sorry to hear that.

21       THE COURT:  Here's what I'll say in response to

22  Marc -- without disagreeing at all.

23       I do think that -- that both sides are going to take

24  depositions, that there is going to be a -- an interesting

25  issue about whether or not there was a breach of contract or

1   not a breach of contract or was there anticipatory repudiation

2   of the contract.

3           Why I bring it up at this point in time is that there

4   appears to be an issue that will be coming up before Judge

5   Johnson which could be determinative for this case, and that

6   is what to do with the -- with the bond on the writ.  It

7   appears that this has become the focus of this case, even more

8   than the breach of the contract, at least at this stage.

9           And, you know, if -- if Judge Johnson raises that

10  bond substantially, that could put Mr. Murphy and his clients

11  out of business.  And, apparently, if he doesn't reduce it,

12  that could greatly impact the ability of your clients to

13  defend the case.  I had not heard that before until today.

14          So, nevertheless, it appeared to be to me a good time

15  for the parties, before any ruling is made on that, to sit

16  down and discuss settlement.  And so that's why I just offer

17  my services.

18          You will not break my heart if I do not have to

19  mediate this case.  I -- I will not take offense at all.  But

20  I have handled cases far larger than this one in mediation

21  and, quite frankly, as an attorney.

22          And it does appear to me that we're quickly getting

23  to the point -- even though there are substantial numbers

24  being thrown around, when you get to what's actually probably

25  at issue in this case, we are -- to borrow Ms. Colbath's

1    language -- getting beyond the realm of proportionality.  So

2    I just make that offer.

3           I would encourage you, regardless of how you do it,

4    to have those conversations sooner rather than later, but, if

5    you decide not to, that's perfectly acceptable with me.  I'll

6    be enjoying a nice cocktail on the back porch and be retired.

7           Okay.  I want to compliment the attorneys.  This is

8    the best hearing that I've had in this case, and I truly

9    appreciate it.  It makes it easier for me.  I could hear what

10   everybody said.  The arguments were very well presented by

11   both sides, and it was a pleasure.

12          Is there anything further, Mr. Murphy, on behalf of

13   the plaintiff?

14          MR. MURPHY:  No.  Thank you, Judge Carman.

15          THE COURT:  Mr. Colbath -- Ms. Colbath, is there

16   anything further on behalf of any of the defendants that you

17   wish to bring up at this time?

18          MS. COLBATH:  No, Your Honor.  Thank you for your

19   time.

20          THE COURT:  Very good.

21          We are in recess.

22          MR. GOTTLIEB:  Thank you, Your Honor.

23          MS. COLBATH:  Thank you.

24       (Proceedings adjourned at 2:55 p.m., July 11, 2024.)

25

1                    C E R T I F I C A T E
2
3
4
5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court
6     Reporter for the United States District Court for the District
7     of Wyoming, a Registered Diplomate Reporter, Certified
8     Realtime Reporter, and Certified Realtime Captioner, do hereby
9     certify that I reported by realtime stenography the foregoing
10    proceedings contained herein on the aforementioned subject on
11    the date herein set forth and that the foregoing pages
12    constitute a full, true, and correct transcript.
13
14         Dated this 12th day of July, 2024.
15
16
17
18                    /s/ Melanie Humphrey-Sonntag
19                    _____
20                         MELANIE HUMPHREY-SONNTAG
                              RDR, CRR, CRC
21                       Federal Official Court Reporter
22
23
24
25