1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3
   BCB CHEYENNE, LLC, d/b/a        | DOCKET NO. 23-CV-00079-ABJ
4  BISON BLOCKCHAIN, a Wyoming     |
   limited liability company,      | (Pages 1 through 78)
5                                  |
        Plaintiff,                 |
6                                  |
        vs.                        |
7                                  |
   MINEONE WYOMING DATA CENTER,    | Mammoth, Wyoming
8  LLC, a Delaware limited         | Monday, August 19, 2024
   liability company; MINEONE      | 2:42 p.m.
9  PARTNERS, LLC, a Delaware       |
   limited liability company;      |
10 TERRA CRYPTO, INC., a Delaware  |
   corporation; BIT ORIGIN LTD.,   |
11 a Cayman Island company;        |
   SONICHASH, LLC, a Delaware      |
12 limited liability company;      |
   BITMAIN TECHNOLOGIES HOLDING    |
13 COMPANY, a Cayman Island        |
   company; BITMAIN TECHNOLOGIES   |
14 GEORGIA LIMITED, a Georgia      |
   corporation; and JOHN DOES 1-20,|
15 related persons and companies   |
   who control or direct some or   |
16 all of the named Defendants,    |
                                   |
17      Defendants.                |

18

19       TRANSCRIPT OF INFORMAL DISCOVERY CONFERENCE

20    **BEFORE THE HONORABLE STEPHANIE A. HAMBRICK**
              **UNITED STATES MAGISTRATE JUDGE**

21

22

         *MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC*
23            *Federal Official Court Reporter*
      *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
24         *307.433.2169 * MelanieSonntagCRR@gmail.com*
      *Proceedings reported remotely with realtime stenography;*
25    *transcript produced with computer-aided transcription.*

```
 1   APPEARANCES (via Zoom):
     For the Plaintiff:         PATRICK J. MURPHY
 2                              SCOTT C. MURRAY
                                WILLIAMS, PORTER, DAY & NEVILLE
 3                              159 North Wolcott Street, Suite 400
                                Casper, WY 82601
 4
     For the Defendants         PAULA COLBATH
 5    MineOne, Terra            DAVID A. FORREST
      Crypto, Bit Origin,       ALEX INMAN
 6    and SonicHash:            LOEB & LOEB, LLP
                                345 Park Avenue
 7                              New York, NY 10154

 8                              KARI HARTMAN
                                SEAN M. LARSON
 9                              HATHAWAY & KUNZ, LLP
                                2515 Warren Avenue, Suite 500
10                              Cheyenne, WY 82001

11   For the Defendants         MARC S. GOTTLIEB, I
      Bit Origin and            ORTOLI ROSENSTADT, LLP
12    SonicHash:                366 Madison Avenue, Third Floor
                                New York, NY 10022
13
                                MEGGAN HATHAWAY
14                              SUNDAHL, POWERS, KAPP & MARTIN, LLC
                                2020 Carey Avenue, Suite 301
15                              Cheyenne, WY 82001

16

17

18

19

20

21

22

23

24

25
```

1                                    I N D E X
                                                                          PAGE
2      Documents Between March 15th and May 3rd, 2023
         Argument by Ms. Colbath                                           7
3        Argument by Mr. Murphy                                           9
         Argument by Ms. Colbath                                          11
4      Responsive Documents After March 7th
         Argument by Ms. Colbath                                         14
5        Argument by Mr. Murphy                                          15
       Documents From Third-Party Subpoenas
6        Argument by Mr. Murphy                                          16
         Argument by Ms. Colbath                                         20
7        Argument by Mr. Murphy                                          21
       BCB's Text Messages
8        Argument by Mr. Murphy                                          18
         Argument by Ms. Colbath                                         21
9        Argument by Mr. Murphy                                          24
         Argument by Ms. Colbath                                         27
10       Argument by Mr. Murphy                                          28
       Documents Regarding BCB's Capitalization
11     and Funding
         Argument by Ms. Colbath                                         29
12     WhatsApp Messages
         Argument by Mr. Murphy                                          18
13     Skype Messages
         Argument by Mr. Murphy                                          19
14     WeChat Messages
         Argument by Mr. Murphy                                          19
15     Email Messages
         Argument by Mr. Murphy                                          19
16     Privilege Log Issue
         Argument by Ms. Colbath                                         34
17       Argument by Mr. Murphy                                          36
         Argument by Ms. Colbath                                         37
18     Request for Proposal Submitted by BCB to
       Black Hills Energy
19       Argument by Ms. Colbath                                         38
         Argument by Mr. Murphy                                          42
20       Argument by Ms. Colbath                                         45
         Argument by Mr. Gottlieb                                        46
21     Ruling by the Court                                       48, 61, 68,
                                                                     69, 71
22     Remaining Issues
         Argument by Mr. Murphy                                          52
23       Argument by Mr. Gottlieb                                        53
         Argument by Ms. Colbath                                         56
24       Argument by Mr. Murphy                                          57
         Argument by Mr. Gottlieb                                        60
25       Argument by Mr. Murphy                                          61

```
 1          (Proceedings commenced 2:42 p.m., August 19, 2024.)

 2               THE COURT:  All right.  Jess, can you hear me?

 3               THE COURTROOM DEPUTY:  Yes, I can.  Thank you, Judge.

 4               THE COURT:  Okay.

 5          All right.  Good afternoon, everybody.  I'm having

 6     some technical difficulties here real quick.

 7               All right.  We are here for an informal discovery

 8     conference in Case 23-CV-79.  The parties have submitted some

 9     letters, and plaintiff submitted some pleadings last night and

10     other information.

11               I do have -- a court reporter is on with us who is

12     reporting so that, if I need to issue a text order, I can be

13     sure to cover all the topics.  Also on with me is my law clerk

14     Benjamin Kelly.  He will be helping me with this hearing, as

15     well.

16               I wanted to set a few ground rules for the hearing.

17     We have several issues to discuss.  My hope is that we can

18     discuss them one at a time.

19               My plan is to start with the issues as bullet-pointed

20     in Ms. Colbath's August 14th of 2024 letter.  We'll go through

21     those.

22               I'm going to let Ms. Colbath speak to each bullet

23     point one at a time, and then, Mr. Murphy, I'm assuming you'll

24     be responding to those or whoever else wants to respond, and

25     then I'll give Ms. Colbath an opportunity, in a sense, to
```

1    reply to that argument.

2            I expect there will be no interrupting each other,

3    and there will be no interrupting the Court.  I expect there

4    to be no name-calling of other parties.  Everybody's to be

5    respectful and not to speak out of turn.

6            I will indicate to you when it's your opportunity to

7    speak, and I assure you I will give both sides an opportunity

8    to present their arguments as to each issue, but I don't want

9    interrupting and I don't want people saying, you know, "If the

10   Court will allow me."  I will come to you and I will allow you

11   to speak when it's your turn.

12           And no raised voices, as well.  Everybody here is

13   experienced attorneys, and I know you can conduct yourself

14   with the appropriate decorum in this situation.

15           So I want to make sure that I know who all I have

16   present.  I've already lost my list.

17           All right.  Well, Mr. Murphy, why don't you go ahead

18   and tell me who else is present for the plaintiffs.

19           MR. MURPHY:  All right.  Thank you, Judge Hambrick.

20           This is Pat Murphy in Casper.  And with me is Scott

21   Murray in my office and that's it.

22           THE COURT:  All right.  And, Mr. Murphy, will you be

23   doing -- primarily speaking on behalf of the plaintiffs?

24           MR. MURPHY:  I think I'll be the only one talking,

25   Your Honor.

1          THE COURT:  All right.  Thank you.  It makes it

2     easier if I know ahead of time.

3          Ms. Colbath, can you tell me who is present with you

4     for your clients?

5          MS. COLBATH:  Yes.

6          So local counsel, Sean Larson and Kari Hartman, are

7     present.  And from my office I have two of my associates, one

8     more -- one to help as necessary and just so that they get

9     experience practicing and -- and handling conferences like

10    that, and that is David Forrest and Alex Inman.

11         THE COURT:  All right.  And then I -- just made a

12    list, I swear.  It disappeared on me.

13         All right.  And I believe we have others present for

14    other defendants.  Is that correct?

15         MR. GOTTLIEB:  Your Honor, Marc Gottlieb.

16         I don't want to interrupt, but it seemed like you

17    were asking the question so I'll answer it.

18         THE COURT:  Yes.

19         MR. GOTTLIEB:  Marc Gottlieb on behalf of BitOrigin

20    and also SonicHash.  And with me also present is our local

21    counsel, Meggan Hathaway.  I don't know if there's anybody

22    else present from Meggan's office.

23         Meggan, you can answer that.

24         I don't believe so.

25         MS. HATHAWAY:  It's just me today, Your Honor.

1    Thank you.

2             THE COURT:  Thank you.  All right.

3             Is there anybody else present?

4        (No response.)

5             THE COURT:  Okay.  All right.

6             So, as I said, I want to start, Ms. Colbath, with

7    your letter of August 14th, 2024.  I have reviewed it.

8    I've also reviewed the -- your letter of August 12th, 2024, as

9    well as Mr. Murphy's pleadings and letters from yesterday, and

10   then, Ms. Colbath, you had a response you filed -- or a

11   statement -- that you filed today, as well.  I haven't

12   necessarily reviewed all of those in great detail, but I think

13   I am up to speed.

14            So the first thing I wanted to discuss, Ms. Colbath,

15   was your first bullet point about the documents between

16   March 15th of 2023 and May 3rd.

17            Do you want to first speak to that request?

18            MS. COLBATH:  Sure.  And I think it's pretty

19   self-explanatory, Your Honor.

20            In connection with prior discovery disputes decided

21   by Judge Rankin when he was our Magistrate Judge, the issue of

22   what -- the cutoff date for production was discussed.  And if

23   you look at ECF No. 190, you'll see that he set a -- May 3rd,

24   the date of the Federal District Court filing, and so we just

25   want a level playing field here.  We have produced

 1  documents -- we've actually produced documents after that

 2  date.

 3          Mr. -- BCB's counsel says that something that

 4  happened subsequent -- we had an evidentiary hearing on

 5  June 26th relating to an attachment application, and, in

 6  connection with that, I sought to introduce a March 2023

 7  email, which Judge Johnson did not permit, and he made some

 8  comment about saber rattling at that time.  The issue that

 9  Judge Johnson was weighing in on was a document in a 90-minute

10  evidentiary hearing, obviously, that doesn't guide the

11  discovery time lines.

12          There have been documents post -- postcommencement of

13  this Federal District lawsuit.  For instance, various loans

14  that have become an issue.

15          And so, again, we want the plaintiff to comply with

16  Judge Rankin's order and the deadline that he thoughtfully set

17  in his May 20th, '24, decision.  There's no basis for one date

18  to apply to the defendants and a totally separate date apply

19  to the plaintiff, and we believe that there are -- there are,

20  obviously, relevant documents during that period or

21  plaintiff's counsel would not be fighting so hard.

22          We complied and they should, too.  I mean, it's

23  very -- it's pretty straightforward.

24          THE COURT:  Thank you, Ms. Colbath.

25          Mr. Murphy, did you want to respond to this request?

1        MR. MURPHY:  If I might, Your Honor.  Thank you.

2        And I did lay all of this out on pages 8 and -- and 9

3   of my letter to Your Honor here very recently.

4        The interesting thing about this is that the first

5   lawsuit, the Chancery Court lawsuit, was filed on March 15th.

6   That's when Judge Johnson remarked in the evidentiary hearing

7   that the parties were at swords' point, which means all the --

8   the facts had happened that would give rise to the complaint

9   and, at that point, they're just in a litigation posture, and

10  he pointed out that the March 16th, 2023, email from

11  Dr. Jiaming Li was simply that.  The parties were at swords'

12  point; we were adverse to one another.

