Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
       smurray@wpdn.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company, | ) ) ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 23-CV-79 |
| | ) | |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; BITMAIN TECHNOLOGIES HOLDING COMPANY, A Cayman Island Company; BITMAIN TECHNOLOGIES GEORGIA LIMITED, a Georgia corporation; and JOHN DOES 1-18, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
|     Defendants. | ) | |

---

## PLAINTIFF'S SUPPLEMENTAL BRIEFING AND MOTION FOR PROTECTIVE ORDER ON MINEONE'S AUGUST SUBPOENAS TO BCB'S PASSIVE INVESTORS, MINEONE'S REQUEST FOR BCB'S CAPITALIZATION AND FUNDING, AND FOR PRODUCTION OF BCB'S REQUEST FOR PROPOSAL TO BHE

---

COMES NOW Plaintiff BCB Cheyenne LLC ("BCB"), through its counsel, Patrick Murphy, and

hereby submits its supplemental briefing[1] and Rule 26(c) Motion for Protective Order on (a) all the August 2024 document and deposition subpoenas MineOne served and/or gave notice it would serve on BCB's passive investors and/or members of BCB member CMV Global, LLC ("CMV"), (b) MineOne's request for documents regarding BCB's capitalization and funding, and (c) MineOne's request for BCB's submission to Black Hills Energy ("BHE") in response to BHE's 2021 Request for Proposal ("RFP").

## I. <u>PRELIMINARY STATEMENT</u>

Discovery is always limited to any "nonprivileged matter that is *relevant* to any party's claim or defense . . . [considering] the importance of the discovery in resolving the issues." Rule 26(b)(1), F.R.Civ.P. (emphasis added). Fishing expeditions are not allowed. MineOne seeks to expand discovery – unnecessarily – *fishing* for irrelevant information related to (a) BCB's capitalization/funding and (b) BCB's RFP submission to BHE in September 2021. MineOne does so to direct attention away from ***its own*** issues with capitalization/funding, to mislead the Court about the damages MineOne owes to BCB, and to drive up BCB's legal costs. There is no reasonable justification for these requests. This is clear from the two controlling agreements between the parties (*i.e.*, the DHS Agreement and Side Letter). The DHS Agreement required that ***MineOne -- not BCB --*** was responsible for ***funding*** the project; this is why MineOne's funding and capitalization was/is relevant to the project/lawsuit but BCB's funding and capitalization was/is ***<u>not</u>*** relevant to the project/lawsuit. Further, the DHS Agreement and Side Letter provide language to assist in determining the value of the power contract that BCB sold/assigned to MineOne, and that language says nothing about using BCB's 2021 RFP submission to BHE to calculate the power contract value. The Court should enter its order denying MineOne's fishing discovery requests from BCB, and the Court should also quash all the subpoenas to BCB's passive investors seeking any information from these passive investors.

### A. The Requested Capitalization and Funding Documents <u>*from BCB*</u> are Not Relevant to the Parties' Contractual Obligations or Their Claims and Defenses in This Case.

---

[1] This Motion and supplemental briefing is being filed pursuant to Judge Hambrick's 8/21/24 Order on Informal Discovery Conference [Doc. 313, p. 2 of 3].

MineOne's counsel keeps saying they "want to see" BCB's capitalization and funding documents and information. *See* Recording of the 8/19/24 Informal Discovery Conference. They "want to see" these BCB capitalization/funding documents because: (1) "It is imperative that the MineOne Defendants be able to understand how [BCB raised] its $3 million and what BCB told its investors in order to induce them to invest[2];" (2) MineOne had to produce ***its*** capitalization funding documents, so BCB should have to produce ***its*** capitalization/funding documents;[3] (3) the MineOne Defendants "are entitled to discovery on what money BCB raised and what it did with the money, since BCB is blaming the MineOne Defendants for the loss of all its money[4];" (4) "while the MineOne Defendants invested nearly $30 million in building out the North Range site, including paying for the North Range property, BCB did not invest a single penny[5]; [consequently], the MineOne Defendants are entitled to discovery regarding BCB's dissipation of [its] assets; and (5) "the Subpoenas seek discovery that is necessary to investigate the veracity of Michael Murphy's [6/26/24] testimony at the Evidentiary Hearing regarding camouflaged equity and irregular

---

[2] If ***BCB's investors*** were suing BCB for anything related to those $3M investment/capitalization funds, which they are not, this information would arguably be relevant in that suit. But they are not relevant in this suit with MineOne.

