# EXHIBIT 2

**BLOCKCHAIN INTERRUPTIBLE ELECTRIC SERVICE AGREEMENT**

This Blockchain Interruptible Electric Service Agreement ("Agreement"), dated and effective this 22nd day of February, 2022 ("Effective Date"), is made and entered into by and between Cheyenne Light, Fuel and Power Company, a Wyoming corporation with its principal place of business at 1301 West 24th Street, Cheyenne, Wyoming 82001 ("Company"), and BCB Cheyenne LLC, a limited liability company, with its principal place of business at 159 N. Wolcott, Suite 400, Casper, Wyoming 82601 ("Customer").  The Company and Customer may be individually referred to herein as a "Party" and collectively as "Parties."

**1.      DEFINITIONS AND RECITALS**

1.1 Recitals.

      a.   Customer is developing a Facility or Facilities in Cheyenne, Wyoming, located in the electric service area of the Company;

      b.   Customer and Company have agreed that Customer shall receive service under the Company's Blockchain Interruptible Service ("BCIS") Tariff;

1.2      Definitions. The following underlined words and phrases when used in this Agreement mean the following:

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly, (a) owns or controls the first Person, (b) is owned or controlled by the first Person, or (c) is under common ownership or control with the first Person, where "own" means ownership of 50% or more of the equity interests or rights to distributions on account of equity of the Person and "control" means the power to direct the management or policies of the Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" shall have the meaning assigned to it in the introductory paragraph.

"BCIS Customer Benefit Credit" shall have the meaning assigned to it in Article 6.3.

"BCIS Customer Facility Load" means the energy requirements necessary to serve Customer's load at its Facilities that has been scheduled in accordance with the scheduling and procurement procedures defined in Article 5 of this Agreement, and all other provisions of this Agreement.

"BCIS Market Energy Service" is energy supplied to Customer from market energy purchases, procured and delivered to serve the Facilities in accordance with this Agreement.

"BCIS Transmission Credit" shall have the meaning assigned to it in Article 6.3.

"Binding Two-Day Forecast" shall have the meaning assigned to it in Article 5.2.

1

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banks in Cheyenne, Wyoming are authorized or required by law to be closed.

"Commercial Operation" shall mean when the Customer begins taking permanent service under this Agreement at any demand level. Customer shall provide written notice to Company no later than fifteen (15) Business Days prior to Commercial Operation. The rate provisions of Article 6 shall become effective upon Commercial Operation.

"Company" shall have the meaning assigned to it in the introductory paragraph.

"Company Margin" shall have the meaning assigned to it in Article 6.4.

"Construction Power" shall mean Customer's electric power and energy requirements during the period of construction and development of the Facility. Construction Power requirements shall be served under regular retail tariff rates at the most applicable general service rate.

"Cost of Supply" shall have the meaning assigned to it in Article 6.3.

"Customer" shall have the meaning assigned to it in the introductory paragraph.

"Effective Date" shall have the meaning assigned to it in the introductory paragraph.

"Emergency" means an emergency condition or any abnormal interconnection or system condition (a) that requires automatic or immediate manual action to prevent or limit loss of Company's load or generation supply as required pursuant to applicable national and regional reliability standards established by the PSC, NERC and the FERC, as applicable, (b) that could adversely affect the reliability of Company's system or generation supply, (c) that could adversely affect the reliability of any interconnected system, or (d) that could otherwise pose a threat to public safety.

"Energy Cost(s)" shall have the meaning assigned to it in Article 6.3.

"Escrow Account" shall have the meaning assigned to it in Article 15.3.

"Escrow Agreement" shall have the meaning assigned to it in Article 15.3.

"Event of Default" shall have the meaning assigned to it in Article 17.

"Facility" or "Facilities" means Customer's data mining and processing equipment located and/or to be installed in the vicinity of Company's East Business Park substation and Company's North Range substation, both in Cheyenne, Wyoming, including all related Customer equipment or property located at those premises. The Facility includes all expansions, modifications, and additions thereto during the Term.

"Fixed Cost of Supply Rate" shall have the meaning assigned to it in Article 6.2.

"Force Majeure" shall mean any cause beyond the reasonable control of the Party failing to perform, including causes such as (a) flood, earthquake, storm, dust storm, lightning, fire,

2



epidemic, pandemic, explosion, pestilence, act of God, or failure or breakdown of facilities and/or equipment from any other cause not specifically listed in this subsection (a) or in subsection (b), provided that the failure or breakdown of the facilities and/or equipment is not caused by the failure of the Party claiming Force Majeure to prudently operate and maintain those facilities and/or equipment or (b) war (regardless of whether declared), act of public enemy, act of civil or military authority, civil disturbance or disobedience, riot, religious strife, sabotage, terrorism, threats of sabotage or terrorism, closing of ports, airports, terminals, roadways, waterways, or rail lines, rationing or allocation, or labor or material shortage.

"GDPM" shall mean the Generation Dispatch and Power Marketing Department of Company's Affiliate, Black Hills Service Company, LLC.

"House Power" shall mean Customer's electric power and energy requirements at the Facility that are not directly related to its data mining operations. House Power requirements shall be served under regular retail tariff rates at the most applicable general service rate.

"Interruption Notification" shall have the meaning assigned to it in Article 3.2.

"Interruption Time" shall have the meaning assigned to it in Article 3.2.

"Issuer" shall have the meaning assigned to it in Article 15.3.

"Letter of Credit" shall have the meaning assigned to it in Article 15.3.

"Long-Term Energy Forecast" shall have the meaning assigned to it in Article 5.4.

"Maximum Contract Energy Requirement" shall be 45,000 kW per month multiplied by the total number of hours in the monthly billing period for Customer's Facility in the vicinity of the North Range substation and shall be 30,000 kW per month multiplied by the total number of hours in the monthly billing period for Customer's Facility in the vicinity of the East Business Park substation. These values represent the maximum quantity of electric power and energy Company is obligated to deliver pursuant to this Agreement, beginning no sooner than the later of one hundred fifty (150) days following the date Customer provides notice to Company that it has closed on the real estate transaction(s) necessary to allow Customer to commence construction of its Facilities, or the date upon which all meters are installed at the Facilities, which shall be no later than two hundred seventy (270) days following the date Customer provides notice to Company that it has closed on the real estate transaction(s) necessary to allow Customer to commence construction of its Facilities. The Parties understand and agree that, with respect to Customer's Facility in the vicinity of the East Business Park Substation, the above referenced one hundred fifty (150) day period may be extended by up to an additional fifty (50) days pursuant to Article 2.2.

