# EXHIBIT A

Patrick J. Murphy, WSB No. 7-1779
Scott C. Murray, WSB No. 7-4896
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Ste. 400
P.O. Box 10700 (82602)
Casper, WY 82601
Email: pmurphy@wpdn.net
        smurray@wpdn.net

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| BCB CHEYENNE LLC d/b/a BISON BLOCKCHAIN, a Wyoming limited liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 23-CV-79 |
| MINEONE WYOMING DATA CENTER, LLC, a Delaware limited liability company; MINEONE PARTNERS LLC, a Delaware limited liability company; TERRA CRYPTO INC., a Delaware corporation; BIT ORIGIN, LTD, a Cayman Island Company; SONICHASH LLC, a Delaware limited liability company; BITMAIN TECHNOLOGIES HOLDING COMPANY, A Cayman Island Company; BITMAIN TECHNOLOGIES GEORGIA LIMITED, a Georgia corporation; and JOHN DOES 1-18, related persons and companies who control or direct some or all of the named Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**AFFIDAVIT OF MICHAEL MURPHY REBUTTING
DEFENDANT MINEONE'S OPPOSITION TO PLAINTIFF BCB'S 8/18/24
EMERGENCY MOTION AND 8/23/24 SUPPLEMENTAL BRIEFING**

---

COMES NOW your affiant, on his oath, and hereby states as follows:

1. I am Michael Murphy, age 42, and I have personal knowledge of these matters and I am competent to provide this testimony.

2. I was born and raised in Casper, Wyoming.  I hold BBA (2004) and Masters of Accountancy (2005) degrees from the University of Notre Dame's Mendoza College of Business, where I graduated number one in each of my respective classes.  I have been a Certified Public Account (with experience at the Financial Accounting Standards Board and PwC) and a licensed real estate broker since 2006.

3. I have significant knowledge of many aspects of the bitcoin data center project (both at North Range and Campstool) and the ongoing litigation between Plaintiff BCB Cheyenne LLC ("BCB") and Defendants MineOne Wyoming Data Center LLC ("MineOne"), Terra Crypto Inc. ("Terra") and MineOne Partners LLC ("MineOne Partners") (collectively, the "MineOne Defendants").  I have provided several Affidavits to this Court: (a) my March 20, 2024 Campstool Affidavit (with respect to the work BCB did to develop the Campstool site); (b) my May 15, 2024 Merits Affidavit (with respect to the merits of BCB's case and the likelihood of BCB's success at trial, and which provides rebuttal for each of MineOne's counterclaims); (c) my June 24, 2024 Amended Emergency Motion Affidavit ("Writs Affidavit") (with respect to the circumstances entitling BCB to prejudgment writs of attachment and garnishment); (d) my July 22, 2024 Bond Amount Affidavit (with respect to the amount of BCB's bond required as security for the payment of costs and damages which may be incurred or suffered by any party as a result of any wrongful issuance of BCB's writs of attachment and garnishment); and (e) my September 4, 2024 Affidavit regarding MineOne's Failure to Comply with Judge Carman's August 9, 2024 Order On Plaintiff's Expedited Motion to Compel Discovery from the MineOne Defendants ("MineOne's Failure to Comply Affidavit").

**A. MineOne's Opposition to Plaintiff's 8/18/24 Emergency Motion and 8/23/24 Supplemental Briefing for Protective Order and to Quash MineOne's August 2024 Subpoenas.**

4. On September 4, 2024, MineOne filed its Opposition to Plaintiff's 8/18/24 Emergency Motion ("Emergency Motion") and 8/23/24 Supplemental Briefing ("Supplemental

Brief") for Protective Order and to Quash MineOne's August 2024 Subpoenas (MineOne's "Opposition Brief").

5. MineOne's Opposition Brief completely misses the mark.  MineOne says it is "seeking documents and testimony from key third party witnesses who have critical knowledge of the claims and counterclaims in this case" [ECF 337 p. 4] and "the information sought in the Subpoenas is relevant to this suit and proportional to the case," [*Id.*] but MineOne fails to specifically identify which ***actual*** claims or counterclaims those third party witnesses have critical knowledge of, and how the information sought from them is relevant and proportional to the ***actual*** case.

6. MineOne says that it wants these documents and testimony from third parties because "BCB seeks to be the sole gatekeeper of information relevant to this case" [*Id.* at 5] and that BCB wants its "...case narrated through the narrow lens of Michael Murphy." [*Id.*] MineOne attempts to support its claim by stating that Michael Murphy was "continuously interjecting and attempting to control counsel's conversation with regard to scheduling depositions of witnesses" [*Id.*] on an August 29, 2024 meet-and-confer call and that Michael Murphy was reading answers "from a prepared document" [*Id.*] at the June 26, 2024 Evidentiary Hearing.  MineOne is wrong.  I did not continuously interject and attempt to control counsel's conversation with regard to scheduling depositions and witnesses[1].  And while I did read from a script during part the Evidentiary Hearing[2], all of my responses were ones that I had personally prepared, and many of my responses were ultimately off-script due to time limitations and/or Ms. Colbath's cross-examination. Neither of these isolated events were meant for me to narrate BCB's case through my "narrow" lens.   Rather, they were meant for me to provide relevant and insightful information about the case.  MineOne doesn't like it when I provide information because

---

[1] BCB's attorney Patrick Murphy invited me to the August 29, 2024 meet-and-confer call because of my subject matter knowledge related to Chong Wang, Huaili Zhang, and Jiaming Li.  I calmly and politely explained why depositions of Chong Wang and Huaili Zhang were relevant to the case and why MineOne and/or Bit Origin should present those individuals to be deposed.  I asked Ms. Colbath, multiple times, about Jiaming Li's passport (which Ms. Colbath has claimed multiple times was confiscated by US Customs), specifically, does Jiaming Li have a Chinese passport and US passport, and if so, which passport was confiscated. Ms. Colbath refused to answer those questions (likely because she knew the answer wasn't favorable to her client's position).  I also interjected on the call when Ms. Colbath and Mr. Gottlieb rudely interrupted Patrick Murphy while Patrick Murphy was speaking.

[2] Among other reasons, this was due to the importance of accurately communicating the results of my detailed analysis of MineOne's alleged related party loans (which were actually camouflaged equity).

I explain the facts (based on my broad knowledge of the project), and those facts rarely, if ever, help MineOne's position.

7.  MineOne asserts there are "numerous reasons [its requested] third-party discovery is necessary." [*Id*. at 6].  This is wrong.  None of MineOne's reasons for its requested third-party discovery justify MineOne receiving this information from third parties, let alone at all, as I explain below.

