1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF WYOMING

3   ────────────────────────────────────────────

4   BCB CHEYENNE, LLC, d/b/a      | DOCKET NO. 23-CV-00079-ABJ
    BISON BLOCKCHAIN, a Wyoming   |
    limited liability company,    | (Pages 1 through 56)

5                                 |

6          Plaintiff,             |

    vs.                           |

7   MINEONE WYOMING DATA CENTER,  | Cheyenne, Wyoming
8   LLC, a Delaware limited       | Thursday, September 26, 2024
    liability company; MINEONE    | 3:22 p.m.
9   PARTNERS, LLC, a Delaware     |
    limited liability company;    |
10  TERRA CRYPTO, INC., a Delaware|
    corporation; BIT ORIGIN LTD., |
11  a Cayman Island company;      |
    SONICHASH, LLC, a Delaware    |
12  limited liability company;    |
    BITMAIN TECHNOLOGIES HOLDING  |
13  COMPANY, a Cayman Island      |
    company; BITMAIN TECHNOLOGIES |
14  GEORGIA LIMITED, a Georgia    |
    corporation; and JOHN DOES 1-20,|
15  related persons and companies |
    who control or direct some or |
16  all of the named Defendants,  |

17         Defendants.            |

18  ────────────────────────────────────────────

         TRANSCRIPT OF MOTION HEARING PROCEEDINGS
19          MOTION TO AMEND SCHEDULING ORDER

20        **BEFORE THE HONORABLE ALAN B. JOHNSON**
             **UNITED STATES DISTRICT JUDGE**

21

22

         *MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC*
23            *Federal Official Court Reporter*
     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
24        *307.433.2169 * MelanieSonntagCRR@gmail.com*
       *Proceedings reported with realtime stenography;*
25   *transcript produced with computer-aided transcription.*

```
 1    APPEARANCES (via Zoom):
      For the Plaintiff:         PATRICK J. MURPHY
 2                               WILLIAMS, PORTER, DAY & NEVILLE
                                 159 North Wolcott Street, Suite 400
 3                               Casper, WY 82601

 4    For the Defendants         PAULA COLBATH
       MineOne, Terra            DAVID A. FORREST
 5    Crypto, Bit Origin,        LOEB & LOEB, LLP
      and SonicHash:             345 Park Avenue
 6                               New York, NY 10154

 7                               SEAN LARSON
                                 KARI HARTMAN
 8                               HATHAWAY & KUNZ, LLP
                                 2515 Warren Avenue, Suite 500
 9                               Cheyenne, WY 82001

10    For the Defendants         MARC S. GOTTLIEB, I
       Bit Origin and            ORTOLI ROSENSTADT, LLP
11    SonicHash:                 366 Madison Avenue, Third Floor
                                 New York, NY 10022
12
                                 MEGGAN HATHAWAY
13                               SUNDAHL, POWERS, KAPP & MARTIN, LLC
                                 2020 Carey Avenue, Suite 301
14                               Cheyenne, WY 82001

15

16

17

18

19

20

21

22

23

24

25
```

23-CV-00079-ABJ                                                              3

1                              I N D E X
                                                            PAGE
2        Remarks by the Court                                5
         Argument by Ms. Colbath                             9
3        Argument by Mr. Murphy                             29
         Argument by Mr. Gottlieb                           43
4        Argument by Ms. Colbath                            48
         Argument by Mr. Murphy                             53
5        Argument by Ms. Colbath                            54
         Argument by Mr. Murphy                             55
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced 3:22 p.m., September 26, 2024.)

2              THE COURT:  I see my screen in this -- at this

3      time -- sorry for the delay caused by another matter.

4              But I look at my screen, and I see BCB Cheyenne, a

5      limited liability company, doing business as Bison Blockchain,

6      who has sued in this court MineOne Wyoming Data Center,

7      MineOne Partners, and others at this point.

8              Looking at the screen, I see Patrick Murphy

9      representing the plaintiff in this case; I think Scott Ortiz

10     has recently entered an appearance; Paula Colbath, who is lead

11     counsel for MineOne Data Center, LLC; Marc Gottlieb, present

12     today.  And then -- and David Forrest.  I thank you,

13     Mr. Forrest.  And, more locally on the defense side, Sean

14     Larson, Kari Hartman, and Meggan Hathaway.

15             As I understand it, there was an earlier hearing

16     before Stephanie Hambrick, the Magistrate.

17             Is that true, Mr. Murphy?

18             MR. MURPHY:  Your Honor, there have been several

19     meetings with Magistrate Judge Hambrick.  I'm not sure which

20     one you're talking about, but there have been several.

21             THE COURT:  I'm talking about today.

22             MR. MURPHY:  Oh, I'm not aware of any today.  You're

23     our only audience today.

24             THE COURT:  Well, I'm glad to hear that.

25             Let me talk about a couple thoughts I have but --

1   I don't think they'll be particularly helpful, but they'll

2   make me feel better -- in this case, which is largely, in my

3   view, a disaster at this point in terms of trial preparation.

4           Both the plaintiffs and the defendants in this action

5   entered into a contractual relationship, anticipating that

6   they would both be, at this point, busy raking in lots of

7   Bitcoins, which convert into truckloads of dollars to their

8   mutual benefit.

9           BCB had the good fortune to convince the powers that

10  be in Wyoming to give them access to substantial power

11  resources, which would be paid for to the local power company.

12          MineOne involved a group of businessmen, most of

13  him -- most of whom hail from China, where Bitcoin mining is

14  not a thing that is typically approved there or is a business

15  model.  It is here in the United States.

16          Looking for opportunity, they encountered BCB and the

17  folks with BCB, inexperienced as they were, and the parties

18  negotiated a contract, anticipating good things.

19          BCB invested its resource, which largely was the

20  access to power and the talent of the principals, and MineOne

21  and others their investment of sizeable amounts of money.

22          We find themselves now mutually accusing one another

23  of breach of contract and seeking to recover a pot of money

24  that is now earning interest under control of the Court.

25          Regardless of the merits of any claim in this matter,

1  both parties, it would appear to me, have suffered a

2  frustration of what their original belief was that this

3  arrangement would yield for them and, certainly, for the

4  Chinese people or the foreign -- folks from China, losing a

5  very substantial investment of -- of money and, for BCB, the

6  opportunity to turn, for profit, their early access to a power

7  resource in this case.

8        Unknown to -- well, maybe unknown.  I don't know.

9  But, certainly, as to MineOne principals, they come from a

10 place where every fault isn't the source of litigation;

11 really, where the Government owns each individual.  Except for

12 domestic problems, there's really not much need to resort to

13 courts at the drop of a hat.

14       They find themselves in the United States of North

15 America where, for any reason at all, a jury can be assembled,

16 lawyers hired, huge amounts of money spent to litigate any

17 point at all.  I suppose their learning curve is very

18 substantial.

19       Despite the circumstances of this case, plaintiff is

20 highly advantaged, it seems to me, in this litigation,

21 convenient to the Court, access to most of the individuals

22 connected with this case, in the United States with all of our

23 communication and transportation system, social media, and

24 abilities to communicate easily.  And defendants are

25 disadvantaged in terms of their ability to travel like an

1    American citizen can, across any border at a moment's notice

2    and -- and be available to -- to testify.

3            We are months down the road in this case and have

4    spent an enormous amount of money and resources sorting out,

5    it seems to me, whether or not there might be a jurisdictional

6    defect in this case -- and that's important because you'd hate

7    to go through this entire process and find out from the

8    Tenth Circuit that somebody down there has decided that

9    jurisdiction didn't exist -- and finding at every turn the

10   personal animosities that exist among counsel.

11           I haven't been in a position to form any personal

12   animosity or feeling one way or the other about any of the

13   principals in the case going forward.  I don't know them.

14   I've seen Mr. Murphy's sons at locations but, other than

15   saying hello, have no particular knowledge of them and

16   certainly don't have any knowledge of the individuals from

17   other places.

18           And part of this case is significantly affected by an

19   action taken by the President of the United States.  The Court

20   has no knowledge whether or not the President of the United

21   States -- had Mr. Murphy gone to the White House and got down

22   on bended knee and pled with President Biden to not do what he

23   did -- that he would have changed his mind -- or that a

24   Chinaman had arrived at the President's White House and tried

25   to enter and speak to the President, the President would say,

1    "Oh, no problem."

2          Everything I'm seeing, I think it would be just sheer

3    speculation to know that the result would be one bit different

4    regardless of who, what, or how the situation was presented to

5    the President with regard to the application of that law and

6    the process.