13        All of those -- really -- those communications after

14  that point -- nearly all of them are privileged documents,

15  either by the attorney-client privilege or the attorney work

16  product and materials prepared in anticipation of litigation

17  privileges.  So there wouldn't be very much.

18        And Ms. Colbath, I think, is mistaken when she says

19  that there must be relevant documents; otherwise, Mr. Murphy

20  wouldn't be arguing.

21        No.  The reason I'm arguing against that is because

22  Judge Johnson himself found that the March 16th email from

23  Dr. Li was not admissible or relevant because the parties were

24  at swords' point.

25        And it's true that Judge Rankin ruled -- he said that

1   the MineOne defendants did have to produce their documents up

2   to May 3rd, but that was back in late March.  As we spun

3   forward into the summer and had the emergency writ issue and

4   we litigated that issue very hard on June 26th, it became very

5   apparent from the transcript -- and I provided Your Honor with

6   the excerpt of what Judge Johnson said in the transcript about

7   those materials after March 6th not being relevant.

8            And that's why I think that -- I think that's what

9   His Honor, Judge Johnson, feels is the relevant cutoff date,

10  is March 15th, on the day we filed the Chancery Court lawsuit.

11           And I don't think that Your Honor knows about this,

12  but we filed that, and then the MineOne defendants opted out

13  of it.  It's -- it's become one of the most unfortunate things

14  in Wyoming, that any defendant in a Chancery Court lawsuit can

15  simply opt out, and then the Court has to dismiss it.  They

16  opted out, it got dismissed by Judge Steve Sharpe, the

17  Chancery Court Judge, and then we refiled in this court on

18  May the 3rd.

19           But the parties were adverse to one another -- very

20  much so, I think you can imagine -- between March 15th and

21  May the 3rd, and that those documents were all prepared in

22  anticipation of litigation, and we, meaning BCB, should not be

23  compelled to, number one, do a privilege log because that will

24  take a -- a long time -- there's a lot of, I imagine, emails

25  and whatnot on that -- or produce any of its documents in that

1   period of time.

2          So we produced everything up through and including --

3   I think it was March 7th, but then we supplemented it up

4   through March 15th.  We believe that's the appropriate cutoff

5   date.

6          Thank you.

7          THE COURT:  All right.  Thank you, Mr. Murphy.

8          Ms. Colbath, I'll give you an opportunity to reply.

9          MS. COLBATH:  So -- so we're really mixing apples --

10  the proverbial apples and oranges here.

11         Judge Johnson did not make any type of discovery --

12  he wasn't presented with a discovery dispute; he was not

13  deciding a discovery issue at the evidentiary hearing.  It was

14  a very precise document that on a particular cross-examination

15  I sought to admit into evidence.  It wasn't making a discovery

16  decision.

17         I would say I'm aware that -- that at certain periods

18  of time plaintiff started -- at least in one instance that I'm

19  aware of -- issued cease and desist letters to potential

20  witnesses very early on, I believe in order to chill testimony

21  and -- and comments by those witnesses.

22         Those are things that would be highly relevant to me,

23  especially as we go forward with depositions, that would

24  postdate the Chancery Court and would be highly relevant.

25         And that's just an example of something that I'm

1   aware of that would be captured by this.  That is not a

2   privileged document.  I'm not asking for privileged documents

3   to be produced.  If it's BCB's counsel's position that there

4   are no documents between March 15th and May 3rd other than

5   privileged documents, I'm happy to -- to suggest a

6   certification from him on that.

7             But that -- but there -- you know, I'm -- I'm fairly

8   certain, based on the discovery that I've reviewed, that there

9   are responsive documents to our document requests, and they

10  should be produced.

11            THE COURT:  Thank you.

12            Hold on one moment.

13            Mr. Murphy, I'm having trouble pulling up the letter

14  that you were just referencing.  Is there any way you could

15  email it again to the Court real quickly?

16            MR. MURPHY:  Of course we can, Judge.  I could -- at

17  least -- I can't but I'll ask Scott Murray to do that for me.

18            THE COURT:  Yes.

19            MR. MURPHY:  This would be our August 19 letter to

20  Your Honor -- let me just turn to Scott.

21            And, Scott, can you find that letter that we sent up?

22            We're going to get it to you one way or another.

23            THE COURT:  Thank you.  I know I had it but I . . .

24  I can't seem to just get it pulled up here.

25            MR. MURPHY:  And all of my discussion on this is

1    at pages 8 and 9 of that letter, and then, of course, it's

2    also with the -- the transcript with Judge Johnson, and that

3    is Exhibit No. 7 to the letter.

4            I -- Scott -- I misspoke, Judge.  This is -- this

5    should be, I think, in my August 16th, 2024, letter to

6    Your Honor and Exhibit 7 to that letter.

7            That's what you're looking for, Scott.

8            MR. MURRAY:  Okay.

9            MR. MURPHY:  We'll get her.

10           THE COURT:  Okay.  Thank you.

11           I'm pulling it up in my email, and it's just not

12   popping up and I don't know why.

13           MR. MURPHY:  I remember -- that was the 16th.  That

14   was my 44th wedding anniversary Friday night, and I was here

15   working on that when I should have been home, so that's why

16   I have a memory of this.

17           THE COURT:  All right.

18           MR. MURPHY:  So it came to you late, around 4:50 in

19   the evening.

20           THE COURT:  All right.  I'm going to -- hopefully,

21   we'll get that here shortly.

22           Okay.  Let's move on to the next bullet point,

23   responsive documents dated after March 7th despite claiming

24   through March 15th would be forthcoming.

25           This sounds like maybe it's somewhat related to the

1  first topic, but, Ms. Colbath, I'll let you speak to that, as

2  well.

3          MS. COLBATH:  It is, Your Honor, and this is

4  something where the plaintiff's counsel agreed to produce the

5  documents and just never did.  And so we continued to press to

6  get them.

7          I would say that last night and very late on Friday

8  night the plaintiff produced to us 14,000 pages.  They must --

9  I don't know, you know, where they found that volume of

10 documents recently.

11         But, in any event, we are in the process of

12 uploading -- obviously, that's a massive undertaking to review

13 that many documents.  They kind of just dropped from the sky

14 on us.  And so -- it could be that second bullet point is

15 included in those 14,000, but I obviously haven't had

16 sufficient time to ascertain that.

17         What I was going to suggest is that these 14,000

18 documents -- there have been outstanding requests that we've

19 written to you about, and I would ask the plaintiff to provide

20 us with something in the way of some quickie-type index.  If,

21 you know, Documents March 7th to March 15th are from X to Y,

22 give us that, you know, in a short index.

23         You know, there are other categories that we're going

24 to look at.  If, you know, Z to A is the third bullet point in

25 my letter, let them identify that because to just have, at

1    this point in the litigation -- they were required to do their

2    production to us back in February, and now, suddenly, massive

3    amounts of documents are appearing a week before we start

4    depositions.  Very unfair.

5           I'm going to get my team together to, you know, begin

6    the review, but I think it's incumbent upon plaintiff's

7    counsel to provide us with some type of map as to what those

8    14,000 documents include and why they're appearing, you know,

9    less than 30 days before the end of discovery.

10          So back to Bullet Point 2, those are documents that

11   were previously promised, and we just had not received them by

12   the time I wrote to the Court, and I cannot confirm that we've

13   received them as of now.

14          THE COURT:  All right.

15          Mr. Murphy, are those documents you believe in --

16   contained within the recent production?

17          MR. MURPHY:  Yes, they are, Judge Hambrick.

18          And the only other thing I would say is this:  All of

19   the supplemental productions that the MineOne defendants have

20   done, there's never even been a sentence describing what they

21   are, let alone an index.  They just say "Here's Volume 15" or

22   Volume 16 or Volume 7, and we're left to discern what they

23   are.

24          And now Ms. Colbath would like me to provide the

25   index of everything in there.  That would just be one-sided.

1    They've never done it.  I haven't done it, either.

2           I just produced nearly 44,000 pages over the course

3    of the case, and it's just too burdensome to go back and do an

4    index of all of that.

5           THE COURT:  Okay.

6           Are there other things, Mr. Murphy, in the

7    August 14th letter that you believe have been provided in the

8    recent production that we can maybe cut to that, other items?

9           MR. MURPHY:  I think I could help Your Honor cut --

10   cut to the quick on this pretty good here.  I've got a little

11   one-page cheat sheet that I made for myself, so let me share

12   that with you if you don't mind.

13          THE COURT:  Sure.

14          MR. MURPHY:  There was an issue about whether my

15   office had provided all of the documents that we've received

16   on our third-party subpoenas.

17          And I can tell you -- and -- and counsel all know

18   this by now -- that BCB has provided all the documents our

19   office has ever received from all third-party subpoenas.

20          Check that one off.

21          THE COURT:  And is that in the recent 14,000 or --

22   also?

23          MR. MURPHY:  No.  No.  That was on a separate

24   production from my legal assistant Wendy Trembath late last

25   week.  That's different than the -- than the 14,000 or --

 1   really, I thought it was a little over 13,000, but I'm not

 2   going to quibble about that.

 3           So that came separately to the other parties.

 4           THE COURT:  And do you have the date, Mr. Murphy,

 5   that was provided?

 6           MR. MURPHY:  I'm guessing, Your Honor, but it --

 7   I have a good guess.  It's either last Thursday or Friday,

 8   August 15 or 16.  I don't remember which.

 9           MS. COLBATH:  It was provided Friday morning --

10           MR. MURPHY:  Okay.  16th.  Thank you, Paula.

11           MS. COLBATH:  -- on the 16th.

12           MR. MURPHY:  Yeah.

13           THE COURT:  All right.

14           MS. COLBATH:  If it --

15           THE COURT:  Hang on.  I'll come back -- I'll get you

16   in just a minute, Ms. Colbath.

17           MS. COLBATH:  Okay.

18           THE COURT:  I'll let you respond.

19           I just wanted to kind of lay out if there's other

20   things they're claiming you've provided, if we can -- I'll get

21   that part of Mr. Murphy's response, and then I'll give you a

22   chance to speak to it again.

23           MS. COLBATH:  Okay.

24           THE COURT:  All right.

25           Anything else, Mr. Murphy?

1        MR. MURPHY:  Yeah.  I've got, really, six things for

2   you that I think would help.

3        The second item, Judge Hambrick, is that they have

4   been wanting BCB's text messages.  And BCB has provided over

5   1,000 individual text messages, and it provided these on

6   Friday, August 16th of 2024.

7        And then I'm ready to go to the next item when you're

8   ready.

9        THE COURT:  Yeah.  Go ahead.

10       MR. MURPHY:  The third item are the WhatsApp

11   messages.  I'm not a WhatsApp guy, but apparently younger

12   folks are.  And I can share with you that BCB has provided

13   over 3,000 individual WhatsApp messages, which is --

14       THE COURT:  Is that -- Mr. Murphy, is that WhatsApp

15   or WeChat?

16       MR. MURPHY:  Man, I have messed that up so much.

17   It's WhatsApp.

18       THE COURT:  Okay.

19       MR. MURPHY:  And it's funny because my oldest son had

20   to correct me on this last night.  But WhatsApp is one word.

21   I always capitalize the A.

22       But -- others don't but -- so BCB has provided over

23   3,000 individual WhatsApp messages.  It first provided them on

24   July 26th of 2024, and then we later provided it on the

25   Relativity load file on August 26th of 2024.

1          So they should -- the -- the defendants should have

2     them in the format that they request.

3          THE COURT:  Okay.

4          MR. MURPHY:  So that's the WhatsApp.

5          And if I could turn to the Skype messages that they

6     asked for, also, I can share with you that BCB did not use

7     Skype to communicate on the project.  It has no Skype messages

8     to produce.