[3] MineOne had to produce ***its*** capitalization and funding documents because (a) ***MineOne*** had the contractual obligation to ***fund*** this project, ___and___ MineOne was threatening to remove, dispose of, assign or remove its $22.5M CleanSpark sales proceeds from the North Range and Campstool properties with the intent to defraud BCB, its largest creditor. *See* BCB's *Amended Emergency Motion for Prejudgment Attachment*, WYO. STAT. § 1-15-201, and Judge Johnson's 6/28/24 *Order Granting Request for Issuance of Prejudgment Writs of Attachment and Garnishment* [Doc 254]. No similar allegations or issues relate to BCB.

[4] This is mistaken. BCB is not suing MineOne for the loss of BCB's investment money. Instead, BCB is suing MineOne for not paying BCB, per MineOne's promise to do so, for BCB's Power Contract with Black Hills Energy. BCB has never blamed the MineOne Defendants for the loss [or, more correctly, the return] of its $3M of investment monies to its investors. That's a strawman argument. Instead, BCB has sued the MineOne Defendants for loss of all of the ***Phase 2 compensation and profits*** BCB was contractually entitled to receive which loss was caused by MineOne's anticipatory repudiation/breach of contract**.**

[5] MineOne's counsel repeatedly – and erroneously – says that BCB did not invest a single penny into the project. This is so mistaken, and insulting. BCB did invest in the project. First and foremost, BCB invested its valuable Power Contract into the project – which BCB had worked for nearly a year of uncompensated work to acquire – when it assigned the Power Contract to MineOne in return for MineOne's promise to pay for the Power Contract in Phase 2 of the project. Furthermore, BCB invested a significant portion of the $450,000 that MineOne paid to BCB for Phase 1 services back into the project (including but not limited to (a) compensating BCB's principals for all their Phase 1 work on the project (and for reimbursing their expenses while working on the project site), (b) hiring and paying BCB's employees for their employees Phase 1 work on the project, (c) paying for project related items (such as equipment rentals) for which MineOne has not reimbursed BCB. In other words, BCB did not take the $450,000 for Phase 1 and keep it all as profit. It was just the opposite: BCB used most of these funds to invest in and further the project (to MineOne's benefit).

accounting practices . . . .**[6]**" By testifying on these subjects at the evidentiary hearing, he has put the issue front and center . . . ."  *See* Ms. Colbath's 8/12/24 Letter to Judges Carman and Hambrick, p. 2.  All of these arguments are meritless.

Fundamentally, BCB did not have any contractual obligation to fund any part of this North Range/Campstool Project.  BCB was only required to provide the asset it had *already* developed, specifically, its Power Contract with BHE.  The *only* party which was contractually obligated to *fund* this Project was MineOne.  As the chart of the Parties' contractual obligations (*see* **"Exhibit A"**) demonstrates, the DHS Agreement did *not* require BCB to bring any funds to the Project.  That is, none of BCB's six specific Phase 1 obligations require anything remotely close to "funding" or "bringing funds" to the project.  In stark contrast, eight of MineOne's ten Phase 1 obligations required MineOne to "finance," "fund," "acquire," "purchase," and/or "procure" items for the project.  Without any obligation to bring any funds to the Project, whether and to what extent BCB raised any capitalization and/or investment funds [from any investors] is *wholly irrelevant* to these Parties' contractual claims and defenses.  If MineOne had wanted BCB to bring funds to the project, it would have required that as an obligation of BCB in the DHS Agreement.  But it did not.  Just as MineOne did not do any due diligence on BCB's funding at the time of executing the DHS Agreement (because that information was irrelevant as BCB was not required to fund the project), there is no justifiable reason now for MineOne to receive BCB's funding information (because it remains irrelevant to the contractual obligations and claims in this case).