"Mediator" shall have the meaning assigned to it in Article 14.3.

"Medium-Term Energy Forecast" shall have the meaning assigned to it in Article 5.4.

"Minimum Contract Energy Charge" shall have the meaning assigned to it in Article 3.5.

3

"Minimum Contract Energy Requirement" shall be 10 MW per month multiplied by the total number of hours in the monthly billing period, which is the minimum quantity of electric power and energy Customer is obligated to purchase pursuant to this Agreement, beginning no later than one hundred eighty (180) days following Company's initial written notice to Customer of the completion of construction of Company installed facilities required pursuant to Article 2.2 of this Agreement.

"Party" and "Parties" shall have the meaning assigned to it in the introductory paragraph.

"Person" includes any natural person, corporation, company, partnership (general or limited), limited liability company, business trust, Governmental Authority, or other entity or association.

"Point of Delivery" shall be meter or meters located on the high-side of the distribution transformer to be constructed by Company in close proximity to each Facility.

"Point of Receipt" means the location that a transmission service provider specifies on its transmission system where a transaction enters the transmission system.

"PSC" means the Wyoming Public Service Commission, a commission of the State of Wyoming, or such other regulatory commission or agency which may hereafter have jurisdiction to determine the rate charged by the Company for the sale of retail electric power and energy.

"Security Fund" means the letter of credit, guarantee and/or other collateral that Customer is required to establish and maintain, pursuant to Article 13, as security for Customer's performance under this Agreement.

"Service Interruption Limit" shall have the meaning assigned to it in Article 3.2.

"Term" shall mean a period of time commencing as of the Effective Date of this Agreement and shall continue through the earlier of the fifth anniversary of the Commercial Operation Date or the date equal to the fifth anniversary of the Effective Date plus two hundred seventy (270) days.  At least one hundred twenty (120) days prior to the expiration of the Term, the parties will work in good faith to negotiate an agreement to extend the Term of this Agreement or a new Blockchain Interruptible Electric Service Agreement, each on terms that are acceptable to each Party at that time, in each Party's sole discretion.  Any negotiation related to a potential term extension or new agreement will be completed at least ninety (90) days prior to the expiration of the then-existing Term.

"Threshold Price" means Customer's indication of the maximum Cost of Supply that Customer is willing to pay for BCIS Customer Facility Load that is included in a Binding Two-Day Forecast.  Under no circumstances may Customer set a Threshold Price that is lower than the Fixed Cost of Supply Rate less the Company Margin.

"Threshold Price Curtailment" shall have the meaning assigned to it in Article 5.3.

"Threshold Price Notification" shall have the meaning assigned to it in Article 5.3.

"Variable Cost of Supply Rate" shall have the meaning assigned to it in Article 6.2.

4

"WAPA Network Transmission Charges" shall have the meaning assigned to it in Article 6.7.

"Weekly Energy Forecast" shall have the meaning assigned to it in Article 5.1.

## 2.    FACILITIES

2.1    Facilities to be Furnished by Customer. Customer shall install and maintain, at its own expense, in approved standards of construction, all facilities on Customer's side of the Points of Delivery that are necessary for the proper reception of electrical power for its requirements beyond such point. Such facilities and Customer's plant equipment shall be of types which will not interfere with other electrical service rendered by Company and be subject to inspection by Company at reasonable times. Customer agrees to provide Company, without cost, a suitable location to be determined by Customer on its premises for lines, locations, and metering equipment necessary to provide electrical service for the Facilities.  Customer agrees to grant the Company unrestricted use of the communication lines to the metering equipment.

2.2    Facilities to be Furnished by Company. Not later than one hundred fifty (150) days after Customer provides notice to Company that it has closed on the real estate transaction(s) necessary to allow Customer to commence construction of its Facilities and to further allow Company to commence construction of the facilities to be furnished by Company pursuant to this Article 2.2 of this Agreement, Company shall install and maintain, in approved standards of construction, all facilities on Company's side of the Points of Delivery which are necessary for the proper delivery of electrical power from Company's East Business Park substation and Company's North Range substation to the respective Points of Delivery.  Provided, however, with respect to the East Business Park substation, Company may extend the one hundred fifty (150) day period referenced herein by up to an additional fifty (50) days by written notice to Customer.  Company will provide written notice to Customer when all facilities on Company's side of each individual Point of Delivery are complete.  All such facilities installed by Company shall remain its property, and it shall have the right to inspect, repair, or remove same.  Customer shall be solely responsible to reimburse Company, no later than thirty (30) days after receiving a final invoice, for the capital and/or construction costs (including a gross-up for federal income taxes) of any such facilities installed on Company's side of the Point of Delivery, to the extent such additions or upgrades are necessary to reliably serve Customer's load.  Company shall obtain Customer's approval of any capital and/or construction costs in excess of two million dollars ($2,000,000) in the aggregate, with Customer's approval not being unreasonably withheld, conditioned, or delayed.  Company shall be responsible for maintenance and repair costs associated with all facilities on Company's side of the Points of Delivery.

## 3.    SALE OF POWER AND ENERGY

3.1    All Requirements. Customer agrees to buy all of the electric power and energy requirements necessary to serve the Facilities during the Term from Company, which for the purposes herein, all requirements shall include all electric power and energy that the Facility uses during the Term; provided, Customer shall be permitted to maintain standby generation and/or use portable power generation and battery backups for use during interruption of the Company's electric service. In operating standby and/or portable power generation, Customer shall not allow any feedback of electric energy into the Company's system.  Company will use commercially

5



CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MINEONE0033148

reasonable efforts to have facilities in place to meet Customer's power and energy requirements upon Customer's desired Commercial Operation Date for its Facilities. Customer understands and agrees that (other than Construction Power and House Power) Company shall have no obligation to deliver any power or energy to either Facility prior to one hundred fifty (150) days following Customer's notification to Company that Customer has closed on its real estate transaction(s), and under no circumstances will Company be obligated to deliver greater than the Maximum Contract Energy Requirement throughout the Term of this Agreement. Customer further agrees that at no point during the Term shall the electric power and energy requirements necessary to serve the Facilities exceed the Maximum Contract Energy Requirement for each respective Facility.