**B.  MineOne Seeks Information that is Not Relevant to MineOne's Counterclaims.**

8.  MineOne's argument for "seeking documents and testimony from key third party witnesses" is that those third party witnesses allegedly have critical knowledge of the claims and counterclaims in this case" [ECF 337 p. 4].  However, MineOne fails to identify which claims and counterclaims those third party witnesses have knowledge of. In my May 15, 2024 Merits Affidavit, I identified all of MineOne's counterclaims (which MineOne had asserted up until that point in time).  I also provided a rebuttal for each counterclaim. [ECF 182-2 p. 27-33]

9.  MineOne asserted three Counterclaims against BCB on September 29, 2023.  [ECF 49]. MineOne has never amended or sought to amend its three Counterclaims.  MineOne's First Counterclaim is for breach of contract. [*Id*.].  MineOne alleges that "BCB failed to secure the promised electric rates and ultimately walked off the project (and hastily filed this and another lawsuit").  [ECF 49 at p. 39].  MineOne alleges that BCB and MineOne are parties to a valid and binding DHS Agreement.  [*Id*. at p. 34]; that "MineOne complied with all of its obligations under the DHS Agreement;" [*Id*.]; and that BCB breached its obligations under the DHS Agreement. [*Id*.].  MineOne alleges that, "BCB walked off the job, refused to [further] communicate with Defendants, and ran to the courthouse with no default or other notice to MineOne;" [*Id*.] that "MineOne is excused from further performing its contractual obligations under the DHS Agreement because of the material breaches of BCB;" [*Id*.] and that "by reason of the foregoing breaches of contract and anticipatory repudiation of the contract, Plaintiff BCB is liable to MineOne Wyoming Data Center LLC for monetary damages on its First Counterclaim in an amount to be determined at trial, which amount is no less than $40,000,000, together with interest accrued." [*Id*.].  Importantly here, nowhere in MineOne's First Counterclaim is any claim or allegation relating to any of BCB's funding or capitalization with its

investor(s) or members.  MineOne's Second Counterclaim is limited to the recovery of its attorney fees as the [alleged] Prevailing Party in Paragraph 18 of Article X of the DHS Agreement.  [*Id*. at p. 40].  MineOne's Third Counterclaim is for the imposition of alter ego liability, individually, against BCB members Michael Murphy, Neil Phippen, and Emory Patterson, but without naming, or even seeking to name, these three individuals as named Defendants (alleging, generally and without specificity, that "adherence to the fiction of the separate existence of the LLC under these circumstances would promote injustice or a fraud").  [*Id*. at p. 42].  Importantly, no allegation is made in the Second or Third Counterclaims about (a) any alleged under-capitalization of BCB or impropriety or issue with any of BCB's capitalization, funding, or BCB's return of any of its investor's money to the investor in 2022 and 2023 and/or (b) any misrepresentation in an RFP submission to BHE as to BCB's financial wherewithal to execute on the project.

**C.  It Is No Longer Imperative that MineOne Understand How BCB Planned to Comply with BCB's Financial Obligations in the Power Contract.  It Has Never Been Imperative that MineOne Understand What BCB Told Its Investors About the Investment Opportunity in BCB in Early 2022, Which was Months Before BCB Ever Made Contact With MineOne.**

10. First, MineOne states "it is imperative that MineOne Data be able to understand (1) how BCB planned to comply with its financial obligations in the Blockchain Interruptible Electric Service Agreement with Black Hills (the "Power Contract") and (2) what BCB told its investors in order to induce them to invest." [ECF 337 p. 6].  MineOne is wrong.  It is not imperative for MineOne to understand these things.  BCB's compliance with the financial obligations in the Power Contract and what BCB told investors to induce them to invest are not relevant to any of BCB's claims against MineOne, nor are they relevant to any of MineOne's counterclaims against BCB.  And none of this information is relevant to any of BCB's obligations under the DHS Agreement nor is it relevant to any of MineOne's obligations under the DHS Agreement.

11. When BCB and MineOne first made contact in March 2022, BCB explained it was seeking a partner to help fund a bitcoin mining project in/around Cheyenne, WY.  BCB first proposed arrangements in which (a) BCB would retain the Power Contract, own the land (with a loan from MineOne), essentially serve as a developer directly contracting the

site build-out with a mark-up for services, and then provide hosting services during the operation phase of the project or (b) MineOne would buy-out BCB (in order to own the Power Contract), purchase the land on its own, develop its own site, and do its own hosting during the operation phase. [BCB144504]. MineOne did not choose either of those options. Instead, MineOne wanted to own/control the project **and** keep BCB involved. Over the ensuing months, BCB and MineOne negotiated their controlling agreements (i.e., the DHS Agreement, Side Letter Agreement, and CS Agreement). During these negotiations, MineOne and BCB discussed BCB's ability to comply with BCB's financial obligations in the Power Contract, and MineOne's knowledge of that informed the terms of the DHS Agreement. There is no longer any need to revisit this information, nor understand it further, as this information was incorporated into the final terms of the controlling agreements. Furthermore, as explained in BCB's Supplemental Brief, "if MineOne had wanted BCB to bring funds to the project, it would have required that as an obligation of BCB in the DHS Agreement. But it did not," [ECF 325 p. 4] even though MineOne knew as late as March 11, 2022 that (a) BCB had raised funds [BCB144321] and BCB had provided to MineOne BCB's financial model for raising funds. Just as MineOne did not do any further due diligence on BCB's funding at the time of executing the DHS Agreement (because that information was irrelevant as BCB was not required to fund the project), "...there is no justifiable reason now for MineOne to receive BCB's funding information (because it remains irrelevant to the contractual obligations and claims in this case)." [*Id.*].

12. MineOne goes on to say that "BCB has not produced a private placement memorandum or the equivalent. If BCB's capital raising efforts were improper, or it mislead investors about its plans relating to the use of funds, MineOne Data is entitled to discovery on these issues." [ECF 337 p. 6]. Again, MineOne doesn't say how any of this is relevant to the claims and counterclaims in the case, nor how any of this is relevant to the Parties' respective obligations under the DHS Agreement. And MineOne provides no basis or evidence to indicate BCB's capital raising efforts were improper to begin with (which makes this request nothing but a fishing expedition). Even though this information is not relevant to the case, I can confirm that BCB Cheyenne LLC did provide James Quid a

private placement memorandum to provide to all prospective investors, which James Quid told me he provided to all CMV Global investors.