7          We have a trial date.  I intend to keep the trial

8    date.  But we may be in a situation where no experts testify

9    and maybe nobody testifies.  Or we do it on affidavits or we

10   do it some other way at this point.

11         But there will be a decision.  I am 100 percent

12   confident that there will be every reason to appeal that

13   decision, whatever it is, and that you'll be successful.  The

14   Tenth Circuit will sort out the pepper from the fly specks,

15   and they'll undoubtedly find some reason in this mess to send

16   it back again for further proceedings, either before me or

17   before someone else, and the process will continue.

18         It just seems that there comes a time when -- when

19   reason should take over and -- and -- and everybody should --

20   at least as adversaries; not enemies, as adversaries -- work

21   together to resolve -- find a resolution or to take this case

22   in the most efficient way possible to trial.

23         I don't mind -- you know, we're here to try cases,

24   and we're glad to do that.  But we're going to spend an

25   enormous amount of resources with clerk time -- and there are

1    lots of other cases with motions that need to be resolved

2    sitting here on the Court docket -- resolving tons of motions

3    for sanctions and -- and things that represent bad feelings in

4    this case -- which we'll do.  But I don't see that it's

5    progressing the case very far.

6          So that's my piece.  At this point I feel that the

7    parties have genuine interests on each side and -- and are

8    deserving of serious consideration of those interests.

9          It's my understanding that there is a need at this

10   point for some adjustment to allow some discovery to take

11   place and that Mr. Murphy has responded to that.

12         So, Ms. Colbath, I'll let you go first.

13         MS. COLBATH:  May it please the Court.  Thank you,

14   Your Honor.

15         And --

16         THE COURT REPORTER:  I can't hear you.

17      (Reporter seeks clarification.)

18         THE COURT:  We've lost you again.

19         I don't know if you can --

20         MR. GOTTLIEB:  Paula, you're on -- oh, there you go.

21   Okay.

22         MS. COLBATH:  May it please the Court -- I apologize

23   for that.  But I appreciate your insights, Your Honor.

24         We certainly always have full and robust discussions

25   about the Court's comments and -- and will do so.  I'm not

1   going to comment on them.  I certainly agree with many of

2   them.

3          You know, I do find us all in a very unfortunate

4   situation.  I think, if you look at the docket, you will see,

5   though, that my clients have been very conservative in filing

6   motions and have filed them when -- primarily -- when Judge

7   Hambrick or Judge Carman or Judge Rankin couldn't resolve

8   things and gave permission.

9          They did their best.  We had multiple meet and

10  confers.  And so I view -- not just in this case but the way

11  I practice -- motions are expensive for clients, and they are

12  a last resort.

13         There is a motion here.  I think that is largely

14  driven by the plaintiff being represented by a family member.

15  And I -- I do my best to have meaningful conversations.

16  I will continue to do so.

17         Just by way of example, this is high priority.  I was

18  away camping in August -- which you see in the papers it is a

19  yearly trip at that yearly time.  I announced it well in

20  advance of going away.

21         During this camping trip I engaged in a meet and

22  confer, which accomplished absolutely nothing.  The plaintiff

23  didn't come to the table with one deposition date, and it went

24  on for three hours.

25         So we are -- I -- I sometimes do feel we're going

1   through the motions.  I do it.  I approach it in good faith.

2   I am optimistic; it's just my general nature.

3          And, to the extent issues can be narrowed, we will

4   continue -- my clients will continue to work on that.  Judge

5   Hambrick, when she said, "Look, you've got to brief" -- there

6   were a lot of outstanding discovery issues; she wanted a full

7   record; she wasn't able to get the parties to break any bread

8   or narrow any of the issues.

9          And I remain hopeful, once we get a response from the

10  plaintiff, that maybe there is a way to take some of the

11  issues off her plate.  But she wanted to have a -- a full and

12  complete record on it.

13         I think there's part of the motion that -- that the

14  parties have made easy for you.  We all agree that there are

15  certain motion dates that should be adjusted.  So there was

16  agreement there.  I wish we had reached it before we filed the

17  motion.

18         But right now, because Judge Hambrick has asked us to

19  brief a number of issues -- by way of example, there are some

20  third parties locally in the Wyoming area, Black Hills Energy

21  being one very important one.  We issued a subpoena to

22  Black Hills, and the plaintiff immediately filed a motion to

23  quash before we could even serve the subpoena, so that is out

24  there.

25         Plaintiff itself has issued at least 2 subpoenas --

1    they've issued over 20 subpoenas.  Now, we didn't think, in

2    all instances -- to legislative representatives and to

3    numerous people.  We -- we thought it was maybe an effort to

4    intimidate some people from talking openly, a fishing

5    expedition.

6         But if the plaintiff thought that there might be

7    something there of relevance, we didn't rush in 20 times and

8    file any motions to quash.  We knew, at the end of the day,

9    whatever was produced we would get the benefit of.

10        And so when -- when -- you know, they have subpoenaed

11   Black Hills twice.  We -- we have documents that we want from

12   Black Hills that they did not request, so we're -- we're --

13   it's incumbent upon us to get those.  I'm facing a motion to

14   quash.  And, you know, that, to me, just -- for so many

15   reasons -- is the type of thing that I think the Court finds

16   frustrating.

17        So we -- we have a number of subpoenas outstanding.

18   Obviously, once the motion to quash in these -- and these were

19   filed right away -- it operates as a stay.  My hands are tied.

20   I'm -- I, frankly, was uncomfortable even calling Black Hills

21   at that point, speaking to the general counsel and talking to

22   a witness about what it is I wanted at the end of the day.

23        While I think that that might have been okay -- in

24   this environment I've got three sanctions motions against me

25   for what is totally frivolous; I've got a motion to revoke my

1     pro hac vice.  So I'm not talking -- you know, if there's a

2     motion to quash, I'm not even looking in the direction of

3     Black Hills at this point.

4          Obviously, plaintiff knows these motions have to get

5     reported to general counsels of firms and, you know -- and --

6     and I say that.  I'm -- you know, at some point the Court will

7     look at them, and I'm -- I'm -- I'm not nervous about the

8     result in them, but it does stymie someone's ability to go and

9     talk to witnesses locally.

10          And so that -- that, in part, is what's happened

11    here.  We have important outstanding discovery, and it's all

12    been subject of a motion.

13          I will write to plaintiff's counsel and say "Do you

14    represent Potential Witness Bryce Fincham?"  My request goes

15    into a black hole.  I subpoena the witness, properly serve

16    him.  The minute that I serve, I get a letter, "Oh, please

17    don't have any contact.  Plaintiff is now -- plaintiff's

18    counsel -- is now representing him."

19          So we have -- I mean, these are just some

20    illustrations.

21          There -- it -- it can't be that, because plaintiff's

22    counsel files motions on all of my discovery and doesn't

23    comply with their own discovery obligations and the Magistrate

24    says "File your motion" -- because she wasn't able to decide

25    instantaneously and asked for full briefing, which, by

1  definition, is -- you know, 14 plus 7 -- you know, it -- it's

2  close to a month -- that, somehow -- and this is what

3  plaintiff's counsel's position is -- that, "Well, the Judge

4  didn't decide it in time and you're out of luck."

5          And I don't believe that's the law.  It's not,

6  certainly, what the Magistrate Judge intended when she asked

7  us to, you know, submit motions.

8          So I think that -- we're not asking for any

9  adjustment of the trial date.  Our trial witnesses -- you

10 know, we've -- we've -- we -- we will be ready to go on the

11 27th.  I will be there in your courtroom on the 10th, and

12 there needs to be some recognition.

13         Let me give you one last illustration of the type of

14 gamesmanship that -- plaintiff's initial disclosures in this

15 case identified many people -- but, certainly, three

16 individuals who were the founding members of BCB -- and it

17 instructed us to contact them through plaintiff's counsel, not

18 an extraordinary-type thing.

19         I started sending letters in July.  I was the party

20 that tried to set up a deposition schedule, not -- not any

21 other defendant, not the plaintiff.  I wrote numerous times

22 and said "Here's my list; this is going to be a heavy lift for

23 all of us; we need an all-hands call to establish a schedule."

24 I started this process in July.

25         A couple weeks ago, we're -- we're having an informal

1   discovery conference with Magistrate Judge Hambrick where

2   she's asked us "Identify the witnesses; identify who controls

3   them."

4          We show up on a Friday.  I give my list, as she

5   instructed; we have a conference with her on Monday.  Between

6   that Friday and Monday, when we had our conference, the

7   plaintiff in this case eliminated two of the witnesses from

8   their website over the weekend and showed up on Monday --

9   after 18 months of representing that they controlled the

10  witnesses, that the witnesses were founders, and that I could

11  only have contact with those witnesses through plaintiff's

12  counsel, he announced for the first time "I don't control

13  them; I can't get them to a deposition; you'll have to

14  subpoena them."  And so these are the types of things that we

15  faced that require some additional time.