9          We know that the Defendant MineOne folks did, and we

10    had -- we've had the big discovery arguments with Judge Carman

11    over that, but BCB does not have any to produce.

12         And then to the fifth item, what you call the WeChat

13    messages -- again, that's one word, "WeChat" -- BCB did not

14    use WeChat to communicate on the project, and it has no WeChat

15    messages to produce.

16         THE COURT:  Okay.

17         MR. MURPHY:  All right?

18         And then my last item -- and I think we've talked

19    about it a little bit -- on the email messages.  I can tell

20    you that BCB has produced over 13,000 emails and attachments

21    consisting of over 44,000 pages, and that's based on our

22    May 2024 and August 2024 productions.  And I think -- and

23    this -- the more recent one of approximately 14,000 is the

24    August of '24 production.

25         And, finally, BCB has been diligently working with

1    its Relativity provider to do a supplemental production this

2    week to provide roughly 2,000 additional emails, most of which

3    are between BCB and MineOne's vendors and counterparties.

4    That's just more of a heads-up for the Court and counsel.

5           THE COURT:  And those are coming this week, you said,

6    Mr. Murphy?

7           MR. MURPHY:  Yes.  We're trying to kick those out

8    this week.

9           So there we just covered the third-party subpoenas,

10   text messages, WhatsApp, Skype, WeChat, and emails.  I hope

11   that was helpful.

12          THE COURT:  Let me look over here.

13          All right.  Ms. Colbath, let's start with the --

14   well, your third bullet point has text messages.

15          MS. COLBATH:  Might I address the subpoenas first,

16   Your Honor, just so that we don't move on from something that

17   there might be an -- still an open issue?

18          THE COURT:  Sure.

19          MS. COLBATH:  So on Friday BCB's counsel produced to

20   us documents from two parties, an entity called CEGEN and an

21   entity called Black Hills Energy.

22          Plaintiff's counsel has issued over 21 subpoenas, and

23   I want to make sure that either they withdrew all their

24   subpoenas or what the status is because they've been

25   outstanding for months and it's quite surprising that they

1    issued 21 separate subpoenas and they've only produced to us

2    documents from 2 parties.

3          So if I could get clarity whether those subpoenas

4    were withdrawn.

5          THE COURT:  All right.

6          Mr. Murphy, can you speak to the other subpoenas that

7    you issued and any documents?

8          MR. MURPHY:  I can.

9          If we have not provided Paula's office by last

10   Thursday or Friday with them, we did not get any subpoenas.

11         What we did early in the case, back in -- in

12   December of last year, Judge Hambrick, is we did issue a lot

13   of subpoenas to third parties and got a slug of objections,

14   not only from MineOne but from those other parties.  Nearly

15   all of the subpoenas that I've served have just been objected

16   to with no documents.

17         As an officer of the Court, I'm representing to you

18   that whatever documents we received from any third-party

19   subpoena have been provided now to all counsel.

20         THE COURT:  All right.

21         MS. COLBATH:  Okay.  And then on the text messages,

22   if we could have Mr. Murphy identify whose phones were

23   searched.

24         Because a cursory review of what was produced seems

25   to indicate that only Michael Murphy's phone was searched,

1  and, obviously, there are other principals and other relevant

2  parties that would need to be searched, as well.  They had

3  different responsibilities.

4       So if he could identify whose phones were searched

5  and who did the search.

6       MR. MURPHY:  Boy -- I'll just wait.

7       THE COURT:  Yeah.  Give me a minute, Mr. Murphy.  I'm

8  trying to take good notes, which I struggle with sometimes,

9  so . . .

10      Ms. Colbath, let me ask you a question.

11      In terms of -- I know you haven't had them very long,

12  the text messages.

13      MS. COLBATH:  That's right.

14      THE COURT:  In looking through them, is it just

15  page after page of text messages?  There isn't any . . .

16      MS. COLBATH:  You know, Your Honor, I didn't --

17  I didn't put my eyes on them.  They were just uploaded this

18  morning by our database technology folks.  However, what --

19  what was becoming apparent was that not all phones were

20  searched.

21      On the WeChat, BCB's counsel said that there were

22  none on the project.  They hired a gentleman by the name of

23  Steve Randall, who did actually use WeChats, so it's clear to

24  me that a good faith search hasn't been done for WeChats.  And

25  I don't think all phones were checked for text messages and --

1    and imaged and searched.

2            But, you know, I'm sure BCB's counsel will let us

3    know what they did in terms of -- you know, we -- we have

4    three principals, just like BCB.  We had all of their phones

5    imaged by a professional vendor, searched, and -- and, you

6    know, we've produced significantly more documents.

7            And so we just want to make sure that we don't move

8    on unless all phones were searched.  We --

9            THE COURT:  All right.

10           MS. COLBATH:  -- we've undertaken it and -- again, in

11   fairness, it took BCB a very, very long time.  We've been more

12   than patient.  We're -- really have our backs against the wall

13   with regard to depositions, and now we're getting, you know,

14   massive document productions.

15           And I don't want to -- there to be any further lag,

16   especially on things like text messages, which tend to be more

17   revealing than, you know, a -- a memo that someone prepared or

18   an invoice.  A lot of these communications were -- were done

19   throughout the project by text messages, and we want to make

20   sure we have a complete set of those.

21           THE COURT:  All right.

22           Mr. Murphy, I'll let you address --

23           MR. MURPHY:  You bet.

24           THE COURT:  -- that specific part of that request.

25           MR. MURPHY:  Judge Hambrick, they do have a complete

 1   set of these.  And what we're seeing here is just classic

 2   projection.

 3          When the MineOne defendants -- when I asked them for

 4   their WeChat and their text messages, they never told me who

 5   the custodians were that they searched.  The only custodian

 6   that we were able to identify that anything came from was a

 7   midlevel employee from MineOne.  Her name is Haku Du.  They

 8   didn't produce any of their messaging from any of their

 9   higher-up people at all, and that's actually the --

10   the subject of the first motion for sanctions back on

11   July the 10th.

12          They have never -- so here they are now, without any

13   interrogatory, asking us to tell you who the custodians were

14   that we searched, but they have not done the same thing for us

15   in our first and original request to them.  All they produced

16   was from one custodian, Haku Du.

17          And -- and that -- but what about Jiaming Li?  We

18   don't have anything from him.  And they say that, "Oh, he's --

19   his phone" -- now, the Skype messages, they did give us some

20   custodians on that but not on the WeChat, not on the text, as

21   I understand it.

22          And if this had to be --

23          ELECTRONIC VOICE:  Recording stopped.

24          MR. MURPHY:  -- some kind of -- I'm sorry.  Did --

25   Paula, did you want to interrupt me?

1      (No response.)

2           MR. MURPHY:  Okay.

3           What should happen -- what should have happened here

4    is, if they wanted to know all the details of a particular

5    search, they should send written discovery requests for those

6    instead of coming to Your Honor today and just say, "Well,

7    have Mr. Murphy tell us all about his searches," even though

8    they haven't done any kind of a request for that.  That's how

9    this should be handled.

10          ELECTRONIC VOICE:  Recording in progress.

11          MR. MURPHY:  So it -- it --

12          THE COURT:  Hold -- hold on a minute, Mr. Murphy.  We

13   had a -- hold on one second.

14          I'm sorry.  We had a technology thing.  I don't know

15   if you guys didn't notice it, but my whole Zoom meeting froze

16   for about the last minute.

17          MR. GOTTLIEB:  We heard the recording went off.

18   That's all we heard.

19          THE COURT:  Okay.  Well, that's when -- I don't know

20   what was said after the recording went off.

21          So I apologize, Mr. Murphy.  You were responding to

22   their request.  You'd stated they -- you got the name of one

23   middle-level person from MineOne as the custodian, and

24   I didn't hear much after that.  So if you wouldn't mind

25   backing up.

1          I hope -- I hope this doesn't happen again.  But if

2     you get notice that the recording goes off, just wait for it

3     to come back on.

4          So hopefully -- yeah.  So -- sorry about that.

5          MR. MURPHY:  No worries, Judge.  I'll just try to

6     summarize it quickly.

7          What I shared with you is that we have made that full

8     production to them of -- of all of our text messages, but

9     they're not satisfied with that.  They say, "Well, now we want

10    Judge Hambrick to order you, Mr. Murphy, to tell us who were

11    all the custodians you did; what did you do to do it, to pull

12    them; did you hire a vendor like we hired to pull all of those

13    things."

14         They have a lot of good deposition questions that

15    they can ask my oldest son, Michael Murphy, about, whose job

16    most of this -- it fell on his shoulders to do that, but these

17    are good -- these are questions they should ask him in his

18    deposition.  That's not something I should have to supplement

19    all of this discovery with.

20         I've told you that we've produced all of those

21    materials, and that should be good enough, and I shouldn't

22    have to do some supplemental verification or certification

23    because, Lord knows, Ms. Colbath never did that on any of her

24    scant production.

25         And I'm not asking her to do it.  I'm just saying

1    I shouldn't have to do it, either.

2              Thank you, Your Honor.

3              THE COURT:  All right.

4              Ms. Colbath, I'll give you another opportunity to

5    reply --

6              MS. COLBATH:  Sure.  I --

7              THE COURT:  -- on the issue in terms of the

8    custodians and the -- that information.

9              MS. COLBATH:  Yeah.  I -- the question -- I didn't

10   realize it was going to elicit such a -- such a strong

11   reaction.

12             We've had represented to us today in -- in this

13   hearing that all text messages were produced by BCB, an LLC.

14   And BCB is made up of a number of team -- Mr. Michael Murphy

15   calls them at the -- at the evidentiary hearing a team; he

16   calls a dozen -- includes about a dozen individuals.  That's

17   evidentiary hearing page 41.

18             We know the team is made up of Michael -- at least

19   Michael Murphy, Sean Murphy, Emory Patterson, Neil Phippen,

20   Steve Randall, and probably some other people.

21             And I'm just simply asking Mr. -- BCB's counsel to

22   identify, when you collected text messages, whose phones did

23   you collect them from.  It needs to be from each of those

24   individuals, as a starting point.

25             This isn't about -- we've already gone before Judge

1    Rankin.  I've done 18 separate productions.  We've fully

2    complied.  And -- and so the issue here isn't what -- what we

3    produced.  The question today I wrote because I haven't gotten

4    a good faith production.

5         And so it's very simple:  Please identify which

6    custodians you went and collected text messages, WhatsApp,

7    Skype, WeChat, Zoom, and emails from because all of those

8    individuals are custodians of BCB; they all had different

9    responsibilities.

10        Michael Murphy wasn't the sole person who was talking

11   with every vendor.  And so -- Sean Murphy was talking to

12   people; Emory Patterson was talking to other people.  And all

13   of them need to be searched and produced.

14        And so, again, it's a simple question to BCB's

15   counsel:  What custodians did you search and how did you go

16   about collecting the documents?

17        THE COURT:  Okay.

18        MR. MURPHY:  Judge Hambrick, just a final thought on

19   that?

20        If -- if I said that we produced all of our text

21   messages, that may be an overstatement, and I want to walk

22   that back.

23        I can't knowingly represent that to the Court.

24   I may -- I know that my client has done a good faith effort to

25   get them, but I don't know if all of them have been produced.

1  So I -- I just wanted to share that with you and -- and

2  counsel.

3          THE COURT:  Understood.

4          Okay.  Let's go to the fourth bullet point.  These

5  are documents regarding BCB's capitalization and funding.

6          Ms. Colbath, I will let you speak to this item.

7          MS. COLBATH:  Okay.  So the investors in BCB are very

8  key witnesses for us.  The -- BCB raised millions and millions

9  of dollars, and, as far as my clients can tell, they didn't

10  invest anything into the project.  They raised millions and

11  millions of dollars, and we want to know what they told

12  investors about the project.