---

[6] This is a flawed argument. Michael Murphy's evidentiary hearing testimony about *MineOne's* capitalization, funding and alleged loans – which were actually camouflaged equity – had everything to do with *MineOne's* defalcations and nothing to do with BCB's capitalization and funding.  The only issue Michael Murphy put "front and center" was *MineOne's* intent to defraud BCB. One of several reasons BCB sought this highly relevant capitalization and funding information from MineOne is because **MineOne misrepresented** how much funding it had.  As detailed in Michael Murphy's Amended Emergency Motion Affidavit and in Michael Murphy's Bond Amount Affidavit, "MineOne provided proof of funds before signing the DHS Agreement of just under $21.5M, however, according to MineOne's own accounting records, MineOne had only received $8,149,975 in investment capital through the end of September 2022, and MineOne had spent approximately $7.7M by that time." MineOne provided its $21.5M proof of funds to BCB and BHE to induce those parties into signing Agreements with MineOne, but then it turned out MineOne did not actually have those funds (as indicated in its accounting records).  MineOne was underfunded, and it misrepresented this to BCB on several occasions.  MineOne's underfunding contributed to several of the delays on the project.

The Court should deny MineOne's request for any of this capitalization and investment information.  The Court should not permit MineOne to acquire this irrelevant information from BCB or from any of its members, members of members, or passive investors.  The Parties' contract, and contract claims, do not involve BCB's capitalization or financing.

**B.    BCB was Contractually Required to Return Its Investors' Funds to Its Investors.  BCB Did Not Make Itself Judgment-Proof When It Returned Its Investors' $3M Investment Funds to Its Investor.**

MineOne next argues that by returning the $3M investment monies to its investor in August 2022 ($350k) and in early February 2023 ($2.65M)

> . . . BCB emptied its bank accounts – making itself suddenly and strategically judgment proof.  Rather than use its $3 million to save the faltering project (a situation BCB itself was responsible for), BCB made itself judgment proof, as it knew lawsuits were likely on the horizon.  The discovery sought by the subpoenas is expected to show that BCB engaged in classic fraudulent conduct by transferring its assets without adequate consideration.  While the MineOne Defendants invested nearly $30 million in building out the North Range site, including paying for the real property, BCB did not invest a single penny.  The MineOne Defendants are entitled to discovery regarding BCB's dissipation of assets.

*See* Ms. Colbath's 8/12/24 Letter, p. 2. None of this is accurate.  It is just rhetoric to persuade the Court to force BCB to disclose all its irrelevant capitalization and funding.

First, as shown in **Exhibit A**, BCB had no contractual obligation "to use its $3M to save the faltering project."  *Id*.  BCB had no contractual obligation to use *any* of its money – including any investment monies – to fund or save the project.  Thus, such information is irrelevant.

Second, BCB did not know "lawsuits were on the horizon" when it contractually returned the investors' $3M to its investor in August 2022 ($350k) and February 2023 ($2.65M).  Factually, it wasn't until early March 2023 that BCB first retained counsel and contemplated suing MineOne, and BCB and its counsel, Patrick Murphy and Scott Murray, drafted the Chancery Court Complaint on March 12-15, 2023.  It is fiction, a non-event, that BCB knew lawsuits were on the horizon "when it returned the $3M to its investors."  *Id.*  It did not.  It is fiction that BCB returned the investors' $3M

to "make itself judgment proof." That never happened. Still more fictional rhetoric is MineOne's counsel's speculation that "BCB engaged in classic fraudulent conduct by transferring its assets without adequate consideration." *Id.* Those were not BCB's assets or monies to keep.

Instead, while BCB did not need to share the following with MineOne's counsel earlier this month, BCB voluntarily provided the following information to MineOne in Mr. Murphy's August 12, 2024 conferral letter to demonstrate that BCB was ***contractually obligated to return its investors' monies to the investors*** when it did so:

- ***CMV Global*** raised ***$2.65M*** in early ***January 2022*** (including $1M from Dr. Bryce Fincham), executed a Unit Purchase Agreement with BCB on January 16, 2022 for 2,650 Class C units, and then sent the $2.65M to BCB on January 18, 2022 in return for 2,650 Class C membership units.