3.2    Interruptible Service. Notwithstanding any provision in this Agreement to the contrary, and subject to the provisions of this Article 3.2, Company shall have the right to interrupt service to Customer, in part or in full, for up to 300 hours per calendar year (the "Service Interruption Limit"), without double-counting to the extent service is interrupted to both of Customer's Facilities at the same time, and with the Service Interruption Limit being prorated during the first year of service, for the period beginning on the Commercial Operation Date and ending on December 31.

   a.   Service to Customer will be interrupted by telephone and e-mail communication from Company (an "Interruption Notification"), setting forth both the beginning hour of the interruption (the "Interruption Time") and the expected duration of the interruption. Company shall give the Interruption Notification no less than one hundred twenty (120) minutes prior to the Interruption Time, unless the interruption is necessary to maintain reliability, ensure adequate operating reserves, and/or protect the Company's electrical equipment.

   b.   To the extent Customer does not curtail its load as prescribed by the Interruption Notification or does not otherwise comply with the requirements of this Article 3.2, Company may take any action it deems necessary to discontinue service to Customer, without liability to Customer in any respect, including, but not limited to, without liability for damage or loss to the Facilities or any of their associated equipment.

   c.   At least 30 days prior to Commercial Operation, Customer shall provide Company written notification of a primary point of contact for receiving Interruption Notifications and shall update this information by written notification as necessary throughout the Term of this Agreement.

   d.   It is the responsibility of Customer to maintain its communication lines and ensure that an individual is available to receive Interruption Notifications at the telephone number identified as the primary point of contact 24 hours per day, and 365 days per year.

   e.   The Company's right to interrupt service hereunder shall be in addition to, and shall not be reduced or limited by either: i) periods of suspended service pursuant

6



                                    MINEONE0033149

to Articles 3.3, 3.4, 5.3, or other provision of this Agreement; or ii) periods where service is reduced, limited, or curtailed by events of Force Majeure.

3.3   <u>Suspension of Service for Unsatisfactory Condition</u>. The Company may suspend the supply of electric power and energy to Customer if, after written notice of an unsatisfactory condition on Customer's system or on the facilities maintained by Customer which interferes with any service supplied from the power system of the Company, and Customer fails or refuses to make such changes necessary to eliminate such unsatisfactory condition within a timeframe provided by Company with its written notice of the unsatisfactory condition, which shall in no case be less than ten (10) business days, unless the unsatisfactory condition presents an immediate risk to Company and/or its power system as determined solely by Company, however, such suspension shall not release Customer from the obligation to pay the Minimum Contract Energy Charge during the period of suspension.

3.4   <u>System Emergency Conditions</u>. Company will not be obligated to deliver and Customer will not be required to receive energy at the Delivery Point in the event of an Emergency.

3.5   <u>Minimum Contract Energy Requirement</u>. Beginning no later than one hundred eighty (180) days following Company's initial notification to Customer of Company's completion of construction of Company installed facilities required pursuant to Article 2.2 of this Agreement, and throughout the remaining Term of the Agreement, Customer shall operate and maintain the Facilities so that Customer's electric power and energy requirements are no less than the Minimum Contract Energy Requirement. The Minimum Contract Energy Requirement will be reduced, however, by the number of MWh's that are interrupted under either Article 3.2 or 3.4 of this Agreement.  To the extent the Customer's actual electric power and energy requirements are less than the Minimum Contract Energy Requirement in any billing period, as may be reduced by the preceding sentence, Customer shall be invoiced for any shortfall (the "<u>Minimum Contract Energy Charge</u>").  For avoidance of doubt, Customer shall be responsible for payment of no less than the Fixed Cost of Supply Rate multiplied by the Minimum Contract Energy Requirement, as may be reduced by the second sentence of this Article 3.5 in each hour of each billing period, regardless of the amount of electric power and energy consumed.

## 4.   BCIS MARKET ENERGY SERVICE

4.1   <u>Energy Supply</u>. Company will be solely responsible for managing the energy supply to serve BCIS Customer Facility Load, in accordance with the scheduling and procurement procedures defined in Article 5 of this Agreement. Except where specifically indicated to the contrary in this Agreement, all energy procured by Company to serve BCIS Customer Facility Load shall be procured in the day-ahead market.  Customer shall be permitted to work with Company to procure blocks of power in advance of the above-stated procurement deadline.

4.2   <u>Transmission and Ancillary Services</u>. In addition to procuring energy to serve the BCIS Customer Facility Load, all in accordance with the terms and conditions of this Agreement, Company shall be responsible for providing or procuring the following related to BCIS Customer Facility Load:

7



MINEONE0033150

a.   All transmission arrangements to deliver energy attributable to the BCIS Customer Facility Load from the Point of Receipt to the Point of Delivery;

b.   The reservation of and activation of operating reserves to fulfill the operating reserve requirements attributable to the BCIS Customer Facility Load;

c.   Energy imbalance service, calculated by identifying variances between the Binding Two-Day Forecast provided by Customer, as compared to actual BCIS Customer Facility Load; and

d.   Other services as may become necessary to reliably serve the BCIS Customer Facility Load from time to time.

4.3   Market Energy Stacking. All procurement activities related to BCIS Market Energy Service will be performed by the Generation Dispatch and Power Marketing Department ("GDPM") of Company's Affiliate, Black Hills Service Company, LLC, pursuant to a Generation Dispatch and Energy Management Agreement between Company and its Affiliate, Black Hills Power, Inc. When GDPM is purchasing energy to serve any of Company's other obligations or any other obligations of Black Hills Power, Inc., where trades are executed on the same day with deliveries covering contemporaneous time periods, transactions with highest Energy Costs among all other contemporaneous transactions will be assigned to BCIS Market Energy Service under this Agreement. By way of example, and not as a means of limitation, if GDPM is in the day ahead market purchasing energy for the next day to serve BCIS Customer Facility Load and is also in the market purchasing energy for the next day to serve other Cheyenne Light retail load and those transactions have different Energy Costs, BCIS Market Energy Service will be assigned the transaction(s) with the highest Energy Costs.