13. MineOne also states that it is entitled to know the details of the "performance incentive" BCB provided to one or more of its members who invested after BCB filed this suit. MineOne is wrong again. This performance incentive is not relevant to the Parties' claims or counterclaims, nor is it relevant to any of the Parties' obligations under the DHS Agreement. MineOne points out that this "performance incentive" was mentioned in Patrick Murphy's August 12, 2024 email, which MineOne provided as Exhibit 4 to its Opposition Brief. In that email, Patrick Murphy said "BCB and Bayview Capital Investments executed a Unit Purchase Agreement for 150 Class D membership units on May 24, 2023 (with an effective date of May 6, 2023). These units were provided to Bayview Capital Investments as a performance incentive for Bayview Capital raising $3M through CMV Global to invest in BCB." [ECF 337-4 p. 3]. This was the only $3M that CMV invested in BCB and it is the same $3M that BCB returned to CMV (which BCB has already shown in bank statements provided to MineOne). BCB was obligated to provide this performance incentive to Bayview Capital Investments based on the Syndicate Bonus and Management Agreement between BCB and Bayview Capital Investments. Further, the delay in timing from when Bayview Capital raised the $3M in CMV Global for investing in BCB to when Bayview Capital actually received the performance incentive from BCB is due to how busy BCB was in dealing with the day to day activities of running its business and executing on the project for MineOne (and dealing with the delays caused by many of MineOne's other vendors). After MineOne removed BCB as the Phase 2 host in March 2023, and BCB transitioned off the project, BCB's principals had available time to complete the administrative task of completing the paperwork for Bayview Capital's performance incentive. MineOne desperately wants to believe the timing of this performance incentive and when BCB filed suit in Federal Court are related, but they are not. Those events took place on their own separate timelines.

14. Patrick Murphy's August 12, 2024 email provided additional information to MineOne regarding Bayview Capital Investments. That email indicated the following [ECF 337-4]:

- ○ Bayview's 150 Class D units represent a 0.25% ownership interest in BCB.
- ○ Bayview has never had anything to do with BCB's management or operations.
- ○ Bayview Capital Investments did not provide any monies, investments, contributions, transfers, loans, payments, or other consideration to Michael Murphy, Emory Patterson, Neil Phippen, and/or BCB Ventures LLC.
- ○ Bayview executed its Unit Purchase Agreement *after* BCB filed its Federal Court lawsuit on May 3, 2023.

These additional points further affirm how details about Bayview's performance incentive are neither relevant nor proportional to this case, and that MineOne should not be entitled to additional information about this performance incentive.

**D. MineOne is NOT Entitled to Discovery on What Money BCB Raised and What BCB Did With That Money.  BCB is NOT Blaming MineOne for the Loss of BCB's Investor's Money; BCB is Blaming MineOne for the Loss of BCB's Future Payments Under Phase 2 of the DHS Agreement.**

15. Second, MineOne states it "...is entitled to discovery on what money BCB raised and what it did with the money since BCB is blaming MineOne Data for the loss of all its money." [ECF 337 p. 7].  This is wrong.  As BCB explained in its Supplemental Brief, "BCB is not suing MineOne for the loss of BCB's investment money.  Instead, BCB is suing MineOne for not paying BCB, per MineOne's promise to do so, for BCB's Power Contract with Black Hills Energy.  BCB has never blamed the MineOne Defendants for the loss [or, more correctly, the return] of its $3M of investment monies to its investors. That's a strawman argument.  Instead, BCB has sued the MineOne Defendants for loss of all of the Phase 2 compensation and profits BCB was contractually entitled to receive which loss was caused by MineOne's anticipatory repudiation/breach of contract." [ECF 325 p. 3].  What money BCB raised, and what BCB did with that money, is not relevant to any of BCB's claims or MineOne's counterclaims, nor is it relevant to any of the parties' obligations under the DHS Agreement.

**E. MineOne is NOT Entitled to Discovery Regarding BCB's Redemption or Return of CMV Global's  Money.**

16. Third, MineOne states it "...is entitled to discovery regarding BCB's dissipation of assets." [ECF 337 p. 7].   This is wrong.  MineOne is not entitled to this discovery.

BCB's return of its investor's $3M is not related to any *__actual__* claims or counterclaims in this case, nor is it related to any of the parties' obligations under the DHS Agreement. Even though MineOne is not entitled to this discovery, BCB provided an explanation in its Supplemental Brief about the return of CMV's investment. Specifically, BCB was obligated to return the funds to CMV based on the terms in BCB's Operating Agreement. BCB also quoted the language from its Operating Agreement, and a Corporate Resolution, to show MineOne why BCB returned the funds to CMV. Nonetheless, MineOne continues to argue – even in the face of evidence to the contrary – that BCB emptied its funds to become judgment proof. MineOne just wants to believe whatever it thinks will help its case, even when it is clearly wrong.

17. MineOne also states "BCB apparently raised significant amounts of money (millions of dollars) from investors, despite the fact that the cryptocurrency project in Cheyenne, WY was struggling financially in February 2023 because of cost overruns and extensive construction delays caused by BCB." [*Id.*]. This sentence makes no sense. BCB received investment money from its investor CMV in January 2022 ($2,650,000) and July 2022 ($350,000). BCB received the majority of these investment funds ($2,650,000) before BCB ever made contact with MineOne, before BCB and MineOne entered into their controlling agreements, and well before the "cryptocurrency project in Cheyenne, WY was struggling financially in February 2023." [*Id.*]. Yet MineOne somehow tries to connect BCB earlier raising money "despite" the later financial struggles of the project in February 2023. Additionally, as I've explained in prior affidavits and testimony, BCB did not cause the cost overruns and extensive construction delays. MineOne's other vendors – which MineOne contracted with directly – were responsible for the cost overruns and construction delays (which MineOne has admitted multiple times in written communications, the most recent of which[3] MineOne just produced in VOL019).

18. MineOne continues, saying "despite having raised significant amounts of money from investors, immediately prior to commencement of its lawsuit, BCB shed itself of all

---

[3] In an email thread with one of MineOne's vendors (Rocky Mountain Sand & Gravel), MineOne's Haku Du states "We have been scrambling with a large number of overheating mining rigs…due to lack of exhaust fans (***huge mistake and misrepresentation of Cegen***).... These are the challenges presented to MineOne as the unprofessional and ***irresponsible party Cegen couldn't deliver the produce on time as they promised (November 30, 2022)*** and we were forced to find our own way out by hiring 3rd party crews to clean the mess." (emphasis added). [MINEONE0036297]

funds, emptied its bank accounts, making itself strategically judgment proof, as it knew counterclaims would be asserted. This is classic fraudulent conduct." [*Id.*].  As explained above, BCB did not empty its bank account to make itself strategically judgment proof. BCB returned the funds to its investor CMV Global because BCB was obligated to do so. BCB did not engage in any fraudulent conduct by transferring its assets without adequate consideration because the investment funds were ***not*** BCB's assets or monies to keep or use as BCB pleased (based on BCB's Operating Agreement).