16         I think the schedule permits it.  I think, given our

17  efforts to take the depositions and secure the documents and

18  complying with Magistrate Judge Hambrick, that it's

19  appropriate that the discovery end date be adjusted to

20  accommodate these types of things.

21         I'm not going to get into tit-for-tat in the motion

22  papers.  I don't think it will benefit the Court.  I'm not

23  someone who engages in mudslinging and things of that sort.

24         I would mention one last thing that -- that supports

25  good cause here to make the requested adjustments, and it's --

1   it's another instance of pure gamesmanship.

2          We served our document requests at the beginning of

3   the year, and the documents were required to be produced to

4   the MineOne defendants in February of this year.

5          They were produced -- they were not produced in

6   proper format.  We went back and forth.  The documents were

7   finally produced in May of this year, and, at that time, they

8   produced -- I think it was -- about 20- or 30,000 pages of

9   documents.  I want to get you the -- the precise number.

10         But, in any event, there were major, major gaps,

11  things like text messages and the equivalent that the parties

12  on this project used.

13         On Friday, August 16th -- one day and one month

14  before the discovery deadline -- and on Monday, August 26th,

15  while I was on vacation, the plaintiff in this matter did a

16  data dump on the defendants and produced more than

17  30,000 pages, more than they had produced in February when

18  they were required to produce the documents.

19         They waited until the end of the day for the key

20  documents and dumped 30,000 pages, which we are still

21  feverishly trying to go through.  Those 30,000 should have

22  been produced in February, and they just -- with no notice --

23  dumped -- we had been complaining about major categories that

24  were missing, but their -- their August -- a month out from

25  the discovery deadline -- dwarfed what they had produced in

1   February.

2          Now, we -- my clients have done 19 separate -- if we

3   find documents, they -- they pressed for additional documents.

4   We produced.  We had a professional vendor come in and take

5   all of the emails, collect from -- my clients did not go and

6   pick what was going to be produced.  All of their devices were

7   collected, and they didn't sit at a computer and -- and pick

8   and choose.

9          The point is that, less than 30 days before the

10  discovery deadline, the plaintiff produced more documents than

11  it had at the date it was supposed to produce in February with

12  little explanation as to how this could even possibly be.

13         And so with items like that, it's just totally

14  prejudicial to my clients to have this dumped -- and then they

15  still want to, you know, do depositions -- which we are

16  amenable and -- and tried to work out dates with them.

17         But it's an injustice and it creates tremendous

18  prejudice.  If there are internal adjustments to the schedule

19  here, there is no prejudice whatsoever to the plaintiff.

20         And they actually try to mete out -- you know,

21  they -- they complain about a lot of things they -- they say

22  we didn't produce.  I can answer all of them.  They'll be

23  addressed before Judge Hambrick.  But they, too, are -- are

24  complaining about documents but don't want to do any internal

25  adjustments to the schedule.

1          And so the defendants -- you know, there has been bad

2    faith and -- you know, we're just -- we're just -- don't talk

3    in the same type of hyperbole when we file our motions, and we

4    don't, as a matter of course, every motion, couple it with

5    sanctions.

6          And so, Your Honor, good cause exists.  There would

7    be tremendous injustice and prejudice if we are not able to

8    get the discovery because the plaintiff has filed motions

9    which operate as a stay and try to prevent us from getting

10   what we need.

11         I appreciate the Court's time.

12         THE COURT:  Thank you.

13         As I understand it, the dates, then, have been -- the

14   parties do agree to the extension of the dates.

15         MS. COLBATH:  Well, Mr. Murphy objects to me getting

16   any of the discovery that is the subject of the pending

17   motions.  And I think that's where the biggest issue is.

18         THE COURT:  And -- and then -- tell me, what are the

19   most important areas that you wish to go into at this point?

20         MS. COLBATH:  So there are -- there are a few.

21         So Black Hills -- Your Honor in your opening remarks

22   said that BCB had the good fortune to access substantial power

23   resources and et cetera.

24         And so, obviously, that power contract is a central

25   point, and how BCB came to secure it is important.  And there

1  was an RFP process, and I have interviewed other competitors

2  who also submitted RFPs.  And the way -- BCB won that RFP

3  because they were the -- the bidder who actually agreed to pay

4  the highest price for the electricity.

5          Something that -- before my clients entered into the

6  contract that's at issue here, we said "That's a no-go

7  contract.  That price -- you agreed in that contract, BCB,

8  that you would pay at least 5 cents."  And my client --

9  5 cents is a cap in the industry.  You generally want, you

10  know, 4 1/4 -- you know -- I don't want to get too technical

11  with it.  But we would not have done this deal if we had not

12  been able to amend that contract.  Okay?

13          And that contract that was secured required BCB to

14  escrow and post security of $11 million.  They didn't have the

15  financial wherewithal to do that.

16          So while the Court puts a great value on the

17  contract, they were unable to perform it.  They had -- you

18  know, and so the financial aspect is I'm trying to identify

19  what type of capitalization did they have at the time,

20  significantly less from what I can tell --

21          THE COURT:  Okay.  Now, this -- this is

22  capitalization you're talking about from BCB?

23          MS. COLBATH:  This is BCB.  So --

24          THE COURT:  So let's --

25          MS. COLBATH:  -- Black Hills, as -- Black Hills, as

1    part of the RFP process, you need to satisfy them that you

2    have the financial wherewithal to be able to build the

3    facility and to support the contract.

4         The initial contract between BCB and the power

5    company here, Black Hills Energy, had a provision that BCB was

6    required to post -- it could be a letter of credit, cash

7    collateral, something -- but the security was --

8         THE COURT:  But Mr. -- Mr. Murphy doesn't want you to

9    have the contract?  Is that where you are?

10        MS. COLBATH:  I'm not sure.

11        But, in any event --

12        THE COURT:  Well, what's --

13        MS. COLBATH:  -- this is some of the discovery that

14   we're seeking.

15        THE COURT:  What's -- okay.  You -- you want to

16   subpoena documents from Black Hills; right?

17        MS. COLBATH:  Black Hills and the investors in BCB.

18   So that I can ascertain what type of capitalization BCB had

19   when it told Black Hills, in order to secure the contract,

20   that it could build the facility.

21        It hadn't met my clients.  I'd like to know whether

22   what it said to Black Hills to secure the contract was true.

23   I don't think it was.  I don't think that they had a -- a dime

24   in the bank at that point.  I think, ultimately, at some point

25   they raised about 3 million.

1          But, also, a month before they walked off this job in

2     March of 2023, that 3 million left their bank account.  It's

3     kind of classic, making yourself judgment proof.

4          They have told the Court repeatedly they don't have

5     any money and they don't have a bond and -- and so -- "Well,

6     why did you return, without any consideration, the money that

7     you had in the bank?"  So there are financial issues.

8          There's a third.  I -- just to keep you like --

9     there's so many on the financial aspects.

10          But jurisdiction was a major thing, as we all know.

11     A couple of months ago, when I'm asking about taking the

12     deposition of a gentleman who I believe put in a million

13     dollars -- although they're totally -- they refuse to produce

14     anything on their finances.  My clients have been tipped

15     upside down.  Every communication relating to a dollar that

16     they -- that they had invested or paid for a supply has been

17     produced.

18          I received a letter about this particular witness

19     that I was pursuing, and Mr. Murphy writes -- excuse me.

20          BCB counsel writes that, "Well, we made a mistake and

21     he wasn't a member on this date, and he signed this document,

22     and it said something as of, and he did Series A and not

23     Series" -- I mean, it was like -- I couldn't follow the

24     letter.

25          Just give me the documents underlying it.  You're now

 1   claiming that someone who -- and they've never corrected their

 2   corporate disclosure on this.  But he wrote a letter.

 3         So there are all kinds of issues relating to the

 4   finances.  And -- and it goes right to did they improperly

 5   secure the initial contract.  Did they have -- once they got

 6   the contract, could they have ever fulfilled it?  I mean, part

 7   of -- part of the first amendment was you have to do certain

 8   things within 45 days.  They had no ability to do it.  They

 9   needed an extension of that 45 days.

10         So -- so let's talk about the witnesses.  The

11   documents -- there's a long list of them.  And that's fully --

12   fully briefed.

13         THE COURT:  Well, I don't -- I don't quite understand

14   at this point.

15         You've indicated that you need documents from

16   Black Hills.

17         MS. COLBATH:  That's one -- that's one party that was

18   subpoenaed.