13          Obviously, there's a contract that had milestones in

14  it that were not met, and this case is who breached the

15  contract first.  And so, before that contract was entered

16  into, the -- numerous investors were approached, and we want

17  to know what they were told about the project, what they were

18  told about construction costs.

19          This was a project that had serious time line delays,

20  cost overruns, and we want to -- we want to know what these

21  investors were told.  We want to know what they were told

22  about the status along the way.  Was BCB acknowledging that it

23  was having problems?  Was it blaming it on vendors?  What were

24  these investors being told?

25          They ponied up significant money, and, as best we can

1  tell -- again, we don't know how the money was used.  We don't

2  believe it was put into the project.

3          As problems were encountered, were the investors --

4  what were the investors told?  They clearly wanted to know

5  what was happening with their money.  What were they told in

6  terms of a return on investment?  Is that return on investment

7  consistent with what now BCB claims its damages are?

8          It -- it appears -- now, this was accred- -- it looks

9  like -- an accredited investor capital raise, yet we have not

10 seen anything in the way of a private placement memorandum,

11 which would have been required by various SEC rules.  So maybe

12 this was done verbally, which is why we want to talk to the

13 investors.

14         Late in the day -- just for a little bit of a

15 time line for Your Honor, the project was supposed to be done

16 and up and running by October 31, 2022.  That day came and

17 went.  November came and went.  December came and went.

18 BCB walks off the job in March of 2023 and, within a few days,

19 has filed their 244-paragraph, 40 -- like a huge complaint in

20 court.

21         And right before they run to court, suddenly all the

22 money gets returned for reasons which are -- Mr. Murphy tries

23 to explain, but I don't -- can't put him on the stand in

24 January of 2025.  I want to see the documents.  I want to see

25 the communications relating to the return of the money, which

1   made BCB judgment proof.

2           And, at the time of the attachment hearing, their

3   papers are replete with them telling the Court "We have no

4   money; we're not going to be able to post a bond more than a

5   thousand dollars," yet they had $3 million, if not more.

6           And so those investors obviously were told what they

7   were investing in, and we want -- we want to see that.  We

8   want to see whether what BCB was telling its investors was the

9   same as it was telling my client when it came to Wyoming in

10  early 2022.

11          THE COURT:  Well, Ms. Colbath, let me interrupt you

12  just briefly.

13          So this goes along with the subpoena issue that --

14          MS. COLBATH:  Correct.

15          THE COURT:  -- that Mr. Murphy mentioned?

16          MS. COLBATH:  Correct.

17          THE COURT:  Okay.

18          MS. COLBATH:  Correct.

19          Now, BCB has some international investors.  They have

20  investors from Portugal and Japan.  And, at some point,

21  because there was foreign ownership in this project, what's

22  called the Committee on Foreign Investment in the

23  United States was tipped off and started an investigation,

24  which ultimately led to a Presidential order that the MineOne

25  defendants needed to divest themselves of the property.  But

1   prior to my clients owning the -- buying the property, BCB had

2   a contract to acquire the land, and they had foreign

3   investors.

4          And so we want to know if they went to CFIUS -- the

5   Committee on Foreign Investment -- did they have discussions

6   with their investors in Portugal and Japan about their -- the

7   foreign ownership, and -- and whether they -- this issue was

8   on their radar screen.

9          There's also an issue that has percolated regarding

10  how parties have logged and -- and accounted for investments.

11  And this was a centerpiece of the attachment hearing.

12         Mr. -- BCB's witness testified that loans that came

13  in to save this project -- that my client went and obtained --

14  they claimed were really camouflaged equity.  And so they have

15  made this a big argument, and we want to see the monies that

16  BCB collected.  Did they characterize them as equity, or did

17  they characterize them as loans?

18         Mr. Michael Murphy, Mr. Murphy's son, testified very

19  emotionally at the evidentiary hearing at the beginning that

20  he is absolutely all in, his entire life savings is wrapped up

21  in this case, the same with the team members that he has,

22  their families and young children.

23         And so if you are testifying that everything you

24  absolutely own is wrapped up in this and you put your life

25  savings as well as 12 other people, team members, we're --

1    we're entitled to test that.  You testified under oath on

2    June 26th.  And we -- we don't have to take Mr. Murphy's

3    detailed letters.  We're entitled to the underlying documents.

4    We're entitled to talk to these individuals themselves who

5    invested their money.  "What were you told?"

6            There should be a private placement memorandum here.

7    There's not.  So -- so we do have to rely on testimony.

8            Mr. Murphy says, "Well, you can't -- this is like a

9    shareholder in a corporation.  You can't just go take the --

10   the testimony and request documents from a shareholder."  This

11   is not like that at all.  This is a closely held LLC that was

12   formed for the sole purpose, as best we can tell, to build

13   this facility in Cheyenne, Wyoming.

14           And so we have -- we have identified -- and there's a

15   long list.  We've tried to -- we know some people were more

16   involved than others.  We -- we subpoenaed a gentleman by the

17   name of Bryce Fincham.  We know that Bryce --

18           THE COURT:  Ms. Colbath, I'm going to interrupt you

19   on this issue, and, Mr. Murphy, I'm not going to give you a

20   chance to respond because I -- we're going to do something

21   else on this issue.  I think it needs further briefing.  And

22   so --

23           MS. COLBATH:  Sure.  Sure.

24           THE COURT:  -- I'm not going to decide that issue

25   today, and so I don't know if we need to keep discussing it.

1       I know that --

2               MS. COLBATH:  Thank you, Your Honor.

3               THE COURT:  -- a lot of this information is in the

4       motion that you filed last night and . . . so I'm not going to

5       decide that issue today, so I'm going to just sort of cut you

6       off on that one.

7               MS. COLBATH:  No worries.  Thank you.

8               THE COURT:  Since it is related, I know we're going

9       to get to that eventually on the -- when we get to the

10      August 12th letter.  So we'll leave that and we'll come back

11      to that issue and what the Court wants to do with that issue

12      in just a moment.

13              I want to just talk quickly about the -- the

14      privilege log issue, Ms. Colbath.  What -- did you want to

15      address that?

16              MS. COLBATH:  Yeah.  Sure.

17              So -- so -- you know, mid-March BCB files its first

18      complaint in Chancery Court -- and, again, this wasn't, you

19      know, a noticed pleading.  This goes on for hundreds and

20      hundreds -- like probably 250 paragraphs.  I mean, talking

21      about things like, "Okay.  The BMW drove up to the site and --

22      and it's a 535 and a BMW of that type costs 170,000" --

23      I mean, that's the level -- that's actually an allegation.

24      It goes on and on and on.

25              And the first entry in the privilege log is dated

1    March 4th, and there is just no conceivable way -- I've been

2    practicing for 30 years -- that a complaint of that detail and

3    heft was prepared overnight.

4         And part of our position here is that BC- -- we know

5    that BCB surreptitiously taped a call in early March because

6    they produced a copy of it, a Zoom meeting.  And they were --

7    you know, in retrospect, when I look at it, you know, if I had

8    been present, I would have thought, "Okay.  These guys are

9    setting, you know, things up."  It's a 50-minute call that

10   they taped with no notice to folks.  They were already in

11   litigation mode.  I think that call was March 7th.

12        And it's clear to us that the complaint -- they

13   were -- they were putting together time lines; they were

14   beginning their lawsuit.  Because what happened here is in

15   December of 2022 my client brought in someone who really

16   builds facilities of this magnitude to say "Could you give an

17   eyeball and -- are we really going to be -- can -- they're

18   telling us 30 days.  Are we going to get there?"  Because

19   these were 10 separate buildings called MDCs, data centers.

20        And so we know that there are documents before

21   March 4th, and they haven't logged them.  And we want to show

22   that they were planning this lawsuit and setting things up

23   back -- December, January, February.

24        For instance, February, if we hadn't pressed, we

25   would have never known that they gutted all their bank

1  accounts and reduced them to like pennies, if we hadn't

2  pressed on this.  So they were already taking action in

3  anticipation of counterclaims and rushing to the courthouse.

4         And, again, on this one, if Mr. Murphy wants to

5  submit a certification that there is not one document before

6  March 4 relating to this project, I'll take it.

7         THE COURT:  All right.

8         Mr. Murphy, do you want to respond?

9         MR. MURPHY:  I do, Your Honor.

10         All of that is speculation by Ms. Colbath.  She's

11  always been amazed in this case at how quickly my sons and

12  I could pull this lawsuit together and get it drafted and

13  filed in the Chancery Court.  She's just never believed it,

14  and there's no -- there's no telling her -- I can't tell her

15  how many times that it didn't happen and it doesn't matter.

16  She keeps saying it.

17         We did produce the only really full privilege log in

18  the case among all of the parties.  The first entry is on

19  March 4th because I didn't represent BCB before that date.

20         Remember, this is a privilege log.  It's not a log of

21  all the things that happened on the site by all the people

22  that were on the site.  It's the -- it's a log of the

23  privileged communications between me and Scott Murray and the

24  BCB principals, and it extends, I think, for the better part

25  of a year.  It's 107 pages long and -- but she just won't

1   accept that.  And that's what it is.

2           And it's full; it's complete.  I attached that to my

3   letter -- which, by the way, is in Your Honor's inbox now.

4           It -- the privilege log we produced -- my goodness.

5   It was a hundred -- I think it was 107 or 110 pages.  But --

6   we produced it as Exhibit 6 or 7, I think.  But you can see

7   how thorough it is.  She just will not accept the notion that

8   there weren't privileged communications before March 6th when

9   I started my privilege log.

10          Why should I have to certify to her beyond what is on

11  my privilege log of the lack of communications with counsel

12  before that?  I've never had anyone do that or even ask for

13  that before.

14          That's the log -- the log is my representation of

15  what the privileged communications are.  I didn't ask her

16  for -- for her to certify anything about her privilege log,

17  but she wants me to make some -- some kind of certification

18  about my log.

19          It's over the top, it's unnecessary, and it just

20  speaks to her unwillingness to believe anything that I say.

21          THE COURT:  Ms. Colbath, I'll let you reply.

22          MS. COLBATH:  Yeah.

23          So -- so the complaint was not dictated in final.

24  Okay?  You could take a look at it, and it was not dictated in

25  final.

1          There was a draft or a time line, and that would

2    exist if -- then the document -- you're saying that the --

3    that you -- your representation started on March 4th.  But the

4    creation of that complaint clearly started before that, and

5    it's not a privileged document.  It should be produced.

6    There's not one item on the privilege log about a draft

7    complaint.  It was not dictated in final.

8          And -- and so, you know, you -- you -- you try to

9    project and -- and take issue -- you have no issues with our

10   privilege log.  You have not raised any issues.  I'm raising

11   that we believe, based on the facts, the circumstantial facts,

12   that there had to be documents before March 4th.

13         And -- and if -- if -- if there's none, I don't

14   understand why a simple certification doesn't just shut this

15   down.

16         THE COURT:  All right.

17         MR. MURPHY:  The last thing, Your Honor, is --

18         THE COURT:  No.  I don't need -- I don't need to hear

19   from you again on that issue.

20         All right.  Next, I want to go to the final bullet

21   point about the request for proposal submitted by BCB to

22   Black Hills Energy.

23         Ms. Colbath, do you want to be heard on that topic?

24         MS. COLBATH:  Sure.

25         So -- so the -- this case is one about who breached

1    first, and it's BCB's position that in early 2022 they won a

2    valuable contract from Black Hills.  And if you look and read

3    the evidentiary transcript, Judge Johnson talks about that

4    this was, you know, something very valuable that they

5    obtained.