- After this, ***CMV Global raised another $350k for investing into BCB***. CMV executed a Unit Purchase Agreement with BCB on January 17, 2022 for 200 additional Class C units, and CMV executed a Unit Purchase Agreement with BCB on June 30, 2022 for an additional 150 Class C units. CMV sent the $350k for these additional 350 Class C units to BCB on July 18, 2022.

- BCB and CMV signed a Membership Interest Redemption Agreement on August 8, 2022 in which CMV redeemed 350 Class C membership units (which had originally been bought for $350k). ***BCB returned $350k to CMV on August 10, 2022 to redeem and assume*** these 350 Class C membership units.

- ***BCB passed a Corporate Resolution on February 7, 2023 to return the remaining $2.65M of CMV's initial capital contributions to CMV*** (while CMV would continue to hold its remaining 2,650 Class C membership units). BCB sent the $2.65M to CMV on February 10, 2023.

BCB was ***contractually obligated*** to return ***all*** of this $3M investment money to its investors. The key language in the Operating Agreement of BCB Cheyenne LLC, is as follows:

- 2.2(b) "The Class B Units shall be issued to one or more financing partners as determined by Manager based upon financing partner(s) providing financing deemed sufficient by Manager (the Financing);" and

- 2.3(b) "In the event Company does not secure the Financing before the initial capital has been sent to lender escrow, the Company will return the initial capital contribution of all Members holding Class C Units no later than sixty (60) days from the date the Manager provides written notification to Members holding Class C Units that the Financing was not secured by Company."

BCB did not find a financing partner deemed sufficient by the Manager, did not issue any Class B Units, did not obtain "the Financing," and did not send the initial capital to lender escrow. Consequently, BCB was obligated to return the initial capital contribution of all Members holding Class C Units.

BCB honored its obligation to its only Class C Unit holder/investor, CMV Global, when BCB Ventures LLC (the Manager of BCB Cheyenne LLC) passed a corporate resolution on February 7, 2023 that stated, "…the Members of BCBV hereby authorize BCBV's Managing Member, Emory Patterson IV, to act on behalf of BCBV as Manager of BCBC to take any and all necessary actions to effectuate the return of the initial capital contributions of the Member holding Class C units (CMV Global, LLC)….," and then proceeded to return the initial capital contribution of CMV Global on February 10, 2023.

C.    **MineOne's Unsupported Claim for Alleged *Alter Ego*/Veil Piercing Does Not Support Production of BCB's Capitalization and Funding.**

In its Third Counterclaim, the MineOne Defendants speculatively and erroneously allege, "upon information and belief," that "the individual members of Plaintiff BCB influenced and governed Plaintiff BCB in such a manner that there is a unity of interest and ownership in Plaintiff BCB, and the separateness of each member and Plaintiff BCB has ceased to exist." [ECF 49, Page 42 of 45]. None of this is true. But the MineOne Defendants may urge this *alter ego* theory of liability as a hook to seek production of BCB's capitalization and funding information. BCB timely and fully objected to producing its capitalization and funding information on MineOne's *alter ego* theory. *See* "**Exhibit B**."    The MineOne Defendants have no evidence to support a piercing the corporate veil claim, and this request is a fishing expedition[7] to search for any such evidence. In

---

[7] Judge Rankin recently ruled, "Although the scope of discovery is broad, ***parties are not allowed to engage in exploratory discovery or a 'fishing expedition' to obtain evidence to support their claims and defenses***." *See* 6/2/22 Order Denying Defendant's Motion to Quash Subpoena *duces tecum* in *Tillman v. Riverton Memorial Hospital, LLC*, Civil No. 21-CV-138-F; United States District Court for the District of Wyoming [Doc 36], *citing Richards v. Convergys Corp.*, No. 05-CV-790-DAK, 2007 WL 474012 at *2 (D. Utah Feb. 7, 2007) (*citing Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1169 (10th Cir. 2000)). (emphasis added).