## 5.   ENERGY FORECASTING, SCHEDULING, AND NOTIFICATION PROCEDURES

5.1   Weekly Energy Forecast. Prior to 5:00AM MPT each day, Customer shall provide Company with an estimated weekly forecast of BCIS Customer Facility Load covering the seven-day period that begins at 12:00AM MPT (HE 1) two days following the date of the forecast (the "Weekly Energy Forecast"). The Weekly Energy Forecast shall include peak demand and hourly energy profiles for each forecasted day.

5.2   Binding Two-Day Forecast. The estimated BCIS Customer Facility Load (including peak demand and hourly energy profiles) beginning at 12:00AM MPT (HE 1) on the day that is two days following the date of the Weekly Energy Forecast and ending at 11:59PM MPT (HE 24) on the day that is three days following the date of the Weekly Energy Forecast shall be binding and effective (the "Binding Two-Day Forecast"). By way of example, and for avoidance of doubt, a Weekly Energy Forecast provided prior to 5:00AM MPT on a Tuesday shall include a Binding Two-Day Forecast for Thursday and Friday of that week. Once Customer provides forecasted BCIS Customer Facility Load in the first instance in a Binding Two-Day Forecast, the forecast for that day may only be modified or adjusted with the consent of Company. In the case of holidays, Binding Two-Day Forecasts may be required in advance of the schedule set forth

8



   MINEONE0033151

herein, and to the extent such advanced scheduling is required, Company shall provide Customer with reasonable notice of such requirement.

     a.     To the extent actual BCIS Customer Facility Load is less than the Binding Two-Day Forecast for any time period, Customer shall be responsible for all Energy Costs related to procurement as a result of or attributable to the deviation, along with any other costs or expenses related to the excess procurement, including but not limited to WAPA Network Transmission Charges, to the extent applicable.

     b.     To the extent actual BCIS Customer Facility Load is greater than the Binding Two-Day Forecast for any time period, Customer shall be required to pay the greater of the following, but only for the BCIS Customer Facility Load that is greater than the Binding Two-Day Forecast, related to procurement as a result of or attributable to Company's reliance on Customer's Binding Two-Day Forecast: i) the sum of the Fixed Cost of Supply Rate and the Company Margin; and ii) the Variable Cost of Supply Rate, to the extent applicable. Company shall have no obligation to provide BCIS Market Energy to serve BCIS Customer Facility Load to the extent such load deviates by more than five percent (5%) over Customer's Binding Two-Day Forecast.

5.3    Threshold Price. In addition to providing a binding forecast of peak demand and hourly energy profiles for BCIS Customer Facility Load for the required periods, with the Binding Two-Day Forecast, Customer shall set the Threshold Price for the two-day period. Once Customer sets a Threshold Price for any day in the first instance, the Threshold Price may only be modified or adjusted with the consent of Company.

     a.     To the extent Company is unable to procure market energy in the day-ahead market at prices that would allow for service of BCIS Customer Facility Load at or below the Threshold Price, Company shall notify Customer via e-mail no later than 11:59AM MPT the day before the scheduled delivery date (the "Threshold Price Notification"). For purposes of determining whether costs are below the Threshold Price, the Cost of Supply will be calculated based on the weighted-average $/MWh cost over the course of the entire day, and so long as the weighted-average $/MWh cost is below the Threshold Price, any Threshold Price requirement shall be deemed satisfied, even if the Cost of Supply in certain discrete hours may be higher than the indicated price.

     b.     In response to the Threshold Price Notification, Customer will be required to curtail its load in the amount specified by Company in the notification (the "Threshold Price Curtailment"), unless Customer and Company agree that BCIS Customer Facility load that would have otherwise been subject to the Threshold Price Curtailment may be served through Company's procurement of energy in the real-time market. To the extent Customer and Company so agree, Customer will be responsible for all costs related to procurement in the real-time market, with such costs not being limited in any way by the Threshold Price or Threshold Price Notification.

9



    c.   To the extent Company is unable to procure energy in the day-ahead market at or below the Threshold Price but fails to provide a Threshold Price Notification within the time requirements set forth in Article 5.3(a), Company may either: i) interrupt Customer's load to the extent allowable pursuant to Article 3.2 of this Agreement; or ii) procure energy in the real-time market, with Customer being required to pay the lower of the Cost of Supply and the Threshold Price for such energy. To the extent the Cost of Supply is less than the Fixed Cost of Supply Rate, however, Customer will be required to pay at the Fixed Cost of Supply Rate for this energy.

    d.   To the extent Customer does not curtail its load as prescribed by this section or does not otherwise comply with the requirements of this section, Company may take any action it deems necessary to discontinue service to Customer, without liability to Customer in any respect, including, but not limited to, without liability for damage or loss to the Facilities or any of their associated equipment.

5.4    <u>Other Forecasts</u>. On a monthly basis, Customer shall provide Company with an estimated forecast of BCIS Customer Facility Load covering the remaining Term of the Agreement (the "<u>Long-Term Energy Forecast</u>") along with an estimated forecast of BCIS Customer Facility Load covering the subsequent six months of service (the "<u>Medium-Term Energy Forecast</u>"). Long-Term Energy Forecasts and Medium-Term Energy Forecasts shall include peak demand and hourly energy profiles for each forecasted day. Long-Term Energy Forecasts and Medium-Term Energy Forecasts shall be non-binding in nature and provided for informational purposes only.

**6.    RATES TO BE CHARGED**

6.1    <u>Rates</u>. The Company shall bill and Customer shall pay for all electric power and energy supplied to Customer, consistent with this Agreement, inclusive of any sales or use taxes, and franchise fees. At least one hundred twenty days prior to the third anniversary of the Effective Date, the parties will work in good faith to negotiate pricing terms effective for the fourth and fifth years of the Term that are acceptable to each Party at that time, in each Party's sole discretion. Said renegotiation shall be completed at least ninety (90) days prior to the third anniversary of the Effective Date.