19. It gets worse.  MineOne then says, "Rather than use its $3 million to save the faltering project (a situation BCB was itself responsible for), BCB made itself judgment proof, as it knew lawsuits were likely on the horizon." [*Id.*].  Wait.  Since when was it BCB's obligation to use its investment money from CMV Global to "save the faltering project?" Answer: it never was.  MineOne has been, and still is, oblivious to the parties' actual contractual obligations under the DHS Agreement (or MineOne avoids discussion of the actual contractual obligations because it knows BCB honored BCB's obligations and MineOne did not).  Nowhere in the DHS Agreement does it say that BCB was obligated to use the $3M of investment funds from CMV Global on the project.  And BCB would never have agreed to that given BCB's actual obligations in BCB's Operating Agreement related to CMV Global's $3M investment.  It should also be strongly stated that BCB was not responsible for the "faltering project."  As mentioned above, the faltering project was due to several of MineOne's vendors (which MineOne contracted with directly) failing their respective contractual obligations to MineOne.  It is also becoming more clear through MineOne's recent productions (particularly VOL010 and VOL009A in which MineOne was ordered to lift redactions) that MineOne itself was also responsible for the faltering project in that MineOne did not have the funds it originally represented to BCB and BHE in May 2022 (which MineOne used to induce BCB and BHE into their respective contractual agreements with MineOne) and MineOne was struggling, desperately working behind the curtain, to raise money to pay for the project (which was one of the most important obligations of MineOne in the DHS Agreement).

20. MineOne has repeatedly (and erroneously) claimed that BCB dissipated its assets to become judgment-proof because BCB had been planning for some time to file a lawsuit against MineOne: "immediately prior to commencement of its lawsuit, BCB shed itself of

all funds;" and "BCB made itself judgment proof, as it knew lawsuits were likely on the horizon." [*Id*.]. MineOne is wrong. BCB did not know "lawsuits were likely on the horizon" when it obligatorily returned investor CMV Global's $3M in August 2022 ($350k) and February 2023 ($2.65M). Factually, it wasn't until early March 2023 (when Erick Rengifo and Jiaming Li informed BCB that BCB was being replaced as the Phase 2 Host by Huaili Zhang), that BCB first retained counsel and contemplated suing MineOne, and BCB and its counsel, Patrick Murphy and Scott Murray, drafted the Chancery Court Complaint on March 12-15, 2023. MineOne simply can't wrap its collective mind around the fact that BCB's team could mobilize to file its lawsuit so quickly. If MineOne could put itself in BCB's shoes when BCB found out it was being replaced by Huaili Zhang, and experience the utter betrayal and financial damage done to it, then maybe, just maybe, MineOne would understand how BCB's team could take such swift action to file its lawsuit to seek the justice BCB deserved.

21. MineOne continues by employing one of its most false and frivolous claims, that "BCB did not invest a single penny" [*Id*. at 8] into the project. As BCB explained in its Supplemental Brief:

> BCB did invest in the project. First and foremost, BCB invested its valuable Power Contract into the project – which BCB had worked for nearly a year of uncompensated work to acquire – when it assigned the Power Contract to MineOne in return for MineOne's promise to pay for the Power Contract in Phase 2 of the project. Furthermore, BCB invested a significant portion of the $450,000 that MineOne paid to BCB for Phase 1 services back into the project (including but not limited to (a) compensating BCB's principals for all their Phase 1 work on the project (and for reimbursing their expenses while working on the project site), (b) hiring and paying BCB's employees for their employees Phase 1 work on the project, (c) paying for project related items (such as equipment rentals) for which MineOne has not reimbursed BCB. In other words, BCB did not take the $450,000 for Phase 1 and keep it all as profit. It was just the opposite: BCB used most of these funds to invest in and further the project (to MineOne's benefit). [ECF 325 p. 3].

The more MineOne makes this ridiculous claim (especially in light of the abundant and obvious evidence to the contrary), the less credible MineOne becomes.

22. MineOne also adds a footnote to its claim that BCB did not invest a single penny. MineOne states:

> "Exhibit A" to BCB's Supplemental Brief (ECF No. 325-1) should also be stricken and disregarded by the Court. This is a chart created by BCB with only BCB's version of each party's "obligations" under the parties' Development, Hosting & Services Agreement ("DHS Agreement") (ECF No. 239-2). BCB describes its "Exhibit A" as "the chart of the Parties' contractual obligations." (ECF No. 325, Supp. Brief at 3). This is not true. This chart was created by BCB with select information BCB deems helpful to its side -- it is not a chart of the parties' contractual obligations. BCB should be admonished for not disclosing to the Court that it created "Exhibit A" as a demonstrative exhibit, and this chart has no legal significance. MineOne Data respectfully requests that the Court exercise its inherent power and give no weight to BCB's "Exhibit A" and strike it from the record. [ECF 337 p. 8].

23. MineOne is wrong again: "Exhibit A" to BCB's Supplemental Brief [ECF No. 325-1] should **_not_** be stricken and disregarded by the Court. This chart does **_not_** contain "only BCB's version of each party's 'obligations' under the parties DHS Agreement." [*Id*.]. This chart does **_not_** contain "select information BCB deems helpful to its side." [*Id*.]. Rather, this chart contains each and every Phase 1 obligation under the DHS Agreement of both MineOne and BCB. Each and every Phase 1 obligation in the chart is presented word for word based on the DHS Agreement. And each and every Phase 1 obligation is cited with its paragraph number from the DHS Agreement. The two differences between the presentation of the Phase 1 obligations in the chart and the actual DHS Agreement are (a) the chart presents the Parties' obligations in two side-by-side columns (whereas the DHS Agreement lists them sequentially in list form) and (b) the chart provides emphasis (by bold formatting of the text) on portions of any text that reference "funding" or "bringing funds" to the project (whereas the DHS Agreement does not provide emphasis on portions of text that reference "funding" or "bringing funds" to the project). I know this because I created the chart. It is telling that none of BCB's six specific Phase 1 obligations require anything remotely close to "funding" or "bringing funds" to the project. In stark contrast, eight of MineOne's ten Phase 1 obligations required MineOne to "finance," "fund," "acquire," "purchase," and/or "procure" items for the project. Thus, without any contractual obligation to bring any raised capital or investment funds to the

Project, whether and to what extent BCB raised any capitalization and/or investment funds [from any investors] is wholly irrelevant to the parties' contractual claims and defenses. The fact that MineOne can't understand that these are the ***actual*** Phase 1 obligations of the Parties may help explain why the parties are still in this lawsuit.