19         THE COURT:  Okay.  And what are you going to do to

20   get those?  Or can you get them?

21         MS. COLBATH:  I --

22         THE COURT:  What does Mr. --

23         MS. COLBATH:  So -- so --

24         THE COURT:  What -- what are you frustrated about

25   that?

1          MS. COLBATH:  Yes.

2          So plaintiff's counsel subpoenaed them twice;

3   I didn't jump up and down.  When I subpoenaed them, I was met

4   immediately -- I did -- I followed the local rules, give

5   plaintiff notice of your intention to serve.

6          Before -- the next day, before I got to Black Hills

7   with serving the subpoena, I was met with a motion to quash.

8   I'm not entitled to any documents from Black Hills.  None.

9   Zero.  No meet and confer.  A motion -- the motion under the

10  rules that operates as a stay.

11         So, Your Honor, my -- both my hands are handcuffed

12  behind my back right now.

13         I issued subpoenas.  They've objected entirely to

14  every subpoena and every witness that -- that I subpoenaed.

15         The -- the Magistrate Judge -- because we had so many

16  issues with Desrochers, who was a member -- he was the one

17  party, as the Court will recall, that was creating the subject

18  matter jurisdiction issue.

19         Ultimately, we hired process servers, two different

20  companies; we ultimately hired a private investigator.  We had

21  people parked -- he never appeared, you know, at that Colorado

22  address.  Judge Rankin finally said "I'm just going to -- if

23  Mr. Murphy's representing him, you can serve him by email."

24         When we had a meeting, an informal discovery

25  conference with Magistrate Judge Hambrick -- when I learned

 1   suddenly overnight people were removed from the website;

 2   they're no longer under the control, even though they're

 3   founders and members -- I said, "Okay.  I anticipate I'm going

 4   to have trouble serving these individuals now."  And she made

 5   plaintiff's counsel represent on the record that he wouldn't

 6   interfere with the service.

 7          I could tell you we know where people live.  When

 8   they don't show up to their primary residence for two weeks,

 9   the three individuals, something has happened.  And they have

10   interfered.

11          So we have a motion pending before -- it's the

12   discovery motion.  We have one large discovery motion before

13   Judge Hambrick, asking her -- we're facing a repeat of -- of

14   the same thing that happened with a prior witness.  We would

15   like to be able to serve them by email.

16          These are people that, until two weeks ago, were

17   listed as founders and -- and I could only contact them

18   through plaintiff's counsel.  One of the individuals is --

19          THE COURT:  Let me tell you --

20          MS. COLBATH:  -- Mr. Murphy's son.

21          THE COURT:  -- all of this seems very scattered

22   to me.

23          MS. COLBATH:  It is because -- because -- I'm trying

24   to give you illustrations.  This is all fully briefed before

25   Judge Hambrick.

1            There are 20 categories of documents that the

2      plaintiff has refused to produce.  She said "Give them to me;

3      I'll decide it."

4            There are witnesses that suddenly no longer go to

5      their regular homes at night.  We've asked her "Please let us

6      serve them by email."

7            And these are people that I would have subpoenaed in

8      August except -- they were on my witness list to -- to

9      plaintiff's counsel.

10            THE COURT:  Okay.  These -- these --

11            MS. COLBATH:  So there is -- it is scattered.

12            THE COURT:  These people are the ones you're talking

13      about that the -- BCB says are merely investors?  And the

14      reason you want them is because of what you referred to in

15      terms of the RFP; right?

16            MS. COLBATH:  No.  No.

17            So -- so there's Black Hills, and that's the RFP.

18      But the RFP has financial aspects to it.  Okay?

19            Then you have BCB and its ability to build the

20      project as it represented it could do.  Okay?  And so the

21      investors are important for that.

22            Then Bryce Fincham -- suddenly it creates

23      jurisdictional issues.  And we just got a letter that's --

24      that's like -- I mean, it -- it's cryptic.  And so I had

25      already determined that I wanted his deposition.  Okay?

1          And then you have BCB telling you at the evidentiary

2     hearing -- Mr. Michael Murphy -- "I lost my entire life

3     savings with this project; all of us did; my entire team lost

4     everything."

5          Well, that -- I -- you know, that makes someone --

6     that was an emotional appeal, and I'm allowed to test that and

7     determine whether it's true.  So there are -- there's -- the

8     finances have multiple -- multiple relevance here.

9          And so a Bryce Fincham, who was subpoenaed and

10    served, contributes, you know, certain aspects for the case.

11    Others contribute something different.

12         But the finances and -- and BCB gutting itself of

13    every dime less than one month before it walked off the job

14    needs an explanation because I've got substantial

15    counterclaims.

16         And it app- -- and we put in that we thought that

17    this might be an alter ego situation.  And, if they don't have

18    a good reason for returning every dime that -- that we've been

19    able to identify that they have -- upwards of 3.2 million --

20    all these investors are much more significant.  So there's the

21    investor bucket.

22         There are three people who are not investors.  That

23    would be Steve Randall, who came on as a project manager;

24    Neil Phippen, who was supposed to be on the site on a daily

25    basis as a founder; and Sean -- Sean Murphy, who took on some

1    roles at the end of the day.

2            So those three are -- are -- who was running the

3    show?  Why wasn't things -- why weren't things getting done?

4    What were the delays?

5            BCB says it was that -- you know, they point the

6    finger at all of the contractors.  I've spoken with many of

7    the contractors.  They tell a completely different story about

8    what the problem was.

9            So there are -- there are three people who were

10   there, responsible, connected to BCB, hired by BCB, members of

11   BCB, and -- and so those are the three that we're subpoenaing.

12           THE COURT:  Now --

13           MS. COLBATH:  Then -- then --

14           THE COURT:  -- is all --

15           MS. COLBATH:  -- let me raise one other --

16           THE COURT:  -- is all of this --

17           MS. COLBATH:  -- let me raise one other --

18           THE COURT:  Okay.  Go ahead.

19           MS. COLBATH:  No, no.  Your Honor, you -- you go.

20   I didn't realize you . . .

21           THE COURT:  I'm just wondering.  Is all of this

22   before a Magistrate at this point?

23           MS. COLBATH:  All of these outstanding discovery

24   issues are briefed and ready -- well, there may be some papers

25   that -- that plaintiff still needs to put in.  But the -- my

 1   motion on everything that we -- that I've mentioned to you is

 2   totally briefed to her, at her request.  So she -- she's fully

 3   informed about all of these items.

 4           THE COURT:  Okay.

 5           Let me ask if there's something that, locally, we

 6   could do -- depending on her rulings in those regards -- such

 7   as requiring all the parties to gather at particular

 8   locations, particular times, right here in the courthouse, and

 9   we'll supervise all of the depositions that you need and --

10   and require --

11           MS. COLBATH:  I think that's --

12           THE COURT:  -- require the plaintiff to --

13           MS. COLBATH:  -- that's a --

14           THE COURT:  -- produce, you know, those founders

15   and -- and -- here at a given day.

16           Would that help?

17           MS. COLBATH:  I totally endorse that, Your Honor.

18           I had wanted the depositions in person, in Wyoming,

19   and said "I will bring my client to your office, Mr. Murphy,

20   so that it can take place and, if there's any issues, we have

21   access.  And you can hand him the documents and he can -- it's

22   not on a screen" -- but that was rejected.

23           And so we ultimately defaulted -- because I just

24   wanted to -- to make things smooth.  I capitulated and I said

25   "Let's just do it by Zoom."

1          I -- I wanted it -- I was ready to bring and -- do

2     everyone right there in Wyoming.  So we're on the same

3     wavelength in that regard.

4          And you want to set a two-week, three-week period

5     where, you know, witnesses -- every day someone comes in,

6     I'm -- I'm ready to do that.

7          MR. MURPHY:  Your Honor, when the time is right, may

8     I be heard.

9          THE COURT:  Sure.

10          MR. MURPHY:  Okay.  Whenever -- you tell me when

11     you're ready.

12          THE COURT:  I'm -- I'm, of course, here.

13          MR. MURPHY:  Okay.  All right.

14          If it please the Court, Ms. Colbath, and all counsel.

15          Let -- let's just back up for a moment and get the

16     context.  Everyone agrees the Court should keep the

17     January 7th trial date.  We all know it's a bench trial for

18     two weeks.  There has to be an end to this contentious

19     lawsuit, and it can't come soon enough.

20          Equally important, there has to be an end to the

21     discovery.  The Court has already granted the defendants' four

22     extensions to the discovery and expert witness designation

23     cutoff deadlines.