6         Obviously, it's my client's position that they

7    obtained it because they were the party that agreed to pay the

8    highest price for electricity and, when you build a facility

9    like this, you need low, low, low electricity costs and that

10   that contract wasn't really worth what they tout it to be, but

11   that will be -- that's for trial.

12        What I want is I want their proposal that they

13   submitted to Black Hills Energy that won them this contract.

14   I want to see what they submitted.  I want -- to the extent

15   they have proposals submitted by Amazon, Microsoft -- there

16   were a number of companies that bid, but they didn't bid to

17   pay anything close to the electrical rate of BCB, and that's

18   why they got the contract.

19        So I want their proposal.  I want to see what they

20   submitted to win this contract.  I mean, it's -- it --

21        THE COURT:  Ms. Colbath, what is -- I mean, you have

22   the -- you have the actual contract; correct?  That they --

23        MS. COLBATH:  I have the contract.

24        THE COURT:  What difference does it make to the case

25   what went on in negotiating that contract?  I don't understand

1    this point of it.

2          MS. COLBATH:  Because I want to be able to show that

3    they won this contract because they agreed to pay not the --

4    they agreed to pay the highest electrical price and that all

5    the other bidders had -- they -- they would only accept the

6    contract if it was significantly lower.

7          Within days of them winning the contract, my clients

8    went in and renegotiated with Black Hills.

9          And so I want to see what they promised Black Hills

10   in terms of pricing, in terms of usage.  These were supposed

11   to -- they -- in their damages they claim that there was

12   supposed to be expansions to the -- there were two sites in

13   Cheyenne, North Range and Campstool.  I want to see whether

14   their proposal even asked or -- or bid on the expansions

15   because they're seeking damages on expansions that never took

16   place.

17         THE COURT:  But isn't the final terms in the contract

18   that you have that they actually came to?

19         MS. COLBATH:  No.  No.  Because I want to know what

20   promises BCB made to Black Hills in order to secure the

21   contract.

22         The contract is -- is not -- so -- so all the other

23   bidders, Your Honor, bid much lower.  And BCB is taking the

24   position that what they -- their proposal was so fantastic

25   that they won this beautiful contract.  And I want to show

1    that what their proposal was was nothing that anyone like --

2    that would run a cryptocurrency would have ever submitted.

3    I mean, it's how they secured the contract.

4           So if they misled Black Hills and made all kinds of

5    like crazy promises, I'm entitled to know that they misled

6    Black Hills in order to get the contract.  I mean, there's a

7    variety of ways that their proposal is -- is relevant.

8           Maybe they promised things that BCB, as a start-up,

9    could have never delivered on, so they had no choice but to

10   contract with my client, who had money.

11          I mean --

12          THE COURT:  So there are things -- binding things in

13   the proposal that are not in the final contract?

14          MS. COLBATH:  Of course.  I -- I know that the

15   proposal was much more expansive than the ultimate contract.

16          And it -- you know, to the extent they -- they made

17   promises to Black Hills on -- that they had the financial

18   wherewithal to do certain things -- I mean, I don't know.

19   Maybe they said they had the financial wherewithal to build a

20   45-megawatt cryptocurrency.

21          If they said that in their proposal, I would very

22   much like to confront Michael Murphy with that at his

23   deposition because they didn't have -- they didn't have the

24   financial wherewithal, they didn't have the manpower, they

25   didn't have the technical knowledge.  And so I want to see

1    what they represented to Black Hills Energy in order to win

2    this contract over other bidders.

3              THE COURT:  All right.

4              Mr. Murphy, do you want to address that?

5              MR. MURPHY:  I do, Your Honor.  Thank you.

6              First of all, Black Hills Energy didn't tell anyone

7    what the other parties did or what they bid.  All of this talk

8    from Ms. Colbath about what other people did with their

9    requests for proposals to Black Hills Energy is nonexistent

10   because Black Hills Energy wouldn't do it.

11             I -- I sent a subpoena to Black Hills Energy for

12   these requests for proposals.  They totally objected, said

13   it's all highly confidential information, and -- and would not

14   produce any of them.

15             And just by way of background, in December of 2023

16   MineOne's RFP No. 14 did seek all the documents and

17   communications concerning the requests for proposal submitted

18   by BCB to Black Hills Energy.

19             And in the next month, January of '24, BCB objected

20   to this request on the ground that it was vague, it's

21   ambiguous, it's overly broad, it's not stated with reasonable

22   particularity, unduly burdensome, and especially not

23   relevant -- and this is the key part -- to any party's claims

24   or defenses.

25             And it is not limited temporally, and it's just not

1   proportional to the needs of the case.  The plaintiff further

2   objects to this request to the extent that it -- it seeks

3   commercially sensitive and confidential information, which has

4   been Black Hills Energy's position.

5          And last Friday night, when I was here at the office,

6   they gave notice of a subpoena to Black Hills Energy for this

7   very document.  I haven't talked to Black Hills Energy, but

8   I can -- I can tell you that -- I can -- I can guess, from

9   having earlier visited with them, they're going to object to

10  producing any of the requests for proposals.

11         BCB did not hear from MineOne regarding this, its

12  objection, until the August 12th letter, six months after they

13  made this request for production, when Mr. Inman, who's on our

14  call, said these documents are undeniably relevant.  But,

15  first and foremost, BCB has not had a meet and confer with

16  Paula Colbath on this issue, and the issue is not even ripe

17  for today.

18         Secondly, given that the defendants have prematurely

19  raised this issue with Your Honor, I've been forced to

20  respond, obviously.

21         And throughout this litigation BCB has, indeed, noted

22  the value of the BCB-Black Hills Energy-BCIS agreement -- in

23  other words, the power contract that you talked about -- and

24  BCB has rightfully done so because it was the most important

25  and valuable asset it provided to MineOne, which it assigned

1    to MineOne for MineOne's promise to pay BCB for it in Phase 2

2    of the project, a promise we all know MineOne never honored.

3            The value of the power contract is based upon the

4    power contract itself.  It is not based on the, quote,

5    "documents and communications concerning the request for

6    proposal submitted to -- by BCB to Black Hills Energy."

7            This is a giant fishing expedition.  How many times

8    today I've already heard Ms. Colbath say "I want to see;

9    I want to see; I want to see; I want to see."  She has a great

10   wish list and a long list of things she wishes to see, but

11   they're all fishing expeditions.

12           Those documents and communications that she's asking

13   for led to months of meetings, emails, and negotiations

14   between BCB and Black Hills Energy over which time many of the

15   proposed ideas and terms evolved, and it first culminated in

16   the February 22, 2022, power contract and later culminated in

17   the June 9th, 2022, power contract, which was the document

18   that was ultimately assigned to MineOne Wyoming Data Center.

19           In other words, BCB's request for proposal submission

20   was simply its foot in the door to prive up -- to provide it

21   the opportunity over the next nine months to discuss,

22   negotiate, sign, and eventually amend the power contract.

23           And the value of the power contract is evident and

24   calculable based on the words in the contract, not on all the

25   activities and -- like the request for proposal submission --

1    that led up to the power contract.

2          And, furthermore, the RFP submission, which was made

3    way back in September of 2021, took place six months before

4    anyone with BCB had ever even heard of MineOne, and, as such,

5    it's outside the scope of the allowable discovery.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Ms. Colbath, do you want to reply to that?

9          MS. COLBATH:  I defer to other counsel on here as to

10   this particular document.

11         I don't know if you want to weigh in, Marc, on this.

12         MR. GOTTLIEB:  I'm not -- I'm not sure I have

13   anything to add to what you've already added on this.

14         MS. COLBATH:  I mean, obviously, the document that

15   BCB submitted to secure the contract -- where it was making

16   representations, making promises to Black Hills in order to

17   secure the contract -- is highly relevant.

18         I -- I think there was probably a lot of puffery

19   going on -- going on in their request for proposal.  And

20   that's part of -- you know, when they -- when they met my

21   clients, I mean, we -- we asked them for their CVs; we asked

22   for background information.  And, when we look today at what

23   they submitted based on, you know, how things unfolded, you

24   know, they definitely oversold themselves.

25         And to the extent that that was part of how they

1    secured the Black Hills contract, by overstating their

2    abilities financially, technical, that is highly relevant to

3    our presentation at trial.

4           MR. GOTTLIEB:  I -- I do agree with that, that all

5    those issues are relevant.

6           If -- if I may be heard very briefly on this, Judge

7    Hambrick, I don't really --

8           THE COURT:  Yes.

9           MR. GOTTLIEB:  I'm not -- I don't have a lot of skin

10   in this game because we didn't put in any -- any opposition

11   here, but I will say this:  In terms of fishing expeditions,

12   plaintiff has gone -- plaintiff is fishing all day long.

13          I mean, I just got 200 requests for admission and --

14   and 30 interrogatories the other day on the eve of -- of us

15   going to depositions.  And most of those are -- are broad

16   fishing expeditions, which will be the subject of future

17   requests -- future meet and confers.

18          But I do believe that both sides are looking for a

19   lot of information in this case, and I think it's been

20   disproportionate all the way around.  And I think that -- what

21   plaintiff is seeking has gone so far above what I would think

22   is fair in this case, so I think that the things that Loeb &

23   Loeb is looking for falls right within the types of things

24   that plaintiff's been looking for, what's good for the goose

25   kind of thing.

 1            THE COURT:  All right.  Thank you.  And,
 2    Mr. Gottlieb, I don't mean to have left you out of -- of these
 3    issues.
 4            Are there any other issues we've discussed you wanted
 5    to weigh in on?
 6            MS. COLBATH:  Marc, I think that was directed to you.
 7            Wasn't it?  Or --
 8            THE COURT:  Yes.
 9            Mr. Gottlieb, I didn't mean to have been leaving you
10    out of these discussions.
11            Were there any of the other points you wanted to
12    weigh in on that would --
13            MR. GOTTLIEB:  Oh, I thought that was to somebody
14    else.  I apologize, Your Honor.
15            THE COURT:  It's okay.
16            MR. GOTTLIEB:  No.  I think that -- I support
17    everything Ms. Colbath has said.  I -- I really believe that
18    her position is the right position on these things.
19            I think that she's been trying -- we've been -- the
20    defendants have been trying to get a lot of the materials that
21    have just been -- not been forthcoming.  And it seems like
22    we're always fighting a battle that what we want is too much
23    but what we try to prevent the plaintiff from getting is -- is
24    not fair.
25            That's all I'll add to this whole thing.

1          THE COURT:  Thank you.

2          All right.  I think that that covers all our bullet

3   points in the 14th letter.

4          Ms. Colbath, would you agree?  We've discussed them

5   all?

6          MS. COLBATH:  Yes, Your Honor.  I appreciate your

7   time.

8          THE COURT:  All right.

9          Okay.  So I'm just glancing at Judge Rankin's order.

10         Okay.  I'm going to rule on a few of these things

11  today, and then I think that further briefing is appropriate

12  on a couple of these issues.

13         All right.  I -- as to the first bullet point, the

14  documents between March 15th and May 3rd, I believe those have

15  been ordered to be produced, and so I will order production of

16  those documents.

17         And, obviously, Mr. Murphy, you can provide a

18  privilege log to any documents that you feel fall within a

19  privilege between those dates.

20         Mr. Murphy's represented they have now provided the

21  documents for Bullet Point 2 as well as the text messages,

22  WeChat.  At this point I will go with Mr. Murphy's

23  representations those have now been provided.

24         I'm going to skip the next bullet point.

25         I think we've addressed the documents to third-party

1    subpoenas.  Mr. Murphy represented they've provided

2    everything.  If there's no production, then they didn't

3    receive anything.  And at this point I think that Mr. Murphy's

4    aware of his ethical duties to the Court, and so, unless

5    something is shown otherwise, I think his representations in

6    court are sufficient.