6

Wyoming, "it bears repeating that limited liability [against the individual members of an LLC] is the rule, and piercing is the **rare exception** to be applied **only** in cases involving **exceptional** circumstances." *GreenHunter Energy, Inc. v. Western Ecosystems Technology, Inc.*, 337 P.3d 454, 465 (Wyo. 2014) (emphasis added).  Nowhere in its Answer or Counterclaim does MineOne allege any fraud by the BCB members with any particularity.  Piercing does not exist here.  Even if Defendants could pierce the LLC veil to impose personal liability on BCB's members, which they cannot, any discovery on any of the four piercing factors in Wyo. Stat. § 17-19-304 is premature in the underlying suit against the limited liability company, BCB, where judgment has not been entered against BCB on MineOne's Counterclaims.  The entry of judgment against the limited liability company is a predicate requirement before MineOne may later pursue any discovery, or judgment, against the LLC members on a piercing the corporate veil theory.  *See e.g., Mandeville v. Quinstar Corp.*, 109 Fed. Appx. 191, 194 (10th Cir. 2004) ("In the instant case, a trial on the issue of piercing the corporate veil would have been unnecessary absent a ruling in Mandeville's favor on the breach of contract or Title VII claim.  Thus, the decision to bifurcate advanced judicial economy.  Moreover, the issues were clearly separable.  The ability to collect a judgment by piercing the corporate veil became relevant only when Mandeville was successful on one of the underlying claims.  Because the issues before the district court were logically separable, and because bifurcation promoted judicial economy, we conclude that the district court did not abuse its discretion in bifurcating the trial"); *and see Wallop Canyon Ranch, LLC v. Goodwin*, 351 P3d 943, 960, 961 (Wyo. 2015) ("[W]e do not consider veil-piercing until the "threshold question of whether there is liability for an underlying cause of action is answered").  The Court should deny MineOne's misguided effort to seek any additional financial or accounting records and information from BCB (beyond the information and documents BCB voluntarily produced to MineOne in Patrick Murphy's August 12 conferral letter).

**D.    The Court Should Enter Its Protective Order Quashing All of the August 2024 Subpoenas to BCB's Passive Investors.  Even If the Requested Information Were**

**Relevant, Which It is Not, It Should Only be Obtained from BCB, Not from BCB's Passive Investors.**

MineOne has served and/or threatens to serve, 12 subpoenas on passive investors of BCB[8]. The document subpoenas all seek BCB's financial information, investments, loan or "other consideration given by you to any of BCB's affiliates or members." *See* **"Exhibit C."** They seek the "use and current location" of such investments or payments; "all documents relating to the operations and business activities of BCB;" all documents relating in any way to North Range and/or Campstool;" and "all documents relating to or mentioning any of the Defendants or this action." *Id.* This is facially overbroad, irrelevant, unduly burdensome, and oppressive. These passive investors are analogous to shareholders in a corporation. In litigation against a corporation, plaintiffs are not allowed to subpoena the shareholders for documents or depositions. *See Meide v. Pulse Evolution Corp.*, No. 3:18-CV-1037-J-34MCR, 2019 WL 1518959, at *7 (M.D. Fla. Apr. 8, 2019) (quashing subpoenas requesting investment amounts and contact information from investors "when [plaintiff] can potentially obtain such information directly from the corporate entity"). And these Ohio, Illinois, Tennessee and Florida BCB investors should not be subjected to these obtrusive subpoenas. Rule 26 of the Federal Rules of Civil Procedure states that "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably **cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive**." Fed. R. Civ. P. 26(b)(2)(C) (emphasis added). In quashing subpoenas directed at five non-parties who provided service to Granite Peak Fabrication, Judge Rankin ruled that:

It is undisputed that at least portions of the documents requested in the Rule 45

---

[8] Consider this: MineOne seeks information from BCB's passive investors, none of whom had a role in management or involvement with the day-to-day activities of the project. However, at the same time, MineOne refuses to make available to BCB for depositions three of the four key individuals responsible for MineOne's breach of contract and Bit Origin's tortious interference. This is how MineOne operates. MineOne forces BCB to defend against irrelevant discovery requests (which burdens BCB and drives up BCB's costs) while at the same time preventing BCB from obtaining critical evidence from individuals who either made critical project decisions and/or were present on site to effectuate those decisions.