6.2    <u>General Rate Components</u>. Customer's rate generally consists of the following components: the Cost of Supply, the Company Margin, and WAPA Network Transmission Charges. As more specifically set forth in Articles 6.3 through 6.7 below: i) when the sum of the Cost of Supply and the Company Margin is less than $44.64/MWh (increased on the first and second anniversary of thirty (30) days after the Commercial Operation Date by $2.50/MWh), Customer will be charged at a rate of $44.64/MWh (as adjusted annually, the "<u>Fixed Cost of Supply Rate</u>"), plus WAPA Network Transmission Charges; and ii) when the sum of the Cost of Supply and the Company Margin is equal to or greater than the Fixed Cost of Supply Rate, Customer will be billed at a rate equal to the sum of the Cost of Supply and the Company Margin (the "<u>Variable Cost of Supply Rate</u>") on a $/MWh basis, plus WAPA Network Transmission Charges.

10



CONFIDENTIAL – ATTORNEYS' EYES ONLY    

6.3   Cost of Supply.  The Cost of Supply includes each of the following components:

a.   Energy Cost(s):  Customer shall be responsible for the cost of all energy, point-to-point transmission (including losses), ancillary services, reserves, energy imbalance, and any other non-discretionary requirements purchased in order to serve or attributable to BCIS Customer Facility Load.

b.   BCIS Transmission Credit:  Customer will be billed and shall pay at a rate of $1.25/MWh for all energy delivered for utilization of Company's local transmission system (115kV and above).  This rate is determined by calculating the sum of $1.00 plus the weighted average of on-peak and off-peak ancillary service rates under Company's Open Access Transmission Tariff that is applicable on the Effective Date of this Agreement.

c.   BCIS Customer Benefit Credit:  Customer will be billed and shall pay at rate of $1.00/MWh for all energy delivery as a benefit to other customers of the Company.

6.4   Company Margin.  The Company Margin shall be calculated by multiplying the Cost of Supply by the margin mark-up percentage indicated by Exhibit A to this Agreement.  By way of example, and for the avoidance of doubt, if the total Cost of Supply calculated pursuant to Article 6.3 above is $44.00/MWh, the Company Margin would be $7.48/MWh ($44.00 x 17% = $7.48).

6.5   Fixed Cost of Supply Rate.  To the extent the sum of the Cost of Supply plus the Company Margin is less than $44.64, Customer will be billed at a rate of $44.64/MWh (as adjusted pursuant to Article 6.2) for all energy delivered.  In addition, Customer is responsible for WAPA Network Transmission Charges pursuant to Article 6.7.

6.6   Variable Cost of Supply Rate.  To the extent the sum of the Cost of Supply plus the Company Margin is equal to or greater than the Fixed Cost of Supply Rate, Customer will be billed at a rate of the sum of the Cost of Supply plus the Company Margin for all energy delivered on a $/MWh basis.  In addition, Customer is responsible for WAPA Network Transmission Charges pursuant to Article 6.7.

6.7   WAPA Network Transmission Charges.  WAPA transmission costs will be allocated based on the load ratio share of BCIS Customer Facility Load to the Company's total system load for the hour(s) identified within the WAPA network transmission service invoice.

6.8   Suspension of Service for Nonpayment.  In the event that any bill for service is not paid in accordance with payment provisions set forth herein and under the rules and regulations adopted from time to time by the PSC, the Company may suspend the supply of electric power and energy hereunder, but such action shall not release Customer from the obligation to pay for service furnished and the Minimum Contract Energy Requirement Charges under Article 3.5 of this Agreement.  Service shall not be suspended if Customer informed the Company in writing of a bona fide good faith dispute with respect to a specific amount due and pays the undisputed portion.

11



## 7.    TEMPORARY DISCONNECTIONS

If for any reason Customer desires the facilities temporarily disconnected, the Company shall comply with such requirement within a reasonable time after written notice thereof; provided, however, such discontinuation shall in no case relieve Customer from complying with the terms of this Agreement.

## 8.    BILLING AND METERING

8.1    Metering. Meters shall be provided, tested, inspected, and billings adjusted for errors as provided by the rules and regulations of the PSC. The Company shall read and bill the usage from the meters on a regular monthly cycle basis and shall give Customer at least 30-day written notice of any change in such cycle.  Any change requested or made by the Customer regarding how energy is delivered through the billing meters shall require the prior written consent of the Company.

8.2    Invoices.  Unless otherwise specified herein, payments due under this Agreement shall be due and payable, without right of set-off, by check or by electronic funds transfer, as designated by Company, on or before twenty (20) days from the date of an invoice.  Unless the invoice is disputed pursuant to this Section, if the amount due is not paid on or before the due date, a late payment charge of 1.5% shall be applied to the unpaid balance and shall be added to the next billing statement.

To the extent any portion of any invoice is subject to a bona fide good faith dispute, the undisputed portion of the invoice shall be paid when due.  Any excess or under-billed amount, which through inadvertent errors or as a result of a dispute, may have been overpaid or under-billed shall be paid by the owing Party upon determination of the correct amount, with interest based on an annual interest rate equal to the Commission Authorized Interest Rate as defined in the then-current PSC rule.  The Parties shall have no rights to dispute the accuracy of any invoice or payment after a period of two (2) years from the date of said bill or payment.  The Parties shall utilize the procedures set forth in Article 14 for resolution of billing disputes.

Each Party shall keep complete and accurate records, and shall maintain such data as may be necessary for the purpose of ascertaining the accuracy of all relevant data, estimates, or statements of charges submitted hereunder for a period of two (2) years from the date of each such invoice.  Within a two (2) year period from the date of invoice, either Party may request in writing copies of records reasonably necessary to verify the accuracy of any statement or charge. The Party from which documents or data have been requested shall cooperate in providing the documents and data within a reasonable time period.

## 9.    RESALE OF POWER PROHIBITED

Customer shall not resell any of the power delivered to it hereunder.