**F.  MineOne is NOT Entitled to Discovery from BCB to Investigate the Veracity of My Testimony at the Evidentiary Hearing Regarding "Camouflaged Equity" and Irregular Accounting Practices.**

24. Fourth, MineOne states it seeks "...discovery that is necessary to investigate the veracity of Michael Murphy's testimony at the Evidentiary Hearing regarding 'camouflaged equity' and irregular accounting practices." [ECF 337 p. 8]. This is wrong and meritless. As BCB explained in its Supplemental Brief, "Michael Murphy's evidentiary hearing testimony about MineOne's capitalization, funding and alleged loans – which were actually camouflaged equity – had everything to do with MineOne's defalcations and nothing to do with BCB's capitalization and funding." [ECF 325 p. 4].

25. MineOne also states, "by testifying on these subjects at the Evidentiary Hearing, Michael Murphy has put the issue front and center: so much so that Magistrate Judge Carman required the MineOne Defendants to produce additional documents regarding loans and equity investments [ECF 337 p. 8]." Again, MineOne is wrong. As BCB explained in its Supplemental Brief, "the only issue Michael Murphy put 'front and center' was MineOne's intent to defraud BCB.[4]" [ECF 325 p. 4]. Furthermore, I'm amazed how can MineOne be so audacious to cite Magistrate Judge Carman's Order to compel MineOne to produce certain documents regarding MineOne's alleged related party loans as part of its argument when MineOne failed to produce so many of the documents that Magistrate

---

[4] One of several reasons BCB sought this highly relevant capitalization and funding information from MineOne is because MineOne misrepresented how much funding it had. As detailed in my Writs Affidavit and in my Bond Amount Affidavit, "MineOne provided proof of funds before signing the DHS Agreement of just under $21.5M, however, according to MineOne's own accounting records, MineOne had only received $8,149,975 in investment capital through the end of September 2022, and MineOne had spent approximately $7.7M by that time." MineOne provided its $21.5M proof of funds to BCB and BHE to induce those parties into signing Agreements with MineOne, but then it turned out MineOne did not actually have those funds (as indicated in its accounting records and recently lifted redactions to MineOne's internal communications). In one of numerous examples, Haku Du tells Erick Rengifo and Jiaming Li, "***as of Sep 30, 215k cash on the book***" ... "excluding transformer payment" (10/3/2022, 4:21 PM) (emphasis added) [MINEONE0030591]. In another, Haku Du tells Erick Rengifo and Jiaming Li, "***We have rubbed out the fund...***" (11/15/2022, 3:44 PM) ... "***Run out of***" (11/15/2022, 3:46 PM) [MINEONE0030646]. MineOne was underfunded, and it misrepresented this to BCB on several occasions. MineOne's underfunding contributed to several of the delays on the project."

Judge Carman ordered MineOne to produce (so much so that MineOne's failure necessitated BCB to file a third motion for sanctions against MineOne).

26. MineOne goes on to say that "...it believes that BCB used the same accounting treatment. BCB must also be required to produce accounting records showing how it booked contributions, monies, loans, etc., from its investors, and how BCB emptied its bank account of all of its funds immediately before commencing suit." [ECF 337 p. 8]. Again, MineOne is wrong. BCB did not use the same accounting treatment. And MineOne has not presented a shred of evidence to support its erroneous belief that BCB used the same accounting treatment. Furthermore, MineOne's requested discovery of BCB's "...accounting records showing how it booked contributions, monies, loans, etc., from its investors" [*Id.*] is not relevant to the claims and counterclaims in this case, nor is it related to any of the parties' obligations under the DHS Agreement.

**G. In Its Legal Argument, MineOne Fails to Specify Any Specific Claim or Counterclaim to Prevent Quashing of Its Subpoenas; As such, MineOne's Subpoenas Should be Quashed.**

27. In Section IV of its Oppositional Brief, MineOne states "the information sought in the Subpoenas is highly relevant to the claims and counterclaims in this case, and proportional to the needs of the case" [*Id.* at 12]. MineOne then goes on to provide nearly a page of legal citations. But at no point in its Section IV does MineOne ever specify to which claim or counterclaim its sought-after information is highly relevant. MineOne doesn't specify which claim or counterclaim its desired information is highly relevant because the information MineOne seeks is not highly relevant to any claim or counterclaim. If MineOne's desired information was highly relevant to a claim or counterclaim, then MineOne would have specified which claim or counterclaim that was. On this basis alone, MineOne's subpoenas should be quashed.

**H. MineOne's Erroneous Assertion that Dr. Bryce Fincham is NOT a Passive Investor; The Irrelevance of MineOne's Desired Information Sought from Dr. Bryce Fincham.**

28. MineOne states "Fincham is not a passive investor. Fincham is a key witness...." [*Id.* at 14] but MineOne doesn't provide any relevant evidence to support its assertion. Why? Because there is no evidence to support MineOne's incorrect and erroneous assertion. Contrary to what MineOne claims, Dr. Fincham is a passive investor. Dr. Fincham did

**_not_** participate in any way in the day to day business of BCB, **_nor_** did Dr. Fincham make, or assist in making, any decisions on behalf of BCB at any time. Rather, Dr. Fincham's involvement was solely limited to making a $1M investment in CMV Global (which CMV Global invested in BCB). Dr. Fincham (like all of the other CMV Global passive investors) expected to receive distributions from CMV Global (based on BCB providing distributions to CMV as a result of BCB's expected future earnings, which never materialized due to MineOne's anticipatory repudiation of the DHS Agreement).

29. MineOne states "Fincham was given a 'bonus'...on May 15, 2023, on the heels of BCB filing this suit, for investing one million dollars in BCB" [*Id.*] and then asks "Why was Fincham given a bonus after BCB filed this suit?" [*Id.*]. And further asks, "Why did Fincham sign the Unit Purchase Agreement two days before BCB filed suit? What was Fincham told as to the circumstances?" [*Id.* at 15]. BCB has repeatedly explained the details of Dr. Fincham's investment in CMV Global, CMV Global's investment in BCB, BCB's return of capital to CMV Global, and CMV Global's return of funds to CMV Global's members. BCB has also explained how Dr. Fincham was provided with an incentive award of 100 Class D units in BCB [ECF 337-4 p. 2-3]. This incentive award was provided solely for Dr. Fincham meeting the $1M investment threshold in CMV Global required to receive an incentive award (which Dr. Fincham met in January 2022). The delay in timing from when Dr. Fincham met the requirements to receive the incentive award to when Dr. Fincham actually received the incentive award was due to how busy BCB was in dealing with the day to day activities of running its business and executing on the project for MineOne (and dealing with the delays caused by many of MineOne's other vendors, which MineOne contracted with directly). After MineOne replaced BCB as the Phase 2 host in March 2023 (and refused to pay BCB its $90,000 invoice), and BCB transitioned off the project, BCB's principals had available time to complete the administrative task of completing the paperwork for Dr. Fincham's incentive award. MineOne desperately wants to believe the timing of Dr. Fincham's signing of the Unit Purchase Agreement and when BCB filed suit in Federal Court are related, but they are not. Those events took place on their own separate timelines.