24          The Court first granted extensions of the

25     jurisdictional discovery deadline for MineOne to receive

1    Tim Desrochers' 1,400 pages of records and take

2    Mr. Desrochers' deposition on -- on April 22nd.

3            The Court next extended the discovery cutoff from

4    August 7th to September 17th at MineOne's request.  The Court

5    next extended the defendants' deadline to designate their

6    expert witnesses.  And the Court then again extended the

7    deposition discovery cutoff from September 17 to September the

8    30th.

9            No further grace or -- or extension should be granted

10   by the Court.  Instead, the only extensions that should be

11   granted are the agreed extensions to the briefing deadlines

12   that both of us have submitted in our briefing.

13           MineOne agreed this month that it will conduct the

14   depositions of the witnesses it identified in its September 4

15   letter to Judge Hambrick and to all counsel by September 30th.

16           And, after sending its list of nearly 20 people it

17   wanted to depose to Judge Hambrick and counsel on

18   September 4th and not listing JWJ Technology or Bitmain on

19   that list, Mine- -- here's how MineOne has spent its

20   September time:  The only deposition it took was of BCB's

21   damages expert, Patrick Gahan, on September 17th; it scheduled

22   the deposition of BCB's member and cofounder, Emory Patterson,

23   on Monday morning, September 30th, which will happen; and it

24   has chased after people that were not on its September 4

25   list -- Bitmain Georgia witness and JWJ Technology witness --

1    with very untimely subpoenas; and, now, it is refusing to take

2    Sean Murphy's deposition on the September 30 deposition

3    discovery deadline because Ms. Colbath says she is too busy.

4            None of this warrants yet another extension of the

5    September 17 document discovery cutoff or the September 30

6    deposition discovery cutoff.

7            Mine- -- in -- in their moving papers on the motion

8    that we're here to talk about today, Judge Johnson, this is

9    what MineOne wrote:  "MineOne will conduct the depositions of

10   witnesses that have been identified by the Court's

11   September 30, 2024, deadline," and that's at ECF 344 at

12   page 4, and that's what should happen, Your Honor.  MineOne

13   should not be given any further grace or extensions to take

14   any depositions after that September 30 deadline.

15           And the reason is this:  These delays are on MineOne.

16   They're not on BCB.  The delays of conducting depositions in

17   July, August, and September are MineOne's fault and doing and

18   should not be saddled on BCB.  BCB should not have to suffer

19   yet another extension because, A, MineOne's key witness,

20   Erick Rengifo, was on a month-long vacation in August;

21   MineOne's counsel, Ms. Colbath, was on a 12-day vacation from

22   August 23 to September 4 and wouldn't allow the rest of us to

23   do any depositions without her being present; and MineOne has

24   been hiding and protecting its four important Chinese

25   witnesses -- Jiaming Li, Chong Wang, Huaili Zhang, and

1   Haku Du -- from giving their depositions in August or

2   September; and MineOne has been preoccupied with chasing after

3   irrelevant depositions of BCB's investor and members of

4   members instead of taking the depositions of these important

5   witnesses.

6          And they've been filing incredibly untimely subpoenas

7   requiring testimony and documents on third parties

8   JWJ Technology and Bitmain Georgia this month but not

9   producing their important witnesses for their depositions.

10         And -- and this is important:  MineOne's counsel

11  volunteered to Judge Hambrick that MineOne would subpoena

12  Stephen Randall and Neil Phippen for depositions in September.

13  But now they seek yet another extension to depose them when

14  MineOne did not serve them with their deposition subpoenas.

15         And MineOne untimely served Bitmain with numerous

16  written discovery requests on September 12, all at -- nearly

17  all of which -- such as Bitmain's CFIUS communications,

18  Bitmain's communications with Huaili Zhang and JWJ Technology,

19  and Bitmain's communications concerning BCB and these

20  facilities -- should have been served in July or August.

21         BCB has made Michael Murphy, Emory Patterson, and

22  Sean Murphy available for MineOne to depose, with Emory

23  Patterson and Sean Murphy on Monday, September 30, but MineOne

24  is deposing only Emory Patterson that day, now saying it is

25  too busy to depose Sean Murphy.  And MineOne has told us that

1    they don't want to depose my oldest son, Michael Murphy.

2           BCB made its managing agents, the keymen, available

3    for their depositions but MineOne has not.  They've hidden

4    their people.

5           Let me tell you -- let's talk about Sean Murphy.

6           Sean Murphy is my second son.  And I absolutely

7    reject any notion that we all gather together in the

8    courthouse in October for more depositions when we need to be

9    briefing the dispositive motions.

10           Here's why you shouldn't do that -- or not even think

11    of it:  Sean Murphy has been available to be deposed nearly

12    all of 2024.  He was available back in December of '23 and

13    January of '24 when BCB first began trying to schedule

14    depositions with MineOne.

15           Sean Murphy was available this July and August when

16    I was trying so hard to schedule and coordinate depositions

17    with MineOne.  All you have to do is look at my July 15th

18    letter to all the other counsel, which I attached as our

19    response to the motion we're here about today.

20           And Sean Murphy was available at the end of August

21    when Ms. Colbath went on her 12-day vacation and wouldn't do

22    any depositions.

23           And MineOne apparently tried to serve Sean Murphy in

24    Cheyenne at his town house there, but Sean was with his son in

25    Colorado and traveling in September.  His son -- and my

1    grandson -- is very sick.  And, given everything going on with

2    his tenuous health situation, after we were all together as a

3    family on September 16th, Sean traveled to South Carolina to

4    be with his palliative care and hospice mentor about

5    everything that was going on because -- Sean is a 15-year

6    hospice volunteer in the VA, but, even with all his palliative

7    care and end-of-life care, he is mightily challenged being a

8    palliative father for his son's progressing brain disease.

9          And when Sean got back to Wyoming and heard that

10   MineOne and Ms. Colbath were wanting to depose him, he reached

11   back to Ms. Colbath and made himself available for a

12   deposition on the discovery deadline on September 30th.

13         But Ms. Colbath declined to schedule Sean's

14   deposition that day, instead hoping the Court will now grant

15   MineOne yet another extension, yet another grace to depose

16   him, but they should not have any more graces or extensions.

17   These extensions are burying BCB.  We are already under great

18   stress and burden, both personally with Sean's son and with

19   our family members involved in this incredibly contentious

20   lawsuit.

21         And, you know, I agree with you.  Enough is enough.

22   MineOne has had a full year to schedule and do its

23   depositions.  This Court has bent over backward and given

24   multiple extensions.  And Sean is another example of why the

25   Court should keep the September 30 discovery deposition

1    deadline that Judge Hambrick, with your leave, Judge Johnson,

2    granted a couple of weeks ago and should not grant another

3    deposition extension.

4          I want to talk to you about the other two people they

5    mentioned about wanting to do depositions of, Neil Phippen and

6    Stephen Randall.  And those are in addition to Sean Murphy.

7          The Court should not allow MineOne to take

8    depositions of Neil Phippen or Neil -- Neil Phippen or Stephen

9    Randall after the September 30 deposition discovery deadline.

10         MineOne's counsel volunteered on September 9th to

11   Judge Hambrick to subpoena Mr. Randall and Mr. Phippen for

12   their depositions later this month, and MineOne has not

13   achieved service on either Mr. Phippen or Mr. Randall at their

14   Denver and Phoenix homes the last 15 days.

15         MineOne should especially not be allowed to depose

16   Mr. Phippen and Randall after the September 30 deposition

17   discovery cutoff where, as here, MineOne never sought to

18   depose Phippen or Randall before September.

19         MineOne is simultaneously hiding and protecting its

20   four most important witnesses -- Li, Du, Zhang, and Wang --

21   from giving any deposition in September, even though all of

22   those people are owners or employees of MineOne.

23         Importantly, Stephen Randall is a for- -- Stephen

24   Randall is a former, not current, employee of BCB who worked

25   at the North Range site until March of 2023 but who is not a

1   member of BCB, was never a founder of BCB, and who has not

2   been involved with BCB management since this case was filed in

3   May of '03 -- or '23 -- and who was never a managing agent of

4   BCB.  And BCB has no control over Steve Randall, and,

5   therefore, cannot voluntarily produce him for his deposition.

6   I don't know where he is.

7          Neil Phippen is a member of BCB, but Mr. Phippen has

8   largely withdrawn from any management of BCB since the lawsuit

9   was filed in early 2023.  He's, frankly, moved on with his

10  life to provide for his family and left this lawsuit and BCB's

11  only remaining business -- this lawsuit -- for Michael Murphy

12  and Emory Patterson to handle.

13         Importantly, MineOne has not demonstrated the

14  predicate facts to support any service of these Randall and

15  Phippen deposition subpoenas by email.  MineOne has not shown

16  that either man is evading personal service of the September

17  deposition subpoenas.