7           And as well as the privilege log.  Again, at this

8    point in time, the Court will assume that Mr. Murphy's duty of

9    candor to the Court he's complying with and that there is

10   nothing to provide before March 4th.

11          In terms of the next bullet point regarding

12   custodians and search terms, Mr. Murphy, I am going to order

13   that you supply a list just of whose information you got in

14   terms of the various different ways that -- WhatsApp,

15   WeChat -- just a list of whose messages were provided.

16          That goes for WeChat, WhatsApp, Skype -- which I know

17   you said there weren't any Skype -- text messages, those kind

18   of things.  Just provide a list of who all's were provided.

19          So when we go to the August 12th -- the issue of the

20   subpoenas that were issued to third-party individuals -- which

21   would include the -- the three notice of intent from

22   August 1st and, I believe, the three more recent as well as

23   the documents -- the fourth bullet point regarding the

24   capitalization and funding, I think those are all related and

25   the last bullet point regarding the request for proposal.

1    I think those are the issues we need further briefing on.

2            So, Mr. Murphy, I know your motion was primarily

3    focused on the subpoenas that were issued.  Would you need

4    additional -- I'm trying to figure out who to have -- right?

5    You've started to address this issue.

6            I don't know if we added in the -- the documents

7    regarding the capitalization and funding -- I'm assuming those

8    are separate documents -- Ms. Colbath, I'll ask you.

9            Those are separate documents from the request for

10   production with the six subpoenas; correct?

11           MS. COLBATH:  Yeah.  The --

12           THE COURT:  Would those be BCB --

13           MS. COLBATH:  Your Honor, the subpoenas had six

14   categories of documents, which included investment-type

15   information.  So I think BCB's counsel's motion covers it.

16   And we'd be prepared to put in our opposition on a date that

17   you select.

18           THE COURT:  All right.  Then I go --

19           MS. COLBATH:  Then I do have two other points that --

20   from -- from when you went through your recitation that

21   I wanted to address.

22           THE COURT:  All right.  Hang on one minute.

23           So, Mr. Murphy, do you believe you need to -- to

24   supplement your motion if we add in the documents that are

25   requested along with those subpoenas about funding and

1  capitalization?

2          MR. MURPHY:  You're right.  Let me try to summarize

3  it.

4          I thought that was the big point for today's

5  conference, honestly, it was the three subpoenas that they

6  served on the passive investors back on August the 5th and my

7  objections to those and Paula and my agreement to have

8  Your Honor rule on that.  I -- I thought that was the big

9  issue.

10          The second issue -- I thought is very closely related

11  to that -- is their request for all of the financial docu- --

12  financial information and documentation.  I briefed that

13  pretty hard, too, in my letter to Your Honor.

14          To me, those are very closely connected issues, and

15  they should be ruled upon -- considered and ruled upon at one

16  time, I believe.  And I think that, if we need briefing, we

17  need, really, briefing on both those together.

18          The other thing -- gosh, there was so much I had in

19  my letter I thought we'd get to today but apparently we won't,

20  like -- especially with Bitmain.

21          But if -- if I am ordered to produce the list of the

22  custodians, I think that Ms. Colbath should also be providing

23  the same list of where they collected all of their social

24  messaging from, just -- that just seems fair to me.

25          THE COURT:  I'll order that -- that both parties

1    provide a list of individuals whose phones, computers,

2    et cetera, were -- that information was obtained from, both

3    sides.  That's fair.

4              MR. MURPHY:  Thank you, Judge.

5              And if I could just -- I've got some yellow tabs.

6    I just want to hit some other points for all of our radar.

7              I had -- I had hoped today that we would address

8    keeping the September 17th discovery cutoff date and not

9    moving that, as the MineOne defendants want to do, to

10   September 30th.

11             That's a very important issue in my mind.  There was

12   that.

13             I also want -- obviously, I wanted to hit on all the

14   objections to those subpoenas on August 5th and the ones that

15   they're trying to issue now that are the subject of my

16   emergency motion.

17             I mean, they're just trying -- they're just papering

18   the world and all our -- our investors with those kinds of

19   things.  And I -- I'll hold my tongue on those.

20             I wanted to visit with you about the six depositions

21   that BCB would like to take before the discovery cutoff and

22   how important those are.  Three of them are from Bitmain

23   Georgia lawyers, and they're not even here today to

24   participate, so that kind of short-circuited that.

25             I wanted to talk about the four big requests for

1    production from Bitmain Georgia, but their lawyer's not here,

2    so we don't get to talk about that.

3            I'm just about here at the end of my to-do list.

4    I don't think the Court asked Ms. Colbath to address her

5    spoliation charge that she made about BCB's website back on

6    July 25th that I responded to on July 30th.  I think it's a

7    nonissue, but, if she thinks it is, she can tell you.

8            I wanted to ask the Court to order the MineOne

9    defendants to produce all of their documents to us in the

10   Relativity format at their cost, just as BCB has had to

11   produce all of its documents to the MineOne defendants at

12   BCB's cost.

13           It's one of those is -- if it's good for the goose,

14   it should be good for the gander kinds of things.  That is an

15   issue.

16           And then, obviously, the -- the big issue is that we

17   should not have to produce documents regarding our

18   capitalization and funding.

19           And I think that covers my Christmas wish list today.

20           MR. GOTTLIEB:  Your Honor, can I -- I haven't spoken

21   a lot on this, but can I just be heard on that one issue about

22   the -- the information that -- that plaintiff -- that

23   defendants are seeking from BCB about their capitalization?

24           THE COURT:  Yes.

25           MR. GOTTLIEB:  There's been a lot of issues in this

1    case regarding whether or not BCB came to the table able to

2    perform and what their expertise was.

3            They've spent a lot of discovery time -- a massive

4    amount of discovery time -- seeking capitalization information

5    from all the defendants.  In fact, we just -- like I just

6    said, while we were in mediation we got hit with over 190 --

7    150 requests for admission, document production.  A lot of it

8    has to do with the capitalization of the -- the defendants and

9    who's putting up what, how much money was put in, how many

10   shares were allocated to who.

11           I don't know what relevance any of those things have,

12   but, since Mr. Murphy likes to use the term "good for the

13   goose, good for the gander," I agree with him that what's good

14   for the goose here is good for the gander.  We need to also

15   see all that information regarding their capitalization for

16   the same reasons, whether or not they had sufficient capital

17   to be able to do the types of things that they said that they

18   were able to do when they were putting these facilities

19   together.

20           So I think that there's a little hypocrisy going on

21   here, and I just want to point that out to the Court.

22           In terms of the discovery schedule, all of us are

23   having to be burdened by the fact that all this -- these

24   discovery issues are going on back and forth, mostly between

25   plaintiff and MineOne.  I'm not casting aspersions on anyone

1    as to -- you know, if they feel they need to make these

2    motions, that's fine, but it's impacting all the other

3    defendants in terms of how we can begin to go forward because

4    we have a September 17th cutoff date.

5          We haven't even begun one deposition.  We don't even

6    have a glean into who's going to be deposed, when they're

7    going to be deposed.  And all I hear from plaintiff's counsel

8    is that "We do not want to move this."

9          Now, I understand why he doesn't want to move it, and

10   it's not an unreasonable reason.  It's because the dispositive

11   motion cutoff date is in October, early October.  And

12   Mr. Murphy's right that I think he has a right to have his

13   deposition transcripts in hand by the time the dispositive

14   motion date is coming around.  So on that -- I give him that.

15         But I do believe we're going to fall into a problem

16   where we're just never going to get these deposition dates

17   done by September 17, and, therefore, we're going to have to

18   come with our hats in our hands to the Court asking not only

19   for an extension on that but probably the dispositive motion

20   cutoff date, as well.

21         So I just -- I know -- Pat, you're shaking your head.

22   You don't want to do that.  I just don't know how this is

23   going to be possible.

24         And I'm not blaming anybody.  I just don't know how

25   it's going to be done.

1           MS. COLBATH:  Well, Your Honor, might I weigh in?

2           BCB's counsel said I went and have asked for the

3    discovery cutoff to be adjusted.  I never wrote that; I never

4    said that; I never had a conversation with -- with Mr. Murphy.

5           We have the September 17th date.  I have written six

6    times to all counsel since July saying "We need an all-hands

7    call with your calendars out; we need to hammer out a logical

8    schedule."

9           I said it with regard to the subpoenas that I issued.

10   I said, "Guys, control dates.  We've got to get these out the

11   door.  Witnesses have to know they're on the radar screen."

12          But all of us need to sit down and talk about

13   scheduling.  I was the first one to put my schedule out there

14   for everyone, when the clients would be on vacation, when I'm

15   on vacation, what particular days I had other hearings.

16          Mr. Murphy has not taken me up on that conference

17   call.  I've asked six times.

18          When -- when you went through your list of things

19   that Mr. Murphy represented that he had done, you said that he

20   had represented that he produced all text messages, WeChats,

21   et cetera.

22          Your Honor, if you'll recall, he initially said that

23   he had produced all of them and then he said "I need to walk

24   that representation back because I'm not sure I have produced

25   all of the text messages and WeChats."

1           And so I would like a date certain, presumably by the

2   end of this week because these should have been produced back

3   in February -- you know, in -- in May when he finally produced

4   documents in the proper format.  I'm prejudiced by not having

5   all of this material.  So he acknowledged that he thought he

6   had not done a fulsome production on that.

7           THE COURT:  Hang on.  Hang on, Ms. Colbath.  That's

8   not what I heard him say.

9           I heard him say that he thought his clients had done

10  everything they were supposed to do and, obviously, if there's

11  some random email that didn't get caught up in their search or

12  text message, that he could not -- I mean, nobody could ever

13  say with 100 percent certainty "We got every last shred" but

14  "We've made every effort."  That's what I heard him say but

15  maybe I'm mistaken.

16          Mr. Murphy, do you want to address that?

17          MR. MURPHY:  No.  There's -- there's nothing further

18  to add on that.

19          I just don't know what we're going to keep arguing

20  about, what you want to talk about today.  I have a lot to say

21  about the other things, about the discovery schedule and the

22  reasons why we need to keep --

23          THE COURT:  Well, I'm -- hold on.  I'm going to tell

24  you right now I don't have the authority to extend any

25  discovery deadline today.

1          Judge Johnson wants to hear any issues with discovery

2    deadlines, so I'm not going to be touching any discovery

3    deadline today so --

4          MS. COLBATH:  Your Honor, that --

5          THE COURT:  Excuse me, Ms. -- nope.  Nope.  I'm

6    speaking.

7          Do not interrupt me.  That was one of the ground

8    rules I set.  If I want to hear from you, I'll let you speak.

9    But I'm not done speaking yet.

10         So I am concerned about the discovery, the deposition

11   schedule, very concerned about that.

12         I want to touch on, Mr. Murphy, a few things and --

13   hold on.  Let me go back.

14         Mr. Murphy, to your knowledge, have your clients made

15   every effort to find all of the responsive text messages,

16   emails, WeChats, WhatsApp, Skype, everything else?

17         MR. MURPHY:  To my knowledge, Your Honor.

18         THE COURT:  So you don't believe there's any other --

19         MR. MURPHY:  I can't certify -- I can't honestly

20   certify that because I don't have personal knowledge of that.

21   But to my knowledge.

22         THE COURT:  All right.  Well --

23         MS. COLBATH:  Your Honor, he just --

24         THE COURT:  No.  No.  Ms. Colbath, when I want to

25   hear from you, I will ask to hear from you.  Don't keep doing

1    this.

2              We've spent a lot of time on the issues you wanted to

3    raise before the Court.  Stop interrupting me.

4              Mr. Murphy, I'm just going to say by Friday I want

5    you to get with your clients, make sure they've made every

6    effort to find and produce all of those things and produce

7    anything that might be left.