> subpoenas seek the same or substantially similar information to that requested from
> Defendant via Plaintiff's discovery requests[9]. This supports the notion that the
> information can be obtained from a more convenient, less expensive, and less
> burdensome source. Additionally, as stated above, Plaintiff's Rule 45 subpoenas are
> overbroad and unduly burdensome, and Defendant may have already produced some
> of the pertinent information in response to Plaintiff's discovery requests.

*McKinney v. Granite Peak Fabrication, LLC*, No. 19-CV-266-J, 2021 WL 7252981, at *5 (D. Wyo.

Aug. 24, 2021). If the information sought from these investors is relevant, which it is not, the Court

should find that the requested information is best obtained from BCB, not these passive investors

around our country. The Court should quash all 12 foreign subpoenas.

      **E.**      **BCB's Response to BHE's 2021 Request for Proposal is Irrelevant.**

On August 12, 2024, MineOne's counsel, Alex Inman, asserted that all of BCB's documents

and communications submitted by BCB to BHE in response to BHE's 2021 RFP are "undeniably

relevant to both the claims and counterclaims in this action" because "BCB has at various points

noted the perceived 'value' of the initial agreement between BHE and BCB." BCB has indeed noted

the value of the Power Contract between BHE and BCB because this is the most important and

valuable asset BCB sold/assigned to MineOne as part of BCB's and MineOne's DHS Agreement

(and Side Letter). However, nothing in BCB's submission to BHE's RFP is relevant for determining

the value of the Power Contract. BCB's submission to BHE's RFP was simply the "foot in the door,"

which led to many months of meetings, emails, and negotiations between BCB and BHE before BCB

and BHE signed their February 22, 2022 Power Contract, and later, their June 9, 2023 Amended and

Restated Power Contract. BCB's RFP submission is ***not*** what is valuable. ***BCB's actual Power***

***Contract (based on all of the terms contained therein) is what is valuable***.

MineOne and BCB agreed on the value of the BCB's Power Contract in the controlling

agreements between MineOne and BCB (specifically, the DHS Agreement and Side Letter). The

DHS Agreement includes a liquidated damages clause and a limitation of liability clause, both of

---

[9] This is precisely the situation here. MineOne has also requested all of this information from BCB. *See* **"Exhibit B."**

which provide the formula[10] for calculating the value of BCB's Phase 2 services (which is a combination of the Power Contract and BCB's services as the Phase 2 O&M provider).  The Side Letter references that same formula, and indicates that is the amount BCB was to be paid if MineOne sold the facilities to a third party that no longer requires BCB's Phase 2 O&M services (like it is currently doing with CleanSpark). Nowhere in the BCB/MineOne controlling agreements does it indicate BCB's submission to BHE's RFP should be used to calculate the value of the power contract.

In addition to the controlling agreements, it is also possible to approximate the value of the Power Contract which BCB sold/assigned to MineOne by looking at how much CleanSpark is currently in the process of paying MineOne for a slightly modified version of that Power Contract. CleanSpark is paying MineOne $22.5M, which is primarily for the Power Contract, the North Range parcel, and Campstool parcel.  The North Range and Campstool parcels cost MineOne approximately $3.5M.  This means the approximate value of the slightly modified Power Contract is $19M.

These two approaches to valuation - the contractual language of BCB's/MineOne's controlling agreements and a comparable transaction – are the most accurate ways to value the Power Contract BCB sold/assigned to MineOne (given the former was how the parties agreed to value the Power Contract and the latter is a real-world arms-length comparable transaction).  The information BCB submitted in response to BHE's RFP was simply the opening salvo in a long series of communications and negotiations that eventually led to BCB possessing the valuable Power Contract.  MineOne's request for BCB's RFP submission is another one of MineOne's irrelevant discovery requests meant to burden BCB and distract this Court from the important issues with the Parties' claims and counterclaims. This Court should not require BCB to provide this information to MineOne.