## 10.    NO GUARANTEE OF CONTINUOUS SERVICE

Company will endeavor to maintain adequate and continuous service, subject to its right to interrupt service pursuant to Article 3.2 of this Agreement, but does not guarantee that the supply

12

of energy will at all times be constant. In case service should be interrupted by Force Majeure, or other accident or other causes not reasonably within its control, Company shall not be liable for damages on account of interruption of service.

## 11.   NOTICES

Any notice, demand or request required or authorized by Articles 11, 13, 14, 15, and 17 of this Agreement shall be deemed properly given if mailed, postage prepaid, on behalf of Customer, to:

> BCB Cheyenne LLC
> Attention: Legal Counsel
> 159 N Wolcott St, Ste 400
> Casper, WY 82601

and on behalf of the Company to:

> Cheyenne Light, Fuel and Power Company
> Attention: Vice President, Operations
> 1301 W. 24th Street
> Cheyenne, Wyoming  82001

With a copy to:
> Black Hills Corporation
> Attention:  Director of Generation Dispatch and Power Marketing
> 7001 Mount Rushmore Road
> P.O. Box 1400
> Rapid City, SD  57709-1400

and:

> Black Hills Corporation
> Attention:  Senior Vice President and General Counsel
> 7001 Mount Rushmore Road
> P.O. Box 1400
> Rapid City, SD  57702

The designation of persons to be notified or the address of such persons may be changed at any time by similar notice.

## 12.   CONFIDENTIALITY

12.1   Non-Disclosure. The Parties, along with their respective agents and representatives will hold in confidence the terms of this Agreement, along with all nonpublic information obtained from the other Party or its respective officers, agents, representatives or employees, whether or not relating to this Agreement, in accordance with the provisions of the Non-Disclosure Agreement, dated December 21, 2021, between Company and Customer, which, notwithstanding

13



CONFIDENTIAL – ATTORNEYS' EYES ONLY

MINEONE0033156

anything contained therein, shall remain in full force and effect following the execution of this Agreement and shall survive any termination of this Agreement in accordance with the terms thereof.

12.2     Public Announcements.  The Parties (on behalf of themselves and their Affiliates) agree that no press release or public announcement related to this Agreement or other business arrangements among the Parties shall be issued or made by any Party hereto without the joint written approval of Company and Customer, unless otherwise required by or reasonably advisable in order to comply with any law or stock exchange requirements, in which case the Parties shall have the right to review and comment upon such press release or public announcement or public disclosure prior to its issuance.

## 13.    REGULATORY ACTIVITIES AND FILINGS

13.1     Blockchain Interruptible Service Agreement Filing.  Within sixty (60) days following the Effective Date, the Company shall provide a copy of this Agreement to the PSC for its file of special contracts, consistent with the PSC's rules and regulations. To the extent the PSC initiates any proceedings related to this Agreement, the Company and the Customer agree to support and defend the Agreement.  The Parties agree that this Agreement may be terminated by either Party if the PSC rejects this Agreement in whole or in part, or imposes conditions on the performance of this Agreement that are not acceptable to either Party in their sole discretion.  To the extent either Party seeks to exercise its right to terminate the Agreement pursuant to this Article 13.1, it must do so by providing written notice to the other Party within 30 days following the PSC order or other action giving rise to such termination right.

13.2     Rates and Service Subject to Regulation.  All rules and regulations of the Company governing the furnishing of electric service and the tariff schedules under which service is furnished to Customer,      as such rules and regulations and tariff schedules exist from time to time, are made a part of this Agreement by reference.  To the extent the provisions of the Company's rules and regulations and tariff schedules are inconsistent with the terms of this Agreement, however, the terms of this Agreement shall control.  The rates agreed to herein were agreed upon by the Parties taking into consideration costs, the Customer's unique requirements for new load, the need for affordable service, the need for contribution to the joint and common costs of the public utility, and the business practices of the parties.

## 14.    DISPUTE RESOLUTION

14.1     Overview. If a dispute should arise pursuant to this Agreement, the Parties agree to first attempt to resolve such disputes by negotiation pursuant to this Article 14. If the Parties are unable to resolve a dispute by the negotiation procedure set forth in this Article 14, the Parties agree to attempt to resolve such dispute by non-binding mediation pursuant to this Article 14. If the Parties are unable to resolve such dispute by the non-binding mediation procedure set forth in this Article 14, either Party may pursue any or all applicable remedies at law or in equity.

14.2     Management Negotiation. Prior to pursuing non-binding mediation pursuant to Article 14.3, either Company or Customer will call for progressive management involvement in the dispute negotiation by notice to the other. Such a notice will be without prejudice to a Party's

14



right to any other remedy permitted by this Agreement. The Parties will use best efforts to arrange personal meetings and/or telephone conferences as needed, at mutually convenient times and places, between the following negotiators for the Parties, each of which will have a period of allotted time as specified below in which to attempt to resolve the dispute:

| Level | Company Negotiator | Customer Negotiator | Allotted Time |
|---|---|---|---|
| Level 1 | Vice President - Operations | General Manager | Thirty (30) days |
| Level 2 | Group Vice President – Electric Utilities | General Counsel | Thirty (30) days |

The allotted time for the first level negotiators will begin on the date the first level of negotiation is invoked. If a resolution is not achieved by negotiators at any given level at the end of their allotted time, then the allotted time for the negotiators at the next level, if any, will begin immediately.

14.3    Non-Binding Mediation. If the Parties were unable to resolve such a dispute by the negotiation procedure set forth in Article 14.2, either Party may require that the Parties enter into non-binding mediation with a mediator (the "Mediator") agreed upon by the Parties in writing. If the Parties cannot agree upon a Mediator within ten (10) business days after first attempting to do so, then the mediator will be selected by lot from a list of four potential Mediators remaining after Customer nominates three, Company nominates three, and each Party eliminates one potential mediator from the other's nominations. The Mediator will determine procedures for such mediation, subject to the terms hereof. The mediation will not be binding on either Party.

## 15.    SECURITY FOR PERFORMANCE

15.1    Security Fund.  Customer shall establish, fund, and maintain during the Term a Security Fund pursuant to the provisions of this Article 15, as follows:  No later than forty five (45) days following the Effective Date, Customer shall establish the Security Fund at a level of $11,000,000, which shall be comprised of one or more of the permitted forms of Article 15.3.