30. MineOne asserts it "...has the right to ask Fincham about his investment in BCB and what BCB represented to Fincham as to BCB's intent to build a digital mining facility and the

use of funds, as well as BCB's performance under the Power Contract." [ECF 337 p. 15]. MineOne also says it has the "...right to know from CMV Global's largest investor what the expectations were as to BCB's performance, what was the anticipated budget with the Power Contract and how was BCB going to accomplish it." [*Id*. at 16]. Despite making these assertions, MineOne never says how any of this desired information is relevant to BCB's claims or MineOne's counterclaims, nor how any of this information is relevant to any of the parties' obligations under the DHS Agreement. That's because this information relates to events that took place before BCB and MineOne ever made contact (let alone entered into the DHS Agreement). If this information mattered to MineOne, it should have been asking BCB about it during the due diligence period for the project (from March 2022 to June 2022, before signing the DHS Agreement), which it did, to some degree. During this time, though, MineOne was primarily focused on how MineOne was going to own/control and execute on the project (based on taking possession of BCB's Power Contract and other development work performed to date), not how BCB had originally intended to execute on the project. That's because MineOne wanted ownership of the development opportunity and to do things its way, not BCB's way. Ultimately, the parties agreed to the DHS Agreement, which specified MineOne's and BCB's obligations going forward. Those obligations had nothing to do with BCB's original plan to build a digital mining facility, BCB's original use of funds, and/or BCB's performance under the Power Contract." In contrast, those obligations had everything to do with what mattered going forward: MineOne's plan to build MineOne's digital mining facility, MineOne's use of funds, and MineOne's performance under the Power Contract. In fact, after signing the DHS Agreement, MineOne chose to change the development plan BCB had created and requested BCB tailor the project to MineOne's needs. For example, "the site plan was updated to increase the number of modular data centers and reduce one (1) 14,000 sf fixed steel building data center structure." [ECF 151-3, p. 14].

31. MineOne states "BCB has not produced a single piece of paper from Fincham, even though Fincham is a BCB member." [*Id*. at 15]. MineOne implies that just because Dr. Fincham is a BCB member, then MineOne is entitled to information about or from Dr. Fincham. That is simply not the case. BCB has not produced any information related to Dr. Fincham to MineOne because Dr. Fincham is a passive investor who never materially

participated in the day to day operations or management of BCB, and as a result, Dr. Fincham does not have information that is relevant to the parties' claims or counterclaims, nor does Dr. Fincham have information that is relevant to the parties' contractual obligations under the DHS Agreement. Furthermore, as BCB has explained to MineOne, Dr. Fincham did not sign his Unit Purchase Agreement for his units in BCB until after BCB filed its Federal Court lawsuit against MineOne on May 3, 2023.

I. **The Irrelevance of MineOne's Desired Information Sought from CMV Global Members Barney Patsel and Todd Edwards.**

32. MineOne states it wants to "explore Patsel's and Edward's investment in BCB." [*Id.* at 16]. MineOne then provides a list of questions it wants to ask Mr. Patsel and Mr. Edwards, but very importantly, MineOne never explains how the information it seeks from Mr. Patsel and Mr. Edwards is relevant to BCB's claims or MineOne's counterclaims, nor how any of that information relates to any of the obligations under the DHS Agreement. It is clear – by MineOne not providing any specific reason how or why this information is relevant – that MineOne is fishing for irrelevant information to burden BCB and these two members of CMV.

33. It is important to note that both Mr. Patsel and Mr. Edwards are both passive investors (just like Dr. Fincham). Neither of them has ever been involved in BCB's day to day operations or management decisions. Mr. Patsel and Mr. Edwards each invested money in CMV (which CMV invested into BCB), and like Dr. Fincham, they expected to receive distributions from CMV Global (based on BCB providing distributions to CMV as a result of BCB's expected future earnings) which never materialized due to MineOne's anticipatory repudiation of the DHS Agreement.

J. **The Irrelevance of MineOne's Desired Information Sought from James Quid, CMV Global, and Bayview Capital.**

34. Similar to how MineOne provides a list of questions it wants to ask Mr. Patsel and Mr. Edwards without explaining how those questions are relevant to the parties' claims or counterclaims, as well as the parties' obligations under the DHS Agreement, MineOne also provides a list of questions it wants to ask James Quid without explaining how those questions are relevant to the parties' claims or counterclaims, as well as the parties' obligations under the DHS Agreement.

35. Regarding one of the questions from MineOne's list, MineOne states "Critically, why was Bayview Capital given a 'performance incentive' three days after BCB filed this suit?" [*Id.* at 18]. Although it wasn't necessary to answer this question (due to its irrelevance to this lawsuit), I did so earlier in this Affidavit (*see* paragraph 13).

36. MineOne states "less than a month before BCB walked off the job, which left the MineOne Defendants in a serious predicament, BCB passed a corporate resolution on February 7, 2023 to return the $2.65 million to CMV Global and did so on three days later on February 10, 2023. (Supp. Br. at 5). Why was this corporate resolution passed? What was discussed at the meeting? Why was this done on the eve of walking off the job and running to Chancery Court in March 2023?" [*Id.*]. So much is wrong with this excerpt. BCB did not leave MineOne in a serious predicament. Lest MineOne forget, MineOne replaced BCB as the Phase 2 host and refused to pay BCB's $90,000 invoice for BCB's two months of prior work. Did MineOne seriously think it was an option for BCB to stay involved in the project given what MineOne did to BCB? Somehow, unbelievably, it did[5]. If you treat a counterparty like this (particularly a counterparty which provided/assigned its valuable Power Contract without receiving any compensation for it), there are consequences for your actions. Regarding MineOne's quoted question above about why BCB returned the $2.65M to CMV Global, I have already answered this multiple times: BCB was obligated to return the $2.65M based on BCB's Operating Agreement. And to be clear, this wasn't done "on the eve of walking off the job and running to Chancery Court." [*Id.*]. It was done in early February, over a month before BCB demobilized from the North Range site and transitioned off the project (due to BCB being replaced by MineOne as the Phase 2 Host, and MineOne's withholding of BCB's payment for services performed contingent upon BCB signing an unfavorable amendment to the DHS Agreement).