18         MineOne has not served Mr. Phippen at his Denver home

19  or Mr. Randall at his Phoenix home the last two weeks, but it

20  is more likely that these men are traveling and not present at

21  their permanent homes than it is that they are avoiding or

22  evading any service of MineOne's 11th-hour subpoenas.

23         And there is just, frankly, no cause or reason to

24  further extend the September 30 deposition discovery cutoff

25  for MineOne to depose these two men, who they should have

1    deposed during the last year.  They should have taken their

2    depositions long ago and chose not to.

3         Even if -- Your Honor, even if the Court were

4    inclined to allow service of their deposition subpoenas by

5    email in lieu of personal service, it is too late for MineOne

6    to take these depositions.  And even if the Court were further

7    inclined to both extend the discovery cutoff to allow MineOne

8    to take their depositions and allow service of their subpoenas

9    by only email, MineOne must first show proof the recipient

10   received, opened, and read the email so the recipient has

11   actual notice he has been served.

12        MineOne bears the burden of proving that the

13   recipient actually opened and read the email, and technology

14   exists where you can show the recipient actually opened and

15   read his email.  Constructive notice of a subpoena being sent

16   to a third person's email address is not actual notice of

17   receipt and awareness of that subpoena under Rule 45.

18        I could talk about the -- the Bitmain subpoena that

19   they served, incredibly, two days after BCB settled with

20   Bitmain Georgia, but that's pending before the Court.  That --

21   that motion to quash has been filed.  MineOne has -- or

22   Bitmain.  Not me.  Bitmain filed that well-taken motion,

23   MineOne responded last night, and Bitmain has a chance to

24   reply to that.  That one is not ripe.

25        But what Ms. Colbath spent most of her time talking

1    about was the subpoenas that she served on BCB's investor

2    CMV Global and four members of member of BCB that are located

3    in Illinois, Ohio, Tennessee, and Florida.

4           And perhaps the Court is not fully aware of that, but

5    Your Honor, Judge Johnson, has under advisement BCB's

6    August 16th motion to quash MineOne's subpoenas to those

7    Illinois, Ohio, Tennessee, and Florida investor and members.

8    That has been fully briefed.  I did supplemental briefing on

9    that pursuant to Judge Hambrick's leave.  MineOne has fully

10   briefed that.

11          And I think it was just -- it may have been this

12   morning or yesterday that this Court unreferred or

13   rereferred -- I don't know what the right words are -- that

14   big motion to Your Honor and took that off of Judge Hambrick's

15   plate.

16          But the point of all of that briefing is that those

17   requested depositions and document subpoenas are irrelevant,

18   they're unnecessary, they're unduly burdensome, they're all

19   fishing expeditions.

20          And, if the Court were to even allow any of those

21   meritless depositions to be taken or document subpoenas to be

22   answered, it would adversely impact the three-week extensions

23   all parties now agree should be granted for briefing the

24   dispositive motions -- excuse me -- the dispositive motions.

25          If MineOne were really serious about wanting to

1    depose BCB's investor and members of members, it should have

2    sought those irrelevant depositions in January through July,

3    not in August or September, and it is too late to go fishing

4    for those irrelevant members.  And the Court should never

5    grant another extension for that.

6              And -- and, Judge Johnson, that -- we talked about --

7    or Ms. Colbath talked about the Black Hills Energy document

8    subpoena.  That is all a part of the August 16th motion to

9    quash those investor subpoenas and the BHE document subpoena.

10   That has been fully briefed by both parties.  Your Honor has

11   that under advisement now -- I think as of today or

12   yesterday -- not Judge Hambrick.

13             And some curious things about the Black Hills Energy

14   situation and the investors.

15             With respect to the investors, MineOne's funding was

16   a contractual obligation of MineOne.  BCB had no contractual

17   obligations for funding involving Black Hills power.  Our

18   funding, BCB's funding, is simply not an issue.  The only

19   funding that is at issue is MineOne's funding.

20             And when I sent, back in December of '23, a subpoena

21   to Black Hills Energy to submit the 15 different requests for

22   proposals that Black Hills Energy received from all of the

23   people vying for that electrical power -- which is, arguably,

24   worth about $150 million to Black Hills Energy over a

25   five-year period -- guess who objected to any of those

1    15 requests for proposal being produced.  That would be

2    MineOne.

3          They filed their objection to it, and I agreed with

4    their objection, and I no longer pursued any of the

5    15 requests for proposal.

6          And now, last month, we see MineOne has changed its

7    colors.  Now MineOne says, "Oh, oh, the -- the -- BCB's

8    request for proposal to Black Hills Energy is suddenly

9    relevant" when it hasn't been relevant for the last 10 months.

10         And the truth is it isn't relevant and it hasn't been

11   relevant and discovery with respect to it would just unduly

12   burden some more people and lump more cost on the most

13   contentious lawsuit I've ever heard of and ever hope to

14   hear of.

15         The . . . so I think we can say this to summarize:

16   The Court has before it the investor -- MineOne's investor

17   subpoena to CMV Global; it has under advisement and fully

18   briefed the four members of member that live -- those

19   gentlemen live in the four states I mentioned earlier, Ohio,

20   Illinois, Tennessee, and Florida.  It has under advisement,

21   fully baked out, the reasons why it should quash the -- the

22   subpoena to Black Hills Energy.

23         I've reviewed with Your Honor the three big

24   depositions -- the fact witness depositions -- that MineOne

25   suddenly wants to take in September but never wanted to take

1    or sought to take when they should have, the past year while

2    discovery was running.

3         I shared with you why Sean Murphy has made himself

4    available to be deposed on September 30, but that invitation

5    has not been accepted by defense counsel.

6         And I shared with you why Randall and Neil Phippen --

7    the Court should not allow service of deposition subpoenas on

8    them by email and it certainly should not allow them to be

9    deposed after the September 30 deposition deadline.

10        I feel like it's déjà vu all over again.  I felt like

11   I had this conversation with Judge Hambrick two weeks ago.

12   And Judge Hambrick advised all of us on the call today that

13   she had reached out to Your Honor and that Your Honor had said

14   it would be okay if she extended the deposition discovery

15   cutoff from September 17th to September 30th and that's -- and

16   she did that.

17        But she also advised us that she would not -- she did

18   not have Your Honor's leave to extend the September 17th

19   document discovery cutoff, and she left that in place.

20        And then what happened thereafter is that MineOne

21   wrote to all of us, saying it would take its depositions by

22   September 30th and now -- and it recognized the September 17th

23   discovery cutoff for document production, and it agreed with

24   the extensions of the briefing deadlines.

25        But now, today, I'm hearing them say they want to

1    undo both of those discovery deadlines and just keep them

2    going into October in addition to having extensions of time on

3    the briefing deadlines.

4         It's too burdensome.  It's too costly.  I cannot do

5    all of this.  I cannot keep doing all of these depositions on

6    and on and on and then be expected to do a good job, like

7    I want to do, with all of the dispositive motion briefing.

8         The depositions of the important people should have

9    been taken by September 30th.  They weren't, through no fault

10   of BCB, through entirely MineOne's fault.

11        And the depositions of the unneeded people -- like

12   the members of member, the investor, and, certainly, the

13   Bitmain Georgia -- they want to go depose Bitmain Georgia

14   about our settlement.  They want us to produce our settlement

15   agreement -- all my negotiations with the -- the Bitmain

16   lawyers leading up to that -- and about 15 categories of

17   documents that, frankly, are -- are insanely irrelevant and

18   should have been requested months ago.

19        All the while -- all the while, MineOne won't produce

20   one of its CFIUS communications at all.  Remember how BCB --

21   or how MineOne was telling you months ago that -- blaming BCB

22   for not getting with CFIUS and not getting their prior

23   approval and all of that?

24        Well, now MineOne won't produce any of its CFIUS

25   communications, won't produce any of its Antalpha

1   communications, won't produce any of its CleanSpark

2   communications, won't produce any of its Republic Title of

3   Texas documents, and, yet, they want to extend the discovery

4   cutoff to hammer on all of our people.

5          Your Honor, to close, the Court knows we're going to

6   have heavy dispositive motion briefing.  But MineOne wants to

7   jam BCB so badly at -- when we were already consumed with

8   stress, burdensome costs, and fishing expeditions -- so

9   I can't focus my time and BCB's time on the dispositive motion

10  briefing.