8              But you can get with your clients and make sure they

9    have done everything they're supposed to do to find all

10   responsive text mails, emails, WeChats, WhatsApp, Skypes,

11   et cetera.

12             So I guess one of my concerns is I -- I don't feel

13   like there's been any sort of meaningful meet and confer on

14   who's going to be deposed and when.

15             I'm looking at your submission, Mr. Murphy, and your

16   list of depositions you would like to take.  Mr. Murphy, have

17   you all had a chance to meet and confer on a deposition

18   schedule?

19             MR. MURPHY:  Great question, Your Honor.

20             We've had chances to meet and confer, and I've

21   written letters asking that we meet and confer, and we have

22   not met and conferred.

23             Instead, it just seems like it's dueling letters of

24   me writing to the other side, suggesting the names and

25   proposed dates that I would like to do it and then Ms. Colbath

 1    writing back saying that she wants to take 20-plus depositions

 2    but not providing any dates.

 3              Bitmain Georgia, who's not on our phone call today,

 4    has never said a word about doing any depositions.  Marc

 5    Gottlieb for BitOrigin and SonicHash has never said a word

 6    about doing any depositions.

 7              That's the status.

 8              MR. GOTTLIEB:  Can I be heard on that, Your Honor?

 9              THE COURT:  You may.

10              MR. GOTTLIEB:  That is absolutely not true, Pat.  You

11    know that.

12              You and I had many discussions about depositions.

13    And whereas I didn't say anything formal to you, I said to you

14    "Let's please, all of us, get together and propose dates,

15    don't -- don't" -- I said "We cannot each pick 20, 30 people."

16              What I said to you was -- you may recall this -- was

17    that if we each take at least the top five that we want to

18    produce and agree on dates at least for those five each, then

19    we can get things done, and then we can add to that as we go

20    forward.

21              Did I not have that conversation with you?  Because

22    if I did, then you're misrepresenting what I said to the

23    Court.

24              MR. MURPHY:  I think -- I'll just wait until Her

25    Honor.

1          THE COURT:  Go ahead, Mr. Murphy.

2          MR. MURPHY:  Okay.

3          Marc called me last Friday and asked me about

4   extending the discovery cutoff date -- that he and Paula

5   wanted to do that -- to September 30th.  I told him I objected

6   to that for some of the reasons that he shared with you.  And

7   Marc has also shared with me that it does make sense to try to

8   get together to figure out the depositions.

9          What I was just simply saying to Your Honor is

10  Marc Gottlieb has never shared with me any depositions he

11  wants to take or any of the dates that he wants to do it.  But

12  Marc is correct that he's said in a very general way that we

13  ought to meet and confer about depositions.

14         THE COURT:  Okay.  Well, it's, you know, difficult

15  for me -- everybody's saying "I reached out and did this" and

16  everybody's saying, "No, nobody did," so that's hard for the

17  Court to mediate, obviously.

18         But -- I mean, you all are going to have to find a

19  time to sit down and hash out exactly -- this -- what I want

20  is for you all to meet and confer and then provide the Court a

21  list of people you're fighting over and why, and we could

22  discuss those.

23         But, you know, these deadlines are coming up, and

24  you've got so many lawyers that I can't imagine what your

25  scheduling -- this has got to be the biggest nightmare ever

1   because it doesn't feel like anybody wants to be particularly

2   cooperative with anybody else.  But it -- you guys are going

3   to have to sit down and figure it out.

4           Let me look at a calendar here.

5           So we've got less than 30 days to your discovery

6   cutoff?

7           MR. GOTTLIEB:  Yes.

8           THE COURT:  About four weeks from tomorrow it looks

9   like.

10          MR. GOTTLIEB:  That's about right.

11          MR. MURPHY:  The parties have been allowed to do

12  discovery the whole -- the last 11 months and it hasn't

13  happened.

14          THE COURT:  That's --

15          MR. MURPHY:  The parties have chosen not to take any

16  depositions other than the seven-hour deposition that I think

17  Your Honor was a part of with Tim Desrochers back in April.

18  That's the only depo that's been taken.

19          MR. GOTTLIEB:  Well, in fairness to that, it's not

20  because we haven't wanted to; it's because we've had all these

21  battles over documents and all these other things, and nobody

22  can get to depositions until all these things are resolved.

23          And I'm not going to say it's anyone's fault, but

24  that's the reason.  It's not because no one's wanted to take

25  depositions.  We're fighting over everything else.

1          THE COURT:  I want to quickly touch on --

2    Ms. Colbath, do you have a copy of Mr. Murphy's August 16th

3    letter?  With the issues he wanted to address today.

4          MS. COLBATH:  Yes.  And -- and, unfortunately, I'm

5    going to have to defer.

6          We -- we advanced the time for this because I --

7    I had a -- a hard stop at 6:15 my time for a 6:30 in-person

8    meeting.

9          But I -- I have it in front of me.

10          THE COURT:  I just saw that Mr. Murphy had provided a

11    list on page 2 of -- one, two, three, four -- four MineOne

12    individuals listed.

13          MS. COLBATH:  Yeah.  There are two there.  He

14    continues to associate people that have nothing to do with

15    MineOne.  He just puts that in parentheses.  There are two

16    people that I control there, Jiaming Li and Erick Rengifo.

17          I provided Mr. Murphy with deposition dates for

18    Mr. Rengifo.  He's been on vacation for part of August.  He

19    has the dates.

20          THE COURT:  And what about -- was Dr. Li the other?

21          MS. COLBATH:  Yes.

22          Dr. Li is a resident of mainland China.  His passport

23    is with the US embassy and will likely not be returned until

24    the CFIUS certification under the Presidential order is

25    delivered, so he cannot testify on the mainland.

1        We are working with trying to get a passport so he

2   could travel to Hong Kong, Singapore, another location.  And,

3   obviously, the expenses in connection with that is something

4   that I will take up with Mr. Murphy.  But this is fairly well

5   known, that you cannot give testimony -- it's a crime -- in

6   China.

7        So it may be that he will not have his passport until

8   after the 17th, but we are willing -- ready, willing, and

9   able, as soon as he does, to present him for deposition.

10       Those are the two witnesses that I control.

11       THE COURT:  All right.  You don't have -- you don't

12  have any objections to the actual taking of those?  You're

13  just trying to schedule?

14       MS. COLBATH:  No.  No.  And I've communicated that to

15  Mr. Murphy on multiple occasions.

16       THE COURT:  Mr. Murphy, what about Chong Wang?  Who

17  is -- who -- does anybody control Mr. Wang?

18       MR. MURPHY:  Yes.  Here's the -- here's the scoop on

19  Chong Wang, Your Honor, and this applies to the Defendants

20  MineOne, BitOrigin, and Terra Crypto.

21       Chong Wang was one of MineOne's three cofounders and

22  is known as the big boss in China, who made all of the

23  high-level decisions about the North Range site.  He is the

24  documented beneficial owner of the North Range site.

25       He was also the CEO and executive chairman of

1   BitOrigin, Mr. Gottlieb's client, from 2022 until recently, in
2   April of '24, when he coincidentally resigned with BitOrigin
3   when the heat got hot with CFIUS.
4           But, yet, the defendants say they don't control
5   Mr. Wang.  But they do control Mr. Wang, and that's why I want
6   him.  I want to depose the big boss, the beneficial owner of
7   the North Range site.
8           THE COURT:  All right.
9           Ms. Colbath, I'm sorry.  Are you needing to --
10          MS. COLBATH:  I -- I -- I am.  But . . . I've never
11  spoken with Mr. Wang.  Mr. Wang is not a principal of the
12  MineOne . . . Mr. Murphy has a document that someone else
13  drafted that on page like 64 someone plugged in a name, a
14  Mr. Wang.
15          And I cannot produce him, wouldn't even know where to
16  go to find him, and I've said this to Mr. Murphy for months
17  and months and months and encouraged him to please take
18  advantage of the Hague Convention on evidence.
19          I don't know this individual.  I don't know where he
20  is, never spoken to him.  And so Chong Wang -- as -- I guess
21  he's -- was with BitOrigin.  I don't represent BitOrigin.
22          So -- and Mr. Murphy knows that starting on
23  August 23rd through September 4th -- I announced this back in
24  July -- I will be on vacation.  I take about three weeks
25  a year and I'm off grid.

1          And so Mr. Murphy is intentionally scheduling

2     depositions when I told him back in July I would be on

3     vacation.

4          THE COURT:  All right.  Well, I think -- I don't want

5     to give short shrift to Mr. Murphy's request, but I think we

6     are running out of time for today.

7          And I also think we need to have somebody -- I'm a

8     little bit frustrated with Bitmain's lack of interest in

9     participating today.

10         So I think that -- what I would like to do is

11    schedule a second conference, hopefully this week -- before

12    your vacation, Ms. Colbath -- and go through some of these --

13    some of Mr. Murphy's issues, as well.

14         MR. GOTTLIEB:  May I make a suggestion, Your Honor.

15         THE COURT:  Certainly.

16         MR. GOTTLIEB:  I'm trying to get -- would love to get

17    the stuff done.

18         By the way, just circling back -- because we were

19    talking about Mr. Wang, who was originally with my client,

20    BitOrigin.

21         I also want to just respond that we, too, have no

22    ability to get in touch with Mr. Wang.  I mean, my

23    understanding was that, at some point in time after he left

24    the company, he sort of went off grid.

25         He left -- I don't know what's going on in China, but

1   please be -- please appreciate the fact that we don't control

2   a lot of things that go on in China.  We don't have any say as

3   to who is where or when they can come to the United States.

4   We're at a little bit of a disadvantage here.

5              And so with a guy like Mr. Wang, I don't know that

6   anyone's going to be able to produce him, and it's not for our

7   lack of wanting to or not wanting to participate in this

8   litigation.  We are just stuck with what we're stuck with.

9              In terms of dates, one of the things I was going to

10  suggest is, before we plug in names, maybe what we could do is

11  at least put a calendar of available dates together.  And once

12  we have those available dates to plug in, then we can plug in

13  the personnel to go with those dates.

14             This way, no one is taking the lead and saying

15  "I want to do this person on this date and this date" when

16  Ms. Colbath may be on vacation.  I know I have a hearing --

17  I'm on trial September 9th through 11th.  And that's going to

18  be a problem for me, but I'm trying to figure our way through

19  this.

20             I think, if we have the available dates, that would

21  help tremendously.

22             THE COURT:  And, Mr. Gottlieb, how long do you think

23  it should take for everybody just to put their available dates

24  out there?  I don't know the dates but --

25             MR. GOTTLIEB:  Again -- tomorrow.

1           THE COURT:  Okay.

2           I'll put that down.  By the end of tomorrow, all

3    counsel is to exchange dates available for depositions without

4    regard to the individual deponents.

5           MR. GOTTLIEB:  Correct.

6           Can we also, just to clarify -- because one of the

7    things that's going to became problematic is whether or not --

8    is it going to be, A, by, let's say, Zoom?  Which would make

9    things a lot easier for a lot of people.

10          And I think we just need to know whether they're

11   going to be virtual or live.  That's going to impact a lot of

12   things.

13          MS. COLBATH:  I feel strongly that the principals

14   should be in person.  I know my client, who has an accent

15   and -- and it would just be much -- would facilitate it if

16   Mr. Murphy took Erick Rengifo's deposition in person, and

17   I would like to take the BCB folks in person, as well.

18          MR. MURPHY:  I absolutely object to that, Your Honor.

19   The expense of going to New York City to do Rengifo is

20   ridiculous in this age of Zoom.

21          All of these depositions for the sake of counsel and

22   the parties should be by Zoom.  The Court well knows its local

23   rules specifically allow for it.  It works well.

24          And -- and I implore you to allow all depositions to

25   be done by Zoom.