---

[10] The formula is "an amount equal to the net present value of the budgeted amount of Hosting Fees net of costs and consulting fees therein corresponding to the remaining Term assuming a continuous utilization of 45MW, and following delivery into Budget and CCO of the Campstool Facility, an aggregate of 75MW" (DHS Agreement, VII(1) and VIII(2)(b)).

DATED this 23rd day of August, 2024.

                        BCB CHEYENNE LLC d/b/a
                        BISON BLOCKCHAIN, Plaintiff

            By:        */s/ Patrick J. Murphy*
                        Patrick J. Murphy (WSB No. 5-1779)
                        Scott C. Murray (WSB No. 7-4896)
                        Williams, Porter, Day & Neville, PC
                        159 N Wolcott St. Suite 400
                        Casper, WY 82601
                        Ph: (307) 265-0700
                        pmurphy@wpdn.net
                        smurray@wpdn.net

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 23rd day of August 2024.

| | |
|---|---|
| Sean M. Larson, WSB No. 7-5112<br>Kari Hartman, WSB No. 8-6507<br>HATHAWAY & KUNZ, LLP<br>P.O. Box 1208<br>Cheyenne, WY 82001<br>slarson@hkwyolaw.com<br>khartman@hkwyolaw.com | [  ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[  ]    Overnight Delivery<br>[  ]    Hand Delivery<br>[  ]    Electronic Mail |
| Paula Colbath, *Pro Hac Vice*<br>Alex Inman, *Pro Hac Vice*<br>Leily Lashkari *Pro Hac Vice*<br>David Forrest, *Pro Hac Vice*<br>LOEB & LOEB LLP<br>345 Park Avenue New York,<br>NY 10154<br>pcolbath@loeb.com<br>ainman@loeb.com<br>llashkari@loeb.com<br>dforrest@loeb.com | [  ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[  ]    Overnight Delivery<br>[  ]    Hand Delivery<br>[  ]    Electronic Mail |

| | |
|---|---|
| Marc Feinstein, *Pro Hac Vice*<br>William Pao, *Pro Hac Vice*<br>Daniel Hirsch, *Pro Hac Vice*<br>David Iden, *Pro Hac Vice*<br>Sherin Parikh, *Pro Hac Vice*<br>O'MELVENY & MYERS<br>400 South Hope Street<br>Los Angeles, CA 90071-2899<br>mfeinstein@omm.com<br>wpao@omm.com<br>dhirsch@omm.com<br>diden@omm.com<br>sparikh@omm.com | [   ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[   ]    Overnight Delivery<br>[   ]    Hand Delivery<br>[   ]    Electronic Mail |
| Khale J. Lenhart, WSB No. 7-4581<br>Tyson R. Woodford, WSB No. 8-6650<br>HIRST APPLEGATE LLP<br>1720 Carey Ave. Room 400<br>P.O. BOX 1083<br>Cheyenne, WY 82003<br>klenhart@hirstapplegate.com<br>twoodford@hirstapplegate.com | [   ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[   ]    Overnight Delivery<br>[   ]    Hand Delivery<br>[   ]    Electronic Mail |
| Meggan J. Hathaway<br>Jane M. France<br>SUNDAHL, POWERS, KAPP & MARTIN, LLC<br>500 W. 18th Street, Ste. 200<br>Cheyenne, WY 82003<br>mhathaway@spkm.org<br>jfrance@spkm.org | [   ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[   ]    Overnight Delivery<br>[   ]    Hand Delivery<br>[   ]    Electronic Mail |
| Marc S. Gottlieb<br>ORTOLI ROSENSTADT, LLP<br>366 Madison Avenue, 3rd Floor<br>New York, NY 10017<br>Telephone: (212) 588-0022<br>Facsimile: (866) 294-0074<br>Email: msg@orllp.legal | [   ]    U. S. Mail (prepaid)<br>[ x ]    CM/ECF Electronic Transmission<br>[   ]    Overnight Delivery<br>[   ]    Hand Delivery<br>[   ]    Electronic Mail |

/s/Patrick J. Murphy

Patrick J. Murphy