15.2    Security Fund Procedures. Company may draw on the Security Fund, according to the following procedures:

      a.    Prior to drawing on the Security Fund, Company shall provide a written notice or invoice to Customer specifying the amount owed and basis therefor.

      b.    Company shall allow Customer five (5) Business Days from the delivery of such notice or invoice to pay such amount prior to drawing on the Security Fund.

      c.    Customer shall have the obligation to replenish the Security Fund within five (5) business days following any draw on the Security Fund by Company.

15



CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MINEONE0033158

    d.    In addition to any other remedy available to it, Company may, upon an Event of Default, before or after termination of this Agreement and after giving written notice of the intent to do so, draw from the Security Fund such amounts as are necessary to recover amounts that are owed to Company pursuant to this Agreement, including, but without limitation, any damages due to Company and any amounts for which Company is entitled to indemnification under this Agreement.

15.3    Form of Security.  The Security Fund shall be maintained at Customer's expense, shall be originated by or deposited in a financial institution or company ("Issuer") satisfying the requirements of this Article, and shall be in the form of one or more of the following instruments:

    a.    The Security Fund may be in the form of an irrevocable standby letter of credit in the form and substance reasonably acceptable to the Company at its sole discretion (the "Letter of Credit"), and consistent with the following:

        i.    The Issuer for the Letter of Credit shall have and maintain an unsecured bond rating (unenhanced by third-party support) equivalent to A- or better as determined by all rating agencies that have provided such a rating, and if ratings from either Standard & Poor's and Moody's are not available, equivalent ratings from alternate rating sources reasonably acceptable to Company. If such rating is equivalent to A-, the Issuer must not be on credit watch or have a negative outlook by any rating agency.

        ii.    The Letter of Credit must be for a minimum term of 360 Days. Customer shall give Company at least 30 Days advance notice prior to any expiration or earlier termination of the Letter of Credit. Customer shall cause the renewal or extension of the Letter of Credit or other authorized security for additional consecutive terms of 360 Days or more (or, if shorter, the remainder of the Term) more than 30 Days prior to each expiration date of the security. If the Letter of Credit or other security is not renewed or extended at least 30 Days prior to its expiration date or otherwise is terminated early, Company shall have the right to draw immediately upon the security and to place the amounts so drawn, at Customer's cost and with Customer's funds, in an interest bearing escrow account in accordance with sub-paragraph (b) below, until and unless Customer provides a substitute form of such security meeting the requirements of this Article 15.3.

    b.    The Security Fund may be in the form of United States Currency, in which Company holds a first and exclusive perfected security interest, deposited with an Issuer who is a state or federally-chartered commercial bank with operations in the state in which the Facility is located (or such other escrow agent acceptable to Company in its sole discretion) in an account under which Company is designated as beneficiary with sole authority to draft from the account or otherwise access the security (the "Escrow Account"). The Escrow Account shall be established

16



pursuant to an Escrow Agreement (the "Escrow Agreement") in the form and substance reasonably acceptable to the Company at its sole discretion. Funds held in the Escrow Account may be deposited in a money-market fund, short-term treasury obligations, investment-grade commercial paper and other liquid investment-grade investments with maturities of three months or less, with all investment income thereon to be taxable to, and to accrue for the benefit of, Customer. Periodic sweeps by Customer for recovery of interest earned by the escrowed funds shall be allowed, but only to the extent the balance in the escrow account exceeds the required amount of security.

16.    **REPRESENTATIONS, WARRANTIES, INDEMNITIES AND LIABILITIES**

16.1    <u>Representations and Warranties</u>. Each Party represents and warrants to the other Party that:

      a.    Such Party is a duly organized, validly existing entity of the type described in the introductory paragraph to this Agreement, is in good standing under the laws of the jurisdiction of its formation, and is duly qualified to do business in good standing as either a domestic or foreign corporation in the State of Wyoming. Such Party has all requisite power and authority to enter into and to perform its obligations under this Agreement and, except as contemplated in this Agreement, has obtained all Permits necessary for it to enter into and to perform its obligations under this Agreement.

      b.    The execution, delivery, and performance of this Agreement has been duly authorized by all necessary action on its part and does not and will not (i) violate any Law applicable to it or (ii) violate its organizational documents.

      c.    This Agreement is legal and binding obligations of such Party, enforceable against such Party in accordance with their respective terms, except to the extent enforceability is modified by bankruptcy, reorganization and other similar laws affecting the rights of creditors generally and by general principles of equity.

      d.    There is no litigation pending or, to the best of its knowledge, threatened to which such Party or any of its Affiliates is a party that could reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Agreement.

      e.    The execution, delivery and performance of this Agreement will not conflict with, violate or breach in any material respect the terms of any agreement of such Party or of any agreement to which its properties are subject.

16.2    <u>Indemnification</u>. To the fullest extent permitted by Law, each Party will indemnify and hold harmless the other Party from third party claims, suits, actions, or liabilities for loss or damage that arise out of the negligence or intentional misconduct of the indemnifying Party.

16.3    <u>Limitation of Liability</u>. Having considered the risks and potential liabilities that may arise out of this Agreement, the benefits of the Agreement, and other valuable consideration

17



CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                          MINEONE0033160

receipt of which is acknowledged, Customer and Company agree that, with the exception of third party claims arising under Article 16.2, neither Customer nor Company shall be liable to each other under any circumstances for any special, consequential, incidental, indirect, punitive, or exemplary damages in any way arising from or related to performance of this Agreement, or breach thereof.