37. MineOne states "BCB was trying to make itself judgment proof because it knew it was going to walk off the job and file a suit. This is tantamount to a fraudulent conveyance and the MineOne Defendants have the right to explore this topic in discovery." [*Id.*]. This is wrong, as I explained earlier in this affidavit. BCB was not trying to make itself

---

[5] In a March 3, 2023 Skype message to Erick Rengifo, Jiaming Li said "BCB will have no option [but] to accept the proposal…" to which Rengifo responded "Yes. They have no option." [MINEONE 0031093-0031094].

judgment proof; BCB was honoring its obligations to CMV Global in BCB's Operating Agreement.   As such, BCB's return of CMV Global's capital contribution is not tantamount to fraudulent conveyance.  And MineOne does not have the right to explore this topic in discovery, as BCB was never obligated per the DHS Agreement to provide any funding for MineOne's project.

38. MineOne further states, "BCB claims it was capitalized with $3 million although the Black Hills Power Contract required BCB to have $11 million in escrow. This is relevant to the MineOne Defendants alter ego claims in its counterclaims." [*Id.*].  Yes, BCB did raise $3M in funding from CMV Global.   And yes, BCB's original 2/22/22 Power Contract did require BCB to "establish the Security Fund at a level of $11,000,000." Before BCB entered into the 2/22/22 Power Contract with Cheyenne Light Fuel and Power, BCB Ventures LLC (as the manager of BCB Cheyenne LLC) passed a corporate resolution to "authorize BCBV's Managing Member, Emory Patterson IV, to act on behalf of BCBV as Manager of BCBC in entering into the BCIS Agreement [Power Contract] with Cheyenne Light, Fuel, and Power Company."  This corporate resolution provided a list of recitals, one of which provided the basis for how BCB planned to establish the $11M Security Fund.  BCB already provided this corporate resolution to MineOne (*see* BCB00010), yet MineOne has either forgotten about it and/or failed to understand that it addresses what MineOne now seeks.  It should also be noted that MineOne finally attempts to specify a particular counterclaim for which this information is relevant: its "alter ego claim."  But as I explained earlier in this Affidavit, and as noted in BCB's Supplemental Brief, MineOne's very general, very conclusory, and very non-specific alter ego claim, is meritless.  Moreover, BCB has provided more than enough evidence (i.e., citations from BCB's Operating Agreement and how BCB honored the requirements of that governing document, BCB's $3M in funding; screenshots of BCB's bank statements showing its funding, BCB following corporate procedures (including passing corporate resolutions for major decisions), etc.) to refute MineOne's frivolous alter ego claims.

39. MineOne goes on to state, "Despite having significant cost overruns of nearly $10 million, BCB never put a penny into the project." [*Id.*]. There it is, again, that BCB never put a penny into the project.  How can MineOne keep using this argument in light of all

of the evidence against it?  Furthermore, as mentioned earlier in this affidavit (and in BCB's Supplemental Brief), BCB was not obligated to pay for MineOne's project; MineOne was responsible for that, and that responsibility is very clear in the language of the DHS Agreement.

**K. BCB's RFP Submission to BHE is Not Relevant to the Parties' Claims or Counterclaims; The BCIS Agreement is the Relevant Document.**

40. MineOne states it "seeks BCB's Request for Proposal (the "RFP") to Black Hills and its communications with BCB." [*Id.* at 19]. MineOne is not clear with its language here. BCB did not provide an RFP to Black Hills ("BHE"). Rather, BHE issued an RFP so that companies could submit responses to that RFP to BHE. Also, BCB has already provided its responsive and non-privileged communication with Black Hills Energy ("BHE") for the required time periods June 9, 2022 to May 3, 2023.

41. MineOne states, "The Power Contract is highly relevant to this litigation and is the centerpiece of this case." [*Id.*]. MineOne is absolutely right: the Power Contract is highly relevant to this litigation. It was the key asset that BCB effectively assigned to MineOne (in return for MineOne's contractual promise to pay for that asset during Phase 2 of the project, which MineOne did not do). In contrast, MineOne does not say the RFP submission is the centerpiece of this case. And BCB did not assign any RFP submission to MineOne. MineOne never asked for that during its due diligence period (from March 2022 to June 2022) before entering into the DHS Agreement with BCB, because MineOne knew (a) that BCB's February 22, 2022 Power Contract was the culmination of the RFP submission's evolution over five months of negotiation and (b) BCB's June 9, 2022 Amended and Restated Power Contract (which was assigned to MineOne) was the further culmination of three more months of negotiation. The information submitted to BHE in the RFP submission evolved and expanded over those many months of negotiation. Furthermore, and very importantly, the Power Contract states "…this [Power Contract] (including all schedules and exhibits attached hereto, which are incorporated herein by reference), constitutes the entire agreement between the parties relating to the transaction, may not be modified except by a written instrument signed by both parties, and supersedes and replaces all prior agreements and understandings, oral or written, with regard to the subject matter of this Agreement." [MINEONE0033163].

This language is clear: the Power Contract embodied the entire agreement between the parties and superseded and replaced all prior agreements and understandings (including the submission to the RFP). This alone makes the RFP submission irrelevant.

42. MineOne also states "It is critical that Black Hills produce a copy of BCB's RFP because otherwise the MineOne Defendants do not have another means of showing that BCB secured its Power Contract with Black Hills by making representations that it had no ability to honor." [ECF 337 p. 19]. MineOne is wrong. It is not critical for BHE to produce any RFP submission. The RFP submissions are not relevant to any of the parties' claims or counterclaims in this lawsuit. BCB did not assign any RFP submission to MineOne, nor did MineOne ask for any RFP submission to be assigned to it. And none of the obligations in any of the agreements between BCB and the MineOne Defendants say anything about an RFP submission. That being said, based on the then-current situation and information available at the time, BCB (a) was truthful in all of its communications with BHE and (b) had a plan sufficient to BHE to honor BCB's representations to BHE. As mentioned earlier in this Affidavit, BCB produced to MineOne a corporate resolution of BCBV (*see* BCB00010) which explains the basis for BCB being able to enter into the February 22, 2022 BCIS Agreement (i.e. the Power Contract). This document should more than suffice to allay MineOne's (irrelevant and misplaced) concerns that BCB made representations it had no ability to honor.