11         Any further extensions only help MineOne cure its

12  delay after delay after delay, and they burden BCB with more

13  cost, more time delays, more difficulties.  Don't -- please

14  don't give MineOne yet another grace -- and that's what I call

15  it, and I don't choose that word lightly but another grace --

16  especially since MineOne is at fault for the predicament it

17  put itself in by not doing the needed discovery when it should

18  have done.  Don't give them more days, more subpoenas, and

19  more depositions to impose themselves on BCB when I need to be

20  briefing to Your Honor.

21         Thank you, Judge Johnson.

22         MR. GOTTLIEB:  Your Honor, may I be heard on this.

23         THE COURT:  Sure.  Absolutely, Mr. Gottlieb.

24         MR. GOTTLIEB:  I don't have as much skin in the game

25  as -- as MineOne, but I am part of this, and I'm -- we're sort

 1   of working with MineOne because we're both defendants and we

 2   have a commonality on certain issues.

 3        But I've been a part of these meet and confers.  And

 4   I will say this:  Mr. Murphy talks a very good game.  He's

 5   extremely polite, he's extremely soft-spoken, and he gives you

 6   the impression that he's the victim here of everything, that

 7   everything we've tried to do in this case is all wrong and

 8   everything he's done is right.

 9        It's just a gamesmanship all the way through.  And

10   I'll give you the best example of this.

11        Judge Hambrick asked us to meet and confer -- she

12   directed us to meet and confer on some of these issues, and we

13   tried to do that.

14        And when we got on the phone with all the counsel,

15   Michael Murphy, Patrick Murphy's son, he took the lead on the

16   meet and confer, which was completely improper.  I objected to

17   it.  I told Patrick Murphy this is inappropriate, Paula

18   Colbath told him this is inappropriate, and he wouldn't let it

19   go.  He wouldn't stop.

20        Michael Murphy conducted the entire meet and confer.

21   And when we were trying to get dates for depositions, it was

22   virtually impossible.

23        What Patrick doesn't tell you is the fact that when

24   we tried to schedule depositions of certain principals of

25   BCB -- including Mr. Emory, who Ms. Colbath was trying to

1   depose since July and couldn't get any response, now we're

2   down to two weeks left to get this done in August -- less than

3   that, actually -- and we were told that he wasn't going to

4   produce his individual clients until -- and unless -- until we

5   did -- we agreed to produce Mr. Li.

6          By the way, MineOne never refused to produce Mr. Li.

7   They told him that they can't produce him for legal reasons

8   because he's in China.  And until he gets his passport back

9   and can go to another state, another -- another country where

10  he can be deposed, we would -- he would be deposed at that

11  point in time.  It was not a refusal.  It was the law.  And

12  it's unfortunate.

13         But Mr. Murphy said, "Well, we're not going to

14  produce our -- we're not going to produce our witnesses, then,

15  until you get him on the calendar."

16         And then when we asked when Mr. Murphy would be

17  available, Michael Murphy, his response was "I have to ask my

18  father when I'm available," which is incredible.

19         So Mr. -- Mr. Murphy waited until very recently to

20  serve all of these myriad demands -- or his responses.  Like

21  Ms. Colbath said, 30,000 pages of documents.  It's no wonder

22  that depositions weren't done until all those documents were

23  produced.

24         Mr. Murphy never responded to you in his reply today

25  about his having delivered 30,000 new pages of documents at

1    the very last minute.  And then he wonders why depositions

2    couldn't be held until recently.

3            By the way, we're all trying to get to the same

4    result.  We just want a fair -- a fair process.  It's -- it's

5    unbelievable to think that all these deposition subpoenas are

6    going out and nobody could be reached and that Mr. Murphy has

7    nothing to do with any of this.

8            This is what happened with -- with Mr. Desrochers

9    when they tried to serve him.  There is interference going on

10   behind the scenes.

11           Another good example of this -- and it's one that we

12   should get to eventually -- is his expert report.  We finally

13   got his expert report.  And when we go to depose their

14   expert -- remember, we only have one shot at this -- the

15   expert testified that all his numbers were wrong, that a whole

16   new report has to be amended, that his damages went from

17   42 million to 15 million, but he wasn't -- he wasn't able to

18   testify on all the individual aspects of why that happened.

19           And now we -- we -- we'd want to get a new report.

20   He's going to submit a brand-new report -- brand-new report --

21   that we don't get to depose him on.  This is all gamesmanship

22   by Mr. Murphy, all of it.

23           And I know he speaks very well; he's very articulate.

24   I mean, the home -- he's got a home field advantage here.  But

25   I've got to tell you -- I've been watching this thing from the

1    sidelines and participating where I need to and it's nonsense.

2          Plaintiff is -- is holding back on everything and

3    making life difficult.  He decides -- Mr. Murphy decides for

4    himself what witnesses are relevant or not.  He'll tell the

5    Court whether they're relevant or not and what we can look

6    into and what we can't look into and that's nonsense.  He

7    doesn't get to decide which witnesses are available to us and

8    which aren't and which witnesses are relevant to the

9    defendants' case.  He doesn't get to do that.  We get to try

10   our own case.

11         And, by the way, when we asked him if we could extend

12   the deadline for getting depositions without moving the trial

13   date at all where there would be no prejudice to anybody, no

14   prejudice -- it's not costing any more money to move

15   depositions back a few weeks or to get some additional time to

16   review things; there's no prejudice to plaintiff -- he just

17   wants to make this as hard for us as possible.

18         And I haven't seen any good faith effort to

19   cooperate.  On every meet and confer it's always "No."  When

20   I asked Mr. Murphy "Can you tell me what prejudice you're

21   going to suffer if we were to move the deposition dates back

22   and the dispositive motion dates back by a little bit" -- and

23   not touch the trial date -- he couldn't give me an answer.

24         He just said, "No, I'm not going to do it.  I don't

25   agree to it.  I want to get this case to trial."

1            You know, he's looking at this pot of gold that's

2    just sitting there, and he thinks it's his money and he's

3    entitled to it, and he wants it today.

4            We're just trying to get a fair result here.  That's

5    all.  And, Your Honor, I --I agree with Ms. Colbath on all of

6    this, that I think there should be a little leeway given to us

7    because we're trying our best to get all this done on very

8    difficult circumstances.

9            I've -- I've spoken my mind.  Thank you, Your Honor.

10           MR. MURPHY:  It just --

11           MS. COLBATH:  Sir, I don't want to belabor things --

12           MR. MURPHY:  I don't either but I --

13           MS. COLBATH:  -- but if it would benefit --

14           MR. MURPHY:  -- that -- I reject all of that.

15           MS. COLBATH:  -- if it would benefit the Court,

16   I would like to address a couple of the points.  I'll make it

17   very short and brief.

18           The three witnesses were subpoenaed for dates before

19   September 30th.  There was a representation made on the record

20   before Magistrate Judge Hambrick -- because we anticipated

21   that we could be in this situation -- that there would be

22   absolutely no interference.

23           It -- it -- it is just incredible that professionals

24   who are working for -- and Mr. Murphy is right.  For 15 days

25   I've had process servers.  I've said "I need you to go during

1  the workday; please start at 7:30 in the morning, go back at

2  lunch, and then go in the evening.  If you don't get them

3  during the week, please go back on Saturday."

4          We checked to make sure you could serve in some of

5  these states on Sundays.  People are going three times a day,

6  no lights, nothing.  And so this is full- -- all of this is

7  fully briefed.

8          We did take -- and those witnesses were on my July

9  list.  They were on my August list.  They were on my September

10 list.

11         It wasn't until Judge Hambrick said "Come in with

12 dates" that, out of the blue, drops from the sky -- Mr. Murphy

13 says, "Oh, these people that I've told you all along you have

14 to schedule through me, as of -- as of this morning, I --

15 I don't control them anymore."

16         As to Sean Murphy, I -- I did send the process

17 server.  I've emailed the subpoena to all these three

18 witnesses; I've asked them to confirm receipt, tell me if

19 they're represented by counsel, "Would you accept service by

20 email?"  All my emails go into a black hole.

21         The -- Tuesday night at 7:50 I got an email from

22 Sean Murphy agreeing to a date where we already have another

23 deposition.  I cannot be in two places at once.  We have Emory

24 Patterson going forward.

25         And the only date that Mr. Sean Murphy -- who was

1    just in South Carolina, and I feel very badly for his personal

2    situation.  But when Mr. Murphy says I could have taken it in

3    July -- I wanted to.  I was actually the only one who offered

4    up a date before September 1 for a deposition, and Mr. Murphy

5    didn't take me up on the deposition that he's going to take

6    tomorrow.

7            So it -- he can't say it's totally my fault,

8    I created this predicament.  I actually was the only one

9    trying -- very deliberately, intentionally, and repeatedly --

10   to get counsel on the line to give me dates for the people

11   that I listed.