1          THE COURT:  Okay.  We can -- we'll cross that bridge

2   when we get to sort of the list of depos and availability.

3          So let's . . . I'm going to have my JA -- I do have

4   some availability this week -- and I realize it's very short

5   notice for a lot of people.  But I'm going to have her reach

6   back out to you and see if we can't schedule another -- at

7   least another hour because I want to touch on some of

8   Mr. Murphy's requests in his letter, as well.

9          And then, hopefully, you'll have an opportunity to

10  exchange your availability dates.

11         I would also like you all just to each exchange a

12  list of who you want to depose -- no dates -- and who objects

13  to that or . . . their availability to be produced, I guess is

14  what I'm saying.  And it seems like that should -- could be

15  done by the end of tomorrow, as well.

16         So each party's to provide a list of who they wish to

17  depose, and then along with that list I want you to put

18  down -- if you think that a party should be responsible for

19  producing, I want specifically who you think the party

20  responsible to produce is.

21         And then we can hash that out, as well.

22         Again, I'm not going to have authority to extend any

23  discovery deadlines, but I am in contact with Judge Johnson

24  and his chambers.  They're keeping on eye on what's going on

25  with these discovery issues.

1          Jess would like to do that now, but I know,

2    Ms. Colbath, you're trying to go and we don't have Bitmain, so

3    I'm not sure we can schedule anything today.

4          MR. MURPHY:  What -- can you tell me, Your Honor,

5    what days you're maybe looking at?

6          THE COURT:  I mean, I have . . . some availability

7    tomorrow afternoon, later in the afternoon, as well as later

8    in the afternoon on Wednesday.

9          Let me look here.

10          MR. MURPHY:  I'll just share with everybody I'm good

11    anytime on Wednesday, bad tomorrow.

12          THE COURT:  And I may have some time late morning on

13    Thursday.

14          MR. MURPHY:  And I'd be available then, too, Judge.

15          THE COURT:  All right.

16          I'll have Jess reach out to make sure we have

17    somebody from Bitmain with us, not optional for them to

18    attend.

19          And then -- so I want to discuss some of the

20    deposition issues and then, like I said, some of the other

21    issues you've raised, Mr. Murphy.

22          I want to go back for a minute on the issue of the

23    six subpoenas to the investors as well as these documents

24    regarding capitalization and funding.

25          Like I said, Mr. Murphy, you have -- you submitted a

1    motion -- in terms of the one that you filed last night --

2    that does address some of this information.  Do you believe

3    that you need additional briefing on -- on this?  Is there

4    information that I've covered here that you feel like you

5    didn't cover in your motion?

6             MR. MURPHY:  No.

7             I think if you look in two places, both in that

8    emergency motion I filed last night with respect to the

9    brand-new subpoenas that MineOne has given notice of -- but

10   now Ms. Colbath says she hasn't actually served those three

11   passive investors -- but then I also sent good information to

12   Your Honor in my letter of August 16th to the Court and the

13   attachments.

14            Those need to -- somehow we need to resolve those on

15   whether Dr. Fincham in Ohio, whether James Quid in Illinois,

16   whether CMV and Bayview have to produce documents, whether

17   they have to show up for their deposition -- we need to bring

18   that to a head because all those people are just hanging out

19   there -- and now they've got two more -- people are just

20   hanging out there waiting for the Court to say do we have to

21   do anything or -- or not.

22            THE COURT:  Well, we're not going to do the

23   depositions of -- the end of this week.

24            So I'll rule on that.  And I think that Ms. Colbath

25   acknowledged that the motion itself delays some of those

 1   things.  But I'm going to say the request for production and

 2   the depositions to the investors are on hold for now.  This is

 3   an issue the Court wants further briefing on.

 4           What I'm trying to get out of you, Mr. Murphy, if you

 5   feel like you've sufficiently briefed these issues in the

 6   motion filed last night or you need additional time.

 7           MR. MURPHY:  I do need some additional time.

 8           I told Marc Gottlieb I had both my anniversary and my

 9   70th birthday, and that took a little into my weekend, and it

10   made for a hard weekend trying to throw that thing together

11   last night, but I do need a little more time to bring

12   something more to bear for you.

13           THE COURT:  All right.

14           MR. MURPHY:  Not a lot to bear but some more to bear,

15   please, so --

16           THE COURT:  And if I give you a deadline of Friday,

17   is that sufficient?

18           MR. MURPHY:  I'll honor that.

19           THE COURT:  And can you include -- I mean, it's sort

20   of a . . . I want you to include, Mr. Murphy -- it's not

21   exactly the same issue, but I want you to brief your refusal

22   to provide the Black Hills Energy request for proposal

23   documents.  Include that issue, as well.

24           MR. MURPHY:  Okay.  We will.

25           THE COURT:  And then -- I'm sorry.  You have a

1    question?

2              MR. MURPHY:  Were the other two issues really what

3    I call the subpoena issues to the passive investors, all five

4    or six of them, and then interrelated with that is the

5    financing information and capitalization that we've talked

6    about?

7              THE COURT:  Correct, yeah.

8              MR. MURPHY:  Great.  I can do it all.

9              THE COURT:  All right.

10             And then, Ms. Colbath, you've got a vacation in

11   there.

12             I'm not sure how this -- how you feel about your time

13   to respond.  Do you need something outside the usual?

14             MS. COLBATH:  Well, that --

15             THE COURT:  Go ahead.

16             MS. COLBATH:  The floor is mine?

17             THE COURT:  Yes.

18             MS. COLBATH:  Okay.

19             So we would like -- this -- this motion is not --

20   oops.  Something just happened.

21             The motion is -- is not simply on quashing subpoenas.

22   It's to strike our answer; it is for an award of attorneys'

23   fees; it is to revoke my pro hac vice admission.  And so we

24   would like the full 14 days to respond to this.

25             THE COURT:  Ms. Colbath, I'm not going to address any

 1    sanctions that were requested because I believe default was

 2    also requested.

 3            MS. COLBATH:  Correct.

 4            THE COURT:  As a Magistrate Judge, I don't have

 5    authority to hear sanctions.

 6            I'm going to strictly deal with discovery and what

 7    needs to be provided, and then any further argument on

 8    sanctions, default, that will be left at this time to Judge

 9    Johnson.  I don't have the authority to grant a default, so

10    I don't feel like I can rule on the sanctions request of that

11    motion.

12            Does that make sense?

13            MS. COLBATH:  It does.  It's just it's a little

14    difficult to sift through and -- and determine on -- I think

15    it was a 43-page motion -- what I should respond to.

16            But, in any event, I return on September 4th.  I'm

17    off grid camping.  And so I would ask until September 4th so

18    at least whatever my office prepares I have an opportunity to

19    look at before we file it.

20            THE COURT:  And so you can do that and have that to

21    the Court by September 4th?

22            MS. COLBATH:  Correct.

23            THE COURT:  Okay.  I will give you until

24    September 4th.

25            MS. COLBATH:  I appreciate that.

1          THE COURT:  And then, Mr. Gottlieb, if you want to

2    jump into the response, you'll have the same deadlines as

3    MineOne.

4          MR. GOTTLIEB:  Well, that -- the response doesn't

5    really apply to me.  The motion doesn't -- I don't think

6    there's anything in there that applies to me.

7          I would beseech Mr. Murphy to maybe think about

8    withdrawing that motion for sanctions and for -- for defaults

9    and things like that.  I don't know what's -- if it's doing

10   anything but delaying, causing more cost to everybody.

11         I'll leave that to his good judgment.  But I don't

12   think we have any -- any skin in that game other than the fact

13   that I oppose it.  I think that --

14         THE COURT:  Well, you -- if you wish to respond, you

15   can.  Certainly --

16         MR. GOTTLIEB:  All right.  I appreciate that,

17   Your Honor.

18         THE COURT:  Same for Bitmain.  I don't know if

19   they'll have a dog in that particular fight, but, if there's

20   anything you want to say about it, you -- it will be all on

21   the September 4th deadline.

22         Ms. Colbath.

23         MS. COLBATH:  Yeah.

24         Could we have BCB's counsel file whatever new motion

25   they're going to file by noon on Friday?

1          THE COURT:  Mr. Murphy, can you get it done by noon?

2          MR. MURPHY:  New motion?

3          THE COURT:  Well, if -- whatever you're going to

4    supplement or add to . . .

5          MR. MURPHY:  I thought it was, yeah, more of a brief,

6    Your Honor, on -- I didn't think it was a motion.  I guess --

7    I guess it would be a motion for protective order.  So Paula

8    may be right about that, yeah.

9          Okay.  I'll call it a motion for protective order,

10   and I'll get that filed Friday.

11         THE COURT:  Can you do it by noon?

12         MR. MURPHY:  Well, I have to because I'm taking a

13   deposition at 8:00 on Friday morning and then going to a

14   funeral in Cheyenne.  So I really have to get it pretty much

15   in the can by Thursday night.

16         THE COURT:  All right.  Well, we'll say by noon

17   and --

18         MR. MURPHY:  Noon Friday would be lovely.

19         THE COURT:  -- you can do it Thursday.  Okay.

20         All right.  Anything else, Ms. Colbath?

21         MS. COLBATH:  Yes.

22         I . . . Mr. Murphy acknowledged that he has a number

23   of emails that have not been produced, and we would just like

24   a date certain -- by Friday of this week, please -- that he

25   finally complete his email production.

1          THE COURT:  Do you have additional emails,

2    Mr. Murphy, to produce?

3          MR. MURPHY:  You know, I don't know that I do.

4    I don't have personal knowledge of that.  I'll have to talk

5    to BCB.

6          But to the extent that we have them, we'll get those

7    to them in Relativity production and -- and hope that they'll

8    also return the favor and -- and produce their documents to us

9    in Relativity.

10          THE COURT:  So my -- you know, we talked earlier

11    about making -- just checking in with your clients to make

12    sure they've done what they need to do for emails, texts,

13    WeChat, WhatsApp.  That covers emails . . . written

14    correspondence, I guess, of -- in whatever format.  So we'll

15    include emails in that, as well.

16          MR. MURPHY:  Okay.

17          THE COURT:  All right.

18          Ms. Colbath, anything else?  I'm trying to get this

19    done so you can move on.

20          MS. COLBATH:  That's it.

21          I'm ready to -- not -- not that this hasn't been

22    enjoyable, but I'm running a little bit behind.  I appreciate

23    your time, Your Honor.

24          THE COURT:  And, Mr. Murphy, we'll set, hopefully, a

25    time this week, and I want to get to the issues -- I don't

1   want to give you short shrift on some of your issues, as well.

2   Okay?

3              MR. MURPHY:  Thank you very much, Your Honor.

4              MS. COLBATH:  Very good.

5              THE COURT:  And, Mr. Gottlieb, thank you for being

6   here, as well.  We'll get everybody back on the line this week

7   and see if we can't hash out some more of these things.

8              I appreciate counsel's tone and general levels of

9   respect for the Court, as well.  I think it went well today,

10  and I do appreciate it.

11             So have a good afternoon.  And I'll see you again

12  later this week.

13             MR. GOTTLIEB:  Okay.  Thank you, Your Honor.

14             MR. MURPHY:  Thank you, Judge.

15        (Proceedings adjourned at 4:32 p.m., August 19, 2024.)

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4

5           I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I remotely reported by realtime stenography the

10   foregoing proceedings contained herein on the aforementioned

11   subject on the date herein set forth and that the foregoing

12   pages constitute a full, true, and correct transcript.

13

14           Dated this 22nd day of August, 2024.

15

16

17

18                        /s/ Melanie Humphrey-Sonntag

19           _____

20                        MELANIE HUMPHREY-SONNTAG
                               RDR, CRR, CRC
21                      Federal Official Court Reporter

22

23

24

25