## 17.   EVENTS OF DEFAULT AND TERMINATION

17.1   <u>Events of Default</u>.  The following occurrences shall constitute Events of Default:

    a.    Failure by a Party to make any payment required hereunder when due if such failure is not remedied within ten (10) Business Days after written notice of such failure; <u>provided</u>, that the payment in question is not the subject of a good faith dispute pursuant to Article 14.

    b.    Failure of Customer to perform any of its respective obligations under Article 15 and such failure continues for a period of ten (10) Business Days after receipt by the Customer of written notice of such failure.

    c.    Failure by a Party to perform any other material obligation hereunder, and such failure is not remedied within thirty (30) days after receipt by the defaulting Party of written notice of such failure; <u>provided</u>, that so long as a defaulting Party has initiated and is diligently attempting to effect a cure, the defaulting Party's cure period shall extend for an additional sixty (60) days or such longer period as is reasonably necessary to effect such cure.

    d.    Any representation or warranty made by a Party pursuant to Article 16.1 shall have been false in any material respect when made, and is not remedied within thirty (30) days after receipt by the defaulting Party of written notice of such falsity; <u>provided</u>, that so long as any potential adverse effect of such falsity is capable of being avoided by curing the falsity, and a Party has initiated and is diligently attempting to effect a cure, the Party's cure period shall extend for an additional sixty (60) days.

    e.    A Party (i) makes an assignment for the benefit of its creditors, (ii) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, (iii) has such petition filed against it and such petition is not withdrawn or dismissed for sixty (60) days after such filing, (iv) becomes insolvent or, (v) is unable to pay its debts when due.

    f.    A Party assigns this Agreement in violation of Article 18.2.

    g.    Failure by an Issuer to make any payment when due under Article 15.

17.2   <u>Termination Upon an Event of Default</u>.  Upon the occurrence of, and during the continuation of, an Event of Default, the non-defaulting Party may terminate this Agreement by

18



MINEONE0033161

notice to the other Party, designating the date of termination, delivered to the defaulting Party no less than thirty (30) days before such termination date.

a. In the event of a termination of this Agreement, (i) the Parties' respective obligations under this Agreement shall terminate (other than those obligations that are to be performed after termination by their express terms), and (ii) each Party shall pay the amounts described in Article 17.2(b), below.

b. In the event of a termination of this Agreement upon an Event of Default, each Party shall pay to the other all amounts due the other under this Agreement for all periods prior to termination. In addition, if Customer is the defaulting Party, Customer shall remain responsible for the Minimum Contract Energy Charges for the lesser of the remaining Term or a period of twelve (12) months , absent termination pursuant to this Article 17.2, subject to the final sentence in this paragraph. In no event shall the non-defaulting Party owe damages provided for in this Article 17.2 to the defaulting Party. In the event of a termination by either Party under this Article 17.2, the non-defaulting Party will use commercially reasonable efforts to mitigate its damages resulting from the other Party's Event of Default.

17.3    Condition Precedent.  At any time within forty five (45) days after the Effective Date, Customer may terminate this Agreement by written notice to Company, without liability of either Party, to the extent Customer has not closed on the real estate transaction(s) necessary to allow Customer to commence construction of its Facilities and to further allow Company to commence construction of the facilities to be furnished by Company pursuant to Article 2.2 of this Agreement.  Further, no later than forty five (45) days after the Effective Date, Customer shall provide notice to Company that Customer has closed on such real estate transaction(s), along with supporting evidence necessary to demonstrate to Company's reasonable satisfaction that such transaction(s) have occurred.  To the extent Customer does not provide such notice or otherwise demonstrate to Company's reasonable satisfaction that such transaction(s) have occurred within the time prescribed herein, Company may, within fifteen (15) days thereafter, terminate this Agreement by written notice to Customer, without liability of either Party.

## 18.    MISCELLANEOUS PROVISIONS

18.1    No Further Relationship.  This Agreement is not intended to create, and will not be construed as creating, a partnership or joint venture.

18.2    Assignment.  Neither Party may assign any of its rights or obligations under this Agreement without the written consent of the other Party, which shall not be unreasonably withheld, conditioned, or delayed. Any purported assignment not permitted by this Agreement will, to the greatest extent permitted by law, be null and void and of no force or effect whatever, and the party engaging or attempting to engage in any such prohibited assignment will indemnify and hold harmless the other party from all costs, liabilities, and damages (including incremental tax liabilities and attorneys' fees) that it may incur as a result of any such assignment or purported assignment.

19



CONFIDENTIAL – ATTORNEYS' EYES ONLY

18.3    Execution in Counterparts; Electronic Delivery. This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered will be an original, but all of which together will constitute but one and the same instrument. This Agreement may be delivered by the facsimile or other electric transmission of signed signature pages.

18.4    Article and Section Headings. The Article and Section headings in this Agreement are for convenience of reference only and may not be utilized in construing or interpreting this Agreement.

18.5    Waivers. Any waiver by either party of any violation of, breach of, or default by the other party under any provision of this Agreement or any exhibit, schedule, or other document referred to in this Agreement, will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any violation, breach of, or default under any other provision of this Agreement or any other document referred to in this Agreement.

18.6    Entire Agreement; Amendments. Except as expressly set forth herein, this Agreement (including all schedules and exhibits attached hereto, which are incorporated herein by reference), constitutes the entire agreement between the parties relating to the transaction, may not be modified except by a written instrument signed by both parties, and supersedes and replaces all prior agreements and understandings, oral or written, with regard to the subject matter of this Agreement.

18.7    Governing Law. This Agreement is subject to, and shall be governed by, the substantive laws of the State of Wyoming, without regard to conflicts of law principles.

18.8    Exclusive Venue for any Suit. Any suit to enforce any right, or rights, under this Agreement shall be filed in the state or federal courts of the State of Wyoming.

18.9    No Third-Party Beneficiaries. Except as provided herein, this Agreement is solely for the benefit of the Parties and their respective permitted successors and permitted assigns, and this Agreement will not otherwise be deemed to confer upon or give to any other third party, including any Lender or other creditor, any remedy, claim, liability, reimbursement, cause of action or other right.

Accordingly, the parties hereto have executed this Agreement on and effective upon the Effective Date stated above.

**BCB CHEYENNE LLC**

By:    Emory E Patterson IV
Title: Managing Member of BCB Ventures LLC, as the Manager of BCB Cheyenne LLC

**CHEYENNE LIGHT, FUEL AND POWER COMPANY**

By: LINDEN R. EVANS
Title PRESIDENT & CEO

20

CONFIDENTIAL – ATTORNEYS' EYES ONLY    MINEONE0033163