43. MineOne states that the RFP submission is a very important document in this case "...because it will likely show that BCB was the winning bidder because BCB overstated its credentials and financial wherewithal to build the Facility at North Range, and offered to pay the highest price for electricity, and this is how BCB won the Power Contract." [*Id*. at 25]. None of this is relevant to the parties' claims and counterclaims, nor does it relate to any of the obligations of BCB or MineOne in the DHS Agreement. Notwithstanding the irrelevancy of this requested discovery, and as alluded to above, BCB did not overstate its credentials and financial wherewithal to BHE. BCB (a) was truthful in all of its communications with BHE and (b) had a plan sufficient to BHE to honor BCB's representations to BHE. Furthermore, MineOne insinuates that offering to pay the highest price is how contracts are won. That is naive and oversimplified (and MineOne knows it, or at least they should, based on the extensive experience they

represented to BCB).  There is much more that goes into a power contract than price. Yes, price is an important element, but it is not the only and deciding element (for example, location of substations, site selection, amount of power available and committed to, local hiring and PR capabilities, professionalism and clarity in written communications, and having been born and raised in Wyoming, among other things, may all have played a part in BHE's decision).

44. MineOne states "BCB has acknowledged the relevance of the MineOne Defendants Subpoena to Black Hills because BCB itself not only served another competitive bidder [YZY Capital] with a similar subpoena, but also served Black Hills with similar subpoena requests." [*Id*. at 20].  MineOne conveniently fails to mention that MineOne objected to BCB's late 2023 subpoenas of both YZY Capital and BHE.  Regarding BCB's December 4, 2023 subpoena to YZY Capital, Paula Colbath emailed a letter to Patrick Murphy dated December 18, 2023 in which MineOne objected "to the scope and subject matter of the Subpoena on several grounds" including that the "documents sought by the Subpoena do not appear to be relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence."  Regarding BCB's November 29, 2023 subpoena to BHE, Paula Colbath emailed a letter to Patrick Murphy dated December 15, 2023, in which MineOne objected "to the scope and subject matter of the Subpoena on several grounds" including that the "Subpoena seeks documents that do not appear to be relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence."  BCB agreed with MineOne that BCB's late 2023 subpoenas to YZY Capital and BHE sought RFP submissions which were not relevant to the subject matter of the lawsuit or reasonably calculated to lead to the discovery of admissible evidence, and as such, BCB ultimately did not pursue those documents from those third parties.  It is disingenuous for MineOne to now claim the RFP submissions are relevant when it previously objected to BCB's subpoenas requesting those documents on the grounds that the documents BCB sought were irrelevant.

45. MineOne states "At the June 26, 2024 Evidentiary Hearing in connection with the prejudgment writ of attachment, Judge Johnson focused on BCB's Power Contract with Black Hills." [*Id*. at 21].  MineOne goes on to state "The MineOne Defendants are entitled to conduct discovery as to how BCB secured the Power Contract with Black

Hills." [*Id.*].  Here, MineOne fails to explain how or why Judge Johnson focusing on the Power Contract entitles MineOne to discovery *on how BCB secured the Power Contract*. Judge Johnson simply focused on the thing of value - the Power Contract.  His Honor did not focus on any RFP submission.

46. MineOne states "BCB's Motion [to quash MineOne's subpoenas] should also be denied because BCB's Amended Complaint (ECF No. 50) makes numerous allegations regarding Black Hills' RFP process and BCB's reputation standing, which the MineOne Defendants are entitled to discover." [*Id.*].  MineOne then goes on to provide examples from BCB's Amended Complaint that reference the RFP and BCB's reputation standing. MineOne seems to think that just because BCB mentioned the RFP submission/process and/or BCB's reputation standing in BCB's Amended Complaint, it entitles MineOne to discovery on those things.  But MineOne is wrong.  BCB's references to those things in its Amended Complaint *were provided as background facts*.  It's important to remember that BCB already had the Power Contract when BCB and MineOne first made contact. MineOne wanted the Power Contract; it did not want any RFP submission.  BCB assigned the Power Contract to MineOne; it did not assign any RFP submission.  The Power Contract clearly states it replaces and supersedes all prior agreements and understandings.

47. MineOne's justification for why it should be allowed discovery on the RFP submissions appears to be centered around MineOne's desire to discredit BCB for the valuable asset BCB negotiated and secured from BHE over many months and then ultimately assigned to MineOne.  MineOne likely wants to do this in a futile attempt to show that the Power Contract is not as valuable as BCB (and BCB's expert) claim it is.  In doing this, MineOne purposefully overlooks the contractual language in the controlling agreements between MineOne and BCB (i.e., the DHS Agreement and Side Letter) that explain how much the Power Contract is worth.  This is contractual language that both MineOne and BCB agreed to – in writing – when signing the DHS Agreement and Side Letter.  It is the contractual language which reflects all of the due diligence MineOne performed from March 2022 to June 2022, when MineOne and BCB discussed and negotiated everything that MineOne deemed relevant before entering into the controlling agreements with BCB (which included conversations about everything BCB had done to secure the Power

Contract).  MineOne wants to re-open that March 2022 to June 2022 pre-DHS Agreement due diligence door so it can attempt to justify a lower value for the Power Contract (and limit MineOne's damages in this lawsuit).  This is wrong.  The value of the Power Contract is established in BCB's and MineOne's controlling agreements.  It is not based on anything included in an RFP submission (which included information that was worked and re-worked over many months before finally arriving at signed Power Contract, which superseded and replaced all previous agreements and understandings).  And tellingly, it is corroborated by the arms-length transaction between MineOne and CleanSpark in which CleanSpark is paying approximately $19M for a slightly modified version of the Power Contract ($22.5M aggregate purchase price less approx. $3.5M cost basis in two land parcels is approx. $19M for the Power Contract).

[Remainder of Page Intentionally Left Blank]

FURTHER AFFIANT SAYETH NOT.

DATED this 11th day of September, 2024.

_____
   (SIGNATURE)

STATE OF COLORADO          )
                           )
COUNTY OF DENVER           )

Before me, a Notary Public in and for the County of Denver, State of Colorado, personally appeared Michael Murphy, this 11th day of September, 2024, and he being duly sworn by me upon his oath, says that the facts alleged in the foregoing instrument are true and correct.

Witness my hand and official seal: _____
                                              Notary Public

S
E     ┌─────────────────────────────────────┐
A     │      RYAN WILLIAM GOODWIN            │
L     │ NOTARY PUBLIC - STATE OF COLORADO   │
      │      NOTARY ID 20034021373          │
      │ MY COMMISSION EXPIRES JUL 23, 2027  │
      └─────────────────────────────────────┘

My Commission Expires: July 23, 2027