12           So Sean Murphy -- I'm happy to take him.  He can find

13   some time next week.  We've spent a fortune trying to serve

14   those three witnesses.  He -- he can find a time next Friday;

15   some -- some date can be agreed upon for him.

16           Phippen and Mr. Randall should have been produced by

17   Mr. Murphy.  He controls them.  He says, "Oh, Mr. Randall left

18   the job in March of 2023."

19           Well, Your Honor, when you decided the attachment

20   motion, you had before you a lengthy affidavit submitted by

21   Mr. Patrick Murphy from Stephen Randall.  And so you can't

22   leave -- you know, you had control of him; you did an

23   affidavit; you were in touch.

24           And he says "I haven't spoken to any of these

25   people."  Well, as of a few months ago, you were submitting

1    affidavits on their behalf.

2           And it literally wasn't until Judge Hambrick said

3    "I want you to do something on a Friday" and -- we -- I get

4    it, after -- the end of business.

5           And I'm like "I can't believe this.  They're actually

6    now going to take the position overnight that they don't

7    control these people" -- that have been on my witness list,

8    that are in their initial disclosures as being under the

9    control -- as of today Randall is still listed in the initial

10   disclosures as "I need to contact Mr. Murphy."

11          The only change was this week -- this week -- he's

12   just served me with amended initial disclosures that address

13   Mr. Phippen.

14          So, Your Honor, all of this -- this -- we have done

15   the best we can to -- to serve subpoenas.  We should have

16   never been put in that position.  These people were always --

17   they remain under the control of this plaintiff.

18          I understand their business stopped in March of 2023.

19   That doesn't mean, if Mr. Murphy picks up the phone and

20   says, "Neil, they need your deposition; could you give me

21   three dates in the month of September or first two weeks in

22   October" -- he would cooperate.  He's still -- remains a

23   member of BCB.  He's going to share in the outcome here if

24   there is any for BCB.

25          So -- so this is absolutely not a situation of

1  MineOne sitting on their hands and not doing what was

2  required.  I can only write so many letters and demand that we

3  all -- and then finally, out of frustration, write to the

4  Magistrate Judge -- never had to do this to schedule

5  depositions, I don't think, in any case I've ever been

6  involved in in over 30 years -- write to my Judge to say

7  "I can't get the people on the line; I'm going to need your

8  help in getting depositions set."

9          And she demanded -- "I want everyone's schedule;

10 I want to know who your witnesses are."  I complied.

11 I submitted everything.

12         I showed up at a meet and confer and -- a three-hour

13 one -- and Mr. Murphy said "I don't have any dates.  And

14 Emory Patterson is out of the country.  He won't be back until

15 the day the discovery deadline ends."  I mean, this is -- this

16 is what we face.

17         So it's fair here to get the depositions that are

18 essential done.  I can document I've been trying repeatedly

19 since July.  These are not new names.  And, you know, if -- if

20 people are -- are not -- not home for two weeks -- you know,

21 I leave it to Your Honor whether you think that -- that

22 someone was notified to maybe make themselves scarce because

23 people generally return to their home after two weeks.  These

24 are -- these are working individuals, and they are just

25 nowhere to be found.

1          I want to address one subpoena that -- Mr. Murphy has

2    been -- said that my client controls a witness by the name of

3    Huaili Zhang and another witness by the name of Chong Wang.

4          We have repeatedly told him we don't control those

5    individuals.  Ultimately, because it just became a repeated

6    narrative from -- from Mr. Murphy every time he wrote to the

7    Court -- I said "You know what?  I'm going to facilitate

8    getting Huaili Zhang's deposition."

9          I have served a subpoena on Huaili Zhang,

10   JWJ Technologies, a Georgia LLC.  And so why Mr. Murphy at

11   this point -- since he has been harping for months that he

12   wants that individual, I said "Here's his contact information;

13   this is his last-known address; this is who he works for; you

14   can readily serve a subpoena."

15         He didn't.  I finally said "I've got to take this off

16   the table.  I'll subpoena him; I'll get the documents; I'll

17   take his deposition."  So Mr. Zhang is -- is available and

18   where -- we anticipate getting documents.

19         MR. MURPHY:  If it please the Court -- or maybe it

20   doesn't please the Court.  You've had a long day.

21         But I reject everything that Marc Gottlieb just

22   represented to the Court.

23         Sorry, Marc.

24         MR. GOTTLIEB:  Michael didn't get on the phone and

25   conduct the meet and confer, Patrick?  That didn't happen?

1          MR. MURPHY:  He did -- he was on the phone, and he

2     did not conduct the meet and confer.  You know it.

3          MR. GOTTLIEB:  That's not true --

4          MR. MURPHY:  He asked -- he asked Paula Colbath --

5     (Simultaneous speaking.)

6     (Reporter seeks clarification.)

7          MR. GOTTLIEB:  Everybody else was there and they can

8     attest to this.

9          And you know that that's not true.

10         THE COURT:  Is Michael on with you now, Patrick?

11         MR. MURPHY:  I'm sorry?

12         THE COURT:  Is Michael with you now?

13         MR. MURPHY:  No.  When -- no, he's not.  He's down in

14    Denver.

15         MS. COLBATH:  Might I add on that point that Judge

16    Hambrick issued an order, Your Honor, dated September 9,

17    2024 -- and because Mr. Michael Murphy's presence made the

18    meet and confer -- I can -- brutal, counterproductive,

19    unprofessional.

20         When we raised what exactly took place in detail with

21    her, she issued an order on 9/9/2024 that states in

22    paragraph 5 -- this is how serious she took the issue and what

23    had taken place -- "And that counsel, dash, not individual

24    agents, officers, or the like of the parties, dash, are the

25    only participants in any and all future meet and confers."

1          She felt the need to issue a court order.  It had

2   been so destructive to have Mr. Michael Murphy on, and that's

3   why the meet and confer lasted three hours.

4          MR. MURPHY:  So incorrect.  It was unprofessional

5   because of Ms. Colbath and her yelling and her refusal to tell

6   us what we all knew, and that's that Jiaming Li has a Chinese

7   passport and could have traveled to Hong Kong to give his

8   deposition.  But she would never answer Michael Murphy's

9   question about that.  I had to write a letter addressing

10  Ms. Colbath's professionalism after that meet and confer.

11         MR. GOTTLIEB:  You just acknowledged that Pat -- that

12  Michael Murphy was participating in this call, just there.

13         MR. MURPHY:  Of course I did.  I've never denied

14  that.

15         It's just when you say, Mr. Gottlieb, that he

16  conducted the entire meet and confer and that he was the

17  problem, that's what I reject.

18         MR. GOTTLIEB:  He did.  And that was true.  And

19  that's exactly what happened.

20         And I stand by it and I'm an officer of the Court.

21         MR. MURPHY:  We all are.

22         Enough is enough.

23         THE COURT:  The Court will enter its order.  I'm not

24  sure just what I'm going to say yet.

25         Thank you.

1          MS. COLBATH:  Thank you, Your Honor.

2          THE COURT:  But you might be thinking about how

3    I introduced -- introduced this case.  I think today would be

4    a good illustration of -- of where this case is headed.

5          And, frankly, after the hearings that I've had --

6    and, I'm sure, the ones that Mark Carman had and I'm sure it's

7    continuing with Stephanie Hambrick -- the Court certainly is

8    no more in control of any of the facts of this case in terms

9    of understanding than the first day that the case was filed

10   and is represented by the -- the pleadings that appear in the

11   file.

12         But that's not surprising because we are still very

13   much engaged in the issues of everybody trying to find out

14   what this case is about.

15         Thank you for your patience.  We'll stand in recess.

16         MR. GOTTLIEB:  Thank you, Your Honor.

17         MS. COLBATH:  Thank you, Your Honor.

18         MR. MURPHY:  Thank you, Judge.

19     (Proceedings adjourned at 4:53 p.m., September 26, 2024.)

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4

5          I, MELANIE HUMPHREY-SONNTAG, Federal Official Court

6    Reporter for the United States District Court for the District

7    of Wyoming, a Registered Diplomate Reporter, Certified

8    Realtime Reporter, and Certified Realtime Captioner, do hereby

9    certify that I reported by realtime stenography the foregoing

10   proceedings contained herein on the aforementioned subject on

11   the date herein set forth and that the foregoing pages

12   constitute a full, true, and correct transcript.

13

14          Dated this 30th day of September, 2024.

15

16

17

18                      /s/ Melanie Humphrey-Sonntag

19          _____

20                    MELANIE HUMPHREY-SONNTAG
                          RDR, CRR, CRC
21                 Federal Official Court Reporter

22

23

24

25